UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**08 CV 01859**

08 Civ.

SHONECA DAVIS, DAWUD EUDELLE, JACLYN
PAGNOTTA, and DAVID POMALES, individually and on
behalf of all others similarly situated, and

KENNETH FINGERMAN,

                Plaintiffs,

     - against -

ABERCROMBIE & FITCH CO., ABERCROMBIE &
FITCH STORES, INC., ABERCROMBIE & FITCH
TRADING CO., d/b/a Abercrombie and Fitch, Abercrombie,
and Hollister and Ruehl,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF CASE

COMPLAINT

PLAINTIFFS DEMAND A
TRIAL BY JURY

Plaintiffs Shoneca Davis ("Davis"), Dawud Eudelle ("Eudelle"), JacLyn Pagnotta

("Pagnotta"), and David Pomales ("Pomales") (collectively "class plaintiffs"), individually and

on behalf of all others similarly situated; and plaintiff Kenneth Fingerman ("Fingerman"),

through their attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complain of defendants

Abercrombie & Fitch Co., Abercrombie & Fitch Stores, Inc., Abercrombie & Fitch Trading Co.,

(collectively "Abercrombie" or "defendants") as follows:

<u>NATURE OF ACTION</u>

    1.    Class plaintiffs, current and former loss prevention agents in defendants'

New York and New Jersey retail apparel stores, bring this class action to remedy defendants'

failure to pay wages and overtime owed to them in violation of the Fair Labor Standards Act of

1938 ("FLSA"), as amended 29 U.S.C. §§ 201 <u>et seq.</u>; the New York Minimum Wage Act

248806 v4

("NYMWA"), and/or the N.Y. Labor Law §§ 650 et seq. Class plaintiffs seek declaratory relief, compensatory damages, and liquidated damages, together with reasonable attorneys' fees, costs of this action, pre- and post-judgment interest, and other appropriate relief pursuant to the FLSA § 16(b), 29 U.S.C. § 216(b), the NYMWA, and the N.Y. Labor Law § 663(1).

2.    Plaintiff Davis also brings this proceeding to remedy defendants' discrimination on the basis of race, and to remedy retaliation for her opposition to such unlawful employment actions, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and to remedy race, sex, sexual orientation, and disability discrimination and to remedy retaliation for her opposition to such unlawful employment actions, in violation of the New York State Human Rights Law, Executive Law § 296 et seq. (the "Human Rights Law"); the Administrative Code of the City of New York § 8-101 et seq. (the "City Law"), and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 et seq. ("NJLAD"). Plaintiff Davis also brings this proceeding to remedy unlawful interference with the exercise of her rights, and discrimination and retaliation against her for such exercise, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA").

3.    Plaintiff Eudelle also brings this proceeding to remedy defendants' discrimination on the basis of race, and to remedy retaliation for his opposition to such unlawful employment actions, in violation of Section 1981, the Human Rights Law, and the City Law.

4.    Plaintiff Pagnotta also brings this proceeding to remedy discrimination on the basis of sex, in violation of the Human Rights Law, and the City Law.

5.    Plaintiff Pomales also brings this proceeding to remedy defendants' retaliation for his opposition to discrimination on the basis of race, in violation of Section 1981;

and to remedy defendants' retaliation for his opposition to discrimination on the basis of race, sex, and sexual orientation, in violation of the Human Rights Law, and the City Law.

6.     Plaintiff Fingerman brings this proceeding to remedy sexual orientation discrimination, in violation of the Human Rights Law, and the City Law.

<u>JURISDICTION AND VENUE</u>

7.     This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1332(a)(1) because plaintiffs and defendants are citizens of different states and the matter in controversy exceeds the sum of $75,000 for each plaintiff.

8.     This Court also has jurisdiction over the FLSA claims set forth herein pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).  The Court has jurisdiction over the Section 1981 claims set forth herein under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

9.     This Court also has supplemental jurisdiction over class plaintiffs' NYMWA claims pursuant to 28 U.S.C. § 1367 because these claims closely relate to the FLSA claims, having arisen from a common nucleus of operative facts, such that they form part of the same case or controversy.

10.     This Court also has supplemental jurisdiction over the Labor Law and City Law claims of plaintiffs Eudelle, Pomales, and Davis, and the NJLAD claims of plaintiff Davis, pursuant to 28 U.S.C. § 1367 because these claims closely relate to the Section 1981 claims, having arisen from a common nucleus of operative facts, such that they form part of the same case or controversy.

11.     Venue is proper within this District pursuant to 28 U.S.C. § 1391, because the defendants regularly conduct business within the Southern District of New York.

248806 v4                                            3

12.    Pursuant to § 8-502(c) of the City Law, prior to filing the Amended Complaint, plaintiffs served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## PARTIES

13.    Plaintiff Shoneca Davis is an African-American, lesbian woman who worked in Abercrombie's stores in New Jersey and New York City from September 2006 until she was constructively discharged in August 2007.  She is a citizen of New Jersey.

14.    Plaintiff Dawud Eudelle is an African-American man who has worked in Abercrombie's New York City stores since September 2005.  He is a citizen of New York.

15.    Plaintiff JacLyn Pagnotta is a woman who worked in Abercrombie's New York City stores from June 2006 until she was constructively discharged in March 2007.  She is a citizen of New York.

16.    Plaintiff David Pomales has worked in Abercrombie's New York City stores since August 2005.  He is a citizen of New York.

17.    Plaintiff Kenneth Fingerman is a gay man who worked in Abercrombie's New York stores from January 2007 until he was constructively discharged in July 2007.

18.    Defendant Abercrombie & Fitch Co. is a Delaware corporation with its principal place of business in Ohio.  It is registered to do business in New York.  It is an employer within the meaning of the Human Rights Law, the City Law, and the FMLA.

19.    Defendant Abercrombie & Fitch Co. is the parent company of defendants Abercrombie & Fitch Stores, Inc. and Abercrombie and Fitch Trading Company.

20.     Defendant Abercrombie & Fitch Stores, Inc. is a Delaware corporation with its principal place of business in Ohio. It is registered to do business in New York. It is an employer within the meaning of the Human Rights Law, the City Law, and the FMLA.

21.     Defendant Abercrombie & Fitch Trading Co. is a Delaware corporation with its principal place of business in Ohio. It is registered to do business in New York. It is an employer within the meaning of the Human Rights Law, the City Law, and the FMLA.

22.     During their employment by defendants, plaintiffs worked in interstate commerce.

23.     At times relevant to this litigation, defendants were the class plaintiffs' employers within the meaning of the FLSA and the NYMWA.

<u>COLLECTIVE AND CLASS ACTION ALLEGATIONS</u>

24.     The class plaintiffs, who all worked overtime in defendants' New York or New Jersey stores without receiving overtime compensation, bring this action on behalf of themselves and all other similarly situated employees and former employees who have common claims under the FLSA.

25.     Eudelle, Pagnotta, and Pomales ("NY class plaintiffs"), who all worked overtime in defendants' New York stores without receiving overtime compensation, bring this action on behalf of themselves and all other similarly situated employees and former employees who have common claims under the NYMWA.

26.     On information and belief, the nominal title of the class plaintiffs was "loss prevention supervisor" until in or about January 2007, when the position was retitled "loss prevention agent" with no change in job duties.

27.    With respect to the FLSA claim, this collective action is brought pursuant to 29 U.S.C. § 216(b), by the class plaintiffs on behalf of themselves and all current or former Abercrombie loss prevention supervisors/agents who worked overtime in defendants' New York and/or New Jersey stores at any time during the past three years and prior to defendants' institution of an overtime compensation method in or about January 2007, and who have given or will give their written consent to be plaintiffs herein pursuant to 29 U.S.C. § 216(b) ("FLSA class").

28.    The NYMWA claim is brought as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, by NY class plaintiffs on behalf of all current and former Abercrombie loss prevention supervisors/agents who worked overtime in defendants' New York stores at any time during the past six years and prior to defendants' institution of an overtime compensation method in or about January 2007 ("NYMWA class").

29.    The number of potential members of the FLSA and the NYMWA classes is not precisely determined at the present time but can be established through discovery. Upon information and belief, each class consists of at least several hundred current and former Abercrombie employees and, therefore, is so numerous that joinder is impracticable.

30.    Since all members of the classes have been damaged by the same wrongful acts alleged herein, these acts raise questions of law or fact common to the class that predominate over any questions affecting only individual members of the class. These questions include, but are not limited to:

(a)    whether defendants were required to pay the class plaintiffs premium pay for hours worked in excess of forty per week under the FLSA and the NYMWA; and

248806 v4                                6

(b)    whether defendants failed to pay the class plaintiffs such premium pay.

31.    The claims of the individual named class plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the collective action or class in that all have suffered from the same wrongful acts of defendants.

32.    The individual named plaintiffs will fairly and adequately represent the interests of the class.   Plaintiffs' attorneys are qualified to pursue this litigation and have experience in class actions.

33.    A collective and class action is superior to other methods for the fair and efficient adjudication of this controversy.   Upon information and belief, no litigation similar to this action is currently pending.   A collective and class action regarding the issues in this case creates no problems of manageability.

## FACTUAL ALLEGATIONS

Factual Allegations Common to All Plaintiffs

34.    Abercrombie operates several chains of retail clothing stores, including Abercrombie & Fitch, Abercrombie, and Hollister and Ruehl.  In New York City, Abercrombie operates two retail stores, a South Street Seaport location and a Fifth Avenue location.  The Fifth Avenue location opened in approximately November 2005.

35.    During their employment, plaintiffs were charged with loss prevention in defendants' stores.   Their duties included monitoring closed circuit televisions, greeting customers at the store entrances, reviewing store records, and monitoring inventory.

36.    During their employment, plaintiffs worked in interstate commerce or were employed by an enterprise engaged in interstate commerce.

37.    Plaintiffs were non-exempt employees and entitled to receive overtime payments for work in excess of forty hours a week.

Factual Allegations Common to All Class Plaintiffs

38.    During their employment, class plaintiffs sometimes worked in excess of forty hours per week on the premises of defendants' stores and/or in the normal course of defendants' business.

39.    From the inception of class plaintiffs' employment until on or about January 2007, defendants failed to pay plaintiffs overtime wages, as required by the FLSA and the NYMWA, for each hour that they worked in excess of forty hours in a workweek.

40.    Plaintiffs did not have any agreement with defendants that they would work more than forty hours per week and not be compensated for hours they worked in excess of forty hours per week.

41.    Defendants' failure to pay plaintiffs wages owed under the FLSA and the NYMWA was a willful violation of those statutes.

42.    On information and belief, class plaintiffs were classified as exempt employees prior to January 2007 but were assigned to perform duties inconsistent with exempt status.

Factual Allegations Relevant to Plaintiff Davis

43.    Davis worked in retail loss prevention for over ten years.  Prior to her most recent position at Abercrombie & Fitch, she was in loss prevention at Ralph Lauren, Rich's Department Store, NYU Bookstore, Sports Authority, and TJ Maxx.

44.    Davis started working for Abercrombie in New Jersey in September 2006. She was assigned to loss prevention duties in three stores.

45.    Davis's performance throughout her tenure at Abercrombie was good.

46.    On information and belief, Davis and plaintiff Pagnotta were the only women working in loss prevention in Abercrombie's northeast region during their employment.

47.    Davis worked a scheduled forty hours per week in the stores, but was also routinely required to work on her scheduled days off, including being directed to participate in conference calls and to assemble and fax her time records. Davis was directed, however, not to enter time on her time records in excess of forty hours per week.

48.    Hector Graciani ("Graciani") was Davis's immediate supervisor in 2006. The first day of Davis's employment, Graciani met with Davis at the Starbucks at the mall where Abercrombie was located to fill out her employment paperwork. Throughout the meeting, he was staring at women and commenting on their appearance and body parts, and trying to engage Davis in discussions about them. He said, "My niece is gay – it's OK – I can be a person you can talk to about women," or words to that effect. Davis attempted to ignore his behavior.

49.    By the end of the day, rebuffed by Davis's lack of response, Graciani had become unfriendly. He called her "son" and "kid."

50.    Graciani began calling Davis's home late at night, or rebuking her for not answering her personal cellular telephone on days that she was not working.

51.    In late 2006, Davis raised her concerns about Graciani's statements and conduct with Robert Ruiz ("Ruiz"), the regional manager for loss prevention. Ruiz asked her to write up a statement and send it to him, which Davis did.

52.    On several occasions in late 2006, Ruiz referred to Davis outside of her hearing as a "miserable bitch" and a "dyke."

53.    On information and belief, Graciani was transferred in late 2006 for about a month, but then in January 2007, Graciani was promoted and given regional authority.

54.    At the same time, Davis was transferred to New York's Fifth Avenue store.

55.    Davis was assigned to work overnight two overnights a week; she and plaintiff Eudelle were the only Fifth Avenue loss prevention employees assigned to work overnight shifts at that time. In approximately February or March 2007, Eudelle took leave for surgery, and Davis was assigned to work only overnight shifts, five overnights a week.

56.    The overnight shift at Fifth Avenue was difficult and dangerous. For example, on one occasion in the first half of 2007, an employee was robbed at gunpoint just outside the store. On another occasion in late 2007 an employee pulled a gun on another employee on store premises during the overnight shift. On information and belief, a number of the employees on the overnight shift at the Fifth Avenue store are active gang members and/or engage in drug dealing on store premises during the shift.

57.    About three weeks after she started working at the Fifth Avenue store, a stock worker told Davis, "Watch your back."

58.    Davis told her immediate supervisor, loss prevention manager Damon Byron ("Byron") and Ruiz that she did not feel safe in her job. Subsequently, they assigned loss prevention agents to rotate on the overnight shift but Davis still worked two overnight shifts per week, more than the other loss prevention agents.

59.    On several occasions during her time at the Fifth Avenue store, Pomales told Davis that Byron made comments about her race and sexual orientation. In one incident, Byron was in his office with loss prevention agents John Ruiz (no relation to Robert Ruiz) and

Ramirez, and the maintenance manager, Matt (last name unknown). Byron pointed to a video on the internet of a gorilla scratching its crotch, and said, "Look at Shoneca." Pomales told Davis about this comment.

60.    Byron also referred to Davis as "he" on several occasions; Pomales told Davis about one such comment in approximately June 2007.

61.    On several occasions, Byron used the term "nigger" generally and to refer to Davis outside her hearing.

62.    In approximately February or March, Davis was placed on "probation" for minor lateness of the kind for which other employees were not disciplined.

63.    During the probation period, Byron instructed Pomales to schedule Davis for an 8:00 a.m. shift soon after she had been scheduled on overnight shifts. When Pomales told Byron this schedule would be difficult for Davis, Byron said, "Hopefully she'll be late – then we can get rid of her."

64.    Byron made statements that he was monitoring the store video to "try to get rid of" Davis.

65.    Around late June 2007, Byron asked Davis if Fingerman was gay. Davis said that that was a question for Fingerman. Byron responded: "You're gay, you can tell," and "Tell me because I have to be alone with him in the [security] office."

66.    When Davis began at the Fifth Avenue store, she informed Ruiz and Byron that she was unable to stand for long periods because of knee problems and they agreed not to assign her to do so. Davis initially was not given assignments where she had to stand; after Davis complained about being assigned to the overnight shift, Ruiz no longer accommodated her knee condition and stated that she was not "special." She offered to provide

medical documentation, but Ruiz said that he "didn't care" about a doctor's note. Davis complied

with the requirement that she stand for long periods despite detrimental health effects.

67.    Davis began to experience a gynecological condition in the spring of 2007

that required her to take several days off for doctor's appointments. At work one day in early

August, Davis had a medical emergency because of that condition and was compelled to leave

work. She produced medical documentation stating that she needed to take a few days off.

68.    Instead of accommodating Davis, Byron first said that the note "looks

fraudulent," then declined to allow her to return to work without further documentation.

69.    Byron also made comments in a derogatory manner to Pomales about

Davis's private medical information.

70.    Because of the intolerable working conditions, Davis was compelled to

leave in August 2007.

71.    After her departure, Ruiz called a meeting of the loss prevention agents at

the Fifth Avenue store during which he stated that Davis was a "whiner."

Factual Allegations Relevant to Plaintiff Eudelle

72.    Plaintiff Eudelle is a dark-skinned African-American man who wears his

hair in braids. He has worked in loss prevention for approximately six years. He was recruited

to work at Abercrombie in September 2005.

73.    Upon information and belief, Eudelle's starting salary was lower than that

offered to employees who had less experience but were not black or who were African-American

but had characteristics such as lighter skin or hairstyles that Abercrombie managers associated

with whites.

74.    At the time of Eudelle's hire, Matt Tracy ("Tracy"), a regional supervisor, told Eudelle that Eudelle could expect to be promoted within three to six months.

75.    Eudelle's performance throughout his tenure at Abercrombie has been good.

76.    Eudelle started at the South Street Seaport store. Apart from two weeks of training, he has always been assigned to work overnight shifts. Eudelle made regular requests to be reassigned to day shifts and for the promised promotion, all of which were denied.

77.    Upon information and belief, more minority than white employees work the overnight shift at Abercrombie's New York stores.

78.    Eudelle frequently worked more than forty hours per week in the course of his duties as a loss prevention employee; his supervisors were aware of his hours. He was not paid overtime prior to January 2007.

79.    When Eudelle began at Abercrombie, Mike Oliveras ("Oliveras"), loss prevention supervisor at the Seaport told him, "We don't do baggy here." Eudelle understood that Oliveras was referring to a manner of dress that Oliveras associated with African Americans. Eudelle changed his manner of dress.

80.    In January 2006, Eudelle was assigned to Fifth Avenue store, which had opened a few months previously. The hours were less desirable and the work was harder because there were more personnel assigned to the overnight shift; it was also a more difficult commute for Eudelle.

81.    Eudelle protested the transfer but was told he had to accept it or be fired. Tracy, the regional supervisor, told Eudelle that if he went to human resources to protest the transfer, Eudelle's pre-approved vacation in late February would be taken away.

82.    Eudelle's supervisor at the Fifth Avenue store, Byron, used the term "nigger" generally and to refer to Eudelle outside his hearing.

83.    In approximately May 2006, despite Eudelle's compliance with Oliveras's early admonishment not to "do baggy," regional loss prevention managers Ruiz and Graciani told Eudelle he had to change his "look"; that people "have a certain perception" of him; and that he had to "fit in with the crowd."

84.    Eudelle repeated his requests for assignment to the day shift.  Byron stated to other employees that Eudelle could not work the day shift because Eudelle was "too thuggish" and "too hip-hop," words Eudelle understood to be disparaging references to African Americans.

85.    In February 2007, Eudelle requested an annual pay raise from Ruiz.  Ruiz refused.  Upon information and belief, pay raises were given to similarly situated employees who were not black or were African-American but had characteristics such as lighter skin or hairstyles that Abercrombie managers associated with whites.

86.    In August 2007, Eudelle told Ruiz that Eudelle thought Abercrombie had discriminated against him because of his race.  He again asked Ruiz for a promotion and pay raise.  Ruiz told Eudelle, "You're from the 'hood; I'm from the 'hood; I've had to change – you can too."  Ruiz said, "People look at you differently."  Ruiz said that he, Ruiz, used to wear baggy clothes and speak "hip-hop slang."  Ruiz asked Eudelle to send his promotion and pay raise request in writing, which Eudelle did.  Eudelle received no response and was not promoted or given a pay raise.

Factual Allegations Relevant to Plaintiff Pagnotta

87.    Pagnotta was recruited to work for Abercrombie out of college.  She attained a bachelor's degree in Justice Studies from John Jay college.

88.    Pagnotta started at the South Street Seaport location in June 2006. On information and belief, Pagnotta and Davis were the only women working in loss prevention in Abercrombie's northeast region during their employment.

89.    Tracy and Ruiz told Pagnotta that she could expect advancement opportunity and that she would be promoted within three to six months.

90.    At the Seaport store, Pagnotta worked with Jesus Ramirez, ("Ramirez") for manager Michael Olivares ("Olivares"). Pagnotta worked hours significantly in excess of forty hours per week. She was not paid overtime prior to January 2007.

91.    Pagnotta consistently performed at or above expectations and met or exceeded the performance goals that Ruiz outlined for her.

92.    In August 2006, Pagnotta attended a birthday party for her manager a bar in Manhattan, with her co-worker Ramirez and other loss prevention employees.

93.    Graciani, who was then a district loss prevention manager for New York and New Jersey, also attended. After the event, Graciani forcibly kissed Pagnotta on the lips. She pulled away and said, "I don't want to lose my job." Graciani said, "If you don't tell I won't."

94.    After this incident, Graciani called Pagnotta at work a number of times, referring to her as "Sunshine" and asking, "When are we going to hang out?" He referred to her "cute little Italian temper." He also sent her text messages asking her to "Come over."

95.    After Pagnotta attended a Halloween party in 2006 during personal time, unrelated to work, Graciani said that he had seen her pictures in costume on the internet. He said that she had "nice legs," and, "I want to wrap your legs around my face."

96.    In early December 2006 Pagnotta asked regional supervisor Ruiz for a promotion and raise based on her excellent performance. Ruiz said, "Don't think you're better

than anyone else" and the he would "knock [her] down to size" or words to that effect. A few weeks later, he transferred Pagnotta to the Fifth Avenue store, which was a less desirable assignment.

97.    Upon information and belief, Ruiz did not respond in a similarly hostile manner to men's requests for promotions and pay raises.

98.    Learning of Pagnotta's imminent transfer to his Fifth Avenue store, manager Byron said to Pomales, who is a loss prevention agent at the Fifth Avenue store, "If you are going to f--k [Pagnotta] do it now because after she gets here it will be fraternization." Another loss prevention agent, Felix Ramirez, said, "No seriously, we know you're f--king that." Pagnotta overheard these comments.

99.    On or about December 28, 2006, Pagnotta complained to Ruiz about these comments and stated that she found them objectionable. She said, "They say I'm f--king Dave" or words to that effect. Ruiz laughed and asked, "Are you?" and said, "I would hope you would go for someone better looking." Pagnotta said she was serious and that the comments were "disgusting."

100.    Ruiz called a meeting of the Fifth Avenue loss prevention staff at which he initially invited Pagnotta to present her concerns but then dismissed them. About two weeks later, Olivares, Pagnotta's former supervisor at the Seaport store, told her that Ruiz had told him and another manager that Pagnotta "snapped out on everyone at Fifth Avenue."

101.    Graciani also called Pagnotta on her personal cell phone at about 1:00 a.m. on at least one occasion, near Christmas 2006. He asked Pagnotta to "come up to the Bronx so we can f--k," and said, "I want to f--k you."

102.    Pagnotta did not welcome Graciani's advances and asked him to stop. However, including because her other complaints met with ridicule, Pagnotta believed it would be futile to report Graciani's conduct.

103.    In late January or early February 2007, Pagnotta learned that Ruiz had said to By ron that he would "never promote a woman to loss prevention manager." With respect to promoting Pagnotta, Ruiz said, "Could you imagine? Everyone on the team would quit."

104.    In February or March 2007, Pagnotta was in the office with a store manager, Byron, and Felix Ramirez. The manager observed a female model walking by and said, "Someone needs to tell her she needs to buy the next size up in shirts." Byron turned to Pagnotta and said, "Why don't you tell her?" Felix Ramirez said to Pagnotta, "You have a hard enough time making sure you don't knock yourself out with those things."

105.    In early 2007, Pagnotta was assigned to investigate a complaint of discrimination against a store model. The general manager of the Fifth Avenue store, Chris Lape ("Lape") told Pagnotta that the model was being "sensitive" for complaining about another model's calling her a "black bitch." During the investigation, Pagnotta learned that Lape had also sent via cellular telephone pictures of his penis to a different female model who worked in the store.

106.    Pagnotta reported her findings about Lape to Byron and advised him that they needed to provide the information to human resources. Byron directed her not to do so. He said Lape's action was "not a big deal," that the model who objected was "just being sensitive" and that Pagnotta should not "get involved."

107.    During her employment at the Fifth Avenue store, other loss prevention agents, including Pomales, John Ruiz, and Fingerman, told Pagnotta that Byron referred to her as a "bitch" and said he was going to force her to quit.

108.    Soon after Pagnotta started at the Fifth Avenue store, in approximately January 2007, Ruiz told her he was assigning her to "administrative" work. He said, "I don't want you to think I'm being sexist, but you have such good administrative and organizational skills," or words to that effect. Pagnotta asked what Ruiz meant and reminded him of her excellent performance the South Street Seaport store. He said she was being "defensive," and "sensitive."

109.    In late February, Pagnotta was written up for having called in sick one day and one half day. On information and belief, men were not written up for similar absences.

110.    Around the same time, Pagnotta was asked to complete a "self-evaluation," but was required to revise the evaluation eight times; each time, the questions were changed to eliminate areas in which she had excelled. Graciani reviewed her grades. He gave Pagnotta a very small raise and denied her request for a better raise or a promotion.

111.    Because of the intolerable working conditions, Pagnotta was forced to resign on or about March 8, 2007.

Factual Allegations Relevant to Plaintiff Pomales

112.    Pomales has worked in retail loss prevention for about seven years. He started working at Abercrombie's South Street Seaport store in August 2005, and was transferred to the Fifth Avenue store when it opened in November 2005.

113.    Pomales regularly worked more than forty hours per week, but was not paid overtime prior to January 2007.

114.    Pomales's performance throughout his tenure at Abercrombie has been good.

115.    On or about August 19, 2007, Pomales called Abercrombie's allegedly confidential hotline and complained about Byron's discrimination, including giving details of Byron's comments comparing Davis to a gorilla and calling her "he," as set forth above.  He stated that Byron was a racist.

116.    A human resources employee followed up with Pomales, and two days later Ruiz asked Pomales about Byron's behavior toward Davis.

117.    Within days, Byron intimated that he was aware of Pomales's complaint.  He made a reference to video game violence that Pomales understood to be a physical threat against him.  Pomales reported this comment to the human resources employee, who dismissed his concerns, saying that the comment "could mean anything."

118.    Within a few weeks, Byron began to make work demands that were difficult or impossible to meet.  For example, he gave Pomales work assignments that could not be completed in the allotted time and assigned Pomales to difficult shift sequences, such as having to work very late one day and come in early the next day.

119.    In early October, about six weeks after Pomales's complaint, Byron placed Pomales on written warning for failing to meet these new, unreasonable demands.  Other loss prevention employees who had not complained about bias and who were involved in similar incidents, were not given warnings.

120.    In November 2007, Abercrombie changed Byron's supervisory responsibility.  Instead of promoting Pomales to supervisor, however, Abercrombie hired an outside supervisor, whom Pomales has been asked to train.

121.    Pomales approached Ruiz and asked if there was anything Pomales could do to improve his performance; Ruiz responded, "Nothing," and, "Keep being a leader."

Factual Allegations Relevant to Plaintiff Fingerman

122.    Fingerman was hired to work at Abercrombie's Fifth Avenue store in January 2007.

123.    Fingerman's performance throughout his tenure at Abercrombie was good.

124.    Within two or three weeks of his hire, Fingerman began to notice his supervisor, Byron, making pointed comments about having gay friends when Fingerman was present. This happened on numerous occasions.

125.    Similarly early in Fingerman's tenure, Byron told another loss prevention agent to watch to see who Fingerman went on breaks with.

126.    Around late June 2007, Byron asked Davis if Fingerman was gay. Davis said that that was a question for Fingerman. Byron responded: "You're gay, you can tell," and, "Tell me because I have to be alone with him in the [security] office."

127.    On or about June 30, 2007, Byron called Fingerman into the security office that was used for interrogation of employees suspected of theft. Byron asked about Fingerman's relationships with other employees and accused Fingerman of having an inappropriate relationship with a male associate.

128.    Opposite-sex sexual relationships between employees were tolerated at Abercrombie, including those between loss prevention managers and store managers or associates. On information and belief, no similarly situated employee has been interrogated in a similar manner concerning opposite-sex relationships.

248806 v4

129.    Byron also questioned Fingerman about his activities on several days that he had taken off the previous week, and ultimately asked if Fingerman had been at the Pride March, a gay and lesbian event, the previous Sunday.

130.    On information and belief, heterosexual employees were not questioned about non-work activities.

131.    After Fingerman left, Byron said to Davis, "I got the fairy out of the closet."

132.    Byron told Fingerman that Ruiz would be coming to deliver a written warning for the alleged fraternization.

133.    Because of the intolerable working conditions Fingerman in July 2007 was compelled to leave.

134.    Approximately the day Fingerman informed Byron that he was compelled to leave, Byron asked if Fingerman was going to sue, stated that Fingerman "should have gotten something in writing," and said "I say what the lawyers tell me to say," or words to that effect.

### FIRST CAUSE OF ACTION

#### Unpaid Overtime Under The FLSA

135.    FLSA class plaintiffs repeat and reallege paragraphs 1 through 134 above.

136.    At all times relevant to this cause of action, defendants employed FLSA class plaintiffs within the meaning of the FLSA.

137.    Defendants willfully violated the FLSA by failing to pay FLSA class plaintiffs overtime for hours worked in excess of forty per week, as required under the FLSA § 7(a)(1), 29 U.S.C. § 207(a)(1).

138.   As a consequence of defendants' willful violation of class plaintiffs' rights under the FLSA, FLSA class plaintiffs are entitled to recover from defendants, jointly and severally, their unpaid overtime wages, an additional equal amount in liquidated damages, costs, and reasonable attorneys' fees pursuant to the FLSA § 16(b), 29 U.S.C. § 216(b).

SECOND CAUSE OF ACTION

Unpaid Overtime Under The NYMWA

139.   NYMWA class plaintiffs repeat and reallege paragraphs 1 through 138 above.

140.   At all times relevant to this cause of action, defendants employed NYMWA class plaintiffs within the meaning of the NYMWA.

141.   Defendants willfully failed to pay NYMWA class plaintiffs overtime for hours worked in excess of forty per week, as required by the NYMWA.

142.   As a consequence of defendants' willful violation of NYMWA class plaintiffs' rights under the NYMWA, NYMWA class plaintiffs are entitled to recover from defendants, jointly and severally, their unpaid overtime wages, 25 percent of that amount as liquidated damages, costs, and reasonable attorneys' fees, pursuant to N.Y. Lab. Law § 663(1).

THIRD CAUSE OF ACTION

Race Discrimination Against Plaintiffs Davis and Eudelle Under Section 1981

143.   Plaintiffs Davis and Eudelle repeat and reallege paragraphs 1-142 above.

144.   By the acts and practices described above, defendants discriminated against plaintiffs Davis and Eudelle in the terms and conditions of their employment, including but not limited to the constructive discharge of Davis, on the basis of their race in violation of Section 1981.

145.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for these plaintiffs' statutorily protected rights.

146.    Plaintiffs Eudelle and Davis have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendants' discriminatory practices unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION

### Retaliation Against Plaintiffs Davis, Eudelle, and Pomales Under Section 1981

147.    Plaintiffs Davis, Eudelle, and Pomales repeat and reallege paragraphs 1-146 above.

148.    By the acts and practices described above, defendants retaliated against plaintiffs Davis, Eudelle, and  Pomales for their opposition to unlawful discrimination under Section 1981.

149.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for these plaintiffs' statutorily protected rights.

150.    Plaintiffs Davis, Eudelle, and Pomales have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendants' retaliatory practices unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION

### Race Discrimination Against Plaintiffs Eudelle and Davis
### Under the Human Rights Law

151.    Plaintiffs Eudelle and Davis repeat and reallege paragraphs 1-150 above.

152.    By the acts and practices described above, defendants discriminated against plaintiffs Eudelle and Davis in the terms and conditions of their employment, including but not limited to constructive discharge of Davis, on the basis of their race in violation of the Human Rights Law.

153.    Plaintiffs Eudelle and Davis have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendants' discriminatory practices unless and until this Court grants relief.

## SIXTH CAUSE OF ACTION

### Sex Discrimination Against Plaintiffs Pagnotta and Davis
### Under the Human Rights Law

154.    Plaintiffs Pagnotta and Davis repeat and reallege paragraphs 1-153 above.

155.    By the acts and practices described above, defendants discriminated against plaintiffs Pagnotta and Davis in the terms and conditions of their employment, including but not limited to constructive discharge, on the basis of their sex, in violation of the Human Rights Law.

156.    Plaintiffs Pagnotta and Davis have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendants' discriminatory practices unless and until this Court grants relief.

## SEVENTH CAUSE OF ACTION

### Sexual Orientation Discrimination Against Plaintiffs Davis and Fingerman
### Under the Human Rights Law

157.    Plaintiffs Davis and Fingerman repeat and reallege paragraphs 1-156 above.

158.    By the acts and practices described above, defendants discriminated against plaintiffs Davis and Fingerman in the terms and conditions of their employment, including but not limited to constructive discharge, on the basis of their sexual orientation, in violation of the Human Rights Law.

159.    Plaintiffs Davis and Fingerman have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendants' discriminatory practices unless and until this Court grants relief.

## EIGHTH CAUSE OF ACTION

### Retaliation Against Plaintiffs Davis, Eudelle, and Pomales
### Under the Human Rights Law

160.    Plaintiffs Davis, Eudelle, and Pomales repeat and reallege paragraphs 1-159 above.

161.    By the acts and practices described above, defendants retaliated against plaintiffs Davis, Eudelle, and Pomales for their opposition to unlawful discrimination under the Human Rights Law.

162.    Plaintiffs Davis, Eudelle, and Pomales have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation

and damage to his reputation as a result of defendants' retaliatory practices unless and until this Court grants relief.

### NINTH CAUSE OF ACTION

Race Discrimination Against Plaintiffs Eudelle and Davis Under the City Law

163.    Plaintiffs Eudelle and Davis repeat and reallege paragraphs 1-162 above.

164.    By the acts and practices described above, defendants discriminated against plaintiffs Eudelle and Davis in the terms and conditions of their employment, including but not limited to constructive discharge of Davis, on the basis of their race in violation of the City Law.

165.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for these plaintiffs' statutorily protected rights.

166.    Plaintiffs Eudelle and Davis have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendants' discriminatory practices unless and until this Court grants relief.

### TENTH CAUSE OF ACTION

Sex Discrimination Against Plaintiffs Pagnotta and Davis Under the City Law

167.    Plaintiffs Pagnotta and Davis repeat and reallege paragraphs 1-166 above.

168.    By the acts and practices described above, defendants discriminated against plaintiffs Pagnotta and Davis in the terms and conditions of their employment, including but not limited to constructive discharge, on the basis of their sex, in violation of the City Law.

169.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for these plaintiffs' statutorily protected rights.

170.    Plaintiffs Pagnotta and Davis have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendants' discriminatory practices unless and until this Court grants relief.

## ELEVENTH CAUSE OF ACTION

Sexual Orientation Discrimination Against Plaintiffs Davis and Fingerman Under the City Law

171.    Plaintiffs Davis and Fingerman repeat and reallege paragraphs 1-170 above.

172.    By the acts and practices described above, defendants discriminated against plaintiffs Davis and Fingerman in the terms and conditions of their employment, including but not limited to constructive discharge, on the basis of their sexual orientation, in violation of the City Law.

173.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for these plaintiffs' statutorily protected rights.

174.    Plaintiffs Davis and Fingerman have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendants' discriminatory practices unless and until this Court grants relief.

## TWELFTH CAUSE OF ACTION

Retaliation Against Plaintiffs Davis, Eudelle, and Pomales Under the City Law

175.    Plaintiffs Davis, Eudelle, and Pomales repeat and reallege paragraphs 1-174 above.

176.    By the acts and practices described above, defendants retaliated against plaintiffs Davis, Eudelle, and Pomales, including but not limited to constructive discharge of plaintiff Davis, for their opposition to unlawful discrimination under the City Law.

177.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for these plaintiffs' statutorily protected rights.

178.    Plaintiffs Davis, Eudelle and Pomales have suffered, are now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation and damage to their reputation as a result of defendants' retaliatory practices unless and until this Court grants relief.

### THIRTEENTH CAUSE OF ACTION

#### Race, Sex, and Sexual Orientation Discrimination and Retaliation under the NJLAD for Plaintiff Davis

179.    Plaintiff Davis repeats and realleges paragraphs 1-178 above.

180.    By the acts and practices described above, including but not limited to constructive discharge, defendants discriminated against plaintiff Davis in the terms and conditions of her employment, and retaliated against her for opposition to unlawful employment practices, on the basis of her race, sex, and/or sexual orientation in violation of the NJLAD.

181.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for Davis's statutorily protected rights.

182.    Plaintiff Davis is now suffering and will continue to suffer irreparable injury, monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory and retaliatory acts, unless and until this Court grants relief.

## FOURTEENTH CAUSE OF ACTION

### Violation of the FMLA for Plaintiff Davis

183.    Plaintiff Davis repeats and realleges paragraphs 1-182 above.

184.    Defendants have interfered with, restrained, and denied plaintiff Davis's exercise of her rights under the FMLA as set forth above.

185.    Defendants knew that their actions constituted an unlawful violation of the FMLA and/or acted with malice or reckless disregard for Davis's statutorily protected rights.

186.    Plaintiff Davis has suffered, is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendants' unlawful practices unless and until this Court grants relief.

## FIFTEENTH CAUSE OF ACTION

### Disability Discrimination Against Plaintiff Davis Under the Human Rights Law

187.    Plaintiff Davis repeats and realleges paragraphs 1-186 above.

188.    By the acts and practices described above, defendants have discriminated against plaintiff Davis on the basis of her disability in the terms and conditions of her employment in violation of the Human Rights Law.

189.    Plaintiff Davis has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and mental anguish and humiliation as a result of defendants' discriminatory practices unless and until this Court grants relief.

## SIXTEENTH CAUSE OF ACTION

### Disability Discrimination Against Plaintiff Davis Under the City Law

190.    Plaintiff Davis repeats and realleges paragraphs 1-189 above.

191.   By the acts and practices described above, defendants have discriminated against plaintiff Davis in the terms and conditions of her employment on the basis of her disability in violation of the City Law.

192.   Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for Davis's statutorily protected rights.

193.   Plaintiff Davis has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and mental anguish and humiliation as a result of defendants' discriminatory practices unless and until this Court grants relief.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs respectfully request that this Court enter a Judgment:

(a)    Certifying the First Cause of Action as a collective action allowing similarly situated employees to "opt in" and permitting discovery to facilitate such certification;

(b)    Certifying the Second Cause of Action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

(c)    Requiring defendants to provide class plaintiffs with a list of all persons employed by defendants at any of defendants' New York stores as loss prevention agents or supervisors since February, 2002, or at any of defendants' New Jersey stores since February, 2005, stating their last known addresses and telephone numbers, so that plaintiff can give such class members notice of the pendency of this action and an opportunity to make an informed decision about whether to participate in it;

(d)    Declaring that defendants' conduct complained of herein violates plaintiffs' rights under the FLSA, the NYMWA, Section 1981, the Human Rights Law, the City Law, the NJLAD, and the FMLA;

248806 v4

30

(e)  Enjoining and permanently restraining defendants from violating the NYMWA, Section 1981, the Human Rights Law, the City Law, the NJLAD and the FMLA;

(f)  Directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(g)  Awarding plaintiffs the unpaid overtime compensation due to them under the FLSA and the NYMWA;

(h)  Awarding plaintiffs liquidated damages because of defendants' willful failure to pay overtime in violation of the FLSA;

(i)  Awarding plaintiffs liquidated damages under the NYMWA, N.Y. Labor Law § 663(1), because of defendants' willful failure to pay them overtime;

(j)  Directing defendants to reinstate plaintiffs Pagnotta, Davis, and Fingerman;

(k)  Directing defendants to place plaintiffs in the position they would have occupied but for defendants' discriminatory and retaliatory and unlawful conduct and making them whole for all earnings and other benefits he would have received but for defendants' discriminatory and retaliatory treatment, including, but not limited to, wages and other lost benefits;

(l)  Directing defendants to pay plaintiffs compensatory damages for their mental anguish and humiliation;

(m)  Directing defendants to pay plaintiffs punitive damages for their intentional disregard of and/or reckless indifference to plaintiffs' statutory rights;

(n)    Directing defendants to pay plaintiffs' attorneys' fees, costs and disbursements pursuant to the FLSA, the NYMWA, Section 1981, the City Law, the NJLAD, and the FMLA;

(o)    directing defendants to compensate plaintiffs for any adverse tax consequences;

(p)    directing defendants to pay prejudgment interest; and

(q)    granting such other and further relief as this Court deems necessary and proper.

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury in this action.

Dated: New York, New York
   February 25, 2008

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By:   _____

Debra L. Raskin (DR5431)
Maia Goodell (MG8905)
Attorneys for Plaintiffs
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300