UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

                                                          08 CV 01859 (PKC) (AJP)

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

                       Plaintiffs,                         **AFFIRMATION OF
ATTORNEY STACIA
M. JONES**

        -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
               d/b/a Abercrombie & Fitch,
               Abercrombie, Hollister and Ruehl,

                       Defendants.
-----------------------------------------------------------------------X

        STACIA M. JONES, an attorney duly admitted pro *hac vice* to practice before this Court,

affirms as follows under penalties of perjury:

    1.    I am an attorney with VORYS, SATER, SEYMOUR AND PEASE LLP, attorneys for

Defendants in the above-captioned matter. I respectfully submit this Affirmation in support of

Defendants' Memorandum in Support of Defendants' Motion for Partial Dismissal of Plaintiff's

Complaint Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

    2.    Annexed hereto as exhibits are true and accurate copies of the following documents

        •   Exhibit A     Robert Ruiz Declaration (with Exhibits 1 through 6)

        •   Exhibit B     Amy Dury Declaration (with Exhibits 1 through 13)

        •   Exhibit C     Declarations of Michael Barrett, Joseph Gandolfo, Juliette Hackett,
                                  Felix Ramirez, Jamie Van Dusen and Andre Walker

- Exhibit D        Allen S. Kinzer Affidavit

- Exhibits E
  through K       Unreported Cases

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
          August 11, 2008

                                    VORYS, SATER, SEYMOUR AND PEASE LLP
                                    Attorneys for Defendants

                                    /s/ Stacia M. Jones_____
                                    By: Sandra M. Jones  (0072401)
                                    52 East Gay Street, P.O. Box 1008
                                    Columbus, Ohio 43216-1006
                                    Telephone:  (614) 464-5492

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,                08 CV 01859 (PKC) (AJP)
And
                                                                            **DECLARATION OF ROBERT
KENNETH FINGERMAN,                                                          RUIZ**

                    Plaintiffs,

        -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
        d/b/a Abercrombie & Fitch,
        Abercrombie, Hollister and Ruehl,

                    Defendants.
-------------------------------------------------------------------X

        I, Robert Ruiz, being first duly cautioned and sworn, and being more than age eighteen

and competent to testify about the matters contained herein, hereby declare and state as follows

upon personal knowledge or information:

        1.      I am currently employed by Abercrombie & Fitch as a Regional Loss Prevention

Manager ("RLPM"). I am responsible for stores in New York, New Jersey, and London,

England. I am the only RLPM in my region. There are currently about 30 Loss Prevention

Agents ("LPAs") working in my region. Those LPA's report to one of two Loss Prevention

Managers ("LPMs") or a District Loss Prevention Manager ("DLPM.") The LPMs and DLPM

are my management team, and they report to me.





**EXHIBIT**

A

2.    Abercrombie instituted an overtime compensation policy for its LPAs as of November 26, 2006. Prior to that date, LPAs were classified as exempt salaried employees.

3.    I am familiar with the type and amount of work performed by the LPAs in my region, including Shoneca Davis, Dawud Eudelle, Jacyln Pagnotta, and David Pomales, both before and after November 26, 2006 – that is "pre-conversion" and "post-conversion." The number of hours worked per week by LPAs generally, and by these four individuals in particular, were substantially the same in both the "pre-conversion" and "post-conversion" time frames. If anything, LPAs are presently working more overtime hours than they did before November 25, 2006, as a result of increasing demands of the job.

4.    Based on my observations and experience at Abercrombie, any assumption that LPAs worked an average of five hours of overtime per week is unreasonable and grossly overstates the time actually worked by LPAs, including Ms. Davis, Mr. Eudelle, Ms. Pagnotta and Mr. Pomales. For example, Ms. Davis in particular had significant issues in even showing up to work on time.

5.    I do not require LPAs to provide a daily report of their activities, and I do not require LPAs to attend or participate in regional loss prevention meetings or conferences during their days off.

6.    LPMs who report to me are responsible for preparing work schedules for the LPAs and submitting the schedules to me. LPAs are regularly scheduled to work a total of 40 hours per week. As examples, attached are Exhibits 1 and 2 which are true and accurate copies of, respectively, "Region 2 Seaport L.P. Schedule January 2006" and "Region 2 LP Schedule June 2006." Names of LPAs other than plaintiffs Dawud Eudelle and Jacyln Pagnotta have been



redacted on these Exhibits. These Exhibits are typical of work schedules and demonstrate that, prior to November 26, 2006, LPAs were always scheduled to work a 40 hour week.

7.     No LPAs are permitted, required or requested to work off the clock. I have never directed any personnel at Abercrombie to work off the clock. I am not aware of any member of my management team so directing personnel.

8.     Shoneca Davis was hired as an LPA on August 22, 2006. She began work at Store A562 in New Jersey. On March 11, 2007, she transferred to Store A936 (Fifth Avenue Flagship) in New York. She submitted her resignation on August 9, 2007.

9.     Attached as Exhibit 3 is a true and accurate copy of a "2006 Calendar Attendance Log" and accompanying form for "Attendance Incidents" for Shoneca Davis. These forms are used by my management team to keep track of attendance, vacation, sick days, tardiness and other issues with respect to LPAs in my region. As shown on this exhibit, Ms. Davis was either absent or tardy on 14 days during 8 separate weeks between her date of hire in August and October 16, 2006 (the last date listed on the "Attendance Incidents").

10.     Dawud Eudelle was hired on September 18, 2005. He began work at Store A529 (South Street Seaport). On January 29, 2006, he transferred to Store A936 (Fifth Avenue Flagship) in New York.

11.     Attached as Exhibit 4 is a true and accurate copy of a "2005 Calendar Attendance Log" and accompanying form for "Attendance Incidents" for Dawud Eudelle. As shown on this exhibit, Mr. Eudelle took four vacation days during one week in October 2005.

12.     Attached as Exhibit 5 is a true and accurate copy of a "2006 Calendar Attendance Log" and accompanying form for "Attendance Incidents" for Dawud Eudelle. As shown on this



exhibit, Mr. Eudelle was either absent or tardy on 19 days during 9 separate weeks between January 1, 2006 and June 16, 2006 (the last date listed on the "Attendance Incidents").

13.    Jaclyn Pagnotta was hired on June 8, 2006. She began work at Store A529 (South Street Seaport). On January 3, 2007, she transferred to Store A936 (Fifth Avenue Flagship) in New York. On March 11, 2007, she gave notice of her resignation effective March 25, 2007.

14.    David Pomales was hired on July 31, 2005. He began work at Store A529 (South Street Seaport). On October 3, 2005, he transferred to Store A936 (Fifth Avenue Flagship) in New York.

15.    Attached as Exhibit 6 is a true and accurate copy of a "2006 Calendar Attendance Log" and accompanying form for "Attendance Incidents" for David Pomales. As shown on this exhibit, Mr. Pomales was either absent or tardy on 13 days during 8 separate weeks between January 1, 2006 and June 15, 2006 (the last date listed on the "Attendance Incidents")

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Robert Ruiz
_____

8/8/08
Date

4

## REGION 2 SEAPORT L.P. SCHEDULE JANUARY 2006

| LP AGENT | STORE # | SUN 1 | MON 2 | TUE 3 | WED 4 | THURS 5 | FRI 6 | SAT 7 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
|  | 529 | OFF | #578 6PM-INV | #598 2P-INV | OFF | 11A-8P | 11A-8P | OFF | 40 |
|  | 529 | OFF | OFF | 11A-8P | 11A-8P | 11A-8P | COMP | 7P-CL | 40 |
|  | 529 | OFF | OFF | 7P-CL | 7P-CL | COMP | 7A-4P | OFF | 40 |
|  | 529 | OFF | 7A-4P | 7A-4P | 7A-4P | COMP | OFF | 11A-8P | 40 |
|  | 529 | 11A-8P | 1P-10P | 1P-10P | 1P-10P | OFF | 1P-10P | OFF | 40 |
|  | 529 | 8A-5P | 11A-8P | OFF | OFF | 7A-4P | COMP | 12P-9P | 40 |
| DAWUD | 529 | 7P-CL | 7P-CL | OFF | OFF | 7P-CL | 7P-CL | COMP | 40 |

*FREDDY LATE 12/31 - 1/2 HOUR*

| LP AGENT | STORE # | SUN 8 | MON 9 | TUE 10 | WED 11 | THUR 12 | FRI 13 | SAT 14 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
|  | 529 | OFF | 9A-6P | 9A-6P | COMP | 10A-7P | 9A-6P | OFF | 40 |
|  | 529 | OFF | OFF | #936 | 11A-8P | 11A-8P | 11A-8P | 11A-8P | 40 |
|  | 529 | OFF | OFF | 7P-CL | 7P-CL | COMP | 7A-4P | 7A-4P | 40 |
|  | 529 | 8A-5P | OFF | 7A-4P | #936 | OFF | 11A-8P | #936 | 40 |
|  | 529 | 11A-8P | 1P-10P | 1P-10P | SICK | OFF | 1P-10P | OFF | 40 |
|  | 529 | OFF | #936 | OFF | OFF | #936 | #936 | 12P-9P | 40 |
| DAWUD | 529 | 7P-CL | 7P-CL | OFF | OFF | 7P-CL | 7P-CL | 7P-CL | 40 |

MLK DAY

| LP AGENT | STORE # | SUN 15 | MON 16 | TUE 17 | WED 18 | THUR 19 | FRI 20 | SAT 21 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
|  | 529 | OFF | 10A-7P | 9A-6P | OFF | 11A-8P | 11A-8P | 11A-8P | 40 |
|  | 529 | OFF | OFF | 11A-8P | 9A-6P | 11A-8P | 9A-6P | 9A-6P | 40 |
|  | 529 | OFF | OFF | 7A-4P | 7A-4P | 7A-4P | 7A-4P | 7A-4P | 40 |
|  | 529 | OFF | 7A-4P | #936 | OFF | COMP | #936 | 3P-12A | 40 |
|  | 529 | 8A-5P | 1P-10P | OFF | 1P-10P | COMP | 1P-10P | OFF | 40 |
|  | 529 | 3P-CL | OFF | OFF | #936 | #936 | #936 | #936 | 40 |
| DAWUD | 529 | OFF | OFF | 7P- CL | 7P-CL | 7P-CL | 7P-CL | COMP | 40 |

| LP AGENT | STORE # | SUN 22 | MON 23 | TUE 24 | WED 25 | THUR 26 | FRI 27 | SAT 28 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
|  | 529 | 4P-INV | INV-3P | 9A-6P | 9A-6P | 9A-6P | 8A-5P | 11A-8P | 40 |
|  | 529 | 4P-INV | OFF | OFF | 9A-5P | 11A-8P | 11A-8P | COMP | 40 |
|  | 529 | 4P-INV | OFF | OFF | 3P-CL | OFF | 12P-9P | 3P-12 | 40 |
|  | 529 | 8A-5P | 7A-4P | 7A-4P | OFF | OFF | 7A-4P | 7A-4P | 40 |
|  | 529 | 1P-10P | 1P-10P | 1P-10P | 1P-10P | 1P-10P | 1P-10P | OFF | 40 |
|  | 529 | OFF | 6A-3P | OFF | 7A-4P | 7A-4P | 9A-6P | 9A-6P | 40 |
| DAWUD | 529 | 7P-INV | 10P-7A | OFF | OFF | SICK | #936 | #936 | 40 |

| LP AGENT | STORE # | SUN 29 | MON 30 | TUE 31 | WED 1 | THUR 2 | FRI 3 | SAT 4 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
|  | 529 | OFF | 9A-6P | 9A-6P | 10A-7P | 11A-8P | 11A-8P | 11A-8P | 40 |
|  | 529 | OFF | OFF | 11A-8P | 7A-4P | 7A-4P | 7A-4P | 7A-4P | 40 |
|  | 529 | OFF | VAC | VAC | VAC | VAC | VAC | OFF | 40 |
|  | 529 | OFF | OFF | 7A-4P | 11A-8P | 11A-8P | 11A-8P | 11A-8P | 40 |
|  | 529 | 8A-5P | 1P-10P | OFF | OFF | 1P-10P | 1P-10P | 1P-10P | 40 |
|  | 529 | 11A-8P | 3P-CL | 3P-CL | OFF | OFF | 9A-6P | 9A-6P | 40 |
| DAWUD | 529 | 7P-CL | OFF | OFF | 7P-CL | 7P-CL | 7P-CL | 7P-CL | 40 |

EXHIBIT
1

## REGION 2 LP SCHEDULE JUNE 2006

### Schedule 1= 8am-5pm 2=10am-7pm 3=11am-close 4=12pm-close 5= Overnight    HOLIDAY MEMORIAL COMP DAY

| LP AGENT | STORE # | Sun 28 | Mon 29 | Tue 30 | Wed 31 | Thur 01 | Fri 02 | Sat 03 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
| | 562 | Off | 2-582 | 1-590 | Off | 2-422 | Off | 4-562 | 40 |
| | 563 | 2-663 | Off | 1-388 | Off | 3-746 | 4-746 | Off | 40 |
| | 610 | Off | 3-610 | 1-115 | 3-115 | Off | 3-105 | Off | 40 |
| | 317 | Off | 2-317 | Off | Off | 3-317 | 3-317 | 3-317 | 40 |
| | 945 | Off | 3-244 | Off | Off | 4-945 | 4-945 | 3-244 | 40 |
| | 948 | 2-946 | Off | 1-622 | Off | Off | 3-946 | 3-591 | 40 |
| | 137 | 2-441 | Off | 1-484 | Off | 3-137 | Off | 3-441 | 40 |
| | 673 | Off | 2-673 | Off | 3-126 | Off | 3-673 | 3-126 | 40 |
| | 527 | Off | Off | 1-278 | Off | 3-527 | 3-527 | 4-527 | 40 |
| 1 | 645 | 2-645 | Off | 1-183 | Off | 2-119 | Off | 3-183 | 40 |
| | 717 | Off | 2-717 | 1-112 | Off | 3-717 | 3-717 | 3-717 | 40 |
| | 590 | Off | Off | 1-590 | 2-590 | 2-174 | 3-590 | 3-174 | 40 |
| | | | | | | | | | |
| | 680 | OFF | OFF | 2-529 | 2-529 | 2-529 | | | 40 |
| | 529 | 2-529 | 1-529 | 1-529 | | | OFF | 2-529 | 40 |
| 1 | 529 | 5-529 | OFF | OFF | 5-529 | | OFF | PER | 40 |
| | 529 | 5-529 | 5-529 | | | 5-529 | 2-529 | 5-529 | 40 |
| | 529 | | | | | 5-529 | 5-529 | OFF | 40 |

### Schedule 1= 8am-5pm 2=10am-7pm 3=11am-close 4=12pm-close 5= Overnight

| LP AGENT | STORE # | Sun 4 | Mon 5 | Tues 6 | Wed 7 | Thurs 8 | Fri 9 | Sat 10 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
| | 562 | Off | 2-562 | 1-344 | 3-422 | Off | 3-562 | 4-344 | 40 |
| | 563 | 2-663 | Off | 1-388 | 3-746 | 3-663 | Off | 4-663 | 40 |
| | 610 | Off | 3-610 | 1-105 | Off | 2-115 | 3-610 | 1-610 | 40 |
| | 317 | 3-317 | 3-317 | 3-317 | Off | Off | 2-317 | 4-317 | 40 |
| | 945 | 2-945 | 3-244 | Off | Off | 3-945 | 3-945 | 3-244 | 40 |
| | 946 | Off | 2-622 | Off | Barev | Barev | 4-622 | 3-948 | 40 |
| | 137 | 2-441 | Off | 1-448 | 3-448 | Off | 3-441 | 3-484 | 40 |
| | 673 | Off | 2-673 | 1-126 | Off | 3-673 | 2-126 | 4-673 | 40 |
| | 527 | 2-527 | 3-527 | 1-527 | Off | Off | 2-126 | 4-527 | 40 |
| | 645 | 2-645 | Off | 1-183 | Rums | 2-645 | Off | 3-645 | 40 |
| | 717 | 2-717 | Off | 1-112 | Off | 3-717 | 3-717 | 3-112 | 40 |
| | 590 | Off | 3-174 | Off | Personal | 3-580 | 3-590 | 2-174 | 40 |
| | | | | | | | | | |
| | 680 | 2-529 | 2-529 | 1-529 | OFF | 2-629 | 1-529 | 1-529 | 40 |
| | 629 | OFF | OFF | 3-529 | 2-529 | 1-529 | 5-529 | 2-529 | 40 |
| | 529 | 5-529 | 5-529 | OFF | OFF | VAC | VAC | VAC | 40 |
| Jaclyn P | 529 | OFF | OFF | #936 | #936 | #936 | #936 | #936 | 40 |

### Schedule 1= 8am-5pm 2=10am-7pm 3=11am-8pm 4=12pm-close 5= Overnight

| LP AGENT | STORE # | Sun 11 | Mon 12 | Tues 13 | Wed 14 | Thurs 15 | Fri 16 | Sat 17 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
| | 562 | 2-582 | Off | 1-663 | 3-344 | 5-529 | Off | 2-590 | 40 |
| | 563 | Off | 3-663 | 1-388 | Off | 2-388 | 3-746 | 4-663 | 40 |
| | 610 | Off | 3-610 | 1-105 | 3-115 | Off | 3-610 | 1-610 | 40 |
| | 317 | 2-317 | Off | 1-317 | PER | 3-317 | 2-317 | Off | 40 |
| | 945 | 2-945 | 3-945 | Off | Off | 3-244 | 2-945 | 3-244 | 40 |
| | 946 | 2-946 | Off | 1-622 | 3-391 | Off | 2-946 | 3-948 | 40 |
| | 137 | Off | 2-441 | 1-448 | 3-137 | 4-137 | 3-137 | Off | 40 |
| | 673 | 2-673 | Off | 1-126 | 2-673 | Off | 3-126 | 4-673 | 40 |
| | 527 | 2-527 | 3-527 | 1-527 | Off | 3-527 | Off | 4-527 | 40 |
| | 645 | 2-645 | Off | 1-183 | Off | 3-645 | Off | 3-645 | 40 |
| | 717 | 2-717 | Off | 1-112 | Off | 3-717 | 2-717 | 3-112 | 40 |
| | 530 | 2-590 | 3-265 | 1-590 | Off | 3-265 | Off | 2-590 | 40 |
| | | | | | | | | | |
| | 680 | 2-529 | 2-529 | 1-529 | 1-529 | OFF | OFF | 1-529 | 40 |
| | 629 | VAC | VAC | VAC | OFF | OFF | 5-529 | 5-529 | 40 |
| | 529 | OFF | OFF | OFF | OFF | 5-529 | 5-529 | 3-529 | 40 |
| Jaclyn P | 529 | 5-529 | #936 | #936 | #936 | #936 | #936 | OFF | 40 |

### Schedule 1= 8am-5pm 2=10am-7pm 3=11am-8pm 4=12pm-close 5= Overnight

| LP AGENT | STORE # | Sun 18 | Mon 19 | Tues 20 | Wed 21 | Thurs 22 | Fri 23 | Sat 24 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
| | 562 | Off | 2-924 | 1-924 | Off | 3-907 | 3-562 | 4-206 | 40 |
| | 924 | Off | 2-924 | 1-924 | Off | 3-907 | RUMS | 4-206 | 40 |
| | 563 | Off | 2-663 | 1-388 | 3-388 | Off | 3-663 | 3-663 | 40 |
| | 610 | Off | 2-610 | 1-105 | Off | 2-115 | 3-610 | 1-610 | 40 |
| | 317 | 2-317 | Off | 1-317 | 3-317 | 2-317 | 3-317 | 3-317 | 40 |
| | 945 | 2-945 | 3-486 | Off | Off | 3-244 | 3-590 | 3-945 | 40 |
| | 946 | 2-946 | Off | 1-622 | 3-391 | 3-946 | Off | 3-946 | 40 |
| | 137 | 2-441 | 2-137 | 1-448 | Off | 3-484 | Off | 2-484 | 40 |
| | 673 | 2-673 | Off | 1-126 | 3-673 | 4-126 | Off | 4-673 | 40 |
| | 527 | Off | 3-279 | 1-527 | Off | 2-527 | 3-527 | 4-527 | 40 |
| | 645 | 2-645 | Off | 1-183 | 2-645 | Off | 3-183 | 4-645 | 40 |
| | 717 | Off | 2-717 | 1-112 | 3-112 | Off | 3-717 | 3-112 | 40 |
| | 530 | 2-590 | Off | 1-590 | Off | 2-174 | 3-590 | 2-174 | 40 |
| | | | | | | | | | |
| | 680 | 5-529 | 1-529 | 1-529 | 4-529 | 3-529 | OFF | OFF | 40 |
| | 629 | 5-529 | 5-529 | OFF | 1-529 | 1-529 | OFF | 1-529 | 40 |
| | 629 | OFF | OFF | 5-529 | 5-529 | 5-529 | 5-529 | 5-529 | 40 |
| Jaclyn P | 529 | 3-529 | 1-529 | 1-529 | 4-529 | 3-529 | OFF | OFF | 40 |

### Schedule 1= 8am-5pm 2=10am-7pm 3=11am-8pm 4=12pm-close 5= Overnight

| LP AGENT | STORE # | Sun 25 | Mon 26 | Tues 27 | Wed 28 | Thurs 29 | Fri 30 | Sat 1 | TOTAL HRS: |
|---|---|---|---|---|---|---|---|---|---|
| | 562 | OFF | 3-422 | 1-344 | 3-562 | Off | 3-422 | personal | 40 |
| | 317 | ORIEN S.I. | Off | 1-344 | 3-308 | Off | 2-308 | 3-317 | 40 |
| | 945 | 2-945 | 3-486 | Off | Off | 3-244 | 3-945 | personal | 40 |
| | 946 | Off | 2-946 | 1-622 | 3-622 | Off | 2-946 | personal | 40 |
| | 590 | 2-174 | Off | 1-590 | 3-265 | 4-590 | Off | 3-174 | 40 |
| | 924 | 2-924 | OC | 1-924 | Off | 3-206 | Off | 3-907 | 40 |
| | 137 | 2-137 | Off | 1-441 | 3-137 | 2-441 | 5-157 | Off | 40 |
| | | | | | | | | | |
| | 663 | 2-388 | Off | 1-388 | 3-746 | 2-115 | Off | 4-663 | 40 |
| | 610 | Off | 2-610 | 1-105 | 3-115 | 3-115 | 3-610 | 1-610 | 40 |
| | 673 | Off | 3-673 | 1-126 | Off | 2-673 | 2-126 | 3-126 | 40 |
| | 527 | 2-527 | Off | 1-527 | 3-279 | 2-428 | 3-279 | 4-675 | 40 |
| | 645 | 2-645 | 3-645 | 1-183 | Off | Off | 3-279 | 4-527 | 40 |
| | 717 | 2-717 | Off | 1-112 | 2-717 | 3-112 | 2-183 | 3-645 | 40 |
| | | | | | | | Off | 3-112 | 40 |

EXHIBIT 2

# 2006 CALENDAR/ATTENDANCE LOG - Retail

Name: Shoneca Davis.          Date of Hire: 8-16-06

## JANUARY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| 1 H | 2 | 3 | | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 H | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

## FEBRUARY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 H | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

## MARCH

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

## APRIL

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24 | 25 | 26 | 27 | 28 | 29 |

## MAY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 H | 30 | 31 | | | |

## JUNE

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

## JULY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | | 1 |
| 2 | 3 | 4 H | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

## AUGUST

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

## SEPTEMBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

## OCTOBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 H | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

## NOVEMBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 H |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 H | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

## DECEMBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24/31 | 25 H | 26 | 27 | 28 | 29 | 30 |

### Attendance Codes

■ = Sick Day     T = Tardy     ■ = Vacation Day     ■ = Personal Day     A = Absent

J = Jury Duty     O = Other     L = Leave of Absence     H = Holiday (Company Closed)

**4 Vacation Days**
**3 Personal Days**
**5 Sick Days**

EXHIBIT
3

## Attendance Incidents:  Record all facts & dates

| Date | Reason/Code | Explanation |
|---|---|---|
| 28-Aug | | late due to traffic |
| 26-Aug | | Transportation issues |
| 27-Aug | | Transportation issues |
| 23-Sep | | Transportation issues |
| 26-Sep | | Transportation issues |
| 27-Sep | | Transportation issues |
| 28-Sep | | Transportation issues |
| 29-Sep | | Transportation issues |
| 30-Sep | | Transportation issues |
| 12-Oct | | late due to flood at home |
| 16-Oct | | late due to traffic |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# 2005 CALENDAR/ATTENDANCE LOG - Retail

**Name: Dawud Eudelle  Date of Hire:  9/20/2005**

## JANUARY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

## FEBRUARY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | | | | | |

## MARCH

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

## APRIL

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

## MAY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

## JUNE

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

## JULY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24/31 | 25 | 26 | 27 | 28 | 29 | 30 |

## AUGUST

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

## SEPTEMBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

## OCTOBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

## NOVEMBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | | | |

## DECEMBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**Attendance Codes**

■ = Sick Day    ▨ = Tardy    ■ = Vacation Day    ■ = Personal Day    ▨A = Absent

J = Jury Duty    O = Other    L = Leave of Absence    H = Holiday (Company Closed)

**4 Vacation Days**
**5 Sick Days**
**0 Personal Days**

EXHIBIT
4

## Attendance Incidents:  Record all facts & dates

| Date | Reason/Code | Explanation |
|------|-------------|-------------|
|      |             |             |
|      |             |             |
| 28-Oct | V | Vacation Day Used. |
| 29-Oct | V | Vacation Day Used. |
| 30-Oct | V | Vacation Day Used. |
| 31-Oct | V | Vacation Day Used. |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |

# 2006 CALENDAR/ATTENDANCE LOG - Retail

Name:   Dawud Eudelle          Date of Hire: 9/20/2006

### JANUARY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| 1 H | 2 | 3 | | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 H | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

### FEBRUARY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 H | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

### MARCH

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

### APRIL

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24 | 25 | 26 | 27 | 28 | 29 |

### MAY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 H | 30 | 31 | | | |

### JUNE

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

### JULY

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | | 1 |
| 2 | 3 | 4 H | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

### AUGUST

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

### SEPTEMBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

### OCTOBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 H | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

### NOVEMBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 H |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 H | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

### DECEMBER

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24/31 | 25 H | 26 | 27 | 28 | 29 | 30 |

**Attendance Codes**

■ = Sick Day        **T** = Tardy        ■ = Vacation Day        ■ = Personal Day        **A** = Absent

J = Jury Duty        **O** = Other        **L** = Leave of Absence        H = Holiday (Company Closed)

**10 Vacation Days**
**3 Personal Days**
**5 Sick Days**

**EXHIBIT 5**

## Attendance Incidents:  Record all facts & dates

| Date | Reason/Code | Explanation |
|------|-------------|-------------|
| 3-Feb | O | Agent left 3 hours early because his eye was irritating him |
| | | |
| | | |
| | | |
| | | |
| | | |
| 20-Apr | O | Spoke to agent concerning info he heard about mgr interview. He was insubordinate as he failed to give a name |
| 16-Jun | O | Agent used July 4 HO day |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# 2006 CALENDAR/ATTENDANCE LOG - Retail

Name:  David Pomales          Date of Hire:  8/1/05

**JANUARY**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| 1 H | 2 | 3 | | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 H | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**FEBRUARY**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 H | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

**MARCH**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

**APRIL**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24 | 25 | 26 | 27 | 28 | 29 |

**MAY**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 H | 30 | 31 | | | |

**JUNE**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

**JULY**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | | 1 |
| 2 | 3 | 4 H | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

**AUGUST**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

**SEPTEMBER**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

**OCTOBER**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 H | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**NOVEMBER**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 H |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 H | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

**DECEMBER**

| Sun | Mon | Tue | Wed | Thur | Fri | Sat |
|-----|-----|-----|-----|------|-----|-----|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24/31 | 25 H | 26 | 27 | 28 | 29 | 30 |

**Attendance Codes**

 = Sick Day      **T** = Tardy      = Vacation Day      = Personal Day      **A** = Absent

J = Jury Duty      = Other     = Leave of Absence     H = Holiday (Company Closed)

**10 Vacation**
**3 Personal**
**5 Sick Days**

EXHIBIT
6

## Attendance Incidents:  Record all facts & dates

| Date | Reason/Code | Explanation |
|------|-------------|-------------|
|      |             |             |
| 6-Feb | O | Agent left 4 hours early because he was sick |
|      |             |             |
| 23-Mar | T | Agent was 25 minutes late for his shift |
|      |             |             |
| 10-Apr | O | Allowed agent to leave an hour early.  He will be staying an hour later Sat 15 |
|      |             |             |
|      |             |             |
|      |             |             |
| 15-Jun | O | Agent used July 4th HO Day |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |
|      |             |             |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,          08 CV 01859 (PKC)
And

**DECLARATION OF AMY
DURY**

KENNETH FINGERMAN,

                Plaintiffs,

   -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
        d/b/a Abercrombie & Fitch,
        Abercrombie, Hollister and Ruehl,

           Defendants.
------------------------------------------------------------------------X

        I, Amy Dury, being first duly cautioned and sworn, and being more than age eighteen and

competent to testify about the matters contained herein, hereby declare and state as follows upon

personal knowledge or information:

        1.     I have been employed at Abercrombie since November, 2001.  My current job

title is LP Coordinator (formerly titled Security Coordinator), which I have held since August 3,

2003.  My job duties include handling and coordinating records for payroll of Loss Prevention

Agents ("LPAs").

        2.     Abercrombie instituted a supplemental pay policy for its LPAs as of November

26, 2006 – the "conversion" date.  Prior to that date, LPAs were classified as exempt salaried

employees.  After that date, Abercrombie continued to pay LPAs a salary but began paying



supplemental pay for hours worked beyond 40 in any work week.

3.     Before November 26, 2006, there was no reason for Abercrombie's Payroll Department to need time sheets for LPAs, because LPAs were salaried employees. Leading up to the conversion, LPAs at the Fifth Avenue Store began recording their hours on payroll time sheets between about July 30, 2006 and November 25, 2006. After November 25, 2006, LPAs began submitting time sheets. At the Fifth Avenue Store, LPAs began punching in and out of work at the Store's computer terminal. When LPAs were converted from salaried employees to hourly employees on November 26, 2006, we started the practice of having LPAs and their managers fax individual time sheets to my attention. Shortly thereafter, the practice was changed so that the managers were to collect time sheets from LPAs to send to my attention. This change was made to promote efficiency. The managers also compiled and sent me Excel spread sheets of the time recorded by the LPAs under their supervision. I directly copied the spread sheets to provide information to our Payroll Department.

4.     True and accurate copies of Abercrombie's records regarding the time and attendance of Shoneca Davis, Dawud Eudelle, JacLyn Pagnotta and David Pomales are attached hereto, as described hereafter for each person.

**Shoneca Davis:**

5.     Shoneca Davis was hired as an LPA on August 22, 2006. She began work at Store A562 in New Jersey. On March 11, 2007, she transferred to Store A936 (Fifth Avenue Flagship) in New York. She submitted her resignation on August 9, 2007.

6.     Attached as Exhibit 1 are true and accurate copies of "Paycheck Detail" records for Ms. Davis for biweekly paychecks issued in 2006. Prior to November 26, 2006, when Ms. Davis and all LPAs were paid based on salary rather than actual hours worked, the field on the

"Paycheck Detail" record automatically defaulted to show 90 hours per two week-period; however, this field was not used or intended to show actual hours worked before November 26, 2006.

7.  Attached as Exhibit 2 are true and accurate copies of time sheets signed by Shoneca Davis for the time period of week ending 12/02/06 through week ending 3/10/07. During this period, Ms. Davis was assigned to Store A562 in New Jersey.

8.  Attached as Exhibit 3 are true and accurate copies of spread sheets recording the Time & Attendance of Shoneca Davis for the time period of week ending 12/02/06 through week ending 3/10/07. This Exhibit also includes reference to Shane Miller, who I understand is or has been a plaintiff in this litigation.

9.  The time period covered by Exhibits 2 and 3 is 15 weeks. For 12 of those weeks, Ms. Davis recorded 40 hours each week, which sometimes included vacation or personal time (for example, weeks ending 2/10/07 and 2/24/07) and sometimes included sick leave (for example, week ending 1/13/07) . For the other 3 weeks in this 15 week period, she recorded 22, 38.5 and 41 hours, respectively. The 41 hour week (week ending 02/17/07) included 16 hours of vacation. Thus, according to her own time sheets, Ms. Davis did not actually work more than 40 hours in any of these 15 weeks.

10.  Attached as Exhibit 4 are true and accurate copies of Time & Attendance Punch Summary Reports for Shoneca Davis for the time period 03/11/07 to 08/07/07 (her last day of attendance). She worked at the Fifth Avenue Store in New York during this time period, which covers 22 weeks. For 17 weeks, this punch summary shows 8 and 40 hours per week. For 5 weeks, this punch summary shows more than 40 hours per week, as follows:

3

| | |
|---|---|
| Week ending 05/12/07: | 44:25 |
| Week ending 05/19/07: | 40.50 |
| Week ending 06/09/07: | 44.00 |
| Week ending 06/23/07: | 40.25 |
| Week ending 07/28/07: | 41.00 |

For the 22 week period covered by this Exhibit, this punch summary shows an average of 30.24 hours per week. Regardless, Ms. Davis was paid her full salary and supplemental pay for hours over 40 in a work week.

**Dawud Eudelle**

11. Dawud Eudelle was hired on September 18, 2005. He began work at Store A529 (South Street Seaport). On January 29, 2006, he transferred to Store A936 (Fifth Avenue Flagship) in New York.

12. Attached as Exhibit 5 are true and accurate copies of "Paycheck Detail" records for Mr. Eudelle for biweekly paychecks issued from October 1, 2005 to December 23, 2006. As noted above, prior to November 26, 2006, when Mr. Eudelle and all LP Agents were paid based on salary rather than actual hours worked, the field on the "Paycheck Detail" record automatically defaulted to show 90 hours per two week-period; however, this field was not used or intended to show actual hours worked before November 26, 2006.

13. Attached as Exhibit 6 are true and accurate copies of Payroll Timesheets for Dawud Eudelle (identified on this exhibit at times as "Dawud" or "Dawud E") for Store A936, the Fifth Avenue Store, for weeks ending August 5, 2006 to November 25, 2006. Note that this Exhibit also includes time entries for David Pomales (identified on the exhibit at times as "David" or "David P"). During this time period, Payroll Timesheets in this format were used at the Fifth Avenue Store but not at other Abercrombie stores. This was before the LPAs received supplemental pay.

4

14.     Attached as Exhibit 7 are true and accurate copies of Time & Attendance Punch

Summary Reports for Dawud Eudelle for the time period 11/26/06 to 3/08/08.  For 33 weeks,

this punch summary shows between 0 and 39 hours per week.  For the remaining 28 weeks, this

punch summary shows more than 40 hours per week, as follows:

| | |
|---|---|
| Week ending 12/23/06: | 40.50 |
| Week ending 01/13/07: | 40.25 |
| Week ending 02/03/07: | 44.50 |
| Week ending 02/10/07: | 43.50 |
| Week ending 02/24/07: | 43.50 |
| Week ending 03/03/07: | 42.25 |
| Week ending 03/17/07: | 42.50 |
| Week ending 03/31/07: | 45.50 |
| Week ending 05/26/06: | 43.50 |
| Week ending 06/09/07: | 42.50 |
| Week ending 06/16/07: | 42.25 |
| Week ending 07/14/07: | 42.75 |
| Week ending 07/28/07: | 41.00 |
| Week ending 08/05/07: | 47.75 |
| Week ending 08/18/07: | 42.00 |
| Week ending 08/25/07: | 42.25 |
| Week ending 09/01/07: | 42.75 |
| Week ending 09/15/07: | 43.00 |
| Week ending 09/29/07: | 42.25 |
| Week ending 10/06/07: | 41.50 |
| Week ending 10/13/07: | 43.75 |
| Week ending 11/10/27: | 44.75 |
| Week ending 11/17/07: | 43.75 |
| Week ending 12/15/07: | 49.25 |
| Week ending 01/12/08: | 42.25 |
| Week ending 01/19/08: | 44.75 |
| Week ending 02/23/08: | 44.00 |
| Week ending 03/01/08: | 44.25 |

For the 61 week time period covered by this Exhibit, this punch summary shows an

average of 36.01 hours per week.  Regardless, Mr. Eudelle was paid his full salary and

supplemental pay for hours over 40 in a work week.

**JacLyn Pagnotta**

15.      JacLyn Pagnotta was hired on June 8, 2006.  She began work at Store A529 (South Street Seaport).  On January 3, 2007, she transferred to Store A936 (Fifth Avenue Flagship) in New York.  On March 11, 2007, she gave notice of her resignation effective March 26, 2007.

16.      Attached as Exhibit 8 are true and accurate copies of "Paycheck Detail" records for Ms. Pagnotta for biweekly paychecks issued from June 10, 2006 to December 23, 2006.  As noted above, prior to November 26, 2006, when Ms. Pagnotta and all LP Agents were paid based on salary rather than actual hours worked, the field on the "Paycheck Detail" record automatically defaulted to show 45 hours per week or 90 hours per two week-period; however, this field was not used or intended to show actual hours worked before November 26, 2006.

17.      Attached as Exhibit 9 are true and accurate copies of time sheets signed by JacLyn Pagnotta for the time period of week ending 12/02/06 through week ending 12/23/06.  During this period, Ms. Pagnotta was assigned to Store A529, the South Street Seaport store.

18.      Attached as Exhibit 10 are true and accurate copies of Time & Attendance Punch Summary Reports for JacLyn Pagnotta for the time period 1/4/07 to 3/17/07.  During this 10-week period, Ms. Pagnotta was assigned to Store A936, the Fifth Avenue Store.  For 8 weeks, this punch summary shows between 12.75 and 40 hours per week.  For the other 2 weeks, this punch summary shows more than 40 hours per week, as follows:

        Week ending 01/13/07:       40.25
        Week ending 02/10/07:       40.75

For the 10 week period covered by this Exhibit, this punch summary shows an average of 32.68 hours per week.  Regardless, Ms. Pagnotta was paid her full salary and supplemental pay for hours over 40 in a work week.

6

**David Pomales**

19.    David Pomales was hired on July 31, 2005.  He began work at Store A529 (South Street Seaport).  On October 3, 2005, he transferred to Store A936 (Fifth Avenue Flagship) in New York.

20.    Attached as Exhibit 11 are true and accurate copies of "Paycheck Detail" records for Mr. Pomales for biweekly paychecks issued from August 6, 2005 to December 23, 2006.  As noted above, prior to November 26, 2006, when Mr. Pomales and all LP Agents were paid based on salary rather than actual hours worked, the field on the "Paycheck Detail" record automatically defaulted to show 90 hours per two week-period; however, this field was not used or intended to show actual hours worked before November 26, 2006.

21.    Attached as Exhibit 12 are true and accurate copies of Payroll Timesheets for David Pomales (identified on this exhibit at times as "David" or "David P") for Store A936, the Fifth Avenue Store, for weeks ending July 29, 2006 to November 25, 2006.  Note that this Exhibit also includes time entries for Dawud Eudelle (identified on the exhibit as "Dawud" or "Dawud E").  During this time period, Payroll Timesheets in this format were used at the Fifth Avenue Store but not at other Abercrombie stores.  This was before the LPAs received supplemental pay.

22.    Attached as Exhibit 13 are true and accurate copies of Time & Attendance Punch Summary Reports for David Pomales for the time period 11/26/06 to 3/08/08.  For 41 weeks, this punch summary shows between 0 and 40 hours per week.  For the remaining 24 weeks, this punch summary shows more than 40 hours per week, as follows:

|                        |       |
| Week ending 12/16/06:  | 40.75 |
| Week ending 01/27/07:  | 40.25 |
| Week ending 02/03/07:  | 40.25 |
| Week ending 02/10/07:  | 40.25 |

7

| | |
|---|---|
| Week ending 04/07/07: | 41.25 |
| Week ending 04/21/07: | 41.75 |
| Week ending 06/09/07: | 40.75 |
| Week ending 06/16/07: | 41.50 |
| Week ending 06/23/07: | 41.00 |
| Week ending 06/30/07: | 41.25 |
| Week ending 07/21/07: | 41.25 |
| Week ending 08/11/07: | 42.00 |
| Week ending 08/18/07: | 43.50 |
| Week ending 08/25/07: | 40.50 |
| Week ending 09/15/07: | 40.75 |
| Week ending 09/22/07: | 40.50 |
| Week ending 10/06/07: | 40.75 |
| Week ending 10/20/07: | 41.50 |
| Week ending 10/27/07: | 40.25 |
| Week ending 11/03/07: | 40.75 |
| Week ending 11/10/07: | 40.25 |
| Week ending 11/17/07: | 40.25 |
| Week ending 01/12/08: | 41.50 |
| Week ending 03/01/08: | 40.25 |

For the 65 weeks covered by this Exhibit, this punch summary shows an average of 35.12 hours per week.  Regardless, Mr. Pomales was paid his full salary and supplemental pay for hours over 40 in a work week.

_____
Amy Dury

_____
08-08-08
Date





Enterprise screen print as of: Feb 29 08:49

EXHIBIT
1

ANF000009



Enterprise screen print as of: Feb 29 08:49





Enterprise screen print as of: Feb 29 08:49

ANF000007



Enterprise screen print as of: Feb 29 08:49

ANF000006





Enterprise screen print as of: Feb 29 08:49

ANF000005



Enterprise screen print as of: Feb 29 08:49

ANF000004



Enterprise screen print as of: Feb 29 08:49

ANF000003



Enterprise screen print as of: Feb 29 08:49

ANF000002



Enterprise screen print as of: Feb 29 08:49

ANF000001

12/04/2006 MON 11:15  FAX 973 376 7359 The Mall at Short Hills                    ☑001/001

EXHIBIT
2

SYDNECA DAVIS
STORE 562 A.e.f          SS 059 586969

WEEK ENDING DATE: 12-2-06

Loss Prevention Time Sheet

FROM : WISDOM:PHARMACY          PHONE NO. : 201 451 3431          Dec. 11 2006 11:24AM P1





FROM : WISDOM:PHARMACY          PHONE NO. : 201 451 3431          Dec. 18 2006 12:00PM P3

WEEK ENDING DATE: 12-23 06

Shoneca Davis

SS# 059586964

608006

Loss Preven... Joe Short

Chance Cel

Completed time sheets are due every Monday by noon local time.

Eastern Zone: fax to Amy Dury (814) 285-8677.

Western Zone: fax to LP Office (614) 285-6740.

Reminders: One lines ahed per week

Write in your lunch times, including break period.

Daily HRS is the total hours worked in the day. Round to the nearest quarter day, i.e. 7.25, 7.5A, 1.75, 8.

Regular hours total is the sum of the 7 days worked for the week.

Comments column is for any vacation, personal, or sick days used and also include in Daily HRS each day.

Signature is needed.

01/08/2007 MON 15:18  FAX 973 376 7359 The Mall at Short Hills                                    @001/004



WEEK E...NG DATE: 07-06-07

Shonda Davis    05858967    608/06

REGULAR (CORE) TOTAL    TOTAL HOURS: 40

| | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| | | | | 11 8 8 | 9 8 | 11 8 8 | 11 8 8 |

Completed time sheets are due every Monday by noon local time.
Eastern Zone fax to Amy Dury (914) 288-8827.
Western Zone fax to LP Office (914) 283-6740.
Reminder: One time sheet per week.
Write in your hours taken, including break period.
Daily HRS is the total hours worked in the day, round to the nearest quarter day, i.e. 7.25, 7.50, 7.75, 8.
Regular hours total is the sum of the 7 days worked for the week.
Comments column is for any vacation, personal, or sick days used and also tradable in Daily HRS each day.
Signature is needed.



2007-01-21 17:46    Apple Bridgewater    (908) 541-1096 >> 17182471709    P 1/1







Feb. 03 2007 05:58PM P1    PHONE NO. : 201 451 3431    FROM : WISDOM:PHARMACY

02/10/2007  19:36    2012161538    USLIVENET    PAGE  01





02/26/2007 MON 11:07  FAX 973 376 7359 The Mall at Short Hills                    ☑001/001



03/11/2007  13:30    2012161638          USLIVENET                    PAGE  01



WEEK ENDING 12/2/06

Page 1

Eastve 12-02-06.xls

ANF000130

EXHIBIT
3

| SS # ASSOCIATE | STORE # | POSITION | RATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | CI | Day/HRS | MONDAY IN | OUT | CI | Day/HRS | TUESDAY IN | OUT | CI | Day/HRS | WEDNESDAY IN | OUT | CI | Day/HRS | THURSDAY IN | OUT | CI | Day/HRS | FRIDAY IN | OUT | CI | Day/HRS | SATURDAY IN | OUT | CI | Day/HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A562 Shoneca Davis Empk | | | | 40.00 | | | | | 10:00A | 3:00P | | | 11:50A | 2:00P | | | 8:00A | 12:00P | | | OFF | OFF | | | 10:45 | 3:30P | | | OFF | OFF | | | 11:00 | 3:00P | | |
| | | | | | | | | | 4:00PM | 7:00P | | 8.00 | 3:00P | 6:45P | | 7.75 | 1:00P | 5:00P | | 8.00 | OFF | OFF | | 8.00 | 4:00P | 8:00P | | 8.25 | OFF | OFF | | 0.00 | 4:00P | 8:00P | | 8.00 |
| A477 Shana Miller Empkd | | | | 40.00 | | | | | 8:00 | 1:00 | | | 11:00 | 4:00 | | | 6:00 | 2:00 | | | OFF | OFF | | | 10:00 | 2:30 | | | OFF | | | | 10:30 | 5:00 | | |
| | | | | | | | | | 2:00 | 6:00 | | | 6:00 | 8:00 | | 8.00 | 3:30 | 5:30 | | 8.00 | off | | | 0.00 | 3:30 | 7:00 | | 8.00 | off | | | | 6:00 | 7:00 | | 8.00 |

Loss Prevention Time Sheet

Page 1

**WEEN ENDING 12-09-06**

| ISS # / ASSOCIATE | STORE # | POSITION RATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | DayHRS | MONDAY IN | OUT | C | DayHRS | TUESDAY IN | OUT | C | DayHRS | WEDNESDAY IN | OUT | C | DayHRS | THURSDAY IN | OUT | C | DayHRS | FRIDAY IN | OUT | C | DayHRS | SATURDAY IN | OUT | C | DayHRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A477 Shana Miller / Emplid | | | 40.00 | | | | | 6:00 | 2:00 | | | 11:00 | 4:00 | | | 8:00 | 3:00 | | | off | | | | 12:00 | 2:00 | | | off | | | | 10:00 | 3:00 | | |
| | | | | | | | | 3:00 | 5:00 | | 8.00 | 5:00 | 8:00 | | 8.00 | 4:00 | 5:00 | | 8.00 | | | | 10.50 | 3:00 | 9:00 | | 8.00 | | | | 0.00 | 4:00 | 7:00 | | 8.00 |
| A562 Shoneca Davis / Emplid | | | 40.00 | | | | | 10:00A/7:00PM | | | 0.00 | 11:00AM/8:00PM | | | 8.00 | 8:00AM/5:00PM | | | 8.00 | 6:30PM/5:00AM | | | | | | | 0.00 | | | | 0.00 | 12:00PM/6:00PM | | | 5.50 |

ANF000131

Loss Prevention Time Sheet

Page 1

**WEEK ENDING DATE:    12/16/06**

| SS# ASSOCIATE | STORE # | POSITION RATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | Daily HRS | MONDAY IN | OUT | C | Daily HRS | TUESDAY IN | OUT | C | Daily HRS | WEDNESDAY IN | OUT | C | Daily HRS | THURSDAY IN | OUT | C | Daily HRS | FRIDAY IN | OUT | C | Daily HRS | SATURDAY IN | OUT | C | Daily HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller Empl# | | AK77 | 41.50 | | | | | 8:00 | 5:00 | | | off | | | | 8:00 | 5:00 | | 8.00 | off | | | | 10:00 | 7:00 | | 8.00 | 10:00 | 7:00 | | 8.00 | 10:00 | 7:00 | | 8.00 |
| Shonica Davis Empl# | | | 40.00 | | | | | 10:00 | 7:00 | | 8 | 11:00 | 8:00 | | 8 | 7:00 | 4:00 | | 8.00 | off | | | | off | | | | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 |

ANF000132

Loss Prevention Time Sheet

Page 1

WEEK ENDING DATE:     12/23/06

| SS #/ASSOCIATE | STORE # | POSITION/RATE | REGULAR HOURS/TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | Daily HRS | MONDAY IN | OUT | C | Daily HRS | TUESDAY IN | OUT | C | Daily HRS | WEDNESDAY IN | OUT | C | Daily HRS | THURSDAY IN | OUT | C | Daily HRS | FRIDAY IN | OUT | C | Daily HRS | SATURDAY IN | OUT | C | Daily HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller Emplk | A477 | | 40.75 | | | | | 10:00 | 7:00 | 9:30A/6:30P | 8.00 | off | | 12:00P/1:00P | 8 | 8:00 | 6:00 | 7:00A/4:00P | 8.00 | 10:00 | 7:00 | | 8.00 | off | | 11:00/8:00P | 8.00 | 10:00 | 7:00 | 12:00P/8:00P | 8.00 | | 7:00 | | 8.00 |
| Shonese Davis Emplk | A592 | | 38.50 | | | | | | | | | | | | | | | | 0.75 | | | | | | | | | | | | | | | 11:30A/6:00P | 6.50 |

ANF000133

Loss Prevention Time Sheet

Page 1

ANF000134

**WEEK ENDING DATE:    12/30/06**

| SS # / STORE # / POSITION RATE | ASSOCIATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | Daily HRS | MONDAY IN | OUT | C | Daily HRS | TUESDAY IN | OUT | C | Daily HRS | WEDNESDAY IN | OUT | C | Daily HRS | THURSDAY IN | OUT | C | Daily HRS | FRIDAY IN | OUT | C | Daily HRS | SATURDAY IN | OUT | C | Daily HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A477 | Shane Miller Emp# | 40.00 | | | | | 10:00 | 7:00 | | | Holiday | | | 8 | 8:00 | | | | 8:00 | off | | | | 12:00 | 9:00 | | | off | | | | 10:00 | 7:00 | | 8.00 |
| A562 | Shonega Davis Emp# | 22.00 | | | | | 10:00 | 7:00 | | | | | | 8 | | | | | 8:00 | 11:30 | 5:30P | | | | 5:00 | | | | | | | | 0.00 |

ANF000135

Loss Prevention Time Sheet

Page 1

**WEEK ENDING DATE:    1/6/07**

| SS # ASSOCIATE | STORE # | POSITION | DATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | Daily HRS | MONDAY IN | OUT | C | Daily HRS | TUESDAY IN | OUT | C | Daily HRS | WEDNESDAY IN | OUT | C | Daily HRS | THURSDAY IN | OUT | C | Daily HRS | FRIDAY IN | OUT | C | Daily HRS | SATURDAY IN | OUT | C | Daily HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller Emplk | A477 | | | 40.00 | | | | | 8:00 | 5:00 | | | holiday | | | | 8:00 | 5:00 | | 8.00 | off | | | | 12:00 | 9:00 | | 8.00 | off | | | | 12:00 | 8:00 | | 8.00 |
| Shoneca Davis Empld | H344 | | | 40.00 | | | | | off | | | | holiday | | | | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | 12:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 |

Loss Prevention Time Sheet

Page 1

**WEEK ENDING DATE:    1/13/07**

| SS# / ASSOCIATE | STORE# | POSITION / RATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS |
|---|---|---|---|---|---|---|---|
| Shana Miller / Empk | A477 | | 40.00 | | | | |
| Shanesa Davis / Empld | H344 | | 40.00 | | | | |

A N F 0 0 0 1 3 6

Page 1

Loss Prevention Time Sheet

**WEEK ENDING DATE: 01/20/2007**

| SS# ASSOCIATE | STORE# | POSITION RATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | Daily HRS | MONDAY IN | OUT | C | Daily HRS | TUESDAY IN | OUT | C | Daily HRS | WEDNESDAY IN | OUT | C | Daily HRS | THURSDAY IN | OUT | C | Daily HRS | FRIDAY IN | OUT | C | Daily HRS | SATURDAY IN | OUT | C | Daily HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller | A477 | | 40.00 | | | | | 9:00 | 6:00 | | | 10:00 | 7:00 | | | 8:00 | 6:00 | | | | | | | | | | | 10:00 | 7:00 | | 8.00 | | | | 4.75 |
| Emp Id | | | | | | | | | | | 8 | | | 16.00 | | | | 8.00 | | | | | | | | | | | | | | | | |
| Shoneca Davis | H344 | | 40.00 | | | | | 10:00 | 7:00 | | | | | | | 8:00 | 4:45 | | | | | | | | | | | 11:00 | 11:30 | | 11.50 | | 1:00 | 6:45 | |
| Emp k | | | | | | | | | | | 8 | | | | | | | 7.75 | | | | | | | | | | | | | | | | |

ANF000137

ANF000138

Loss Prevention Time Sheet

Page 1

**WEEK ENDING DATE: 1/27/07**

| ASSOCIATE | SS# | STORE# | POSITION DATE | REGULAR HOURS/TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | DaYHRS | MONDAY IN | OUT | C | DaYHRS | TUESDAY IN | OUT | C | DaYHRS | WEDNESDAY IN | OUT | C | DaYHRS | THURSDAY IN | OUT | C | DaYHRS | FRIDAY IN | OUT | C | DaYHRS | SATURDAY IN | OUT | C | DaYHRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller Emplk | | A477 | | 40.00 | | | | | 3:00 | 11:00 | | 8 | 6:00 | 3:00 | | 8 | 8:00 | 6:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 |
| Shonea Davis Emplk | | H844 | | 40.00 | | | | | 5:00 | 1:00 | | 8 | | | | | 7:45 | 4:45 | | 8.00 | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 |

Loss Prevention Time Sheet

Page 1

WEEK ENDING DATE: 2/3/07

| SS # / ASSOCIATE | STORE # | POSITION RATE | REGULAR HOURS/TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | Day/HRS | MONDAY IN | OUT | C | Day/HRS | TUESDAY IN | OUT | C | Day/HRS | WEDNESDAY IN | OUT | C | Day/HRS | THURSDAY IN | OUT | C | Day/HRS | FRIDAY IN | OUT | C | Day/HRS | SATURDAY IN | OUT | C | Day/HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller Empld | A477 | | 40.00 | | | | | 10:00 | 7:00 | | | 8:00 | | | | 8:00 | 5:00 | | 8.00 | 10:00 | 11:30 | | 1.50 | 12:00 | 8:00 | | 8.00 | 10:00 | 7:00 | | 8.00 | 11:00 | 8:30 | | 6.50 |
| Shnoeca Davis Empld | H344 | | 40.00 | | | | | | | | | 11:00 | 8:00 | | 8 | 7:45 | 4:45 | | 8.00 | 4:00 | 8:00 | | 4.00 | 8:30 | 3:30 | | 7.00 | 1:30 | 8:00 | | 7.00 | 11:00 | 5:00 | | 6.00 |

ANF000139

Loss Prevention Time Sheet

Page 1

WEEK ENDING DATE:    2/10/07

| SS # ASSOCIATE | STORE # | POSITION | RATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | Daily HRS | MONDAY IN | OUT | C | Daily HRS | TUESDAY IN | OUT | C | Daily HRS | WEDNESDAY IN | OUT | C | Daily HRS | THURSDAY IN | OUT | C | Daily HRS | FRIDAY IN | OUT | C | Daily HRS | SATURDAY IN | OUT | C | Daily HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller | A477 | | | 40.00 | | | | | 8:00 | 6:00 | | 8 | | | | | 8:00 | 5:00 | | 8.00 | 12:00 | 9:00 | | 8.00 | | | | | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 |
| Empl#: | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Shoneca Davis | H344 | | | 40.00 | | | | | Personal | 8:00 | | 8 | 11:00 | 8:00 | | 8 | 11:00 | 8:00 | | 8.00 | | | | 8.00 | | | | | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 |
| Empl#: | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ANF000140

Loss Prevention Time Sheet

Page 1

WEEK ENDING DATE:    2/17/07

| SS # | STORE # | POSITION | RATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | SUNDAY OUT | C | Daly HRS | MONDAY IN | MONDAY OUT | C | Daly HRS | TUESDAY IN | TUESDAY OUT | C | Daly HRS | WEDNESDAY IN | WEDNESDAY OUT | C | Daly HRS | THURSDAY IN | THURSDAY OUT | C | Daly HRS | FRIDAY IN | FRIDAY OUT | C | Daly HRS | SATURDAY IN | SATURDAY OUT | C | Daly HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASSOCIATE | AA77 | | | 40.00 | | | | | 9:00 | 6:00 | | 8 | | 12:00 | | | 6:00 | 5:00 | | 8.00 | | | | | 12:00 | 9:00 | | 8.00 | 10:00 | 7:00 | | 8.00 | | 8.00 | | |
| Steine Miller | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Emp/K | H844 | | | 41.00 | | | | | 6:30 | 12:00 | | 6.5 | 12:00 | 10:30 | | 10.5 | 7:45 | 4:15 | | 8.00 | Vaca | | | 8.00 | Vaca | | | 8.00 | | | | | | | | |
| Shoneca Davis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Emp/d | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ANF000141

Loss Prevention Time Sheet

Page 1

ANF000142

**WEEK ENDING DATE:    New England  02/24/2007**

| SS# / ASSOCIATE | STORE # / POSITION RATE | REGULAR HOURS TOTAL | OVERTIME HOURS | CODE | HOURS | TOTAL HOURS | SUNDAY IN | OUT | C | Day/HRS | MONDAY IN | OUT | C | Day/HRS | TUESDAY IN | OUT | C | Day/HRS | WEDNESDAY IN | OUT | C | Day/HRS | THURSDAY IN | OUT | C | Day/HRS | FRIDAY # | IN | OUT | C | Day/HRS | SATURDAY IN | OUT | C | Day/HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller | A477 | 40.00 | | | | | | | | | | | | | 8:00 | 5:00 | | 8.00 | 10:00 | 7:00 | | 6.00 | 12:00 | 9:00 | | 8.00 | 10:00 | 7:00 | | 8.00 | 11:00 | 8:00 | | 8.00 |
| Emp# | | | | | | | vaca | | | | vaca | | | | | | | | | | | | | | | | | 2:15 | 8:15 | | | 10:45 | 8:15 | | |
| Shonea Davis | h344 | 40.00 | | | | | vaca | | | 8 | vaca | | | 8 | vaca | | | 8.50 | | | | 6.00 | | | | | | | 6.00 | | | | 6.00 | | | 8.50 |
| Emp# | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ANF000143

Loss Prevention Time Sheet

Page 1

**WEEK ENDING DATE:  3/3/07**

| SS# / ASSOCIATE | STORE # | POSITION RATE | REGULAR HOURS TOTAL | SUNDAY IN | OUT | O | Daily HRS | MONDAY IN | OUT | O | Daily HRS | TUESDAY IN | OUT | O | Daily HRS | WEDNESDAY IN | OUT | O | Daily HRS | THURSDAY IN | OUT | O | Daily HRS | FRIDAY IN | OUT | O | Daily HRS | SATURDAY IN | OUT | O | Daily HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller / Empl id | A477 | | 40.00 | | | | | 10:00 | 7:00 | | 8 | 8:00 | 5:00 | | 8.00 | 10:00 | 7:00 | | 8 | | | | | 10:00 | 5:00 | | 8.00 | 10:00 | 7:00 | | 8.00 |
| Shoneca Davis / Empl id | H344 | | 40.00 | | | | | 11:00 | 8:00 | | 8 | 7:45 | 4:45 | | 8.00 | | | | | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 |

Loss Prevention Time Sheet

Page 1

WEEK ENDING DATE:    3/10/07

| ASSOCIATE | SS#/STORE# | POSITION RATE | REGULAR HOURS TOTAL | SUNDAY IN | OUT | C | Daily HRS | MONDAY IN | OUT | C | Daily HRS | TUESDAY IN | OUT | C | Daily HRS | WEDNESDAY IN | OUT | C | Daily HRS | THURSDAY IN | OUT | C | Daily HRS | FRIDAY IN | OUT | C | Daily HRS | SATURDAY IN | OUT | C | Daily HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shane Miller Emplid | A477 | | 40.00 | 9:00 | 6:00 | | 8 | 10:00 | 7:00 | | 8 | 8:00 | 5:00 | | 8.00 | | | | | 11:00 | 8:00 | | 8.00 | | | | | 10:00 | 7:00 | | 8.00 |
| Shoneca Davis Emplid | H344 | | 40.00 | 10:00 | 7:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | | | | | | | | | 11:00 | 8:00 | | 8.00 | 11:00 | 8:00 | | 8.00 | Personal | | | 8.00 |

ANF000144

Abercrombie & Fitch Trading Co.

STORE:  STR0936 - FIFTH AVENUE NY-ANF

Time & Attendance
Punch Summary Report

EXHIBIT 4

ANF000103

**EMPLOYEE NAME and ID (by SSN):** DAVIS,SHONECA L (000)

### Week of 3/11/2007 – 3/17/2007

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 3/11 | | | |
| Monday 3/12 | 12:00 p / 05:00 p | 04:00 p / 09:00 p | 8.00 |
| Tuesday 3/13 | 12:00 p / 04:00 p | 03:00 p / 09:00 p | 8.00 |
| Wednesday 3/14 | 10:00 p / 04:00 a | 03:00 a / 07:00 a | 8.00 |
| Thursday 3/15 | 10:00 p / 04:00 a | 03:00 a / 07:00 a | 8.00 |
| Friday 3/16 | | | |
| Saturday 3/17 | 01:00 p / 08:00 p | 05:00 p / 10:00 p | 8.00 |
| **Week Totals** | | | **40.00** |

### Week of 3/18/2007 – 3/24/2007

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 3/18 | | | |
| Monday 3/19 | | | |
| Tuesday 3/20 | 10:00 p / 05:00 a | 04:14 a / 08:55 a | 8.25 |
| Wednesday 3/21 | 10:07 p | 05:00 a | 7.00 |
| Thursday 3/22 | | | |
| Friday 3/23 | | | |
| Saturday 3/24 | | | |
| **Week Totals** | | | **15.25** |

### Week of 3/25/2007 – 3/31/2007

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 3/25 | | | |
| Monday 3/26 | | | |
| Tuesday 3/27 | | | |
| Wednesday 3/28 | | | |
| Thursday 3/29 | | | |
| Friday 3/30 | | | |
| Saturday 3/31 | 08:28 a / 05:00 a | 04:32 a / 10:32 a | 12.50 |
| **Week Totals** | | | **12.50** |

### Week of 4/1/2007 – 4/7/2007

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 4/1 | | | |
| Monday 4/2 | 11:55 a | 08:08 p | 8.25 |
| Tuesday 4/3 | 12:58 p / 08:00 p | 05:04 p / 10:00 p | 8.00 |
| Wednesday 4/4 | 09:58 p | 08:28 a | 8.50 |
| Thursday 4/5 | 10:14 p | 06:39 a | 8.50 |
| Friday 4/6 | | | |
| Saturday 4/7 | 03:24 p | 10:13 p | 6.75 |
| **Week Totals** | | | **40.00** |

### Week of 4/8/2007 – 4/14/2007

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 4/8 | | | |
| Monday 4/9 | 09:07 p | 05:09 a | 8.00 |
| Tuesday 4/10 | 08:33 a / 11:00 p | 10:53 p / 05:09 a | 7.50 |
| Wednesday 4/11 | 08:29 a / 12:00 a | 11:10 p / 04:07 a | 4.75 |
| Thursday 4/12 | | | |
| Friday 4/13 | | | |
| Saturday 4/14 | | | |
| **Week Totals** | | | **20.25** |

### Week of 4/15/2007 – 4/21/2007

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 4/15 | | | |
| Monday 4/16 | | | |
| Tuesday 4/17 | | | |
| Wednesday 4/18 | | | |
| Thursday 4/19 | | | |
| Friday 4/20 | 09:55 p | 05:04 p | 7.25 |
| Saturday 4/21 | 06:05 a / 10:30 a | 09:05 p / 05:20 a | 8.25 |
| **Week Totals** | | | **32.25** |

### Week of 4/22/2007 – 4/28/2007

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 4/22 | 09:57 p | 05:27 a | 7.50 |
| Monday 4/23 | 06:25 a / 11:00 p | 10:57 p / 05:17 a | 7.75 |
| Tuesday 4/24 | 09:00 p | 05:09 a | 8.25 |
| Wednesday 4/25 | 06:00 a / 11:00 p | 10:55 p / 05:48 a | 8.50 |
| Thursday 4/26 | 06:31 a | | 0.50 |
| Friday 4/27 | | | |
| Saturday 4/28 | 08:00 p | 12:33 p | 15.50 |
| **Week Totals** | | | **40.00** |

ANF000104

**EMPLOYEE NAME and ID (by SSN)** — DAVIS,SHONECA L (000)

| | Sunday 4/29/2007 | | | Monday 4/30/2007 | | | Tuesday 5/1/2007 | | | Wednesday 5/2/2007 | | | Thursday 5/3/2007 | | | Friday 5/4/2007 | | | Saturday 5/5/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| | 09:38 p | 05:21 a | 7.75 | 08:39 a | 09:41 p | | | | | 09:29 p | 05:07 a | 7.75 | 06:30 a | | 0.50 | 10:01 p | 01:02 a | | 09:28 p | 05:19 a | 7.75 | 39.00 |
| | | | | 10:00 p | 05:16 a | 8.25 | | | | | | | | | | 02:00 a | 06:00 a | 7.00 | | | | |

**EMPLOYEE NAME and ID (by SSN)** — DAVIS,SHONECA L (000)

| | Sunday 5/6/2007 | | | Monday 5/7/2007 | | | Tuesday 5/8/2007 | | | Wednesday 5/9/2007 | | | Thursday 5/10/2007 | | | Friday 5/11/2007 | | | Saturday 5/12/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| | 09:35 p | 05:02 a | 7.50 | 08:31 a | 09:27 p | | | | | 09:27 p | 05:05 a | 7.75 | 08:32 a | 09:02 p | | 08:24 a | | 0.50 | 09:30 p | 04:54 a | | 44.25 |
| | | | | 10:00 p | 05:13 a | 8.25 | | | | | | | 10:00 p | 05:09 a | 7.75 | | | | 05:50 a | 10:54 a | 12.50 | |

**EMPLOYEE NAME and ID (by SSN)** — DAVIS,SHONECA L (000)

| | Sunday 5/13/2007 | | | Monday 5/14/2007 | | | Tuesday 5/15/2007 | | | Wednesday 5/16/2007 | | | Thursday 5/17/2007 | | | Friday 5/18/2007 | | | Saturday 5/19/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| | 10:30 p | 08:28 a | 8.00 | 09:30 p | 05:12 a | 7.75 | 06:30 a | | 0.50 | 09:30 p | 05:05 a | 7.50 | 08:39 a | 09:32 p | | 06:28 a | | 0.50 | 09:30 p | 05:43 a | 8.25 | 40.50 |
| | | | | | | | | | | | | | 10:20 p | 05:09 a | 8.00 | | | | | | | |

**EMPLOYEE NAME and ID (by SSN)** — DAVIS,SHONECA L (000)

| | Sunday 5/20/2007 | | | Monday 5/21/2007 | | | Tuesday 5/22/2007 | | | Wednesday 5/23/2007 | | | Thursday 5/24/2007 | | | Friday 5/25/2007 | | | Saturday 5/26/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| | 09:28 p | 03:15 a | | 06:50 p | 03:58 a | | | | | | | | 10:58 a | 08:05 p | | | | | | | | 23.75 |
| | 04:00 a | 06:03 a | 7.75 | 05:01 a | 06:59 a | 8.00 | | | | | | | 04:03 p | 08:02 p | 8.00 | | | | | | | |

**EMPLOYEE NAME and ID (by SSN)** — DAVIS,SHONECA L (000)

| | Sunday 5/27/2007 | | | Monday 5/28/2007 | | | Tuesday 5/29/2007 | | | Wednesday 5/30/2007 | | | Thursday 5/31/2007 | | | Friday 6/1/2007 | | | Saturday 6/2/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| | | | | 09:58 a | 03:05 p | | 11:58 a | 08:04 p | 8.00 | | | | 09:53 p | 02:03 a | | 09:49 p | 04:07 a | | | | | 32.50 |
| | | | | 04:08 p | 07:07 p | 8.25 | | | | | | | 03:01 a | 06:55 a | 8.00 | 05:01 a | 06:52 a | 8.25 | | | | |

**EMPLOYEE NAME and ID (by SSN)** — DAVIS,SHONECA L (000)

| | Sunday 6/3/2007 | | | Monday 6/4/2007 | | | Tuesday 6/5/2007 | | | Wednesday 6/6/2007 | | | Thursday 6/7/2007 | | | Friday 6/8/2007 | | | Saturday 6/9/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| | 11:41 a | 03:48 p | | 11:58 a | 03:52 p | | 11:00 a | 03:57 p | | | | | | | | 09:46 p | 05:44 a | 8.00 | 09:54 p | 04:04 a | | 44.00 |
| | 04:49 p | 09:01 p | 8.25 | 04:48 p | 09:11 p | 8.25 | 04:54 p | 08:17 p | 8.25 | | | | | | | | | | 05:05 a | 10:04 a | 11.25 | |

**EMPLOYEE NAME and ID (by SSN)** — DAVIS,SHONECA L (000)

| | Sunday 6/10/2007 | | | Monday 6/11/2007 | | | Tuesday 6/12/2007 | | | Wednesday 6/13/2007 | | | Thursday 6/14/2007 | | | Friday 6/15/2007 | | | Saturday 6/16/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| | | | | | | | | | | | | | 01:00 p | 08:07 p | | 08:56 p | 04:17 a | | 09:47 p | 05:10 a | 7.50 | 23.75 |
| | | | | | | | | | | | | 07:00 p | 10:03 p | 8.25 | 05:15 a | 06:53 a | 8.00 | | | | |

**EMPLOYEE NAME and ID (by SSN): DAVIS,SHONECA L (000)**

| | Sunday 6/17/2007 | | | Monday 6/18/2007 | | | Tuesday 6/19/2007 | | | Wednesday 6/20/2007 | | | Thursday 6/21/2007 | | | Friday 6/22/2007 | | | Saturday 6/23/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 09:45 p | 04:34 a | | 09:50 p | 05:00 a | 7.25 | 08:11 a | | 0.75 | | | | 11:59 a | 04:09 p | | 09:58 a | 03:04 p | | 11:03 a | 04:24 p | | |
| | 05:27 a | 06:48 a | 8.25 | | | | | | | | | | 05:00 p | 09:04 p | 8.25 | 04:01 p | 06:37 p | 7.76 | 05:11 p | 07:53 p | 8.00 | 40.25 |

| | Sunday 6/24/2007 | | | Monday 6/25/2007 | | | Tuesday 6/26/2007 | | | Wednesday 6/27/2007 | | | Thursday 6/28/2007 | | | Friday 6/29/2007 | | | Saturday 6/30/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 08:53 p | 06:31 a | 7.75 | | | | 06:38 a | | 0.25 | | | | 11:51 a | 04:23 p | | 10:58 a | 05:00 p | 6.00 | 11:01 a | 02:55 p | | |
| | | | | | | | | | | | | | 05:20 p | 08:52 p | 8.00 | | | | 03:55 p | 08:16 p | 8.25 | 30.25 |

| | Sunday 7/1/2007 | | | Monday 7/2/2007 | | | Tuesday 7/3/2007 | | | Wednesday 7/4/2007 | | | Thursday 7/5/2007 | | | Friday 7/6/2007 | | | Saturday 7/7/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | 09:52 p | 06:47 a | 9.00 | 09:50 p | 02:46 a | | | | | | | | 10:53 a | 03:11 p | | 11:01 a | 03:11 p | 8.00 | |
| | | | | | | | 03:33 a | 08:17 a | 7.75 | | | | | | | 04:00 p | 07:49 p | 8.00 | | | | 32.76 |

| | Sunday 7/8/2007 | | | Monday 7/9/2007 | | | Tuesday 7/10/2007 | | | Wednesday 7/11/2007 | | | Thursday 7/12/2007 | | | Friday 7/13/2007 | | | Saturday 7/14/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 09:50 a | 02:20 p | | 09:55 p | 05:10 a | 7.25 | 08:11 a | 09:18 p | | | | | | | | | | | | | | |
| | 03:18 p | 06:57 p | 8.25 | | | | 10:00 p | 02:33 a | | | | | | | | | | | | | | |
| | | | | | | | 03:28 a | 08:47 a | 9.00 | | | | | | | | | | | | | 24.50 |

| | Sunday 7/15/2007 | | | Monday 7/16/2007 | | | Tuesday 7/17/2007 | | | Wednesday 7/18/2007 | | | Thursday 7/19/2007 | | | Friday 7/20/2007 | | | Saturday 7/21/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | | | | | | | 09:43 a | 01:59 p | | | | | 12:53 p | 08:57 p | 8.00 | |
| | | | | | | | | | | | | | 02:55 p | 08:52 p | 8.25 | | | | | | | 16.25 |

| | Sunday 7/22/2007 | | | Monday 7/23/2007 | | | Tuesday 7/24/2007 | | | Wednesday 7/25/2007 | | | Thursday 7/26/2007 | | | Friday 7/27/2007 | | | Saturday 7/28/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 08:53 a | 03:03 p | | 09:51 p | 06:48 a | 9.00 | | | | | | | 11:57 a | 03:57 p | | 08:54 a | 03:32 p | | 01:04 p | 08:59 p | 8.00 | |
| | 04:00 p | 06:54 p | 8.00 | | | | | | | | | | 04:54 p | 08:55 p | 8.00 | 04:35 p | 07:02 p | 8.00 | | | | 41.00 |

| | Sunday 7/29/2007 | | | Monday 7/30/2007 | | | Tuesday 7/31/2007 | | | Wednesday 8/1/2007 | | | Thursday 8/2/2007 | | | Friday 8/3/2007 | | | Saturday 8/4/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 08:43 a | 02:08 p | | 09:51 a | 04:30 a | | | | | | | | 11:53 a | 04:16 p | | | | | | | | |
| | 03:07 p | 06:44 p | 8.00 | 05:27 a | 06:45 a | 8.00 | | | | | | | 05:00 p | 08:58 p | 8.25 | | | | | | | 24.25 |

ANF000105

ANF000106

| EMPLOYEE NAME and ID (by SSN) | Sunday 8/5/2007 | | | Monday 8/6/2007 | | | Tuesday 8/7/2007 | | | Wednesday 8/8/2007 | | | Thursday 8/9/2007 | | | Friday 8/10/2007 | | | Saturday 8/11/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| DAVIS,SHONECAL (000) | | | | 09:54 p | 05:00 a | 7.00 | 06:01 a | 07:01 a | 1.00 | | | | | | | | | | | | | 8.00 |

Dawud Eudelle Pay Summary



EXHIBIT
5

ANF000034

Dawud Eudelle Pay Summary





ANF000033

Dawud Eudelle Pay Summary



Dawud Eudelle Pay Summary





ANF000031

Dawud Eudelle Pay Summary





ANF000030

## Dawud Eudelle Pay Summary





ANF000029

Dawud Eudelle Pay Summary





ANF000028

Dawud Eudelle Pay Summary



ANF000027

Dawud Eudelle Pay Summary





ANF000026

Dawud Eudelle Pay Summary





ANF000025

Dawud Eudelle Pay Summary





ANF000024

Dawud Eudelle Pay Summary





ANF000023

Dawud Eudelle Pay Summary





ANF000022

Dawud Eudelle Pay Summary



Dawud Eudelle Pay Summary





ANF000020

Dawud Eudelle Pay Summary





A N F 0 0 0 0 1 9

Dawud Eudelle Pay Summary





ANF000018



ANF000057

**Abercrombie and Fitch**
Payroll Timesheet
Store:
Week Ending: 8-9-06

| Associate Name: | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | | | |
| David P. | 1:00 | 9:00 | 3:00 | 4:00 | 7:01 | 6:30 | 1:00 | 2:00 | | | 3:00 | 4:30 | | 7:00 | 4:00 | 5:00 | | | | | | 1:00 | | 15:00 | | | | | | | |

| Associate Name: | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | Time In: | Time Out: | Lunch Out: | Lunch In: | | | |
| Dawud E. | 7:54 | 4:14 | 2 | 2 | | | | | 9:51 | 7:00 | 3:30 | 4:30 | 9:41 | 7:00 | 8:30 | 4:20 | 9:30 | 1:00 | 8:13 | 3:45 | 4:15 | | 8:15 | 1:0 | 10:15 | 6:34 | 2:5 | 2:45 | | | |

ANF000059



Abercrombie and Fitch
Payroll Timesheet
Store: 936
Week Ending: 8/12/06

ANF000061

# Abercrombie and Fitch
## Payroll Timesheet
Store:
Week Ending: 6/16/06

**Associate Name:** David P

**Associate Name:** Dawud E

ANF000063



ANF000066



## Abercrombie and Fitch
Payroll Timesheet
Store: 93
Week Ending: 8/9/02

ANF000067



Abercrombie and Fitch
Payroll Timesheet
Store:
Week Ending: 9/16/06

ANF000069



ANF000071

# Abercrombie and Fitch
Payroll Timesheet
Store:
Week Ending: 10/07/06

| Associate Name: | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | | | |
| David Ponce | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Associate Name: | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | | | |
| DAWDE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Associate Name: | Sunday | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | Time In: | Time Out: | Lunch Out | Lunch In: | | | |

ANF000073



ANF000074



Abercrombie and Fitch
Payroll Timesheet
Store:
Week Ending: 10/21

ANF000075

**Abercrombie and Fitch**
Payroll Timesheet
Store:
Week Ending: 10|28

| | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Associate Name: | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | | | |
| Dav'd | 11 | 8 | | | | | | | | | | | 6:50 | | | | | | | | | | | | | | | | | | |

| | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Associate Name: | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | | | |
| DAviá.E | 9:15 | | 2:30 | 13 b | 10:15 | 7:57 | 4 | | 9:53 | | 4 | | | | | | | | | | | | | | | | | | | | |



Abercrombie and Fitch
Payroll Timesheet
Store:
Week Ending:

ANF000077





Abercrombie and Fitch
Payroll Timesheet
Store:
Week Ending:

ANF000079

Abercrombie & Fitch Trading Co.

STORE: STR0936 - FIFTH AVENUE NY-ANF

Time & Attendance Punch Summary Report

EXHIBIT 7

ANF000107

**EMPLOYEE NAME and ID (by SSN)** — EUDELLE,DAWUD (000)

| | Sunday 11/26/2006 In / Out / Hrs | Monday 11/27/2006 In / Out / Hrs | Tuesday 11/28/2006 In / Out / Hrs | Wednesday 11/29/2006 In / Out / Hrs | Thursday 11/30/2006 In / Out / Hrs | Friday 12/1/2006 In / Out / Hrs | Saturday 12/2/2006 In / Out / Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|
| | 09:58 p / 04:00 a | 10:13 p / 04:37 a | | | | | 10:11 p / 04:07 a / 11.00 | 34.75 |
| | 05:00 a / 07:29 a / 8.00 | 05:49 a / 07:02 a / 7.75 | | | | | 05:07 a / 10:07 a / 11.00 | |

**EMPLOYEE NAME and ID (by SSN)** — EUDELLE,DAWUD (000)

| | Sunday 12/3/2006 In / Out / Hrs | Monday 12/4/2006 In / Out / Hrs | Tuesday 12/5/2006 In / Out / Hrs | Wednesday 12/6/2006 In / Out / Hrs | Thursday 12/7/2006 In / Out / Hrs | Friday 12/8/2006 In / Out / Hrs | Saturday 12/9/2006 In / Out / Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|
| | 09:46 p / 05:09 a / 7.50 | | 06:00 a / 07:06 a / 1.00 | | 05:12 a / 06:53 a / 8.00 | | | 32.25 |

**EMPLOYEE NAME and ID (by Name)** — EUDELLE,DAWUD (000)

| | Sunday 12/10/2006 In / Out / Hrs | Monday 12/11/2006 In / Out / Hrs | Tuesday 12/12/2006 In / Out / Hrs | Wednesday 12/13/2006 In / Out / Hrs | Thursday 12/14/2006 In / Out / Hrs | Friday 12/15/2006 In / Out / Hrs | Saturday 12/16/2006 In / Out / Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|
| | 08:51 p / 04:08 a | 10:06 p / 04:08 a | | 10:00 a / 04:00 a | 10:00 p / 04:05 a | | | 32.00 |
| | 05:11 a / 06:58 a / 8.00 | 05:08 a / 07:05 a / 8.00 | | 05:00 a / 07:07 a / 8.00 | 05:04 a / 06:58 a / 8.00 | | | |

**EMPLOYEE NAME and ID (by Name)** — EUDELLE,DAWUD (000)

| | Sunday 12/17/2006 In / Out / Hrs | Monday 12/18/2006 In / Out / Hrs | Tuesday 12/19/2006 In / Out / Hrs | Wednesday 12/20/2006 In / Out / Hrs | Thursday 12/21/2006 In / Out / Hrs | Friday 12/22/2006 In / Out / Hrs | Saturday 12/23/2006 In / Out / Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|
| | 01:00 p / 06:07 p | 10:06 p / 04:01 a | | 06:45 p / 04:00 a | 09:50 p / 04:21 a | 08:57 p / 04:07 a | | 40.50 |
| | 07:06 p / 10:04 p / 8.00 | 05:01 a / 07:04 p / 8.00 | | 05:00 a / 07:06 a / 8.00 | 05:21 a / 07:09 a / 8.25 | 05:07 a / 07:01 a / 8.00 | | |

**EMPLOYEE NAME and ID (by Name)** — EUDELLE,DAWUD (000)

| | Sunday 12/24/2006 In / Out / Hrs | Monday 12/25/2006 In / Out / Hrs | Tuesday 12/26/2006 In / Out / Hrs | Wednesday 12/27/2006 In / Out / Hrs | Thursday 12/28/2006 In / Out / Hrs | Friday 12/29/2006 In / Out / Hrs | Saturday 12/30/2006 In / Out / Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|
| | 11:40 a / 04:00 p | 07:57 p / 01:55 a | 06:05 a / 07:06 a / 7.25 | | 09:52 p / 03:59 a | 09:56 p / 04:14 a | | 31.25 |
| | 05:00 p / 07:30 p / 6.75 | 02:55 a / 05:09 a / 8.25 | | | 05:00 a / 07:06 a / 8.00 | 06:14 a / 07:06 a / 8.25 | | |

**EMPLOYEE NAME and ID (by Name)** — EUDELLE,DAWUD (000)

| | Sunday 12/31/2006 In / Out / Hrs | Monday 1/1/2007 In / Out / Hrs | Tuesday 1/2/2007 In / Out / Hrs | Wednesday 1/3/2007 In / Out / Hrs | Thursday 1/4/2007 In / Out / Hrs | Friday 1/5/2007 In / Out / Hrs | Saturday 1/6/2007 In / Out / Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|
| | 02:30 p / 10:44 p / 8.25 | | | | 08:51 p / 04:17 a | 08:51 p / 04:17 a | 02:00 p / 11:00 p / 8.00 | 33.75 |
| | | | | | 05:09 a / 07:03 a / 8.25 | 05:09 a / 07:03 a / 8.25 | | |

**EMPLOYEE NAME and ID (by Name)** — EUDELLE,DAWUD (000)

| | Sunday 1/7/2007 In / Out / Hrs | Monday 1/8/2007 In / Out / Hrs | Tuesday 1/9/2007 In / Out / Hrs | Wednesday 1/10/2007 In / Out / Hrs | Thursday 1/11/2007 In / Out / Hrs | Friday 1/12/2007 In / Out / Hrs | Saturday 1/13/2007 In / Out / Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|
| | 06:16 p / 12:04 a | 09:58 p / 05:07 a | 10:04 p / 04:13 a | | 10:23 p / 04:54 a | 09:47 p / 04:21 a | | 40.25 |
| | 01:00 a / 02:09 a / 8.00 | | 05:00 p / 07:20 a / 8.25 | | 05:53 p / 07:09 a / 7.75 | 05:22 a / 07:03 a / 8.25 | | |

**EMPLOYEE NAME and ID (by Name)** — EUDELLE,DAWUD (000)

| | Sunday 1/14/2007 In / Out / Hrs | Monday 1/15/2007 In / Out / Hrs | Tuesday 1/16/2007 In / Out / Hrs | Wednesday 1/17/2007 In / Out / Hrs | Thursday 1/18/2007 In / Out / Hrs | Friday 1/19/2007 In / Out / Hrs | Saturday 1/20/2007 In / Out / Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|
| | 10:12 p / 03:56 a | | 10:04 p / 04:19 a | | 09:58 p / 04:02 a | | | 23.75 |
| | 04:58 a / 07:04 a / 7.75 | | 05:19 a / 07:03 a / 8.00 | | 05:00 a / 07:02 a / 8.00 | | | |

ANF000108

| EMPLOYEE NAME and ID (by Name) | Sunday 1/21/2007 | | | Monday 1/22/2007 | | | Tuesday 1/23/2007 | | | Wednesday 1/24/2007 | | | Thursday 1/25/2007 | | | Friday 1/26/2007 | | | Saturday 1/27/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 09:51 p 04:59 a | 03:54 a 07:03 a | 8.25 | | | | | | | 10:08 p 05:01 a | 04:00 a 06:59 a | 7.75 | 10:30 p 04:59 a | 03:58 a 07:08 a | 7.50 | | | | 10:01 p 04:49 a | 03:50 a 09:50 a | 10.75 | 34.25 |

| EMPLOYEE NAME and ID (by Name) | Sunday 1/28/2007 | | | Monday 1/29/2007 | | | Tuesday 1/30/2007 | | | Wednesday 1/31/2007 | | | Thursday 2/1/2007 | | | Friday 2/2/2007 | | | Saturday 2/3/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 09:46 p 04:58 a | 03:50 a 07:17 a | 8.50 | | | | 10:09 p 04:55 a | 03:55 a 07:03 a | 8.00 | 09:47 p 05:00 a | 04:04 a 07:07 a | 8.50 | 09:48 p 05:06 a | 04:11 a 07:10 a | 8.50 | | | | 09:50 p 04:51 a | 03:54 a 09:54 a | 11.00 | 44.50 |

| EMPLOYEE NAME and ID (by Name) | Sunday 2/4/2007 | | | Monday 2/5/2007 | | | Tuesday 2/6/2007 | | | Wednesday 2/7/2007 | | | Thursday 2/8/2007 | | | Friday 2/9/2007 | | | Saturday 2/10/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 10:14 p 04:49 a | 03:54 a 07:05 a | 8.00 | | | | 08:54 p 05:00 a | 04:05 a 07:05 a | 8.25 | 09:50 p 05:00 a | 04:03 a 06:59 a | 8.25 | 09:58 p 04:50 a | 03:57 a 07:02 a | 8.00 | | | | 09:58 p 05:05 a | 04:04 a 10:04 a | 11.00 | 43.50 |

| EMPLOYEE NAME and ID (by Name) | Sunday 2/11/2007 | | | Monday 2/12/2007 | | | Tuesday 2/13/2007 | | | Wednesday 2/14/2007 | | | Thursday 2/15/2007 | | | Friday 2/16/2007 | | | Saturday 2/17/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 09:56 p 04:57 a | 03:57 a 06:57 a | 8.00 | | | | 10:09 p 05:03 a | 04:03 a 07:03 a | 8.00 | 10:02 p 05:00 a | 04:02 a 07:03 a | 8.00 | 10:14 p 05:00 a | 04:06 a 06:59 a | 7.75 | | | | 10:31 p | 12:00 a | 1.50 | 33.25 |

| EMPLOYEE NAME and ID (by Name) | Sunday 2/18/2007 | | | Monday 2/19/2007 | | | Tuesday 2/20/2007 | | | Wednesday 2/21/2007 | | | Thursday 2/22/2007 | | | Friday 2/23/2007 | | | Saturday 2/24/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | | | | 09:50 p 05:08 a | 04:05 a 06:55 a | 8.00 | 10:07 p 05:05 a | 04:06 a 07:05 a | 8.00 | 10:07 p 05:46 a | 04:50 a 07:02 a | 8.00 | 09:52 p 05:05 a | 04:03 a 06:58 a | 8.00 | | | | 09:55 p 05:36 a | 04:31 a 10:31 a | 11.50 | 43.50 |

| EMPLOYEE NAME and ID (by Name) | Sunday 2/25/2007 | | | Monday 2/26/2007 | | | Tuesday 2/27/2007 | | | Wednesday 2/28/2007 | | | Thursday 3/1/2007 | | | Friday 3/2/2007 | | | Saturday 3/3/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 09:55 p 05:09 a | 04:08 a 07:02 a | 8.00 | | | | 09:59 p 05:17 a | 04:16 a 09:21 a | 10.50 | 09:53 p | 05:28 a | 7.50 | 09:52 p 02:59 a | 01:59 a 05:04 a | 8.25 | | | | 10:07 p 04:00 a | 05:05 a 09:05 a | 10.00 | 42.25 |

| EMPLOYEE NAME and ID (by Name) | Sunday 3/4/2007 | | | Monday 3/5/2007 | | | Tuesday 3/6/2007 | | | Wednesday 3/7/2007 | | | Thursday 3/8/2007 | | | Friday 3/9/2007 | | | Saturday 3/10/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | | | | | | | | | | | | | | | | | | | | | | 0.00 |

| EMPLOYEE NAME and ID (by Name) | Sunday 3/11/2007 | | | Monday 3/12/2007 | | | Tuesday 3/13/2007 | | | Wednesday 3/14/2007 | | | Thursday 3/15/2007 | | | Friday 3/16/2007 | | | Saturday 3/17/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 10:03 p 04:01 a | 03:04 a 07:04 a | 8.00 | | | | 10:09 p 05:15 a | 04:12 a 07:04 a | 7.75 | 10:40 p 04:58 a | 03:56 a 07:00 a | 7.25 | | | | 09:59 p 05:27 a | 04:35 a 06:58 a | 8.00 | 10:16 p 05:51 a | 04:51 a 10:51 a | 11.50 | 42.50 |

ANF000109

| EMPLOYEE NAME and ID (by Name) | Sunday 3/18/2007 | | | Monday 3/19/2007 | | | Tuesday 3/20/2007 | | | Wednesday 3/21/2007 | | | Thursday 3/22/2007 | | | Friday 3/23/2007 | | | Saturday 3/24/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 09:15 p 03:53 a | 02:54 a 06:05 a | 7.75 | | | | 10:36 p 04:03 a | 03:03 a 07:03 a | 7.50 | 09:45 p 04:01 a | 03:01 a 07:05 a | 8.25 | 09:40 p 04:00 a | 03:08 a 07:06 a | 8.50 | | | | | | | 32.00 |

| EMPLOYEE NAME and ID (by Name) | Sunday 3/25/2007 | | | Monday 3/26/2007 | | | Tuesday 3/27/2007 | | | Wednesday 3/28/2007 | | | Thursday 3/29/2007 | | | Friday 3/30/2007 | | | Saturday 3/31/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 09:28 p | 07:00 a | 9.50 | | | | 09:59 p 05:00 a | 04:00 a 07:08 a | 8.25 | 09:46 p 04:00 a | 03:05 a 07:01 a | 8.25 | 09:53 p 04:28 a | 03:28 a 07:15 a | 8.25 | | | | 09:55 p 05:00 a | 04:07 a 10:07 a | 11.25 | 45.50 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 4/1/2007 | | | Monday 4/2/2007 | | | Tuesday 4/3/2007 | | | Wednesday 4/4/2007 | | | Thursday 4/5/2007 | | | Friday 4/6/2007 | | | Saturday 4/7/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 02:21 a 03:22 a | 06:50 a | 7.75 | 09:56 p 05:09 a | 04:09 a 07:04 a | 8.25 | 09:56 p 05:27 a | 04:26 a 07:05 a | 8.25 | | | | | | | 09:52 p | 05:04 a | 7.25 | 08:06 a 11:00 p | 10:51 p 03:00 a | 5.75 | 37.25 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 4/8/2007 | | | Monday 4/9/2007 | | | Tuesday 4/10/2007 | | | Wednesday 4/11/2007 | | | Thursday 4/12/2007 | | | Friday 4/13/2007 | | | Saturday 4/14/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | | | | | | | | | | | | | | | | | | | | | | 0.00 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 5/20/2007 | | | Monday 5/21/2007 | | | Tuesday 5/22/2007 | | | Wednesday 5/23/2007 | | | Thursday 5/24/2007 | | | Friday 5/25/2007 | | | Saturday 5/26/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | | | | 09:50 p 03:17 a | 02:17 a 07:00 a | 8.25 | 09:09 p 03:28 a | 02:33 a 08:19 a | 8.25 | 09:59 p 03:55 a | 02:57 a 07:04 a | 8.25 | | | | 09:51 p 04:45 a | 03:45 a 06:56 a | 8.00 | 09:40 p 04:45 a | 03:38 a 09:38 a | 10.75 | 43.50 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 5/27/2007 | | | Monday 5/28/2007 | | | Tuesday 5/29/2007 | | | Wednesday 5/30/2007 | | | Thursday 5/31/2007 | | | Friday 6/1/2007 | | | Saturday 6/2/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 09:55 p 03:09 a | 02:08 a 06:14 a | 8.25 | | | | 09:40 p 04:02 a | 03:06 a 06:37 a | 8.00 | 09:45 p 04:00 a | 03:00 a 06:45 a | 8.00 | | | | 09:48 p 03:36 a | 02:36 a 07:01 a | 8.25 | | | | 32.50 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 6/3/2007 | | | Monday 6/4/2007 | | | Tuesday 6/5/2007 | | | Wednesday 6/6/2007 | | | Thursday 6/7/2007 | | | Friday 6/8/2007 | | | Saturday 6/9/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 09:47 p | 05:03 a | 7.25 | 06:13 a | | 0.75 | | | | 09:46 p 03:53 a | 02:52 a 07:04 a | 8.25 | 10:03 p 03:11 a | 02:12 a 07:04 a | 8.00 | 09:48 p 03:40 a | 02:45 a 06:58 a | 8.25 | 10:03 p 04:04 a | 03:02 a 09:02 a | 10.00 | 42.50 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 6/10/2007 | | | Monday 6/11/2007 | | | Tuesday 6/12/2007 | | | Wednesday 6/13/2007 | | | Thursday 6/14/2007 | | | Friday 6/15/2007 | | | Saturday 6/16/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | Hrs |
| EUDELLE,DAWUD (000) | 10:25 p 03:50 a | 02:49 a 07:04 a | 7.75 | | | | | | | 09:54 p 04:46 a | 03:40 a 07:02 a | 8.00 | 09:49 p 04:03 a | 03:07 a 07:07 a | 8.25 | | | | 09:47 p 03:58 a | 02:56 a 08:56 a | 10.00 | 42.25 |

ANF000110

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 6/17/2007 | | | | | |
| Monday 6/18/2007 | | | | | |
| Tuesday 6/19/2007 | 09:57 p | 02:58 a | 03:59 a | 07:01 a | 8.00 |
| Wednesday 6/20/2007 | 09:52 p | 03:01 a | 04:00 a | 06:59 a | 8.25 |
| Thursday 6/21/2007 | | | | | |
| Friday 6/22/2007 | | | | | |
| Saturday 6/23/2007 | 09:50 p | 02:51 a | 03:49 a | 08:51 a | 10.00 |
| **Week Totals** | | | | | **26.25** |

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 7/1/2007 | 10:01 p | 06:33 a | | | 8.50 |
| Monday 7/2/2007 | | | | | |
| Tuesday 7/3/2007 | | | | | |
| Wednesday 7/4/2007 | | | | | |
| Thursday 7/5/2007 | | | | | |
| Friday 7/6/2007 | 10:03 p | 07:48 a | | | 9.75 |
| Saturday 7/7/2007 | 10:05 p | 05:29 a | | | 7.50 |
| **Week Totals** | | | | | **33.75** |

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 7/8/2007 | 10:33 p | 03:57 p | 04:00 a | 06:49 a | 8.00 |
| Monday 7/9/2007 | | | | | |
| Tuesday 7/10/2007 | 09:42 p | 04:04 a | 05:00 a | 08:47 a | 8.25 |
| Wednesday 7/11/2007 | 09:51 p | 02:59 a | 03:59 a | 06:52 a | 8.00 |
| Thursday 7/12/2007 | 10:04 p | 02:58 a | 03:56 a | 07:00 a | 8.00 |
| Friday 7/13/2007 | | | | | |
| Saturday 7/14/2007 | 10:21 p | 04:00 a | 05:02 a | 10:00 a | 10.50 |
| **Week Totals** | | | | | **42.75** |

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 7/15/2007 | 10:33 p | 03:57 a | 03:55 a | 08:54 a | 7.75 |
| Monday 7/16/2007 | | | | | |
| Tuesday 7/17/2007 | 04:59 a | 05:57 a | | | 1.00 |
| Wednesday 7/18/2007 | 06:00 a | 07:12 a | 09:56 p | 03:06 a | 9.25 |
| | 04:09 a | 07:00 a | | | |
| Thursday 7/19/2007 | 03:56 a | 07:00 a | | | 8.00 |
| Friday 7/20/2007 | | | | | |
| Saturday 7/21/2007 | 09:50 p | 02:54 a | 03:57 a | 08:54 a | 10.00 |
| **Week Totals** | | | | | **28.00** |

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 7/22/2007 | 09:51 p | 02:46 a | 03:47 a | 06:57 a | 8.00 |
| Monday 7/23/2007 | | | | | |
| Tuesday 7/24/2007 | 09:49 p | 04:20 a | 05:25 a | 07:02 a | 8.25 |
| Wednesday 7/25/2007 | 09:51 p | 03:58 a | 05:02 a | 08:44 a | 8.75 |
| Thursday 7/26/2007 | 09:52 p | 03:02 a | 04:00 a | 06:55 a | 8.00 |
| Friday 7/27/2007 | 10:05 p | 03:56 a | 04:59 a | 07:04 a | 8.00 |
| Saturday 7/28/2007 | | | | | |
| **Week Totals** | | | | | **41.00** |

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 7/29/2007 | 09:40 p | 03:05 a | 04:00 a | 07:02 a | 8.50 |
| Monday 7/30/2007 | | | | | |
| Tuesday 7/31/2007 | 09:05 p | 04:08 a | 05:00 a | 06:50 a | 9.00 |
| Wednesday 8/1/2007 | 09:51 p | 04:07 a | 05:00 a | 06:55 a | 9.25 |
| Thursday 8/2/2007 | 08:58 p | 04:09 a | 05:00 a | 08:41 a | 9.00 |
| Friday 8/3/2007 | | | | | |
| Saturday 8/4/2007 | 08:52 p | 04:01 a | 05:06 a | 10:01 a | 12.00 |
| **Week Totals** | | | | | **47.75** |

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 8/5/2007 | 09:29 p | 03:06 a | 04:00 a | 06:32 a | 8.25 |
| Monday 8/6/2007 | | | | | |
| Tuesday 8/7/2007 | 09:34 p | 04:22 a | 05:18 a | 07:53 a | 9.50 |
| Wednesday 8/8/2007 | | | | | |
| Thursday 8/9/2007 | 09:01 p | 03:13 a | 04:12 a | 07:11 a | 9.25 |
| Friday 8/10/2007 | | | | | |
| Saturday 8/11/2007 | 10:08 p | 04:14 a | 05:11 a | 10:14 a | 11.25 |
| **Week Totals** | | | | | **38.25** |

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 8/12/2007 | 09:59 p | 04:14 a | 05:09 a | 06:49 a | 8.00 |
| Monday 8/13/2007 | | | | | |
| Tuesday 8/14/2007 | 09:46 p | 04:12 a | 05:11 a | 07:08 a | 8.25 |
| Wednesday 8/15/2007 | 08:45 p | 04:25 a | 05:15 a | 08:41 a | 9.00 |
| Thursday 8/16/2007 | 09:00 p | 07:00 a | | | 10.00 |
| Friday 8/17/2007 | 11:02 p | 04:46 a | 05:30 a | 06:28 a | 6.75 |
| Saturday 8/18/2007 | | | | | |
| **Week Totals** | | | | | **42.00** |

ANF000111

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 8/19/2007 | 09:58 p | 04:08 a | 05:00 a | 07:01 a | 8.25 |
| Monday 8/20/2007 | 09:58 p | 04:04 a | 05:00 a | 07:06 a | 8.25 |
| Tuesday 8/21/2007 | 08:51 p | 04:07 a | 05:00 a | 06:38 a | 9.00 |
| Wednesday 8/22/2007 | 09:43 p | 03:59 a | 04:57 a | 07:10 a | 8.50 |
| Thursday 8/23/2007 | 10:52 p | 07:01 a | | | 8.25 |
| Friday 8/24/2007 | | | | | |
| Saturday 8/25/2007 | | | | | |
| **Week Totals** | | | | | **42.25** |

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 8/26/2007 | 09:49 p | 04:08 a | 05:00 a | 07:13 a | 8.50 |
| Monday 8/27/2007 | 10:00 p | 07:07 a | | | 9.00 |
| Tuesday 8/28/2007 | 08:57 p | 04:08 a | 05:02 a | 06:43 a | 8.75 |
| Wednesday 8/29/2007 | | | | | |
| Thursday 8/30/2007 | 09:59 p | 03:59 a | 04:47 a | 07:17 a | 8.25 |
| Friday 8/31/2007 | 09:54 p | 04:01 a | 05:00 a | 07:01 a | 8.25 |
| Saturday 9/1/2007 | | | | | |
| **Week Totals** | | | | | **42.75** |

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 9/2/2007 | | | | | |
| Monday 9/3/2007 | 09:49 p | 03:55 a | 04:53 a | 06:58 a | 8.25 |
| Tuesday 9/4/2007 | | | | | |
| Wednesday 9/5/2007 | 10:02 p | 03:48 a | 04:53 a | 06:55 a | 8.00 |
| Thursday 9/6/2007 | | | | | |
| Friday 9/7/2007 | 09:56 p | 03:59 a | 04:56 a | 06:59 a | 8.00 |
| Saturday 9/8/2007 | 09:35 p | 03:55 a | 04:54 a | 08:55 a | 11.25 |
| **Week Totals** | | | | | **35.50** |

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 9/9/2007 | 09:44 p | 03:67 a | 04:54 a | 06:35 a | 8.00 |
| Monday 9/10/2007 | | | | | |
| Tuesday 9/11/2007 | 09:56 p | 04:01 a | 05:03 a | 07:12 a | 8.25 |
| Wednesday 9/12/2007 | 09:55 p | 04:03 a | 05:03 a | 07:09 a | 8.25 |
| Thursday 9/13/2007 | 09:51 p | 03:59 a | 05:00 a | 07:20 a | 8.50 |
| Friday 9/14/2007 | | | | | |
| Saturday 9/15/2007 | 10:12 p | 03:08 a | 04:01 a | 09:08 a | 10.00 |
| **Week Totals** | | | | | **43.00** |

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 9/16/2007 | | | | | |
| Monday 9/17/2007 | | | | | |
| Tuesday 9/18/2007 | 10:07 p | 04:04 a | 05:00 a | 07:04 a | 8.00 |
| Wednesday 9/19/2007 | 08:38 p | 04:05 a | 05:00 a | 06:27 a | 9.00 |
| Thursday 9/20/2007 | 09:33 p | 04:10 a | 05:00 a | 06:58 a | 8.50 |
| Friday 9/21/2007 | | | | | |
| Saturday 9/22/2007 | 09:45 p | 03:58 a | 04:46 a | 09:58 a | 11.50 |
| **Week Totals** | | | | | **37.00** |

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 9/23/2007 | | | | | |
| Monday 9/24/2007 | 09:41 p | 04:51 a | 05:55 a | 07:00 a | 8.00 |
| Tuesday 9/25/2007 | 09:43 p | 04:59 a | 05:50 a | 06:57 a | 8.50 |
| Wednesday 9/26/2007 | 09:36 p | 02:59 a | 03:58 a | 07:10 a | 8.50 |
| Thursday 9/27/2007 | 09:48 p | 04:38 a | 05:31 a | 06:54 a | 8.25 |
| Friday 9/28/2007 | 09:52 p | 04:14 a | 05:00 a | 07:20 a | 8.75 |
| Saturday 9/29/2007 | | | | | |
| **Week Totals** | | | | | **42.25** |

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 9/30/2007 | 09:57 p | 04:09 a | 05:00 a | 07:06 a | 8.25 |
| Monday 10/1/2007 | | | | | |
| Tuesday 10/2/2007 | 08:54 p | 03:00 a | 04:00 a | 06:50 a | 8.25 |
| Wednesday 10/3/2007 | 09:23 p | 02:50 a | | | 9.30 |
| Thursday 10/4/2007 | 09:58 p | 04:09 a | 05:10 a | 06:48 a | 7.75 |
| Friday 10/5/2007 | 09:52 p | 02:57 a | 03:58 a | 08:48 a | 8.00 |
| Saturday 10/6/2007 | | | | | |
| **Week Totals** | | | | | **41.50** |

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 10/7/2007 | 09:03 p | 03:58 a | 04:55 a | 05:59 a | 8.00 |
| Monday 10/8/2007 | | | | | |
| Tuesday 10/9/2007 | 09:54 p | 06:50 a | | | 9.00 |
| Wednesday 10/10/2007 | 09:07 p | 03:32 a | 04:31 a | 06:00 a | 8.00 |
| Thursday 10/11/2007 | 09:46 p | 04:09 a | 05:11 a | 08:50 a | 8.00 |
| Friday 10/12/2007 | | | | | |
| Saturday 10/13/2007 | 10:09 p | 03:59 a | 05:02 a | 09:59 a | 10.75 |
| **Week Totals** | | | | | **43.75** |

ANF000112

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

**Week of 10/14/2007 — Week Totals 33.75**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 10/14/2007 | 09:56 p | 06:42 a | 8.75 |
| Monday 10/15/2007 | 09:55 p | 07:17 a | 9.25 |
| Tuesday 10/16/2007 | 10:02 p / 05:02 a | 04:06 a / 08:44 a | 7.75 |
| Wednesday 10/17/2007 | 09:55 p | 08:34 a | 8.00 |

**Week of 10/21/2007 — Week Totals 28.00**

| Day | In | Out | Hrs |
|---|---|---|---|
| Tuesday 10/23/2007 | 08:49 p | 06:13 a | 9.50 |
| Wednesday 10/24/2007 | 08:35 a | 06:54 a | 8.00 |
| Thursday 10/25/2007 | 10:03 p | 08:54 a | 8.75 |

**Week of 10/28/2007 — Week Totals 38.75**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 10/28/2007 | 09:06 p / 04:04 a | 03:19 a / 05:12 a | 8.25 |
| Tuesday 10/30/2007 | 10:05 p / 04:10 a | 03:20 a / 07:13 a | 8.25 |
| Wednesday 10/31/2007 | 10:03 p / 05:00 a | 04:06 a / 06:39 a | 8.25 |
| Saturday 11/3/2007 | 08:55 p | 12:57 p | 15.00 |

**Week of 11/4/2007 — Week Totals 44.75**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 11/4/2007 | 08:56 p / 05:00 a | 04:49 a / 05:30 a | 8.50 |
| Tuesday 11/6/2007 | 09:51 p / 04:55 a | 03:53 a / 06:48 a | 8.00 |
| Wednesday 11/7/2007 | 10:00 p / 05:17 a | 04:23 a / 08:44 a | 7.75 |
| Thursday 11/8/2007 | 10:00 p | 07:02 a | 9.00 |
| Saturday 11/10/2007 | 10:00 p / 05:00 a | 04:13 a / 06:13 a | 11.50 |

**Week of 11/11/2007 — Week Totals 43.75**

| Day | In | Out | Hrs |
|---|---|---|---|
| Monday 11/12/2007 | 10:02 p / 05:01 a | 04:08 a / 06:57 a | 8.00 |
| Wednesday 11/14/2007 | 08:53 p / 04:37 a | 03:42 a / 06:08 a | 8.25 |
| Thursday 11/15/2007 | 09:49 p / 05:00 a | 04:08 a / 06:59 a | 8.25 |
| Saturday 11/17/2007 | 10:09 p / 05:02 a | 04:15 a / 10:16 a | 11.25 |

**Week of 11/18/2007 — Week Totals 33.50**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 11/18/2007 | 10:02 p | 07:00 a | 8.00 |
| Monday 11/19/2007 | 10:02 p | 06:57 a | 8.00 |
| Wednesday 11/21/2007 | 10:07 p | 07:56 a | 9.75 |
| Friday 11/23/2007 | 10:12 p | 12:57 p | 14.75 |

**Week of 11/25/2007 — Week Totals 34.25**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 11/25/2007 | 10:10 p | 08:24 a | 8.25 |
| Thursday 11/29/2007 | 10:59 p / 05:00 a | 04:29 a / 06:03 a | 6.50 |
| Saturday 12/1/2007 | 09:51 p / 05:23 a | 04:26 a / 10:25 a | 11.50 |

**Week of 12/2/2007 — Week Totals 34.50**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 12/2/2007 | 10:40 p / 05:00 a | 04:04 a / 08:58 a | 8.00 |
| Monday 12/3/2007 | 10:05 p / 05:00 a | 04:04 a / 08:58 a | 8.00 |
| Tuesday 12/4/2007 | 09:56 p | 06:33 a | 8.50 |
| Wednesday 12/5/2007 | 03:01 a | 08:49 a | 6.50 |
| Thursday 12/6/2007 | 04:05 a | 06:43 a | 2.75 |
| Friday 12/7/2007 | 10:02 p | 06:44 a | 8.75 |
| Saturday 12/8/2007 | 08:54 p / 04:38 a | 03:40 a / 09:40 a | 10.75 |

ANF000113

**EMPLOYEE NAME and ID (by SSN): EUDELLE,DAWUD (000)**

### Week of Sunday 12/9/2007 – Saturday 12/15/2007 — Week Totals: 49.25

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 12/9/2007 | | | | | |
| Monday 12/10/2007 | | | | | |
| Tuesday 12/11/2007 | 09:59 p | 04:37 a | 05:28 a | 07:00 a | 8.25 |
| Wednesday 12/12/2007 | 10:05 p | 06:59 a | | | 9.00 |
| Thursday 12/13/2007 | 08:48 p | 03:55 a | 04:46 a | 07:12 a | 8.50 |
| Friday 12/14/2007 | 10:00 p | 04:11 a | 05:00 a | 07:08 a | 8.25 |
| Saturday 12/15/2007 | 10:01 p | 01:19 p | | | 15.25 |

### Week of Sunday 12/16/2007 – Saturday 12/22/2007 — Week Totals: 20.50

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 12/16/2007 | | | | | |
| Monday 12/17/2007 | | | | | |
| Tuesday 12/18/2007 | | | | | |
| Wednesday 12/19/2007 | 09:19 p | 06:31 a | | | 9.25 |
| Thursday 12/20/2007 | | | | | |
| Friday 12/21/2007 | | | | | |
| Saturday 12/22/2007 | 10:01 p | 04:11 a | 05:00 a | 10:11 a | 11.25 |

### Week of Sunday 12/23/2007 – Saturday 12/29/2007 — Week Totals: 36.50

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 12/23/2007 | 10:09 p | 03:35 a | 04:28 a | 07:02 a | 8.00 |
| Monday 12/24/2007 | | | | | |
| Tuesday 12/25/2007 | 07:42 p | 01:30 a | 02:21 a | 05:07 a | 8.50 |
| Wednesday 12/26/2007 | | | | | |
| Thursday 12/27/2007 | | | | | |
| Friday 12/28/2007 | 10:00 p | 03:39 a | 04:33 a | 08:57 a | 8.00 |
| Saturday 12/29/2007 | 09:55 p | 04:44 a | 05:35 a | 10:44 a | 12.00 |

### Week of Sunday 12/30/2007 – Saturday 1/5/2008 — Week Totals: 35.00

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 12/30/2007 | 10:03 p | 04:33 a | 05:07 a | 07:02 a | 8.25 |
| Monday 12/31/2007 | 10:03 p | 03:24 a | 04:31 a | 06:54 a | 8.25 |
| Tuesday 1/1/2008 | 10:22 p | 04:22 a | 05:08 a | 06:50 a | 7.75 |
| Wednesday 1/2/2008 | | | | | |
| Thursday 1/3/2008 | | | | | |
| Friday 1/4/2008 | | | | | |
| Saturday 1/5/2008 | 09:55 p | 04:17 a | 05:21 a | 10:17 a | 11.25 |

### Week of Sunday 1/6/2008 – Saturday 1/12/2008 — Week Totals: 42.25

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 1/6/2008 | 09:57 p | 02:49 a | 03:50 a | 06:51 a | 8.00 |
| Monday 1/7/2008 | 09:57 p | 03:56 a | 04:57 a | 06:58 a | 8.00 |
| Tuesday 1/8/2008 | 10:11 p | 04:26 a | 05:28 a | 06:58 a | 7.75 |
| Wednesday 1/9/2008 | | | | | |
| Thursday 1/10/2008 | 10:00 p | 04:45 a | 05:41 a | 07:06 a | 8.25 |
| Friday 1/11/2008 | | | | | |
| Saturday 1/12/2008 | 10:04 p | 03:17 a | 04:16 a | 08:17 a | 10.25 |

### Week of Sunday 1/13/2008 – Saturday 1/19/2008 — Week Totals: 44.75

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 1/13/2008 | 09:57 p | 04:13 a | 05:07 a | 07:02 a | 8.25 |
| Monday 1/14/2008 | 09:57 p | 04:13 a | | | 8.25 |
| Tuesday 1/15/2008 | | | | | |
| Wednesday 1/16/2008 | 09:47 p | 04:07 a | 05:02 a | 07:14 a | 8.50 |
| Thursday 1/17/2008 | | | | | |
| Friday 1/18/2008 | 09:56 p | 03:59 a | 04:54 a | 07:01 a | 8.25 |
| Saturday 1/19/2008 | 09:52 p | 04:20 a | 05:24 a | 10:20 a | 11.50 |

### Week of Sunday 1/20/2008 – Saturday 1/26/2008 — Week Totals: 28.75

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 1/20/2008 | 10:14 p | 03:58 a | 04:57 a | 06:58 a | 7.75 |
| Monday 1/21/2008 | | | | | |
| Tuesday 1/22/2008 | | | | | |
| Wednesday 1/23/2008 | | | | | |
| Thursday 1/24/2008 | 09:38 p | 04:06 a | 05:00 a | 06:31 a | 8.00 |
| Friday 1/25/2008 | | | | | |
| Saturday 1/26/2008 | 10:02 p | 04:03 a | 05:00 a | 10:03 a | 11.00 |

### Week of Sunday 1/27/2008 – Saturday 2/2/2008 — Week Totals: 32.75

| Day | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 1/27/2008 | 09:58 p | 04:04 a | 05:00 a | 07:07 a | 8.25 |
| Monday 1/28/2008 | 09:44 p | 03:57 a | 04:57 a | 07:12 a | 8.25 |
| Tuesday 1/29/2008 | | | | | |
| Wednesday 1/30/2008 | 09:59 p | 03:59 a | 05:00 a | 07:10 a | 8.25 |
| Thursday 1/31/2008 | 10:03 p | 04:12 a | 05:04 a | 08:34 a | 7.75 |
| Friday 2/1/2008 | | | | | |
| Saturday 2/2/2008 | | | | | |

| EMPLOYEE NAME and ID (by SSN) | Sunday 2/3/2008 In | Out | Hrs | Monday 2/4/2008 In | Out | Hrs | Tuesday 2/5/2008 In | Out | Hrs | Wednesday 2/6/2008 In | Out | Hrs | Thursday 2/7/2008 In | Out | Hrs | Friday 2/8/2008 In | Out | Hrs | Saturday 2/9/2008 In | Out | Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EUDELLE,DAWUD (000) | 10:31 p | 08:58 a | 8.50 | | | | | | | 08:39 p 05:00 a | 04:08 a 07:11 a | 8.75 | 10:00 p 05:07 a | 04:03 a 06:37 a | 7.50 | | | | | | | 24.75 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 2/10/2008 In | Out | Hrs | Monday 2/11/2008 In | Out | Hrs | Tuesday 2/12/2008 In | Out | Hrs | Wednesday 2/13/2008 In | Out | Hrs | Thursday 2/14/2008 In | Out | Hrs | Friday 2/15/2008 In | Out | Hrs | Saturday 2/16/2008 In | Out | Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EUDELLE,DAWUD (000) | 09:45 p | 07:01 a | 9.25 | | | | | | | 08:50 p 04:24 a | 03:24 a 08:35 a | 8.75 | 10:08 p | 05:17 a | 7.25 | 06:17 a | | 0.75 | | | | 26.00 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 2/17/2008 In | Out | Hrs | Monday 2/18/2008 In | Out | Hrs | Tuesday 2/19/2008 In | Out | Hrs | Wednesday 2/20/2008 In | Out | Hrs | Thursday 2/21/2008 In | Out | Hrs | Friday 2/22/2008 In | Out | Hrs | Saturday 2/23/2008 In | Out | Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EUDELLE,DAWUD (000) | | | | 09:47 p 04:45 a | 03:56 a 07:08 a | 8.50 | 09:34 p 05:00 a | 04:05 a 08:30 a | 8.50 | 10:07 p 05:14 a | 04:13 a 07:14 a | 8.00 | | | | 10:02 p 05:14 a | 04:12 a 07:04 a | 8.00 | 10:05 p 05:10 a | 04:20 a 10:20 a | 11.50 | 44.00 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 2/24/2008 In | Out | Hrs | Monday 2/25/2008 In | Out | Hrs | Tuesday 2/26/2008 In | Out | Hrs | Wednesday 2/27/2008 In | Out | Hrs | Thursday 2/28/2008 In | Out | Hrs | Friday 2/29/2008 In | Out | Hrs | Saturday 3/1/2008 In | Out | Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EUDELLE,DAWUD (000) | 09:38 p 05:00 a | 04:08 a 06:57 a | 8.50 | | | | 09:55 p 05:07 a | 04:10 a 06:29 a | 7.50 | 09:31 p 05:00 a | 04:09 a 07:27 a | 9.00 | | | | 09:53 p 05:17 a | 04:25 a 06:59 a | 8.25 | 09:48 p 04:44 a | 03:47 a 09:47 a | 11.00 | 44.25 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 3/2/2008 In | Out | Hrs | Monday 3/3/2008 In | Out | Hrs | Tuesday 3/4/2008 In | Out | Hrs | Wednesday 3/5/2008 In | Out | Hrs | Thursday 3/6/2008 In | Out | Hrs | Friday 3/7/2008 In | Out | Hrs | Saturday 3/8/2008 In | Out | Hrs | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EUDELLE,DAWUD (000) | | | | | | | 09:45 p 05:00 a | 04:04 a 06:29 a | 7.75 | 09:50 p 05:12 a | 04:16 a 07:06 a | 8.25 | | | | 09:54 p 04:35 a | 03:38 a 06:59 a | 8.25 | | | | 24.25 |

ANF000114

Jaclyn Pagnotta Pay Summary



EXHIBIT
8

Jaclyn Pagnotta Pay Summary





ANF000016

Jaclyn Pagnotta Pay Summary



ANF000015

Jaclyn Pagnotta Pay Summary



ANF000014

Jaclyn Pagnotta Pay Summary





ANF000013

Jaclyn Pagnotta Pay Summary





ANF000012

Jaclyn Pagnotta Pay Summary



ANF000011

Jaclyn Pagnotta Pay Summary





A N F 0 0 0 0 1 0



PAGE 01/02                    STAPLES                    2127859525    86:39    12/03/2006

EXHIBIT
9



P.2    212 925 4336    Abercrombie & Fitch    05:21p    Dec 09 06



Dec 17 06 07:58p    Abercrombie & Fitch    212 925 4336    p.1

Dec 23 06 03:24p    Abercrombie & Fitch    212 925 4336    p.3

Loss Prevention Time Sheet

WEEK ENDING DATE: 12/23/00

Page 1

LUNCH 130-230

Completed time sheets are due every Monday by noon local time.

Eastern Zone fax to Amy Story (614) 283-8627.

Western Zone fax to Li' Cruce (614) 283-0740.

Attendance: One time sheet per week.

- Write by your initials (Illness, Vacation, bereavement, personal).
- Only HRS. s the total hours worked in the day. Round to the nearest quarter day, i.e. 7.25, 7.50, 7.75, &.
- Regular hours total is the sum of the 7 days worked for the week.
- Comments/columns is for any vacation, personal, or sick days used and also include if Only HRS each day.
- Signature is required.

# Abercrombie & Fitch Trading Co.

STORE: STR0936 - FIFTH AVENUE NY-ANF

Time & Attendance
Punch Summary Report



EXHIBIT
10

ANF000115

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 12/31/2006 | | | Monday 1/1/2007 | | | Tuesday 1/2/2007 | | | Wednesday 1/3/2007 | | | Thursday 1/4/2007 | | | Friday 1/5/2007 | | | Saturday 1/6/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | | | | | | | 04:00 p | 07:59 p | 4.00 | 11:50 a | 04:06 p | | 09:56 a | 02:00 p | | 19.75 |
| | | | | | | | | | | | | | | | | 05:06 p | 08:00 p | 8.25 | 03:01 p | 06:23 p | 7.50 | |

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 1/7/2007 | | | Monday 1/8/2007 | | | Tuesday 1/9/2007 | | | Wednesday 1/10/2007 | | | Thursday 1/11/2007 | | | Friday 1/12/2007 | | | Saturday 1/13/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 09:51 a | 02:02 p | | 08:57 a | 02:00 p | | | | | 08:48 a | 01:48 p | | 10:23 a | 03:06 p | | | | | 07:51 a | 12:51 p | | 40.25 |
| | 03:01 p | 07:00 p | 8.25 | 03:03 p | 07:59 p | 8.00 | | | | 02:51 p | 06:59 p | 8.25 | 04:57 p | 07:09 p | 7.75 | | | | 01:58 p | 04:52 p | 8.00 | |

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 1/14/2007 | | | Monday 1/15/2007 | | | Tuesday 1/16/2007 | | | Wednesday 1/17/2007 | | | Thursday 1/18/2007 | | | Friday 1/19/2007 | | | Saturday 1/20/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 07:56 a | 01:07 p | | 06:35 a | 01:58 p | | | | | 07:56 a | 01:37 p | | 09:30 a | 03:53 p | 6.50 | | | | | | | 32.75 |
| | 02:02 p | 05:06 p | 8.25 | 03:08 p | 06:02 p | 8.25 | | | | 02:38 p | 06:43 p | 9.75 | | | | | | | | | | |

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 1/28/2007 | | | Monday 1/29/2007 | | | Tuesday 1/30/2007 | | | Wednesday 1/31/2007 | | | Thursday 2/1/2007 | | | Friday 2/2/2007 | | | Saturday 2/3/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | 10:53 a | 02:54 p | | 11:58 a | 04:08 p | | 09:55 a | 02:52 p | | 11:50 a | 04:03 p | | 12:00 p | 03:57 p | | 40.00 |
| | | | | | | | 03:56 p | 08:03 p | 8.25 | 05:00 p | 08:55 p | 8.25 | 05:00 p | 07:11 p | 8.25 | 05:00 p | 08:49 p | 8.00 | 04:58 p | 09:02 p | 7.50 | |

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 2/4/2007 | | | Monday 2/5/2007 | | | Tuesday 2/6/2007 | | | Wednesday 2/7/2007 | | | Thursday 2/8/2007 | | | Friday 2/9/2007 | | | Saturday 2/10/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | 11:28 a | 02:48 p | | | | | 11:55 a | 03:27 p | | 09:47 a | 01:14 p | | 07:54 a | 12:55 p | | 11:53 a | 03:24 p | | 40.75 |
| | | | | 03:44 p | 07:59 p | 7.50 | | | | 04:24 p | 09:00 p | 8.25 | 02:00 p | 07:02 p | 8.50 | 01:52 p | 05:00 p | 8.25 | 04:25 p | 09:02 p | 8.25 | |

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 2/11/2007 | | | Monday 2/12/2007 | | | Tuesday 2/13/2007 | | | Wednesday 2/14/2007 | | | Thursday 2/15/2007 | | | Friday 2/16/2007 | | | Saturday 2/17/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | | | | 11:55 a | 03:06 p | | 10:23 a | 02:08 p | | 08:00 a | 01:05 p | | 10:52 a | 03:00 p | | 32.25 |
| | | | | | | | | | | 04:12 p | 09:00 p | 8.00 | 03:01 p | 07:14 p | 8.00 | 02:03 p | 06:28 p | 9.50 | 04:00 p | 06:34 p | 6.75 | |

ANF000116

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 2/18/2007 | | | Monday 2/19/2007 | | | Tuesday 2/20/2007 | | | Wednesday 2/21/2007 | | | Thursday 2/22/2007 | | | Friday 2/23/2007 | | | Saturday 2/24/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 10:00 a | 02:03 p | | 12:57 p | 04:58 p | | | | | | | | 08:07 a | 01:03 p | | 09:58 a | 02:01 p | | 12:38 p | 03:08 p | | |
| | 03:06 p | 07:01 p | 8.00 | 06:00 p | 10:02 p | 8.00 | | | | | | | 02:00 p | 05:03 p | 8.00 | 03:00 p | 04:57 p | 6.00 | 04:00 p | 10:39 p | 8.25 | 39.25 |

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 2/25/2007 | | | Monday 2/26/2007 | | | Tuesday 2/27/2007 | | | Wednesday 2/28/2007 | | | Thursday 3/1/2007 | | | Friday 3/2/2007 | | | Saturday 3/3/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 09:59 a | 02:08 p | | 10:59 a | 01:31 p | | 10:01 a | 01:59 p | | | | | | | | 10:14 a | 01:10 p | | 11:59 a | 02:54 p | | |
| | 03:02 p | 06:58 p | 8.00 | 02:32 p | 08:04 p | 8.00 | 03:00 p | 07:06 p | 8.00 | | | | | | | 02:09 p | 07:05 p | 7.75 | 03:55 p | 05:03 p | 8.00 | 39.75 |

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 3/4/2007 | | | Monday 3/5/2007 | | | Tuesday 3/6/2007 | | | Wednesday 3/7/2007 | | | Thursday 3/8/2007 | | | Friday 3/9/2007 | | | Saturday 3/10/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 01:02 p | 03:07 p | | | | | | | | | | | 11:00 a | 03:05 p | | 11:00 a | 02:55 p | | 07:51 a | 12:56 p | | |
| | 04:00 p | 07:01 p | 5.00 | | | | | | | | | | 04:04 p | 08:00 p | 8.00 | 03:54 p | 08:00 p | 8.00 | 01:56 p | 05:02 p | 8.25 | 29.25 |

**EMPLOYEE NAME and ID (by SSN): PAGNOTTA,JACLYN (000)**

| | Sunday 3/11/2007 | | | Monday 3/12/2007 | | | Tuesday 3/13/2007 | | | Wednesday 3/14/2007 | | | Thursday 3/15/2007 | | | Friday 3/16/2007 | | | Saturday 3/17/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | 12:39 p | 02:58 p | | | | | | | | 07:59 a | 02:25 p | 6.50 | | | | | | | |
| | | | | 03:59 p | 08:00 p | 6.25 | | | | | | | | | | | | | | | | 12.75 |

David Pomales Pay Summary



EXHIBIT
11

## David Pomales Pay Summary





ANF000052

David Pomales Pay Summary



A N F 0 0 0 0 5 1

David Pomales Pay Summary





ANF000050

David Pomales Pay Summary





ANF000049

# David Pomales Pay Summary





A N F 0 0 0 0 4 8

## David Pomales Pay Summary





ANF000047

## David Pomales Pay Summary



**444506 - Pomales David**
AST - Abercrombie & Fitch Stores Inc
A936 - Fifth Avenue Flagship
BWI - A&F Stores
Active    07/31/2005    Reg/FT

Company: AST
Pay Group: BWI
Period End: 02/18/2006
Page: 5215
Line: 2

Off Cycle: N
Separate Check #: 0
Reprint: N
Adjustment: N

### Paycheck Detail

Paycheck View | Earnings | Taxes | Deductions | Garnishments | Special Accumulators | Distributions

Name: Pomales David        Confirmed    Advice

| Check# | Issue Date | Earnings | Taxes | Deductions | Net Pay |
|--------|-----------|----------|-------|-----------|---------|
| 2155525 | 02/24/2006 | 1,134.62 | 285.47 | 40.00 | 809.15 |

**Regular and Overtime Earnings**

| Reg Hours | Reg Pay | OT Hours | OT Pay |
|-----------|---------|----------|--------|
| 90.00 | 1134.62 | | |

**Taxes**

| | | | |
|-----|-----|-------------|--------|
| FED | SS/Dis EE | | 69.12 |
| FED | MedicareEE | | 16.16 |
| FED | Withholding | | 125.76 |
| FED | SS/Dis ER | | 69.12 |
| FED | MedicareER | | 16.16 |

**Other Earnings**

| Code | Hours | Amounts | Add to Gross |
|------|-------|---------|--------------|

**Deductions**

| | | |
|------|------------|-------|
| DPI | After-Tax | 20.00 |
| PMED | Before-Tax | 20.00 |
| DPT | Taxable | 46.62 |
| LIFE | Taxable | 0.25 |

---

**444506 - Pomales David**
AST - Abercrombie & Fitch Stores Inc
A936 - Fifth Avenue Flagship
BWI - A&F Stores
Active    07/31/2005    Reg/FT

Company: AST
Pay Group: BWI
Period End: 02/04/2006
Page: 5373
Line: 5

Off Cycle: N
Separate Check #: 0
Reprint: N
Adjustment: N

### Paycheck Detail

Paycheck View | Earnings | Taxes | Deductions | Garnishments | Special Accumulators | Distributions

Name: Pomales David        Confirmed    Advice

| Check# | Issue Date | Earnings | Taxes | Deductions | Net Pay |
|--------|-----------|----------|-------|-----------|---------|
| 2139252 | 02/10/2006 | 1,134.62 | 285.49 | 40.00 | 809.13 |

**Regular and Overtime Earnings**

| Reg Hours | Reg Pay | OT Hours | OT Pay |
|-----------|---------|----------|--------|
| 90.00 | 1134.62 | | |

**Taxes**

| | | | |
|-----|-----|-------------|--------|
| FED | SS/Dis EE | | 69.13 |
| FED | MedicareEE | | 16.17 |
| FED | Withholding | | 125.76 |
| FED | SS/Dis ER | | 69.13 |
| FED | MedicareER | | 16.17 |

**Other Earnings**

| Code | Hours | Amounts | Add to Gross |
|------|-------|---------|--------------|

**Deductions**

| | | |
|------|------------|-------|
| DPI | After-Tax | 20.00 |
| PMED | Before-Tax | 20.00 |
| DPT | Taxable | 46.62 |
| LIFE | Taxable | 0.25 |

David Pomales Pay Summary





A N F 0 0 0 0 4 5

## David Pomales Pay Summary





ANF000044

# David Pomales Pay Summary





ANF000043

David Pomales Pay Summary

---

444506 - Pomales, David
AST - Abercromble & Fitch Stores Inc
A936 - Fifth Avenue Flagship
BWI - A&F Stores
Active    07/31/2005    Reg/FT

Company: AST
Pay Group: BWI
Period End: 06/10/2006
Page: 4513
Line: 6

Off Cycle: N
Separate Check #: 0
Reprint: N
Adjustment: N

### Paycheck Detail

Paycheck View | Earnings | Taxes | Deductions | Garnishments | Special Accumulators | Distributions

Name: Pomales, David                Confirmed        Advice

| Check# | Issue Date | Earnings | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| 2288996 | 06/16/2006 | 1,173.08 | 296.99 | 40.00 | 836.09 |

**Regular and Overtime Earnings**

| Reg Hours | Reg Pay | OT Hours | OT Pay |
|---|---|---|---|
| 90.00 | 1173.08 | | |

**Taxes**

| | | | |
|---|---|---|---|
| FED | SS/Dis EE | | 71.51 |
| FED | MedicareEE | | 16.73 |
| FED | Withholding | | 131.54 |
| FED | SS/Dis ER | | 71.51 |
| FED | MedicareER | | 16.73 |

**Other Earnings**

| Code | Hours | Amounts | Add to Gross |
|---|---|---|---|

**Deductions**

| | | | |
|---|---|---|---|
| DPI | After-Tax | | 20.00 |
| PMED | Before-Tax | | 20.00 |
| DPT | Taxable | | 46.62 |
| LIFE | Taxable | | 0.30 |

---

444506 - Pomales, David
AST - Abercromble & Fitch Stores Inc
A936 - Fifth Avenue Flagship
BWI - A&F Stores
Active    07/31/2005    Reg/FT

Company: AST
Pay Group: BWI
Period End: 05/27/2006
Page: 4500
Line: 5

Off Cycle: N
Separate Check #: 0
Reprint: N
Adjustment: N

### Paycheck Detail

Paycheck View | Earnings | Taxes | Deductions | Garnishments | Special Accumulators | Distributions

Name: Pomales, David                Confirmed        Advice

| Check# | Issue Date | Earnings | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| 2272299 | 06/02/2006 | 1,173.08 | 296.98 | 40.00 | 836.10 |

**Regular and Overtime Earnings**

| Reg Hours | Reg Pay | OT Hours | OT Pay |
|---|---|---|---|
| 90.00 | 1173.08 | | |

**Taxes**

| | | | |
|---|---|---|---|
| FED | SS/Dis EE | | 71.51 |
| FED | MedicareEE | | 16.72 |
| FED | Withholding | | 131.54 |
| FED | SS/Dis ER | | 71.51 |
| FED | MedicareER | | 16.72 |

**Other Earnings**

| Code | Hours | Amounts | Add to Gross |
|---|---|---|---|

**Deductions**

| | | | |
|---|---|---|---|
| DPI | After-Tax | | 20.00 |
| PMED | Before-Tax | | 20.00 |
| DPT | Taxable | | 46.62 |
| LIFE | Taxable | | 0.30 |

ANF000042

David Pomales Pay Summary



ANF000041

David Pomales Pay Summary





ANF000040

## David Pomales Pay Summary





ANF000039

## David Pomales Pay Summary





ANF000038

## David Pomales Pay Summary





ANF000037

## David Pomales Pay Summary





ANF000036

David Pomales Pay Summary





ANF000035

**Abercrombie and Fitch**
Payroll Timesheet
Store: 936
Week Ending: 7/22/06

EXHIBIT
12

| Associate Name: | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time In | Time Out | Lunch Out | Lunch In | Time In | Time Out | Lunch Out | Lunch In | Time In | Time Out | Lunch Out | Lunch In | Time In | Time Out | Lunch Out | Lunch In | Time In | Time Out | Lunch Out | Lunch In | Time In | Time Out | Lunch Out | Lunch In | Time In | Time Out | Lunch Out | Lunch In | | | |
| David Gonzales | | | | | | | | | | | | | 12:00pm | 8:55 | 12:00pm | 4:00pm | 11:34 | 8:30 | 3:53 | 4:50 | 1:58 | 8:05 | 7:05 | | | | | 40 | | |

ANF000054

**Abercrombie and Fitch**
Payroll Timesheet
Store: 426
Week Ending: 8/6/06

| Associate Name: | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | | | |
| David P. | | | | | 10:15 | 20:15 | | 16:30 | 12:00 | 19:00 | | 7:00 | 11:02 | 2:00 | | 3:03 | 10:58 | 14:05 | | | | | | | | | | | | | |

| Associate Name: | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | Time In: | Time Out: | Lunch In: | Lunch Out: | | | |
| Dawid E. | 8:15 pm | 5:01 pm | 2:00 | | | | | | 9:54 | 6:03 | 12 | 5 | | | | | 3:01 | 9:00 | 12 | 4 | 3:03 | 9:03 | 12 | 3 | 10:15 | 10:13 | 12 | 5 | | | |

ANF000057



Abercrombie and Fitch
Payroll Timesheet
Store:
Week Ending: 8-3-06

ANF000059



ANF000061



ANF000063



ANF000066

# Abercrombie and Fitch
Payroll Timesheet
Store: 93
Week Ending: 29/02

| | Sunday | | | Monday | | | Tuesday | | | Wednesday | | | Thursday | | | Friday | | | Saturday | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Associate Name: | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | | | |
| | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | | | |
| David P | | | | | | | 7:00 | 3:55 | | 6:00 | 1:00 | | 7:00 | 4:00 | | | sick | | 10:00 | 7:00 | | | | |
| | | | | | | | 12:01 | 1:07 | | | | | 7:00 | 1:00 | | | | | 7:00 | 3:00 | | | | |

| | Sunday | | | Monday | | | Tuesday | | | Wednesday | | | Thursday | | | Friday | | | Saturday | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Associate Name: | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | Time In: | Time Out: | | | | |
| | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | Lunch Out | Lunch In: | | | | |
| Dawud E | 9:47 | 6:55 | | | 6:55 | | 10:03 | 7:40 | | | 10:04 | | | 7:00 | | | | | | 9:41 | 6:55 | | | | |



ANF000069



ANF000071



ANF000073



ANF000074



ANF000075

**Abercrombie and Fitch**
Payroll Timesheet
Store:
Week Ending: 10/28

| Associate Name: | Sunday | | | | Monday | | | | Tuesday | | | | Wednesday | | | | Thursday | | | | Friday | | | | Saturday | | | | Total Hours Scheduled: | Total Lunch Hours: | Total Hours Worked: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | Time In | Time Out | Lunch In | Lunch Out | | | |

Associate Name: David's

Associate Name: David G

ANF000076



**Abercrombie and Fitch**
Payroll Timesheet
Store:
Week Ending: 11/18/06



**Abercrombie & Fitch Trading Co.**

STORE:  STR0936 - FIFTH AVENUE NY-ANF

**Time & Attendance Punch Summary Report**

EMPLOYEE NAME and ID (by Name) / POMALES,DAVID / (000) / and ID (by SSN)

**Week of 11/26/2006 – 12/2/2006**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 11/26/2006 | 11:03 a | 03:04 p | 8.00 |
|  | 04:00 p | 07:55 p |  |
| Monday 11/27/2006 | 10:23 a | 01:56 p | 5.50 |
|  | 02:00 p | 04:43 p |  |
| Tuesday 11/28/2006 | 07:00 a | 12:21 p | 8.25 |
|  | 01:07 p | 04:02 p |  |
| Wednesday 11/29/2006 |  |  |  |
| Thursday 11/30/2006 | 11:03 a | 03:32 p | 8.00 |
|  | 04:27 p | 07:55 p |  |
| Friday 12/1/2006 |  |  |  |
| Saturday 12/2/2006 |  |  |  |
| **Week Totals** |  |  | **21.75** |

**Week of 12/3/2006 – 12/9/2006**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 12/3/2006 | 11:03 a | 03:04 p | 8.00 |
|  | 04:00 p | 07:55 p |  |
| Monday 12/4/2006 | 07:02 a | 12:06 p | 8.00 |
|  | 01:01 p | 04:00 p |  |
| Tuesday 12/5/2006 |  |  |  |
| Wednesday 12/6/2006 | 12:59 p | 04:57 p | 8.25 |
|  | 05:50 p | 10:01 p |  |
| Thursday 12/7/2006 |  |  |  |
| Friday 12/8/2006 |  |  |  |
| Saturday 12/9/2006 | 09:59 a | 02:11 p | 8.00 |
|  | 03:06 p | 06:57 p |  |
| **Week Totals** |  |  | **32.25** |

**Week of 12/10/2006 – 12/16/2006**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 12/10/2006 | 10:59 a | 03:29 p | 8.00 |
|  | 04:22 p | 07:52 p |  |
| Monday 12/11/2006 | 10:58 a | 04:17 p | 8.00 |
|  | 05:00 p | 07:57 p |  |
| Tuesday 12/12/2006 | 12:04 p | 04:04 p | 8.25 |
|  | 05:00 p | 08:55 p |  |
| Wednesday 12/13/2006 | 11:58 a | 04:17 p | 8.00 |
|  | 05:07 p | 09:01 p |  |
| Thursday 12/14/2006 |  |  |  |
| Friday 12/15/2006 |  |  |  |
| Saturday 12/16/2006 | 07:57 a | 01:20 p | 8.25 |
|  | 02:17 p | 05:12 p |  |
| **Week Totals** |  |  | **40.75** |

**Week of 12/17/2006 – 12/23/2006**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 12/17/2006 |  |  |  |
| Monday 12/18/2006 | 11:58 a | 04:05 p | 8.00 |
|  | 05:00 p | 08:55 p |  |
| Tuesday 12/19/2006 |  |  |  |
| Wednesday 12/20/2006 | 12:57 p | 05:10 p | 8.25 |
|  | 06:09 p | 09:57 p |  |
| Thursday 12/21/2006 | 10:59 a | 04:06 p | 8.25 |
|  | 05:00 p | 08:02 p |  |
| Friday 12/22/2006 |  |  |  |
| Saturday 12/23/2006 | 11:59 a | 04:12 p | 8.00 |
|  | 05:00 p | 08:53 p |  |
| **Week Totals** |  |  | **32.50** |

**Week of 12/24/2006 – 12/30/2006**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 12/24/2006 | 11:02 a | 02:57 p | 6.00 |
|  | 03:54 p | 06:00 p |  |
| Monday 12/25/2006 | 11:58 a | 04:09 p | 8.25 |
|  | 05:00 p | 08:55 p |  |
| Tuesday 12/26/2006 |  |  |  |
| Wednesday 12/27/2006 | 12:57 p | 05:10 p | 8.25 |
|  | 06:09 p | 09:57 p |  |
| Thursday 12/28/2006 | 11:55 a | 04:52 p | 8.25 |
|  | 05:40 p | 08:55 p |  |
| Friday 12/29/2006 | 10:52 a | 04:09 p | 8.25 |
|  | 05:04 p | 08:04 p |  |
| Saturday 12/30/2006 | 08:57 a | 03:13 p | 8.25 |
|  | 04:13 p | 06:09 p |  |
| **Week Totals** |  |  | **30.75** |

**Week of 12/31/2006 – 1/6/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 12/31/2006 | 08:00 a | 01:16 p | 8.25 |
|  | 02:00 p | 05:00 p |  |
| Monday 1/1/2007 | 11:30 a | 02:05 p | 5.50 |
|  | 03:02 p | 06:54 p |  |
| Tuesday 1/2/2007 |  |  |  |
| Wednesday 1/3/2007 |  |  |  |
| Thursday 1/4/2007 | 11:52 a | 04:09 p | 8.25 |
|  | 05:00 p | 08:52 p |  |
| Friday 1/5/2007 | 11:08 a | 03:10 p | 8.00 |
|  | 04:00 p | 07:58 p |  |
| Saturday 1/6/2007 | 11:03 a | 03:59 p | 7.75 |
|  | 04:56 p | 07:53 p |  |
| **Week Totals** |  |  | **29.50** |

**Week of 1/7/2007 – 1/13/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 1/7/2007 | 08:00 a | 01:16 p | 8.25 |
|  | 02:00 p | 05:00 p |  |
| Monday 1/8/2007 |  |  |  |
| Tuesday 1/9/2007 |  |  |  |
| Wednesday 1/10/2007 | 12:59 p | 05:08 p | 8.00 |
|  | 06:08 p | 10:00 p |  |
| Thursday 1/11/2007 | 12:01 p | 05:14 p | 7.75 |
|  | 06:00 p | 08:26 p |  |
| Friday 1/12/2007 | 08:58 a | 01:58 p | 8.00 |
|  | 02:56 p | 05:58 p |  |
| Saturday 1/13/2007 | 10:00 a | 01:58 p | 8.00 |
|  | 02:55 p | 06:57 p |  |
| **Week Totals** |  |  | **40.00** |

**Week of 1/14/2007 – 1/20/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 1/14/2007 | 10:00 a | 03:09 p | 8.25 |
|  | 04:00 p | 07:04 p |  |
| Monday 1/15/2007 | 12:59 p | 05:06 p | 8.00 |
|  | 06:00 p | 10:00 p |  |
| Tuesday 1/16/2007 |  |  |  |
| Wednesday 1/17/2007 |  |  |  |
| Thursday 1/18/2007 | 12:01 p | 03:54 p | 8.00 |
|  | 04:55 p | 09:02 p |  |
| Friday 1/19/2007 | 08:00 a | 01:56 p | 8.00 |
|  | 05:00 p | 08:12 p |  |
| Saturday 1/20/2007 |  |  |  |
| **Week Totals** |  |  | **32.50** |

EXHIBIT 13

ANF000121

EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)

| Day / Date | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 1/21/2007 | | | | | |
| Monday 1/22/2007 | 07:54 a | 01:25 p | 02:22 p | 04:59 p | 8.25 |
| Tuesday 1/23/2007 | 11:00 a | 04:12 p | 05:00 p | 08:08 p | 8.25 |
| Wednesday 1/24/2007 | 12:58 p | 06:09 p | 07:08 p | 09:58 p | 8.00 |
| Thursday 1/25/2007 | 12:02 p | 04:07 p | 05:00 p | 09:57 p | 8.00 |
| Friday 1/26/2007 | 07:57 a | 01:03 p | 02:04 p | 04:38 p | 7.75 |
| Saturday 1/27/2007 | | | | | |
| **Week Totals** | | | | | **40.25** |

EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)

| Day / Date | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 1/28/2007 | 09:57 a | 01:59 p | 02:57 p | 06:54 p | 8.00 |
| Monday 1/29/2007 | | | | | |
| Tuesday 1/30/2007 | 08:05 a | 01:12 p | 02:12 p | 04:59 p | 8.00 |
| Wednesday 1/31/2007 | 12:59 p | 05:18 p | 06:08 p | 10:00 p | 8.25 |
| Thursday 2/1/2007 | 08:15 a | 01:59 p | 02:53 p | 08:04 p | 8.00 |
| Friday 2/2/2007 | | | | | |
| Saturday 2/3/2007 | 12:58 p | 05:07 p | 06:00 p | 09:58 p | 8.00 |
| **Week Totals** | | | | | **40.25** |

EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)

| Day / Date | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 2/4/2007 | 09:56 a | 03:10 p | 04:00 p | 06:28 p | 7.75 |
| Monday 2/5/2007 | 07:58 a | 02:09 p | 03:00 p | 04:59 p | 8.25 |
| Tuesday 2/6/2007 | 11:01 a | 04:02 p | 05:02 p | 07:57 p | 8.00 |
| Wednesday 2/7/2007 | 01:00 p | 04:25 p | 05:30 p | 09:58 p | 8.00 |
| Thursday 2/8/2007 | | | | | |
| Friday 2/9/2007 | 01:01 p | 06:10 p | 07:00 p | 10:07 p | 8.25 |
| Saturday 2/10/2007 | | | | | |
| **Week Totals** | | | | | **40.25** |

EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)

| Day / Date | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 2/11/2007 | | | | | |
| Monday 2/12/2007 | 08:00 a | 01:06 p | 02:00 p | 04:05 p | 7.25 |
| Tuesday 2/13/2007 | 11:09 a | 04:03 p | 05:07 p | 07:59 p | 7.75 |
| Wednesday 2/14/2007 | 12:59 p | 05:15 p | 06:03 p | 09:57 p | 8.25 |
| Thursday 2/15/2007 | | | | | |
| Friday 2/16/2007 | | | | | |
| Saturday 2/17/2007 | 10:03 a | 03:02 p | 04:00 p | 06:57 p | 8.00 |
| **Week Totals** | | | | | **39.25** |

EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)

| Day / Date | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 2/18/2007 | 08:00 a | 01:16 p | 02:11 p | 05:02 p | 8.00 |
| Monday 2/19/2007 | 11:04 a | 03:57 p | 04:55 p | 12:02 a | 12.00 |
| Tuesday 2/20/2007 | 03:55 p | 08:01 p | | | 4.00 |
| Wednesday 2/21/2007 | 12:58 p | 04:58 p | 05:55 p | 09:53 p | 8.00 |
| Thursday 2/22/2007 | 09:04 a | 02:08 p | 03:01 p | 06:03 p | 8.00 |
| Friday 2/23/2007 | | | | | |
| Saturday 2/24/2007 | 04:00 p | 06:57 p | | | 8.00 |
| **Week Totals** | | | | | **32.00** |

EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)

| Day / Date | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 2/25/2007 | | | | | |
| Monday 2/26/2007 | 11:02 a | 03:23 p | 04:20 p | 07:26 p | 7.50 |
| Tuesday 2/27/2007 | 10:33 a | 04:14 p | 05:00 p | 07:32 p | 8.25 |
| Wednesday 2/28/2007 | | | | | |
| Thursday 3/1/2007 | 11:02 a | 04:06 p | 06:01 p | 07:59 p | 8.00 |
| Friday 3/2/2007 | 10:57 a | 04:05 p | 05:00 p | 07:58 p | 8.00 |
| Saturday 3/3/2007 | 12:57 p | 05:06 p | 06:02 p | 09:55 p | 8.00 |
| **Week Totals** | | | | | **39.75** |

EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)

| Day / Date | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 3/4/2007 | | | | | |
| Monday 3/5/2007 | 08:00 a | 02:07 p | 03:00 p | 06:56 p | 8.25 |
| Tuesday 3/6/2007 | 10:00 p | 02:16 a | 03:08 a | 06:56 a | 8.00 |
| Wednesday 3/7/2007 | | | | | |
| Thursday 3/8/2007 | | | | | |
| Friday 3/9/2007 | 09:59 a | 04:08 p | 05:00 p | 06:57 p | 8.00 |
| Saturday 3/10/2007 | 11:03 a | 03:03 p | 04:02 p | 08:00 p | 8.00 |
| **Week Totals** | | | | | **32.25** |

EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)

| Day / Date | In | Out | In | Out | Hrs |
|---|---|---|---|---|---|
| Sunday 3/11/2007 | 08:02 a | 02:11 p | 03:11 p | 05:04 p | 8.00 |
| Monday 3/12/2007 | | | | | |
| Tuesday 3/13/2007 | 07:59 a | 01:04 p | 02:04 p | 05:00 p | 8.00 |
| Wednesday 3/14/2007 | 10:59 a | 03:02 p | 04:01 p | 07:59 p | 8.00 |
| Thursday 3/15/2007 | | | | | |
| Friday 3/16/2007 | 09:56 a | 02:57 p | 03:59 p | 06:57 p | 8.00 |
| Saturday 3/17/2007 | 10:33 a | 04:03 p | 05:02 p | 07:38 p | 8.00 |
| **Week Totals** | | | | | **40.00** |

ANF000122

| EMPLOYEE NAME and ID (by SSN) | Sunday 3/18/2007 | | | Monday 3/19/2007 | | | Tuesday 3/20/2007 | | | Wednesday 3/21/2007 | | | Thursday 3/22/2007 | | | Friday 3/23/2007 | | | Saturday 3/24/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID (000) | | | | 07:58a 02:00p | 01:08p 05:04p | 8.25 | 09:58a | 03:28p | 5.50 | 10:57a 04:07p | 03:04p 08:18p | 8.25 | | | | 09:55a 04:26p | 03:29p 06:59p | 8.00 | 10:12a 03:04p | 02:19p 07:03p | 8.00 | 38.00 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 3/25/2007 | | | Monday 3/26/2007 | | | Tuesday 3/27/2007 | | | Wednesday 3/28/2007 | | | Thursday 3/29/2007 | | | Friday 3/30/2007 | | | Saturday 3/31/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID (000) | | | | | | | 09:58a 05:00p | 04:07p 06:55p | 8.00 | 10:59a 05:00p | 04:06p 07:58p | 8.00 | 08:04a 02:26p | 01:27p 03:59p | 7.00 | 11:53a 05:08p | 04:12p 08:59p | 8.25 | 10:13a 04:15p | 03:08p 07:20p | 8.00 | 39.25 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 4/1/2007 | | | Monday 4/2/2007 | | | Tuesday 4/3/2007 | | | Wednesday 4/4/2007 | | | Thursday 4/5/2007 | | | Friday 4/6/2007 | | | Saturday 4/7/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID (000) | | | | | | | 07:59a 03:13p | 02:13p 05:14p | 8.25 | 08:01a 03:08p | 02:14p 05:00p | 8.00 | | | | 10:58a 04:12p | 03:14p 09:51p | 10.00 | 07:57a 02:00p | 01:15p 03:13p | 6.50 | 41.25 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 4/8/2007 | | | Monday 4/9/2007 | | | Tuesday 4/10/2007 | | | Wednesday 4/11/2007 | | | Thursday 4/12/2007 | | | Friday 4/13/2007 | | | Saturday 4/14/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID (000) | 06:52a 03:11p | 02:13p 06:57p | 8.50 | 12:00p 08:07p | 05:08p 09:13p | 8.25 | 10:01a 05:00p | 04:07p 06:59p | 8.00 | | | | | | | 11:59a 05:00p | 04:04p 06:59p | 8.00 | 08:01a 03:01p | 02:09p 05:02p | 8.25 | 32.50 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 4/15/2007 | | | Monday 4/16/2007 | | | Tuesday 4/17/2007 | | | Wednesday 4/18/2007 | | | Thursday 4/19/2007 | | | Friday 4/20/2007 | | | Saturday 4/21/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID (000) | 08:00a 02:11p | 01:08p 06:14p | 8.25 | 11:01a 05:00p | 04:23p 08:00p | 8.25 | 10:13a 04:28p | 03:29p 07:09p | 8.25 | 11:01a | 08:22p | 9.25 | | | | | | | 12:49p 06:14p | 05:18p 09:50p | 8.00 | 41.75 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 4/22/2007 | | | Monday 4/23/2007 | | | Tuesday 4/24/2007 | | | Wednesday 4/25/2007 | | | Thursday 4/26/2007 | | | Friday 4/27/2007 | | | Saturday 4/28/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID (000) | | | | | | | 09:58a 04:04p | 03:07p 08:03p | 9.25 | 08:02a 03:00p | 02:11p 05:21p | 8.50 | 07:58a 02:00p | 01:18p 04:12p | 7.50 | | | | | | | 33.25 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 5/6/2007 | | | Monday 5/7/2007 | | | Tuesday 5/8/2007 | | | Wednesday 5/9/2007 | | | Thursday 5/10/2007 | | | Friday 5/11/2007 | | | Saturday 5/12/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID (000) | 08:52a 03:11p | 02:13p 06:57p | 8.00 | | | | | | | 12:54p 06:22p | 05:23p 09:00p | 7.00 | 10:57a 04:00p | 03:09p 07:56p | 8.25 | 11:58a 04:58p | 03:57p 08:47p | 7.75 | 11:52a 05:00p | 04:03p 08:51p | 8.25 | 31.25 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 5/13/2007 | | | Monday 5/14/2007 | | | Tuesday 5/15/2007 | | | Wednesday 5/16/2007 | | | Thursday 5/17/2007 | | | Friday 5/18/2007 | | | Saturday 5/19/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID (000) | 11:08a 04:00p | 03:10p 07:43p | 7.75 | | | | 10:05a 04:15p | 03:15p 06:57p | 7.75 | 12:57p 06:04p | 05:09p 09:58p | 8.00 | 10:56a 05:04p | 04:13p 07:59p | 8.25 | | | | 07:58a 03:07p | 02:07p 05:12p | 8.25 | 40.00 |

ANF000123

Case 1:08-cv-01859-PKC    Document 37-8    Filed 08/11/2008    Page 19 of 24

ANF000124

**EMPLOYEE NAME and ID (by SSN)** — POMALES,DAVID (000)

**Week of 5/27/2007 – 6/2/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 5/27/2007 | | | |
| Monday 5/28/2007 | 08:02 a / 03:00 p | 02:19 p / 05:11 p | 8.50 |
| Tuesday 5/29/2007 | | | |
| Wednesday 5/30/2007 | | | |
| Thursday 5/31/2007 | | | |
| Friday 6/1/2007 | | | |
| Saturday 6/2/2007 | 12:58 p / 06:14 p | 05:16 p / 09:58 p | 8.00 |
| **Week Totals** | | | **24.50** |

**Week of 6/3/2007 – 6/9/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 6/3/2007 | | | |
| Monday 6/4/2007 | 08:09 a / 03:24 p | 02:30 p / 06:12 p | 8.25 |
| Tuesday 6/5/2007 | | | |
| Wednesday 6/6/2007 | 10:58 a / 05:02 p | 03:59 p / 07:59 p | 8.00 |
| Thursday 6/7/2007 | | | |
| Friday 6/8/2007 | 10:58 a / 04:00 p | 03:08 p / 07:53 p | 8.00 |
| Saturday 6/9/2007 | 07:48 a / 02:32 p | 01:36 p / 05:16 p | 8.50 |
| **Week Totals** | | | **40.75** |

**Week of 6/10/2007 – 6/16/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 6/10/2007 | 07:53 a / 02:05 p | 12:59 p / 05:07 p | 8.25 |
| Monday 6/11/2007 | 08:02 a | 02:59 p | |
| | 04:07 p | | |
| Tuesday 6/12/2007 | 07:57 a / 03:29 p | 02:32 p / 06:08 p | 9.25 |
| Wednesday 6/13/2007 | | | |
| Thursday 6/14/2007 | 10:57 a / 04:30 p | 03:58 p / 07:52 p | 8.50 |
| Friday 6/15/2007 | 08:57 p / 03:32 a | 02:23 a / 05:49 a | 7.75 |
| Saturday 6/16/2007 | | | |
| **Week Totals** | | | **41.50** |

**Week of 6/17/2007 – 6/23/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 6/17/2007 | 08:01 p | | 10.00 |
| Monday 6/18/2007 | 07:55 a | 06:01 p | 10.00 |
| Tuesday 6/19/2007 | 10:10 a / 04:07 p | 03:09 p / 07:01 p | 8.00 |
| Wednesday 6/20/2007 | 08:00 a / 03:08 p | 02:11 p / 04:57 p | 8.00 |
| Thursday 6/21/2007 | 09:58 p / 03:15 a | 02:16 a / 06:52 a | 8.00 |
| Friday 6/22/2007 | | | |
| Saturday 6/23/2007 | 07:55 a | 03:00 p | 7.00 |
| **Week Totals** | | | **41.00** |

**Week of 6/24/2007 – 6/30/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 6/24/2007 | 10:55 a / 04:00 p | 03:03 p / 07:30 p | 7.75 |
| Monday 6/25/2007 | 07:55 a | 03:03 p | |
| Tuesday 6/26/2007 | 09:57 a / 03:44 p | 02:42 p / 06:59 p | 8.00 |
| Wednesday 6/27/2007 | 07:56 a / 03:09 p | 02:09 p / 05:39 p | 8.75 |
| Thursday 6/28/2007 | 10:05 a / 04:04 p | 03:20 p / 07:08 p | 8.50 |
| Friday 6/29/2007 | 09:57 a / 02:54 p | 01:55 p / 07:32 p | 8.50 |
| Saturday 6/30/2007 | | | |
| **Week Totals** | | | **41.25** |

**Week of 7/1/2007 – 7/7/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 7/1/2007 | | | |
| Monday 7/2/2007 | | | |
| Tuesday 7/3/2007 | 10:54 a / 04:15 p | 03:19 p / 07:56 p | 8.00 |
| Wednesday 7/4/2007 | 09:52 a / 03:00 p | 02:13 p / 06:58 p | 8.25 |
| Thursday 7/5/2007 | 06:55 p / 02:00 a | 01:11 a / 04:10 a | 8.50 |
| Friday 7/6/2007 | | | |
| Saturday 7/7/2007 | 07:54 a / 03:02 p | 02:10 p / 05:00 p | 8.25 |
| **Week Totals** | | | **33.00** |

**Week of 7/8/2007 – 7/14/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 7/8/2007 | | | |
| Monday 7/9/2007 | | | |
| Tuesday 7/10/2007 | 10:00 a | 03:55 p | 8.00 |
| Wednesday 7/11/2007 | 07:54 a / 03:07 p | 02:03 p / 04:59 p | 8.00 |
| Thursday 7/12/2007 | 11:08 a / 05:00 p | 04:02 p / 07:57 p | 8.00 |
| Friday 7/13/2007 | | | |
| Saturday 7/14/2007 | 07:56 a / 03:02 p | 02:09 p / 04:57 p | 8.25 |
| **Week Totals** | | | **30.25** |

**Week of 7/15/2007 – 7/21/2007**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 7/15/2007 | 10:54 a / 05:00 p | 04:15 p / 07:49 p | 8.25 |
| Monday 7/16/2007 | | | |
| Tuesday 7/17/2007 | 11:35 a / 05:00 p | 04:11 p / 08:14 p | 7.75 |
| Wednesday 7/18/2007 | 10:59 a | 07:56 p | 9.00 |
| Thursday 7/19/2007 | | | |
| Friday 7/20/2007 | 10:13 a / 04:03 p | 03:15 p / 07:56 p | 9.00 |
| Saturday 7/21/2007 | 07:58 a / 02:05 p | 01:25 p / 03:57 p | 7.25 |
| **Week Totals** | | | **41.25** |

Case 1:08-cv-01859-PKC    Document 37-8    Filed 08/11/2008    Page 20 of 24

ANF000125

**EMPLOYEE NAME and ID (by SSN)**
POMALES,DAVID (000)

| | Sunday 7/22/2007 | | | Monday 7/23/2007 | | | Tuesday 7/24/2007 | | | Wednesday 7/25/2007 | | | Thursday 7/26/2007 | | | Friday 7/27/2007 | | | Saturday 7/28/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | | | | | | | | | | | | | | | | 0.00 |

**EMPLOYEE NAME and ID (by SSN)**
POMALES,DAVID (000)

| | Sunday 7/29/2007 | | | Monday 7/30/2007 | | | Tuesday 7/31/2007 | | | Wednesday 8/1/2007 | | | Thursday 8/2/2007 | | | Friday 8/3/2007 | | | Saturday 8/4/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | | | | | | | | | | | | | 09:49 a | 02:55 p | | 7.50 |
| | | | | | | | | | | | | | | | | | | | 03:54 p | 06:19 p | 7.50 | |

**EMPLOYEE NAME and ID (by SSN)**
POMALES,DAVID (000)

| | Sunday 8/5/2007 | | | Monday 8/6/2007 | | | Tuesday 8/7/2007 | | | Wednesday 8/8/2007 | | | Thursday 8/9/2007 | | | Friday 8/10/2007 | | | Saturday 8/11/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 07:56 a | 02:37 p | | | | | | | | 11:30 a | 04:05 p | | | | | 11:30 a | 04:05 p | | | | | 42.00 |
| | 03:23 p | 04:58 p | 8.25 | | | | | | | 05:00 p | 07:54 p | 7.50 | | | | 05:00 p | 07:05 p | 7.25 | | | | |

**EMPLOYEE NAME and ID (by SSN)**
POMALES,DAVID (000)

| | Sunday 8/12/2007 | | | Monday 8/13/2007 | | | Tuesday 8/14/2007 | | | Wednesday 8/15/2007 | | | Thursday 8/16/2007 | | | Friday 8/17/2007 | | | Saturday 8/18/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 07:56 a | 01:24 p | | 11:01 a | 04:05 p | | | | | 07:56 a | 04:37 p | 8.75 | | | | 07:59 a | 03:16 p | | | | | 43.50 |
| | 02:22 p | 05:01 p | 8.00 | 05:00 p | 07:54 p | 8.00 | | | | | | | | | | 04:00 p | 07:20 p | 10.50 | | | | |

**EMPLOYEE NAME and ID (by SSN)**
POMALES,DAVID (000)

| | Sunday 8/19/2007 | | | Monday 8/20/2007 | | | Tuesday 8/21/2007 | | | Wednesday 8/22/2007 | | | Thursday 8/23/2007 | | | Friday 8/24/2007 | | | Saturday 8/25/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 12:01 p | 03:55 p | | | | | | | | 07:54 a | 02:07 p | | 12:54 p | 04:58 p | | 09:52 p | 04:12 a | | | | | 40.50 |
| | 04:54 p | 08:56 p | 8.00 | | | | | | | 03:00 p | 04:55 p | 8.25 | 05:59 p | 09:53 p | 8.00 | 05:11 a | 06:59 a | 8.00 | | | | |

**EMPLOYEE NAME and ID (by SSN)**
POMALES,DAVID (000)

| | Sunday 8/26/2007 | | | Monday 8/27/2007 | | | Tuesday 8/28/2007 | | | Wednesday 8/29/2007 | | | Thursday 8/30/2007 | | | Friday 8/31/2007 | | | Saturday 9/1/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 07:55 a | 02:12 p | | | | | | | | | | | 09:53 a | 03:10 p | | 09:57 a | 03:11 p | | 07:58 p | 01:05 a | | 32.25 |
| | 03:03 p | 04:57 p | 8.25 | | | | | | | | | | 04:02 p | 07:02 p | 8.25 | 04:07 p | 06:32 p | 7.75 | 02:03 a | 04:57 a | 8.00 | |

**EMPLOYEE NAME and ID (by SSN)**
POMALES,DAVID (000)

| | Sunday 9/2/2007 | | | Monday 9/3/2007 | | | Tuesday 9/4/2007 | | | Wednesday 9/5/2007 | | | Thursday 9/6/2007 | | | Friday 9/7/2007 | | | Saturday 9/8/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 09:01 p | 02:03 a | | 08:57 p | 01:58 a | | 09:55 p | 02:09 a | | | | | | | | | | | | | | 24.25 |
| | 03:00 a | 05:57 a | 8.00 | 02:55 a | 06:55 a | 8.25 | 03:00 a | 06:55 a | 8.25 | | | | | | | | | | | | | |

**EMPLOYEE NAME and ID (by SSN)**
POMALES,DAVID (000)

| | Sunday 9/9/2007 | | | Monday 9/10/2007 | | | Tuesday 9/11/2007 | | | Wednesday 9/12/2007 | | | Thursday 9/13/2007 | | | Friday 9/14/2007 | | | Saturday 9/15/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 06:50 a | 02:03 p | | 10:55 a | 02:59 p | | | | | 10:02 a | 03:06 p | | 06:58 a | 01:10 p | | 09:53 p | 05:04 a | 7.25 | 06:00 a | 07:09 a | 1.25 | 40.75 |
| | 03:03 p | | 8.25 | 03:59 p | 07:53 p | 8.00 | | | | 04:02 p | 06:57 p | 8.00 | 02:00 p | 03:55 p | 8.00 | | | | | | | |

ANF000126

**EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 9/16/2007 | | | |
| Monday 9/17/2007 | 12:55 p / 06:00 p | 05:07 p / 10:05 p | 8.25 |
| Tuesday 9/18/2007 | 10:54 a / 05:00 p | 04:08 p / 07:57 p | 8.25 |
| Wednesday 9/19/2007 | 08:52 a / 01:08 p | 12:10 p / 04:01 p | 8.25 |
| Thursday 9/20/2007 | 08:50 a / 02:00 p | 01:09 p / 03:27 p | 7.75 |
| Friday 9/21/2007 | 09:56 p / 04:00 a | 03:07 a / 03:56 p | 8.00 |
| Saturday 9/22/2007 | | | |
| **Week Totals** | | | **40.50** |

**EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 9/23/2007 | | | |
| Monday 9/24/2007 | | | |
| Tuesday 9/25/2007 | 12:56 p / 06:02 p | 05:08 p / 09:59 p | 8.25 |
| Wednesday 9/26/2007 | | | |
| Thursday 9/27/2007 | 11:41 a / 05:00 p | 04:14 p / 08:44 p | 8.25 |
| Friday 9/28/2007 | 10:50 a / 04:00 p | 03:08 p / 07:50 p | 8.25 |
| Saturday 9/29/2007 | 12:54 p / 06:00 p | 05:04 p / 09:53 p | 8.00 |
| **Week Totals** | | | **32.75** |

**EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 9/30/2007 | | | |
| Monday 10/1/2007 | 06:53 a / 02:55 p | 01:56 p / 04:10 p | 8.25 |
| Tuesday 10/2/2007 | 07:53 a / 03:10 p | 02:15 p / 05:01 p | 8.25 |
| Wednesday 10/3/2007 | | | |
| Thursday 10/4/2007 | | | |
| Friday 10/5/2007 | 12:54 p / 06:21 p | 05:29 p / 10:04 p | 8.25 |
| Saturday 10/6/2007 | 08:52 p / 04:37 a | 03:38 a / 06:58 a | 8.00 |
| **Week Totals** | | | **40.75** |

**EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 10/7/2007 | | | |
| Monday 10/8/2007 | 06:54 a / 03:26 p | 02:25 p | 8.00 |
| Tuesday 10/9/2007 | 10:53 a / 05:31 p | 04:37 p / 07:56 p | 8.25 |
| Wednesday 10/10/2007 | 12:54 p / 07:00 p | 06:13 p / 09:53 p | 8.25 |
| Thursday 10/11/2007 | | | |
| Friday 10/12/2007 | 10:56 a / 05:04 p | 03:56 p / 08:05 p | 8.00 |
| Saturday 10/13/2007 | | | |
| **Week Totals** | | | **32.50** |

**EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 10/14/2007 | 12:53 p | 10:00 p | 9.00 |
| Monday 10/15/2007 | 10:59 a / 04:00 p | 03:03 p / 08:08 p | 8.25 |
| Tuesday 10/16/2007 | 12:56 p / 06:00 p | 05:04 p / 08:57 p | 8.00 |
| Wednesday 10/17/2007 | | | |
| Thursday 10/18/2007 | 06:54 a / 02:00 p | 01:10 p / 03:57 p | 8.25 |
| Friday 10/19/2007 | | | |
| Saturday 10/20/2007 | | | |
| **Week Totals** | | | **41.50** |

**EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 10/21/2007 | 09:56 a / 04:00 p | 03:08 p / 06:56 p | 8.25 |
| Monday 10/22/2007 | 06:52 a / 01:02 p | 12:09 p / 04:00 p | 8.25 |
| Tuesday 10/23/2007 | | | |
| Wednesday 10/24/2007 | 11:54 a / 05:02 p | 04:11 p / 07:56 p | 8.00 |
| Thursday 10/25/2007 | 06:58 a / 01:16 p | 12:20 p / 03:44 p | 7.75 |
| Friday 10/26/2007 | | | |
| Saturday 10/27/2007 | 09:59 a / 03:00 p | 02:02 p / 06:57 p | 8.00 |
| **Week Totals** | | | **40.25** |

**EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 10/28/2007 | | | |
| Monday 10/29/2007 | 06:53 a / 01:59 p | 12:57 p / 04:06 p | 8.25 |
| Tuesday 10/30/2007 | | | |
| Wednesday 10/31/2007 | 06:58 a / 02:15 p | 01:14 p / 04:03 p | 8.00 |
| Thursday 11/1/2007 | 06:52 a / 01:03 p | 12:12 p / 04:31 p | 8.00 |
| Friday 11/2/2007 | 11:02 a / 03:53 p | 02:58 p / 08:03 p | 8.25 |
| Saturday 11/3/2007 | 09:55 a / 02:54 p | 01:58 p / 06:59 p | 8.25 |
| **Week Totals** | | | **40.75** |

**EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)**

| Day | In | Out | Hrs |
|---|---|---|---|
| Sunday 11/4/2007 | 09:54 a / 03:03 p | 02:21 p / 07:32 p | 8.50 |
| Monday 11/5/2007 | | | |
| Tuesday 11/6/2007 | 10:57 a / 04:01 p | 03:05 p / 07:54 p | 8.00 |
| Wednesday 11/7/2007 | 11:54 a / 05:13 p | 04:18 p / 08:24 p | 7.50 |
| Thursday 11/8/2007 | | | |
| Friday 11/9/2007 | 10:49 a / 04:04 p | 03:00 p / 08:01 p | 8.25 |
| Saturday 11/10/2007 | 06:53 a / 01:04 p | 12:08 p / 03:54 p | 8.00 |
| **Week Totals** | | | **40.25** |

ANF000127

### Week of 11/11/2007 – 11/17/2007

| EMPLOYEE NAME and ID (by SSN) (000) | Sunday 11/11/2007 | | | Monday 11/12/2007 | | | Tuesday 11/13/2007 | | | Wednesday 11/14/2007 | | | Thursday 11/15/2007 | | | Friday 11/16/2007 | | | Saturday 11/17/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID | 08:50 a | 01:33 p | | 09:55 a | 04:10 p | | 10:54 a | 03:57 p | | | | | | | | 10:52 a | 04:10 p | | 10:00 a | 03:11 p | | 40.25 |
| | 02:24 p | 06:31 p | 7.75 | 05:01 p | 06:59 p | 8.25 | 04:54 p | 07:58 p | 8.00 | | | | | | | 05:06 p | 07:57 p | 8.25 | 04:09 p | 06:59 p | 8.00 | |

### Week of 11/18/2007 – 11/24/2007

| EMPLOYEE NAME and ID (by SSN) (000) | Sunday 11/18/2007 | | | Monday 11/19/2007 | | | Tuesday 11/20/2007 | | | Wednesday 11/21/2007 | | | Thursday 11/22/2007 | | | Friday 11/23/2007 | | | Saturday 11/24/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID | 09:45 a | 03:05 p | | 10:58 a | 04:03 p | | 12:48 p | 09:57 p | 9.25 | 12:59 p | 10:00 p | 9.00 | | | | | | | | | | 34.50 |
| | 04:00 p | 06:59 p | 8.25 | 05:00 p | 07:58 p | 8.00 | | | | | | | | | | | | | | | | |

### Week of 11/25/2007 – 12/1/2007

| EMPLOYEE NAME and ID (by SSN) (000) | Sunday 11/25/2007 | | | Monday 11/26/2007 | | | Tuesday 11/27/2007 | | | Wednesday 11/28/2007 | | | Thursday 11/29/2007 | | | Friday 11/30/2007 | | | Saturday 12/1/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID | | | | 01:53 p | 08:14 p | | 09:48 a | 03:53 a | | | | | | | | 02:00 p | 10:55 p | 9.00 | | | | 33.50 |
| | | | | 07:09 p | 10:50 p | 8.00 | 04:47 a | 06:59 a | 8.25 | | | | | | | | | | | | | |

### Week of 12/2/2007 – 12/8/2007

| EMPLOYEE NAME and ID (by SSN) (000) | Sunday 12/2/2007 | | | Monday 12/3/2007 | | | Tuesday 12/4/2007 | | | Wednesday 12/5/2007 | | | Thursday 12/6/2007 | | | Friday 12/7/2007 | | | Saturday 12/8/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID | 01:51 p | 07:00 p | | 01:02 p | 04:19 p | | 11:05 a | 03:05 p | | | | | | | | 09:51 a | 01:58 p | | 10:50 a | 03:09 p | | 35.50 |
| | 07:59 p | 10:59 p | 5.25 | 05:14 p | 08:34 p | 6.50 | 04:02 p | 07:28 p | 7.50 | | | | | | | 02:55 p | 06:57 p | 8.25 | 04:09 p | 07:50 p | 8.00 | |

### Week of 12/9/2007 – 12/15/2007

| EMPLOYEE NAME and ID (by SSN) (000) | Sunday 12/9/2007 | | | Monday 12/10/2007 | | | Tuesday 12/11/2007 | | | Wednesday 12/12/2007 | | | Thursday 12/13/2007 | | | Friday 12/14/2007 | | | Saturday 12/15/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID | | | | 09:55 a | 02:10 p | | 06:48 a | 12:21 p | | | | | | | | 01:59 p | 06:59 p | 5.00 | 08:46 a | 02:05 p | | 30.00 |
| | | | | 03:00 p | 07:04 p | 8.25 | 01:15 p | 04:13 p | 8.50 | | | | | | | | | | 03:05 p | 06:04 p | 8.25 | |

### Week of 12/16/2007 – 12/22/2007

| EMPLOYEE NAME and ID (by SSN) (000) | Sunday 12/16/2007 | | | Monday 12/17/2007 | | | Tuesday 12/18/2007 | | | Wednesday 12/19/2007 | | | Thursday 12/20/2007 | | | Friday 12/21/2007 | | | Saturday 12/22/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID | | | | | | | | | | 08:53 a | 01:07 p | | 01:57 p | 11:00 p | 9.00 | 12:01 p | 05:01 p | | 07:58 a | 01:18 p | | 32.25 |
| | | | | | | | | | | 02:11 p | 05:57 p | 8.00 | | | | 06:03 p | 08:54 p | 7.50 | 02:03 p | 04:08 p | 7.50 | |

### Week of 12/23/2007 – 12/29/2007

| EMPLOYEE NAME and ID (by SSN) (000) | Sunday 12/23/2007 | | | Monday 12/24/2007 | | | Tuesday 12/25/2007 | | | Wednesday 12/26/2007 | | | Thursday 12/27/2007 | | | Friday 12/28/2007 | | | Saturday 12/29/2007 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID | 08:58 a | 02:11 p | | 10:59 a | 03:11 p | | | | | 06:50 p | 08:40 a | | 09:54 p | 03:25 a | | | | | | | | 33.00 |
| | 03:09 p | 06:09 p | 8.25 | 04:01 p | 08:07 p | 8.25 | | | | 04:36 a | 07:05 a | 8.25 | 04:09 a | 08:57 a | 8.25 | | | | | | | |

### Week of 12/30/2007 – 1/5/2008

| EMPLOYEE NAME and ID (by SSN) (000) | Sunday 12/30/2007 | | | Monday 12/31/2007 | | | Tuesday 1/1/2008 | | | Wednesday 1/2/2008 | | | Thursday 1/3/2008 | | | Friday 1/4/2008 | | | Saturday 1/5/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID | | | | | | | | | | 09:53 a | 02:08 p | | 06:52 a | 01:09 p | | 12:59 p | 05:30 p | | 06:50 a | 12:05 p | | 32.50 |
| | | | | | | | | | | 03:08 p | 07:56 p | 9.00 | 02:02 p | 04:03 p | 8.25 | 06:26 p | 10:01 p | 8.25 | 01:04 p | 02:55 p | 7.00 | |

ANF000128

**EMPLOYEE NAME and ID (by SSN): POMALES,DAVID (000)**

| | Sunday 1/6/2008 | | | Monday 1/7/2008 | | | Tuesday 1/8/2008 | | | Wednesday 1/9/2008 | | | Thursday 1/10/2008 | | | Friday 1/11/2008 | | | Saturday 1/12/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 10:56 a | 08:06 p | | | | | 09:53 a | 02:04 p | | 08:58 a | 12:07 p | | | | | 12:59 p | 10:00 p | 9.00 | 11:17 a | 03:05 p | | |
| | 04:03 p | 08:04 p | 8.25 | | | | 03:00 p | 07:11 p | 8.25 | 01:04 p | 04:16 p | 8.25 | | | | | | | 04:03 p | 07:59 p | 7.75 | 41.50 |

| | Sunday 1/13/2008 | | | Monday 1/14/2008 | | | Tuesday 1/15/2008 | | | Wednesday 1/16/2008 | | | Thursday 1/17/2008 | | | Friday 1/18/2008 | | | Saturday 1/19/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | 10:58 a | 04:07 p | | 08:54 a | 01:58 p | | 08:58 a | 02:13 p | | | | | | | | |
| | | | | | | | 05:06 p | 08:04 p | 8.00 | 09:01 p | 06:59 p | 8.00 | 03:00 p | 06:08 p | 8.60 | | | | | | | 24.50 |

| | Sunday 1/20/2008 | | | Monday 1/21/2008 | | | Tuesday 1/22/2008 | | | Wednesday 1/23/2008 | | | Thursday 1/24/2008 | | | Friday 1/25/2008 | | | Saturday 1/26/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | | | | 11:55 a | 04:07 p | | 08:54 a | 12:07 p | | 11:59 a | 03:57 p | | 08:55 a | 02:10 p | | |
| | | | | | | | | | | 05:00 p | 08:55 p | 8.00 | 01:02 p | 03:55 p | 8.00 | 05:06 p | 08:57 p | 7.75 | 03:01 p | 08:04 p | 8.25 | 32.00 |

| | Sunday 1/27/2008 | | | Monday 1/28/2008 | | | Tuesday 1/29/2008 | | | Wednesday 1/30/2008 | | | Thursday 1/31/2008 | | | Friday 2/1/2008 | | | Saturday 2/2/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | 08:55 a | 02:01 p | | 08:56 a | 01:08 p | | 11:52 a | 04:01 p | | | | | 08:57 a | 02:04 p | | |
| | | | | | | | 03:00 p | 06:01 p | 8.25 | 02:04 p | 06:58 p | 8.00 | 05:04 p | 08:57 p | 8.00 | | | | 03:01 p | 05:38 p | 7.75 | 40.00 |

| | Sunday 2/3/2008 | | | Monday 2/4/2008 | | | Tuesday 2/5/2008 | | | Wednesday 2/6/2008 | | | Thursday 2/7/2008 | | | Friday 2/8/2008 | | | Saturday 2/9/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 01:02 p | 04:24 p | 3.25 | | | | 11:56 a | 04:48 p | | 08:54 a | 02:10 p | | 12:53 p | 03:57 p | | 08:55 a | 01:10 p | | | | | |
| | | | | | | | 05:44 p | 09:00 p | 8.00 | 03:00 p | 06:08 p | 8.50 | 05:00 p | 08:59 p | 7.00 | 02:02 p | 06:03 p | 8.25 | | | | 35.00 |

| | Sunday 2/10/2008 | | | Monday 2/11/2008 | | | Tuesday 2/12/2008 | | | Wednesday 2/13/2008 | | | Thursday 2/14/2008 | | | Friday 2/15/2008 | | | Saturday 2/16/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | 09:51 a | 02:06 a | | | | | 10:10 a | 02:02 p | | 08:55 a | 01:58 p | | 09:48 a | 02:04 p | | 11:55 a | 04:02 p | | |
| | | | | 03:00 a | 06:55 a | 8.25 | | | | 03:02 p | 06:55 p | 7.75 | 03:01 p | 06:00 p | 8.00 | 03:01 p | 07:04 p | 8.25 | 05:00 p | 08:41 p | 7.75 | 40.00 |

| | Sunday 2/17/2008 | | | Monday 2/18/2008 | | | Tuesday 2/19/2008 | | | Wednesday 2/20/2008 | | | Thursday 2/21/2008 | | | Friday 2/22/2008 | | | Saturday 2/23/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | | | | | | | | | | 09:59 a | 03:08 p | | 10:59 a | 03:18 p | | 08:56 a | 12:59 p | | 09:00 a | 02:11 p | | |
| | | | | | | | | | | 04:00 p | 07:02 p | 8.25 | 04:02 p | 07:55 p | 8.25 | 02:03 p | 03:05 p | 7.00 | 03:00 p | 06:00 p | 8.25 | 31.75 |

| | Sunday 2/24/2008 | | | Monday 2/25/2008 | | | Tuesday 2/26/2008 | | | Wednesday 2/27/2008 | | | Thursday 2/28/2008 | | | Friday 2/29/2008 | | | Saturday 3/1/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| | 09:56 a | 02:08 p | | | | | 08:56 a | 02:12 p | | 08:53 a | 01:11 p | | 09:58 a | 03:12 a | | | | | 09:00 a | 02:09 p | | |
| | 03:05 p | 08:59 p | 8.00 | | | | 03:07 p | 06:01 p | 8.25 | 02:02 p | 04:04 p | 8.25 | 04:00 a | 06:57 a | 8.25 | | | | 03:00 p | 05:25 p | 7.50 | 40.25 |

| EMPLOYEE NAME and ID (by SSN) | Sunday 3/2/2008 | | | Monday 3/3/2008 | | | Tuesday 3/4/2008 | | | Wednesday 3/5/2008 | | | Thursday 3/6/2008 | | | Friday 3/7/2008 | | | Saturday 3/8/2008 | | | Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | In | Out | Hrs | |
| POMALES,DAVID (000) | | | | | | | 06:54 a | 01:08 p | | 08:53 a | 01:37 p | | 09:50 p | 02:58 p | | | | | 10:00 a | 03:06 p | | 31.75 |
| | | | | | | | 02:02 p | 03:03 p | 7.25 | 02:03 p | 04:06 p | 8.25 | 03:59 a | 07:05 a | 8.25 | | | | 04:00 p | 06:58 p | 8.00 | |

ANF000129

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And                                                                    08 CV 01859 (PKC)

KENNETH FINGERMAN,                                      **DECLARATION OF MICHAEL
                                                                       BARRETT**

                        Plaintiffs,

        -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
                d/b/a Abercrombie & Fitch,
                Abercrombie, Hollister and Ruehl,

                        Defendants.
-------------------------------------------------------------------X

        I, Michael Barrett, being first duly cautioned and sworn, and being more that age

eighteen and competent to testify about the matters contained herein, hereby declare and state as

follows upon personal knowledge or information:

        1.  I am currently employed by Abercrombie & Fitch as a Loss Prevention Agent

("LPA") in Abercrombie's South Street Seaport location in New York, New York.  I have been

employed in this position since February 10, 2008 according to company records.  Prior to

working at the South Street Seaport store, I was employed by Abercrombie at its Fifth Avenue

store in New York, New York.  I worked in that store from October 7, 2007 until I transferred

over to the South Street Seaport store in February, 2008.

1



2.  As an LPA at Fifth Avenue, I was part of a loss prevention team that had the ultimate responsibility for all loss prevention efforts and initiatives in the store. There were approximately seven to eight LPAs working at the Fifth Avenue store at that time. We collectively directed store management and employees in loss prevention efforts. We partnered with store management to respond to loss prevention issues and to help the store perform at its lowest shrink potential.

3.  Conversely, at the South Street Seaport store, I am one of only two LPAs assigned to work at that store. The other LPA and I only work together three days a week and, when we do, we work different shifts such that we only work in the store at the same time for a few hours a day at most. We are each independently responsible for performing the various loss prevention duties associated with that store, although we do communicate with each other on our various loss prevention efforts.

4.  My primary responsibilities at the South Street Seaport store include implementing loss prevention and shortage reduction programs, regularly training all store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

   a.  I effectively work with store management to implement a loss prevention and shortage reduction program in each of my stores. While the larger goal of reducing shrink and following certain loss prevention rules to prevent shrink is the same for all stores, the shortage reduction programs for stores differs based upon the particular characteristics of each store. For example, those stores that have high shrink are placed on more aggressive shortage reduction programs that other, low shrink stores are not required to follow. Nonetheless, all programs must be

2



tailored to meet the specific problems in each individual store. I must decide, in partnership with store management, the most effective way to implement the programs so that I can optimize the opportunity for success in the store. When I identify specific problems in the store that must be address, I provide direction to store management to assist them in our overall efforts to reduce loss.

b.  I conduct regular training sessions for associates and managers. Once a week, I conduct orientation for all new hires on how to detect, avoid, prevent and report any loss or potential loss. Orientation usually consists of a review of the company's basic loss prevention video and then I meet with the new associates to discuss the general topics addressed in the video and then also address various other specific topics with them. I determine what topics to address with them based upon my own experience and observations. I also decide how to deliver this orientation in a creative way based upon my own style. For example, rather than just talk at the associates regarding loss prevention issues and techniques, I like to make the session more interactive by presenting various situations to them and asking them how they would handle that particular situation. I also discuss with them particular situations I have experienced and how I've dealt with those situations so as to educate them on techniques to detect and prevent theft. I also conduct regular continuing training, or workshops, with managers and associates on the current loss prevention issues I detect in the store and strategies for preventing theft. I train management and associates how to approach customers suspected of theft in a way that will allow us to prevent theft while maintaining good customer relations. In addition, I attend weekly management meetings. At

3



these meetings, I field questions from management and I also notify them of current trends of theft and problems in the store that I have observed and discuss with them strategies for addressing those problems. None of the training sessions I conduct involve me reading from a script, and they vary widely depending on the particular loss issues existing at the store at any given time.

c. There are two types of theft, external and internal.

    i. External theft is theft by an individual who does not work for Abercrombie, usually a customer. When my observations at the store lead me to suspect external theft, I am responsible to take action to prevent the theft and apprehend the suspect when theft occurs, and I take the necessary action to address the suspect. When I apprehend a suspect I complete the necessary paperwork and contact the police. I do not have to report to anyone or get permission when taking these actions. I work alone with the police and prosecutors and will attend court if it is required. I complete all paperwork on my external cases and have to do so in a manner that will be most helpful in a later criminal or civil proceeding.

    ii. Similar to external cases, if I suspect that there is internal theft, I decide what action to take to verify my suspicions. I do this by, for example, reviewing cash register transactions and associate purchase logs. I gather evidence and build a case to a certain point to assure that my suspicions are solidified and then I submit that evidence to my loss prevention manager who then conducts an interview of the internal suspect. I

4



complete paperwork for my internal cases and, again, must do so in a way

that it will be most helpful in a court proceeding.

d. In an effort to prevent loss, I conduct regular audits of my stores to ensure

compliance with loss prevention initiatives. This is done by walking through the

stores and responding to a loss prevention audit questionnaire. After conducting

the audit, I review the results with management and identify with management

what things must be improved. I then follow-up with management in our training

sessions, workshops, meetings and during the normal course of the week to make

sure that the issues identified in the audit are addressed.

e. In addition to conducting the audits, I am always making observations in my store

to determine whether there are any issues that need to be addressed. Once I

identify any issues, I decide how to address the issues, whether through more

training or meetings, or through a planned course of action.

5. As an LPA, I have ultimate responsibility for all loss prevention efforts and initiatives

in my store and me and my fellow LPA at the store are the main point of contact in that regard. I

direct store management and employees in loss prevention efforts and hold them accountable for

reaching the company's loss prevention goals. I also partner with store management to respond

to loss prevention issues and to help the store perform at its lowest shrink potential. I regularly

field loss prevention questions from the management in my store.

6. It is essential to my success as an LPA, and to the success of the stores to which I am

assigned, that I exercise independent judgment and discretion in performing my duties every day.

I am constantly reviewing and analyzing the current loss prevention problems in each of my



store, determining what specific issues are hindering my store from meeting all loss prevention goals, and determining the best way to help my store improve.

7. Earlier, I stated that I previously worked at the Fifth Avenue store. The Fifth Avenue store is a completely separate monster from the South Street Seaport store due to the volume of customers, the volume of business, the number and types of associates and managers hired at the store and, therefore, the number and type of loss prevention issues that exist at that store. While many of my loss prevention duties at the South Street Seaport store are similar to those I had at the Fifth Avenue store I do not carry out my duties at the South Street Seaport in exactly the same manner. First, at the Fifth Avenue store I was expected to work in different areas of the store performing specific activities at specific times and I rotated through those areas and duties with the various other LPAs working at the store. At the South Street Seaport store, I decide when and how to perform my various loss prevention duties at the store each day based upon what aspects of the store's loss prevention I determine I need to focus on at any given time. Also, my duties at the South Street Seaport store do not require me to watch a live television monitor to observe activity in the store in an effort to prevent theft. I was expected to do so at the Fifth Avenue store at specified times each day. At the South Street Seaport store, I typically only watch video from store monitors after the fact when I am investigating suspicions of internal or external theft. Overall, I feel that I have more ownership of my loss prevention duties at the South Street Seaport store than I did when I worked at Fifth Avenue because I am one of only two LPAs assigned to that store and have more freedom in determining how and when to perform each of my loss prevention duties. The store management and associates at the South Street Seaport store rely on me to a much greater degree than they did at the Fifth Avenue store, but only because the loss prevention team at Fifth Avenue was so much larger than the two of us

6

at South Street Seaport. That being said, I am a highly motivated individual and take pride in excelling at my job. As a result, even when I was at the Fifth Avenue store, I made efforts to be more involved in directing and implementing loss prevention initiatives at the store beyond the basic duties expected of me each day. For example, I often sought out additional involvement in associate and management orientation and other training. My managers at the Fifth Avenue store recognized my leadership potential early on and after only two or more weeks on the job, they involved me in management meetings where I was able to communicate with store management on loss prevention programs, issues and strategies to prevent theft. Conversely, I observed that most of my fellow LPAs at the Fifth Avenue store did not take initiative to engage in these efforts. It appeared to me that they preferred to perform the minimal duties required of them and nothing more. I believe my leadership ability and potential was a large part of the reason why I was asked so early in my employment at the company to transfer to the South Street Seaport store and implement and direct the loss prevention initiatives there.

8.   I record the hours I work by logging them on a timesheet. I also call my manager and report my hours to him each day. I record every hour that I work. I have not been instructed by management to alter my work time or to work off the clock. In fact, my manager has specifically instructed me that I am not permitted to work off the clock. I have been paid for every hour that I have worked for the company. I have never witnessed a manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

9.   I do not work significant, if any, overtime hours. I do not believe the LPA job requires much, if any, overtime. On the rare occasions that I can recall having worked overtime, I have recorded all such hours worked on a timesheet and have been paid accordingly.

7

10. My manager at the Fifth Avenue store was Damon Byron. My manager at the South Street Seaport store has been Robert Ruiz.

11. I voluntarily spoke with Corey Donovan, counsel for my employer Abercrombie & Fitch ("Abercrombie"), with respect to the issues set forth in this Declaration. Ms. Donovan informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. Ms. Donovan informed me that no retaliation would be permitted if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Donovan told me that she does not represent me individually. I understand that she represents the Company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_____
Michael Barrett

7/20/08
_____
Date

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And                                                                  08 CV 01859 (PKC)

                                                                     **DECLARATION OF JOSEPH**
KENNETH FINGERMAN,                                                   **GANDOLFO**

                    Plaintiffs,

        -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
                    d/b/a Abercrombie & Fitch,
                    Abercrombie, Hollister and Ruehl,

                    Defendants.
-----------------------------------------------------------------------X

        I, Joseph Gandolfo, being first duly cautioned and sworn, and being more that age

eighteen and competent to testify about the matters contained herein, hereby declare and state as

follows upon personal knowledge or information:

        1.  I am currently employed by Abercrombie & Fitch as a Loss Prevention Agent

("LPA").

        2.  I have responsibility for three stores.  Two of my stores, Hollister and Abercrombie &

Fitch, are in the Monmouth Mall in Eaton Town, New Jersey and the other store, Hollister, is in

the Ocean County Mall in Ocean County, New Jersey.  I also have some responsibility for the

abercrombie store in the Monmouth Mall, but that responsibility is minimal since that store does

not have significant issues with theft.  I am the only LPA who works in my stores.

1

_J6_

3.  As an LPA, I have responsibility for all loss prevention efforts and initiatives in my three stores and, for those stores, I am the main point of contact in that regard.  I direct store management and employees in loss prevention efforts.  I partner with store management to respond to loss prevention issues and to help the store perform at its lowest shrink potential.  I regularly field loss prevention questions from the management in my stores.

4.  My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training all store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

a.  I effectively implement a loss prevention and shortage reduction program in each of my stores.  Each of the stores that I work in have different loss prevention issues every week and I must decide the most effective way to implement loss prevention efforts in those stores so that I can optimize the opportunity for success in preventing theft in each store.  I do this by researching and analyzing inventory reports and other store documents, by observing conduct of associates and customers on the sales floor, and also by familiarizing myself with the current trends in organized retail crime in order to identify the main causes of loss in each particular store.  Once I identify the specific problems, I then decide how to implement the loss prevention initiatives in the particular store and how to allocate my loss prevention resources to end the loss.

b.  I conduct regular training sessions for employees and managers.  Most weeks, I conduct orientation for all new hires on how to recognize, avoid, prevent and report any loss or potential loss.  Orientation usually consists of associates watching a loss prevention video and then I spend 30 to 40 minutes with them

2

discussing all aspects of loss prevention in the store, including the current trends in theft and strategies and techniques to detect and prevent that theft. I do not have a set list of topics that I have been instructed by the company to cover with the associates during orientation. Rather, I have created my own list of topics I developed through my own experience and observations as an LPA. I also conduct daily training, or workshops, with managers and associates on the current loss prevention issues that I detect in their particular store, as well as strategies for addressing those issues and preventing theft. In these workshops, I also train management and associates how to approach customers suspected of theft in a way that will allow us to prevent theft while maintaining good customer relations. In addition, I make presentations at management meetings. While I am required by the company to address a weekly loss prevention topic in these management meetings, I also cover various other loss prevention topics that I have determined, based upon my own observations and independent judgment, are worth discussing. For example, I will address recent trends in organized retail crime that may exist or current problems that I have observed within my stores that make them more susceptible to theft. I also ask each of my individual store managers to identify loss prevention issues they are having and then I provide them with feedback on how I think they should address those issues.

c. There are two types of theft, external and internal.

  i. External theft is theft by an individual who does not work for Abercrombie, usually a customer. When my observations lead me to suspect external theft, I am solely responsible to take action to prevent the

3

JG

theft and apprehend the suspect when theft occurs, and I take whatever action I believe is proper to address the suspect within general company guidelines. When I apprehend a suspect I complete the necessary paperwork and contact the police. I do not have to report to anyone or get permission when taking these actions. I work alone with the police and prosecutors and will attend court if it is required. I complete all paperwork on my external cases and have to do so in a manner that will be most helpful in a later criminal or civil proceeding.

    ii.  Similar to external cases, if I suspect that there is internal theft, I pursue my suspicions. I do this by, for example, reviewing cash register transactions and associate purchase logs or reviewing videotapes of the specific time period and associate at issue to see if I can confirm the theft. After I gather all evidence I believe solidifies my suspicions, I submit that evidence to my District Loss Prevention Manager. My District Loss Prevention Manager then conducts an interview of the internal suspect to confirm the results of my investigation. When I attend these interviews, my manager will ask me after the interview for my input on the suspect and theft at issue.

  d.  In an effort to prevent loss, I conduct regular audits to ensure compliance with loss prevention policies and procedures. This is done by walking through the store and responding to a loss prevention audit questionnaire. After conducting the audit, I provide the results to management and identify what things must be improved.

4

e.  In addition to conducting the audits, I am always making observations in my stores to determine whether there are any issues that need to be addressed. I then adapt my daily and weekly loss prevention efforts to meet the needs of each particular store that I oversee. For example, if I determine that there is an increased problem with external theft at one of my stores, I may adapt my work schedule to spend more time at that store and then focus my time at the store on detecting and preventing the external theft observed at that store. I may forego other loss prevention duties that I might have otherwise performed that day in order to address the external theft at issue and put in place steps to prevent that theft. I make these decisions regarding where and how to direct my loss prevention efforts each week on my own.

f.  My duties do not regularly require me to sit and watch a television monitor to observe activity in the store in an effort to prevent theft. Rather, I only watch video from the store cameras as part of my investigation of suspicions of internal or external theft. When I do that, I will go back to video that has been recorded in the past and watch it for the particular time and associate or customer at issue in an attempt to confirm my suspicions of theft or to identify the particular associate or customer at issue.

5.  It is essential to my success as an LPA, and to the success of the stores to which I am assigned, that I exercise independent judgment and discretion in the handling of my loss prevention duties every day. I am constantly reviewing and analyzing the current loss prevention problems in each of my individual stores, determining what specific issues are hindering the prevention of theft, and determining the best way to help the stores improve.

J6

6. Earlier, I stated that I am responsible for three separate stores. Those stores are very different. I do not carry out my duties in any of my three stores in exactly the same manner. Rather, I determine how to carry out my duties with respect to each store based upon the particular loss prevention issues each of those stores face each week.

7. I record the hours I work by logging them on a timesheet. I have not been instructed by management to alter my work time or to work off the clock. I have never witnessed a manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

8. My manager has been Carlos Ortiz until recently when he was promoted.

9. I do not work significant, if any, overtime hours. I do not believe the LPA job requires much, if any, overtime.

10. I voluntarily spoke with Corey Donovan, counsel for my employer Abercrombie & Fitch ("Abercrombie"), with respect to the issues set forth in this Declaration. Ms. Donovan informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation if the court allows it and that I could be entitled to monetary relief if I opt in and the plaintiffs are successful. Also, Ms. Donovan informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement.

6

JG

Ms. Donovan told me that she does not represent me individually.  I understand that she represents the Company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_____
Joseph Gandolfo

_____
7/19/08
Date

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

        Plaintiffs,

    -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
        d/b/a Abercrombie & Fitch,
        Abercrombie, Hollister and Ruehl,

        Defendants.
------------------------------------------------------------------------X

08 CV 01859 (PKC) (AJP)

**DECLARATION OF
JULIETTE HACKETT**

    I, Juliette Hackett, being first duly cautioned and sworn, and being more than age

eighteen and competent to testify about the matters contained herein, hereby declare and state as

follows upon personal knowledge or information:

    1.  I am currently employed by Gilly Hicks as a Loss Prevention Agent ("LPA") in the

Smith Haven Mall in Lake Grove, New York (the "Store"). I was hired on or around May 25,

2008, and have worked in Abercrombie & Fitch's South Street Seaport store and various

Hollister stores located in New Jersey.

    2.  Prior to working for Gilly Hicks, I was a surveillance investigator for about 10 years,

working for law firms, school districts and insurance companies. I conducted covert operations,



1

accident reconstruction, and was involved in trial preparation and the collection of witness statements. I was the Senior Vice President of the investigation company for which I worked.

3. As an LPA, I have ultimate responsibility to make sure that the Store meets all loss prevention expectations and initiatives, and to protect Store employees and assets. I instruct Store management and employees on company and store-specific loss prevention efforts and I hold them all accountable for reaching loss prevention goals. I am the main point of contact for all loss prevention initiatives and programs in the Store, and I regularly field loss prevention questions from the management in the Store. I partner with Store management to respond to loss prevention issues and strive for the Store to operate at its lowest shrink potential.

4. I have an individual relationship with all managers in the Store. They approach me with many questions every day, seeking my advice on a wide range of issues. For example, I *Dunbar(xh)* recently had a manager call me and say that the normal Brinks person who picks up the cash deposits did not come to the Store -- there was a different person and the person did not seem to know what he was doing. The manger wanted to know what to do. I made some phone calls to figure out what was going on and then got back to the manager. I also receive calls about operational errors, cash register problems and other loss prevention issues, and about employee-related problems.

5. As an LPA, I must exercise independent judgment and discretion everyday. I could not succeed if I had to read a script, consult a binder, or otherwise follow a set formula that purported to direct my every move. I have to constantly analyze different situations, stay on my toes and use the years of investigation experience that I have to implement the loss prevention initiatives of the company and to execute my job so that the Store succeeds. I am solely

2



responsible to determine what specific issues hinder the Store from meeting all loss prevention goals, and to determine the best way to help the Store improve.

6. My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training all Store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal, external and operational loss.

    a. I am the only agent assigned to the Store and I have no other stores that I am currently responsible for. When I started in the Store, it was on the Target Store Program ("TSP") -- only stores that have high shrink are placed on TSP. It is not good to be on TSP and I wanted to take action to get off TSP. It appeared to me that a large reason the Store was on TSP was loss caused by customers. To help get off TSP, I did several things, including conducting more audits that were focused on where it appeared the loss was most occurring. And I gave more training to employees and managers on how to approach suspicious customers in a legally responsible manner. The Store is now off the TSP.

    b. There is also the Shortage Reduction Program ("SRP"). SRP is targeted towards managers to help them address loss issues in the Store. I oversee SRP in my Store and make sure that the managers are taking ownership of what they must do to help address the loss prevention problems in the Store. The managers consult me regarding the SRP and what they must do to succeed in the SRP. I receive reports bi-weekly regarding the Store's performance on the SRP. When I receive that report, I study it, and then discuss it with management. I direct management in a conversation about how the Store progressed or not over the past weeks and what

3



the Store must do to progress in the coming week. Also, there are problems that I observe in the Store that are not on the report that I receive. Those issues I similarly review with management.

c. The Store is fairly new and as a result I conduct a lot of training. I give individual training to all managers, group training to employees, and, when situations arise, individual training to employees. The training I provide is continual and takes place in different formats, depending on the audience and topic. Weekly, I conduct orientation for all new hires on how to respond to emergencies and how to avoid, prevent and report any loss or potential loss. Also, I conduct regular training of managers on the current loss prevention program and on loss prevention issues I detect in the Store. I also train management how to approach customers suspected of theft in a way that is legal and in compliance with company policy. In addition, I make presentations at management meetings and conduct workshops with store employees.

    i. Some of the training that I conduct is required of me by the company and there are specific topics pointed out by the company that I could cover during the training. However, what the company gives me to discuss during the training sessions is general. I am expected to and do discuss a wide range of topics outside of what is asked of me by the company and I tailor the company's general topics to my Store so that the training is relevant and helpful. Honestly, after reviewing the training topics suggested by the company one time, I do not consult them anymore. I know what training the Store needs from working in it everyday and I

4



train on what is needed. None of the training sessions I conduct involve me reading from a script or acting as a puppet, and the training sessions vary widely depending on the Store. In addition, I must decide how to deliver the training (e.g. role playing or presentation format) and I must decide the most creative manner in which to deliver the training. For example, I saw that some of the employees in the Store were not following the fitting room policies. So, I got the employees together and reviewed the fitting room policies with them. I did so by role playing and also talking with them to make sure they understood not only how to appropriately work the fitting rooms, but also why the fitting room policies had to be followed.

ii. Recently, the Store was boosted. That means that professionals came into the store and stole a significant amount of merchandise—42 units with $1,109.00 − ∦
~~$1,100~~ to be exact. I take all loss in the Store very personally and this was a serious concern for me. I collected evidence that was left in the Store by one of the suspects and worked with my management team to start collecting statements. Also, I partnered with the loss prevention agent from Banana Republic. That agent had information on the suspects. I alerted the authorities, worked with the police and detectives to collect evidence, and have continued to work them towards locating the suspects. Once the suspects are caught, I will work with the police and prosecutors to prosecute the case. When we were collecting the evidence, we had to have a Gilly Hicks manager go to the local precinct and be fingerprinted.

5



We had to separate her fingerprints from those of the suspect. She was very nervous and asked that I accompany her to precinct. I did accompany her and walked her through the process. After the boosting incident, I reviewed the surveillance tape and met with the management team. We reviewed the tape frame by frame to pick apart and analyze everything the suspects did from the time they entered the store until they left. For example, the suspects had concealed under their clothes a bag in which to place the merchandise and when they left the store, one stayed behind for a few minutes to determine whether anyone suspected them. We talked about what the Store could have done to prevent what occurred.

d. I work hard to address and prevent "external loss." "External loss" is theft by an individual who does not work for Gilly Hicks, usually a customer. When I suspect external theft in my Store, I am responsible to decide what action is necessary to verify my suspicions and take that action, gather evidence in support of my suspicions, and take whatever action I believe is proper to address the suspect, if at all. If I apprehend an external suspect, then I am responsible to interview the suspect and take action to recover loss and make sure the case is prosecutable. I do not have to report to anyone or get permission when taking these actions. I work alone with the police and prosecutors and will attend court if any of my cases are prosecuted. I also complete all paperwork on external cases and have to do so in a manner that will be most helpful in a later court proceeding.

6

e. Similar to external cases, if I suspect that there is internal theft, I decide, sometimes in partnership with management, whether to pursue my suspicions. If I so decide, I am responsible to determine what action to take to verify my suspicions and then take that action. I do this by, for example, reviewing cash register transactions and associate purchase logs. After I gather all evidence I believe solidifies my suspicions, I submit that evidence to a loss prevention investigator who then conducts an interview of the internal suspect. I complete paperwork for my internal cases and, again, must do so in a way that it will be most helpful in a court proceeding.

i. Recently, there was a box of shipment missing, about 20 pairs of underwear. I interviewed managers to try to figure out if they had any information that could help me determine what occurred. I spoke with Regional Loss Prevention Manager Robert Ruiz about placing additional cameras in the Store. I have since gone through the Store to determine where we could strategically place additional cameras to stop internal loss. There are cameras currently in the Store, but they are not placed in every location. I have experience from my prior employment on the placement of cameras and I am using that expertise now to address this internal loss problem.

f. In an effort to prevent loss, I conduct regular audits of my Store to ensure compliance with loss prevention initiatives. This is done by walking through the stores and responding to a loss prevention audit questionnaire. After conducting the audit, I review the results with management and identify with management

7

what things must be improved. I then follow-up with management in our training sessions and meetings and during the normal course of the week to make sure that the issues identified in the audit are addressed. I hold the management team accountable for addressing these issues. In addition to conducting the audits, I am always making observations in my Store to determine whether there are any issues that need to be addressed. Once I identify any problems, I decide how to address the problems, whether through more training or meetings, or through a planned course of action.

      i. As an example, another LPA for the company told me that there was a problem with employees from another Abercrombie affiliated store coming into a Gilly Hicks store and stealing merchandise. The problem was that the fitting room attendants were not following the fitting room policies when the customer was an employee of an Abercrombie affiliated store. After learning about this, I met with my management team to tell them about the potential problem. To make sure that the problem did not occur in my Store, I started a new program, and did so without asking permission. Now, in my Store, when employees of my Store or from any other Abercrombie affiliated store come into my Store, they must alert a manager or me before trying on clothes. The manager or myself will then let the employee into the fitting room and complete the fitting room procedures for the employee.

g. I work with management on employee issues related to loss prevention. For example, yesterday, a customer touched an employee in an improper manner.



The employee was upset that the customer touched her. The employee spoke with a manager who asked me to address the situation. I spoke with the employee and determined that the customer probably worked in the mall. I did some digging and located the customer. I then worked with mall security and the police to approach the customer. I acted as the liaison between the police, mall security, and the employee and her mother. I had to oversee the entire process, issue a criminal trespass warning against the customer, prohibiting him from entering any Gilly Hicks or other Abercrombie affiliated stores in any mall in any state. I also started the process of pressing charges against the customer. I did not need permission from store management or loss prevention management to take these actions.

7.    I have worked in some Hollister and Abercrombie stores. Sometimes, LPAs are asked to go to an Abercrombie affiliated sore that does not have an assigned LPA to perform a "blitz." A "blitz" occurs when there are significant losses in a particular store. LPAs are brought into conduct research and evaluate the store so that we can determine the cause of the loss. While we make our observations, we advise management on what they can do differently. We also look for external loss and take action to end it. After the blitz, we report to Mr. Ruiz what we observed and what we recommend.

8.    From talking with the LPAs assigned to Abercrombie and Hollister stores, and from training with them and conducting the blitzes, I know that we have similar duties, although how we execute those duties is very different and depends on the particular loss prevention problems plaguing our different stores.

9



9. I partner with management to decide what discipline action to take against employees with loss prevention. I also provide management with the evidence and advice necessary to make discipline decisions. For example, in the incident described above about boosting, I noted from a surveillance tape that one of our employees was in a room adjacent to the room from where we were boosted. That employee was talking to other employees and distracting them. Had she not been talking and been more attentive to her job, we might not have had the loss. I spoke with management about the employee and we talked about the fact that the employee is a constant distraction to other employees in the store. The next time I saw her, I showed her the video, gave her a workshop about boosting and told her what she did wrong. I told management that we had to monitor the employee closely. I did not want the employee to work in the areas of the Store where we were most prone to loss because she was not attentive. I did not want her at the fitting rooms because I was not convinced she would follow the policies, and I did not want her in the back of the Store because she had to be watched closely. I told management that if the employee violated any more loss prevention policies she would have to be disciplined. Management listened to me and they are acting accordingly.

10. I work in an independent manner and the work I perform is office or non-manual work.

11. My work day is not scripted. I am free to execute my duties in a manner that most benefits my store. I use my training, skills and experience to spot problems and theft, and to decide how to address those issues.

12. I record the hours I work by logging them on a timesheet. I have not been instructed by management to alter my work time or to work off the clock. I have never witnessed a

10

manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

13. I do not work significant, if any, overtime hours. I do not believe the LPA job requires much overtime. When I do work overtime, I record all such hours worked on a timesheet and have been paid accordingly. No manager has ever told me not to record any hours I worked over 40.

14. I voluntarily spoke with Stacia Jones, counsel for my employer, with respect to the issues set forth in this Declaration. Ms. Jones informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of <u>Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. Ms. Jones informed that I would not be retaliated against for any of my statements. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statements in this Declaration. Ms. Jones told me that she does not represent me individually. She only represents the company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_Juliette_ **Hackett**

7/20/08
**Date**

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

        Plaintiffs,

   -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
      d/b/a Abercrombie & Fitch,
      Abercrombie, Hollister and Ruehl,

        Defendants.
------------------------------------------------------------------------X

08 CV 01859 (PKC) (AJP)

**DECLARATION OF SHAJI MATHEW**

     I, Shaji Mathew, being first duly cautioned and sworn, and being more than age eighteen and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

     1.  I am currently employed by Abercrombie & Fitch as a Loss Prevent Agent ("LPA"). I was hired by the company in March 2008. I have ultimate responsibility for all loss prevention efforts and initiatives for six (6) stores located at the Westchester and Palisades Malls in New York.  At the Westchester Mall, I oversee loss prevention at the Abercrombie & Fitch, abercrombie and Hollister stores.  These same three stores are also located at the Palisades Mall.

     2.  I direct store management and associates in loss prevention efforts and hold them accountable for reaching the company's loss prevention goals.  I also partner with store

1

SM

management to respond to loss prevention issues and to help the store perform at its lowest shrink potential. I regularly field loss prevention questions from the management in my stores. I keep them informed about recent trends so far as theft is concerned and educate them about issues that I have observed and actions that I have taken in other stores to further the company's loss prevention efforts. I regularly develop game plans for the stores that I oversee and challenge them to engage in activities that I believe will reduce the store's shrink.

3. It is essential to my success as an LPA, and to the success of the stores to which I am assigned, that I exercise independent judgment and discretion everyday. I am not a security guard and I do not follow a set formula that directs me in my every move. To the contrary, I review and analyze the current loss prevention problems in each of my individual stores, determining what specific issues are hindering the stores from meeting all loss prevention goals, and determining the best way to help the stores improve. For example, I regularly audit my stores' cash register logs and, if there is a shortage or overage in excess of $10.00, I will dig deeper by reviewing camera footage and analyzing and tracking register usage.

4. My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training all store associates and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

    a. I effectively implement a loss prevention and shortage reduction program in each of my stores. While the larger goal of reducing shrink and following certain loss prevention rules to prevent shrink is the same for all stores, the shortage reduction programs that I implement are different from store to store. For example, those stores that have high shrink are placed on aggressive shortage reduction programs that other, low shrink stores are not required to follow. Nonetheless, all programs

2

SM

must be tailored to meet the specific problems in each individual store. Each of the stores that I work in is sufficiently different such that I must decide the most effective way to implement the programs so that I can optimize the opportunity for success in the store. I do this by researching and analyzing inventory reports and other store documents and information to identify the main causes of loss in each particular store. For example, if I find that a store is regularly missing large quantities of merchandise, then I may focus more on the stock room. Once I identify the specific problems, I then decide how to implement the loss prevention programs and initiatives in the particular store and how to allocate my loss prevention resources to end the loss.

b. I conduct regular training sessions for associates and managers. I conduct orientation every Sunday for all new hires on how to respond to emergencies and how to avoid, prevent and report any loss or potential loss. I begin the orientation by showing a video and then I quiz the associates and go over, in great detail, the broader loss prevention issues that were addressed in the video with a fine tooth comb. It is critical that I communicate to the associates, in great detail, what they should be looking for, in terms of identifying and preventing theft, before they begin their employment with the company. I also conduct regular training of managers on current loss prevention programs and on loss prevention issues I detect in their particular store. For example, I train management how to approach customers suspected of theft in a way that is legal and in compliance with company policy. While some of the training that I conduct is required of me by the company, I also discuss a wide-range of topics outside of what is asked of me

3

SM

by the company and I tailor the company's general topics to each of my stores so that the training is relevant and helpful. During the weekly management meetings that I attend, I speak with the managers about issues that I have personally observed during the previous week and I use that meeting to communicate my expectations to the management in terms of loss prevention efforts. For example, I may communicate to management the need to concentrate on floor sweeping (searching the floor for sensors and other evidence of loss) to reduce the store's shrink.

c. There are two types of theft, external and internal.

    i. External theft is theft by an individual who does not work for Abercrombie, usually a customer. When I suspect external theft in any of my stores, I am responsible to decide what action is necessary to verify my suspicions and take that action, gather evidence in support of my suspicions, and take whatever action I believe is proper to address the suspect, if at all. I interview external suspects and, to the extent I find that a suspect caused a loss, take action to recover loss and make sure the case is prosecutable. I do not have to report to anyone or get permission when taking these actions. I then work also with the police and prosecutors to pursue the case. I also complete all paperwork on external cases and have to do so in a manner that will be most helpful in a later criminal or civil proceeding.

    ii. Similar to external cases, if I suspect that there is internal theft, I decide, sometimes in partnership with management, whether to pursue my

4

SM

suspicions.   If I so decide, I am responsible to determine what action to take to verify my suspicions and then take that action.  I may review video, reports, monitor the floor more closely, etc. depending on what I think will be most effective.  After I gather all evidence I believe solidifies my suspicions, I submit that evidence to my District Loss Prevention Manager who then conducts an interview of the internal suspect.  I complete paperwork for my internal cases and, again, must do so in a way that it will be most helpful in a court proceeding.

d.  To identify loss, I review cash register transactions, associate purchase logs and other documents to determine whether there are losses attributable to paperwork error or other causes.  Based on what I find, I will either further investigate and/or formulate a plan to address the losses.  I then partner with management to role out the plan I devised and continue to work with management through the successful completion of my plan.

e.  In an effort to prevent loss, I conduct regular audits of my stores to ensure compliance with loss prevention initiatives.  I then follow-up with management in our training sessions, workshops, meetings and during the normal course of the week to make sure that the issues identified in the audit are addressed.  I hold the management team accountable for addressing these issues.

f.  In addition to conducting the audits, I am always making observations in my stores to determine whether there are any issues that need to be addressed.  Once I identify any issues, I decide how to address the issues, whether through more training or meetings, or through a planned course of action.

5

SM

5.  I do not execute discipline against associates.  However, I partner with management when disciplinary issues arise and I provide management with the evidence and advice necessary to make discipline decisions.  For example, as mentioned above, I regularly conduct associate clothing audits.  If I see an associate wearing a new item of the company's clothing, I may decide to perform an audit to confirm that the clothing has been purchased by that associate.  Or, if an associate is acting in a way that I deem to be suspicious, I may review that associates' purchase log to determine whether he or she purchased an item and I may decide to track that associate's purchases over a period of time.

6.  I am the only LPA who works in my stores.  I work in an independent manner.  Right now, the issue of organized retail crime ("ORC") is an epidemic in my area.  ORC involves groups of individuals who move from store to store stealing large amounts of merchandise.  The stores that I oversee are part of the company's Target Store Program, meaning that they have experienced a great deal of merchandise loss.  In order to confirm that the problem is ORC, I must first confirm that the problem is not related to internal theft.  Then, I must educate store managers and associates about ORC and the signs to look for and the steps to take to protect the company's merchandise.  I recently attended a very comprehensive all-day meeting on the topic of ORC.  Detectives from the New York Police Department were among the presenters.  Because the clientele at Westchester Mall is very different from the clientele at Palisades Mall, I then needed to educate the staff differently at my stores to effectively implement a loss prevention strategy in their particular stores.  I focus the majority of my attention on the Abercrombie & Fitch and Hollister stores at the Palisades and Westchester malls based on the level of shrink they are experiencing.

6

SM

7.   I use my training, skills and experience to spot problems and theft, and to decide how to address those issues.  I constantly educate managers and associates as to what signs they should look for to prevent internal and external theft.  And, I need to educate them how to make an appropriate recovery statement, how to create a presence on the sales floor and what to look for in terms of suspicious and potentially criminal behavior.

8.   I also oversee safety issues in all of my stores.  For example, I bring to the managers' attention any safety issues that I identify in the stores and recommend specific actions that need to be taken to address those issues.

9.   I complete monthly accomplishment reports and submit them to Rob Ruiz.  In these reports, I identify, for example, the number of apprehensions, orientations, training sessions, workshops, I have accomplished for that time period.  I typically complete these reports in an office inside one of our three (3) stores at the Westchester mall.

10. I don't have an office in any of my stores inside the Palisades mall and I don't have any monitors to review.  All of my stores inside the Westchester Mall, however, have monitors.  Therefore, my loss prevention efforts must vary between the stores at those two (2) malls.

11. The LPAs in our region participate in weekly conference calls.  If I am scheduled to be off the day and/or time of a meeting, I am not required to attend and I can get a recap of the meeting from another LPA.

12. I record the hours I work by logging them on a timesheet.  I accurately record every hour that I work.  I have not been instructed by management to work off the clock.  I have never witnessed a manager instruct any LPA to alter her work time or to work off the clock, nor has any LPA ever told me that a manager instructed her to do so.  I do not work more than forty (40) hours per week.          nimor    (SR)

7

SM

13. My direct supervisor is Okitto Bailey, but I also report to Rob Ruiz.

14. I voluntarily spoke with Audrey Adams, counsel for my employer Abercrombie, with respect to the issues set forth in this Declaration.  Ms. Adams informed me that I was not required to speak with her and that I could have ended our conversation at any time.  I understand that this Declaration was obtained for purposes of Abercrombie's defense of <u>Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents.  The statements made in this Declaration are truthful and voluntary. Ms. Adams informed that I would not be retaliated against for making my statements.  She told me if I experienced any retaliation, I could contact Human Resources immediately.  Also, I know that I will receive no special treatment for providing my statements in this Declaration.  Ms. Adams told me that she does not represent me individually.  She only represents the company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

7-20-08

Shaji Mathew

8

SM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------

SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

          Plaintiffs,

   -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
      d/b/a Abercrombie & Fitch,
      Abercrombie, Hollister and Ruehl,

        Defendants.

------------------------------------------------------------------------

08 CV 01859 (PKC) (AJP)

**DECLARATION OF FELIX RAMIREZ**

I, **Felix Ramirez**, being first duly cautioned and sworn, and being more than age eighteen and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

    1.  I am currently employed by Abercrombie & Fitch as a Loss Prevention Agent ("LPA") in Abercrombie's Fifth Avenue location in New York, New York ("Fifth Avenue").

    2.  I was first employed by Abercrombie as a Loss Prevention Supervisor at South Street Seaport ("SSS") in New York, New York. I was hired in February 2005. My title was later changed to Loss Prevention Agent ("LPA"). I was transferred to Fifth Avenue in ~~November~~ Spring F.R. 2006.

    3.  There are stark differences between working at SSS and working at Fifth Avenue.

1

4.   At SSS, I was one of three LPAs.  We typically worked different shifts so that there was one LPA per shift.   When I worked at SSS, my primary focus was to effectively implement the company's loss prevention initiatives and shrinkage reduction program, and in doing so I constantly exercised independent judgment and discretion.  It was essential to my success as an LPA, and to the success of SSS, that I exercised independent judgment and discretion everyday. I was not working as security guard and I did not follow a set formula that directed me in my every move.  To the contrary, I was constantly analyzing the current loss prevention problems in SSS, determining what specific issues were hindering the store from meeting all loss prevention goals, and determining the best way to help the store improve. I did this in several ways.

    a.   First, I focused heavily on training.  I trained both managers and employees, and I did so with respect to all loss prevention initiatives, which included how to open and close the store, operate the cash register, address customers suspected of theft, monitor store employees to prevent theft, and take other necessary steps throughout the work day to prevent loss.   The training took place during weekly New Hire Orientation, management meetings and on a daily basis through the constant conversations I had with management.  Also, I had regular touch base meetings with employees on loss prevention issues.  The training I gave was not scripted.  There were general topics that the company wanted me to review, but I was expected and did tailor the training to the specific store and the problems I observed it to be having at the time.

    b.   Second, I worked as a partner with the in-store management team at SSS, and they relied on me heavily to address all loss prevention problems in the store. The management team listened to me, addressed the problems I directed them to

2

*FIL*

address, and continuously asked for my advice on loss prevention problems and
issues in the store.

c.  I helped management to address associates who I observed violate loss prevention
policies.  For example, if I observed that an associate working in the fitting rooms
was not operating those rooms pursuant to loss prevention policy, I would alert
management to the problem then direct management to replace the associate at the
fitting room.  Also, I gave management information necessary to discipline
associates on loss prevention related problems and I partnered with them to decide
what discipline to take.

d.  Third, I regularly conducted audits throughout the store.  The audits were
designed to assist me in detecting loss prevention problems, including internal,
external and operational loss.  After I conducted the audits, I met with
management to review the audits and advised them on what specific things they
needed to do to address the problem.  Also, while conducting the audits, I picked
up on problems not necessarily covered in the audits, and I reviewed those
problems with management.  In addition to meeting with management, I decided
if additional training was necessary and I attended weekly management meetings
to review any problems I found.  I then followed up with the management team
and held them accountable for addressing the problems I found.  I did not need
oversight nor approval for training and follow up with management.

e.  I was always focused on detecting external and internal loss and taking the
appropriate action to address that loss.  To identify loss, I reviewed cash register
transactions, associate purchase logs and other documents to determine whether

3

*FR*

there were losses attributable to paperwork error or other causes, internal, external
or operational. Based on what I found, I would further investigate or formulate a
plan to address the problem. I then partnered with store management to roll out
the plan I devised and continued to work with management through the successful
completion of my plan.

f.   If I detected an external loss – loss caused by individuals who are not employees
of the company – I took actions to verify what I detected, approach the
individual(s) I believed was causing the loss, apprehend him/her, interview
him/her, involve the authorities, if appropriate, and take every action to assemble
a prosecutable case. I had no oversight in my execution of these external cases. I
used my own independent judgment and discretion in how to approach these
situations and how to address them.

g.   Internal loss is loss caused by an employee of the Company. If I detected that an
Abercrombie employee was causing a loss to the company, I researched journals,
logs and other paperwork to build my case. I decided what was necessary to build
the case and built it. I had no oversight when deciding whether to build a case
and while building it. If, after building a case, I thought there might be an internal
loss problem, I gave the case to my supervisor, Mike Oliveras. Mr. Oliveras
interviewed the individuals suspected of internal loss. There were times,
however, that after researching a potential problem, I did not believe an interview
was necessary, but rather that training and other types of communication were
necessary. For example, once, while reviewing the cash register transaction logs
at SSS, I noticed that a manager completed a return transaction after the store

4

FR

closed.  Comparing the cash register identification code in the log and, given that the transaction occurred after the store closed, I determined that the manager made a refund to himself, which is in violation of loss prevention policy.  The manager could have run a refund transaction to get money for himself out of the cash register, but without returning any merchandise.  After making this observation, I reviewed additional logs for the particular manager's cash register identification code to determine whether he completed any similar transactions at any other time.  I found no other suspicious transaction.  I decided that the manager was likely not causing an internal loss.  I spoke with the manager about what he did and also spoke with the entire management team to re-train them on cash register transactions.

h.  The company gave us guidance on how to implement the loss prevention initiatives, but I had to tailor what the company gave me to meet the specific problems that I observed in SSS.  I made decisions relating to how I should implement loss prevention programs by researching and analyzing inventory reports and other store documents and information.  Based on my observations and research, I decided where to focus my attention in the store, what types of potential loss to address more aggressively, and how to perform my job on any particular day to best address the current loss prevention problems in the store.

5.  At SSS, there were some additional duties that I was responsible for, but those duties were not my primary duties or my primary focus.  For example, I monitored shipment when it came in and I also went through the store trash to make sure that there was no merchandise hidden in the trash.

5

FR

6. At Fifth Avenue, my duties are different.

   a. First, Fifth Avenue is much larger than SSS and has a much larger loss prevention team working in the store. I find that my days at Fifth Avenue are more structured than they were at SSS. I am assigned for different periods of time during every shift to work at posts. Currently, there are three posts. One post is greeting. Before recently, I was assigned as a greeter at the front door. That meant that I checked employees' personal items when they left the store, checked customer bags if the sensor alarm alerted upon their exit from the store, and attended to any other loss prevention problems by the front door. Another post is in the CCTV room where I watch monitors for cameras placed throughout the store. The third post is walking the sales floors to look for any potential loss to the company.

   b. We did not have posts at SSS and did not watch cameras or greet. My entire day at SSS was determined by what I thought the problems were and how I thought they needed to be addressed.

   c. I do conduct training at Fifth Avenue, but I do not get as involved as I did at SSS. However, I do have liberty to add information to training and to elaborate on the topics I am to discuss in training.

   d. I do not participate in management meetings at Fifth Avenue, but I do partner with management. I give management information that they can use to discipline or take other action against associates for loss prevention problems.

   e. I do review transaction logs and other documents the same as I did at SSS to detect signs of internal or external loss. I am responsible for external cases,

6

without oversight from management, and I am responsible to build internal cases, also without oversight. I do use independent judgment and discretion at Fifth Avenue – I have to if I am going to successfully implement our loss prevention initiatives and partner with management to reduce shrink. I would just say that it is not to the same degree as at SSS.

7. I have worked in loss prevention since about 1992. Prior to working for Abercrombie, I worked at Banana Republic and Bloomingdales. My experience at those stores was different from my experiences at SSS. At Banana Republic and Bloomingdales my work day was more structured and I did not have the opportunity to use the independent judgment and discretion that I exercised everyday at SSS. I did not partner with management at Banana Republic and Bloomingdales, and I did not have the freedom to alter training topic and formats in the same manner as at SSS.

8. I record the hours I work by punching in and out at a computer terminal. I accurately record every hour that I work. I have not been instructed by management to alter my work time or to work off the clock. I have never witnessed a manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

9. I have been paid for all time worked since being employed at Abercrombie.

10. During my time at Abercrombie, I have never been instructed to make daily reports. I do not make reports or complete other paperwork during times that I am off work.

11. I do not work significant, if any, overtime hours. I do not believe the LPA job requires much, if any, overtime. I do not spend overtime hours on regional loss prevention phone calls or drafting email communications to my manager. On those occasions that I can recall

7

having worked overtime, I have recorded all such hours worked on a timesheet and have been paid accordingly.

12. I voluntarily spoke with Stacia Jones, counsel for my employer Abercrombie, with respect to the issues set forth in this Declaration. Ms. Jones informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation if the Court allows it and that I could be entitled to monetary relief if I opt in and the plaintiffs are successful. Also, Ms. Jones informed that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statements in this Declaration. Ms. Jones told me that she does not represent me individually. She only represents the company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.


_____
**Felix Ramirez**

_____7/19/08_____
**Date**

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,          08 CV 01859 (PKC) (AJP)
And
                                                                     **DECLARATION OF JAMIE**
KENNETH FINGERMAN,                                                    **VAN DUSEN**

                    Plaintiffs,

        -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
            d/b/a Abercrombie & Fitch,
            Abercrombie, Hollister and Ruehl,

                    Defendants.
------------------------------------------------------------------------X

        I, Jamie Van Dusen, being first duly cautioned and sworn, and being more than age

eighteen and competent to testify about the matters contained herein, hereby declare and state as

follows upon personal knowledge or information:

        1.  I am employed by Abercrombie & Fitch as a Loss Prevention Agent ("LPA").  As an

LPA, I am responsible for all loss prevention efforts and initiatives in four stores at the Garden

State Mall.  Those stores include Abercrombie & Fitch, abercrombie, Hollister and Ruhl.  I direct

store management and employees in loss prevention efforts and hold them accountable for

reaching the Company's loss prevention goals.  I also partner with store management to respond

to loss prevention issues and to help the store perform at its lowest shrink potential.  I regularly

field loss prevention questions from the management in my stores.

1

2.  I constantly review and analyze the current loss prevention problems in each of my individual stores, determining what specific issues are hindering the stores from meeting all loss prevention goals, and determining the best way to help the stores improve.

3.  My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training all store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

a.  I effectively implement a loss prevention and shortage reduction program in each of my stores.  While the larger goal of reducing shrink and following certain loss prevention rules to prevent shrink is the same for all stores, the shortage reduction programs must often be tailored to the specific needs of the individual stores.  For example, stores that have high shrink are placed on aggressive shortage reduction programs that other, low shrink stores are not required to follow.  Nonetheless, all programs must be tailored to meet the specific problems in each individual store.  Each of the stores that I work in is sufficiently different that I must decide the most effective way to implement the programs so that I can optimize the opportunity for success in the store. Once I identify the specific problems, I then decide how to implement the loss prevention programs and initiatives in the particular store and how to allocate my loss prevention resources to end the loss.

b.  I conduct regular training sessions for employees and managers.  For example, I conduct regular training of managers on the current loss prevention program and on loss prevention issues I detect in their particular store.  I also train management how to approach customers suspected of theft in a way that is legal and in compliance with company policy.  In addition, I make weekly presentations at

2

management meetings. Some of the training that I conduct is required of me by the company and there are specific topics that I must cover during the training. But, I also address topics that are store-specific and I make recommendations based on successes that I have experienced at other stores and opportunities that I see to further loss prevention efforts.

c. There are two types of theft, external and internal.

    i. External theft is theft by an individual who does not work for Abercrombie, usually a customer. If I observe external theft in one of my stores, I will approach the suspect and apprehend him/her once I have confirmed that an illegal act has taken place. I do not have to report to anyone or get permission to take such action; however, I will ask a manager to be present when I interview the suspect simply as a witness. I work alone with the police and prosecutors and attend court. I also complete all paperwork on external cases and have to do so in a manner that will be most helpful in a later criminal or civil proceeding.

    ii. Similar to external cases, if I suspect that there is internal theft, I will conduct an investigation, monitoring the situation to confirm my suspicions. For example, I review cash register transactions and associate purchase logs. If I gather evidence that solidifies my suspicions, I submit that evidence to my Loss Prevention Manager who then conducts an interview of the internal suspect. I complete paperwork for my internal cases and, again, must do so in a way that it will be most helpful in a court proceeding.

d.  To identify loss, I review cash register transactions, associate purchase logs and other documents to determine whether there are losses attributable to paperwork error or other causes.  Based on what I find, I will either further investigate and/or formulate a plan to address the losses.  I then partner with management to roll out the plan I devised and continue to work with management through the successful completion of my plan.

e.  In an effort to prevent loss, I conduct regular audits of my stores to ensure compliance with loss prevention initiatives.  I then follow-up with management in our training sessions, workshops, meetings and during the normal course of the week to make sure that the issues identified are addressed.

f.  In addition to conducting the audits, I am always making observations in my stores to determine whether there are any issues that need to be addressed.  Once I identify any issues, I decide how to address the issues, whether through more training or meetings, or through a planned course of action.

g.  I am also responsible for identifying and monitoring cash register shortages. Because one isolated incident doesn't provide me with a clear view of what is going on, I may decide to review video transactions to determine whether there is a larger loss prevention issue.   I may also decide to track the store, through reports and/or personal observations, to identify a pattern and possible employee theft.

h.  I also conduct monthly safety audits to make sure that the computers are operational and all Company and legally-required safety procedures are being

4

JV

followed. If I identify a concern or violation, I will recommend specific remedial steps to the Store Manager.

    i.   I monitor store inventory and I am ultimately responsible for lost merchandise or "shrink." I have decided to focus my attention, at this time, on the Hollister store because it has a high shrink number. In order to reduce that number, I train associates in loss prevention techniques so that they are able to identify the root causes of the loss such as employee or customer theft and overall dishonesty issues. Loss prevention issues like this are broken down individually by store.

    4.  I do not execute discipline against employees. But, if I observe an associate who is not performing his/her job I will recommend to the Store Manager that the associate be re-assigned to a different position. The managers typically follow my recommendations in order to further the Company's loss prevention efforts. And, I provide management with the evidence and advice necessary to make discipline decisions.

    5.  I am the only LPA assigned to the Company's stores at the Garden State Mall. I work independently to advance the Company's loss prevention efforts at those stores.

    6.  Earlier, I stated that I am responsible for four separate stores. Each store's loss prevention issues are different and unique based on the number of employees that work in the store, the volume of business the store conducts, the area in which the store is located, the dedication of the store management team, and the types of employees hired. I do not carry out my duties in any of the four stores in exactly the same manner. For example, my loss prevention tactics at the Hollister store are more aggressive than my tactics at the other stores at the Garden State Mall and will remain that way until I am able to decrease that Store's shrink number.

JV

7.  I use my training, skills and experience to spot problems and theft, and to decide how to address those issues.

8.  I have not been instructed by management to alter my work time or to work off the clock.  I have never witnessed a manager instruct any LPA to alter her work time or to work off the clock.  Nor has any LPA ever told me that a manager instructed her to do so.

9.  I do not work overtime hours.  Although Rob Ruiz schedules a regional loss prevention call for every Tuesday, I am not required to participate in the call if I am off work that day.  Instead, I will just ask another LPA for his/her notes from the call.

10.  Every month, I send my monthly accomplishments to Rob Ruiz.  For example, I advise him of my training accomplishments, a list of recovered merchandise, and other loss prevention efforts that I have accomplished.  If I do not complete this report at work, I finish it at home.  When that happens, I simply report to Rob the amount of time spent completing the report and he adds the time to pay for the week.  I have never had a problem getting paid for the time I submitted.  These reports don't take me longer than a half hour to complete.

11.  From what I have heard from LPA's at the Fifth Avenue store, my job is very different from their jobs.  I think there is a big difference being assigned to a mall versus a stand-alone store.  I don't have the luxury of a camera room.  I think I have the same title but a very different role.

12.  Although I am assigned to the Garden State Mall, Rob Ruiz has asked me, on different occasions, to report to a different mall because of loss prevention issues that need to be addressed at a particular store.  Often times, if there is a theft problem I will analyze the store to identify the problem and put in place a plan to decrease our losses.  In the event that I am asked to report to a different store, I am paid for my travel as well as all hours worked.

JV

13. I voluntarily spoke with Audrey Adams, counsel for my employer Abercrombie, with respect to the issues set forth in this Declaration. Ms. Adams informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of <u>Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation if the Court allows it and that I could be entitled to monetary relief if I opt in and the plaintiffs are successful. Also, Ms. Adams informed that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statements in this Declaration. Ms. Adams told me that she does not represent me individually. She only represents the company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_7-19-08_

_Jamie Van Dusen_

7

JV

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And

08 CV 01859 (PKC)

**DECLARATION OF ANDRE
WALKER**

KENNETH FINGERMAN,

             Plaintiffs,

    -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
      d/b/a Abercrombie & Fitch,
      Abercrombie, Hollister and Ruehl,

            Defendants.
-------------------------------------------------------------------------

    I, Andre Walker, being first duly cautioned and sworn, and being more than age eighteen

and competent to testify about the matters contained herein, hereby declare and state as follows

upon personal knowledge or information:

    1.  I am currently employed by Abercrombie & Fitch as a Loss Prevention Agent

("LPA") in Abercrombie's Fifth Avenue location in New York, New York ("Fifth Avenue"). I

have been employed in this position since August 19, 2007 according to company records.

    2.  As an LPA at Fifth Avenue, I am part of a loss prevention team that has the ultimate

responsibility for all loss prevention efforts and initiatives in the store. We direct store

management and employees in loss prevention efforts. We partner with store management to

respond to loss prevention issues and to help the store perform at its lowest shrink potential.

1



3.  My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

   a.  I conduct regular training sessions for employees and managers.  I conduct orientation for new hires on how to respond to emergencies, what techniques to use to prevent theft (e.g. recovery statements to use), how to avoid, prevent and report any loss or potential loss, and other general company policies such as the company's sexual harassment policy.  Several times a month I conduct workshops with store managers and associates on loss prevention issues I detect in Fifth Avenue and ways to prevent or reduce loss in the future.  I also train store management and associates how to approach customers suspected of theft in a way that will allow us to prevent theft while maintaining good customer relations.

   b.  There are two types of theft, external and internal.

      i.  External theft is theft by an individual who does not work for Abercrombie, usually a customer.  When my observations lead me to suspect external theft, I am solely responsible to take action to prevent the theft and apprehend the suspect when theft occurs, and I take whatever action I believe is proper to address the suspect.  When I apprehend a suspect I complete the necessary paperwork and contact the police.  I do not have to report to anyone or get permission when taking these actions. I work alone with the police and prosecutors and attend court if it is required.  I complete all paperwork on my external cases and have to do so



in a manner that will be most helpful in a later criminal or civil

proceeding.

    ii.   Similar to external cases, if I suspect that there is internal theft, I pursue

my suspicions. I do this by, for example, reviewing cash register

transactions and associate purchase logs and through my own observations

of associates. After I gather all evidence I believe solidifies my

suspicions, I submit that evidence to my Loss Prevention Manager. My

Loss Prevention Manager then conducts an interview of the internal

suspect to confirm the results of my investigation.

c.  In an effort to prevent loss, I conduct regular audits to ensure compliance with

loss prevention initiatives and safety policies and procedures. This is done by

walking through the store and responding to a loss prevention audit questionnaire.

After conducting the audit, I review the results with management and identify

with management what things must be improved.

d.  In addition to conducting the audits, I am always making observations in my

stores to determine whether there are any issues that need to be addressed. For

example, I recently noticed that cashiers were switching registers without logging

out. This causes a problem with respect to loss prevention because it prevents the

accurate tracking of purchases. I approached a cash manager to report this

concern, identified the employees I had observed engaging in this conduct and

recommended that the manager issue discipline to the employees for their

inappropriate conduct. The cash manager agreed with and implemented my

recommendation.

3

e.  On most shifts that I work I am assigned to detect loss by watching monitors for 55 cameras located throughout Fifth Avenue.  But, I do not simply sit and watch the monitors.  Instead, I use my skills and training to detect potential loss, then manipulate the cameras so that I can hone in on the potential loss, and decide whether further action should be taken.  If so, I then communicate with my fellow LPAs on the sales floor and we decide what action should be taken and put that action into place.

f.  Also, I am sometimes assigned to work in the loss prevention office where I am responsible to sign out store keys and sensor guns, and monitor the lost and found and door alarms.

g.  Throughout my different shifts, I may be assigned to complete my duties at a particular post in the store.  If I am assigned to monitor the front doors, then I am also responsible to check customers and employees' personal items and/or purchases when they leave the store to make sure there is no theft.  When I am not assigned to a particular post, however, I walk through Fifth Avenue looking for loss prevention problems, assessing those problems, and taking the appropriate action.

4.  I understand from talking to one of my fellow LPAs who worked with me at Fifth Avenue and now works in the South Street Seaport store that the Fifth Avenue Store is a different beast.  Among other things, the South Street Seaport does not use televisions to monitor employees and customers for theft in the same manner as Fifth Avenue.  He also indicated that Fifth ~~Street~~ Ave has more blind spots and less lighting and, therefore, more opportunities for theft.

4



Based upon this conversation, I believe that his job duties as an LPA at the South Street Seaport store differ from mine.

5.    I partner with management on deciding what discipline action to take against employees with loss prevention issues and I provide management with the evidence and advice necessary to make discipline decisions.

6.    I use my training, skills and experience to spot problems and theft, and to decide how to address those issues.  If I did not, I would not be successful at my job.  As a naturally competitive person, I am motivated to perform my job duties in ways that differ from and exceed the efforts of my fellow LPAs.  I take pride in exercising my independent judgment in finding new ways to advance the store's loss prevention efforts and apprehend those who steal from the company.

7.    I record the hours I work by punching in and out at a computer terminal.  I accurately record every hour that I work.  I have not been instructed by management to alter my work time or to work off the clock.  I have never witnessed a manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

8.    I do not work significant, if any, overtime hours.  I do not spend overtime hours on regional loss prevention phone calls or drafting email communications to my manager.  On the rare occasions that I can recall having worked overtime, I have recorded all such hours worked on the time clock and have been paid accordingly.

9.    I voluntarily spoke with Corey Donovan and Audrey Adams, counsel for my employer Abercrombie & Fitch ("Abercrombie"), with respect to the issues set forth in this Declaration.  Ms. Donovan and Ms. Adams informed me that I was not required to speak with

them and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation if the court allows it and that I could be entitled to monetary relief if I opt in and the plaintiffs are successful. Also, Mses. Adams and Donovan informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with them. They told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Mses. Adams and Donovan told me that they do not represent me individually. I understand that they represent the Company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_____
Andre Walker

_____
Date 7/21/08

6

Westlaw.

Slip Copy                                                                   Page 1
Slip Copy, 2006 WL 3314624 (E.D.N.Y.)
**2006 WL 3314624 (E.D.N.Y.)**

▷

Briggs v. Arthur T. Mott Real Estate LLC
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
William BRIGGS, individually and on Behalf of
All Other Persons Similarly Situated, Plaintiffs,
v.
ARTHUR T. MOTT REAL ESTATE LLC, Defendant.
No. 06-0468 (DRH)(WDW).

Nov. 14, 2006.

Locks Law Firm, PLLC, by Seth R. Lesser, Esq.,
Fran L. Rudich, Esq., New York, NY, for Plaintiff.
Epstein, Becker & Green, P.C., by Peter M.
Panken, Esq., David B. Feldman, Esq., Barbara Lee
Ford, Esq., New York, NY, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

HURLEY, Senior District Judge.

*1 On February 2, 2006, William Briggs
("Plaintiff" or "Briggs") commenced this action individually and on behalf of all others similarly situated against Arthur T. Mott Real Estate LLC
("Defendant" or "Mott") asserting claims under
section 216(b) of the Fair Labor Standards Act
("FLSA"), 29 U.S.C. § 216(b), and the New York
Labor Law §§ 650 et seq. for unpaid wages for
overtime work for which they did not receive overtime pay. The FLSA claims are brought as purported collective claims and the state law claims are
brought as purported class action claims on behalf
of similarly situated persons. Presently before the
Court is Mott's motion to dismiss Briggs' claims
pursuant to Rules 12(b)(1) and (6) of the Federal
Rules of Civil Procedure. For the reasons set forth
below, the motion is granted.

### *BACKGROUND*

The following facts are taken from the Amended
Complaint and the documents submitted in connection with the motion to dismiss which are properly
considered on a Rule 12(b)(1) motion. *Phifer v.
City of New York*, 289 F.3d 49, 55 (2d Cir.2002).

Briggs was employed by Defendant from January
15, 2005 to September 29, 2005 as a non-exempt
assistant mechanic. Briggs was paid an hourly wage
of $10.00 per hour during his entire tenure with
Mott. The number of hours worked by Briggs for
each of the thirty-seven weeks of his employed
with Mott are set forth in weekly time sheets submitted on the motion. According to these time
sheets, Briggs worked a total of 205.5 overtime
hours. He was paid at his straight time rate of
$10.00 for these hours.

On February 2, 2006, Briggs filed the original complaint in this action. He brought the FLSA claims as
a collective action on behalf of himself and other
similarly situated current and former employees of
Mott who elect to opt into this action who were
non-exempt employees who did not receive overtime compensation for which they were entitled. To
date, no persons have opted into the collective action. Additionally, Briggs asserts class claims, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of those similarly situated current
and former employees who are entitled to back
wages for overtime for which they did not receive
premium pay in violation of the New York Labor
Law. No motion for class certification has yet been
made.

On March 7, 2006, Mott presented Briggs with an
offer of judgment pursuant to Rule 68 of the Federal Rules of Civil Procedure in the amount of
$3,000.00 plus "reasonable attorney's fees, costs
and expenses and reasonable expert fees actually
incurred, to which Mr. Briggs is entitled by law, in
an     amount     to     be     determined     by     the
Court."According to Defendant, the $3,000.00 exceeds any amount Briggs could recover. The most
Briggs could recover for unpaid overtime is

EXHIBIT

E

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                    Page 2
Slip Copy, 2006 WL 3314624 (E.D.N.Y.)
**2006 WL 3314624 (E.D.N.Y.)**

$1027.50 (205.5 hrs x $5.00). Added to that amount are liquidated damages in an equal amount, bringing the total to $2055.00. Briggs did not accept the offer.

Defendant then moved to dismiss the complaint, as amended, pursuant to Rules 12(b)(1) and (6). Defendant's argument is that its offer of full relief to Briggs moots his FLSA claim, thereby divesting this Court of subject matter jurisdiction and, given the absence of a federal claim, the Court should decline to exercise supplemental jurisdiction over the state claim.

### DISCUSSION

*2 When faced with a motion under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction, a court need not accept contested jurisdictional allegations and may resolve disputed jurisdictional facts by reference to matters outside the pleadings. *Phifer,* 289 F.3d at 55;*Ward v. Bank of New York,* 2006 WL 2925650 at *2 (S.D.N.Y.2006). As the party invoking this court's jurisdiction, Plaintiff has the burden of demonstrating subject matter jurisdiction. *Id.* (citing *Aurecchione v. Schoolman Transp. Sys, Inc.,* 426 F.3d 635, 638 (2d Cir.2005).

Under the FLSA, an employer is required to pay its employees at a rate not less than one and one half times the employee's regular rate for all hours worked in excess of forty hours per week. 29 U.S .C. § 207(a). Any employer who fails to satisfy the overtime pay requirement is liable for the unpaid overtime plus liquidated damages in the amount of the unpaid wages, together with reasonable attorney's fees and costs. *Id* at § 216(b).

Article III, Section 2 of the United States Constitution limits the jurisdiction of federal courts to "actual cases and controversies." *Central States Southeast and Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care L.L. C.,* 433 F.3d 181, 198 (2d Cir.2005); *Jefferson v. Abrams,* 747 F.2d 94, 96 (2d Cir.1984)."When the issues

presented are no longer 'live' or the parties 'lack a legally cognizable interest in the outcome,' the case is moot."*Id.* When a defendant offers all that a plaintiff could hope to recover through litigation, "there is no justification for taking the time of the court and defendant in the pursuit of a minuscule claim which defendant has ... satisfied."*Abrams v. Interco, Inc.,* 719 F.2d 23, 32 (2d Cir.1983). In such a case, the plaintiff has no legally cognizable interest or personal stake. *Ambalu v. Rosenblatt,* 194 F.R.D. 451, 452 (E.D.N.Y.2000) (citing *Rand v, Monsanto Co.,* 926 F.2d 596, 598 (7th Cir.1991) ("Once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate ... and a plaintiff who refuses to acknowledge this loses outright under Fed.R.Civ.P. 12(b)(1), because he has no remaining stake."). When a case lacks a legally cognizable interest, a justiciable case or controversy no longer exists and the case must be dismissed for lack of subject matter jurisdiction. *Fox v. Bd. of Trustees of the State Univ. of New York,* 42 F.3d 135, 140 (2d Cir.1994), *cert. denied,*515 U.S. 169 (1995); *Abrams,* 719 F.2d at 32.

While the Second Circuit had not had ruled on the issue of mootness when an offer of judgment is made in an FLSA collective action, other courts have. In those cases where no other similarly situated individuals have opted in and the offer of judgment satisfies all damages of the plaintiff, plus all costs and attorney's fees, the courts have held that a Rule 68 offer of judgment moots an FLSA collective action thereby depriving the court of subject matter jurisdiction. *See, e. g. Ward,* 2006 WL 2925650 at *4-6;*Vogel v. American Kiosk Mgmt, 371 F.Supp.2d 122, 129 (D.Conn.2005); *Mackenzie v. Kindred Hospitals East, L.L.C .,* 276 F.Supp.2d 1211, 1213 (M.D.Fla.2003).*Cf. Reed v. TJX Cos .,* 2004 U.S.Dist. LEXIS 21605 at *2 (N.D.Ill. October 27, 2004) (denying motion to dismiss for lack of subject matter jurisdiction because court could not determine from record whether offer of judgment satisfied damages claim and two additional individuals had opted in); *Reyes v, Carnival Corp.,*



Slip Copy                                                                        Page 3
Slip Copy, 2006 WL 3314624 (E.D.N.Y.)
**2006 WL 3314624 (E.D.N.Y.)**

2005 U.S. Dist. LEXIS 11948 (S.D.Fla. May 25, 2005) (denying motion to dismiss as two individuals opted in after offer and there was a dispute over whether offer of judgment was sufficient); *Geer v. Challenge Fin. Investors Corp.,* 2006 U.S. Dist. LEXIS 10903 (D. Kan March 14, 2006) (denying motion to dismiss as offer covered only two of three opt-in plaintiffs and evidence was insufficient to determine if offer covered all damages); *Raney v. Young & Brooks,* 2005 WL 1249265 (S.D. Tex. April 26, 2005) (denying motion to dismiss as offer of judgment did not include attorney's fees).

*3 In this case, Plaintiff argues that the offer of judgment does not moot his FLSA for three reasons. First, it is argued that subject matter jurisdiction exists because defendant has not fully satisfied Plaintiff's claim. Second, allowing an employer to use an offer of judgment to pick-off a named plaintiff to avoid its legal obligation to other collective action members violates the policies of the FLSA. Third, the case is not moot because federal jurisdiction exists. The Court will address each argument in turn.

Plaintiff's challenge to the sufficiency of the offer of judgment is two-fold. First, it is argued that defendants rely on materials outside the complaint for which no discovery has been taken and he has not had an opportunity to review Defendant's records to determine the amount he is owed. Second, the offer of judgment does not address the request for declaratory relief. Neither of these claims have merit. As set forth above, this Court is permitted to consider materials outside the four corners of the complaint on a Rule 12(b)(1) motion and may even resolve disputed jurisdictional facts by referring to evidence outside the pleadings. *See, e.g., Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000). The defendant has submitted copies of Briggs' actual time sheets for each week that Briggs was in its employ. Briggs had possession of these time sheets in the context of this motion. If he had any issues with them he should have raised them on this motion. He did not.

*Cf. Ward,* 2006 WL 2925650 at *5.

The time sheets detail the number of hours worked by Briggs for each of the thirty-seven weeks of his employment by Defendant. In twenty-two of those weeks, Briggs worked in excess of 40 hours. The total number of overtime hours was 205.5. Briggs was paid for these hours at his regular rate of $10.00 per hour. He should have been paid at one and one half his regular rate or $15.00 per hour. 29 U.S.C. § 207(a). There is due him an additional $5.00 per hour worked or $1027.50. He is also entitled to liquidated damages in an equal amount, or an additional $1027.50. *Id.* at § 216(b). Thus, under the FLSA Defendant is liable to plaintiff for $2055.00 plus reasonable attorney's fees and costs. *Id.* Briggs was no longer an employee of Defendant when this action was commenced and fails to allege that he was either discharged or discriminated against for filing this action. He is therefore not entitled to equitable relief, which includes declaratory relief. *Id.* at §§ 215(a)(3), 216(b). Moreover, a case and controversy must exist when declaratory relief is sought. *See* 28 U.S.C. § 2201 (requiring a case of actual controversy within the court's jurisdiction for declaratory relief). The offer of judgment for $3,000 plus reasonable attorney's fees, costs, expenses and reasonable expert fees actually incurred exceeds what Briggs could recover at trail.

Plaintiff's second argument is that allowing an employer to use an offer of judgment to pick off a proposed FLSA collective action plaintiff prior to the time that a court permits service of a collective action notice renders the congressionally chosen method for combating the failure to pay overtime a nullity. This argument fails in this case for several reasons. First, there is no pending motion to certify the collective action. *Cf. Ambalu v. Rosenblatt,* 194 F.R.D. 451, 453 (E.D.N.Y.2000) (holding that in a class action context where a class action has not been certified and no motion for class certification has been made, a Rule 68 offer of judgment mooted named class representative's claim requiring dismissal for lack of subject matter jurisdiction).



Second, there was nothing to prevent any similarly situated individuals from opting into this action. No one has done so. Finally, the argument is not compelling because even if notice had been sent out, under the FLSA procedure only plaintiffs who affirmatively opt in can benefit from a judgment or be bound by it. *See Damassia v. Duane Reade, Inc.,* 2006 WL 2853971 at *2 (S.D.N.Y.2006).

*4 Plaintiff's third argument is that the case is not moot because jurisdiction does exist. According to Plaintiff, jurisdiction existed at the time the action was commenced and therefore Briggs should be permitted to continue to represent the putative class and the collective action plaintiffs. This argument fails to recognize, however, that there are no putative class members or collective action plaintiffs to represent. No collective plaintiffs have opted into this action and class certification has not been sought or granted. Thus, only Plaintiff's individual claims are at stake. Where, as here, a defendant offers all that a plaintiff could hope to recover through litigation, the plaintiff has no legally cognizable interest or personal stake, *Ambalu,* 194 F.R.D. at 452, and "there is no justification for taking the time of the court and defendant in the pursuit of a minuscule claim which defendant has ... satisfied."*Abrams v. Interco, Inc.,* 719 F.2d 23, 32 (2d Cir.1983).

In sum, the Court concludes that Defendant's Rule 68 offer of judgment gives Plaintiff all that he could hope to recover on his FLSA claim and thereby renders it moot. Accordingly, the Court lacks subject matter jurisdiction over the FLSA claim.

With respect to Plaintiff's state law claims, the Court exercises its discretion and declines to exercise supplemental jurisdiction over them. *See Bd of Locomotive Eng'rs Div. 269 v. Long Island R.R. Co.,* 85 F.3d 35, 39 92d Cir.1996).

*CONCLUSION*

Defendant's Rule 68 offer of judgment did moot Briggs' FLSA claims and therefore the Court GRANTS the motion to dismiss the FLSA claims for lack of subject matter jurisdiction. Further, the Court declines to exercise supplemental jurisdiction over Briggs' state law claims. Accordingly all of Plaintiff's claims are dismissed.

**SO ORDERED.**

E.D.N.Y.,2006.
Briggs v. Arthur T. Mott Real Estate LLC
Slip Copy, 2006 WL 3314624 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 1660937 (N.D.Ga.), 150 Lab.Cas. P 34,872
**2004 WL 1660937 (N.D.Ga.)**

H
Taylor v. CompUSA, Inc.
N.D.Ga.,2004.

United States District Court,N.D. Georgia, Atlanta
Division.
Robin TAYLOR, Michael K. Bell, Terry Mclaurin
Sr., and James L. Powell, on behalf of themselves
and all those similarly situated who consent to rep-
resentation, Plaintiffs,
v.
COMPUSA, INC., Defendant.
**No. CIVA1:04CV718-WBH.**

Filed March 12, 2004.
July 14, 2004.

represented by Allan Leroy Parks, Jr., Andrew Yan-
cey Coffman, David F. Walbert, Parks Chesin &
Walbert, Atlanta, GA, Lead Attorney, Attorney to
be Noticed, Larry Allen Pankey, Miles McGoff &
Moore, Atlanta, GA, Lead Attorney, Attorney to be
Noticed, for Robin Taylor, Plaintiff.
represented by Allan Leroy Parks, Jr., Andrew Yan-
cey Coffman, David F. Walbert, Larry Allen Pan-
key, (See above for address), Lead Attorney, Attor-
ney to be Noticed, for Michael K. Bell, Plaintiff.
represented by Allan Leroy Parks, Jr., Andrew Yan-
cey Coffman, David F. Walbert, Larry Allen Pan-
key, (See above for address), Lead Attorney, Attor-
ney to be Noticed, for Terry McLauaurin, Sr.,
Plaintiff.
represented by Allan Leroy Parks, Jr., Andrew Yan-
cey Coffman, David F. Walbert, Larry Allen Pan-
key, (See above for address), Lead Attorney, Attor-
ney to be Noticed, for James L. Powell, on behalf
of themselves and all those similarly situated who
consent to representation, Plaintiff.
represented by Ann Marie Painter, Baker & McK-
enzie, Dallas, TX, Lead Attorney, Attorney to be
Noticed, Charlotte Kaye McClusky, Littler Mendel-
son, Atlanta, GA, Lead Attorney, Christine E.
Howard, Fisher & Phillips, Atlanta, GA, Lead At-
torney, Attorney to be Noticed, Dudley Cecile

Rochelle, Littler Mendelson, Atlanta, GA, Lead At-
torney; E. Jewelle Johnson, Fisher & Phillips, At-
lanta, GA, Lead Attorney, Attorney to be Noticed,
Ronald E. Manthey, Baker & McKenzie, Dallas,
TX, Lead Attorney, Attorney to be Noticed, for
Compusa, Inc., Defendant.

*ORDER*

HUNT, J.
*1 Before the Court are Plaintiffs' Motion for Con-
ditional Certification, for Defendant to Disclose
Names and Addresses of Similarly Situated Em-
ployees, and for Approval of Notice to Potential
"Opt-In" Plaintiffs [6]; Plaintiffs' Motion to Com-
pel Responses to Interrogatories and Requests for
Production of Documents [50]; and Defendant's
Emergency Motion to Stay and for Reconsideration
of Motion to Dismiss [55]. On July 7, 2004, the
Court held a status hearing at which counsel for
Plaintiffs and Defendant presented arguments re-
garding the pending motions.[FN1]

> FN1. The Court has also considered the
> unsolicited letter brief filed by Plaintiffs
> after the hearing, as well as CompUSA's
> response.

BACKGROUND

On March 12, 2004, four Named Plaintiffs, on be-
half of themselves and others similarly situated,
filed this Fair Labor Standards Act ("FLSA") case
against Defendant CompUSA, Inc. CompUSA
owns and operates approximately 225 retail com-
puter supply stores throughout the United States.
Plaintiffs, former commercial sales representatives
("CSRs") for CompUSA, claim that they were reg-
ularly required to work more than 40 hours per
week without being paid overtime. Plaintiffs allege
that prior to February 1, 2004, CompUSA inten-
tionally mischaracterized CSRs as exempt from
overtime pay under the FLSA. According to
Plaintiffs, this mischaracterization occurred as part

EXHIBIT
F

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                     Page 2
Not Reported in F.Supp.2d, 2004 WL 1660937 (N.D.Ga.), 150 Lab.Cas. P 34,872
**2004 WL 1660937 (N.D.Ga.)**

of a company-wide policy that affected CSRs at all CompUSA locations. On February 1, 2004, CompUSA changed its policy and now defines CSRs as non-exempt employees subject to overtime pay. As of the date of the hearing, nine current or former CompUSA commercial sales employees had filed notices of consent to participate as plaintiffs ("Opt-In Plaintiffs") in this action.

On April 13, 2004, Plaintiffs moved for conditional certification of this action as a collective action under the FLSA, disclosure of the names and addresses of all persons employed by CompUSA as CSRs between March 12, 2001 and the present, and approval of their proposed notice to potential opt-in employees. Approximately one month later, CompUSA filed a motion to dismiss the action as moot in light of an offer of full relief to the Named and Opt-In Plaintiffs. In its Order of June 29, 2004, the Court, *interalia*, denied CompUSA's motion to dismiss and scheduled a hearing regarding the motion for conditional certification, the status of CompUSA's offers of judgment, and the potential for expedited discovery to determine Plaintiffs' damages.

### DISCUSSION

In moving to dismiss Plaintiffs' claims, CompUSA contends that its offers of full relief render the case moot and deprive the Court of subject matter jurisdiction. On or around April 2, 2004, CompUSA submitted a written offer to Plaintiffs, through their counsel, to provide full relief to each Plaintiff for the amount of overtime pay claimed "based on an affidavit from each [Plaintiff] stating the number of hours worked each week during their employment up until the contested pay practice stopped in February 2004."CompUSA also offered to pay liquidated damages in an amount equal to any backpay, as well as reasonable attorneys' fees as agreed by the parties or determined by the Court.[FN2] Since that time, CompUSA has extended Rule 68 offers of judgment to the Named Plaintiffs and represents that it will extend such offers to the Opt-In

Plaintiffs once they provide their initial damages calculations.[FN3]

> FN2. Section 216(b) of the FLSA permits employees in a private action to recover their unpaid overtime compensation, an additional equal amount as liquidated damages, a reasonable attorney's fee, and costs. 29 U.S.C. § 216(b). Similar offers have been extended to the Opt-In Plaintiffs.

> FN3. Rule 68 provides, in relevant part: "At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued ... If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer."Fed.R.Civ.P. 68.

**\*2** In its June 29 Order, the Court denied the motion to dismiss because the parties had not yet reached a consensus on the amount of overtime pay owed to each Plaintiff. CompUSA now asserts that it has produced time and payroll records and awaits identification by Plaintiffs' counsel of any additional records that are required to calculate Plaintiffs' damages. At the hearing, CompUSA advised the Court that it is amenable to an expedited discovery period and will not dispute the claims made by Plaintiffs in their affidavits. Because CompUSA has offered Plaintiffs all they could hope to recover at trial, CompUSA asks the Court to either dismiss the case or stay consideration of the motion for conditional certification so that the parties may conduct expedited discovery.

The Court agrees with CompUSA that the offers of judgment represent offers of full relief that will, upon submission of Plaintiffs' affidavits establishing a sum certain, extinguish Plaintiffs' interests and moot this case. *SeeMackenzie v. Kindred Hos-*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1660937 (N.D.Ga.), 150 Lab.Cas. P 34,872
**2004 WL 1660937 (N.D.Ga.)**

*pitals East, L.L.C.,* 276 F.Supp.2d 1211, 1219 (M.D.Fla.2003) (citing cases for the proposition that an offer of judgment of full relief, even if rejected, renders the action moot). The fact that Plaintiffs have filed a motion for conditional certification does not bar consideration of the motion to dismiss. Plaintiffs refer to a footnote in a district court case, *Mackenzie v. Kindred Hospitals East, L.L.C.,* 2003 U.S. Dist. LEXIS 18927, at *3 n. 2 (M.D.Fla. July 24, 2003), which recognizes the potential for misuse of Rule 68 to escape compliance with the FLSA.[FN4] This case, however, does not present such a situation. CompUSA has extended offers of full relief to each Named and Opt-In Plaintiff and intends to extend formal Rule 68 offers to the Opt-In Plaintiffs upon receipt of their damages estimates. Thus, the Opt-In Plaintiffs will not be denied relief, and resolution of the claims asserted in this case will not compromise the rights of similarly situated individuals who have not filed notices of consent.[FN5]

FN4. Plaintiff also cites an FLSA case from the Southern District of Texas for the proposition that a Rule 68 defense and mootness argument should not be considered where a motion for certification is pending. *See Villatoro v. Kim Son Restaurant. L.P.,* 286 F.Supp.2d 807, 811 (S.D.Tex.2003) ("Plaintiff's rejection of a Rule 68 offer is not relevant to the issue presently before the Court, namely, whether there are individuals similarly situated to her in regard to underpayment of wages"). As CompUSA points out, however, it does not appear that the issue was before the court in the context of a motion to dismiss for lack of subject matter jurisdiction.

FN5. While the certification of a collective action might make it more convenient for potential plaintiffs, neither dismissal nor entry of judgment in the present case impairs their rights. Unlike Rule 23 class action members who are bound unless they opt out, FLSA claimants may pursue their claims individually or jointly, subject only to the statute of limitations. *See LaChapelle v. Owens-Illinois, Inc.,* 513 F.2d 286, 288 (5th Cir.1975) ("Under § 16(b) of FLSA ... no person will be bound by or may benefit from judgment unless he has affirmatively 'opted into' the class"). Moreover, the Court notes that CompUSA has already changed the complained of policy regarding the compensation of CSRs. *See* Plaintiffs' First Amended Complaint [53], ¶ 29.

In order to give the four Named and nine Opt-In Plaintiffs an opportunity to calculate their damages and prepare affidavits, the Court hereby orders the parties to participate in a 60-day expedited discovery period. During this time, Plaintiffs shall complete their initial disclosures, and CompUSA shall assist Plaintiffs in identifying and obtaining documents relevant to the calculation of damages. In particular, Plaintiffs' counsel has indicated the need for a Rule 30(b)(6) deposition and for the production of additional documents to determine base pay rates and verify the accuracy of the Kronos records, all of which should be accomplished within the 60-day period. Plaintiffs shall provide their affidavits to CompUSA by the close of the discovery period on September 13, 2004. In the absence of an agreement among the parties, attorneys' fees will be fixed thereafter by the Court.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Conditional Certification, for Defendant to Disclose Names and Addresses of Similarly Situated Employees, and for Approval of Notice to Potential "Opt-In" Plaintiffs [6] is DENIED; Plaintiffs' Motion to Compel Responses to Interrogatories and Requests for Production of Documents [50] is DENIED AS MOOT; and Defendant's Emergency Motion to Stay and for Reconsideration of Motion

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1660937 (N.D.Ga.), 150 Lab.Cas. P 34,872
**2004 WL 1660937 (N.D.Ga.)**

to Dismiss [55] is GRANTED as set forth herein.

**\*3** It is so ORDERED.

N.D.Ga.,2004.
Taylor v. CompUSA, Inc.
Not Reported in F.Supp.2d, 2004 WL 1660937
(N.D.Ga.), 150 Lab.Cas. P 34,872

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

Page 1

▷
Reyes v. Carnival Corp.
S.D.Fla.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. Florida.
Richard REYES, on behalf of himself and similarly
situated employees of defendant, Plaintiffs,
v.
CARNIVAL CORPORATION, Defendant.
**No. 04-21861-CIV.**

May 25, 2005.

Steven Frederick Grover, Jonathan Leon Gaines,
Miramar, FL, for Plaintiffs.
Andrew L. Rodman, Guilleramo W. Perez, Robert T.
Kofman, Stearns Weaver Miller Weissler Alhadeff &
Sitterson, P.A., Miami, FL, for Defendant.

*ORDER ON DEFENDANT'S MOTION TO DISMISS
AND PLAINTIFF'S OMNIBUS MOTION FOR CONDI-
TIONAL CERTIFICATION OF COLLECTIVE ACTION*

GOLD, J.
**\*1** THIS CAUSE is before the Court upon Defendant's
Motion to Dismiss for Lack of Subject Matter Jurisdic-
tion [DE 15], filed January 7, 2005, and Plaintiff's Om-
nibus Motion for Conditional Certification of Collective
Action [DE 14], filed December 22, 2004. Both parties
filed opposition briefs [DE 16, 22] and reply briefs [DE
20, 23]. Oral argument was held on March 4, 2005.
Upon a review of the parties' arguments and relevant
case law and statutes, I conclude that Defendant's Mo-
tion should be denied and Plaintiff's Motion should be
granted in part and denied in part.

*Facts*

Plaintiff Richard Reyes ("Reyes" or "Plaintiff") was
employed by Defendant Carnival Corporation
("Carnival" or "Defendant") for approximately eighteen
weeks, from April 8, 2002 to August 16, 2002, as a Per-
sonal Vacation Planner ("PVP"). PVPs promote cruises
and obtain bookings from consumers. Reyes alleges that

he did not receive any overtime pay while employed as
a PVP, nor did any of his fellow PVPs, despite the fact
that they frequently worked over sixty hours a week.
Accordingly, Plaintiff's complaint seeks unpaid over-
time compensation under the Fair Labor Standards Act
of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA"). Plaintiff
seeks relief on behalf of himself and on behalf of a class
of similarly situated PVPs.

Defendant has filed a motion to dismiss for lack of sub-
ject-matter jurisdiction. Plaintiff has filed an omnibus
motion seeking to conditionally certify this case as a
collective action, to compel production by Defendant of
a complete list of employees of a defined class and their
contact information, and to authorize Plaintiff's counsel
to mail a court-approved notice to all such persons
about their right to opt into this collective action. I will
address Defendant's motion first and Plaintiff's motion
second.

I. SUBJECT-MATTER JURISDICTION

*Standard of Review*

Under Federal Rule of Civil Procedure 12(b)(1), the
"plaintiff bears the burden of establishing that the court
has jurisdiction." *Rosner v. United States,* 231 F.Supp.2d
1202, 1205 (S.D.Fla.2002) (citing *Menchaca v.
Chrysler Credit Corp.,* 613 F.2d 507 (5th
Cir.1980)).FN1 The Eleventh Circuit has stated that
"because a federal court is powerless to act beyond its
statutory grant of subject matter jurisdiction, a court
must zealously insure that jurisdiction exists over a
case."*Smith v. GTE Corp.,* 236 F.3d 1292, 1299 (11th
Cir.2001) (citations omitted).

> FN1. All Fifth Circuit decisions prior to Octo-
> ber 1, 1981 are binding precedent on the Elev-
> enth Circuit. *See Bonner v. Prichard,* 661 F.2d
> 1206, 1209 (11th Cir.1981).

Motions to dismiss under Rule 12(b)(1) fall into two

EXHIBIT

G

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

Page 2

categories: "facial" or "factual attacks." *Morrison v. Amway Corp.,* 323 F.3d 920, 925 n. 5 (11th Cir.2003) (citation omitted). Facial attacks are based on the allegations in the complaint, and the court takes these allegations as true in deciding whether to grant the motion. *Id.* Factual attacks rely on evidence outside the pleadings. *Id.* In the case before the Court, Defendant has asserted a lack of subject matter jurisdiction on the basis of facts outside of pleadings, making this jurisdictional attack a factual one. *Id.*

*Analysis*

**\*2** Carnival has moved to dismiss the complaint for lack of subject matter jurisdiction on the basis that an offer of judgment has been made to the Plaintiff for more than complete relief which renders the case moot. On January 4, 2005, Carnival served on Plaintiff an offer of judgment under Federal Rule of Civil Procedure 68, offering Plaintiff $4,275.00, plus interest, costs, and reasonable attorneys' fees to be determined by the Court. Carnival contends that this offer of judgment offers Plaintiff more than he could recover if her were to prevail at trial, based upon Plaintiff's own Rule 26 damages computation of $2,700. See Plaintiff's Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a). Carnival argues that even though Plaintiff has not accepted its offer of judgment, the offer nevertheless renders moot any case or controversy, depriving the Court of subject matter jurisdiction.

Plaintiff argues in opposition that Plaintiff has not accepted the offer of judgment, that the offer of judgment does not provide full relief to him, and that because other plaintiffs have opted in to this suit since the offer of the judgment was made, the offer of judgment does not address their claims which remain live and pending. Plaintiff argues that the offer of judgment does not offer complete relief because it is based on the estimates in Plaintiff's initial Rule 26(a) disclosures, which are made only based upon the information then reasonably available, prior to the completion of discovery and without access to Carnival's complete wage and hour records concerning the Plaintiff that would allow for a more accurate estimation of his damages. Plaintiff also argues

in opposition that, as a matter of policy, Carnival should not be allowed to frustrate the purpose of the FLSA's collective action provision by making a hasty offer of judgment to the named plaintiff before damages can be determined with any degree of certainty.

Rule 68 governs offers of judgment. That Rule states:

At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.

Fed. R. Civ. Proc. 68. Because a case becomes moot when the parties lack a legally cognizable interest in the outcome of the litigation, *see City of Erie v. Pap's A.M.,* 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), at least one court has dismissed a complaint as moot as the result of an offer of judgment made under Rule 68 for the full damage amount. *See Mackenzie v. Kindred Hospitals East, L.L.C.,* 276 F.Supp.2d 1211 (M.D.Fla.2003) (dismissing plaintiff's FLSA claims as moot after the employer made an offer of judgment). In *Mackenzie,* the plaintiff did not dispute that the defendant's offer was for more than the maximum amount of damages he could possibly recover under the FLSA, and the plaintiff did not argue that he could obtain any additional relief. *Id.* at 1218.Furthermore, in *Mackenzie,* no other individual asserted a claim or interest in the case. *Id.* Accordingly, the court held that the controversy was no longer live and dismissed the case for lack of subject matter jurisdiction.

**\*3** I conclude that the instant case is distinguishable

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                    Page 3
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

from *Mackenzie* for several reasons. First, the plaintiff in this case disputes that Carnival's offer is for more than the maximum amount of damages he could recover under the FLSA. Carnival based its offer on the Plaintiff's estimate as provided in his initial disclosure under Rule 26. The parties dispute whether Plaintiff has been provided all the documents in Carnival's possession regarding the number of hours Plaintiff actually worked. Indeed, the Plaintiff's Rule 26 disclosure states that it is merely a preliminary estimate due to incomplete records in the possession of the Plaintiff. Since the Plaintiff has rejected Carnival's offer and there is no basis for me to conclude that the offer of judgment is definitively for more than the Plaintiff could recover at trial, I conclude that a live controversy remains pending. Second, two other persons, Natasha Brooks and Guillermo Perez, have opted in to this suit, and Carnival has not made offers of judgment to them. Carnival argues that the Court had already lost subject matter jurisdiction before those persons opted in because the offer of judgment had already been made. While Brooks and Perez did indeed opt in after the offer of judgment was made, the Court did not "lose" subject matter jurisdiction in the interim; the initial Plaintiff, Reyes, had not accepted the offer and it is unclear whether sufficient time had passed for Reyes to ascertain whether the offer of judgment was fair or complete. There is no Eleventh Circuit precedent regarding the exact moment a case becomes moot after the making of a qualified offer of judgment, but at the very least, a court cannot lose jurisdiction before the parties themselves can ascertain whether they retain a legally cognizable interest in the outcome of the litigation. *See City of Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S.Ct. 1382, 1390, 146 L.Ed.2d 265 (2000) (explaining that a case becomes moot when it is "impossible for the court to grant any effectual relief whatever to the prevailing party"); *see also Taylor v. CompUSA, Inc.,* 2004 WL 1660939, at *3 (N.D.Ga. June 29, 2004) ("As the parties are still in the process of determining the correct amount of damages, the Court finds that the matter is still in dispute and dismissal of Plaintiffs' claims would be inappropriate at this time."). Accordingly, two other persons opted in to this suit and no offer of judgment has been made to them, thus a live controversy remains.

Finally, it is important to note that the defense strategy of providing an offer of judgment to the initial plaintiff in a FLSA collective action in order to bar the case from proceeding as to all similarly situated plaintiffs violates the very policies behind the FLSA. *See, e.g., Reed v. TJX Companies, Inc.,* 2004 WL 2415055 (N .D. Ill. Oct 27, 2004) (denying motion to dismiss for lack of subject matter jurisdiction). The FLSA was enacted to ensure that every employee receives "a fair day's pay for a fair day's work." *A.H. Phillips v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945). The FLSA requires that employees be paid a minimum wage for their work, and that employees working more than forty hours per week receive overtime compensation for all hours over forty at a rate of 1.5 times their regular pay. *See* 29 U.S.C. § 207(a)(1), (e); 29 C.F.R. § 778.108. Given the relatively small amounts of money at issue in an individual case seeking overtime compensation, Congress included provisions in the FLSA to encourage litigation, including 29 U.S.C. § 216(b), the "collective action" provision, which allows an action to be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." *Id.*

*\*4* Permitting a defendant to evade a collective action by making an offer of judgment at the earliest possible time defeats the purpose of the collective action mechanism. In *Reed,* the plaintiff brought suit against his employer under the FLSA for deprivation of overtime compensation. *Reed v. TJX Companies, Inc.,* 2004 WL 2415055 (N.D. Ill. Oct 27, 2004). The plaintiff argued that the employer made its offer in bad faith, simply to pay off the named representative of a potential class action and thereby to defeat the formation of the class. The court concluded that the plaintiff was correct:

Reed asserts that TJX Co.'s defense strategy creates a virtually unwinnable situation for plaintiffs in collective or class action lawsuits. Defendant makes an offer of "judgment" to Plaintiff, then alleges that the action is moot. Plaintiff therefore must either pursue discovery very early in the case, when a court likely will deem it premature, or seek class certification and/or notice before discovery, which runs the risk of harming the interests of those as-yet undiscovered class members. In



Slip Copy                                                                                                          Page 4
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

cases where there are statutory ceilings on recoverable damages, such a strategy may be effective and yet still protect the interests of a plaintiff. In a situation such as the instant case, where there are no statutory caps on damages and where substantial discovery may be necessary before damages can be determined with any degree of certainty, such a strategy allows defendants to bar the courtroom door. This court finds such a result inappropriate at this early stage in litigation.

*Id.* at *3 (internal citations omitted).

For the reasons described herein, I conclude that Defendant's motion to dismiss for lack of subject matter jurisdiction should be DENIED.

## II. CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION

### *Standard of Review*

Opt-in class actions on behalf of similarly situated plaintiffs are provided by the opt-in class mechanism under 29 U.S.C. § 216(b).Section 216(b) states in relevant part that "[a]n action ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."*Id.* Moreover, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."*Id.*

Section 216(b) collective actions differ from class actions provided by Federal Rule of Civil Procedure 23. "In a Rule 23 class action, each person who falls within the class definition is considered to be a class member and is bound by the judgment, favorable or unfavorable, unless he has opted out. By contrast, a putative plaintiff must affirmatively opt into a § 216(b) action by filing his written consent with the court in order to be considered a class member and be bound by the outcome of the action."*Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d

1208, 1216 (11th Cir.2001) (citations omitted).

*5 The Eleventh Circuit Court of Appeals has stated that "[t]o maintain an opt-in class action under § 216(b), plaintiffs must demonstrate that they are 'similarly situated.' " *Id.* at 1217 (citations omitted). "[P]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members." ' *Id.* (quoting *Grayson v. K Mart Corp. .,* 79 F.3d 1086, 1096 (11th Cir.1996)) (citations omitted). The " 'similarly situated requirement' [of § 216(b) ] is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Id.* at 1219 (quoting *Grayson,* 79 F.3d at 1095).

In *Hipp,* the Eleventh Circuit provided district courts within the Circuit with valuable guidance in adjudicating motions such as Plaintiffs', stating that "we will clarify the meaning of § 216(b)'s 'similarly situated' requirement in this circuit." *Id.* at 1217.In that case, the Eleventh Circuit suggested that district courts use what was described as a "two-tiered approach in making the similarly situated determination. Under this approach, during the early stages of litigation, the district court would have evaluated the case under a lenient standard and likely would have granted preliminary certification of an opt-in class. The court would then have reevaluated the similarly situated question at a later stage, once discovery produced more information regarding the nature of Plaintiffs' claims."*Id.* at 1217-18.In discussing the specifics of this two-tiered approach, the *Hipp* court quoted language from *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1213-14 (5th Cir.1995), in which the Fifth Circuit stated that "[t]he first determination is made at the so-called 'notice stage.' At the notice stage, the plaintiff has the burden of demonstrating a reasonable basis for the claim of classwide discrimination. *See Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir.1996). The plaintiff's burden is "not heavy," and is met by "making substantial allegations of classwide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary."*See id.* at 1096-97.The affidavits must indicate that there are other employees who are "similarly situated" with respect to their job require-

Westlaw.

Slip Copy                                                                                                Page 5
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

ments and to their pay provisions, and that these employees desire to opt in. *See Dybach*, 942 F.2d at 1567-68; *see also Harper v. Lovett's Buffet*, 185 F.R.D. 358, 362-64 (M.D.Ala.1999) (court conditionally certified a class of all hourly employees at the defendant's restaurant where plaintiff provided affidavits stating that the amount the servers were paid, that they were required to do additional jobs for which they received no additional compensation, that these servers received W-2s and check stubs that falsely stated tips not received, and that management would clock out employees without their knowledge)."If the district court 'conditionally certifies' the class, putative class members are given notice and the opportunity to 'opt-in.' The action proceeds as a representative action throughout discovery." *Hipp*, 252 F.3d at 1218. At the second stage, which is "typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial,""the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question." *Id.*

*6 The Eleventh Circuit concluded that "[t]he two-tiered approach to certification of § 216(b) opt-in classes described above appears to be an effective tool for district courts to use in managing these often complex cases, and we suggest that district courts in this circuit adopt it in future cases." *Id.* at 1219.The Eleventh Circuit stressed that it was not mandating that the two-tiered approach be adopted, given that "[t]he decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court ." *Id.* It did, however, endorse the two-tiered approach as an "effective tool" for district courts to use in making their § 216(b) determinations. *Id.; see also Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1242 n. 2 (11th Cir.2003) ("Since Hipp, the district courts in our circuit have utilized the two-tiered approach."); *see, e.g., Stone v. First Union Corp.*, 203 F.R.D. 532, 537 (S.D.Fla.2001).

*Analysis*

Plaintiff has submitted the affidavit of named plaintiff Reyes [DE 14, Exh. D] in support of the motion for conditional certification. Plaintiff's affidavit sets forth the time period during which he worked at Carnival, the hours he worked each week, and his hourly pay. He also claims to be familiar with other similarly-situated Personal Vacation Planners ("PVP"), and claims that Carnival did not pay any overtime to any of these PVPs. He claims that during the four months that he worked for Carnival, first in the Miami location and then in Miramar, there were approximately one hundred and fifty (150) PVPs, many of whom worked over sixty hours per week without receiving overtime pay and would be interested in joining this litigation. Plaintiff also states that the PVP position had a high turnover rate, thus the actual number of PVPs may be significantly higher.

At least two PVPs-Natasha Brooks and Guilleramo W. Perez-have filed notices of consent to opt-in. [DE 17, 19]. Attached as exhibits to Plaintiff's reply brief are affidavits by Brooks and Perez in which both individuals state that they were employed by Carnival as PVPs, worked over forty hours per work on a regular basis, and received no overtime pay. Both individuals state that Carnival told them that it was Carnival's policy not to provide overtime pay to PVPs.

I conclude that Plaintiff's affidavit, in combination with the opt-in notices and affidavits of Brooks and Perez which confirm the allegations in Plaintiff's affidavit, contains sufficiently detailed allegations to demonstrate a reasonable basis for the Plaintiff's claim of classwide discrimination and demonstrate interest of other PVPs to opt-in. The affidavits appear to be based upon personal knowledge, observation, and experience, thus they are not "conclusory" as alleged by Carnival. The allegations that other PVPs did not receive overtime pay appears to be based upon the affiants' knowledge of the position of PVP and of Carnival's employment policies with respect to that position. At this stage in the proceedings, it is reasonable to infer that this knowledge forms a sufficient basis for the affiants' allegations that other PVPs were treated similarly.

*7 While Plaintiff has met his initial burden, the parties

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                            Page 6
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

also dispute whether Plaintiff is "similarly situated" to the class of PVPs as defined by the Plaintiff.[FN2] The Plaintiff bears the burden of establishing that he and the class he wishes to represent are similarly situated. *See Grayson,* 79 F.3d at 1096. Ordinarily, this burden is not heavy and may be met by detailed allegations supported by affidavits. *Id.* at 1097. The Eleventh Circuit has stated that the "similarly situated" requirement is "more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance) ... [and] that a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal 'similarly situated' requirement of § 216(b)...." *Grayson,* 29 F.3d at 1095. I explained the implications of this standard in *Stone:*

> FN2. Carnival proposes that the motion either be denied on this basis, or that the Court re-define the proposed class so that it bears a more rational relationship to Plaintiff's claims. [DE 16 at 14-15, n. 10].

Accordingly, that the plaintiffs are "similarly situated" may be established even if the transactions or occurrences are not identical. *Grayson* so holds when it quotes *Sperling v. Hoffmann-La Roche* for the proposition that, "[P]laintiffs need show only 'that their positions are similar, not identical,' to the positions held by the putative class members." *Grayson,* 79 F.3d at 1096 (quoting *Sperling v. Hoffman-La Roche,* 118 F.R.D. 392, 407 (D.N.J.1988), aff'd in part and appeal dismissed in part, 862 F.2d 439 (3rd Cir.1988), aff'd, *Hoffmann-La Roche Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Moreover, by implication, not all questions of law or fact must be common; rather, it is enough if some questions of law or fact are common to all parties, even if such questions do not predominate. *See Grayson,* 79 F.3d at 1096 (quoting *Flavel v. Svedala Indus. Inc.,* 875 F.Supp. 550, 553, which states, "The 'similarly situated' requirement, in turn, is considerably less stringent than the requirement of [Rule 23(b)(3) ] that common questions 'predominate,' or presumably, the Rule 20(a) requirement that claims 'arise out of the same action or occurrence." ').

*Stone,* 203 F.R.D. at 541.

No one factor is dispositive in the assessment of whether Plaintiff is similarly situated to the sought-after class. In *Stone,* a collective action for age discrimination brought pursuant to the Age Discrimination in Employment Act, I stated:

The factors enunciated in *Grayson* and *Hipp* to assist in this analysis include: (1) whether the plaintiffs all held the same job titles (applicable in both *Grayson,* 79 F.3d at 1090, and *Hipp,* 252 F.3d at 1219); (2) whether the plaintiffs worked in different geographical locations (a factor held to be "nonconclusive" in *Hipp,* 252 F.3d at 1219); (3) the extent to which the claimed discrimination occurred during different time periods and by different decision makers (*cf., Alexander,* 207 F.3d at 1324); (4) whether plaintiffs have provided "statistically significant" evidence of [unlawful conduct] (*Grayson,* 79 F.3d at 1097); (5) whether the Plaintiffs all alleged similar, though not identical [unlawful] treatment (*Hipp,* 252 F.3d at 1219); (6) whether the plaintiffs have sufficiently pled and supported by affidavits, depositions, and the like that Defendant's decision makers have articulated and manifested a clear intent to [engage in unlawful conduct] (*Grayson,* 79 F.3d at 1097-99); and (7) whether the Defendant took steps to implement its plan ...(*Id.*). Obviously, each case must be reviewed on its pertinent facts to determine whether these, or other factors, are relevant to measure the nature and degree of "similarity."

*\*8 Id.* at 542-43.

In this case, Plaintiff seeks to represent a class of PVPs employed at any time from January 1, 2002 to the present; precisely, Plaintiff seeks to represent "each and every person ... who was employed by Defendant, performed any services on Defendant's behalf, and/or performed any services which benefitted Defendant in any way, at any time from January 1, 2002 through the present, and who was classified and/or described by Defendant as a 'vacation planner' and/or 'personal vacation planner,' or the like."[DE 14 at 1-2]. Considering the factors as I enunciated them in *Stone,* I conclude that Plaintiff has met the standard for demonstrating

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 7
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

that he is "similarly situated" to his class. Reyes seeks to represent a class of persons with the same title.[FN3] Reyes seeks to represent PVPs in his group, headquartered in Miami, Florida.[FN4] Reyes states in his affidavit that he worked alongside other PVPs, that many of them worked overtime, including over sixty (60) hours per week, that working overtime was inevitable because of sales quotas that PVPs were required to meet, and that Carnival did not pay overtime pay to any PVPs. [DE 14, Exh. D]. Reyes's affidavit is corroborated by the affidavits of Brooks and Perez, both of whom stated that it was Carnival's stated policy to pay PVPs base pay plus incentive award payments for bookings, but not to pay overtime pay to PVPs. [DE 20, Exh. C, D]. All three individuals have submitted pay statements which corroborate their affidavits. Thus it appears from the affidavits and pay statements submitted that it was Carnival's stated, official policy to deny overtime pay to PVPs. This is precisely the type of "similar, though not identical" treatment for which opt-in collective actions were intended. *Hipp*, 252 F.3d at 1219.

> FN3. The phrase "or the like" is unnecessary and potentially expands the class beyond persons of the same title as Reyes; accordingly, I will strike that phrase from the definition of the opt-in class. Furthermore, I note that the class is limited to persons of the same title, paid in the same manner as the Plaintiff. The class *does not* include reservation sales agents who are paid under a different incentive structure.

> FN4. This geographic limitation is not evident from the description of the class provided in the first two pages of Plaintiff's motion, but is evident from his affidavit, which speaks only to the policies and employees that were part of his group. It appears from Plaintiff's affidavit that he seeks only to represent PVPs that were part of his group. Accordingly, I will limit Plaintiff's opt-in class to PVPs employed out of the Miami headquarters. In any event, this geographic factor was not held to be "nonconclusive" in *Hipp*, 252 F.3d at 1219.

Defendant argues that this class is defined too broadly since Plaintiff was employed for only nineteen weeks, from April 8, 2002 through August 16, 2002. Defendant argues that "whether the alleged violations occurred during the same time period" is a dispositive factor to be considered in the "similarly situated" analysis. [DE 16] (citing *Smith v. Tradesmen Int'l, Inc.,* 289 F.Supp.2d 1369, 1372 (S.D.Fla.2003); *Mackenzie v. Kindred Hosps. East, LLC,* 276 F.Supp.2d 1211, 1221 (M.D.Fla.2003)). With respect to the time period in question, Reyes was in fact employed as a PVP from April 2002 through August 2002, Brooks was employed as a PVP from November 2001 until July or August 2002, and Perez was employed as a PVP for approximately a year and a half, in 2001 and 2002. Plaintiff seeks to represent a class of PVPs employed at any time from January 1, 2002 to the present. I conclude that based upon the affidavit testimony of Brooks and Perez, which corroborates Reyes's affidavit, that there is no reason to believe that PVPs employed starting January 1, 2002 are not "similarly situated" to Reyes in any significant way. *See, e.g., Heagney v. European American Bank,* 122 F.R.D. 125, 128 (E.D.N.Y.1988) ("The workers may have left their jobs at different times via different procedural mechanisms, but the alleged unity of the discriminatory scheme they faces overwhelms those differences.") (citation omitted). Because Reyes alleges that his denial of overtime pay was a matter of official company policy, and because Reyes has submitted evidence that this policy has existed since before January 1, 2002, in the interest of judicial economy (which motivated the enactment of § 216(b) in the first instance), I conclude that the class proposed by Reyes meets the requisite standard. In so concluding, I bear in mind that the certification of this collective action is *conditional* at this stage in the proceedings, and consideration will be given once more to Defendant's arguments upon Defendant's motion for decertification, at which time I will have a more complete record on which to base a decision. *Hipp,* 252 F.3d at 1218. But given that Plaintiff's burden is "not heavy," *Grayson,* 79 F.3d at 1096, it has been met in this case.

### III. COMPELLED PRODUCTION OF A CLASS LIST

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                    Page 8
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
2005 WL 4891058 (S.D.Fla.)

*9 In Plaintiff's Omnibus Motion, Plaintiff moves to compel expedited production by Defendant, within fifteen (15) days of this order, of a complete list of *"each and every person-and their last-known home addresses, telephone numbers, e-mail addresses, and social security numbers-who was employed by Defendant, performed any services on Defendant's behalf, and/or performed any services which benefitted Defendant in any way, at any time from January 1, 2002 through the present, and who was classified and/or described by Defendant as a "vacation planner" and/or "personal vacation planner" or the like."* (hereinafter "the Proposed Class"). As I stated earlier in this order, I will require that the Proposed Class be amended so as to reflect a geographic limitation to persons employed out of Miami and/or Miramar, and will strike the phrase "or the like" from the definition of the Proposed Class. The only basis for Defendant's opposition to this motion was Defendant's belief that Plaintiff failed to meet the "similarly situated" requirement of § 216(b). Because I conclude that the Proposed Class should be conditionally certified, Plaintiff's motion to compel production of contact information is GRANTED.[FN5]

> FN5. Plaintiff's request for Defendant to provide Plaintiff's counsel with the list both by hard copy and electronically-in an Excel spreadsheet with each person listed alphabetically from "A" to "Z" and with each person's last-known home address, telephone number, e-mail address, and social security number in a separate field corresponding with each name is GRANTED.

## IV. AUTHORIZATION TO MAIL NOTICES TO THE PROPOSED CLASS

Plaintiff seeks authorization to mail a Court-approved Notice to members of the Proposed Class about their right to opt into this collective action by filing a Consent to Join Lawsuit. Plaintiff has submitted a proposed Notice and proposed Consent form as exhibits to his Omnibus Motion [DE 14, Exh. A, B]. I prefer that the parties stipulate to the use of a Notice and Consent form, now that I have ruled upon Plaintiff's motion to conditionally certify the opt-in class. Accordingly, the

parties are hereby ORDERED to meet and attempt to reach a stipulation as to the Notice and Consent form on or before June 16, 2005. The parties shall file a Status Report regarding the Notice and Consent form on or before June 16, 2005.

### V. CONCLUSION

For the reasons stated in this Order, it is hereby ORDERED AND ADJUDGED that:

1. Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [DE 15] is DENIED.

2. Plaintiff's Omnibus Motion for Conditional Certification of Collective Action [DE 14] is GRANTED IN PART and DENIED IN PART.

3. This action is hereby CONDITIONALLY CERTIFIED as a collective action under the Fair Labor Standards Act.

4. Defendant SHALL PRODUCE to Plaintiff, on or before June 16, 2005, a complete list of each and every person-and their last-known home addresses, telephone numbers, e-mail addresses, and social security numbers-who was employed by Defendant out of its Miami or Miramar locations, performed any services on Defendant's behalf, and/or performed any services which benefitted Defendant in any way, at any time from January 1, 2002 through the present, and who was classified and/or described by Defendant as a "vacation planner" and/or "personal vacation planner."

*10 5. Defendant SHALL PRODUCE the aforementioned list both by hard copy and electronically-in an Excel spreadsheet with each person listed alphabetically from "A" to "Z" and with each person's last-known home address, telephone number, e-mail address, and social security number in a separate field corresponding with each name.

6. The parties are hereby ORDERED to meet and attempt to reach a stipulation as to the Notice and Consent form on or before June 16, 2005. The parties SHALL FILE a Status Report regarding the Notice and



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 9
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

Consent form on or before June 16, 2005.

7. The parties SHALL FILE a Revised Joint Scheduling Report (Appendix A) on or before June 9, 2005.

DONE AND ORDERED.

*JOINT CONFERENCE REPORT*

*APPENDIX I*

Pursuant to the Court's Order Requiring Compliance with Local Rule 16.1, the parties have agreed to the following deadlines:

| | DATE | ACTION |
|---|---|---|
| By | | Opt-in cut off date, assuming preliminary certification is granted and notice is approved. |
| By | | Counsel for both parties shall prepare and serve detailed discovery plans. Each plan shall include a detailed time line for the submission of, and response to, written interrogatories, admissions, production of documents, and the like in accordance with the Federal Rules of Civil Procedure and the Local Rules of this District. Each plan shall include a proposed time schedule for the taking of depositions of non-expert witnesses and tentative dates for further expert witness discovery. |
| By | | Counsel for the parties shall confer in an effort to resolve any disputes relative to the discovery plans. Any such resolution shall be in |

Westlaw

writing and signed by

each party and shall constitute an amendment to the

each discovery plan. If both plans are agreed to, an

order to that effect shall be submitted for signature

by the Judge. Any subsequent disagreements shall be

resolved in accordance with the procedures

highlighted below.

By        Each party shall file any objection to the other

party's discovery plan specifying the grounds for the

objection and the remedy requested.

By        The objections shall be referred to the Magistrate

Judge and a hearing held to resolve any pending

objections. The Magistrate Judge's order shall

adopt the final discovery plan. Any proposed

amendment to the order shall first be discussed

by the parties. If agreed to, an order to that

effect shall be given to the Magistrate Judge for

signature. If not agreed to, the parties shall set a

conference call with the Magistrate Judge to

discuss the disputed matter before filing any

motions for protection or enforcement. Such



Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

motions shall only be filed after all efforts for

resolution by the Magistrate Judge have been

exhausted.

By      All non-dispositive pretrial motions (including

motions pursuant to Fed.R.Civ.P. 14, 15, 18

through 22, and 42 motions) shall be filed. Any

motion to amend or supplement the pleadings filed

pursuant to Fed.R.Civ.P. 15(a) or 15(d) shall

comport with S.D.Fla.L.R. 15.1 and shall be

accompanied by the proposed amended or

supplemental pleading and a proposed order as

required. Prior to filing any non-dispositive

motion, counsel for the moving party shall

confer, or make reasonable effort to confer, with

counsel for the opposing party in a good faith

effort to resolve the matter, and shall include in

the motion a statement certifying that this has

been done.

By      Plaintiff shall furnish opposing counsel with a

written list containing the names and addresses of all

*expert* witnesses intended to be called at trial and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

|  |  |
|---|---|
|  | only those expert witnesses listed shall be permitted to testify. |
| By | Defendant shall furnish opposing counsel with a written list containing the names and addresses of all expert witnesses intended to be called at trial and only those expert witnesses listed shall be permitted to testify. |
| By | All expert reports and summaries are to be exchanged per S.D.Fla.L.R. 16.1 K. This date shall supercede any other date in Local Rule 16.1 K. |
| By | All expert discovery shall be completed. |
| By | All non-expert discovery shall be completed. |
| By | Defendant shall file any motion to decertify the members of the opt-in class. Any such motion shall be accompanied by a memor-andum of law which addresses, at a minimum, the fol-lowing issues: (i) whether an evidentiary hearing is required on the motion or may the motion be de-cided based on affidavits and discovery of re-cord? (ii) what is the legal standard to be applied on the "similarly situated" issue under 11th Circuit case law, or if no |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 13
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

case is on point, what is the applicable law in other circuits? (iii) who bears the burden of proof on class certification, or decertification, at this stage of the proceedings? (iv) If class decertification is granted what goes forward to trial relative to the opt-in plaintiffs? (v) If decertification is denied, should the case be bifurcated in two stages, namely, a liability and a remedial phase? (vi) In the liability phase, what defense(s) is the Defendant permitted to raise? (vii) If the jury determines against the Plaintiffs in the liability phase based on the "pattern and practice" theory, what additional rights, if any, does the named Plaintiff, and/or the opt-in plaintiffs, have to go forward with alternative individual theories under the *McDonnell Douglas* test or otherwise? (viii) In the remedial stage, what relief is permitted to the named Plaintiff and individual plaintiffs? In other words, will each plaintiff have a "mini-trial" as to their requested relief, and, if so, what defenses may the Defendant raise at this stage [given any already raised and decided against at the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 14
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

liability stage]?

If no motion is filed by the Defendants, then the

Defendant's shall nonetheless file their legal

memorandum addressing the matters raised by items

(iv) through (vii) above, by the date indicated.

By                  Plaintiffs shall file their response to the motion for

decertification, if any, and/or to the legal matters

raised by the court in this order and by the

Defendant in its memorandum.

By                  Defendants shall file their reply.

By                  The court will hold an evidentiary hearing and/or

oral argument on any motion to decertify the class.

This date may need to be adjusted depending on

whether an evidentiary hearing is held.

In the event no motion for decertification is filed, the

court shall hold oral argument on the pending legal

matters addressed by the parties.

By                  The court shall rule on the decertification motion, if

any, and set forth the procedures to be followed for

the trial of the cause. Dispositive motions then may

be filed based on those procedures.

By                  All dispositive pretrial motions and memoranda of

Westlaw.

Slip Copy
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

Page 15

law must be filed, including as to both the liability

and remedial stage. If any party moves to strike

an expert affidavit filed in support of a motion

for summary judgment [for reasons stated in

*Daubert v. Merrill Dow Pharmaceuticals, Inc,* 509

U.S. 579, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)

and *Kumho Tire Company, Ltd. v. Carmichael* 526

U.S. 137, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ],

the motion to strike shall be filed with that

party's responsive memorandum. In the event

that a *Daubert* motion must be determined

before the dispositive motions are ruled on, the

court shall establish procedures and dates after

conferring with the parties.

By                    Mediation shall be completed.

By                    Pretrial Stipulation and *Motions in Limine.* The

joint pretrial stipulation shall be filed pursuant to

S.D.Fla.L.R. 16.1(E). In conjunction with the Joint

Pretrial Stipulation, the parties shall file their

motions in limine.

On                    Pretrial Conference will be held.

On                    Trial.

S.D.Fla.,2005.       Reyes v. Carnival Corp.



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 4891058 (S.D.Fla.)
**2005 WL 4891058 (S.D.Fla.)**

Slip Copy, 2005 WL 4891058 (S.D.Fla.)

END OF DOCUMENT



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2415055 (N.D.Ill.)

**2004 WL 2415055 (N.D.Ill.)**

▷

Reed v. TJX Companies, Inc.

N.D.Ill.,2004.

Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.

Brian REED, on behalf of himself and all other Plaintiffs similarly situated known and unknown Plaintiff,

v.

THE TJX COMPANIES, INC., d/b/a Marshalls Defendant.

No. 04 C 1247.

Oct. 27, 2004.

John William Billhorn, Billhorn Law Firm, Chicago, IL, for Plaintiff.

Rebecca Pratt Bromet, Seyfarth Shaw, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

COAR, J.

*1 Before this Court is Defendant's Federal Rule of Civil Procedure 12(b)(1) Motion to Dismiss.

I. Facts

Plaintiff Brian Reed (hereinafter "Plaintiff" or "Reed") worked as an hourly sales associate and merchandise processing coordinator at Marshalls discount clothing store from July 2002 until his termination in August 2003. Marshalls is owned by The TJX Companies, Inc. (hereinafter "Defendant" or "TJX Co.").

Reed brings this lawsuit under the Fair Labor Standards Act, 29 U.S.C. § 201*et seq.*, the Portal-to-Portal Act, 29 U.S.C. § 251*et seq.*, the Illinois Minimum Wage Law, 820 ILCS 105/1*et seq.*, and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1*et seq.* He alleges that during his tenure at Marshalls, he was required to clock in and out

during his lunch break, but to continue working without pay for that time. Moreover, he asserts that because of this practice, he sometimes worked in excess of forty hours per work week, without receiving appropriate compensation.

II. Analysis

Defendant moves this court to dismiss Plaintiff Reed's action for lack of subject matter jurisdiction. In late March 2004, Defendant offered Reed $500 to settle this lawsuit. Defendant bases this motion to dismiss on its assertion that its offer of $500 fully satisfies Reed's claim, thereby eliminating any actual case or controversy between the parties as required by Article III of our Constitution. Reed denies this assertion and argues that TJX Co.'s offer does not satisfy his claim fully. Moreover, Reed alleges that TJX Co. made its offer in bad faith, simply to pay off the named representative of a potential class action and thereby to defeat the formation of the class. Defendant provides supplementary material to explain how it arrived at the amount it offered Reed as settlement of his claims. Nichols Decl. Defendant also alleges that Reed has not disputed TJX Co.'s calculation of damages. This is incorrect. Reed asserts that TJX Co.'s supplementary material regarding its method of calculating the proposed settlement amount is incomplete. Specifically, Reed alleges that TJX Co. based its calculations on declarant Rachel Nichols' unsupported statement that she "identified all of [Reed's] time reports that reflected that his time report had been edited."Nichols Decl. ¶ 13. TJX Co. does not clarify how Ms. Nichols identified that a particular time report had been edited nor how she determined that other time reports had not been edited. In addition, Reed argues that his claim asserts that he was asked to clock in and out for a lunch break while he continued, in actuality, to work. In those situations, his time report would show no "editing," but he would have continued to work without pay and, in some instances, exceeded a 40-hour work week. Defend-

EXHIBIT

H

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2415055 (N.D.Ill.)
**2004 WL 2415055 (N.D.Ill.)**

ant has offered no indication that it took such circumstances into account in its calculations nor has it offered any indication of how it might make such a determination. As such, Reed has and does dispute that TJX Co.'s $500 offer would compensate him fully for his claims. It is not for this court to engage in extensive fact determination at this preliminary stage of litigation. To attempt to determine whether TJX Co.'s offer of $500 fully compensates Reed for his claim would require just such a far-reaching and supposition-laced inquiry.

**\*2** Defendant relies on a decision from the Middle District of Florida to support its contention that this Court should dismiss the instant action.*MacKenzie v. Kindred Hospitals East, L.L.C.,* 276 F.Supp.2d 1211 (M.D.Fla.2003). The decisions of other districts provide persuasive indications of how other peer courts have interpreted similar legal questions, but this Court is not bound to follow the Middle District of Florida or any other sister court. In the instant case, this Court finds the *MacKenzie* decision distinguishable and therefore declines to adopt its reasoning. In *MacKenzie,* the magistrate judge issued a report and recommendation, which was adopted by the district court, finding that defendant's offer compensated plaintiff "in full for his alleged damages."*MacKenzie,* 276 F.Supp.2d at 1213. In support of his finding that the offer rendered plaintiff's claim moot, the magistrate emphasized that plaintiff "has failed to identify any similarly situated individual who has expressed an interest in filing a written consent to join this lawsuit."*Id.* In the case at bar, however, the court cannot determine that TJX Co.'s offer fully compensates plaintiff for his damages. Furthermore, unlike the plaintiff in *MacKenzie,* Reed has identified two similarly situated individuals who have filed written consents with this court to join this lawsuit.

The other cases on which Defendant relies likewise are inapposite. The first Seventh Circuit case cited by Defendant, *Greisz v. Household Bank (Ill.), N.A.,* 176 F.3d 1012 (7th Cir.1999), arises under the Truth in Lending Act ("TILA"), in which there is a statutory-cap on plaintiff's potential recovery. The second, *Holstein v. City of Chicago,* 29 F.3d 1145 (7th Cir.1994), addresses an alleged due process violation under the municipal code provisions for car towing, in which the amount of plaintiff's claim was limited to his damages from the ticket and towing fees. *Id.* at 1147. Under these cases, when a defendant makes a Rule 68 offer equal to the statutory cap or the amount of damages claimed by plaintiff, there is nothing further a plaintiff can recover.[FN1] As Judge Posner noted in *Greisz,* "You cannot persist in suing after you've won."*Greisz,* 176 F.3d at 1015. Reed's cause of action, however, is not subject to a statutory cap. Therefore, this court cannot compare TJX Co.'s settlement offer against the statutory language and determine that there is nothing more Reed might be entitled to recover. It is not clear in this case, as it was in *Greisz,* that Reed has "won." Moreover, in keeping with the standard of review on motions to dismiss, it is not unreasonable to infer that Reed will be able to show he is entitled to more than $500 in back pay and overtime. Defendant argues, however, that *Holstein* should control the case at bar, because "once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under Federal Rule of Civil Procedure 12(b)(1), because he has no remaining stake."*Holstein,* 29 F.3d at 1146. Without disputing this principle, this Court is unable to find that TJX Co. has offered to satisfy Reed's entire demand or that there is no dispute over which to litigate.

> FN1. TJX Co. also cites an unpublished case from this court, *Letellier v. First Credit Services, Inc.,* No. 00 C 6316, 2001 U.S. Dist. LEXIS 10288 (N.D.Ill. July 20, 2001), in support of its motion to dismiss. A careful reading of *Letellier,* followed by a review of *Greisz,* would suggest caution to a party seeking to rely on these cases. Each involved putative class actions brought by the same attorney, whose performance is criticized harshly. Each also

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2415055 (N.D.Ill.)
**2004 WL 2415055 (N.D.Ill.)**

involved a class action lawsuits under statutes with statutory recovery caps, defendants who made a Rule 68 offer of at least the statutory maximum, and bumbling or disingenuous conduct by plaintiff's attorney. None of these circumstances has been alleged in the instant case.

**\*3** Of particular concern in this case is the ability of defendant purposefully to moot the class action complaint between the time of filing and class notification or certification. *See,e.g.,Crisci v. Shalala,* 169 F.R.D. 563, 568 (S.D.N.Y.1996); *Goetz v. Crosson,* 728 F.Supp. 995, 1000 (S.D.N.Y.1990). Reed asserts that TJX Co.'s defense strategy creates a virtually unwinnable situation for plaintiffs in collective or class action lawsuits. Defendant makes an offer of "judgment" to Plaintiff, then alleges that the action is moot. Plaintiff therefore must either pursue discovery very early in the case, when a court likely will deem it premature, or seek class certification and/or notice before discovery, which runs the risk of harming the interests of those as-yet undiscovered class members. In cases where there are statutory ceilings on recoverable damages, such a strategy may be effective and yet still protect the interests of a plaintiff. *See,e.g.,Greisz,* 176 F.3d 1012;*Holstein,* 29 F.3d 1145. In a situation such as the instant case, where there are no statutory caps on damages and where substantial discovery may be necessary before damages can be determined with any degree of certainty, such a strategy allows defendants to bar the courtroom door. This court finds such a result inappropriate at this early stage in litigation.

**III. Conclusion**

For the foregoing reasons, Defendant's Motion to Dismiss is denied.

N.D.Ill.,2004.
Reed v. TJX Companies, Inc.
Not Reported in F.Supp.2d, 2004 WL 2415055 (N.D.Ill.)

END OF DOCUMENT



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 2240686 (N.D.N.Y.)
**2005 WL 2240686 (N.D.N.Y.)**

H
Jeffers v. Doe
N.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
Jeffrey JEFFERS, Plaintiff,
v.
John DOE, Sgt. at Watertown Corr. Facility; John
Doe, Correctional Officer at Watertown Corr. Fa-
cility; Mr. Ladue, Sergeant, in his official and indi-
vidual capacity; Clint Loren, C.O., in his official
and individual capacity; Randy Hanson, C.O., in his
official and individual capacity; Anne Eckert,
Nurse Administrator, Ulster Corr. Fac., in her offi-
cial and individual capacity; and Marge Byrnes,
Nurse Administrator, Downstate Corr. Fac., in her
official and individual capacity, Defendants.[FN1]

> FN1. In his amended complaint, Plaintiff
> also asserted claims against Glenn S.
> Goord. *See*Dkt. No. 50.By Stipulation and
> Order dated June 16, 2004, this Court so
> ordered the parties' stipulation to dismiss
> Plaintiffs' claims against Defendant Goord
> with prejudice. *See*Dkt. No. 96.

No. 9:99CV335(FJS/GHL).

Sept. 13, 2005.

Golding & Associates, New York, New York, for
Plaintiff, Kevin S. Golding, of counsel.
Office of the New York, State Attorney General,
Syracuse, New York, for Defendants, Maria Moran,
AAG, of counsel.

MEMORANDUM-DECISION AND ORDER

SCULLIN, Chief J.

I. INTRODUCTION

*1 On November 30, 1998, Plaintiff filed his com-
plaint in this action in the United States District
Court for the Southern District of New York.[FN2]
On August 1, 2002, he filed an amended complaint,

pursuant to 42 U.S.C. § 1983, in which he alleged
(1) that Defendants Ladue, Loren, and Hanson were
negligent in handcuffing his wrists too tightly and
thereby causing him injury; (2) that Defendants
Ladue, Loren and Hanson were negligent in refus-
ing his request to loosen the handcuffs; and (3) that
Defendants Ladue, Loren, Hanson, Eckert, Byrnes,
and two "John Doe" Defendants violated his Eighth
Amendment rights by refusing to provide him with
prompt medical care for his injuries. *See*Dkt. No.
50.Although Plaintiff sought compensatory and
punitive damages against Defendants Ladue, Loren
and Hanson, he did not request any specific relief
from the other Defendants. *See id.*

> FN2. By Order dated February 26, 1999,
> Judge Griesa transferred the matter to this
> District. *See*Dkt. No. 3.

Thereafter, on August 25, 2003, Defendants filed
several motions to dismiss and/or for summary
judgment. *See* Dkt. Nos. 72, 79, 81.Specifically,
Defendants Ladue, Loren, and Hanson moved to
dismiss Plaintiff's amended complaint, pursuant to
Rule 12(b)(6) of the Federal Rules of Civil Proced-
ure, or, in the alternative for summary judgment.
*See*Dkt. No. 72.In support of their motion, they ar-
gued (1) that Plaintiff had failed to exhaust his ad-
ministrative remedies, (2) that the Eleventh Amend-
ment barred suits against them as state actors acting
in their official capacities, and (3) that Plaintiff
failed to state a cause of action against them. De-
fendants Eckert and Byrnes moved to dismiss
Plaintiff's amended complaint, pursuant to Rule
12(b)(6), arguing that Plaintiff had failed to state a
cause of action against them. *See* Dkt. Nos. 79, 81.

Currently before the Court are Magistrate Judge
Lowe's April 4, 2005 Report-Recommendation, in
which he recommended that this Court dismiss
Plaintiff's amended complaint in its entirety, and
Plaintiff's objections thereto.[FN3]

> FN3. In a subsequent Order, dated June 16,

EXHIBIT
I

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2240686 (N.D.N.Y.)
**2005 WL 2240686 (N.D.N.Y.)**

2005, Magistrate Judge Lowe stated that the submission that Plaintiff characterized as an Objection was, in reality, a request for leave to file an amended complaint. *See*Dkt. No. 107.Alternatively, Magistrate Judge Lowe noted that, if the Court were to construe Plaintiff's submission as an Objection, Plaintiff had not timely filed it because he filed it sixteen days after the filing of the Report-Recommendation to which it pertained. *See id.*

With respect to the issue of the timeliness of Plaintiff's submission, the Court notes that it appears that Plaintiff did, in fact, file his Objection in a timely fashion. Under the "mailbox rule," a court considers a prisoner's papers filed at the moment that the prisoner delivers them to prison authorities. *See Houston v. Lack,* 487 U.S. 266, 270-71 (1988) (citation omitted). In the present case, it appears that Plaintiff delivered his Objection to prison officials on April 15, 2005, within the ten-day period allowed for the filing of objections to report-recommendations.

## II. BACKGROUND

Between August 31, 1998 and September 1, 1998, Plaintiff was transported from Riverview Correctional Facility to Elmira Correctional Facility. While en route, Plaintiff's bus made several stops at various correctional facilities. Defendants Ladue, Loren, and Hanson, a sergeant and two corrections officers, respectively, accompanied Plaintiff from Watertown Correctional Facility to Oneida Correctional Facility. Plaintiff alleges that, during this part of the trip, these Defendants handcuffed him too tightly, causing swelling, abrasions, and bleeding to his wrists. In addition, Plaintiff alleges that Defendants refused his requests to loosen the handcuffs and his request for medical attention both while en route and during a stop at Oneida Correctional Facility. Finally, Plaintiff contends that Defendants denied his repeated requests for medical attention during stopovers at Ulster Correctional Facility and Downstate Correctional Facility, where Defendants Eckert and Byrnes worked as nurse-administrators, respectively.

**\*2** Plaintiff filed an initial grievance regarding these incidents at Elmira Correctional Facility on September 14, 1998. On October 9, 1998, Elmira Correctional Facility's First Deputy Superintendent, Dana M. Smith, informed Plaintiff that his grievance would be closed and dismissed and that he should file his grievance with Watertown Correctional Facility and/or Downstate Correctional Facility. Plaintiff requested a copy of his grievance on October 12, 1998, and received the requested copy, together with a statement that his grievance was granted insofar as he was directed to forward the grievance to Watertown Correctional Facility. Shortly after receiving this document, Plaintiff filed his original complaint in this action on November 30, 1998.

## III. DISCUSSION

### A. Standard of review

A court reviews *de novo* those findings and recommendations in a magistrate judge's report-recommendation to which a party has filed timely objections and for clear error those parts of the report-recommendation to which a party does not object. *See*28 U .S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72; *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.1990).

Although Plaintiff characterizes his response to Magistrate Judge Lowe's Report-Recommendation as an "Objection," he does not assert any specific objections to any of Magistrate Judge Lowe's findings or recommendations. Rather, he argues that his counsel has been ineffective in prosecuting this case, has failed to submit his amended complaint to the Court, and has not communicated with him. *See*Dkt. No. 103, Plaintiff's Objection, dated April

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2240686 (N.D.N.Y.)

**2005 WL 2240686 (N.D.N.Y.)**

15, 2005, at 1-2. Moreover, Plaintiff requests that this Court review his proposed amended complaint as part of its consideration of his claims. *See id.* at 1.

B. Plaintiff's claims against the "John Doe" Defendants

Pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, a defendant can move for dismissal of a complaint on the grounds that the plaintiff failed to prosecute the claim or failed to comply with a court order. *See* Fed.R.Civ.P. 41(b). In addition, the court has the authority to dismiss a claim even in the absence of such a motion. *See Link v. Wabash R.R. Co.,* 370 U.S. 626, 629 (1962) (citation omitted). A plaintiff's failure to prosecute his claims justifies such a dismissal. *See Chira v. Lockheed Aircraft Corp.,* 634 F.2d 664, 667 (2d Cir.1980) (citations omitted). Moreover, in dismissing a complaint for failure to prosecute, a federal court has substantial discretion. *See Ali v. A & G Co., Inc.,* 542 F.2d 595, 596 (2d Cir.1976) (citation omitted).

With respect to the two "John Doe" Defendants, Magistrate Judge Lowe noted that it had been six years since Plaintiff filed his original complaint in this action and that he had made no progress or apparent effort to identify these individuals. *See* Report-Recommendation at 6. Moreover, Magistrate Judge Lowe noted that Plaintiff had failed to identify these Defendants despite his Order that Plaintiff take reasonable and expeditious steps to do so. *See id.* Finally, he noted that Plaintiff's counsel had a long history of non-prosecution of this case "as evidenced by his numerous extension requests." *See id.* (citing Dkt. Nos. 30, 41, 64, 97) (footnote omitted).[FN4] Therefore, Magistrate Judge Lowe recommended that this Court, *sua sponte,* dismiss Plaintiff's claims against the "John Doe" Defendants with prejudice on the ground that he had failed to prosecute these claims. *See id.* at 6, 19.

> FN4. Specifically, Magistrate Judge Lowe noted that "plaintiff's response to the mo-

tions currently under consideration was late, it cited New York State authority which is not binding on this Court, and it lacked a response to defendants' Statement of Material Facts, which is required under Local Rule 7.1.(a). Further, plaintiff's counsel seems to have spent greater effort in his failed attempt to secure his own removal from the case rather than he has in prosecuting it." *See* Report-Recommendation at 6 n. 5.

> The Court reminds Plaintiff's counsel that, as an officer of this Court, he has an obligation to proceed in a professional and competent manner with respect to all actions in which he is involved in this Court. The conduct that Magistrate Judge Lowe addresses in his Report-Recommendation as evidence of counsel's failure to prosecute Plaintiff's claims against the "John Doe" Defendants, at least arguably, does not meet this standard. Accordingly, the Court hereby places Plaintiff's counsel on notice that it will not hesitate to sanction him in the future if he conducts himself in a similar manner.

\*3 As Magistrate Judge Lowe explained, the record in this case demonstrates Plaintiff's longstanding failure to prosecute his claims against the "John Doe" Defendants. Moreover, there is no indication in the record that Plaintiff is any closer today to identifying these individuals than he was when he filed his original complaint. Accordingly, the Court concludes that Magistrate Judge Lowe's recommendation is well-founded and, therefore, adopts this recommendation and, *sua sponte,* dismisses Plaintiff's claims against the "John Doe" Defendants with prejudice pursuant to Rule 41 of the Federal Rules of Civil Procedure.

C. Eleventh Amendment Immunity

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2005 WL 2240686 (N.D.N.Y.)
**2005 WL 2240686 (N.D.N.Y.)**

"The Eleventh Amendment, with few exceptions, bars federal courts from entertaining suits brought by a private party against a state in its own name."*Ying Jing Gan v. City of N.Y.,* 996 F.2d 522, 529 (2d Cir.1993) (citations omitted). However, whether an individual state official is entitled to invoke Eleventh Amendment immunity "depends initially on the capacity in which he is sued."*Id.*"To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."*Id.* (citations omitted)."As to a claim brought against him in his individual capacity, however, the state official has no Eleventh Amendment immunity."*Id.* (citations omitted).

Based upon these well-established principles, Magistrate Judge Lowe recommended that this Court grant Defendants' motion for summary judgment to the extent that Plaintiff sued Defendants in their official capacities. *See* Report-Recommendation at 8. The Court agrees with, and therefore adopts, this recommendation and grants Defendants' motion for summary judgment with respect to Plaintiffs' claims against them insofar as he sues them in their official capacities.

**D. Plaintiff's failure to exhaust his administrative remedies**

To determine if a prisoner exhausted his available administrative remedies prior to filing a complaint pursuant to § 1983 in federal court, as the Prison Litigation Reform Act ("PLRA") requires, the court must ask (1) if those remedies were actually available to the prisoner at the time of his grievance proceedings; (2) if the defendants forfeited the affirmative defense of non-exhaustion by failing to raise it, failing to preserve it, or inhibiting the prisoner's use of the remedies; and (3) if any special circumstances justified the prisoner's failure to exhaust all of his available remedies. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (citations omitted). For purposes of this inquiry, a remedy is

not available to a prisoner if the prison officials prevented him from using that particular remedy. *See Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (citations omitted). Moreover, if prison officials erroneously informed a prisoner that his complaint was not grievable or that it was only grievable through other means, the court will conclude that those officials prevented the prisoner from using that remedy. *See Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004) (citations omitted).

*4 Although Magistrate Judge Lowe concluded that Plaintiff had not exhausted all of his available administrative remedies, he, nonetheless, noted that there was considerable question as to whether all of these remedies were, in fact, available to Plaintiff. *See* Report-Recommendation at 10. In this regard, Magistrate Judge Lowe found that there was a least a possibility that the officials at Elmira Correctional Facility misled Plaintiff into believing that he could not pursue his grievance at that facility, when, in fact, New York regulations require that an inmate file his grievances at the facility where he is housed at the time, in this case, Elmira Correctional Facility. *See id.* at 12.Additionally, Magistrate Judge Lowe noted that the officials at Elmira Correctional Facility informed Plaintiff that his grievance was granted, which could have led Plaintiff to believe, and to reasonably rely on the belief, that he had nothing to appeal. *See id.* at 12-13.Therefore, because he concluded that there remained considerable questions as to whether there were administrative remedies available to Plaintiff, Magistrate Judge Lowe recommended that this Court deny Defendants' motion on the ground that Plaintiff had failed to exhaust his administrative remedies. *See id.* at 13 .[FN5]

> FN5. Defendants did not file any objections to this recommendation.

The Court agrees with Magistrate Judge Lowe's conclusion that there are issues of fact that preclude the Court from granting Defendants' motion on this ground. Accordingly, the Court adopts that recom-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 2240686 (N.D.N.Y.)
**2005 WL 2240686 (N.D.N.Y.)**

mendation and denies Defendants' motion for summary judgment based upon their argument that Plaintiff failed to comply with the PLRA's exhaustion requirements.

E. Defendants Ladue's, Lauren's and Hanson's motion for summary judgment

*1. Summary judgment standard*

A court may grant summary judgment when the moving party carries its burden of showing the absence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56(c). In making this determination, the court must resolve all ambiguities and draw all reasonable inferences in a light most favorable to the non-moving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991) (citation omitted). If the moving party has met its burden, the nonmoving party may not rely upon his pleadings but must come forward with specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e). "A dispute is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 554 (2d Cir.2002) (quoting *Anderson v.. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

*2. Plaintiff's Eighth Amendment claim that Defendants Ladue, Loren and Hanson failed to provide him with necessary medical care for his injuries*

Under the Eighth Amendment, " 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny....' " *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling*, 509 U.S., at 31, 113 S.Ct., at 2480). Prison officials have a duty to provide humane conditions of confinement, including adequate medical care. *See id.* (citations omitted).

*5 "In order to establish an Eighth Amendment

claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs." ' *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). A medical need is considered to be sufficiently serious if " 'a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." ' *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir.2000) (quotation omitted). Factors that courts consider in determining whether a medical need is sufficiently serious include " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' *Chance*, 143 F.3d at 702 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir.1992)) (other citation omitted).

To establish the second or subjective prong of an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate that the defendants acted with deliberate indifference to his health and safety. Deliberate indifference is established when an individual is aware of a substantial risk to another's health or safety, consciously disregards the substantial risk, and could draw the inference that a substantial risk of serious harm exists based upon the situation. *See Farmer*, 511 U.S. at 837. However, a claim that negligence or medical malpractice has occurred is insufficient to establish a violation of the Eighth Amendment. *See Estelle*, 429 U.S. at 106.

With respect to the first element of Plaintiff's "deliberate indifference" claims, i.e., that Plaintiff suffered a serous injury, Magistrate Judge Lowe concluded that Plaintiff's injuries were not serious but, rather, appeared to be superficial in nature. *See* Report-Recommendation at 14. Specifically, he found that, despite Plaintiff's description of his injuries in his amended complaint, the record indicated that he only needed bandages and ointment and

Not Reported in F.Supp.2d                                                          Page 6
Not Reported in F.Supp.2d, 2005 WL 2240686 (N.D.N.Y.)
**2005 WL 2240686 (N.D.N.Y.)**

required no follow-up care. *See id.*Moreover, with respect to the second element of these claims, Magistrate Judge Lowe found that the record indicated that Defendants Ladue, Loren and Hanson were no longer with Plaintiff at the time he requested medical care and, therefore, could not have deprived him of that care. *See id.* at 15.[FN6]Based upon these findings, Magistrate Judge Lowe recommended that this Court grant Defendants Ladue's, Lauren's and Hanson's motion for summary judgment with regard to Plaintiff's Eighth Amendment deliberate indifference claims.

> FN6. Magistrate Judge Lowe also noted that Plaintiff's amended complaint did not specifically state which of the Defendants had denied him medical care. *See* Report-Recommendation at 15 (citing Dkt. No. 50 at ¶¶ 15-19).

Having reviewed the record, the Court concludes that Magistrate Judge Lowe correctly found that Defendants had met their burden to show that no genuine issue of material fact existed with respect to these claims. First, Plaintiff offered no evidence to show that his injuries rose above the superficial level indicated in the record. Additionally, Plaintiff presented no evidence to demonstrate that these Defendants deprived him of any medical care. In fact, the record indicates that Defendants Ladue, Loren and Hanson were not with Plaintiff at the time that he requested medical care and, therefore, could not have denied him such care, let alone have been deliberately indifferent to his requests for such care. Accordingly, the Court adopts Magistrate Judge Lowe's recommendation and grants Defendants Ladue's, Lauren's and Hanson's motion for summary judgment with respect to Plaintiff's Eighth Amendment claims against them.

**F. Defendants Eckert's and Brynes' motions to dismiss Plaintiff's claims against them**

*1. Standard of review*

**\*6** A court may grant a motion to dismiss only where " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)) (other citation omitted). In deciding a motion to dismiss, "the court must accept the material facts alleged in the complaint as true." *Id.* (citing *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1733, 12 L.Ed.2d 1030 (1964) (per curiam)). Nonetheless, dismissal is appropriate when the complaint offers only general or conclusory allegations that the defendants violated the plaintiff's rights. *See Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) (citations omitted). Therefore, to withstand a motion to dismiss, the plaintiff's complaint must specifically identify who violated his rights, when the violation occurred, how the violation occurred, and how the violation harmed the plaintiff. *See Phelps v. Kapnolas,* 308 F.3d 180, 187 n. 6 (2d Cir.2002).

*2. Plaintiff's claims against Defendants Eckert and Byrnes*

As an initial matter, Magistrate Judge Lowe found that Plaintiff had failed to allege any specific claims against either Defendant Eckert or Defendant Byrnes. *See* Report-Recommendation at 16. Specifically, he noted that nowhere in his amended complaint did Plaintiff allege any material fact that the Court could construe as a claim against either Defendant. *See id.*Additionally, he found that Plaintiff had not alleged how or when either Defendant allegedly violated his rights. *See id.*Furthermore, he noted that Plaintiff had not asserted that he had ever spoken to, or had any contact with, either Defendant. *See id.* at 17.Moreover, Magistrate Judge Lowe concluded that Plaintiff implicitly acknowledged that Defendant Byrnes lacked any knowledge of either his medical condition or his needs and that he failed to allege that Defendant Byrnes denied him medical care. *See id.*Finally, with specific reference to Defendant Eckert, Magis-

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2240686 (N.D.N.Y.)
**2005 WL 2240686 (N.D.N.Y.)**

Page 7

trate Judge Lowe found that there was no evidence in the record that she was present during any of the events in question. *See id.* at 18.Therefore, based upon the lack of specificity in Plaintiff's amended complaint, Magistrate Judge Lowe recommended that this Court grant Defendants Eckert's and Byrnes' motions to dismiss Plaintiff's claims against them with prejudice. *See id.*

Having reviewed the record in its entirety, the Court concludes, as Magistrate Judge Lowe did, that the record in this case contains no evidence that either Defendant Byrnes or Defendant Eckert violated Plaintiff's rights in any manner. Indeed, as Magistrate Judge Lowe noted, Plaintiff has not come forward with any evidence to show that he ever had any direct contact with either of these Defendants. Accordingly, the Court adopts Magistrate Judge Lowe's recommendation and grants Defendants Byrnes' and Eckert's motions to dismiss Plaintiff's claims against them.

G. Defendants Ladue's, Loren's and Hanson's motion to dismiss Plaintiff's negligence claims against them

*7 Courts do not recognize negligence as a basis for a cause of action upon which a court can grant relief under § 1983. *See Salim v. Proulx,* 93 F.3d 86, 92 (2d Cir.1996) (citing *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986)) (other citation omitted). However, pursuant to 28 U.S.C. § 1367, a federal court may exercise jurisdiction over a state law claim, such as negligence, when that claim is substantially related to the federal claim that established the basis for the federal court's original jurisdiction. Nonetheless, if a federal court dismisses all of the federal claims in a complaint, it has the discretion to, and generally should, dismiss the related state claims without prejudice. *See Castellano v. Bd. of Trustees of Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir.1991) (citing *[United Mine Workers v. Gibbs,* 383 U.S. 715] at 726, 86 S.Ct. at 1139) (other citation omitted). The decision to dis-

miss related state claims requires the court to weigh several factors, including judicial efficiency, fairness, comity, and convenience. *See id.*(citation omitted). Moreover, to protect the plaintiff's ability to bring the state claims in a state court if the federal court dismisses those claims after the expiration of the applicable state statute of limitations, § 1367(d) tolls the statute of limitations for any such claims while they are "pending and for a period of 30 days after [they are] dismissed...." 28 U.S .C. § 1367(d).

Addressing Defendants' contention that Plaintiff's negligence claims failed to state a claim upon which this Court could grant relief, Magistrate Judge Lowe limited his discussion to the recognition that claims of negligence are insufficient to support a § 1983 cause of action. *See* Report-Recommendation at 18. Accordingly, Magistrate Judge Lowe recommended that this Court grant Defendants Ladue's, Loren's and Hanson's motion to dismiss Plaintiff's claims of negligence against them. *See id.* at 19.

There is no question that, to the extent that Plaintiff's negligence claims form a basis for his § 1983 claims against these Defendants, the Court must dismiss these claims. However, Plaintiff's amended complaint, which is very poorly drafted, is unclear as to whether he intended to assert that Defendants' negligence violated his Constitutional rights or whether he intended to assert separate and distinct state claims for negligence and, thereby, invoke this Court's supplemental jurisdiction over such claims pursuant to § 1367. Drawing all reasonable inferences in Plaintiff's favor, as it must when considering a motion to dismiss, the Court concludes that Plaintiff intended to assert state law negligence claims against these Defendants in addition to his Eighth Amendment claims under § 1983 against these same Defendants arising from the same incidents.

Even viewing Plaintiff's negligence causes of action in this way, however, does not spare them from dismissal. Although these claims have been pending in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                Page 8
Not Reported in F.Supp.2d, 2005 WL 2240686 (N.D.N.Y.)
**2005 WL 2240686 (N.D.N.Y.)**

this Court for more than six years, this case remains in its initial stages procedurally. Thus far, this Court's involvement has been minimal, e.g., merely addressing requests for extensions of time, requests to amend the complaint, the parties' stipulations, and the motions that are the subject of this Memorandum-Decision and Order. Moreover, the parties have not engaged in any significant discovery. Most importantly, the Court's dismissal of these claims without prejudice pursuant to § 1367 will not prejudice Plaintiff because he will have thirty days from the date of this Memorandum-Decision and Order to commence an action based upon these claims in the appropriate New York State court. Accordingly, the Court dismisses Plaintiff's state law negligence claims against Defendants Ladue, Loren and Hanson without prejudice pursuant to its discretion under § 1367.

**H. Plaintiff's request to amend his amended complaint**

**\*8** Courts generally grant a plaintiff's motion for leave to amend his complaint unless (1) he has unduly delayed his request to amend, (2) he seeks the amendment for dilatory purposes or in bad faith, (3) the court's granting of his request to amend would cause undue prejudice to the defendants, or (4) his proposed amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962).

As noted, in response to Plaintiff's filing of a document that he characterized as an "Objection," Magistrate Judge Lowe issued an Order, in which, after construing this submission as a motion for leave to amend the amended complaint, he denied that motion. *See*Dkt. No. 107.He based his denial on his finding that Plaintiff unduly delayed his request to amend his amended complaint because more than six years had passed since Plaintiff had filed his original complaint in this action, had successfully moved to amend his original complaint in August 2002, and had filed the instant motion to amend only after the issuance of the Report-Recommendation that is currently before this Court.

*See* Order, dated June 16, 2005, at 2-3. Alternatively, Magistrate Judge Lowe concluded that granting Plaintiff's motion to amend would prejudice Defendants because they had had to endure his litigation for more than six years and, having finally prevailed, they should not be subjected to additional litigation. *See id.* at 3. As a third ground for denying Plaintiff's motion, Magistrate Judge Lowe concluded that Plaintiff's proposed amendment would be futile because it failed to address any of the inadequacies that Magistrate Judge Lowe had identified in his Report-Recommendation. *See id.*Finally, Magistrate Judge Lowe noted that the motion improperly cited non-binding New York civil practice rules, rather than federal rules, did not comply with this District's Local Rules as to content, and failed to identify the defendants against whom he proposed to assert his claims. *See id.* at 3-4.

The Court agrees with, and therefore adopts, Magistrate Judge Lowe's reasoning and conclusions regarding Plaintiff's attempt to request leave to amend his amended complaint. Accordingly, to the extent that Plaintiff's "Objection" can be construed to include a request for leave to amend his amended complaint, the Court denies that request.

### IV. CONCLUSION

After carefully considering Magistrate Judge Lowe's April 4, 2005 Report-Recommendation and his June 16, 2005 Order, Plaintiff's objections, the relevant parts of the record, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Magistrate Judge Lowe's Report-Recommendation, dated April 4, 2005, is ADOPTED IN ITS ENTIRETY; and the Court further

ORDERS that Magistrate Judge Lowe's Order, dated June 16, 2005, is AFFIRMED; and the Court further

ORDERS that Plaintiff's claims against the "John Doe" Defendants are SUA SPONTE DISMISSED WITH PREJUDICE pursuant to Rule 41(b) of the



Not Reported in F.Supp.2d                                         Page 9
Not Reported in F.Supp.2d, 2005 WL 2240686 (N.D.N.Y.)
**2005 WL 2240686 (N.D.N.Y.)**

Federal Rules of Civil Procedure for failure to pro-
secute these claims; and the Court further

**\*9** ORDERS that Defendants' motion to dismiss
Plaintiff's § 1983 claims against them in their offi-
cial capacities is GRANTED; and the Court further

ORDERS that Defendants Ladue's, Loren's and
Hanson's motion for summary judgment with re-
gard to Plaintiff's Eighth Amendment claims
against them is GRANTED; and the Court further

ORDERS that Defendants Eckert's and Byrnes' mo-
tions to dismiss all of Plaintiff's claims against
them are GRANTED; and the Court further

ORDERS that Defendants Ladue's, Loren's and
Hanson's motion to dismiss Plaintiff's negligence
claims against them is GRANTED and, insofar as
those claims form the basis for Plaintiff's Eighth
Amendment claims, pursuant to § 1983, they are
DISMISSED WITH PREJUDICE and, insofar as
those claims constitute separate and distinct state
law claims, they are DISMISSED WITHOUT PRE-
JUDICE pursuant to the Court's discretion under §
1367; and the Court further

ORDERS that Plaintiff's request to amend his
amended complaint is DENIED; and the Court fur-
ther

ORDERS that the Clerk of the Court enter judg-
ment against Plaintiff and in favor of Defendants
and close this case.

IT IS SO ORDERED.

N.D.N.Y.,2005.
Jeffers v. Doe
Not Reported in F.Supp.2d, 2005 WL 2240686
(N.D.N.Y.)

**END OF DOCUMENT**



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

**H**
Henkin v. Forest Laboratories, Inc.
S.D.N.Y.,2003.

United States District Court,S.D. New York.
Galina HENKIN, Plaintiff,
v.
FOREST LABORATORIES, INC., Defendant.
**No. 01 Civ. 4255(AKH).**

March 5, 2003.

Sixty-one-year-old chemist, who was Russian-Jewish immigrant, brought wrongful termination action against employing pharmaceutical company. Employer moved for summary judgment. The District Court, Hellerstein, J., held that: (1) chemist was not fired due to her ethnic or religious background, in violation of Title VII; (2) chemist was not fired due to her age, in violation of Age Discrimination in Employment Act (ADEA); (3) chemist was not subjected to hostile work environment, under Title VII or ADEA; (4) chemist could not maintain quantum meruit action, seeking additional bonus payments; (5) company did not violate Fair Labor Standards Act (FLSA) by stopping overtime payments; and (6) court would not exercise supplemental jurisdiction to consider claim that discharge violated state whistleblower protection statute.

Judgment for company.

West Headnotes

**[1] Civil Rights 78 ⊂⊃ 1122**

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited Cases
    (Formerly 78k144)

**Civil Rights 78 ⊂⊃ 1137**

78 Civil Rights

78II Employment Practices
    78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)

**Civil Rights 78 ⊂⊃ 1157**

78 Civil Rights
    78II Employment Practices
        78k1151 Religious Discrimination
            78k1157 k. Particular Cases. Most Cited Cases
    (Formerly 78k151)

**Civil Rights 78 ⊂⊃ 1158**

78 Civil Rights
    78II Employment Practices
        78k1151 Religious Discrimination
            78k1158 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)

Pharmaceutical company did not violate Title VII by firing chemist who was Russian-Jewish immigrant because of her ethnic and religious background; company had nondiscriminatory reasons for discharge, as chemist destroyed test materials in violation of regulations and had substandard performance reviews, and chemist failed to show these reasons were pretext for discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights 78 ⊂⊃ 1204**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1204 k. Discharge or Layoff. Most Cited Cases
    (Formerly 78k170)

**Civil Rights 78 ⊂⊃ 1209**

78 Civil Rights

EXHIBIT

J

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

78II Employment Practices
    78k1199 Age Discrimination
        78k1209 k. Motive or Intent; Pretext.
Most Cited Cases
    (Formerly 78k170)
Pharmaceutical company did not violate the ADEA by firing 61-year-old chemist; company had nondiscriminatory reasons for discharge, as chemist destroyed test materials in violation of regulations and had substandard performance reviews, and chemist failed to show these reasons were pretext for discrimination. Age Discrimination in Employment Act of 1967, § 2 et seq, 29 U.S.C.A. § 621 et seq.

**[3] Civil Rights 78 ☞ 1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)

**Civil Rights 78 ☞ 1161**

78 Civil Rights
    78II Employment Practices
        78k1151 Religious Discrimination
            78k1161 k. Harassment; Work Environment. Most Cited Cases
    (Formerly 78k151)
Chemist who was Russian-Jewish immigrant failed to establish that pharmaceutical company subjected her to hostile work environment due to her ethnicity or religion, in violation of Title VII, when she claimed harassment not inflicted upon colleagues; there was no showing that hostility was anything more than dislike of her as individual. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 ☞ 1213**

78 Civil Rights
    78II Employment Practices

        78k1199 Age Discrimination
            78k1213 k. Harassment; Work Environment. Most Cited Cases
    (Formerly 78k168.1, 78k145)
Chemist who was 61 years old failed to establish that pharmaceutical company subjected her to hostile work environment due to her age in violation of the ADEA when she claimed harassment not visited upon colleagues; there was no showing that hostility was anything more than dislike of her as individual. Age Discrimination in Employment Act of 1967, § 2 et seq, 29 U.S.C.A. § 621 et seq. .

**[5] Implied and Constructive Contracts 205H ☞ 34**

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(C) Services Rendered
            205Hk33 Rendition and Acceptance of Services in General
                205Hk34 k. Implication of Request or Promise to Pay. Most Cited Cases
Employee could not maintain quantum meruit action against former employer, under New York law, for difference between amount of bonuses mentioned in hiring letter and amount actually received, when hiring letter merely indicated range of bonuses paid in past without promising that same payments wold be made to chemist.

**[6] Labor and Employment 231H ☞ 2267**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)3 Exemptions
                231Hk2265 Professional Employees
                    231Hk2267 k. Particular Employees. Most Cited Cases
    (Formerly 232Ak1206 Labor Relations)
Pharmaceutical company did not violate the FLSA by ceasing to pay overtime to chemist, following her reclassification as exempt professional employee. Fair Labor Standards Act of 1938, § 13(a), 29



Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

U.S.C.A. § 213(a); 29 C.F.R. § 541.3(a)(1).

**[7] Federal Courts 170B ⬤�top 18**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk14 Jurisdiction of Entire Controversy; Pendent Jurisdiction
            170Bk18 k. Validity or Substantiality of Federal Claims and Disposition Thereof. Most Cited Cases
Court would not exercise supplemental jurisdiction, to consider claim by chemist that employing pharmaceutical company violated New York Labor Law by terminating her in retaliation for whistleblower activity, after court dismissed all federal causes of action. 28 U.S.C.A. § 1367; MdcKinney's Labor Law § 740(4)(a).

*OPINION AND ORDER GRANTING DEFEND-ANT'S MOTION FOR SUMMARY JUDGMENT*

HELLERSTEIN, J.
**\*1** Plaintiff Galina Henkin brings suit against defendant Forest Laboratories, Inc. ("Forest Labs"), claiming that defendant's termination of her employment was a discriminatory action based on national origin and religion, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (2002), and based upon age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634 (2002). In addition, she claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207 (2002), and for quantum meruit for defendant's failure to pay overtime and bonuses, and asserts a claim for retaliation under New York Labor Law § 740(2) (2002). Defendant moves for summary judgment, dismissing all of plaintiff's claims.

I hold that plaintiff has failed to show merit with respect to her Title VII, ADEA, FLSA and quantum meruit claims, and that defendant is entitled to summary judgment, dismissing them. I decline to exer-

cise supplemental jurisdiction over plaintiff's remaining state claim.

I. *Background*

A. *Plaintiff's Discrimination Claims*

Plaintiff is a Russian-Jewish immigrant. She began her employment with defendant Forest Labs, a pharmaceutical company, on August 9, 1995, when she was fifty-seven years old. She was hired for the position of Scientist I in Forest Lab's Research and Development Department. During her first two years of employment, plaintiff received satisfactory performance evaluations and received annual performance bonuses.

In 1997, Forest Labs brought in new management. Soon after that, in the summer of 1997, the Research and Development unit was transferred from a facility in Inwood, N.Y. to Farmingdale, NY. The Inwood facility remained open for other functions. Plaintiff was displeased with the transfer because it increased her commute by about three hours a day, but she continued to work for defendant. She claims, however, that the Human Resources Manager and the Director of Research and Development at the time promised her that the transfer was only temporary. Defendant claims that no such promise was, nor could have been, made, since there were no longer Research and Development positions at the Inwood facility, the whole unit having been transferred to Farmingdale.

Plaintiff alleges that, after the transfer, she was subjected to disparaging and humiliating behavior because she was Jewish, a Russian immigrant, and older than most of the other employees in her division. For example, plaintiff complains that on one occasion, when she was helping the Section Head of the Research and Development Department, Kostas Lambiris, fix a machine needing repairs, he threw a wrench at her. Plaintiff also alleges that, on another occasion, she was asked to move forty one-gallon bottles of solvent while younger chemists

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                          Page 4
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

were allowed to play computer games. In addition, she claims that after Benedict Albolote became her supervisor in March of 1998, he paged her up to fifteen times a day, often asking her to bring numerous reports with her, despite knowing that recent foot surgery made it difficult for her to carry heavy objects. She claims that Mr. Albolote approached younger chemists at their desks, but made plaintiff come to him in his office. Finally, plaintiff complains that when she and other members of her team made mistakes, she alone would be singled out for criticism.

*2 Plaintiff alleges that from 1997 until the time she was discharged, defendant fired or constructively discharged all the other Jewish chemists, chemists over the age of forty, and Russian chemists. She complains that younger, non-Jewish chemists with less experience than she were promoted, pointing to Mr. Albolote, who, when he was promoted to plaintiff's supervisor, had fewer years of education and less experience than plaintiff. Plaintiff also claims that she was the last older, Jewish immigrant chemist left when her employment was terminated. However, the evidence shows that, of the two older Jewish chemists who left, one did so in order to pursue other business opportunities, and the other was terminated after failing to return from an extended FMLA leave.

### B. Plaintiff's Performance Evaluations and Warning Letters

While plaintiff complains that she was singled out for criticism and was not promoted, an examination of her job evaluations reveals that her performance was evaluated as below average. During the course of her employment, plaintiff received three job performance evaluations and two letters regarding the performance of her duties. Plaintiff's performance evaluations show that while her work was not unsatisfactory, her cumulative ratings always fell below expectations. Under the assessment system followed by Forest Labs, a mark of "1" indicated unsatisfactory performance, a "2" indicated that im-

provement was needed, a "3" indicated that expectations were attained, a "4" indicated that expectations were exceeded, and a "5" indicated that expectations had been substantially exceeded. On her first evaluation, in 1996, after one year of work at the company, plaintiff received a cumulative overall performance rating of 2.6. Her second evaluation, done at the end of 1997, indicated a performance rating of 2.7. The third evaluation, done at the end of 1998, gave plaintiff a performance rating of 2.8. Each of these evaluations was completed by a different supervisor, and all reflected that plaintiff's work was below expectations and needed improvement.

Moreover, two letters plaintiff received from management indicate that she was not carefully following laboratory procedures. In August 1997, plaintiff received a letter from Mr. Lambiris, inquiring into a change of data file names that was made without proper authorization. Plaintiff responded by blaming the computer system. In March 1999, plaintiff again received a performance warning from Mr. Lambiris, citing her carelessness in following written procedures for sample preparations and analyses.

### C. Forest Lab's Discharge of Plaintiff

Plaintiff's substandard performance was not, however, defendant's immediate reason for terminating her employment. In early May 1999, a lab supervisor in Forest's Research and Development Department noticed irregularities in calibration reports done by two chemists, Seung-Yeon Won, who had been trained by plaintiff, and Albert Gall, both of whom admitted to discarding test results. Plaintiff admitted that she, also, discarded test results, claiming that she had been instructed to do so and that such practices were consistent with Forest Lab's procedures. Finding that plaintiff had violated FDA regulations, defendant suspended plaintiff, and two weeks later formally discharged her. Mr. Gall was also discharged, and Ms. Won and Mr. Albolote, the Project Team Leader, were disciplined.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 5
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

**\*3** This was not the first time that defendant had discharged an employee for discarding data. A few months before plaintiff's discharge, in February 1999, a Scientist II who had admitted to throwing out eight test reports was terminated.

### D. *Plaintiff's Retaliation Claim*

Plaintiff claims that it was not she, but the Research and Development Department at Forest Labs that was violating FDA regulations, and she contends that her negative performance evaluations and discharge constituted retaliation for her reports of these violations and her refusal to take part in violative activity. Plaintiff alleges that her training did not follow FDA requirements, so that instead of being trained to use certain equipment, as required by the FDA, she had to learn by self-study. She also contends that before a 1999 inspection by FDA auditors, the management of the Research and Development department instructed team leaders to discard any experiment result receipts that were not included in the official record, again in violation of FDA regulations. Plaintiff claims that she complained of these violations to management. She also claims that she refused to engage in testing practices that she believed violated the FDA. For example, in April 1999, she claims that she was ordered to perform tests on tablets enclosed in rusty packaging, in direct violation of FDA regulations, and refused to do so.

Plaintiff filed a charge with the New York State Division of Human Rights ("Human Rights Division") on October 19, 1999. On November 28, 2000, the Human Rights Division issued a determination and order finding that there was no probable cause to believe that Forest Labs had engaged in unlawful discrimination. On or about November 19, 1999, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), which issued a Right to Sue letter on February 8, 2001. Plaintiff filed the instant Complaint on May 18, 2001, and defendants, after discovery, now move for summary judgment.

### II. *Summary Judgment Standards*

Summary judgment is warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, *seeHarlen Assocs. v. Village of Mineola,* 273 F.3d 494, 498 (2d Cir.2001), the non-moving party must raise more than just "metaphysical doubt as to the material facts,"*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)."[M]ere speculation and conjecture is insufficient to preclude the granting of the motion."*Harlen,* 273 F.3d at 499. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."*Anderson,* 477 U.S. at 249-50 (internal citations omitted).

**\*4** While the court views the evidence in the light most favorable to the non-moving party, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."*Anderson,* 477 U.S. at 247-48. Rather, summary judgment is appropriate "when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."*Matsushita,* 475 U.S. at 587.

In an employment discrimination case, such as this, where intent is an issue, the Second Circuit has urged caution in granting summary judgment, since direct evidence of intentional discrimination is available only in the rarest of instances. *Belfi v. Prendergast,* 191 F.3d 129 (2d Cir.1999) (noting that "the trial court must be especially cautious in deciding whether to grant [summary judgment] in a discrimination case, because the employer's intent

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950

**2003 WL 749236 (S.D.N.Y.)**

Page 6

is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination"); *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). However, summary judgment is by no means precluded in employment discrimination cases. Indeed, the Second Circuit has noted that the "salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials-apply no less to discrimination cases than to ... other areas of litigation."*Meiri,* 759 F.2d at 998.

### III. *Plaintiff's Title VII and ADEA Discrimination Claims*

[1][2] Plaintiff claims that her termination was a discriminatory action taken on the basis of national origin and religion in violation of Title VII, 42 U.S.C. §§ 2000e-2000e-17, and on the basis of age, in violation of the ADEA, 29 U.S.C. §§ 621-634. Title VII, in relevant part, makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with regard to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."42 U.S.C. § 2000e-2(a)(1). The ADEA provides that "[i]t shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."29 U.S.C. § 623(a)(1).

### A. *Burden-Shifting Analysis*

Courts analyzing claims under Title VII and the ADEA apply the three step burden-shifting approach established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972); *seeSlattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91 (2d Cir.2001); *Richardson v. New York State*

*Dep't of Corr. Servs.,* 180 F.3d 426, 443 (2d Cir.1999). At the first stage, the burden of production rests with the plaintiff to prove by a preponderance of the evidence a prima facie case of discrimination. *SeeSt. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 446 (2d Cir.1999), *cert. denied,*530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000). If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action of which plaintiff complains. *SeeTexas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996). If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the reasons proffered by the defendant are merely pretexts for discrimination. *St. Mary's Honor Ctr.,* 509 U.S. at 507-08. At this stage, in order to prevail on a summary judgment motion, the plaintiff must submit "evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by ... discrimination." *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997). Evidence "contradicting the employer's given reason-without more-does not necessarily give logical support to an inference of discrimination," and is therefore not enough to meet plaintiff's burden. *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000). Instead, the court must conclude, based on the factual record taken as a whole, that a reasonable jury could find discrimination to have been at least a contributing factor in the defendant's decision. *Wolde-Meskel v. Argus Cmty. Inc.,* No. 99 Civ. 10112, 2001 U.S. Dist. Lexis 11261, at *15-*16 (S.D.N.Y. Aug. 6, 2001)."The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."*St. Mary's Honor Ctr.,* 509 U.S. at 507 (citation omitted).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

B. *Plaintiff's Prima Facie Case*

*5 In order to establish a prima facie case under Title VII, plaintiff must demonstrate that: (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she was discharged; and (4) her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997). The test for making out a prima facie case under the ADEA is substantially the same. *See Slattery,* 248 F.3d at 91 (in order to make out a prima facie case of age discrimination, plaintiff had to demonstrate that he was within the protected age group, meaning that he was over the age of forty; was qualified for the position; was discharged; and that such discharge occurred under circumstances giving rise to an inference of discrimination).

Plaintiff is a Russian immigrant, is Jewish, and at the time she was discharged, was 61 years old. The first and third prongs of the test are therefore satisfied. With respect to the second prong, the Second Circuit has held that "all that is required is that the plaintiff establish basic eligibility for the position at issue." *Id.* at 92; *Gregory v. Daly,* 243 F.3d 687, 696 (2d Cir.2001) (holding that plaintiff need only show that he "possesses the basic skills necessary for performance of [the] job."). When plaintiff started her employment at Forest Labs, she had almost 30 years of experience as a chemist, including two years at a pharmaceutical company in the United States, and had published various articles and books, some of which had been translated into English. Such experience is sufficient to show that she possessed the basic skills necessary for the position she held as Scientist I at Forest Labs. The only question that remains is whether her discharge occurred in circumstances giving rise to an inference of discrimination.

Recognizing that the burden at this stage is de minimis, *McLee,* 109 F.3d at 134, plaintiff's allegations of being singled out for harsh treatment while younger non-Jewish coworkers were not disciplined for the same or similar mistakes; that defendant put a younger, non-Jewish employee in the position plaintiff held at the Inwood facility; that defendant promoted younger, less experienced chemists over her; and that she was the only older, Jewish chemist left in the department when she was fired may be enough to make out a prima facie case. I will assume that plaintiff has satisfied at this stage her minimal burden.

C. *Defendant Has a Legitimate Non-Discriminatory Reason for Discharge That Plaintiff Fails to Show is Pretextual*

Defendant explains that plaintiff was discharged because she admitted to discarding data, in violation of FDA and Forest Labs regulations, and points to her substandard job performance evaluations and two performance warning letters as further cause for discharge. Defendant thus proffers a legitimate, nondiscriminatory reason for terminating plaintiff's employment, and any presumption of discrimination is rebutted. *See Wolde-Meskel,* 2001 U.S. Dist. Lexis 11261, at *26 (finding that defendant had carried burden in rebutting presumption of discrimination where defendant had presented evidence to show that plaintiff was fired due to documented poor work product). The burden is therefore shifted to plaintiff to show that defendant's reasons for discharging her are pretextual.

*6 Plaintiff contends that defendants had no basis for discharging her, claiming that she did not discard data, that if she did, it was under the direction of management, and that she did satisfactory work as illustrated by the performance bonus she received after her first year of work. Plaintiff also criticizes her performance evaluations as being inconsistent and untruthful. She insists on her professionalism, and points not only to her considerable experience as a chemist, but also to a number of occasions when, because of her expertise, she was asked by the management at Forest Labs to give demonstrations to the other chemists.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 8
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

Although plaintiff challenges the reasons behind her termination, "the creation of a genuine issue of fact with respect to pretext alone is not sufficient" to make out a case of discrimination. *Grady,* 130 F.3d at 561. Instead, plaintiff must also proffer evidence that would permit a rational factfinder to infer that her termination was actually motivated, in whole or in part, by discrimination. *Id.; see also St. Mary's Honor Ctr.,* 509 U.S. at 515 (holding that an employer's proffered reason for termination "cannot be proved to be a pretext 'for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason"); *Wolde-Meskel,* 2001 U.S. Dist. Lexis 11261, at *28 (ruling that even if plaintiff's defenses and explanations with respect to his poor job performance create a genuine issue of fact, plaintiff must "come forward with evidence suggesting discrimination and not just the falsity of his employer's proffered reasons" for discharge). Thus, an employee's disagreement with her employer's perception of her work does not satisfy her burden of showing that the employer's proffered reason for termination was a pretext for discrimination. *See McLee,* 109 F.3d at 135; *Abouzied v. Roy H. Mann Jr. H.S. No. 78,* No. 97-CV-7613, 2000 U.S. Dist. LEXIS 14038, at *12 (E.D.N.Y. Aug. 30, 2000). Although plaintiff contests her evaluations and her discharge, this alone cannot provide the basis for her discrimination claims. Indeed, even assuming that a jury could believe that plaintiff's disposal of data and substandard job evaluations could not have sufficed to make defendant fire her, the evidence presented by plaintiff is not enough to permit a jury to find that the real reason she was fired was because of her national origin, her religion, or her age. *See Slattery,* 248 F.3d at 94.

Plaintiff, attempting to buttress her claim of pretext, contends in her deposition that at least one of her supervisors referred to her as "an old Jew witch." Not only does defendant categorically deny that any such remarks were made, but plaintiff did not make these allegations in her filing before the Human Rights Division, in her Complaint, or in the body of her supporting affidavit. The first time that plaintiff made this charge was in rebuttal of Mr. Lambiris' affidavit. Plaintiff's late charge cannot supplant the absence of proof of discrimination.

*7 Plaintiff also claims that Mr. Gall, who was fired at the same time that she was, was Jewish. While this fact is disputed, it makes little difference. The Second Circuit has cautioned against attributing much, if any, significance to the fact that another member of the protected class was discharged along with the plaintiff. *Zimmerman v. Assocs. First Capital Corp.,* 251 F.3d 376, 382 (2d Cir.2001). Moreover, because defendant provides a legitimate non-discriminatory reason for Mr. Gall's termination, his discharge does not support an inference of discrimination.

Plaintiff also seeks to support her discrimination claim with her allegations that at the time she was terminated, she was the last older person left in the Research and Development department. However, the record shows that after her termination, in 2000, Forest Labs hired two chemists over the age of forty. Of the six workers who held positions as Scientist I and were terminated between 1997 and 2000, only two were over the age of forty and three were below the age of thirty. Finally, of the two Russian, Jewish immigrants whom plaintiff identifies as having been constructively discharged by defendant, defendant explains that one left after failing to return from FMLA leave and an additional 10-week leave, and the other resigned to pursue alternate business opportunities, thanking the staff at Forest Labs by letter for their kindness. Given this evidence, and evidence that defendant continued to hire people in plaintiff's age group, plaintiff cannot meet her burden of showing that her discharge was motivated by discrimination.

Finally, plaintiff intimates that the chronology of events surrounding her discharge impugns the credibility of Forest Lab's reasons for her termination. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2d Cir.2000). The chronology, however, is not enough

Westlaw.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

to show discrimination. Defendants allegedly discovered that data was being destroyed on May 5, 1999. Mr. Gall was fired within two days of the discovery, and plaintiff was fired two weeks later, on May 21, 1999. Ms. Won, who was new, was issued a warning on August 13, 1999, three months after the incident. Plaintiff argues that the delay was because plaintiff retained counsel, but that argument, whether true or not, does not show that her termination occurred because of discriminatory animus.

Plaintiff also does not rebut defendant's proof with respect to Mr. Albolote's promotion and her transfer to the Farmingdale facility. Although plaintiff asserts that younger workers, like Mr. Albolote, were promoted while she was not, since plaintiff's performance reviews were substandard, it is clear that there would be no basis to promote her. In addition, the evidence is clear that plaintiff's position at the Inwood laboratory was transferred to a position at the Farmingdale facility, and was not given to someone else. There is no showing, therefore, that defendant's actions were motivated by discrimination.

*8 Instead, the record makes clear that plaintiff was not reaching adequate levels of performance and was not following procedures correctly. On the basis of such a record, a rational factfinder would have no grounds for finding discrimination to have been even a contributing factor in the defendant's decision to discharge plaintiff. See *Wolde-Meskel,* 2001 U.S. Dist. Lexis 11261, at *15-*16. Plaintiff's claims for discrimination based on national origin and religion under Title VII and on age under the ADEA are therefore dismissed.

### IV. *Plaintiff's Hostile Work Environment Claim*

[3][4] In addition to her discrimination claims, plaintiff also brings a hostile work environment claim under Title VII and the ADEA. Under both statutes, a plaintiff bringing a hostile work environment claim must demonstrate that she belongs to a protected class, she suffered unwelcome harass-

ment, she was harassed because of her membership in a protected class and that the harassment was sufficiently pervasive to alter the conditions of her employment and create an abusive work environment. *Meritor Sav. Bank FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995) (Title VII); *Brennan v. Metro. Opera Ass'n Inc.,* 192 F.3d 310, 316-17 (2d Cir.1999) (ADEA).

Plaintiff alleges that Mr. Lambiris screamed at her and, on one occasion, threw a wrench at her. She claims that she was forced her to carry bottles and files back and forth after undergoing foot surgery. She also complains that Mr. Albolote would constantly page her to call her to his office, and would sometimes page her and then leave his office. She also alleges that a coworker called her an "old Jew witch." She claims that these incidents show a hostile work environment.

In order to make out a hostile work environment claim under either Title VII or the ADEA, plaintiff must show that the alleged hostile behavior was discriminatory. *Richardson v. N.Y. State Dep't of Corr. Servs.,* No. 97-CV-0818E, 2001 U.S. Dist. LEXIS 7164, at *23 (W.D.N.Y. May 25, 2001) ("Plaintiff must present evidence that the acts complained of were motivated by discriminatory intent."). Plaintiff has not met her burden in this respect. The evidence is clear that plaintiff's supervisors may have been hostile towards her, but there is no evidence that this hostility was because of her protected class. Plaintiff does not show that hostility to her arose out of any animus towards plaintiff based on her religion, national origin, or age. Title VII and the ADEA are not general civility codes. *Brennan,* 192 F.3d at 314-16, 319. And, as for the alleged epithet of an "old Jewish witch," this one isolated allegation does not create a hostile work environment. See *Stembridge v. City of New York,* 88 F.Supp.2d 276, 286 (S.D.N.Y.) (finding use of epithets "uppity nigger" and "boy" on two isolated occasions over the course of three years not suffi-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

cient to create hostile work environment). Summary judgment is therefore granted to defendant on plaintiff's hostile work environment claim.

### V. *Plaintiff's FLSA and Quantum Meruit Claims*

**\*9** [5] In addition to her Title VII and ADEA claims, plaintiff brings a claim under the FLSA, 29 U.S.C. § 207, and for quantum meruit, complaining that defendant was unjustly enriched because the amount of her bonuses for 1997 and 1998 were lower than was stipulated in her hiring letter and because beginning on January 1, 1999, defendant stopped paying her overtime. Defendant asserts that the FLSA claim is time-barred, and challenges the merits of both claims. Whether the FLSA claim is timely is irrelevant because neither claim has merit.

First, plaintiff's claim that she was not afforded the bonuses she was promised must fail because defendant's employment offer letter never guaranteed plaintiff a particular bonus level, but only suggested that past bonuses had been in the range of five to ten percent. It is axiomatic that without a promise there can be no contract and no action in quasi-contract. *See* Restatement (Second) of Contracts, §§ 1 -2, § 90 (1981). Plaintiff's claim for quantum meruit is therefore dismissed.

[6] Second, the discontinuance of plaintiff's overtime after January 1, 1999, was in no way a violation of the FLSA. In January 1, 1999, defendant began to treat its chemists as exempt employees, increasing their salary level, but terminating the payment of overtime. This decision fully accords with the FLSA and the regulations promulgated pursuant to it.

Under section 13(a) of the FLSA, "any employee employed in a bona fide executive, administrative or professional capacity" is exempted from the minimum wage and maximum hour requirements of the Act. 29 U.S.C. § 213(a). The regulations promulgated under the FLSA provide that an employee will be deemed to be working in a "professional ca-

pacity" if her "primary duty consists of the performance of ... [w]ork requiring knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study." 29 C.F.R. § 541.3(a)(1). Plaintiff's work as a chemist certainly meets this criteria. Indeed, the regulations expressly contemplate that chemists would fit within the purview of exempt employees under section 13(a). *See* id. § 541.306(a) (providing example of a professional chemist to illustrate what it means to be engaged in work predominantly intellectual and varied in character as required by 29 C.F.R. § 541.3). Since plaintiff was properly deemed an exempt employee, she has no claim under the FLSA for overtime. Defendant's motion for summary judgment is granted.

### VI. *Plaintiff's Retaliation Claim Under New York Labor Law § 740(2)*

[7] New York Labor Law § 740(2) prohibits an employer from taking "any retaliatory personnel action against an employee because such employee ... discloses or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation" where the violation "creates and presents a substantial and specific danger to the public health or safety," or because the employee "objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation." N.Y. Lab. Law § 740(2) (2002). An employee who has been subjected to a retaliatory personnel action and wishes to institute a civil action on these grounds must do so within one year after the alleged retaliatory personnel action was taken. N.Y. Lab. Law § 740(4)(a).

**\*10** Plaintiff claims that her discharge was a retaliatory personnel action taken because she complained to management about violations of FDA regulations and refused to take part in tests that she believed violated such regulations.[FN1] Defendant urges the Court to find the claim time-barred, since

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 11
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

plaintiff filed her Complaint on May 18, 2001, two years after her discharge, and a year after the statute of limitations on the § 740(2) claim had run. Plaintiff, in response, urges the court to follow those courts who have tolled the statute of limitations on an independent state claim during the pendency of an EEOC filing. I shall not, however, address either this issue, nor the merits of plaintiff's claim. Having dismissed plaintiff's Title VII, ADEA, and FLSA claims, I decline to take supplemental jurisdiction over her state claim.

> FN1. It should be noted that plaintiff has not brought, and in fact would have no basis for, a claim for retaliation under Title VII. In order to make out a retaliation claim under Title VII, a plaintiff must demonstrate that (1) she engaged in an activity protected by Title VII; (2) her employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there is a causal connection between the protected activity and that employment action. *McMenemy v. City of Rochester,* 241 F.3d 279, 283 (2d Cir.2001). Because plaintiff never openly opposed any alleged unlawful employment practice, never reported any alleged discrimination to anyone in defendant's Human Resources department, and, before her discharge, never made any claims before either the Human Rights Division or the EEOC, she did not engage in activity protected by Title VII, and therefore would not be able to demonstrate the first factor in the test.

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if the district court has dismissed all claims over which it has original jurisdiction. Once the federal claims in a case have been dismissed, the court, in its discretion, should consider whether the considerations of judicial economy, convenience, and fairness to litigants require that supplemental jurisdiction be ex-

ercised. *Castellano v. Bd. of Trustees,* 937 F.2d 752, 758 (2d Cir.1991). Where, as here, plaintiff's claims are dismissed before trial, these considerations weigh in favor of dismissing the state claims. *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered ... judicial economy, convenience, fairness, and comity ... will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Castellano,* 937 F.2d at 758 ("If the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). Other factors, too, demonstrate that these considerations favor declining jurisdiction. In particular, the state policies behind § 740(2) differ considerably from those implicated in Title VII and the ADEA, *see Swanston v. Pataki,* No. 97 Civ. 9406, 1999 U.S. Dist. Lexis 10756, at *19 (S.D.N.Y. July 15, 1999) (holding that the "[w]histleblower cause of action incorporates policies, elements and remedies distinct from those of Title VII"), weighing strongly in favor of allowing the state court to hear plaintiff's claims. Moreover, plaintiff will not be barred from bringing her claim before the state court, since her claim is tolled under New York Civil Practice Law § 205(a). Taking all of this into consideration, then, I decline to exercise supplemental jurisdiction over plaintiff's § 740(2) claim.

## VII. *Conclusion*

As summary judgment has been granted to defendant on plaintiff's Title VII, ADEA, FLSA, and quantum meruit claims, and I have declined to exercise supplemental jurisdiction over plaintiff's remaining state law claim, the Clerk of the Court is directed to mark this case as closed.

**\*11** SO ORDERED.

S.D.N.Y.,2003.
Henkin v. Forest Laboratories, Inc.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 749236 (S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950
**2003 WL 749236 (S.D.N.Y.)**

Not Reported in F.Supp.2d, 2003 WL 749236
(S.D.N.Y.), 8 Wage & Hour Cas.2d (BNA) 950

END OF DOCUMENT



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

c

LaBella v. New York City Admin. for Children's Services

E.D.N.Y.,2005.

Only the Westlaw citation is currently available.

United States District Court,E.D. New York.

Keith LABELLA, Plaintiff,

v.

NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES, Defendant.

No. 02-CV-2355(NGG)(KAM).

March 28, 2005.

Leonard N. Flamm, Law Offices of Leonard N. Flamm, New York, NY, for Plaintiff.

William S.J. Fraenkel, Corporation Counsel of the City of NY, New York, NY, for Defendant.

*MEMORANDUM & ORDER*

GARAUFIS, J.

*1 On March 11, 2005, Magistrate Judge Kiyo A. Matsumoto issued a Report and Recommendation ("R & R") in which she recommended that the New York City Administration for Children's Services' ("Defendant") motion for summary judgment be granted with respect to all of Keith LaBella's ("Plaintiff") federal law claims, and that the Plaintiff's state law claims be dismissed without prejudice. Despite the fact that Judge Matsumoto recommended summary judgement in its favor, the Defendant still chose to submit objections to certain portions of the R & R. The Plaintiff, however, did not submit any objections.[FN1] Because the Defendant submitted timely objections to the R & R, this court makes a *denovo* review of all portions of the R & R to which the Defendant specifically objected. 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). The court may adopt the remaining portions of the R & R to which no objections were made, as long as those portions are not clearly erroneous. Cespedes v. Coughlin, 956 F.Supp. 454, 463 (S.D.N.Y.1997) (citing Thomas v. Arn, 474 U.S.

140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)).

FN1. On March 16, 2004, the Plaintiff's attorney, Leonard Flamm, submitted a motion for leave to withdraw as counsel, which the court denied. Flamm explained in his accompanying affidavit: "I am constrained to make this motion because I no longer believe that Plaintiff's claims herein are sufficiently meritorious for my Firm to serve and file any Objections to the substantially adverse findings in the said Report and Recommendation, let alone for my Firm to pursue any other steps in prosecution of Plaintiff's claims in this or any other forum."(Flamm Aff. at ¶ 3.) While the court appreciates Flamm's efforts to refrain from filing objections that he finds insufficiently meritorious, it must question whether that same restraint should have been exercised at the initiation of this suit. Alternatively, if Flamm originally deemed the suit to be meritorious, then his abrupt withdrawal in the face of the setback posed by Judge Matsumoto's R & R bespeaks a disconcerting lack of zealousness in advocating for his client.

The Defendant's objection to the R & R is that it contains two parts, III.A. (ii) and III.A.(iii), that address the viability of theories of the Plaintiff's disability that were not raised by the parties. After determining that the Plaintiff had not offered sufficient evidence to support his contention that he is disabled under the definition laid out in 42 U.S.C. § 12102(2)(A), as he claimed in his complaint, Judge Matsumoto went on to evaluate whether the Plaintiff was disabled under either § 12102(2)(B) or (C). Judge Matsumoto recognized that the Plaintiff had not invoked these classifications of disability but undertook the analysis "in the interest of completeness." (R & R at 22, 24.)The Defendant seeks to have these sections of the R & R excised and for the court to adopt the remainder of the R & R.



EXHIBIT

K

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

The only rationale offered for the Defendant's baffling decision to object to dicta in an opinion recommending a disposition in its favor is its statement that "[t]he R & R should not have engaged in this analysis."(Def. Obj. at 2.) The Defendant's objection is denied because after a *denovo* review of these sections, the court agrees with Judge Matsumoto's determination to include them, and because the court can discern no prejudice to the Defendant caused by their inclusion.

Since the Defendant only objects to the inclusion of parts III.A.(ii) and III.A.(iii), and not Judge Matsumoto's reasoning therein, the court's review is limited solely to determining whether their presence is improper. The analysis contained in these sections is dicta since it was not essential to Judge Matsumoto's conclusions regarding the motion. *SeeHormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 508 (2d Cir.1996) (" 'Dictum' generally refers to an observation which appears in the opinion of a court which was unnecessary to the disposition of the case before it.") (internal quotations and citations omitted). But the fact that these parts are dicta does not mean that it was improper for Judge Matsumoto to engage in the analysis. Courts frequently include dicta in their opinions for a variety of reasons. In this case, Judge Matsumoto explained that she undertook this additional analysis in the interest of thoroughness. Although Judge Matsumoto ultimately found that the Plaintiff's claim lacks merit, the completeness of her opinion demonstrates that the Plaintiff's claims were carefully considered and evaluated. Showing an unsuccessful litigant that his claims and grievances have been given this level of serious consideration may have the beneficial effect of providing the feeling that, even though he did not win, he had his day in court and his claims were given thoughtful and thorough consideration. For this reason, the court adopts these portions of the R & R.

*2 Moreover, although Judge Matsumoto's analysis of other theories of disability clearly was not necessary to her ultimate recommendation, its presence in the R & R just as clearly poses no harm to the Defendant. Under Rule 72(b) of the Federal Rules of Civil Procedure, "after being served with a copy of the recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations."Here, where the motion was for summary judgment, Judge Matsumoto could not make any factual findings and was required only to make a recommendation on the outcome of the motion. Since the Defendant does not object to this recommendation (or presumably even to the recommendations contained in the dicta), there can be no good reason for it to object.

Moreover, while the Second Circuit employs the rule that "failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision," *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989), this restraint on seeking appellate review does not mean that a corresponding limitation is placed upon an appellee's general right to advocate alternative grounds by which a court can sustain a judgment. Had the Plaintiff objected to Judge Matsumoto's R & R and then appealed the court's adoption of it, the Defendant would have been free on appeal to raise arguments in support of its position that differed from those relied on by this court. *SeeAVC Nederland B.V. v. Atrium Inv. P'ship,* 740 F.2d 148, 152 (2d Cir.1984) ("an appellee may seek to sustain a judgment on the basis of any argument that is supported by the record, whether it was ignored by the court below or flatly rejected") (internal quotations omitted).

For the foregoing reasons, the court DENIES the Defendant's objection and ADOPTS parts III.A.(ii) and III.A.(iii) of the R & R. After a review of the remainder of the R & R to which no objections were made, the court finds no clear error and therefore ADOPTS these portions of the R & R for the reasons stated therein. The Clerk of Court is hereby directed to close this case.

SO ORDERED.



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

*REPORT AND RECOMMENDATION*

MATSUMOTO, Magistrate J.

Plaintiff Keith LaBella, Esq. ("plaintiff" or "LaBella") brings this action under the American with Disabilities Act, 42 U.S.C. §§ 12101*et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. §§ 701*et seq.,* the New York City Human Rights Law, §§ 8-107 *et seq.* and §§ 8-502 *et seq.* and 42 U.S.C. § 1983.[FN1] Specifically, plaintiff alleges that the Administration for Children's Services ("defendant" or "ACS") created a hostile work environment based on plaintiff's alleged disability and retaliated against him by terminating his employment for visiting the offices of the Equal Employment Opportunity Commission ("EEOC").

> FN1. Plaintiff voluntarily withdraws his claim pursuant to 42 U.S.C. § 1983, as set forth in his third cause of action. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 8 ("Plaintiff's Opp MOL"). Accordingly, the Court will not address the plaintiff's section 1983 claim herein and respectfully recommends the claim be dismissed with prejudice.

Before the Court is defendant's motion for summary judgment (Docket no. 13), referred by District Judge Nicholas G. Garaufis, pursuant to 28 U.S.C. § 636(b), to Magistrate Judge Steven M. Gold for a Report and Recommendation.Docket no. 17.This matter was subsequently reassigned to the undersigned magistrate judge on July 30, 2004. On February 22, 2005, the undersigned held a settlement conference in this matter and also provided the parties with an opportunity to address the merits of defendant's motion and plaintiff's opposition thereto.

**\*3** For the reasons set forth below, this Court respectfully recommends to the District Court that defendant's motion for summary judgment be granted with respect to all of plaintiff's federal law claims and that plaintiff's state law claims be dismissed

without prejudice.

### I. BACKGROUND

Examination of the pleadings, affidavits and declarations, Local Civil Rule 56.1 statements, and exhibits accompanying defendant's motion for summary judgment, and plaintiff's opposition thereto, disclose the following undisputed material facts.

### A. FACTS

Plaintiff alleges that he suffers from a "psychotic disorder" classified as NOS ("Not Otherwise Specified") DSM-IV Code 298.9. Compl. ¶ 10. He was employed by defendant as a probationary Noncompetitive Agency Attorney Intern assigned to the Queens Family Court Unit of the Legal Services Division, from on or about August 27, 2001 to on or about January 17, 2002. Compl. ¶ 4; *seealso* Docket no. 13, Defendant's Local Civil Rule 56.1 Statement of Undisputed Facts ¶ 1 ("Defendant's 56.1 Statement"). During his employment as an Agency Attorney Intern, plaintiff was subject to a one year probationary period.Docket no. 13, Ex. F, Cardieri Declaration ¶ 4 ("Cardieri Decl."). Plaintiff understood that as a probationary Agency Attorney Intern, he was not covered by a union grievance mechanism and that he could be terminated without cause.Docket no. 21, Transcript of Deposition of Keith LaBella, dated January 10, 2003, at 87 ("LaBella Dep."). Agency Attorney Interns assigned to the Queens Family Court Unit represent the Commissioner of ACS in proceedings brought pursuant to Article 10 of the New York Social Services Law in child abuse and neglect matters. Cardieri Decl. ¶ 4. Their work duties include, "among other things, preparing files and documents in order to insure that all required documents are available before court appearances, analyzing, identifying and researching legal issues in order to formulate legal opinions, participating in the drafting [sic] legal documents including pleadings, and appearing before the court at hearings, trials and



Not Reported in F.Supp.2d                                                                                 Page 4
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

other judicial proceedings in order to further agency objectives."*Id.* During his employment with defendant, as counsel representing the Commissioner, plaintiff was "require [d] ... to prepare detailed, concise, and legally accurate presentations, to attend court proceedings on schedule, and to conduct himself in a professional manner."*Id.* The Tasks and Standards for an Agency Attorney Intern Performance Evaluation are annexed as "Exhibit F" to Defendant's 56.1 Statement and to the Cardieri Declaration.

Plaintiff's Accommodation Request

Plaintiff was assigned to work at the Queens Family Court under the supervision of Team Leader Guljit Bains, Esq., but was not assigned a case load until October 1, 2001. Defendant's 56.1 Statement ¶¶ 3, 4; LaBella Dep. at 85-86; Docket no. 16, Ex. 2, LaBella Affidavit ¶ 3 ("LaBella Aff."). Approximately one month after receiving a case load, on or about November 5, 2001, during the course of a court appearance on behalf of ACS, plaintiff "experienced an apparent memory lapse" (LaBella Aff. ¶ 4; docket no. 13, Ex. D, Accommodation Request dated November 6, 2001 ("Accommodation Request")), during which plaintiff admits his mind "went blank," he confused which of his two cases was a parole and which was a remand, and further admits that he was not "coherent enough to ask the Court to do the right thing in the right case."LaBella Dep. at 97, ll. 5-7. According to plaintiff, Ms. Bains and another colleague then handled his two cases. LaBella Aff. ¶ 4.

**\*4** The following day, "because [plaintiff] wanted defendant to understand what had happened and because [he] wanted to ensure that a problem of this nature would not recur," (LaBella Aff. ¶ 5), plaintiff delivered a letter to, among others, his supervisors Ms. Bains and Fredda Monn, Esq., Supervising Attorney at ACS's Queens Family Court Unit, Anthony Ferraro, Assistant Supervisor, and Harriet Gerwertz, Ms. Bains's supervisor. In his Accommodation Request dated November 6, 2001,

plaintiff asserted that he was a "person with a mental disability as defined by the [ADA]," and requested an accommodation based on his alleged disability. Accommodation Request at 1. At that time, plaintiff did not provide medical documentation evidencing his purported disability. Plaintiff's Accommodation Request noted that Ms. Bains was "professional in her assessment of ... [his] problems," but noted that she was not an expert in the area and may "confuse symptoms of depression, memory disorder and dysfunction with insubordination, ... [and] with the inability to take work orders from a superior of another gender (a subject ... [previously] broached [by Ms. Bains] with [plaintiff] ... )"*Id.* at 1. As an accommodation, plaintiff proposed that:

[Ms. Bains] reduce to a writing on either a weekly or bi-weekly basis what she observes to be deficiencies in my performance. This can give me material to work with my therapist and psychiatrist so that they may render professional advice and possibly change my medication schedule, if needed.... If need be a reasonable accommodation can be comparable work as an attorney other than handling trials.

*Id.* at 2. According to plaintiff, his November 6 letter was the first and only formal accommodation request plaintiff made to defendant. LaBella Aff. ¶ 8; LaBella Dep. at 72, ll. 7-15.

Plaintiff alleges that his accommodation request was denied (Compl. ¶ 13; *seealso* docket no. 16, Ex. 4, Plaintiff's MOL in Opp'n to Motion for Summary Judgment at 2 ("Plaintiff's Opp'n MOL")), however, he acknowledges that a reasonable accommodation need not be the particular one that is suggested by the employee, but should be an effective accommodation. Accommodation Request at 2; LaBella Dep. at 74-75. Although Ms. Bains did not reduce plaintiff's deficiencies to writing on a weekly or bi-weekly basis as plaintiff requested, Mr. Cardieri considered Ms. Bains's report that she supervised plaintiff closely to assist him as much as possible and directed plaintiff himself to write

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

down all feedback and instructions, because plaintiff indicated he had poor short term memory. Docket no. 16, Ex. H, Email from Guljit Bains, dated Jan. 16, 2001, at 1 ("Bains Email"). Plaintiff testified that he "reduced everything to writing" and "usually carried around a yellow pad" and also "typed out things." LaBella Dep. at 133-143. Further, plaintiff concedes that Ms. Bains promptly responded to plaintiff's accommodation request by reducing his trial work and reassigning him to "dispositional cases and easier cases." LaBella Dep. at 88, ll. 1-6, 130, ll. 13-25.

*5 Although plaintiff admits that he requested closer supervision, he believes that Ms. Bains placed undue burdens on him and singled him out when she directed him to reorganize his files during her supervision of him. LaBella Aff. ¶¶ 8-12; La-Bella Dep. at 110-111, 131. Ms. Bains reported to Mr. Cardieri that plaintiff "on an ongoing basis strongly resisted supervision," was "totally unresponsive and at times hostile to feedback" offered by his supervisor, and that plaintiff resisted writing down instructions. Bains Email at 1. Ms. Bains reported to her superiors that on more than one occasion, plaintiff failed to fill out remand orders at arraignments, even when asked to do so, and that plaintiff would "argue the point at length." *Id.*

Following his accommodation request, plaintiff asserts that Ms. Bains "became, on an almost daily basis, harsh, humiliating and even cruel" in her treatment of him, calling him an "idiot," and "repeatedly" criticizing "unimportant things ... including the way [he] sat in a chair." LaBella Aff. ¶ 10. Specifically, plaintiff claims that Ms. Bains called plaintiff an "idiot" and "yelled" at him. Plaintiff's Opp'n MOL at 2; LaBella Dep. at 122, ll. 17-22. Although plaintiff testified at his deposition that a "couple of times" Ms. Bains hung up on him (LaBella Dep. at 123, ll. 23), plaintiff further testified that before Ms. Bains hung up, she said, "I'm busy right now. Talk to you later. Thanks for calling."*Id.* at 123-24.

**Plaintiff's Disability**

The only medical documentation of plaintiff's disability in the court record and presented to the defendant is a handwritten note dated January 15, 2002, which plaintiff provided to defendant on the afternoon of January 16, 2002, from a certified social worker at the Arista Center for Psychotherapy, Inc., in Forest Hills, New York. The note stated that plaintiff was currently receiving psychotherapy treatment for specified diagnoses of "Depressive Disorder Code 311 with paranoid features," "irritable bowel," "erectile dysfunction" and "minimum social life." Docket no. 16, Ex. 1, Note from Harvindar Mann, CSW-R to EEOC ("Psychotherapist's Note"). The note further stated that the "mentioned diagnosis [sic] make the patient highly susceptable [sic] to disparate impacts in the work place," and further, that the "patient exhibits treatable behavior abnormalities." Psychotherapist's Note. The note listed plaintiff's daily prescribed medication of Zoloft, Risperdol, Dalmanx and Xanax. *Id.;seealso* LaBella Aff. ¶ 18. The note does not provide specific information about whether and, if so, how plaintiff's disability substantially limits his ability to engage in major life activities, nor how plaintiff might reasonably be accommodated in performing the essential functions of his job.

**The Decision To Terminate Plaintiff's Probationary Employment**

Joseph Cardieri, Deputy Commissioner/General Counsel for ACS, is responsible for, *inter alia,* "all employment decisions regarding attorneys such as plaintiff, assigned to ACS's Legal Services Division."Cardieri Decl. ¶ 3. Plaintiff offers no evidence to dispute defendant's showing that on January 16, 2002, Mr. Cardieri requested the termination of plaintiff's probationary service "based on a series of oral and written reports regarding his unsatisfactory job performance" from "his direct supervisor Guljit Bains, from Ms. Bains' supervisor Fredda Monn, and from Michelle L. Weinstat, the Associate General Counsel and Director of the Employment Law

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

Unit."*Id.* ¶ 5.

*6 In his decision to terminate plaintiff on January 16, Mr. Cardieri considered, and plaintiff does not dispute, *inter alia,* two reported incidents involving plaintiff's courtroom behavior that occurred the previous day on January 15, when plaintiff was scheduled to appear in three separate matters in Queens Family Court. Both courtroom incidents on January 15, 2002 were reported in an email from plaintiff's colleague, Lauren Cooper, Esq., to, among others, Ms. Bains and Ms. Monn and considered by Mr. Cardieri in terminating plaintiff. Cardieri Decl. ¶ 5; docket no. 16, Ex. G, Email from Lauren Cooper dated Jan. 15, 2002 ("Cooper Email").

First, while attempting to organize the various parties and attorneys for a scheduled hearing, plaintiff was speaking loudly and entering and exiting a courtroom in which there was an ongoing matter. Defendant's 56.1 Statement ¶ 10; Cardieri Decl. ¶¶ 5, 9, Bains Email; Cooper Email; LaBella Dep. at 104-05, 122. The presiding Family Court judge, Judge Hunt, asked plaintiff to leave the courtroom because he was being disruptive. The court officer then directed plaintiff to leave the courtroom. While in the hall outside the courtroom, plaintiff spoke with his colleague, Ms. Cooper, about the incident and referred to the court officer as a "motherfucker." Cooper Email. In her email reporting the incident, Ms. Cooper expressed her concern to Ms. Bains and Ms. Monn about plaintiff's reaction to being ejected from Judge Hunt's courtroom because she "definitely saw a volatile streak in Keith [LaBella]."*Id.* When asked at his deposition about the incident and whether he remembered using a profanity, plaintiff testified: "[w]hatever, some vulgarity. Some profanity. No, I don't."*LaBella Dep. at 105, ll. 13-14.

Mr. Cardieri was also informed of a second incident which occurred that same day involving plaintiff's courtroom behavior, which is also described in Ms. Cooper's email and is not disputed by plaintiff. While presenting a case summary to the presiding judge, Judge Friedman, plaintiff discussed a subject

child's placement as follows: "the child is in non-kinship foster care, at the following address."Defendant's Statement ¶ 13; Cooper Email; Cardieri Decl. ¶ 10. Because the subject child's natural mother, from whose custody the child was removed, was in the courtroom, a colleague of plaintiff's stopped him to remind him that non-kinship foster care addresses are confidential. According to Ms. Cooper, plaintiff then stated, "Sorry your Honor, I can't give that information to you right now ... I am not allowed."*Id.* Ms. Cooper stated in her email report that she "would be happy to discuss ... [the incidents] at greater length with any management if necessary."Cooper Email.

In his decision to request the termination of plaintiff, Mr. Cardieri also considered a third incident that occurred on January 15, 2002, which Ms. Bains reported in writing to her superiors by email on January 16, 2002. Cardieri Decl. ¶ 5. Ms. Bains reported to her superiors that on January 15, 2002, in an attempt to assist plaintiff to prepare a case for an upcoming trial, she reviewed the case "from cover to cover," and organized the case "to make it easier for LaBella."Bains Email at 1. According to Ms. Bains, she had discussed the case with plaintiff on four separate occasions and had asked him to write down all necessary tasks to be completed in the case. *Id.* Ms. Bains reported her concern that plaintiff had not read the transcript or the Article 10 petition because he did not know that there were two respondents, even though they had discussed the case several times. *Id.* Plaintiff does not dispute that after Ms. Bains first suggested, then directed, that plaintiff organize the case file the way she organized her own case files, he "first demanded a lot of overtime and then said that without that he would refuse to do the work."*Id.* Ms. Bains reported that plaintiff stated he was being treated unfairly and verbally threatened to sue the City "for a lot of money." *Id.* Plaintiff states in his affidavit, and defendant does not dispute, that he told Ms. Bains her directive regarding file organization "seemed impractical and onerous as to certain smaller files," and that "her directive was not required

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

of any other ACS attorney."LaBella Aff. ¶ 15. Nor does defendant dispute plaintiff's claim that Ms. Bains responded, "I can supervise you differently because you have a disability."*Id.*

*7 It is likewise undisputed that Ms. Bains also reported to Mr. Cardieri that, later on January 15, 2002, plaintiff "made a scene in the common space" of their offices by claiming that she was "harassing" him and that she was a "fucking bitch," and by plaintiff screaming out, "I'm psychotic," and "I need accommodation." Bains Email at 1; Cardieri Decl. ¶ 12. Ms. Bains further reported to her superiors that plaintiff then confronted a female attorney, asked if she had to organize her files, cornered her in a cubicle and was observed punching walls and cabinets and stating, "I want to punch someone." *Id.* at 1-2; Cardieri Decl. ¶ 12. As reported by Ms. Bains, this female attorney was "very shaken by the episode," and one of the other attorneys who witnessed the incident was ready to call 911 for assistance. *Id.* at 1; Cardieri Decl. ¶ 12. Ms. Bains further advised her superiors that, as plaintiff exited the office that evening, he kicked the exit door and was heard making derogatory comments about Ms. Bains's Punjabi "ethnic and religious identity." *Id.* at 1-2.That same evening, Ms. Bains reported that a colleague called to warn her of plaintiff's behavior and stated that the colleague was worried that plaintiff would confront Ms. Bains. *Id.* at 2. Ms. Bains further reported to Mr. Cardieri that on the evening of January 15, 2002, plaintiff called her twice after 6:30 p.m., arguing that he should not have to organize his files, calling her "anal retentive," stating that Ms. Bains was "stressing him," was "up his ass" and was "harassing him." *Id.* at 2. That night, according to Ms. Bains, she felt "uncomfortable leaving [the office] alone" and was also concerned about a female colleague who was still in court, so she and her colleague drove home together. *Id.* at 1.

In addition to informing Mr. Cardieri of plaintiff's aforementioned conduct, Ms. Bains also reported that plaintiff had previously made inappropriate re-

marks to staff members concerning female colleagues, specifically, "rating their body parts," and referring to female attorneys as "those girls" or "that girl." Defendant's 56.1 Statement ¶ 17; Bains Email at 1; Cardieri Decl. ¶ 7. Ms. Bains further reported, and plaintiff does not specifically deny, that on one occasion, "plaintiff invited a paralegal intern to lunch under the guise of helping her study for the Law School Aptitude [sic] Test" but later "propositioned her for a date." Cardieri Decl. ¶ 7. When the paralegal declined, plaintiff "repeatedly harassed her for a date, putting pressure on her to accept."*Id.* Eventually, plaintiff represented to co-workers that he was "seeing her." *Id.* As a result, the paralegal confronted plaintiff and asked him to stop misrepresenting the nature of their relationship. *Id.* Plaintiff also does not deny having "told colleagues that he punched a female date over a dispute," as reported to and considered by Mr. Cardieri. *Id.*

*8 In addition, defendant asserts, and plaintiff's own deposition testimony confirms, that plaintiff "offered information about his sexual impotence and use of Viagra to any male or female colleague who would listen."*Id.* ¶ 19; Cardieri Decl. at ¶ 7; LaBella Dep. at 46. Plaintiff also testified at his deposition that his long term memory is better than his short term memory, but that he could not remember any incidents at work where he "mouthed off to a supervisor or made any threatening suggestions or ... said anything ... off-color to any supervisor...." LaBella Dep. at 62.

In terminating plaintiff, Mr. Cardieri further considered, and plaintiff does not dispute, that shortly after he was assigned a case load, he failed to complete his work in a timely manner, "refuse[d] to make changes to documents that he had drafted when asked to do so by his supervisors," and "appeared to resent" his supervisors' feedback on his work product (Defendant's Statement ¶ 15-16), even though plaintiff requested feedback and closer supervision. Plaintiff's Aff. ¶¶ 5, 6, 8, 9; Cardieri Decl. ¶¶ 5-6; Bains Email at 1; Cooper Email. Not-

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

ably, plaintiff does dispute or present any evidence to raise a material issue of fact that Mr. Cardieri considered oral and written reports regarding plaintiff's performance in his decision to terminate plaintiff, including the incidents related in Ms. Bains's email report dated January 16, 2002 (Exhibit H to Defendant's 56.1 Statement), and other reports from plaintiff's supervisors.

### Plaintiff's Visit to the EEOC

Plaintiff states, and defendant does not dispute, that "over a period of several days" in early January 2002, he verbally asked Ms. Bains for "comp" time so he could visit the local federal EEOC office to discuss the defendant's treatment of him and alleged lack of accommodation, and that Ms. Bains reacted negatively to his requests, refusing to give him time off from work to visit the EEOC. Plaintiff's Aff. ¶ 13. At some point on or about January 15, 2002, plaintiff informed Ms. Bains that he intended to go to the EEOC, a fact not disputed by the defendant. LaBella Aff. ¶ 17. On or about January 16, 2002, plaintiff visited the EEOC's District Office in New York, N.Y. to inquire about procedures for filing a formal complaint of discrimination, based on his disability, against defendant. Plaintiff brought to the EEOC a handwritten note dated January 15, 2002 from a certified social worker at the Artista Center for Psychotherapy, documenting various diagnoses and prescribed medications, as previously described. *See* Psychotherapist's Note.

It is likewise undisputed by defendant that, upon returning to work from the EEOC at approximately 12:30 p.m. on January 16, 2002, plaintiff arrived in court, informed Ms. Bains and Mr. Ferraro that he had visited the EEOC that morning and provided a copy of the same note, dated January 15, 2002, from his therapist's office that he had given to the EEOC. LaBella Aff. ¶ 19. After appearing in court, plaintiff provided a copy of the Psychotherapist's Note to supervisors Ms. Gerwertz and Ms. Monn. *Id.* Following the lunch seminar, at approximately

2:00 p.m., Ms. Monn's secretary directed plaintiff to meet Ms. Monn in a conference room. At the meeting, Ms. Monn directed plaintiff to leave the ACS premises immediately and report to ACS headquarters in Manhattan the following morning. *Id.* ¶ 20.

**\*9** On January 17, 2002, plaintiff reported to defendant's headquarters and was given a letter from Roger A. Hannon, Commissioner of ACS, informing him that "[e]ffective immediately, your services as a Non-competitive Agency Attorney Intern are terminated." *Id.* ¶ 23;Docket no. 13, Ex. B, Letter from Roger A. Hannon, dated Jan. 17, 2002 ("Termination Letter"). Although plaintiff argues that he was not warned of his termination, he also does not provide evidence indicating that defendant had a policy of progressive discipline requiring a written warning before a probationary employee could be terminated. Indeed, plaintiff acknowledges that as a probationary employee he could be terminated without cause or protection of a union grievance mechanism. *See* LaBella Aff. ¶ 21; LaBella Dep. at 87, ll. 4-14. On January 18, 2002, plaintiff filed a formal complaint with the EEOC alleging disability discrimination and retaliation. *Id.* ¶ 24;Docket no. 16, Ex. 3, Charge of Discrimination.

### B. PROCEDURAL HISTORY

Plaintiff alleges that his EEOC complaint of discrimination asserted that ACS "engaged in disability discrimination ... by wrongfully terminating his employment because of (1) a qualified disability which did not preclude him from performing the essential functions of the employment position he held, [and] (2) his protesting the discriminatory treatment he was being subjected to."Compl. ¶ 7. On or about February 21, 2002, plaintiff was issued a Notice of Right to Sue. This case was subsequently timely commenced on April 19, 2002, within ninety days from the date of plaintiff's receipt of the Notice of Right to Sue.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

## II. SUMMARY JUDGMENT STANDARD

A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried.*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. Gen. Elec. Co.,* 242 F.3d 78, 83 (2d Cir.2001).

Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial."Fed.R.Civ.P. 56(e); *seealsoNational Westminster Bank USA v. Ross,* 676 F.Supp. 48, 51 (S.D.N.Y.1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."); *Harlen Associates v. Incorporated Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion."). Nor can the nonmoving party rest only on the pleadings. *Celotex,* 477 U.S. at 324 (Fed. R. Civ. P 56(e)"requires the nonmoving party to go beyond the pleadings"); *Davis v. New York,* 316 F.3d 93, 1000 (2d Cir.2002). Instead, each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Fed.R.Civ.P. 56(e) and Local Civil Rule 56.1(d). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."*Anderson,* 447 U.S. at 247-48 (emphasis in original). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted."*Id.* at 249-50 (internal citations omitted).

**\*10** In support of its motion for summary judgment on plaintiff's ADA claims, defendant first asserts that plaintiff is not "disabled" within the meaning of the ADA. Second, defendant argues that even if plaintiff is found to be disabled within the meaning of the ADA, he cannot establish that defendant's conduct was sufficient to constitute a hostile work environment. Defendant's MOL at 1-2. Third, defendant argues that plaintiff's retaliation claim must fail because he cannot establish a causal connection between his termination from ACS and his complaint to the EEOC. *Id.* Finally, defendant argues that plaintiff has failed to establish a claim under the New York City Human Rights Law because plaintiff could not perform his position in a reasonable manner with reasonable accommodation, and the defendant did not discharge plaintiff because of his actual or perceived disability. *Id.* at 10-11.

## III. DISCUSSION

### A. THE ADA

Plaintiff alleges, *inter alia,* that he was discharged due to his disability in violation of the ADA. The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual."42 U.S.C. § 12112(a). The same burden-shifting analysis used in Title VII claims is also used to evaluate disability discrimination claims under the ADA: (1) a plaintiff must establish a *prima facie* case of discrimination; (2) the burden of production then

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

shifts to defendant to offer non-discriminatory reasons for its actions; and (3) the plaintiff then must show that those reasons are merely pretextual. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Heyman v. Queens Village Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir.1999). In order to establish a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that: (1) his employer is subject to the ADA; (2) plaintiff was disabled within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability. See Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir.2004) (citing Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir.2003)); Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 (2d Cir.2000).

There is no dispute that the first element of a prima facie showing is satisfied because defendant is a covered entity subject to the ADA. At issue, then, is whether plaintiff suffers from a "disability" within the meaning of the ADA, was "otherwise qualified" to perform the essential functions of his job, and was discharged "because of" his disability.

### "Disability" As Defined By The ADA

An individual with a "disability" is defined as any person who (I) has a physical or mental impairment that "substantially limits" one or more "major life activities"; (ii) has "a record of such impairment"; or (iii) is "regarded as" having such an impairment. 42 U.S.C. § 12102(2). Irrespective of whether a plaintiff's claim is based upon actual, recorded or perceived disability, the disability must be an impairment covered by the ADA, that is, the disability is one that substantially limits a major life activity. See Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 645-46 (2d Cir.1998). Disability determinations are made on an individualized, case-

by-case basis. Reeves v. Johnson Controls World Servs., 140 F.3d 144, 151-52 (2d Cir.1998).

### (I) Impairment that Substantially Limits One or More Major Life Activities

**\*11** The first definition of disability requires plaintiff to establish a physical or mental impairment that substantially limits one or more of his major life activities. 42 U.S.C. § 12102(2)(A). The Supreme Court enunciated the following three-step process for determining whether a plaintiff has satisfied his burden of proof in establishing that he has a physical or mental impairment that substantially limits one or more of his major life activities: First, the court determines if the plaintiff suffers from a physical or mental impairment. Second, the life activity upon which plaintiff relies is identified and a determination is made whether it constitutes a "major life activity" under the ADA. Third, plaintiff must show that the impairment "substantially limited" the life activity identified in the second step. Bragdon v. Abbott, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); Colwell, 158 F.3d at 641. The interpretation of the ADA by the Equal Employment Opportunity Commission ("EEOC") is accorded "great deference" in this circuit. Muller v. Costello, 187 F.3d 298, 312 (2d Cir.1999). The EEOC defines a "mental impairment" as: "Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). The EEOC defines "substantially limits" to mean:

(I) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Finally, the EEOC defines

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)

**2005 WL 2077192 (E.D.N.Y.)**

"major life activities" to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(I). In addition, the Supreme Court has recently clarified that the identified major life activity must be "of central importance to daily life." *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

Here, plaintiff claims that he suffers from insomnia, depression, anxiety, paranoia, and short term memory loss. LaBella Dep. at 41-45; Plaintiff's Opp'n MOL at 10-14; Accommodation Request at 1. First, plaintiff claims that "his depression, compulsive behavior, anxiety and paranoia, even when controlled by medication, also affec[t] ... [his] concentration and learning ability." Opp'n MOL at 10. Second, plaintiff argues that his "depression, compulsive behavior, anxiety and paranoia ... substantially affect [his] ability to 'interact with others.'" ' Plaintiff's Opp'n MOL at 10. Third, to the extent that plaintiff "often gets only 2-3 hours of sleep per night," plaintiff argues that his major life activity of "sleeping" is substantially limited. *Id.*

*12 Although defendant concedes that plaintiff has a "mental impairment," defendant contends that it "is not one that triggers ADA protection," because plaintiff is not substantially limited in the major life activities of working, sleeping, concentrating or socializing. Defendant's MOL at 4. As previously noted, plaintiff's complaint alleges that his disability is "a psychotic disorder, NOS. DSM-IV Code 298.9" (Compl.¶ 10), but does not allege any related symptoms or whether any of plaintiff's major life activities are substantially limited by his disability. Moreover, the record before the Court is devoid of any affidavit by a qualified mental health practitioner, or hospital record or treating physician's record indicating any medical or psychological diagnosis of plaintiff, with the exception of the one handwritten note by a certified social worker dated January 15, 2002, documenting plaintiff's medical diagnoses and medication regimen. As dis-

cussed above, the Psychotherapist's Note merely states that plaintiff's diagnoses "make the patient highly susceptible [sic] to disparate impacts in the work place. *Id.* This note further states that the "[p]atient exhibits treatable behavior abnormalities," but does not indicate any limitation in plaintiff's life activities. *Id.* Plaintiff's pleadings and his Accommodation Request also fail to specify to what extent plaintiff's major life activities are substantially limited by his alleged disability.

Even if the evidence and inferences therefrom are liberally construed in plaintiff's favor, plaintiff has nevertheless failed to offer sufficient evidence that he is "substantially limited" in any major life activity as compared to the average person in the general population. *See* 29 C.F.R. § 1630.2(j)(1). Plaintiff's own testimony regarding his impairments and the limitations they place on his major life activities falls short of establishing a triable issue of fact as to whether he is disabled within the meaning of the first definition of "disability" under the ADA. With respect to plaintiff's alleged depression and specifically, its effect on his ability to "interact with others," "work" and "concentrate" (Plaintiff's Opp'n MOL at 11), the following exchange from plaintiff's deposition is revealing:

Q. You're depressed?

A. Yes.

Q. What can you do?

A. I can work.

Q. Outside of work, what can you do?

A. I can have intimate relations with a woman. I can have a few drinks at a bar. I can watch TV. I can watch a movie. I can read a book. I can hold a conversation. *I can do most everything.*

LaBella Dep. at 41-42 (emphasis added).

With respect to whether plaintiff's mental impairment substantially limits his ability to "interact with



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

others," the Second Circuit's recent decision in *Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 203 (2d Cir.2004), is illuminating. While the *Jacques* court observed that the circuits are divided on this issue, it decided that "interacting with others" qualifies as a major life activity under the ADA when the impairment limits an individual's fundamental ability to communicate. *Jacques,* 386 F.3d at 203. Specifically, the Second Circuit stated:

*\*13 A plaintiff is "substantially limited" in "interacting with others" when the mental or physical impairment severely limits the fundamental ability to communicate with others. This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, i.e., to initiate contact with other people and respond to them, or to go among other people-at the most basic level of these activities. The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective or unsuccessful. A plaintiff who otherwise can perform the functions of a job with (or without) reasonable accommodation could satisfy this standard by demonstrating isolation resulting from any of a number of severe conditions, including acute or profound cases of: autism, agoraphobia, depression or other conditions that we need not try to anticipate today.*

*Jacques,* 386 F.3d at 203-04.

Here, plaintiff's own testimony belies any claim that he is substantially limited in the life activity of "interacting with others" as contemplated by the *Jacques* court. Indeed, his deposition testimony reveals that he is relatively articulate. The *Jacques* court expressly declined to extend ADA protection to those who communicate unsuccessfully, ineffectively or inappropriately. Moreover, plaintiff's emotional and violent outbursts neither appear nor are claimed to be associated with any severe mental or physical impairment which affects plaintiff's ability to interact with others at the most basic level. This Court cannot find that plaintiff's "behavior abnormalities" were intended to be afforded ADA protec-

tion pursuant to the *Jacques* decision.

In addition, the record reflects that plaintiff's alleged insomnia, concentration and memory problems do not rise to the level of substantially limiting plaintiff in any major life activity. First, with respect to his alleged insomnia, plaintiff stated that his use of sleep medication and "fans to drown out ... street noise" ameliorate his difficulty sleeping. LaBella Dep. at 48, ll. 9-10. Notably, the Supreme Court has ruled that mitigating or ameliorating measures should be considered in determining whether an individual is disabled within the meaning of the ADA. *SeeSutton v. United Air Lines, Inc.,* 521 U.S. 471, 483 (1999). Second, with respect to his alleged concentration and memory problems, plaintiff testified that he has "excellent" long term memory (LaBella Dep. at 48, ll. 16-17), but that he has difficulty with his short term memory, manifested by a "memory lapse" about "once a month" (*id.* at 52, ll. 22-23). The Court notes that Ms. Bains, plaintiff's direct supervisor, reported to her supervisors that she attempted to assist plaintiff with his claimed memory deficiencies by meeting with him, preparing him for his court appearances, directing him to write down tasks and directives, and directing that he better organize his files. However, as noted above, it was reported to Mr. Cardieri that plaintiff "resisted" and was "hostile to" Ms. Bains's assistance. Finally, and in the interest of completeness, with respect to his allegedly "sporadic" social life, plaintiff testified that he speaks to a friend "a couple of times a day on the phone" and that there is a "girl" he "go[es] out with once in a while."*Id.* at 42, ll. 17-23.

*\*14 Based on the foregoing analysis, applying the applicable EEOC regulations and law in the context of the evidence presented by the parties, the Court finds that plaintiff has presented no triable issue of fact regarding defendant's showing that plaintiff is not disabled within the first definition of "disability" under the ADA. Accordingly, this Court recommends that the District Court find that plaintiff does not have a mental or physical impair-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

ment that substantially limits one or more of his major life activities.

*(ii) Record of Impairment*

Even without a showing that an impairment substantially limits a major life activity, the ADA's definition of "disability" may be satisfied if plaintiff demonstrates "a record" of an impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(2)(B); *see also Colwell*, 158 F.3d at 645-46. Although plaintiff does not claim that he is disabled within this definition of disability, the Court will nevertheless address whether plaintiff has established a "record" of impairment under the ADA in the interest of completeness.

According to EEOC regulations, "the intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability."29 C.F.R. pt. 1630, App. 1630.2(k). The definition is satisfied "if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment." *Colwell*, 158 F.3d at 645 (citing 29 C.F.R. pt. 1630, App. 1630.2(k))."The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities."29 C.F.R. pt. 1630, App. 1630.2(k). Thus, the "record must be one that shows an impairment that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough."*Colwell*, 158 F.3d at 645.

Plaintiff's own Accommodation Request dated November 6, 2001, in which plaintiff disclosed for the first time his purported history of "depression, memory disorder and dysfunction," and how that history has allegedly affected him, is one of the "records" regarding plaintiff's disability that was presented to defendant. In his Accommodation Request, plaintiff stated that he had been "an outpatient for about two years at the Arista Center for

Psychotherapy in Forest Hills, New York."It is undisputed that this particular record of impairment was not known to defendant prior to November 6, 2001.

The only other record of plaintiff's impairment that was available to defendant was the note from plaintiff's certified social worker, dated January 15, 2002, which was provided to the EEOC and the defendant on or about January 16, 2002. This note indicated that plaintiff was currently receiving treatment "at [Artista Center for Psychotherapy, Inc.] 1x week psychotherapy," but did not state how long plaintiff had received such treatment. Psychotherapist's Note. Nor did the note state that any of the diagnosed impairments substantially or otherwise limited one or more of plaintiff's major life activities. The note states only that "the mentioned diagnosis [sic] make the patient highly susceptable [sic] to disparate impacts in work place," and that the plaintiff "exhibits treatable behavior abnormalities." *Id.*

**\*15** As in *Colwell*, the records of impairment submitted by plaintiff in opposition to defendant's motion for summary judgment "involved no greater degree of limitation of major life activities than the ... impairments" he alleges in this action. *Colwell*, 158 F.3d at 645. Moreover, plaintiff's weekly visits to his psychotherapist cannot qualify as a record of an impairment that "substantially limits" him in a major life activity. Indeed, courts have refused to find that hospitalizations of one month,[FN2] two months,[FN3] and even three and one-half months[FN4] establish a record of a "substantially limiting" impairment. Similarly, the Court concludes that neither of the two "records" offered by plaintiff to document his mental impairment constitutes a "record of disability" evidencing a substantially limiting impairment as required by the ADA. Accordingly, plaintiff falls short in establishing a triable issue of fact as to whether he is disabled within the second definition of "disability" under the ADA.

FN2.*Colwell*, 158 F.3d at 646.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                Page 14
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

FN3. *Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 200 (4th Cir.1997).

FN4. *Sanders v. Arneson Products*, 91 F.3d 1351, 1354 (9th Cir.1996)

### (iii) Regarded as Having Such an Impairment

Although plaintiff does not claim defendant regarded him as disabled within the third definition of "disability" under the ADA, the Court will nevertheless address whether plaintiff has established a disability under this factor in the interest of completeness. Under this third method of establishing a disability, a plaintiff must show that he is "regarded as" having an impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(2)(C). In *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir.1997), the Second Circuit explained that whether an individual is "regarded as" having a disability "turns on the employer's perception of the employee" and is therefore "a question of intent, not whether the employee has a disability." *See also Colwell*, 158 F.3d at 646. In other words, "the decisive issue is the employer's perception of his or her employee's alleged impairment." *Giordano v. City of New York*, 274 F.3d 740, 748 (2d Cir.2001)."It is not enough, however, that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as *disabled within the meaning of the ADA.*" *Colwell*, 158 F.3d at 646 (citing *Francis*, 129 F.3d at 285-86) (emphasis in original)."In *Sutton*, the Supreme Court explained that an employee can be 'regarded as' disabled in two ways: (1) a covered entity mistakenly believes that a person has a[n] ... impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.'" *Giordano*, 274 F.3d at 748 (quoting *Sutton*, 527 U.S. at 489). Here, plaintiff's allegations fall within the second *Sutton* category-that defendant mistakenly believed that an actual, nonlimiting impairment substantially limited one or more

of plaintiff's major life activities.

**\*16** Specifically, and although plaintiff does not argue this point, the record reflects that there is an issue of material fact as to whether defendant perceived plaintiff as substantially limited in the major life activity of "working." In order to prove that he was regarded as substantially limited in his ability to work, plaintiff bears the burden of demonstrating that defendant "perceived [him] to be incapable of working in a broad range of jobs" suitable for one of similar age, experience, and training. *Milford v. New York City Bd. of Health*, No. 02-2834, 2005 WL 195561, at \*6 (E.D.N.Y. Jan.27, 2005); *see also Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 872 (2d Cir.1998) (" 'Substantially limit[ed]' in the ability to work means that a plaintiff is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs.'" ') (quoting 29 C.F.R. § 1630.2(j)(3)(I)).

Plaintiff claims, and defendant does not deny, that Ms. Bains stated to him, on January 15, 2002, that she could supervise plaintiff "differently" because of his disability. LaBella Aff. ¶ 15. Plaintiff's deposition testimony reveals that Ms. Bains made this statement in response to plaintiff's November 6, 2001 request for feedback and closer supervision. LaBella Dep. at 110, ll. 5-6. However, the record is unclear as to whether Ms. Bains perceived plaintiff as incapable of "working in a broad range of jobs" suitable for his age, experience and training. *Ryan*, 135 F.3d at 872. Although plaintiff continued to make court appearances on behalf of ACS and was generally assigned responsibilities consistent with his position as Agency Attorney Intern, Ms. Bains's statement permits an inference that defendant may have mistakenly believed that plaintiff's actual non-limiting disability (*e.g.* his short term memory loss) substantially limited his ability to work. Moreover, plaintiff's unrefuted allegation that Ms. Bains referred to him as an "idiot" (LaBella Aff. ¶ 10) further supports the inference, to be drawn in plaintiff's favor, that defendant may have mistakenly perceived plaintiff's short term memory

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

problem to substantially limit his ability to work as an attorney.[FN5]

> FN5. The Second Circuit has found the practice of law to be a "class of jobs" for purposes of determining whether a plaintiff-attorney is substantially limited in the ability to "work." See*Bartlett v. New York State Bd. of Law Examiners,* 226 F.3d 69, 84 (2d Cir.2000) ("[I]f an impairment bars a person with a law degree from practicing law, then that impairment is a disability under the ADA.").

The Court notes that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Reeves,* 140 F.3d at 153 (quoting *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir.1996)). However, Ms. Bains's statements reflect how defendant may have perceived plaintiff. To the extent that this implicates the employer's motive or intent, such questions are "rarely susceptible to resolution at the summary judgment stage." *Ross v. Campbell Soup Co.,* 237 F.3d 701, 706 (6th Cir.2001). Accordingly, because the record presents an inference that plaintiff may have been "regarded as" having an impairment that would substantially limit one or more of his major life activities, based on the foregoing, the Court has determined that there is a triable issue of fact regarding whether plaintiff is disabled within the meaning of the third definition of "disability" under the ADA.

*\*17* In concluding that factual issues remain for trial as to whether plaintiff was "regarded as" disabled within the meaning of the ADA, the Court will next proceed to the third element of plaintiff's *prima facie* case: whether plaintiff was "otherwise qualified" to perform the essential functions of his job with or without reasonable accommodation.

### Otherwise Qualified To Perform Essential Job

Functions With or Without Reasonable Accommodation

Having established that there is a genuine issue of material fact with respect to the existence of a disability within the third definition of "disability" under the ADA, the Court turns to whether plaintiff was "otherwise qualified" to perform the essential functions of his job with or without reasonable accommodation. "To be qualified, an individual must satisfy the requisite skill, experience, education and other job-related requirements of the employment position." *Misek-Falkoff v. I.B.M. Corp.,* 854 F.Supp. 215, 226 (S.D.N.Y.1994), *aff'd,* 60 F.3d 811 (2d Cir.1995); *seealso* 29 C.F.R. § 1630.2(3)(m). An "otherwise qualified" individual is "one who is able to meet all of the program's requirements" in spite of the individual's disability. *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 285, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Plaintiff bears the burden of proving he is "otherwise qualified" for his job. *Borkowski v. Valley Central School Dist.,* 63 F.3d 131, 138 (2d Cir.1995).

There is no dispute that plaintiff satisfied the education and legal licensing qualifications required for his position as an ACS Agency Attorney Intern. As a licensed attorney, plaintiff was qualified to perform the essential duties of his position for which he was hired, as described at paragraph four of, and listed in Exhibit F to, the Cardieri Declaration (docket no. 13). Plaintiff alleges that his disability "did not prevent him from performing in a reasonable manner the activities involved in the position he held as a non-competitive Agency Attorney Intern at ACS."Compl. ¶ 29. Accordingly, the Court will next consider whether plaintiff was terminated from his employment "because of" his perceived disability.[FN6]

> FN6. The Court will not address whether plaintiff could preform the essential functions of his job "with or without reasonable accommodation" because plaintiff conceded that reasonable accommodation is not at issue in this case. Transcript for



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

Page 16

Conference held on February 22, 2005 at 41 ("Tr."):

( [Plaintiff's counsel]: "I'm not sure, your Honor, that this is a reasonable accommodation case.... I'm not sure [plaintiff's] request was reasonable, I'm not sure if Ms. Bains's response was unreasonable. I'm just saying there was a lack of dialogue, evidenced in perhaps hostility. It's the hostility point, not the absence of the accommodation...."

However, it should be noted that in his Accommodation Request dated November 6, 2002, plaintiff asked to be reassigned to less trial work and also requested that Ms. Bains reduce to writing what she observed to be deficiencies in plaintiff's performance, to help alleviate his short term memory problem. Accommodation Request at 2. Although reasonable accommodation is not at issue, the record demonstrates that defendant provided reasonable accommodation to plaintiff. Indeed, plaintiff concedes that he was reassigned to "easier" cases involving less trial work. LaBella Dep. at 88, ll. 6-10. Moreover, to the extent that plaintiff requested that Ms. Bains reduce to writing her perceived deficiencies in plaintiff's performance, Ms. Bains asked plaintiff himself to write down "all feedback and instructions given to him," (Bains Email at 1), and plaintiff did so (LaBella Dep. at 133-34). It is well settled that, although an employer should consider an employee's preferred accommodation, "the employer ... has the ultimate discretion to choose between effective accommodations...."29 C.F.R. § 1630 appx. That is, the ADA "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommoda-

tion provided is reasonable." *Fink v. New York City Dept. of Personnel,* 53 F.3d 565, 567 (2d Cir.1995).

Adverse Employment Action "Because of" Disability

"The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met [his] burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason."*Gonzalez v. Rite Aid of New York, Inc.,* 199 F.Supp.2d 122, 130 (S.D.N.Y.2002)."In the ADA context, a plaintiff must show that 'he suffered an adverse employment action because of his disability.' " *Warmsley v. New York City Transit Auth.,* 308 F.Supp.2d 114 (E.D.N.Y.2004) (quoting *Giordano,* 274 F.3d at 747). Plaintiff has failed to present any evidence that defendant considered his disability in deciding to terminate his employment or that the disability was one of the motivating factors in defendant's decision to terminate his employment. *SeeParker,* 204 F.3d at 337 (2d Cir.2000) (Under "mixed-motive" analysis available in the Title VII context, plaintiff employee may establish *prima facie* case of disability discrimination pursuant to ADA by showing that disability played a "motivating" but not "sole" role in employer's decision to take adverse employment action against plaintiff). Plaintiff cannot meet his burden of establishing a *prima facie* case of disability discrimination by showing that his employment was terminated "because of" his disability.

**\*18** Specifically, plaintiff has not presented evidence to dispute defendant's showing that Mr. Cardieri's decision to terminate plaintiff was based on a series of verbal and written reports from plaintiff's supervisors regarding his unsatisfactory job performance, resistance to supervision, hostility to feedback, and inappropriate conduct in the courtroom and office. Cardieri Decl. ¶¶ 4-13; Defendant's MOL at 9. Moreover, plaintiff has not presented evidence disputing, or otherwise specifically denying, any of his inappropriate and threaten-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                              Page 17
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

ing conduct on January 15, 2002 that was reported to and considered by Mr. Cardieri. This conduct includes but is not limited to plaintiff's use of profane language and inappropriate and disruptive conduct in the courthouse, and his derogatory, threatening and abusive verbal outburst and physical violence at defendant's offices the day before he was terminated. Courts have held that an employee's disruptive behavior and insubordination are legitimate nondiscriminatory reasons for termination. See *McLean-Nur v. Dep't of Transp.,* No. 98 Civ. 819, 2000 WL 297176, at *6 (S.D.N.Y. Mar.21, 2000) (citing *Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 130 (2d Cir.1996)) (finding that employer's explanations for terminating employee were "all legitimate reasons" when employee had "difficulty working with her co-workers and supervisors," was "disruptive" and "did not take direction from her supervisors.") (internal citations omitted). Notably, even if Mr. Cardieri's decision to terminate plaintiff was informed by erroneous facts or mistaken beliefs, it was nevertheless based on non-discriminatory reasons. Indeed, "[a]bsent discrimination, an employer may fire an employee for a good reason, bad reason, a reason based on erroneous facts, or no reason at all, so long as its action is not based on a discriminatory reason." *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 290 (S.D.N.Y.1999) (citing *Mohamed v. Marriott Int'l Inc.,* 905 F.Supp. 141, 155 (S.D.N.Y.1995))."It is not for the Court to scrutinize the personnel decisions of an employer, who need only prove that the motives for its choices were non-discriminatory." *McLean-Nur,* 2000 WL 297176, at *6 (citing *Texas Dep't. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

In addition, the record lacks any evidence, or any claim by plaintiff, that his misconduct and threatening behavior was caused by his alleged mental impairments. To the contrary, when asked whether his "disability ever reflect [s] itself in violent outbursts" or whether his disability "ever manifested itself in violent outbursts," plaintiff testified "No" on both occasions. LaBella Dep. at 53, ll. 4-16.

Even if plaintiff's conduct was caused by his mental impairment, when an employer terminates an employee because of that employee's "unacceptable behavior, the fact that that behavior was precipitated by mental illness does not present an issue under the ADA." *Johnson v. Maynard,* No. 01 Civ. 7393, 2003 WL 548754 (S.D.N.Y. Feb.25, 2003) (plaintiff suffering from paranoid schizophrenia and bipolar illness with a history of favorable performance evaluations failed to prove that she was discharged "because of" her disability when she exhibited erratic and abusive behavior at work) (citing *Palmer v. Circuit Court of Cook County,* 117 F.3d 351, 352 (7th Cir.1997)).

**\*19** Defendant has presented abundant, undisputed evidence that defendant had legitimate, nondiscriminatory reasons to terminate plaintiff's employment. Accordingly, the undersigned respectfully recommends that defendant's motion for summary judgment should be granted based on defendant's undisputed showing that plaintiff was not terminated "because of" his disability.

### B. HOSTILE WORK ENVIRONMENT

Plaintiff also alleges that defendant "creat[ed] and condon[ed] a hostile work environment based on ... disability."Compl. ¶ 24. Defendant contends in its summary judgment motion that plaintiff's hostile work environment claim must fail as a matter of law because its conduct does "not rise to the level of being sufficiently egregious to have altered plaintiff's working environment."Defendant MOL at 7.

Although the Second Circuit has not expressly determined whether the ADA provides the basis for a claim of hostile work environment (*see Bonura v. Sears Roebuck & Co.,* No. 02 Civ. 7991, 2003 WL 21024620, at *1 (2d Cir. May 2, 2003)), several courts in this circuit have recognized such a claim. *See e.g., Hendler v. Intelecom USA, Inc.,* 963 F.Supp. 200, 208 (E.D.N.Y.1997) (finding that because the statutory language of the ADA is identic-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 18
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

al to the language of Title VII, and a hostile work environment claim is actionable under Title VII, such a claim is also actionable under the ADA); *Memorial Sloan-Kettering Cancer Center,* 190 F.Supp.2d 590, 599 (S.D.N.Y.2002) (same); *Disanto v. McGraw-Hill, Inc./Platt's Div.,* No. 97 Civ. 1090, 1998 WL 474136, at *5 (S.D.N.Y. Aug. 11, 1998) (same).

To prevail on a hostile work environment claim, a plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult, ... sufficiently severe or pervasive to alter the conditions of the ... employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (quoting *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A court should "examine the totality of the circumstances," including the (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767-68 (2d Cir.1998); *Williams v. County of Westchester,* 171 F.3d 98, 100 (2d Cir.1999); *Millin v. McClier Corp.,* No. 02 Civ. 6592, 2005 WL 351100, at *5 (S.D.N.Y. Feb 14, 2005) (quoting *Harris,* 510 U.S. at 21).

Because the controlling authority requires this Court to analyze plaintiff's hostile work environment claim in light of the "totality of the circumstances," this Court cannot find that plaintiff was subject to a hostile or abusive work environment based on his disability. Defendant does not dispute that Ms. Bains periodically called plaintiff an "idiot" at intervals between approximately November 6, 2001, the date of plaintiff's accommodation request, through some point prior to his termination on January 16, 2002. *See* LaBella Aff. ¶ 10. However, these periodic comments directed at plaintiff by Ms. Bains did not create a work envir-

onment "so severely permeated with discriminatory intimidation" as to alter the conditions of plaintiff's employment. *Alfano,* 294 F.3d at 373.

**\*20** The Supreme Court has noted that "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] ... because of [the employee's membership in a protected class]." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris,* 510 U.S. at 21). Here, plaintiff has not demonstrated that Ms. Bains's use of the work "idiot" or generally, her behavior toward him, was motivated by his alleged disability. While harassing words or conduct need not refer specifically to his alleged disability (*Gregory v. Daly,* 243 F.3d 687, 694-95 (2d Cir.2001)), at most, Ms. Bains' conduct "reflect[s] a clash of personalities more than [a] discriminatory animus" towards plaintiff. *Shabat v. Blue Cross Blue Shield of Rochester Area,* 925 F.Supp. 977, 982 (W.D.N.Y.1996), *aff'd*108 F.3d 1370 (2d Cir.1997). It appears that Ms. Bains and plaintiff had a difficult supervisory relationship. Notably, an employer's conduct is not hostile merely because it is "unpleasant, harsh, combative or difficult." *Benette v. Cinemark U.S.A., Inc.,* 295 F.Supp.2d 243, 250 (W.D.N.Y.2003).

Although plaintiff may have subjectively felt "demoralized" or "victimized" (LaBella Aff. ¶ 11; Plaintiff's Opp'n MOL at 15), as defendant points out, plaintiff "must also show that the environment was objectively hostile, i.e., 'whether a reasonable person ... would find the working conditions so severe or pervasive as to alter the terms or conditions of employment for the worse.' ' Defendant's Reply MOL at 5 (quoting *Richardson v. New York State Dep't of Correctional Servs.,* 180 F.3d 426 (2d Cir.1999)). The Court notes that plaintiff was employed as an Agency Attorney Intern, and thereby subject to a probationary period which included intensive training on litigation, advocacy, and case management skills. It is reasonable for any new litigator to expect, as part of the training pro-

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

cess, instruction on case management skills and proper courtroom decorum, as well as criticism. Moreover, in view of plaintiff's request for closer supervision, his ongoing performance issues and the instances of unprofessional conduct in defendant's offices and in the courthouse, defendant's efforts to train and supervise plaintiff during his at-will probationary period of employment did not create a hostile work environment. Accordingly, the undersigned respectfully recommends that defendant's summary judgment motion regarding plaintiff's ADA claim for hostile work environment be granted.

## C. RETALIATION

LaBella also alleges that defendant retaliated against him in violation of the ADA. Claims of retaliation under the ADA are analyzed under the *McDonnell-Douglas* burden-shifting approach as set forth above. *See Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 223 (2d Cir.2001) ("We analyze a retaliation claim under the ADA using the same framework employed in Title VII cases.")). To make out a *prima facie* claim for retaliation, a plaintiff must first show (1) that he participated in a protected activity, (2) that the defendant was aware that he engaged in that protected activity, (3) that he suffered an adverse employment action, and (4) that there was a causal connection between that protected activity and the adverse employment action. *Treglia,* 313 F.3d at 719 (citing *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir.2001)). Once a plaintiff makes out a *prima facie* claim for retaliation, the burden then shifts to the employer to articulate a legitimate, non-retaliatory explanation for having taken the particular adverse employment action at issue. "If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, non-retaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation

is merely a pretext for impermissible retaliation." *Cifra,* 252 F.3d 216.

### Plaintiff's *Prima Facie* Case of Retaliation

#### *(1) Participation in Protected Activity Known to Defendant*

**\*21** The parties do not dispute that plaintiff engaged in protected activity or that defendant was aware of that activity. Specifically, defendant does not dispute that it was aware of plaintiff's intention to visit the EEOC. Defendant also does not deny that "over a period of several days" in early January 2002, plaintiff verbally asked Ms. Bains to use "comp" time to visit the local EEOC office to discuss defendant's treatment of him and its alleged lack of accommodation. LaBella Aff. ¶ 13. Further, defendant does not deny that Ms. Bains reacted negatively to plaintiff's requests, refusing to give him time off from work to visit the EEOC. *Id.* In addition, it is undisputed that plaintiff participated in protected activity on or about January 16, 2002, when he visited the EEOC District Office in Manhattan to inquire about procedures for filing against defendant a formal complaint of discrimination based on his disability. Finally, defendant does not deny that upon returning to work from the EEOC at approximately 12:30 p.m. on January 16, 2002, plaintiff informed his supervisors, Ms. Bains and Mr. Ferraro, that he had visited the EEOC that morning. Based on the foregoing, plaintiff has satisfied the first two factors of his *prima facie* retaliation claim. However, the fact "[t]hat plaintiff engaged in a protected activity" by inquiring about the proper procedures for filing an EEO charge, and informing his employers of this activity, "does not insulate him from being discharged...." *Valentine,* 50 F.Supp.2d at 291.

#### *(ii) Adverse Employment Action*

Plaintiff alleges that he was terminated [FN7] from his position as Attorney Agency Intern at the ACS

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

as a result of engaging in protected activities. Compl. ¶ ¶ 23, 27. Obviously, termination is an adverse employment action. *SeeWilliams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir.2004) ("Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment' ...") (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)). Plaintiff has therefore satisfied the third element of his *prima facie* retaliation claim.

FN7. Plaintiff was terminated on January 17, 2002. *See* Termination Letter.

*(iii) Causal Connection*

To establish the last element of his *prima facie* case of retaliation, plaintiff must show that his termination occurred "under circumstances from which a reasonable jury could infer retaliatory intent."*Treglia,* 313 F.3d at 720. "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus."*Milford v. New York City Bd. of Health,* Nos. Civ. 2834, 03 Civ. 2765, 2005 WL 195561, at *7 (E.D.N.Y. Jan.27, 2005) (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)). Plaintiff has not offered any direct evidence indicating a retaliatory animus on the part of defendant, and specifically, by Mr. Cardieri, who ultimately decided to terminate plaintiff's employment. Thus, plaintiff must establish causation through circumstantial evidence.

*\*22* Plaintiff has presented sufficient facts to permit an inference of a causal connection between his protected activity and the adverse employment action at issue. The requirement that a plaintiff demonstrate a causal connection between his protected activity and his adverse employment action may be "satisfied by the temporal proximity between the two."*Feingold v. New York,* 366 F.3d 138, 156-57 (2d Cir.2004) (citing cases in context

of Title VII); *seealsoHoney v. County of Rockland,* 200 F.Supp.2d 311, 320 (S.D.N.Y.2002) ("close proximity in time between the plaintiff's protected activity and the adverse employment action leads to an inference of causation necessary to establish plaintiff's *prima facie* case of retaliation.") (citing *Manoharan v. Columbia Univ. College of Surgeons and Physicians,* 842 F.2d 590, 593 (2d Cir.1988)). Here, plaintiff's protected activity, a visit to the EEOC, and Mr. Cardieri's decision to terminate the defendant occurred on or about January 16, 2002. The adverse employment action, plaintiff's termination from employment, was implemented and made effective on January 17, 2002. Given that this Court has already determined that defendant was aware of plaintiff's protected activity, the temporal proximity of one day between plaintiff's visit to the EEOC and the effective date of his termination raises an inference that the plaintiff's protected activity may have resulted in the adverse employment action.

Because plaintiff has satisfied all four factors necessary to make out a *prima facie* case of retaliation under the ADA, the burden shifts to defendant to articulate a legitimate, non-discriminatory explanation for plaintiff's termination. Before addressing defendant's reasons for terminating plaintiff, the Court notes that, despite defendant's knowledge of plaintiff's protected activity, the temporal proximity between plaintiff's termination and his protected activity creates an *inference* of retaliation, but is not by itself sufficient to support a finding that his termination was a result of retaliation. *SeePonniah Das v. Our Lady of Mercy Med. Cntr.,* No. 00 Civ. 2574, 2002 WL 826877, at *12 (S.D.N.Y. Apr.30, 2002) (Proximity in time alone will not support a finding-as opposed to an inference of causation when making out a minimal *prima facie* case-that a plaintiff has proved a causal connection between protected activity and an adverse employment action.) (citing *Padob v. Entex Info. Serv.,* 960 F.Supp. 806, 814 (S.D.N.Y.1997)); *Neishlos v. City of New York,* No. 00 Civ. 914, 2003 WL 22480043 (S.D.N.Y. Nov.3, 2003) ("[T]he inference of retaliation raised by temporal proximity can be destroyed

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



by other evidence."). As discussed below, other than demonstrating a temporal proximity between his visit to the EEOC and his termination, plaintiff has failed to present any evidence to support the claim that his termination from his employment was retaliatory.

### Defendant's Reasons for Terminating Plaintiff

**\*23** Defendant contends, and the unrefuted evidence before the Court establishes, that plaintiff was terminated due to his "poor job performance," as well as "his behavior, his inability or unwillingness to properly handle his assigned case load, his inappropriate courtroom demeanor, his unwillingness to follow or accept instructions, his inappropriate conduct toward women in his office and his violent outbursts."Defendant's MOL at 8. Specifically, in his decision to terminate plaintiff, Mr. Cardieri considered, *inter alia,* "a series of oral and written reports regarding his unsatisfactory job performance," which he had received from several of plaintiff's supervisors. Cardieri Decl. ¶ 5.

First, the record reflects that Mr. Cardieri considered reports that plaintiff not only failed to satisfactorily perform work-related duties, but also resisted his supervisors' attempts to improve his work product and better manage his work load. It is undisputed that Mr. Cardieri considered reports that plaintiff "resisted supervision and was hostile to feedback from his supervisors, ... failed to timely complete sensitive documents and cases, ... failed to fill out remand orders at arraignments" and "[w]hen reminded, he protested and argued the matter with his supervisor," and "refused to make changes to documents he had drafted when asked to do so by his supervisors."Cardieri Decl. ¶ 6. Mr. Cardieri also considered reports that plaintiff "appeared to resent the feedback, and instead argued the point at length, without resolution." *Id.*

It was further reported to Mr. Cardieri by plaintiff's supervisors that plaintiff made "inappropriate comments to staff about female colleagues," persisted

in seeking a date from a paralegal intern who repeatedly had declined his invitations and asked him to stop telling colleagues that he was seeing her, and made other inappropriate statements about his personal and sex life.*Id.* ¶ 7. In addition, Mr. Cardieri, in deciding to terminate plaintiff's employment, considered incidents involving plaintiff's conduct in court and in defendant's office that occurred on or about January 15, 2002, the day before Mr. Cardieri's decision to terminate plaintiff. *Id.* ¶¶ 9-10.Both incidents related to plaintiff's court conduct were reported in an email dated January 15, 2002 from plaintiff's colleague, Lauren Cooper, Esq., to, among others, Ms. Bains and Ms. Monn and have been discussed above, as have the instances of plaintiff's emotional and violent outbursts in defendant's offices. *Seesupra* at 7-12.

Notwithstanding plaintiff's disability, "an employee who is fired because of outbursts at work directed at fellow employees has no ADA claim."*Valentine,* 50 F.Supp.2d at 289 (quoting *Hamilton v. Southwestern Bell Tel. Co.,* 136 F.3d 1047 (5th Cir.1998)); *seealsoHusowitz v. Runyon,* 942 F.Supp. 822, 834 (E.D.N.Y.1996) (judgment for employer where plaintiff brought claim of discrimination pursuant to Rehabilitation Act, and evidence showed that plaintiff, diagnosed with bipolar affective disorder, was uncooperative, disruptive, and "engaged in threatening conduct with his co-workers.").

**\*24** An employee's disruptive behavior and insubordination are surely legitimate non-discriminatory reasons for termination. *SeeHolt,* 95 F.3d at 130. Accordingly, on the record before this Court, defendant has articulated legitimate, non-retaliatory reasons for plaintiff's termination.

### Plaintiff's Showing of Pretext

Once defendant has met its burden of articulating legitimate, non-discriminatory reasons for terminating plaintiff's employment, the burden then shifts to plaintiff to "point to evidence that would be suffi-



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

cient to permit a rational fact-finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra,* 252 F.3d 216.

Plaintiff offers no evidence to show that defendant's reasons for terminating his employment are a pretext for retaliation. Indeed, rather than counter the factual bases of Mr. Cardieri's decision to terminate plaintiff, plaintiff argues that Ms. Bains first noted his work deficiencies "after it was determined to fire plaintiff."Plaintiff's Opp'n MOL at 17. That is, there was *"no* written notation by defendant of any work deficiencies during the period [from] November 6, 2001 to January 15, 2002."*Id.* (emphasis in original). Plaintiff argues that the lack of documentation establishes "either that (1) plaintiff was performing satisfactorily during that period and his conduct was appropriate, or (2) Ms. Bains declined to note any deficiencies as part of her animus or refusal to accommodate plaintiff."*Id.* The Court does not agree. In fact, as detailed above, Mr. Cardieri's decision to terminate plaintiff's employment was based on both oral and written reports. *See* Cardieri Decl. ¶ 5. The earliest documentation before this Court describing plaintiff's deficient performance and inappropriate conduct in court and in defendant's offices were emails written by Ms. Cooper and Ms. Bains, dated January 15 and January 16, 2002, respectively, memorializing the events of January 15, 2002. Thus, the evidence does not support plaintiff's speculation that a written record of his work-related deficiencies was somehow manufactured after defendant's decision to terminate his employment.

Even in a light most favorable to plaintiff as the nonmoving party, the evidence before the Court fails to establish a triable issue of fact regarding plaintiff's conduct as considered by Mr. Cardieri in his decision to terminate plaintiff's employment. Indeed, the relevant portions of plaintiff's affidavit that discuss Ms. Bains's email report to her supervisors, states:

[Ms. Bains's] descriptions of my demeanor in court are false; this was not an issue raised to me during my tenure.... Ms. Bains states in her memo that I was 'aggressive and abrasive' and that she received complaints about me from unnamed 'opposing counsel'. This is false and 'news' to me. None of these issues were ever discussed with me, even though I had begged for written feedback so that I could work on any problems that might interfere with my performance.

*25 LaBella Aff. ¶¶ 25-26. At best, plaintiff offers only general denials regarding Ms. Bains's characterization of his conduct, however, "[s]peculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."*Celotex,* 466 U.S. at 324. Plaintiff had the opportunity in opposing defendant's summary judgment motion to show that defendant's reasons for terminating his employment are a pretext. For example, plaintiff could have denied and refuted defendant's showing regarding his poor job performance and his violent and inappropriate conduct in defendant's offices on January 15, 2002. Plaintiff has not done so.

After a review and consideration of the entire record before the Court, this Court concludes that no reasonable jury could find that the reasons for plaintiff's termination were a pretext for retaliation against him for visiting the EEOC. Instead, plaintiff's own "failure to recognize the boundaries of appropriate behavior in the workplace unfortunately led to his termination."*Valentine,* 50 F.Supp.2d at 291. Accordingly, the undersigned respectfully recommends that the District Court grant defendant's motion for summary judgment on plaintiff's retaliation claim.

### D. 42 U.S.C. § 1983

As noted above, plaintiff voluntarily withdraws his claim pursuant to 42 U.S.C. § 1983, as set forth in his third cause of action. *See* Plaintiff's Opp MOL at 8. Accordingly, the Court will not address the plaintiff's section 1983 claim herein and respectfully recommends the claim be dismissed with prejudice.



Not Reported in F.Supp.2d                                                                  Page 23
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

E. NEW YORK CITY HUMAN RIGHTS LAW

If the District Court dismisses plaintiff's federal claims pursuant to this Report and Recommendation, the District Court must decide whether federal jurisdiction exists over the remaining state claims. Plaintiff has invoked the Court's supplemental jurisdiction under 28 U.S.C. § 1367 for his claims under the New York City Human Rights Law ("CHRL" or "state law claims"). Compl. ¶ 1. "Because the parties are not diverse, the Court would have jurisdiction over ... [state law] claims only by the exercise of supplemental jurisdiction." *Stuevecke v. New York Hosp. Medical Ctr. of Queens,* No. 01 Civ. 326, 2003 WL 22019073, at *6 (E.D.N.Y. Aug.26, 2003).*See*28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."). The Supreme Court and the Second Circuit have instructed courts to ordinarily decline to exercise supplemental jurisdiction in the absence of federal claims. *Stuevecke,* 2003 WL 22019073, at *6 (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent [form of supplemental] jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point towards declining to exercise jurisdiction over the remaining state-law claims.").

**\*26** After considering the factors of judicial economy, convenience, fairness and comity, this Court recommends that the District Court decline to exercise its supplemental jurisdiction over plaintiff's state law claims. Specifically, with respect to judicial economy and convenience, the Court has considered that the complaint in this case was filed in April 2002, that no trial date has been set, and that the remaining issues are founded on state discrimination law alone. The Court therefore believes that it

would be an unwise investment of federal judicial resources to retain jurisdiction over this case for the sole purpose of adjudicating plaintiff's state law claims. Although plaintiff's state and federal claims are identical, the standards which govern a successful state and federal claim of disability discrimination are "analytically distinct" (*Epstein v. Kalvin-Miller Int'l., Inc.,* 100 Supp.2d 222, 229 (S.D.N.Y.2000)), given that the definition of "disability" under state law is to be construed more broadly than the federal definition. See*Reeves,* 140 F.3d at 149-50. Moreover, with respect to fairness, the Court notes that plaintiff would not be barred from recommencing his action in state court on grounds that the statute of limitations has expired. See*N.Y. C.P.L.R. § 205(a) (McKinney 2004). Accordingly, recognizing that the state courts are better positioned to "decide for themselves whatever questions of state law this case may present" (*Giordano,* 274 F.3d at 754), the undersigned respectfully recommends that the District Court decline to exercise its supplemental jurisdiction over plaintiff's state claims and instead, dismiss such claims without prejudice.

*IV. CONCLUSION*

For the reasons set forth above, the undersigned respectfully recommends to the District Court that defendant's motion for summary judgment be granted with respect to all of plaintiff's federal law claims and that plaintiff's state law claims be dismissed without prejudice.

Any objections to this Report and Recommendation must be filed with District Judge Nicholas G. Garaufis within ten days of the date of entry of this Report and Recommendation. Failure to object within ten days will preclude appellate review by the District Court. Local Civil Rule 6.3; *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,*506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989); see*also*Fed.R.Civ.P. 72(a) ("Within 10 days after

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)
**2005 WL 2077192 (E.D.N.Y.)**

being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made."). Any requests for extensions of time to file objections should be made to Judge Garaufis.

SO ORDERED.

E.D.N.Y.,2005.
LaBella v. New York City Admin. for Children's Services
Not Reported in F.Supp.2d, 2005 WL 2077192 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.