UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

                                                        08 CV 01859 (PKC) (AJP)

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

                       Plaintiffs,                         **ORAL ARGUMENT**
                                                        **REQUESTED**

        -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
                d/b/a Abercrombie & Fitch,
                Abercrombie, Hollister and Ruehl,

                     Defendants.
------------------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION PURSUANT TO THE FLSA, FOR COURT-FACILITATED NOTICE TO SIMILARLY SITUATED PERSONS, AND FOR EXPEDITED DISCOVERY

                                VORYS, SATER, SEYMOUR AND PEASE LLP
                                Attorneys for Defendants

                                Sandra J. Anderson  (0002044)
                                Allen S. Kinzer  (0040237)
                                Stacia M. Jones  (0072401)
                                52 East Gay Street, P.O. Box 1008
                                Columbus, Ohio 43216-1006
                                Telephone:  (614) 464-6405

                                BOND, SCHOENECK & KING, PLLC
                                Attorneys for Defendants

                                John S. Ho (JH 7831)
                                330 Madison Avenue, 39th Floor
                                New York, NY  10017-5001
                                Telephone:  (646) 253-2320

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ................................................................1

II.     STATEMENT OF FACTS ....................................................................2

    A.  Abercrombie's Loss Prevention Agents. ......................................2

    B.  The Named Plaintiffs ..................................................................4

        1.  Shoneca Davis.....................................................................4

        2.  Dawud Eudelle....................................................................5

        3.  Jaclyn Pagnotta ..................................................................5

        4.  David Pomales ....................................................................5

    C.  Abercrombie's Fifth Avenue Flagship Store Where Plaintiffs Primarily Worked Is Unique In Relation To Other Stores In The NY/NJ Region. ......................6

    D.  LPAs In Abercrombie's Fifth Avenue Flagship Store Are Not Similarly Situated To Other LPAs In The NY/NJ Region. .........................8

    E.  Abercrombie's Policies Require The Recording And Payment Of All Overtime Hours Worked By Non-Exempt Employees..............................13

III.    ARGUMENT ....................................................................14

    A.  Preliminary Certification Of A Collective Action Of All LPAs In The NY/NJ Region Is Inappropriate..................................................14

        1.  Standard for Collective Action. ..........................................14

        2.  LPAs In The NY/NJ Region Are Not Similarly Situated With Respect To Their Allegations Of Misclassification...............17

        3.  LPAs In The NY/NJ Region Are Not Similarly Situated With Respect To Their Allegations Of "Off The Clock" Violations................23

    B.  If The Court Finds Conditional Certification Of A Collective Action Is Appropriate, Notice Is Only Warranted For A Two-Year Period. ............26

    C.  If The Court Certifies A Class, Plaintiffs' Proposed Notice Is Defective In Several Respects And Cannot Be Adopted Wholesale................28

i

1.  Plaintiffs' Proposed Notice Should Explain The Potential Consequences Of Joining The Collective Action. ........................................................................28

2.  Plaintiffs' Proposed Notice Improperly Indicates That Potential Opt-In Plaintiffs Must Be Represented By Plaintiffs' Counsel. ......................................29

3.  Minimal Or Lacking Information In The Notice Regarding Abercrombie's Position Is Unfairly Prejudicial. ...............................................................................30

D.  Even If This Case Is Deemed Appropriate For Preliminary Certification Of A Collective Action, Discovery Should Be Limited Only To Names And Addresses Of Putative Class Members. ...........................................................30

IV.   CONCLUSION ..................................................................................................................32

## I.    __PRELIMINARY STATEMENT__

In their Motion for Preliminary Certification Pursuant to the Fair Labor Standards Act ("FLSA"), for Court-Facilitated Notice to Similarly Situated Persons and for Expedited Discovery (hereinafter "Plaintiffs' Motion"), Plaintiffs ask this Court to order that notice of a collective action be sent to every Loss Prevention Agent ("LPA") employed by Abercrombie & Fitch Stores, Inc. ("Abercrombie") in 86 stores in its New York and New Jersey region ("NY/NJ Region").  At this stage of the case, the essential inquiry is whether Plaintiffs have met their burden to demonstrate that they are similarly situated to the other employees they seek to notify of the pendency of this action.  Plaintiffs have not met this burden.

Plaintiffs claim that before November, 2006, all LPAs in the NY/NJ Region were misclassified as exempt and therefore denied overtime pay to which they were entitled.  The facts and relevant legal authorities demonstrate, however, that most if not all of the putative collective action plaintiffs are excluded from the overtime requirements of the FLSA by virtue of the "administrative exemption."  To the extent any potential opt-in plaintiffs are not covered by that exemption, burdensome individualized inquiries relevant to that exemption will be required to determine each class member's eligibility and entitlement to the alleged unpaid overtime.  Such individualized inquiries are inappropriate for certification as a collective action.

Plaintiffs also claim that after November, 2006, all LPAs in the NY/NJ Region were prohibited from recording overtime hours worked or had their time records altered to eliminate any such recorded time.[1]  Plaintiffs' allegations fail, however, to establish a common policy or plan by Abercrombie to require its LPAs to work off the clock.  Additionally, several declarants testified that their time was accurately recorded and never altered.  Such testimony is consistent

---

[1]    Yet, only two of the four Plaintiffs (Davis and Pagnotta) allege such alteration.

with Abercrombie policies prohibiting any such off the clock work.  Further, like their misclassification claim, analysis of Davis's and Pagnotta's off-the-clock claim requires burdensome individualized inquiries relevant to each LPAs experiences which are inappropriate for collective action certification.

Taking all of the evidence and legal authorities into consideration, there can be but one conclusion:  Plaintiffs' Motion for Preliminary Certification should be denied.

## II.   **STATEMENT OF FACTS**

### A.   **Abercrombie's Loss Prevention Agents.**

Abercrombie's Loss Prevention Department consists of various personnel (both management and non-management), who are responsible for carrying out loss prevention initiatives at the stores in order to prevent shrink which results in millions of dollars lost by the Company each year.  Declaration of Robert Ruiz at ¶ 4.[2]  "Shrink" is the merchandise that is charged to a particular store, but later cannot be accounted for through sales, transfers, and markdowns due to employee theft, shoplifting, paperwork error, a mistake at the register, or various other reasons.  Id. at ¶ 7.  The Loss Prevention Department acts to reduce shrink in the stores by targeting the causes of shrink and taking steps to address those causes.  Id.

Abercrombie's LPAs are the loss prevention personnel who work at the store level and have ultimate responsibility for all loss prevention efforts and initiatives in their assigned store(s).  Id. at ¶ 8.  While each LPA's loss prevention efforts at a particular store will differ based upon a variety of factors including, among other factors, store brand, location, size, volume, staffing, and clientele, as well as each individual LPA's personality and style, LPAs are generally responsible to perform the following key functions at their stores:  implementing loss

---

[2]   The Declaration of Robert Ruiz is attached to the Jones Affirmation as Exhibit A and is cited herein as "Ruiz Dec. at ¶ __."

prevention and shortage reduction programs to reduce overall shrink at the store(s); regularly training all store employees and managers on loss prevention programs, issues and strategies; and preventing, detecting and ending external, internal and operational shrink.  Ruiz Dec. at ¶ 8.

The implementation of loss prevention and shortage reduction programs by LPAs involves not only compliance with standard loss prevention policies and procedures, but also the development of initiatives or efforts specific to each store to combat existing shrink and prevent other potential causes of shrink from occurring.  Id.  Training of employees on loss prevention programs involves both new employee orientation efforts as well as continuing training and education on loss prevention procedures, issues and strategies.  Id.  The detection and prevention of internal and operational shrink involves monitoring and investigating employee conduct and reviewing internal merchandise documentation to detect potential error, dishonesty and/or theft by employees.  Id.  The detection and prevention of external shrink involves monitoring customers while they are in the store and taking appropriate action to apprehend and prosecute those customers who steal merchandise.  Id.

Prior to November 26, 2006, Abercrombie called its LPAs "Loss Prevention Supervisors" ("LPSs") and classified them as exempt from the FLSA's overtime pay requirements.  Id. at ¶ 6, 19.  Accordingly, Abercrombie paid its LPSs a fixed salary that compensated them for any hours they worked in a given work week.  Id. at ¶ 19.  In November 2006, Abercrombie reviewed its LPS position and, while it believed its LPSs were properly classified as exempt, voluntarily decided to reclassify the LPS position to a non-exempt status.  Id.  At that same time, Abercrombie changed the LPS position title to LPA without any change in duties.  Id.  These classification and name changes were made effective November 26, 2006.  Id.

3

As a result of the reclassification of the LPA position to a non-exempt status, Abercrombie continued to pay its LPAs a base salary, but also began paying them "Supplemental Pay" to account for any overtime hours worked, pursuant to the fluctuating work week method of calculating overtime compensation. Ruiz Dec. at ¶ 19. Abercrombie communicated this change in compensation method to its LPAs by providing a Supplemental Pay Acknowledgement Form to each of them to review and sign. Id. at ¶ 19 and see e.g. Ex. 6. In particular, this form notified the LPAs that, from that point forward, they would continue to be paid on a salary basis for all hours they worked in a week, but that they would also be eligible for "Supplemental Pay" of half of their individual regular hourly rates for any time worked in excess of 40 hours in a workweek. Id. Each of the named Plaintiffs received, reviewed and signed Abercrombie's Supplemental Pay Acknowledgement form in November 2006. Id. at ¶ 22, Exs. 6 - 9. Abercrombie thereafter required its LPA employees to record all their hours worked on time sheets or, if employed at the Fifth Avenue store, by clocking in and out at a cash register in the store. Id. at ¶ 19.

**B.      The Named Plaintiffs**

*1.      Shoneca Davis*

Abercrombie hired Shoneca Davis as a LPA on August 20, 2006. Ruiz Dec. at ¶ 15. Upon hire, she was assigned to implement and direct the loss prevention activities at the Abercrombie & Fitch, abercrombie and Hollister stores located in the Short Hills Mall in New Jersey, and at the Abercrombie & Fitch store at the Bridgewater Commons mall in Bridgewater, New Jersey. Davis Aff. at ¶¶ 2-3.[3] On March 11, 2007, per her request, Abercrombie transferred Davis to an LPA position based solely at its Fifth Avenue Abercrombie & Fitch store.

---

[3]      The Affirmation of Shoneca Davis has been separately filed with the Court as Document # 31.

4

Ruiz Dec. at ¶ 15.  Davis continued her employment with Abercrombie at the Fifth Avenue store until August 9, 2007 when she resigned.  Id.

### 2.     *Dawud Eudelle*

Abercrombie hired Dawud Eudelle as an LPA on September 18, 2005.  Eudelle Aff. at ¶ 2;[4] Ruiz Dec. at ¶ 16.  Abercrombie initially assigned Eudelle to work at its South Street Seaport Abercrombie & Fitch store in New York City.  Ruiz Dec. at ¶ 16.  On January 29, 2006, Eudelle transferred to the Fifth Avenue Abercrombie & Fitch store where he was assigned to work the overnight shift.  Eudelle Aff. at ¶¶ 2, 4, 11; Ruiz Dec. at ¶ 16.  Eudelle's employment with Abercrombie was terminated in July 2008, for repeated unprofessional conduct at work in violation of the terms of a Final Written Warning that had been issued to him.  Ruiz Dec. at ¶ 16.

### 3.     *Jaclyn Pagnotta*

Abercrombie hired Jaclyn Pagnotta as a LPA on June 4, 2006.  Pagnotta Aff. at ¶¶ 2-3;[5] Ruiz Dec. at ¶ 17.  Like Eudelle, Pagnotta began her employment at the Company's South Street Seaport Abercrombie & Fitch store, but on December 24, 2006 she was transferred to the Fifth Avenue Abercrombie & Fitch store.  Pagnotta Aff. at ¶ 2, 4; Ruiz Dec. at ¶ 17.  On March 27, 2007, Pagnotta resigned her employment with Abercrombie.  Pagnotta Aff. at ¶ 2; Ruiz Dec. at ¶ 17.

### 4.     *David Pomales*

Abercrombie hired David Pomales as a LPA on July 31, 2005.  Pomales Aff. at ¶¶ 2, 4;[6] Ruiz Dec. at ¶ 18.  Like Eudelle and Pagnotta, Pomales was hired into the Company's South Street Seaport Abercrombie & Fitch store, but only worked there until September 18, 2005,

---

[4]     The Affirmation of Dawud Eudelle has been separately filed with the Court as Document # 29.

[5]     The Affirmation of Jaclyn Pagnotta has been separately filed with the Court as Document # 30.

[6]     The Affirmation of David Pomales has been separately filed with the Court as Document # 28.

when he was transferred to the Fifth Avenue Abercrombie & Fitch store.  Pomales Aff. at ¶¶ 2,

4, 11; Ruiz Dec. at ¶ 18.  Pomales currently remains employed as a LPA at the Fifth Avenue

store.  Id.

      **C.**      **Abercrombie's Fifth Avenue Flagship Store Where Plaintiffs Primarily
Worked Is Unique In Relation To Other Stores In The NY/NJ Region.**

Abercrombie's Fifth Avenue Store is the largest in the NY/NJ Region, with

approximately 1,400 employees and managers, four floors of shopping, three stock rooms and is

a total of 35,000 square feet.  Ruiz Dec. at ¶ 11.a.  There are also an additional two floors of

office space in an adjacent building that houses the offices of several higher level managers

employed at the Fifth Avenue store, interview rooms, meeting/conference rooms and workspaces

for various other Abercrombie employees who do not actually perform work directly related to

the Fifth Avenue store itself (e.g. clothing designers for the Company).  Id.  Conversely, the

typical Abercrombie store in the NY/NJ Region has one shopping floor, one stock room, one

small office, around 50 employees and managers, and is about 3,000 square feet.  Id.  None of

the other stores in the NY/NJ Region have interview rooms, meeting/conference rooms or other

workspaces for employees.  Id.  Nor do any of those stores house any Abercrombie employees

who are not directly involved with the stocking and sale of the Company's merchandise at those

stores.  Id.

The Fifth Avenue store is the largest volume store in the entire NY/NJ Region.  Ruiz

Dec. at ¶ 11.a.  The volume and customer traffic in the Fifth Avenue store is such that it makes

the store equivalent to an entire region in the Company, which would include approximately 40

stores.  Id.  As such, the Fifth Avenue store *alone* has a dedicated Regional Manager.  Id.  In

addition, while Abercrombie typically assigns a District Manager to manage around eight stores

within a given region, the Fifth Avenue store has four District Managers assigned to it alone.

Ruiz Dec. at ¶ 11.a.  The Fifth Avenue store also has a Visual Manager assigned to it who is charged with ensuring that the store's merchandising and visual presentation meet the Company's standards. Id.  Most Abercrombie stores in the NY/NJ Region do not have Visual Managers.  Id.  In addition, the Fifth Avenue store has about 60 managers acting as store or assistant-level managers, and higher, whereas a typical Abercrombie store has a single Store Manager, approximately two Assistant Managers and one Manager-in-Training. Id.

The Fifth Avenue store is also the only store in the NY/NJ Region that operates on a 24-hour basis year round.  Ruiz Dec. at ¶ 11.a.  Most nights, overnight employees work to restock merchandise on the floor and ensure that all merchandise is properly presented according to Company standards prior to the next shopping day.  Id.  While a full restocking operation may not occur at the Fifth Avenue store every night of the year, one or more Abercrombie employees are always present in the store at all hours.  Id.  None of the other stores in the NY/NJ Region have this type of regular round-the-clock presence.  Id.  While some of the larger stores may have employees who work through the night from time to time to set new merchandise out, or restock existing merchandise on the sales floor, they do not do so on a nightly or even weekly basis.  Id.  On nights when no restocking operation is occurring at those stores, there are not any Abercrombie employees present at the store during the overnight hours.  Id.

Because of the size of the Fifth Avenue store and the huge potential for loss, the loss prevention staffing at that store is unparalleled by any other store in the NY/NJ Region.  Ruiz Dec. at ¶ 11.b.  These staffing differences inevitably mean that LPAs in the Fifth Avenue store perform different duties than those LPAs at other stores in the NY/NJ Region and also perform their similar duties in a significantly different manner.  In particular, the Fifth Avenue store employs a Loss Prevention Manager ("LPM") who is responsible for overseeing all loss

prevention efforts at the store, including general management of the various LPAs that work at the store.  Ruiz Dec. at ¶ 5.  No other single store in the NY/NJ Region has an LPM assigned to it.  Id.  Indeed, the only other LPM in the U.S. in this region is stationed at the Roosevelt Field Mall and oversees the loss prevention efforts of LPAs at each of the four Abercrombie stores in that mall.  Id.  The Fifth Avenue store also employs a Loss Prevention Investigator ("LPI"), which is the only position of its kind in the NY/NJ Region.  Id.  The only other position of this nature is a Regional Loss Prevention Investigator position which has responsibility for the entire NY/NJ Region outside the Fifth Avenue store.[7]  Id.

The Fifth Avenue store also employs multiple LPAs, about 12 currently, that are assigned to work solely in that store.  Id. at ¶ 11.b.; Declaration of Matthew Yount at ¶ __.[8]  One or more of those LPAs is dedicated to an Overnight LPA position, which does not exist at any other store in the NY/NJ Region.  Ruiz Dec. at ¶ __.  Some smaller stores and/or stores with a lower rate of "shrink" (i.e. merchandise that is charged to a particular store, but later cannot be accounted for through sales, transfers or markdowns), do not employ any LPAs, while the South Street Seaport store currently employs two LPAs due to its large size and volume.  Id. at ¶ __.  Most LPAs in the NY/NJ Region are responsible for multiple stores, up to three or four at a time.  Id. at ¶ __.

**D.    LPAs In Abercrombie's Fifth Avenue Flagship Store Are Not Similarly Situated To Other LPAs In The NY/NJ Region.**

At the Fifth Avenue store, there are typically about three to five agents assigned to a shift each day.  Yount Dec. at ¶ 4.  The presence of multiple LPAs in the Fifth Avenue store on any given shift dictates that those LPAs work in a team format.  Id.  In this team format, each LPA at the Fifth Avenue store does not individually complete or have responsibility for all loss

---

[7]    This position is currently vacant.  Ruiz Dec. at ¶ 5.

[8]    The Declaration of Matthew Yount is attached to the Jones Affirmation as Exhibit B and is cited herein as "Yount Dec. at ¶ __."

prevention duties for the store every day they work.  Rather, the duties are completed by the

"team."  Yount Dec. at ¶ 4.  In this team format, store management does not rely on one single

LPA for loss prevention direction and assistance, but instead refer any questions or requests to

any LPA, or to the LPM or LPI stationed at the store.  Id.  There is one exception to this team

format at the Fifth Avenue store and that is the Overnight LPA.  Unlike the day time LPAs at the

store, the Overnight LPA is responsible for all loss prevention duties for the entire store and for

the entire shift and is the person upon whom overnight management in the store will rely for loss

prevention direction and assistance.  Id.; Ruiz Dec. at ¶ 11.c.

LPAs at the Fifth Avenue store are assigned each day to rotate through two-hour shifts in

three different posts.  Yount Dec. at ¶ 5.  The first LPA who arrives for the day schedules him or

herself and the remaining LPAs on a "grid" of two-hour periods of time for each of the three

posts in the store.  Id.  One assigned post is in the closed circuit television ("CCTV") room

where the LPA watches several monitors showing live images from cameras strategically placed

throughout the store to detect theft and other types of loss, and to spot security problems.  Id.;

Ruiz Dec. at ¶ 11.b.i.  While working in the CCTV room, the LPA is also responsible to sign out

store keys, sensor guns, and to maintain the lost and found.  Yount Dec. at ¶ 5; Ruiz Dec. at ¶

11.b.ii.

Another post in the Fifth Avenue store is the "greeter" post.  Yount Dec. at ¶ 5; Ruiz Dec.

at ¶ 11.b.iii.  A "greeter," is stationed solely at the front-door of the Fifth Avenue Store.  Id.  The

LPA "greeter" is responsible for checking employees' personal items when they leave the store

and, when the sensormatic alarm system is triggered, searching the Abercrombie shopping bags

of customers exiting the store, both in an effort to prevent theft of merchandise.  Id.  LPA

"greeters" also alert fellow LPAs working on the sales floor to the presence of suspicious

customers and attend to any other loss-prevention related issues that may arise at the front of the store.  Yount Dec. at ¶ 5.  At different times of the year when the store's customer traffic is especially high, some LPAs may also be stationed just outside the store to monitor and control the line of customers waiting to enter the store.  Id.

The final post for LPAs at the Fifth Avenue store is not really a "post" but is instead a time for the LPAs to walk through the four levels of sales floor looking for signs of potential theft by customers and failure by employees to follow operational procedures that could result in loss.  Yount Dec. at ¶ 5.  At times, an LPA will not be assigned to one of these three posts so that they will be able to engage in various other loss prevention activities at the store, including training the store's managers and employees on various aspects of loss prevention, conducting audits on aspects of the store's loss prevention procedures, reviewing store logs and other paperwork for operational and internal problems that may lead to loss, monitoring door alarms that sound when employees and customers access inappropriate exits and closely monitoring shipment when it is delivered to the store.  Id. at ¶ 6; Ruiz Dec. at ¶ 11.b.iv.  While some Fifth Avenue LPAs have, in the past, also participated to some extent in regular meetings with store management, the LPAs at the Fifth Avenue store do not currently engage in these meetings.  Yount Dec. at ¶ 8; Declaration of Michael Barrett at ¶ 7.[9]

Contrary to the LPAs at the Fifth Avenue store, LPAs assigned to other stores throughout the NY/NJ Region do not work with other LPAs in their stores.  Ruiz Dec. at ¶ 11.f.  They do not, therefore, share their loss prevention duties with any other LPA, and are solely responsible

---

[9]  The Declarations of seven LPAs (Michael Barrett, Joseph Gandolfo, Juliette Hackett, Shaji Mathew, Felix Ramirez, Jamie Van Dusen and Andre Walker) are attached to the Jones Affirmation in alphabetical order as Exhibit C and are referred to herein as, for example, "Barrett Dec. at ¶ __."

for all loss prevention efforts in the stores to which they are assigned.[10]  Ruiz Dec. at ¶ 11.f. Store management relies on them alone for loss prevention direction and assistance.  <u>Id.</u>

Because most LPAs outside the Fifth Avenue store are responsible for more than one store, they travel from store to store each week, or as often as daily, depending on the loss prevention needs and issues facing each particular store at any given time.  <u>Id.</u>  When they are working at a particular store, those LPAs do not have specified posts at which they are stationed at various points during their work day.  Ramirez Dec. at ¶¶ 4,6; Barrett Dec. at ¶ 7; <u>see also generally</u> Gandolfo Dec.; Hackett Dec.; Mathew Dec.; Van Dusen Dec.  Instead, they decide how and when to perform their various loss prevention duties.  <u>Id.</u>.

LPAs at stores outside the Fifth Avenue store do not perform a "greeter" duty where they stand at a store's door checking customers' and employees' bags or monitor lines of customers waiting to enter the store.  Ruiz Dec. at ¶ 11.b.iii.  Further, while some stores do have a video monitor in the store's office that provides ongoing video surveillance of the store, other stores do not.  Mathew Dec. at ¶ 10.  In those stores that do have a monitor, LPAs do not simply sit and watch live footage on a monitor for periods of time.  Rather than watch live video surveillance to detect theft as it occurs, those LPAs may, from time to time, review previously taped footage in an effort to confirm suspected internal or external theft, or as a means of training store employees on proper loss prevention procedures and techniques.  Barrett Dec. at ¶ 7; 3.g.; Gandolfo Dec. at ¶ 4.f.; Hackett Dec. at ¶ 6.c.ii.  In addition, while LPAs in stores outside Fifth Avenue are responsible for ensuring that any shipment to a store is as stated in the relevant

---

[10]    While the South Street Seaport store currently has two LPAs assigned to it due to its large size and volume, those LPAs typically work on different days and different shifts such that they are each independently responsible for all loss prevention duties for that store when they are working.  Ruiz Dec. at ¶ 11.e.&f.; Barrett Dec. at ¶ 3.

paperwork, they are not required to actually monitor the delivery of merchandise to the store like the LPAs at Fifth Avenue store are required to do.  Ruiz Dec. at ¶ 11.b.iv.

       While LPAs in the Fifth Avenue store and LPAs in other stores in the NY/NJ Region may perform similar duties at times, they do not all perform those duties in the same manner or even at the same level of involvement.  The personality and work ethic of each LPA greatly affects the functions that they perform as LPAs.[11]  For example, all LPAs are similarly responsible for orienting and training both management and non-management employees in their stores on loss prevention policies and practices.   Ruiz Dec. at ¶ 8.  Some LPAs conduct this training pursuant to a fixed outline.  Pomales Aff. at ¶ 8; Davis Aff. at ¶ 14; Pagnotta Aff. at ¶ 10; Eudelle Aff. at ¶ 11.  Other LPAs do not follow any set outline and, instead, regularly tailor the training to address specific topics and issues relevant to each particular store for which they are responsible based upon their own observations and experiences.  Ramirez Dec. at ¶ 4.a., 5.c.; Hackett Dec. at ¶ 6.c.i.; Barrett Dec. at ¶ 4.b.; Van Dusen Dec. at ¶ 3.b; Gandolfo Dec. at ¶ 4.b.; Mathew Dec. at ¶ 4.b.  LPAs also deliver this training to employees in different ways.  While some may simply speak to employees as if giving a speech or reading off a script, others have developed other more creative ways to educate and train store employees.  Barrett Dec. at ¶ 4.b. (providing associates with various hypothetical situations and requiring them to respond as to how they would handle the situation); Hackett Dec. at ¶ 6.c. (role playing with associates as to the proper application of certain loss prevention policies/procedures and reviewing surveillance video with associates to identify areas where they failed to follow policy/procedure).  Finally, some LPAs might limit their involvement in employee training to only the minimal level that is generally required of them by Abercrombie, while others seek more extensive involvement.

---

[11]   This is true even within the Fifth Avenue store itself where LPAs may exercise varying levels of independent discretion and judgment in the performance of their similar duties.  See e.g. Walker Dec. at ¶ 6.

Barrett Dec. at ¶ 7; Ramirez Dec. at ¶ 4.a., 6.c.  In this manner, LPAs's duties differ both outside

the Fifth Avenue store and within the store itself.

> ### E.     Abercrombie's Policies Require The Recording And Payment Of All Overtime Hours Worked By Non-Exempt Employees.

Abercrombie's policies regarding the recording and payment of overtime for non-exempt

employees clearly provide that non-exempt employees must record all time worked and that they

will be paid for any overtime hours worked.

In particular, Abercrombie's Associate Handbook provides as follows:

> **Overtime**
>
> Abercrombie & Fitch pays overtime to non-exempt associates in a manner consistent with federal and state laws…
>
> **Record of Hours Worked**
>
> Non-Exempt and Supplemental Pay…associates are required to punch in and out for ***all*** hours worked.  This is the official record of hours worked and serves as the basis of calculating pay.  You must punch in at the beginning of your shift, punch out at the end of your shift and in and out for breaks as described in the section "Break & Meal Periods."  ***All hours worked must be accounted for***…. Any falsification or attempt to misrepresent hours worked is a violation of Company policy and will result in termination…. Any discrepancies of hours worked must be brought to your supervisor's attention immediately….

Ruiz Dec. at ¶ 20, Ex. 1 (emphasis added).  These policies further instruct employees to contact

their managers or Abercrombie's Human Resources Department if they have any questions about

their overtime pay or hours worked.  Id.  Abercrombie provides its Associate Handbook,

including these two policies, to all employees upon their hire.  Id. at ¶ 20.  Accordingly, each

Plaintiff received a copy of the Associate Handbook and reviewed these particular policies

during their initial orientation sessions at Abercrombie.  Ruiz Dec. at Exs. 2 - 5.

The Supplemental Pay Acknowledgement form that all Abercrombie LPAs receive and sign upon employment also describes the manner in which LPAs will be compensated for all hours worked, including any overtime hours worked.[12]  Id. at ¶ 19 & see e.g. Ex. 6.  In particular, that form explains that "hours worked" for purposes of calculating Supplemental Pay includes "*actual* hours worked, such as regular work time, meetings in or out of the store, inventory, management training and court appearances."  Id. at Ex. 6 (emphasis added).

## III.    ARGUMENT

### A.    Preliminary Certification Of A Collective Action Of All LPAs In The NY/NJ Region Is Inappropriate.

#### 1.    *Standard for Collective Action.*

Although the FLSA provides for collective actions through an "opt in" procedure, 29 U.S.C. § 216(b), a collective action should be permitted to proceed only where it facilitates a court's ability to resolve multiple claims *efficiently* in one proceeding.  Hoffman-LaRoche, Inc. v. Sperling, 493 U.S. 165, 170 (1989); See also Severtson v. Phillips Beverage Co., 137 F.R.D. 264, 266 (D.Minn. 1991) (the "power [to authorize court-supervised notice to potential class members] is to be exercised … only in 'appropriate cases,' and remains within the discretion of the district court.").  Section 216(b) provides that only "similarly situated" employees may utilize the opt in procedure.  Id.

The courts in this Circuit utilize a two-tiered approach when deciding whether a suit should proceed as a collective action.  Scholtisek v. Eldre Corp., 229 F.R.D. 381, 387 (W.D.N.Y.

---

[12]    As noted above, Plaintiffs each received and signed Abercrombie's Supplemental Pay Acknowledgement form in November, 2006 when they began receiving Supplemental Pay for overtime hours worked.  Ruiz Dec. at ¶22, Exs. 6 - 9.

2005).[13]  The first stage of this "two-tiered" process is referred to as the "notice" stage and has

been described as follows:

> In the first step, the court examines the pleadings and affidavits of
> the proposed collective action and determines whether the
> proposed class members are 'similarly situated.' If the court finds
> that the proposed class members are similarly situated, the court
> 'conditionally certifies' the class. Putative class members are given
> notice and the opportunity to 'opt in' and the action proceeds as a
> representative action throughout discovery.

Scholtisek, 229 F.R.D. at 387; Morales, 2006 WL 278154, at *1; Jacobs, 483 F.Supp.2d at 265.

After notice has been sent and discovery has largely been completed, the case enters the second

stage in which the court revisits its preliminary determination that other employees are similarly

situated to the plaintiffs.  This stage is typically precipitated by the defendant's filing of a motion

for decertification challenging the court's conditional certification of a class.  See Jacobs, 483

F.Supp.2d at 265; Morales, 2006 WL 278154, at *1.  If the Court finds that the claimants are

similarly situated, the collective action proceeds to trial.  However, if the Court finds that

claimants are not similarly situated, the court decertifies the class, the claims of the opt-in

plaintiffs are dismissed and the named plaintiffs then proceed to trial on their individual claims.

Scholtisek, 229 F.R.D. at 387.

      This case is currently at the first stage, or "notice" stage.  At this first stage, "[p]laintiffs

bear the burden of showing they are similarly situated to the remainder of the proposed class."

Morisky v. Public Serv. Elec. and Gas Co., 111 F. Supp. 2d 493, 496 (D.N.J. 2000), citing

Bayles v. American Med. Response of Colo., Inc., 950 F. Supp. 1053, 1062-63 (D.Colo. 1996).

Although the FLSA and its regulations do not define the term "similarly situated," courts in this

Circuit have held that plaintiffs can meet this burden by making a "modest factual showing"

---

13    See also Morales v. Plantworks, Inc., 2006 WL 278154, at *1 (S.D.N.Y. Feb. 2, 2006), a copy of which is
attached to the Jones Affirmation as Exhibit D; Jacobs v. N.Y. Foundling Hosp., 483 F.Supp.2d 251, 265
(E.D.N.Y. 2007).

sufficient to demonstrate that they and potential plaintiffs together were "victims of a common policy or plan that violated the law." <u>Lynch v. United States Auto Ass'n</u>, 491 F.Supp.2d 357 (S.D.N.Y. 2007); <u>Morales</u>, 2006 WL 278154, at *2.[14]

While "modest," this burden is real. It is not, as Plaintiffs would have it, non-existent. Indeed, this burden requires that Plaintiffs show "a demonstrated similarity among the individual situations[,].... some identifiable factual nexus which binds the named plaintiffs and the potential class members together." <u>Heagney v. European American Bank</u>, 12 F.R.D. 125, 127 (E.D.N.Y. 1988) (quoting <u>Palmer v. Readers Digest Ass'n</u>, 1986 WL 11458, at *1 (S.D.N.Y. Oct. 3, 1986), copy attached to Jones Affirmation as Exhibit F).[15] As one court has stated:

> The courts, as well as practicing attorneys, have a responsibility to avoid the "stirring up" of litigation through unwanted solicitation. … [T]his court feels a responsibility to assure that there is some factual basis for plaintiffs' claims of class-wide discrimination before judicial approval of the sending of notice is granted. A factual showing is particularly appropriate in this case given that defendants have challenged the allegations of the complaint by submitting affidavits and deposition testimony tending to show that no widespread practice of discrimination exists at the defendant companies…Requiring a showing that there is some factual basis for the class allegations…hardly places an unreasonable burden on the plaintiffs…To obtain court authorization to send the proposed notice, plaintiffs must submit evidence establishing at least a colorable basis for their claim that a class of "similarly situated" plaintiffs exist.

---

[14]   <u>See</u> <u>also</u> <u>Rodolico v. Unisys Corp.</u>, 199 F.R.D. 468, 480 (E.D.N.Y. 2001) ("Generally, at the notice stage, courts require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan."); <u>Bunyan v. Spectrum Brands, Inc.</u>, No. 07CV00089, at p. 10-13 (S.D. Ill., July 31, 2008) (denying conditional certification for failure to establish a "common policy or plan that violated the law" where the plaintiffs identified a common plan but "failed to provide sufficient evidence that they and the potential class members are similarly situated with respect to their work responsibilities and functions."), a copy of which is attached to the Jones Affirmation as Exhibit E.

[15]   <u>See</u> <u>also</u> <u>Mendoza v. Casa de Cambio Delgado, Inc.</u>, 2008 WL 938584, at *1 (S.D.N.Y. Apr. 7, 2008) ("conclusory allegations or lack of a nexus with the putative class will prevent the case from moving forward as a collective action."), a copy of which is attached to the Jones Affirmation as Exhibit G.

Severtson 137 F.R.D. at 266-67.[16]  A collective action should not be conditionally certified in this case as Plaintiffs are unable to meet their burden of demonstrating that they are similarly situated to the proposed class.

>    **2.      LPAs In The NY/NJ Region Are Not Similarly Situated With Respect To Their Allegations Of Misclassification.**

Plaintiffs allege that they spent their time as LPAs performing non-exempt tasks and, as such, Abercrombie misclassified them and all other LPAs in the NY/NJ Region as exempt from overtime pay before November, 2006.  Plaintiffs' conclusory allegation is insufficient to meet their factual burden because Plaintiffs only worked at six of Abercrombie's 86 stores in the NY/NJ Region, and LPAs working at different stores do not all perform the same job duties and/or do not all perform similar job duties in the same manner.  Indeed, many, if not all, of the LPAs in the NY/NJ Region are not similarly situated to Plaintiffs because they perform their job duties in such a way as to qualify them for the FLSA's administrative exemption.[17]

The FLSA exempts, among others, employees employed in a "bona fide executive, administrative, or professional capacity" from its minimum wage and overtime pay requirements.  29 U.S.C. § 213(a)(1).  The Secretary of Labor has broad authority to define these

---

[16]   See also Prizmic v. Armour, Inc., 2006 WL 1662614 at *2 (E.D.N.Y. Jun. 12, 2006) (finding that a plaintiff must "provide actual evidence of a factual nexus between his situation and those that he claims are similarly situated rather than mere conclusory allegations. Absent such a showing, an employer may be 'unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense.'") (internal citations omitted), a copy of which is attached to the Jones Affirmation as Exhibit H.

[17]   While Plaintiffs assert at various points in their Motion that it is inappropriate for the Court to engage in this type of an evaluation of the merits of their FLSA claim in determining whether to conditionally certify a collective action, this Court has recently held that just such an analysis of the merits is appropriate.  See Amendola v. Bristol-Myers Squibb Co., No. 07Civ6088, at ftnt. 9 (S.D.N.Y. June 4, 2008) (denying conditional certification where evidence showed that the putative class members were administratively exempt, stating "Although district courts have held that the merits of a plaintiff's FLSA claim should not be evaluated in determining whether to authorize notice, see, e.g., Lynch, 491 F.Supp.2d at 368, these holdings may have derived from jurisprudence discouraging engagement with the merits that was developed in the context of a Rule 23 class action certification…This Court will, therefore, scrutinize the merits based on the record developed to date by the parties and to the extent necessary to address this motion for authorization of notice."), a copy of which is attached to the Jones Affirmation as Exhibit I.

17

exemptions by regulations, and such regulations are entitled to great deference. Auer v. Robbins, 519 U.S. 452 (1997). Additionally, the Wage and Hour Division of the U.S. Department of Labor ("DOL") issues opinion letters concerning the FLSA regulations as they apply to particular job duties. An opinion letter signed by the Administrator of the Wage and Hour Division is an official ruling or interpretation of the U.S. DOL Wage and Hour Division for purposes of the Portal-to-Portal Act, 29 U.S.C. 259. Such opinion letters are also entitled to deference. See, e.g., Beck v. City of Cleveland, Ohio, 390 F.3d 912 (6th Cir. 2004), cert. denied, 545 U.S. 1128 (2005).

Under the FLSA regulations, the LPA must meet each of the following criteria to satisfy the "administrative" exemption:

1) Be compensated on a salary or fee basis at a rate of not less than $455 per week.

2) Have as a primary duty the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers.

3) Have as a primary duty the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

In interpreting the FLSA regulations for the administrative exemption as they relate to "loss prevention managers" employed by a "large retail business operating over 200 department stores," the DOL opined that those loss prevention managers met the administrative exemption from overtime pay. See U.S. Department of Labor Opinion Letter FLSA 2006-30 (September 6, 2006) ("Opinion Letter").[18] In so finding, the DOL identified the following job duties as

---

18    A copy of the DOL's Opinion Letter is attached to the Jones Affirmation as Exhibit J.

meeting the requirement that the employee have as a primary duty the "performance of office or

non-manual work directly related to the management or general business operations:"

> [E]ffectively implementing a loss prevention and shortage control program by, among other duties, analyzing inventory results, allocating store Loss Prevention resources to successfully reduce inventory shortage, focusing prevention activities on high shortage departments, identifying paperwork control weaknesses and implementing procedures to correct them, conducting audits for compliance and ensuring store follow-up on price accuracy initiatives, reviewing cash discrepancies to keep the store within allowable guidelines, identifying cash registers with unacceptable shortages, and regularly reviewing loss prevention exception reports for signs of dishonesty…ensuring training standards for associates regarding emergency procedures, robbery, fire, etc….

Id.  The DOL further opined that, in performing these job duties, the loss prevention employees

exercised sufficient "discretion and independent judgment with respect to matters of

significance" as follows:

> Working independently shows that the LPM has certain decision-making authority that is "free from immediate direction or supervision."  In selecting appropriate steps to address the problem of inventory shortage and pursuing the selected course of action, the LPM compares and evaluates possible courses of conduct, and acts or makes a decision after the various possibilities have been considered....The LPM's primary duty of implementing the loss prevention and shortage control program for the store….demonstrate[s] that the employee "implement[s] management policies or operating practices"...In implementing the loss prevention and shortage control program for the store, the LPM "performs work that affects business operations to a substantial degree" because the effective performance of such duty is essential for the profitability of the store and, in fact, frequently determines the store's success or failure.  In developing complementary store-specific programs to meet or exceed the store's shortage goals, the LPM "carries out major assignments in conducting the operations of the business." In determining what internal investigations to pursue and when to conduct interviews, in ascertaining prosecutable cases…the LPM "investigates and resolves matters of significance on behalf of management." In addition, in consulting with and providing expert advice to store management with respect to the loss prevention and shortage

19

> control program, the LPM "provides consultation or expert advice
> to management."

Id. (internal citations omitted).

Both before and after November, 2006, Abercrombie has paid its LPAs on a salary basis in an amount exceeding $455 per week. Ruiz Dec. at ¶ 19.[19] Further, the declarations of various LPAs in the NY/NJ Region submitted by Defendants indicate that they perform many duties identified by the DOL as office or non-manual work directly related to the management or general business operation (including implementing loss prevention and shortage reduction programs, training all store employees on loss prevention programs, researching and analyzing inventory reports, cash register transactions, associate purchase logs and other store documents to identify loss, allocating store loss prevention resources to eliminate shrink and conducting audits to ensure compliance with loss prevention initiatives). See generally Barrett Dec.; Gandolfo Dec.; Hackett Dec.; Mathew Dec.; Ramirez Dec.; Van Dusen Dec. Those declarations further demonstrate that LPAs in the NY/NJ Region perform many, if not all, of their job duties with independent discretion and judgment recognized by the DOL as sufficient to satisfy the requirements of that exemption (including working independently, identifying loss prevention problems, tailoring loss prevention programs to meet specific problems in each individual store, deciding how to implement the loss prevention programs and initiatives in particular stores, deciding what action to take when confronted with potential internal or external theft, building prosecutable cases of internal and external theft, implementing the loss prevention and shortage reduction program for each store, and consulting with and providing expert advice to store management with respect to the loss prevention and shortage reduction programs). Id.

---

[19]  The Declarations of the LPAs proffered by Abercrombie confirm that each of those LPAs were properly paid for their time. Ramirez Dec. at ¶¶ 8-9; Barnett Dec. at ¶¶ 8-9; Van Dusen Dec. at ¶ 8; Walker Dec. at ¶¶ 7-8; Hackett Dec. at ¶¶ 12-13; Mathew Dec. at ¶ 12; Gandolfo Dec. at ¶ 7.

Therefore, to the extent Plaintiffs' affirmations demonstrate, as they claim, that their duties do not satisfy the requirements of the administrative exemption, they are unable to show that they are similarly situated to other LPAs in the NY/NJ Region who do perform "exempt" duties as specified by the U.S. Department of Labor.

Further, the purpose of a collective action is the "efficient resolution in one proceeding of common issues of law and fact." Hoffman-LaRoche, Inc., 493 U.S. at 170. Collective action certification is not, therefore, appropriate where certification would require the court to engage in burdensome individualized inquiries of each class member's eligibility for overtime under the FLSA, thereby obviating the judicial economies of scale and efficiencies underpinning FLSA collective actions. See e.g. Sheffield v. Orius Corp., 211 F.R.D. 411, 413 (D.Or. 2002) (denying certification because each claim would require extensive consideration of individualized issues of liability, and stating that "[a]n action dominated by issues particular to individual plaintiffs can not be administered efficiently because individual issues predominate over collective concerns").[20]

To determine whether Plaintiffs are similarly situated to the other LPAs in the NY/NJ Region with respect to their claim that they were misclassified as exempt before November 2006, the Court will necessarily be required to conduct an individualized factual inquiry of the exempt nature of each LPA's actual job duties. See Morisky 111 F. Supp. 2d 493, 498 (D.N.J. 2000) ("To determine which employees are entitled to overtime compensation under the FLSA

---

[20] See also Mike v. Safeco Ins. Co. of Am., 274 F.Supp.2d 216, 220-21 (D.Conn. 2003) (denying collective action certification "because the proof in this case is specific to the individual…"); Pfaahler v. Consultants for Architects, Inc., 2000 WL 198888, at *2 (N.D.Ill. Feb. 8, 2000) (denying motion for collective action when "the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's employment relationship with [defendant]."), a copy of which is attached to the Jones Affirmation as Exhibit K.

depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria.").[21]

Thus, in <u>Holt v. Rite Aid Corp.</u>, 333 F. Supp. 2d 1265 (M.D.Ala. 2004), the court concluded that Rite Aid managers and assistant managers were not similarly situated because the court would have to engage in an inappropriately individualized examination of the day to day tasks of each employee. The <u>Holt</u> court reviewed declarations submitted by the defendant which contradicted the plaintiff's allegation that managers spent the overwhelming majority of their time performing non-exempt tasks and, in denying conditional certification of a collective action, concluded:

> … [S]ubstantial evidence has been presented which indicates to this court that, if the case were conditionally certified as a collective action at this stage, the court would have to inquire at a second stage as to the daily tasks of each putative collective action member to determine whether they are similarly situated to the persons identified by the Plaintiffs, and then, on the merits, whether they had suffered an FLSA violation because they were not eligible for overtime compensation. … The court cannot conclude, therefore, that a nationwide group of Store Managers and Assistant Managers, or even a regional group, is similarly situated for purposes of certifying a collection action.

<u>Id.</u> at 1274-75.[22]

Given Plaintiffs' theory that they were misclassified as exempt, the determination of whether other LPAs in the NY/NJ Region are similarly situated with respect to their duties would require a mini-trial as to the nature and type of *each* LPA's duties as well as the different

---

[21]  <u>See also</u> <u>Mike</u>, 274 F. Supp. 2d at 220 ("Determining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing . . . duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities.'")

[22]  <u>See also</u> <u>Clausman v. Nortel Networks, Inc.</u>, 2003 WL 21314065 (S.D. Ind. May 1, 2003) (declining to conditionally certify a collective action, following examination of competing witness affidavits, where employer's defense that it properly classified each potential claimant as exempt required an individual assessment of each claimant's factual circumstances, including how much time each claimant spent performing non-exempt work), a copy of which is attached to the Jones Affirmation as Exhibit L.

ways in which each LPA performs those duties.  This type of individualized inquiry dictates that

Abercrombie's LPAs are simply not similarly situated.  Holt 333 F. Supp. 2d 1265.  Conditional

certification of a collective action based upon Plaintiffs' claim of misclassification should,

therefore, be denied.

### 3. LPAs In The NY/NJ Region Are Not Similarly Situated With Respect To Their Allegations Of "Off The Clock" Violations.

Plaintiffs are likewise unable to meet their burden of demonstrating that they are

similarly situated to all other LPAs in the NY/NJ Region with respect to their "off the clock"

allegations.  Contrary to Plaintiffs' allegations, Abercrombie has a clear company-wide policy

dictating the payment of regular and overtime compensation to its non-exempt employees for all

hours worked.  Ruiz Dec. at ¶ 20, Ex. 1.  Indeed, Abercrombie's policies specifically require

employees to record all hours worked upon penalty of termination.  Id.  Nothing in

Abercrombie's policies even remotely suggests that Abercrombie had a common plan or policy

of prohibiting LPAs from recording all hours they actually worked, or that it would alter any

overtime hours they had recorded as worked to show that they did not work any such hours.

While two of the four Plaintiffs (Davis and Pagnotta) assert that the loss prevention

managers in the NY/NJ Region deviated from Abercrombie's stated policies, they fail to present

any facts that demonstrate that any such common policy or practice existed.  Indeed, with the

exception of Davis who worked at four stores in New Jersey for a period of time, Plaintiffs'

allegations of unpaid overtime relate solely to their employment at either the Fifth Avenue store

or the South Street Seaport store.  Davis Aff. at ¶¶ 2-3, 17; Eudelle Aff. at ¶ 2; Pagnotta Aff. at

¶¶ 2;[23] Pomales Aff. at ¶ 2.  They do not identify any other LPAs who worked at other stores, or

---

[23]    While Pagnotta alleges that she worked at other Abercrombie stores in Long Island, Staten Island and New Jersey, she was never actually employed at any of those stores.  Rather, any work she performed at those stores was likely rare and part of a loss prevention "blitz" that occurred from time to time.  A "blitz" involves a

even in the same stores as they did, who did not receive pay for any overtime hours that they

worked.  Plaintiffs' First Amended Complaint at ¶¶ 25-43 and Plaintiffs' affirmations generally.

Contrary to Plaintiffs' allegations, the declarations of LPAs who have worked in

Plaintiffs' stores and also other stores in the NY/NJ Region show that when they worked

overtime hours they were paid for all such hours worked, and they were never told by

Abercrombie not to record any such overtime hours.  Barrett Dec. at ¶¶ 8-9; Gandolfo Dec. at ¶¶

7, 9; Hackett Dec. at ¶¶ 12-13;  Mathew Dec. at ¶ 12; Ramirez Dec. at ¶¶ 8-9, 11; Van Dusen

Dec. at ¶ 8.  Even accepting all Plaintiffs' allegations as true, these alleged facts demonstrate

only that any such "off the clock" work occurred with Plaintiffs Davis and Pagnotta.  This hardly

establishes the requisite common policy or procedure necessary to support conditional

certification. See e.g. Flores v. Lifeway Foods, Inc., 289 F.Supp.2d 1042, 1046 (N.D.Ill. 2003)

(evidence that only two out of fifty employees were not paid overtime did not constitute a

"modest factual showing" of a common policy or plan).[24]

Further, while Davis and Pagnotta allege that they were told that they were not permitted

to record overtime hours worked or that any such recorded hours would be deleted or otherwise

altered, Eudelle and Pomales fail to point to any such directive by Abercrombie.  Davis Aff. at ¶¶

10-12; Pagnotta Aff. at ¶¶ 7-8; Eudelle and Pomales Aff., generally.  Instead, they conclusorily

state only that they "worked overtime without pay" without any further assertion of facts

demonstrating any common policy or plan by Abercrombie to require its LPAs to work off the

---

handful of LPAs who go to a store that has no assigned LPA and/or has suffered a high rate of merchandise
loss and who work in those stores to evaluate and detect the reasons for the loss and develop policies or
procedures to prevent that loss from occurring in the future.  A blitz typically only requires the LPA to go to
another store for a single shift and is focused on a particular issue or problem such that it does not involve the
"borrowed" LPAs assuming all responsibility for the wide range of loss prevention duties at the store.  Ruiz
Dec. at ¶ 13.b.

[24]  See also Tracy v. Dean Witter Reynolds, Inc., 185 F.R.D. 303, 305 (D.Colo. 1998) ("[e]ven if it is true that
some individuals failed to receive appropriate compensation for hours which were worked overtime, that fact
alone does not lead me to conclude that there must be some unlawful national policy out there somewhere.")

clock.  Eudelle Aff. at ¶ 9; Pomales Aff. at ¶ 7.  Plaintiffs have, therefore, failed to demonstrate that they are similarly situated amongst themselves, let alone other LPAs in the wider NY/NJ Region.

Moreover, Davis's and Pagnotta's allegations of altered time sheets and other off the clock work are too individualized to warrant collective relief under the FLSA.  See Lawrence v. City of Philadelphia, 2004 WL 945139, at *2 (E.D. Penn. Apr. 29, 2004).[25]  In Lawrence, the plaintiffs shared the same general job description of "Fire Service Paramedic," but worked in different unit types, different platoons, different locations and under different supervisors.  Id. The court held that a collective action under the FLSA for claims of off the clock work could not be maintained, stating that their off the clock claim:

> Does not involve regularly scheduled time that is worked by all members of the class.  Rather, each of the Plaintiffs may potentially claim that on any given day he or she arrived early or departed outside their regularly scheduled hours and were not compensated for such. The circumstances of those individual claims potentially vary too widely to conclude that in regard to their "off-the-clock" claim, the Plaintiffs are similarly situated. The questions of fact will likely differ for each Plaintiff and will be unduly burdensome to both Defendant and to the court in managing as a collective claim.

Id.

The court in Diaz v. Electronics Boutique of America, Inc., 2005 WL 2654270, at *5 (W.D.N.Y. Oct. 17, 2005),[26] reached a similar conclusion.  In Diaz, the plaintiff asserted that his timesheets were altered to delete overtime hours worked, but the court held that the plaintiff's off the clock allegations could not support certification of a collective action.  Id.  The court found that these allegations were "too individualized" to warrant collective action treatment because

---

[25]    Copy attached to the Jones Affirmation as Exhibit M.
[26]    Copy attached to the Jones Affirmation as Exhibit N.

they would require the court to examine not only when the plaintiff was scheduled to work, when he actually worked, and whether he was paid for his work, but would also require the court to conduct the same analysis for each and every class member.  Id.

Similarly here, the Court will have to analyze each LPA's work schedule and actual hours worked in order to determine whether Plaintiffs' allegations of off the clock work are sufficiently common or widespread to justify certification of a collective action.  The requirement that the Court perform this type of individualized inquiry demonstrates that LPAs in the NY/NJ Region are not similarly situated, and Plaintiffs' Motion for preliminary certification must be denied.

**B.     If The Court Finds Conditional Certification Of A Collective Action Is Appropriate, Notice Is Only Warranted For A Two-Year Period.**

The FLSA provides for a two-year statute of limitations for overtime and minimum wage violations, unless the violations at issue are proven to be willful, in which case the statute of limitations extends to three years.  29 U.S.C. § 255; McLaughlin v. Richland Shoe Co., 486 U.S. 128, 135 (1988).  Plaintiffs' Motion seeks to certify a conditional class that extends back three years.  There is, however, no evidence that Abercrombie willfully violated the FLSA.

The Second Circuit has explained that "a violation is willful for purposes of the FLSA limitations provision only if the employer knowingly violates or shows reckless disregard for the provisions of the Act."  Brock v. Superior Care, Inc., 840 F.2d 1054, 1062 (2nd Cir. 1988).[27] "Willfulness cannot be found on the basis of mere negligence or 'on a completely good faith but incorrect assumption that a pay plan complied with the FLSA in all respects.'"  Bowrin v. Catholic Guardian Soc., 417 F.Supp.2d 449, 475 (S.D.N.Y. 2006) (quoting Boekemeier v. Fourth Universalist Soc'y in the City of New York, 86 F.Supp.2d 280, 288 (S.D.N.Y. 2000)).  Indeed,

---

[27]   See also McLaughlin, 486 U.S. at 133 (the standard for determining willful behavior is whether "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.")

Defendant's classification of the Plaintiffs is consistent with the U.S. DOL's Opinion Letter issued September 6, 2006.

Plaintiffs have not alleged facts sufficient to demonstrate that Abercrombie knew it was violating the FLSA, or that it acted with reckless disregard of violating the FLSA, with respect to their allegations of misclassification before November 2006. Indeed, the facts presented by each of the LPA declarations proffered by Abercrombie in support of this memorandum in opposition show that many, if not all, of Abercrombie's LPAs do, in fact, perform duties sufficient to qualify them for the FLSA's administrative exemption. See generally Barrett Dec.; Gandolfo Dec.; Hackett Dec.; Mathew Dec.; Ramirez Dec.; Van Dusen Dec. Any good faith decision by Abercrombie to classify LPAs as exempt cannot, therefore, be said to have been made with knowledge or reckless disregard for the requirements of the FLSA, and Plaintiffs cannot make the minimal showing of willfulness required to justify the extension of the statute of limitations from two to three years. See Bowrin, 417 F.Supp.2d at 475-76.[28]

Further, while Plaintiffs allege in relation to their "off-the-clock" claims against Abercrombie that one or more managers instructed them not to record overtime hours worked or otherwise altered their time sheets to reflect that no such overtime hours were worked, those "off-the-clock" allegations relate only to the time period beginning November 26, 2006 (when LPAs were "converted" to a non-exempt status and paid overtime pay) through January 2007. Those allegations, even if sufficient to demonstrate willful conduct on the part of Abercrombie (which they are not), do not extend outside the two year limitations period such that a three year

---

[28]    See also Gustafson v. Bell Atlantic Corp., 171 F.Supp.2d 311, 323-24 (S.D.N.Y. 2001) (holding that the two year statute of limitations would apply to the plaintiff's FLSA claim because "plaintiff offered no credible evidence to support his argument that defendants were reckless in failing to determine whether plaintiff was eligible for overtime pay under the FLSA." Rather, "plaintiff merely concluded that willfulness and recklessness existed, without pointing to any concrete evidence in the record."); Debejian v. Atlantic Testing Laboratories, Ltd., 64 F.Supp.2d 85, 92 (N.D.N.Y. 1999) (holding that the two year statute of limitations applied to the plaintiff's FLSA claim because the plaintiff presented no evidence that the employer knew that it was violating the FLSA or that it recklessly disregarded its obligations under the FLSA).

limitations period simply is not justified.

Accordingly, if this Court decides to conditionally certify a class, it should properly be limited to only two years.

**C.    If The Court Certifies A Class, Plaintiffs' Proposed Notice Is Defective In Several Respects And Cannot Be Adopted Wholesale.**

Plaintiffs included with their Motion a proposed notice to potential opt-in plaintiffs that it asks the Court to approve. Plaintiffs' Motion at Ex. 1. Plaintiffs' notice is deficient as it contains a number of defects and omissions that unfairly prejudice Abercrombie and otherwise deprive the proposed class members of basic information necessary to inform their decision as to whether or not to opt-in to the litigation. If the Court should see fit to conditionally certify a collective action, it should not therefore simply "rubber stamp" Plaintiffs' notice, regardless of its alleged sufficiency in an entirely separate matter. Plaintiff's Motion at p. 17.

Some of the more prominent deficiencies of Plaintiffs' proposed notice that must be remedied are outlined below. Abercrombie respectfully requests leave to address other deficiencies with the Court prior to approval of any such notice.

**1.    *Plaintiffs' Proposed Notice Should Explain The Potential Consequences Of Joining The Collective Action.***

Any notice to potential opt-in plaintiffs should include a full description of the potential consequences of their participation in the litigation so as to ensure that any such plaintiff's decision to opt-in to the class is based on a full and fair informed consent. In particular, notice of the collective action should include a statement that the opt-in plaintiffs may be required to participate in written discovery and that they may be required to appear for deposition and/or trial in the Southern District of New York. See Reab v. Elec. Arts, Inc., 214 F.R.D. 623, 630 (D.Colo. 2002) (approving notice advising potential opt-in plaintiffs that if they opt-in, they may

be asked to appear for deposition in Denver, respond to written discovery, and appear at trial in

Denver).  Notice should further advise potential opt-in plaintiffs that they may be held liable for

the payment of Abercrombie's costs associated with this lawsuit if Abercrombie prevails.  See

Robbins-Pagel v. Wm. F. Puckett, Inc., 2006 WL 3393706, at *1 (M.D. Fla. Nov. 22, 2006)

(holding that the plaintiff's proposed notice was inadequate because it failed to inform plaintiff

that, if they did opt-in and were unsuccessful on the merits of their claim, they may be

responsible for the defendants' costs.)[29]

### 2. *Plaintiffs' Proposed Notice Improperly Indicates That Potential Opt-In Plaintiffs Must Be Represented By Plaintiffs' Counsel.*

Plaintiffs' proposed notice also fails to clearly inform the putative class members that

they have a right of representation in this litigation by counsel of their own choosing.  In fact,

Plaintiffs' proposed notice specifically states in the "Your Legal Representation If You Join"

paragraph that "[i]f you choose to join this case by filing a Plaintiff Consent Form, you *will* be

agreeing to representation by Plaintiffs' Counsel."  This language misleads potential opt-in

plaintiffs to believe that they must be represented by Plaintiffs' counsel when that is not required

by law.  To be sure, notices approved by courts in other collective actions have confirmed that

named plaintiffs are required to make this point clear to putative class members.  See e.g.

Gjurovich v. Emmanuel's Marketplace, Inc., 282 F.Supp.2d 101, 107 (S.D.N.Y. 2003) (revising

plaintiff's proposed notice to state that opt-in plaintiffs may join the class with counsel of their

own choosing).[30]

---

[29]  Copy attached to the Jones Affirmation as Exhibit O.

[30]  See also Heitman v. City of Chicago, 2004 WL 1718420 at *3 (N.D. Ill. Jul. 30, 2004) (holding that the named plaintiffs' proposed notice to potential opt-in plaintiffs should be revised to indicate that they have a right to be represented by counsel of their own choosing), a copy of which is attached to the Jones Affirmation as Exhibit P; Schwed v. Gen. Elec. Co., 159 F.R.D. 373, 380 (N.D.N.Y. 1995) (approving a notice that states that each opt-in plaintiff is entitled to be represented by the named plaintiffs' counsel or by counsel of his or her own choosing).

### 3. Minimal Or Lacking Information In The Notice Regarding Abercrombie's Position Is Unfairly Prejudicial.

While Plaintiffs' proposed notice does include a brief statement that Abercrombie denies Plaintiffs' allegations of overtime violations, fairness dictates that Abercrombie be permitted to further describe its position in the litigation, including any particular defenses it believes it may have. Abercrombie should also be permitted to state that it believes it has complied with the FLSA in good faith. Indeed, because this may be the first communication potential opt-in plaintiffs receive about this lawsuit, it is particularly critical that the notice contain a full and balanced disclosure of both parties' position in the matter. See e.g. Belcher v. Shoeney's, Inc., 927 F.Supp.249, 253 (M.D. Tenn. 1996) (authorizing notice that included statement of employer's affirmative defenses); Belt v. Emcare, Inc., 299 F.Supp.2d 664, 671 (E.D. Tenn. 2003) (approving notice that described defendant's affirmative defenses).

### D. Even If This Case Is Deemed Appropriate For Preliminary Certification Of A Collective Action, Discovery Should Be Limited Only To Names And Addresses Of Putative Class Members.

Plaintiffs' request for discovery of putative class members' "name, address, telephone number, dates of employment…, location of employment, date of birth, and last four digits of their Social Security number" is overbroad. In particular, Abercrombie should not be required to disclose exceptionally private personal information regarding its current and former employees' dates of birth, social security numbers and personal phone numbers. See Chowdhury v. Duane Reade, Inc., 2007 WL 2873929, at *2 (S.D.N.Y. Oct. 2, 2007) (permitting disclosure of potential opt-in plaintiffs' names and addresses).[31] Courts typically find discovery of putative class members' names and addresses to be sufficient to provide notice of a collective action. See e.g.

---

[31] Copy attached to the Jones Affirmation as Exhibit Q.

Hoffmann-La Roche, Inc., 493 at 170 (allowing discovery of the names and address of potential plaintiffs).[32]

First, this is not a collective action asserting claims of age discrimination pursuant to the Age Discrimination in Employment Act.  The dates of birth of putative class members are wholly irrelevant to Plaintiffs' claims that Abercrombie failed to pay them overtime compensation they were allegedly due.  Nor is such information necessary to allow Plaintiffs to facilitate notice of a collective action to potential opt-in plaintiffs.  Plaintiffs' request for disclosure of such sensitive birth date information should, therefore, be denied.

Similarly, the social security numbers of the putative class members are exceedingly private information subject to significant protection from disclosure under the law given the potentially large costs associated with identity theft and fraud that have become paramount in today's society.  Indeed, the State of New York recently passed a law that effectively forbids employers from publishing their employees' social security numbers and requiring them to take certain steps to protect the confidentiality of that information.  See New York Gen. Bus. Law § 399-dd.  There is no rational reason why the Plaintiffs need to invade potential plaintiffs' privacy rights by requiring Abercrombie to disclose their social security numbers.  The provision of names and last known address should be more than sufficient to allow Plaintiffs to locate all of the putative class members and notify them of the preliminary certification of a collective action that they may or may not wish to join.  Disclosure of sensitive personal information such as social security numbers is unnecessary and overly invasive and should not be permitted.  See

---

[32]   See also Carter v. Indianapolis Power & Light Co., 2003 WL 23142183, at *4 (S.D.Ind. Dec. 23, 2003) (allowing discovery of the names and address of potential plaintiffs), a copy of which is attached to the Jones Affirmation as Exhibit R; Laroque v. Domino's Pizza, LLC, 2008 WL 2303493, at *10 (E.D.N.Y. May 30, 2008) (same), a copy of which is attached to the Jones Affirmation as Exhibit S.

Damassia v. Duane Reade, Inc., 2006 WL 2853971, at *8 (S.D.N.Y. Oct. 5, 2006) (finding that "it is unnecessary and inappropriate to provide Social Security numbers...").[33]

The disclosure of Abercrombie's current and former employees' personal phone numbers would also constitute a significant invasion of those individuals' privacy rights. As anyone who has experienced a call at home from a mere telemarketer can attest, such calls are highly intrusive. A call from an unknown attorney requesting that they join a lawsuit against their current or former employer has the potential to be even more so. This is particularly true for those current and former employees of Abercrombie who have provided only their personal cellular telephone numbers to Abercrombie (as Abercrombie employees commonly do). Notification of this litigation via U.S. mail will serve the same purpose of notifying putative class members of the existence of this action, without unduly intruding upon their personal lives. Provision of potential opt-in plaintiffs' telephone numbers to Plaintiffs' counsel should not, therefore, be permitted.

## IV.    **CONCLUSION**

Plaintiffs have not met their burden for certification as an FLSA collective action because they are not similarly situated to all the LPAs in New York and New Jersey. The attached declarants demonstrate that the LPAs duties vary from store-to-store and person-to-person. The U.S. Department of Labor officially opined as to the exempt duties of loss prevention employees. The declarants describe duties consistent with the duties deemed to be "exempt" duties by the U.S. Department of Labor. Additionally, Plaintiffs allegations of altered time sheets and working off-the-clock are not shared by other LPAs. Thus, those claims too are not appropriate for an FLSA collective action.

---

[33]    Copy attached to the Jones Affirmation as Exhibit T.

Thus, for the foregoing reasons, Plaintiffs' Motion for Designation of FLSA Claims as Collective Action and Authority to Send Notice to Similarly Situated Employees should be denied.

VORYS, SATER, SEYMOUR AND PEASE LLP
Attorneys for Defendants

*/s/* Sandra J. Anderson
By: Sandra J. Anderson  (0002044)
Allen S. Kinzer  (0040237)
Stacia M. Jones  (0072401)
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1006
Telephone:  (614) 464-6405

BOND, SCHOENECK & KING, PLLC
Attorneys for Defendants
John S. Ho (JH 7831)
330 Madison Avenue, 39th Floor
New York, NY  10017-5001
Telephone:  (646) 253-2320
Email:  jho@bsk.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was electronically filed through the Court's ECF system and served this 11th day of August, 2008 by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/* Sandra J. Anderson
Sandra J. Anderson
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1006
Telephone:  (614) 464-6405