UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

                                                               08 CV 01859 (PKC) (AJP)

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

                Plaintiffs,                          **AFFIRMATION OF**
                                                   **ATTORNEY STACIA**
      -against-                                      **M. JONES**

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
                  d/b/a Abercrombie & Fitch,
                  Abercrombie, Hollister and Ruehl,

                  Defendants.
-----------------------------------------------------------------------X

      STACIA M. JONES, an attorney duly admitted pro *hac vice* to practice before this Court,

affirms as follows under penalties of perjury:

    1.    I am an attorney with VORYS, SATER, SEYMOUR AND PEASE LLP, attorneys for

Defendants in the above-captioned matter. I respectfully submit this Affirmation in support of

Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Certification

Pursuant to the FLSA, for Court-Facilitated Notice to Similarly Situated Persons, and for

Expedited Discovery.

    2.    Annexed hereto as exhibits are true and accurate copies of the following documents

        • Exhibit A      Robert Ruiz Declaration (with Exhibits 1 through 9)

        • Exhibit B      Matt Yount Declaration

1

- Exhibit C    Declarations of Michael Barrett, Joseph Gandolfo, Juliette Hackett, Shaji Mathew, Felix Ramirez, Jamie Van Dusen and Andre Walker

- Exhibits D
  through T    Unreported Cases

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
August 11, 2008

VORYS, SATER, SEYMOUR AND PEASE LLP
Attorneys for Defendants

*/s/* Stacia M. Jones
By: Stacia M. Jones  (0072401)
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1006
Telephone:  (614) 464-5492

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

08 CV 01859 (PKC) (AJP)

Individually and on behalf of all others similarly situated,
And

**DECLARATION OF ROBERT RUIZ**

KENNETH FINGERMAN,

        Plaintiffs,

  -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
        d/b/a Abercrombie & Fitch,
        Abercrombie, Hollister and Ruehl,

        Defendants.
-----------------------------------------------------------------------X

      I, Robert Ruiz, being first duly cautioned and sworn, and being more than age eighteen

and competent to testify about the matters contained herein, hereby declare and state as follows

upon personal knowledge or information:

      1.      I am currently employed by Abercrombie & Fitch ("Abercrombie" or

"Company") as a Regional Loss Prevention Manager ("RLPM").

      2.      Abercrombie operates five brands which have separate and distinct stores:

Abercrombie & Fitch, Hollister, abercrombie, Ruehl No. 925 and Gilly Hicks.  The Abercrombie

& Fitch brand is a fashion-oriented casual apparel business directed at 18 to 22 year olds with a

youthful lifestyle based on an East Coast heritage and Ivy League traditions.  The abercrombie

"kids" brand is based on the tradition of Abercrombie & Fitch, but targets 7 to 14 year-olds.



1



Hollister is a West Coast oriented lifestyle brand targeted at 14 to 18 year-olds and it embodies the laid-back California surf style. Ruehl targets customers 22 to 35 years old, and the merchandise is a mix of business casual and trendy fashion created to appeal to the post-college consumer. Finally, Gilly Hicks, which opened its first store in 2008, specializes in women's intimate apparel, loungewear and personal care products. As of July 2008, Abercrombie operated 27 Abercrombie & Fitch stores, 19 abercrombie stores, 35 Hollister stores, 4 Ruehl No. 925 stores and 1 Gilly Hicks store in the New York/New Jersey Region.

3.      In my position as RLPM, I am responsible for stores in New York, New Jersey, and London, England. I am the only RLPM in my region.

4.      I am part of Abercrombie's Loss Prevention Department. That Department consists of various personnel (both management and non-management) who are responsible for carrying out the loss prevention initiatives of a multi-billion dollar company that suffered more than one hundred million in shrink (defined below) losses between February 2007 and February 2008. Needless to say, the effective implementation of loss prevention and shortage reduction initiatives in stores throughout the country are essential to the profitability of the Company. The work performed by the Department, especially at the store level, is directly related to the general business operations and to the success of the Company. The lower the loss, the higher the probability.

5.      The Department is divided in two – the East Coast and the West Coast. My region is on the East Coast. We have Loss Prevention Agents ("LPAs") who work in different areas throughout the country. I currently have about 30 LPAs in my region. Those LPAs report to one of two Loss Prevention Managers ("LPMs") or a District Loss Prevention Manager ("DLPM"). The LPMs and DLPM in my region report to me and are responsible for the general



management of the various LPAs that work at the store. The Fifth Avenue store is the only store in the New York/New Jersey region ("NY/NJ Region") that has an LPM assigned to it. The only other LPM in this region is stationed at the Roosevelt Field Mall and oversees the loss prevention efforts of LPAs at each of the four Abercrombie stores in that mall. The Fifth Avenue store also employs a Loss Prevention Investigator ("LPI"), which is the only position of its kind in the NY/NJ Region. The only other position of this nature is a Regional Loss Prevention Investigator position which has responsibility for the entire NY/NJ Region outside the Fifth Avenue store. That position is currently vacant.

6. I have worked in the Department for about five years. I was originally hired as a Security Supervisor, which is a position that no longer exists at Abercrombie, but which is equivalent to the LPA position that currently exists. The Security Supervisor position was later titled Loss Prevention Supervisor ("LPS") before it finally became known by its current LPA title. Because of my prior experience as a Security Supervisor and subsequent experiences as a manager in this region, I can attest that the duties required of LPAs, and how they execute those duties, are substantially the same today as they have been over the past six years. The only significant difference is that we have provided more guidance to the LPAs over the more recent years; but, at no time has that guidance been a regimented schedule of duties from which the LPAs/LPSs/Security Supervisors had no independence. I have not given any binder or other document to the LPAs/LPSs/Security Supervisors in my region to guide them in their every duty. Also, as indicated above, LPAs, LPSs and Security Supervisors are the same.

7. In the Loss Prevention Department, our main focus is "shrink." "Shrink" is the merchandise that is charged to a particular store, but later cannot be accounted for through sales, transfers, and markdowns. The merchandise may be missing for a variety of reasons, including

3



employee theft, shoplifting or because of paperwork error or a mistake at the register. LPAs are tasked with reducing the shrink in the stores to which they are assigned to zero and they do that by targeting the causes of shrink in their particular stores and taking steps to address those causes. The following are the three major causes of shrink:

    a.  External. External shrink may be caused by shoplifting, price ticket switching, and burglary.

    b.  Internal. Internal shrink may be caused by associate theft, discount abuse, and under-ringing at the cash register.

    c.  Operational. Operational shrink may be caused by poor cash register techniques and mistakes in the completion of paperwork or inventory.

8.    LPAs work at the store level and are assigned to work in specific stores. They have ultimate responsibility for all loss prevention efforts and initiatives in their assigned stores. In particular, LPAs are responsible for implementing loss prevention and shortage reduction programs to reduce overall shrink at the stores. The implementation of these programs involves the development of initiatives or efforts specific to each store to combat existing shrink and prevent other potential causes of shrink from occurring. LPAs are also responsible for providing regular training and guidance to store managers and employees on loss prevention programs, issues facing the particular stores, and strategies for preventing, detecting and ending shrink at the stores. This training involves new employee orientation efforts as well as continuing training and education. LPAs detect and prevent internal, external and operational shrink in various ways. Depending on the type of shrink at issue, LPAs may monitor employee or customer conduct, review internal merchandise documentation for potential error, dishonesty and theft, investigate suspicious conduct and take appropriate action to address employee theft or



4

apprehend and prosecute customers who steal merchandise. LPAs direct store management and employees in loss prevention efforts and hold them accountable for reaching the Company's loss prevention goals. LPAs are directly responsible for the success of loss prevention initiatives in their stores and, thus, for the profitability of stores and, ultimately, the success of the stores. Stores that experience high shrink may be dropped to a lower store ranking (which translates into fewer resources to operate) and management bonuses may be affected.

9.    LPAs are required to exercise independent judgment and discretion every day. LPAs are not security guards and they do not follow a set formula that dictates their daily activities. LPAs are to be constantly reviewing and analyzing the current loss prevention problems, and determining the best way to help the stores improve. If the LPAs do not use their skill, training, and experience to make independent judgments, then they will not be able to effectively address the loss prevention problems specific to their stores or to build prosecutable cases when there is loss. In other words, they will not meet the Company's expectations of them.

10.    The work the LPAs perform is office or non-manual work.

11.    How LPAs carry out their duties vary greatly.

        a.    LPAs who work at Abercrombie's Fifth Avenue location in New York, New York work in only one store. The Fifth Avenue Store is the largest in the region, with approximately 1,400 employees and managers, four floors of shopping, three stock rooms, and totals 35,000 square feet. There are also an additional two floors of office space in an adjacent building that houses the offices of several higher level managers employed at the Fifth Avenue store, interview rooms, meeting/conference rooms and workspaces for various other Abercrombie employees who do not actually

5



perform work directly related to the Fifth Avenue store itself (e.g. clothing designers for the Company). The typical Abercrombie store has one shopping floor, one stock room, around 50 employees, and about 3,000 square feet of shopping. None of the other stores in the NY/NJ Region have interview rooms, meeting/conference rooms or other workspaces for employees. Nor do they house any Abercrombie employees who are not directly involved with the stocking and sale of the Company's merchandise at those stores. Also, the Fifth Avenue store is the largest volume store in the NY/NJ Region. The volume and customer traffic in the Fifth Avenue location make that store equivalent to an entire region, which could include about 40 stores. The typical Abercrombie store has one store manager, around two assistant managers, and a manager-in-training. The Fifth Avenue store has about 60 managers acting as store or assistant-level managers, and higher. Also, the Company typically assigns a district manager to manage around eight stores and a regional manager to about six districts. Fifth Avenue has four district managers and one regional manager dedicated to Fifth Avenue alone. The Fifth Avenue store also has a Visual Manager assigned to it who is charged with ensuring that the store's merchandising and visual presentation meet the Company's standards. Most Abercrombie stores in my region do not have Visual Managers. The Fifth Avenue store is the only 24-hour operation. Most nights, overnight employees work to restock merchandise on the floor and ensure that all merchandise is properly presented according to



6

Company standards prior to the next shopping day. While a full restocking operation may not occur at the Fifth Avenue store every night of the year, one or more Abercrombie employees are always present in the store at all hours. None of the other stores in the NY/NJ Region have this type of regular round-the-clock presence. While some of the larger stores may have employees who work through the night from time to time to set new merchandise out, or restock existing merchandise on the sales floor, they do not do so on a nightly or even weekly basis. On nights when no restocking operation is occurring at those stores, there are not any Abercrombie employees present at the store during the overnight hours.

b.　Because of the size of the Fifth Avenue store and the huge potential for loss, there are multiple LPAs, about 12 currently, who work in the store. The LPAs in Fifth Avenue perform tasks similar to the LPAs in other stores, but do so in more of a team format. In addition, they have job duties that are not performed by LPAs at other stores. For example:

　　i.　During their shifts, there is one Fifth Avenue LPA assigned at a time to watch monitors for 55 surveillance cameras that are positioned throughout the store. They use the cameras to detect theft and other types of loss, and to spot security problems.

　　ii.　LPAs at Fifth Avenue also monitor door alarms that sound when employees and customers access inappropriate exits. They are also responsible for the lost and found; there are 40 to 50 items lost in the store each day. They also sign out store keys and sensor guns.



iii.    Fifth Avenue LPAs may be assigned to work at the front door as a "greeter" to check the personal items of employees exiting the store.

iv.    Fifth Avenue LPAs closely monitor shipment when it is delivered to the store. They stay with the shipment to make sure that the shipment is as indicated in the paperwork. In other locations, LPAs are responsible to make sure the shipment is as stated in the paperwork, but they do not have to stay with the shipment and watch it as it is placed in the store.

c.    Fifth Avenue has an Overnight LPA position. No other store in the NY/NJ Region has such a position. Over the past few years, there has usually been one LPA who works the overnight shifts at Fifth Avenue. At times, there been two LPAs working at the same time on the overnight shift. The overnight LPA is responsible for the entire Fifth Avenue facility during the overnight hours. The store is closed to the public during this time, so the overnight LPA's focus is primarily on losses caused internally. The overnight LPA position is important because during the overnight hours, there are fewer store managers in the store and more places for individuals to hide and attempt to cause loss to the Company or do other things that might harm the store or its employees.

d.    Since November 26, 2006, LPAs who work in the Fifth Avenue store have been required to record their time worked each day by clocking in an out at one of the store's computerized cash registers. LPAs working at other



8

stores in the New York and New Jersey Region during that same time frame record their hours worked on time sheets that are then submitted to Abercrombie's corporate headquarters for payroll processing.

e.  LPAs that work at the Company's South Street Seaport ("SSS") store in New York, New York, are also assigned to work only at one store, but are oftentimes borrowed out to work at other stores. SSS is also a large store (although smaller than the Fifth Avenue store) and requires more than one agent to be assigned primarily to that store alone. There are two LPAs currently assigned to SSS.

f.  LPAs working in stores other than SSS and Fifth Avenue are typically responsible for two to three stores, with the exception of two agents in New York; one of whom is assigned to one store because of the huge shrinkage problem in the store and the other because the store in which she works is a new Abercrombie brand concept, Gilly Hicks. Those LPAs with multiple stores travel from store to store each week or as often as daily depending on the loss prevention needs and issues facing each particular store at any given time. All of the LPAs that work outside of the SSS and Fifth Avenue stores are the only agent assigned to their respective stores. They do not, therefore, share their loss prevention duties with any other LPA and are solely responsible for all loss prevention efforts in the stores to which they are assigned. Store management relies on them alone for loss prevention direction and assistance. Some smaller



stores and/or stores with a lower shrink rate are not assigned any LPAs at all.

g.    In addition, how LPAs roll out loss prevention programs and initiatives depends on factors particular to the loss problems in each of their specific stores. They vary based on the number of employees that work in the store, the volume of business the store conducts, the area in which the store is located, the dedication of the store management team, and the types of employees hired. For example, there is a store in New York that tends to have a more physically aggressive customer base. The agent assigned to that store has to take that into account and tailor his efforts and the loss prevention programs accordingly. LPAs cannot simply roll out a program in the general manner provided by the Company and cannot roll it out based on what works in a different store. Instead, loss prevention programs and initiatives will only be successfully implemented if the LPAs use independent judgment to analyze their specific stores and then to tailor the programs and initiatives to their stores.

12.    There is some non-loss-prevention work the LPAs perform in their stores. For example, at Fifth Avenue, the LPAs are responsible to collect witness statements when an employee complains to an LPA, regardless if the complaint regards a loss prevention issue. In the other stores, store managers regularly call upon LPAs for their input on discipline, investigations, and other such employee matters. When they are called upon, LPAs give managers guidance on how to address the different matters.



10

13.    I have worked in loss prevention for eleven years. Prior to working for Abercrombie, I was a Regional Investigator for Guess. When I began work for Abercrombie I was a Security Supervisor, which is the same as today's LPA and the LPS position before that. When I was a Security Supervisor, I was responsible for three stores in New York, which included stores in the Palisades and Westchester malls. I did everything I now require my LPAs to perform in their various stores, including rolling out loss prevention initiatives, tailoring those initiatives to the problems in each of the three stores, and preventing, detecting and addressing internal, external and operational losses. The only thing I did different from what most LPAs do today is that I interviewed internal suspects. The LPAs today interview only external suspects, unless they have a certification to interview internal suspects.

a.    When I was a Security Supervisor, I exercised independent judgment and discretion. I was responsible for three stores and managing the losses in those stores. To do that, I partnered with store management, trained them and the employees in the store on loss prevention initiatives and programs particular to their respective stores, provided guidance to managers and employees in the stores, and observed and pointed out loss prevention problems in the store. I also reviewed reports and logs to detect potential loss and to monitor compliance with loss prevention initiatives. In some of the very early years, we did not have the general shrinkage reduction programs that we have now. When we did not have the programs, we were responsible to analyze our respective stores and create shortage reduction programs to effectively implement so that the shrinkage problem was addressed.

11

b.    Also, I traveled to other stores throughout the Company that were not assigned a LPA to conduct interviews of internal suspects. I also went to other stores in the Company to assess the loss prevention problems in those stores and to guide store management in what they needed to do to address the problems I identified. Traveling to other stores to conduct this type of analysis and to give guidance has been a function that LPAs, who work in stores other than Fifth Ave., have continued to do since the time I was a Security Supervisor. Sometimes when we travel to other stores, we conduct a "blitz," which involves a handful of LPAs who go to a store that has no assigned LPA and/or has suffered a high rate of merchandise loss and who work in those stores to evaluate and detect the reasons for the loss and develop policies or procedures to prevent that loss from occurring in the future. A blitz typically only requires the LPA to go to another store for a single shift and is focused on a particular issue or problem such that it does not involve the "borrowed" LPAs assuming all responsibility for the wide range of loss prevention duties at the store.

c.    As a former Security Supervisor and in my current role as a RLPM, I have observed that the amount of dependence store managers have on LPAs directly relates to the individual LPA's competence level. Store managers with LPAs who are less competent are less likely to call on the LPAs. Those of us, however, who are competent and effectively address loss prevention issues in the stores have considerable interaction with store managers, are depended upon to give guidance, and are constantly



12

contacted by store management to address loss prevention and operational issues. In fact, I can recall as a Security Supervisor that store managers would often call me instead of their stores' district managers on operational issues (e.g., running the cash register) because they trusted me and knew I would be responsive.

14.   In my region, I try to hire LPAs with prior experience and demonstrated skill to work in the stores outside of the Fifth Avenue store. The LPAs have to use considerable skill to make the types of independent judgment necessary to control shrink and other loss prevention problems in their different stores. For Fifth Avenue, we do not require the same level of experience and skill. Although the LPAs assigned to that store must also use skill-based independent judgment to effectively complete their jobs, they work in a team format and there is assistance more readily available to them. Also, some of the tasks performed at Fifth Avenue, such as watching employees and customers on camera and searching bags at the front door, helps LPAs without much experience to hone their detection skills so that they can better determine when there are potential problems.

15.   According to Abercrombie's records, Abercrombie hired Shoneca Davis on August 20, 2006 as an LPA at its Short Hills Mall stores. On March 11, 2007, Ms. Davis was transferred to the Fifth Avenue store at her own request. Ms. Davis resigned her employment with the Company, effective August 9, 2007.

16.   According to Abercrombie's records, Abercrombie hired Dawud Eudelle on September 18, 2005 as an LPA at its South Street Seaport store. On January 29, 2006, Mr. Eudelle transferred to the Fifth Avenue store. At the Fifth Avenue store, Mr. Eudelle was



13

assigned to work the overnight shift.  Mr. Eudelle's employment with Abercrombie was terminated, July, 2008, for repeated unprofessional conduct.

17.     According to Abercrombie's records, Abercrombie hired Jaclyn Pagnotta on June 4, 2006 as an LPA at its South Street Seaport store.  On December 24, 2006, Ms. Pagnotta was transferred to the Fifth Avenue store.  Ms. Pagnotta resigned her employment with the Company, effective March 27, 2007.

18.     According to Abercrombie's records, Abercrombie hired David Pomales on July 31, 2005 as an LPA at its South Street Seaport store.  On September 18, 2005, Mr. Pomales was transferred to the Fifth Avenue store.  Mr. Pomales currently remains employed by the Company at the Fifth Avenue store.

19.     Prior to November 26, 2006, Abercrombie paid its LPSs on a salary basis and classified them as exempt from the Fair Labor Standards Act's ("FLSA") overtime pay requirements.  Accordingly, Abercrombie paid its LPSs a fixed salary that compensated them for any hours they worked in a given work week.  In November 2006, Abercrombie reviewed its LPS position and, while it believed its LPS employees were properly classified as exempt, voluntarily decided to reclassify that position to a non-exempt status.  This classification change was made effective November 26, 2006.  From what I recall, around this same time, Abercrombie changed the LPS position title to LPA without any change in duties.  Abercrombie thereafter required its LPAs to record all their hours worked on time sheets or, if employed at the Fifth Avenue store, by clocking in and out at a cash register located in the store.  Abercrombie continued to pay its LPAs a base salary, but also began paying them "Supplemental Pay" to account for any overtime hours worked.  Abercrombie provided all LPAs with a Supplemental Pay Acknowledgement form in November 2006 describing this new method of compensation



14

and has since provided that same form to all LPAs upon hire. Regardless of the method of compensation utilized by the Company, my understanding is that, both before and after November 26, 2006, Abercrombie has compensated all of its LPAs at a rate of at least $455 per week.

20.     Abercrombie provides a copy of its Associate Handbook to all employees upon hire. A true and accurate copy of Abercrombie's Overtime and Record of Hours Worked policies are attached hereto as Exhibit 1.

21.     True and accurate copies of the Orientation Checklists signed by Ms. Davis, Mr. Eudelle, Ms. Pagnotta and Mr. Pomales are attached hereto as Exhibits 2, 3, 4 and 5, respectively.

22.     True and accurate copies of the Supplemental Pay Acknowledgement Forms signed by Ms. Davis, Mr. Eudelle, Ms. Pagnotta and Mr. Pomales are attached hereto as Exhibits 6, 7, 8 and 9, respectively.

23.     I voluntarily spoke with Stacia Jones, counsel for my employer Abercrombie, with respect to the issues set forth in this Declaration. Ms. Jones informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of <u>Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation if the Court allows it and that I could be entitled to monetary relief if I opt in and the plaintiffs are successful. Also, Ms. Jones informed that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I



experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statements in this Declaration. Ms. Jones told me that she does not represent me individually. She only represents the Company

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
**Robert Ruiz**

_____
**Date**

16

Your Social Security Number
For Proof of Employment *plus* Income
1) Visit www.theworknumber.com/employee or call 1-800-367-2884
2) Enter the following information:
      Employer Code: **10902**
      Your Social Security Number
      Your PIN (*Birth Month, Birth Day, and last four digits of your social security number → MM-DD-####*)
3) Select to obtain a Salary Key – Write down the salary key given to you
4) Give the person needing proof of your employment and income (the verifier) the following information:
      Your Social Security Number:
      Employer Code: **10902**
      Your Salary Key (from #3 above)
      The Work Number Access Options:
- www.theworknumber.com/verifier
- 800-367-5690
- 900-555-9675

## PAY, HOURS, AND ATTENDANCE

**Your Paycheck**
You will receive a paycheck on a bi-weekly basis. Your manager will tell you what your rate of pay will be. Each pay period begins on a Sunday and ends on a Saturday. Any questions about your paycheck should first be discussed with your Store Manager if appropriate. If the pay issue is not satisfactorily resolved, you may discuss the problem with your District Manager, the Store Communications Department or Human Resources. You are encouraged to keep records of hours worked in case you have a discrepancy in your paycheck. See the Company directory for contact information.

**Privacy of Confidential Records**
We are committed to protect your privacy and will not share your personnel records or compensation information to anyone except authorized managers and government agencies. As part of our efforts to safeguard employment related information, you are asked not to disclose your private information with anyone except authorized managers. Unauthorized access or disclosure of confidential records (personnel file contents, etc.) may result in disciplinary action up to and including termination.

**Overtime**
Abercrombie & Fitch pays overtime to non-exempt associates in a manner consistent with federal and state laws. More information about overtime pay is provided in the Overtime Exemption Definitions table in the General Information section of this handbook. If you have questions about overtime pay, contact your manager or Human Resources.

**Record of Hours Worked**
Non-exempt and Supplemental Pay (see Overtime Exemption Definitions table in the General Information section for a definition of "Supplemental Pay") associates are required to punch in and out for all hours worked. This is the official record of hours worked and serves as the basis of calculating pay. You must punch in at the beginning of your shift, punch out at the end of your shift and in and out for breaks as described in the section "Break & Meal Periods." All hours worked must be accounted for. Punching another associates' time or letting another associate punch your time is a violation of Company policy. If you should punch in or out at the wrong time (too early, too late, etc.) you may get an error message. If this happens, notify your manager immediately so your actual hours worked can be punched in/out properly and your paycheck will accurately reflect all actual hours worked. Any falsification or attempt to misrepresent hours worked is a violation of Company policy and will result in termination. Repeated failure to properly punch in and out for hours worked is considered a performance issue and may result in disciplinary action up to and including termination.

You are encouraged to retain the printout from your punches in case there are questions concerning your hours worked. Any discrepancies of hours worked must be brought to your supervisor's attention immediately, along with your record of hours worked so issues can be resolved in a timely manner. If you have any questions, contact Human Resources.

**EXHIBIT**

tabbies

1

Revised 9/06

### Abercrombie & Fitch
### ORIENTATION CHECKLIST
Page 1

NAME **Shoneca Davis**     STORE # **562**     DATE **8/21/06**

#### ORIENTATION OVERVIEW

We have achieved tremendous success because we have uncompromised standards for clean, easy to shop merchandise presentation and for friendly helpful customer service. And because we hire exceptional people to help maintain these standards and represent our brand with pride - cool people like you.

This orientation will take place during your first shift. The purpose of this orientation is to:

- Complete your new hire paperwork
- Provide you with a brief overview of your job responsibilities
- Inform you of essential Company policies and procedures
- Establish important job performance expectations
- Familiarize you with how the store works
- Answer any questions that you have

#### I. FORMS TO COMPLETE
(Manager: Place initials in the Sign-off column at left when the form has been completed)

| Sign-off | Paperwork | Description | Distribution |
|---|---|---|---|
| | Orientation Checklists - All Three Pages | As each form described on this page is completed, the manager should place his or her initials in the column to the left. This page, along with the other two Orientation Checklist pages, should be completed and signed per instructions. As associate and manager review the information on pages 2 and 3, the new associate must initial the box at the left of each discussion point listed. When all discussion points have been covered, the new associate and manager must sign where indicated. | Associate File |
| | Application Form | Associate must have a completed application form on file. An extra application form is enclosed in this new hire packet. | Associate File |
| | Associate's Personnel Action form (PAF) | Associate must complete all areas specified. Management completes remaining sections. Manager must key info into PAF immediately following orientation to generate new hire PAF so new associate can verify info and sign, (i.e., social security number, pay rate, etc). Print 2 copies of PAF-1st for associate's file and 2nd copy for associate. (Associates are responsible for updating personal info, i.e., address, phone number, etc. All Home Office correspondence will be sent to current address on file with Payroll department, i.e. all tax info including W-2's, stock info, etc. Refer to associate's last paycheck to verify address at Home Office.) | Associate File, |
| | W-4 | Complete for proper tax deductions: 0=more taxes deducted & possible refund; 1=less deducted during year & less refunded/possible payment required; exempt=no taxes deducted - must be full time student or making less than amount specified on W-4 at year end from all sources. Consult your accountant for complete tax filing instructions. | Payroll |
| | State/Local Tax | Complete required forms. Refer to the Required State Tax Forms list in this Forms Booklet. State and local tax forms should be ordered and kept in stock as a separate supply item by each store. | Payroll |
| | Minnesota Only- | Minnesota: Child Support Obligation Form - available through store supply #1046 | Associate File |
| | CA, WA, ID | Training Verification Worksheet - available through store supply #5048 | Associate File |
| | I-9 Immigration (Employment Eligibility Verification) | Proof that associate is eligible to work in US. Form must be filled out exactly as indicated in example. Original (white) copy should be placed in associate's personnel file. | White copy to Personnel File |
| | State Work Permit for Minors (if applicable) | Certificate may be required by state if new associate is under 18. If manager is not sure of state's minor work rules, refer to the handbook or call Human Resources. | Associate File |
| | Direct Deposit Authorization | Election to deposit paycheck in checking or savings accounts. A voided check must be attached to this form. This program is optional but highly recommended. | Payroll |
| | Stock Purchase Plan Enrollment Form | All part-time and full-time associates may choose to participate in this program by completing the form and sending it to Payroll. | Payroll |
| | Supplemental Pay (AM, MIT, Trainee only) | (For all states EXCEPT California) Associate must complete this form acknowledging that they are eligible for supplemental pay for any hours worked over 40. | Associate File |
| | Group Health Benefits | This is a reminder that if the associate does not receive a benefits packet within two weeks of their employment, they should contact Human Resources at 614-283-6623. | Associate Keeps |

*Place in Associate's File when Checklist is Completed and Signed*     ANF     Revised 1/05

PERSONNEL FILE

EXHIBIT

2

NEW HIRE FORMS - ALL ASSOCIATES

**ORIENTATION CHECKLIST, Page 2**                                   **(continued) --**

## II. COMPANY POLICIES AND PROCEDURES TO COVER
### New associates must be given time necessary to read the Store Associate Handbook.

The items below must be explained to the new associate by a member of management. Associate must initial each item to indicate it was covered and all questions were answered. Use the Employee Handbook as a talking point for this section. Refer to the appropriate page number (indicated at the right) and go through the detailed information for each section.

### Employment and Benefits

Handbook Page Number

☑ **Customer Service** - Review Service Standards and explain policies and procedures...........................................18-19

☐ **Look Policy** - Review Brand Rep position description and look guidelines.............................30-31

☐ **Partners in Growth** (pt only) - Explanation of flexible and fluctuating weekly scheduled hours for Brand Reps..........15

☐ **Discrimination & Harassment Policy** - Definition of policy including definition of sexual harassment and steps to report suspected violations.................................................7-9

☐ **Respect Policy** - Respecting others and their unique qualities...................................9-10

☐ **Americans with Disabilities Act** - Policy regarding equal treatment of disabled customers, applicants and employees...........10-11

☐ **Non-Fraternization Policy** (all members of store management) - Policy regarding relationships at work.........................42

☑ **Violations of Company Policy** - Grounds for termination. See "Introduction" and "Conduct" sections.........................3, 28-29

☐ **Performance or "Quality" Reviews/Pay Increases** - Brand Rep Quality Reviews will occur no less frequently than once per year. All managers are evaluated once a year in March. Pay increases are determined by Quality Review rating...................................12

☐ **Family Medical Leave Act** - Policy regarding associate leaves due to a personal serious medical condition or to care for family members with a serious medical condition. Associates expected to be off work for three or more days should discuss eligibility for coverage under FMLA with their manager and Human Resources....................................................16-17

☑ **SARP (401K Savings and Retirement Plan)** - Associates are eligible to participate in SARP after 1 year of service, if they are 21 years old and have worked 1,000 hours or more. Associates will be sent a packet of info to their home when they become eligible.................................................36-37

☑ **Associate Discount Info** - Abercrombie & Fitch and abercrombie store associates: 30% off original ticket price for all PT associates and 40% off the original ticket price for all FT associates. All stores: "AAA" Abercrombie Associate with Attitude - Special discount given periodically to associates to receive designated items at special offerings....................................32

### Loss Prevention

☑ **Bag/Coat Checks** - Associates must be accompanied by a manager and their bags and coats checked whenever they leave the store, including breaks.................................................20

☐ **What is Shrinkage?** Discuss store's current shrink - Review section of Store Associate Handbook..................................19

☐ **Store Loss Prevention Rules and Forewarned is Fairwarned** - Point out Loss Prevention Posters and take time to explain each rule..............20

☑ **How to Spot and Stop a Shoplifter** - Review sections of Store Associate Handbook.................................22-23

☑ **Sensormatic Systems** - Explain use and removal of sensors, how to approach customer if Sensormatic alarm sounds as they enter or leave store, and ink tags. All merchandise in the store must be tagged with a sensor at all times.................................................26

☐ **No Wearing Merchandise before Purchase** - Associates must never wear merchandise for any reason prior to purchasing the item.................................................20

☐ **Loss Prevention Hotline** - If you suspect any wrongdoing or policy violations, you must contact Loss Prevention at 800-666-4712 or immediately inform your manager.................................................24

*Place in Associate's File when Checklist is Completed and Signed*                        ANF                Revised 1/05

**NEW HIRE FORMS - ALL ASSOCIATES**

## ORIENTATION CHECKLIST, Page 3                    (continued)

(Continued) The items below must be explained to the new associate by a member of management. Associate must initial each item to indicate it was covered and any questions were answered. Refer to Handbook for detailed information where a page number is indicated to the right.

### Attendance, Work Schedule and Pay

☑ Schedule - See "Absence" section. Review how to request time off, posting of schedule, "call-ins", what to do when sick, must switch schedules with "like" person via manager (i.e., cashiers only switch with cashiers, men's department with men's department, etc.) and who to notify for schedule conflicts.............................................................................................16

☑ Attendance/Punctuality - Procedures for "calling off", importance of promptness (i.e., relieving associates for breaks, end of shifts, etc.) and consequences of excessive abuse.............................................................................................16

☑ Record of Hours Worked - Signing in and out at register, when to notify manager for help and meal breaks.................14-15

☑ Privacy of Confidential Information - Your paycheck is a confidential document.............................................................................................14

☑ Pay period/Pay day - See "Your Paycheck" section. Paid every 2 weeks. Associate picks up and verifies paycheck at store. Next payday is _____. All questions about checks must be forwarded to Store Manager. Review first paycheck carefully to verify social security number, address, pay rate, number of hours worked, etc.............................................................................................14

☑ Assistant Manager/MIT Pay (For all states EXCEPT California) - Assistant Managers receive a weekly base salary for all hours worked each week. Hours over 40 per week are paid at the Supplemental Pay rate.............................................................................................041

### Locations to Note

☑ Mall Parking Area - Where associates are required to park.

☑ Mall Entrance/Store Entrance - Which entrance associates use, note if there are different entrances for different times of day or different days of the week. Is there a doorbell at the store entrance?

☑ Lockers/Coat Area - Show location, give combination

☑ Break Area/Restrooms/First Aid - Show location and explain importance of cleanliness.

☑ Bulletin Boards/Zone Coverage Board - Show location.

☑ Telephones/Emergency Numbers/Fire Extinguishers - Show location.

### Fit Session/"AAA" Purchase

☑ New associates should try on a variety of items (i.e., bottoms, shirts, sweaters, etc.) to compare size and fit.

**By signing below, you acknowledge:**
- The items listed in the Orientation Checklist above have been explained to you in detail,
- You have received and been given an opportunity to read a copy of the Store Associate Handbook,
- You agree to abide by the statements and policies in the Store Associate Handbook,
- You are responsible for reporting violations of these policies to a member of management or the Human Resources Department
- You understand that Abercrombie & Fitch reserves the right to change its policies and benefits at any time without prior notice,
- You understand that employment with Abercrombie & Fitch is "at will" and that receipt of this handbook and signing this acknowledgement do not constitute a contract of employment.

| _(signature)_ | 8-21-06 | _(signature)_ | 8/21/06 |
|---|---|---|---|
| **Store Manager Signature** | **Date** | **Associate Signature** | **Date** |
| Hector Graciani | | Shoneca Davis | 8/21/06 |
| **Store Manager Name (Print)** | **Date** | **Associate Name (Print)** | **Date** |

*Place in Associate's File when Checklist is Completed and Signed*                    ANF    Revised 1/05

**PERSONNEL FILE**

# HOLLISTER Co.
## ORIENTATION CHECKLIST
### Page 1

NAME **Dawna Eudelle**    STORE # **529**    DATE **9/20/05**

### ORIENTATION OVERVIEW

We have achieved tremendous success because we have uncompromised standards for clean, easy to shop merchandise presentation and for friendly helpful customer service. And because we hire exceptional people to help maintain these standards and represent our brand with pride – cool people like you.

This orientation will take place during your first shift. The purpose of this orientation is to:

- Complete your new hire paperwork
- Provide you with a brief overview of your job responsibilities
- Inform you of essential Company policies and procedures
- Establish important job performance expectations
- Familiarize you with how the store works
- Answer any questions that you have

### I. FORMS TO COMPLETE
(Manager: Place initials in the Sign-off column at left when the form has been completed)

| Sign-off | Paperwork | Description | Distribution |
|---|---|---|---|
| DE | Orientation Checklists – All Three Pages | As each form described on this page is completed, the manager should place his or her initials in the column to the left. This page, along with the other two Orientation Checklist pages, should be completed and signed per instructions. As associate and manager review the information on pages 2 and 3, the new associate must initial the box at the left of each discussion point listed. When all discussion points have been covered, the new associate and manager must sign where indicated. | Associate File |
| DE | Application Form | Associate must have a completed application form on file. An extra application form is enclosed in this new hire packet. | Associate File |
| DE | Associate's Personnel Action form (PAF) | Associate must complete all areas specified. Management completes remaining sections. Manager must key info into PAF immediately following orientation to generate new hire PAF so new associate can verify info and sign, (i.e., social security number, pay rate, etc). Print 2 copies of PAF-1st for associate's file and 2nd copy for associate. (Associates are responsible for updating personal info, i.e., address, phone number, etc. All Home Office correspondence will be sent to current address on file with Payroll department, i.e., all tax info including W-2's, stock info, etc. Refer to associate's last paycheck to verify address at Home Office.) | Associate File |
| DE | W-4 | Complete for proper tax deductions; 0=more taxes deducted & possible refund; 1=less deducted during year & less refunded/possible payment required; exempt=no taxes deducted - must be full time student or making less than amount specified on W-4 at year end from all sources. Consult your accountant for complete tax filing instructions. | Payroll |
| DE | State/Local Tax | Complete required forms. Refer to the Required State Tax Forms list in this Forms Booklet. State and local tax forms should be ordered and kept in stock as a separate supply item by each store. | Payroll |
| DE | Minnesota Only | Minnesota: Child Support Obligation Form – available through store supply #1046 | Associate File |
| DE | CA, WA, ID | Training Verification Worksheet – available through store supply #5048 | Associate File |
| DE | I-9 Immigration (Employment Eligibility Verification) | Proof that associate is eligible to work in US. Form must be filled out exactly as indicated in example. Original (white) copy should be placed in associate's personnel file. | White copy to Personnel File |
| DE | State Work Permit for Minors (if applicable) | Certificate may be required by state if new associate is under 18. If manager is not sure of state's minor work rules, refer to the handbook or call Human Resources. | Associate File |
| DE | Direct Deposit Authorization | Election to deposit paycheck in checking or savings accounts. A voided check must be attached to this form. This program is optional but highly recommended. | Payroll |
| DE | Stock Purchase Plan Enrollment Form | All part-time and full-time associates may choose to participate in this program by completing the form and sending it to Payroll. | Payroll |
| DE | Supplemental Pay (AM, MIT, Trainee only) | (For all states EXCEPT California) Associate must complete this form acknowledging that they are eligible for supplemental pay for any hours worked over 40. | Associate File |
| DE | Group Health Benefits | This is a reminder that if the associate does not receive a benefits packet within two weeks of their employment, they should contact Human Resources at 614-283-6823. | Associate Keeps |

*Place in Associate's File when Checklist is Completed and Signed*

HOL

Revised 1/05

PERSONNEL FILE

EXHIBIT
3

**ORIENTATION CHECKLIST, Page 2**                                    **(continued) --**

## II. COMPANY POLICIES AND PROCEDURES TO COVER
### New associates must be given time necessary to read the Store Associate Handbook.

The items below must be explained to the new associate by a member of management. Associate must initial each item to indicate it was covered and all questions were answered. Use the Employee Handbook as a talking point for this section. Refer to the appropriate page number (indicated at the right) and go through the detailed information for each section.

### Employment and Benefits

Handbook Page Number

☑ Customer Service – Review Service Standards and explain policies and procedures.................16-17

☑ Look Policy - Review Brand Rep position description and look guidelines.................24-25

☑ Partners in Growth *(pt only)* – Explanation of flexible and fluctuating weekly scheduled hours for Brand Reps.................13

☑ Discrimination & Harassment Policy – Definition of policy including definition of sexual harassment and steps to report suspected violations.................6-8

☑ Respect Policy – *Respecting others and their unique qualities*.................6

☑ Americans with Disabilities Act –Policy regarding equal treatment of disabled customers, applicants and employees.................8-9

☑ Non-Fraternization Policy *(all members of store management)* – Policy regarding relationships at work.................37

☑ Violations of Company Policy – Grounds for termination. See "Introduction" and "Conduct" sections .................3, 23-24

☑ Performance or "Quality" Reviews/Pay Increases –Brand Rep Quality Reviews will occur no less frequently than once per year. All managers are evaluated once a year in March. Pay increases are determined by Quality Review rating.................11

☑ Family Medical Leave Act – Policy regarding associate leaves due to a personal serious medical condition or to care for family members with a serious medical condition. Associates expected to be off work for three or more days should discuss eligibility for coverage under FMLA with their manager and Human Resources.................15-16

☑ SARP (401K Savings and Retirement Plan) – Associates are eligible to participate in SARP after 1 year of service, if they are 21 years old and have worked 1,000 hours or more. Associates will be sent a packet of info to their home when they become eligible.................33-35

☑ Associate Discount Info – Hollister associates: 20% off original ticket price for all PT associates and 30% off the original ticket price for all FT associates. All stores: "AAA" Abercrombie Associate with Attitude - Special discount given periodically for associates to receive designated items at special offerings.................29-30

### Loss Prevention

☑ Bag/Coat Checks - Associates must be accompanied by a manager and their bags and coats checked whenever they leave the store, including breaks.................19

☑ What is Shrinkage? Discuss store's current shrink - Review section of Store Associate Handbook.................18

☑ Store Loss Prevention Rules and Forewarned is Fairwarned - Point out Loss Prevention Posters and take time to explain each rule.................20

☑ How to Spot and Stop a Shoplifter - Review sections of Store Associate Handbook.................20

☑ Sensormatic Systems - Explain use and removal of sensors, how to approach customer if Sensormatic alarm sounds as they enter or leave store, and Ink tags. All merchandise in the store must be tagged with a sensor at all times.................21

☑ No Wearing Merchandise before Purchase – Associates must never wear merchandise for any reason prior to purchasing the item.................19

☑ Loss Prevention Hotline - If you suspect any wrongdoing or policy violations, you must contact Loss Prevention at 800-666-4712 or immediately inform your manager.................20

*Place in Associate's File when Checklist is Completed and Signed*                    HOL          Revised 1/05

**ORIENTATION CHECKLIST, Page 3**                                      *(continued)*

---

(Continued) The items below must be explained to the new associate by a member of management. Associate must initial each item to indicate it was covered and any questions were answered. Refer to Handbook for detailed information where a page number is indicated to the right.

### Attendance, Work Schedule and Pay

☑ **Schedule** – See "Absence" section. Review how to request time off, posting of schedule, "call-ins", what to do when sick, must switch schedules with "like" person via manager (i.e., cashiers only switch with cashiers, men's department with men's department, etc.) and who to notify when schedule conflicts.................................................................................14

☑ **Attendance/Punctuality** - Procedures for "calling off", importance of promptness (i.e., relieving associates for breaks, end of shifts, etc.) and consequences of excessive abuse.................................................................................14

☑ **Record of Hours Worked** - Signing in and out at register, when to notify manager for help and meal breaks.................13-14

☑ **Privacy of Confidential Information** – Your paycheck is a confidential document.................................................13

☑ **Pay period/Pay day** – See "Your Paycheck" section. Paid every 2 weeks. Associate picks up and verifies paycheck at store. Next payday is _____. All questions about checks must be forwarded to Store Manager. Review first paycheck carefully to verify social security number, address, pay rate, number of hours worked, etc.................................................13

☑ **Assistant Manager/MIT Pay** (For all states EXCEPT California) – Assistant Managers receive a weekly base salary for all hours worked each week. Hours over 40 per week are paid at the Supplemental Pay rate.................................................39

### Locations to Note

☑ **Mall Parking Area** - Where associates are required to park.

☑ **Mall Entrance/Store Entrance** - Which entrance associates use, note if there are different entrances for different times of day or different days of the week. Is there a doorbell at the store entrance?

☑ **Lockers/Coat Area** - Show location, give combination.

☑ **Break Area/Restrooms/First Aid** - Show location and explain importance of cleanliness.

☑ **Bulletin Boards/Zone Coverage Board** - Show location.

☐ **Telephones/Emergency Numbers/Fire Extinguishers** - Show location.

### Fit Session/"AAA" Purchase

☑ New associates should try on a variety of items (i.e., bottoms, shirts, sweaters, etc.) to compare size and fit.

---

By signing below, you acknowledge:

- The items listed in the Orientation Checklist above have been explained to you in detail,
- You have received and been given an opportunity to read a copy of the Store Associate Handbook,
- You agree to abide by the statements and policies in the Store Associate Handbook,
- You are responsible for reporting violations of these policies to a member of management or the Human Resources Department
- You understand that Hollister reserves the right to change its policies and benefits at any time without prior notice,
- You understand that employment with Hollister is "at will" and that receipt of this handbook and signing this acknowledgement do not constitute a contract of employment.

| Store Manager Signature          9/20/05 | Associate Signature   Dawud Erdelle   9/20/05 |
| Store Manager Name (Print)  Michael Oliveras   9/20/05 | Associate Name (Print)  Dawud Erdelle   9/20/05 |

*Place in Associate's File when Checklist is Completed and Signed*          HOL          Revised 1/05

PERSONNEL FILE

NEW HIRE FORMS - ALL ASSOCIATES

## Abercrombie & Fitch
## ORIENTATION CHECKLIST
### Page 1

NAME Jaclyn Pagnotta     STORE # 5/29     DATE 6/06/06

### ORIENTATION OVERVIEW

We have achieved tremendous success because we have uncompromised standards for clean, easy to shop merchandise presentation and for friendly helpful customer service. And because we hire exceptional people to help maintain these standards and represent our brand with pride – cool people like you.

This orientation will take place during your first shift. The purpose of this orientation is to:

- Complete your new hire paperwork
- Provide you with a brief overview of your job responsibilities
- Inform you of essential Company policies and procedures
- Establish important job performance expectations
- Familiarize you with how the store works
- Answer any questions that you have

### I. FORMS TO COMPLETE
(Manager: Place initials in the Sign-off column at left when the form has been completed)

| Sign-off | Paperwork | Description | Distribution |
|---|---|---|---|
| | Orientation Checklists – All Three Pages | As each form described on this page is completed, the manager should place his or her initials in the column to the left. This page, along with the other two Orientation Checklist pages, should be completed and signed per instructions. As associate and manager review the information on pages 2 and 3, the new associate must initial the box at the left of each discussion point listed. When all discussion points have been covered, the new associate and manager must sign where indicated. | Associate File |
| | Application Form | Associate must have a completed application form on file. An extra application form is enclosed in this new hire packet. | Associate File |
| | Associate's Personnel Action form (PAF) | Associate must complete all areas specified. Management completes remaining sections. Manager must key info into PAF immediately following orientation to generate new hire PAF so new associate can verify info and sign, (i.e., social security number, pay rate, etc). Print 2 copies of PAF-1st for associate's file and 2nd copy for associate. (Associates are responsible for updating personal info, i.e., address, phone number, etc. All Home Office correspondence will be sent to current address on file with Payroll department, i.e., all tax info including W-2's, stock info, etc. Refer to associate's last paycheck to verify address at Home Office.) | Associate File |
| | W-4 | Complete for proper tax deductions: 0=more taxes deducted & possible refund; 1=less deducted during year & less refunded/possible payment required; exempt=no taxes deducted - must be full time student or making less than amount specified on W-4 at year end and from all sources. Consult your accountant for complete tax filing instructions. | Payroll |
| | State/Local Tax | Complete required forms. Refer to the Required State Tax Forms list in this Forms Booklet. State and local tax forms should be ordered and kept in stock as a separate supply item by each store. | Payroll |
| | Minnesota Only | Minnesota: Child Support Obligation Form – available through store supply #1046 | Associate File |
| | CA, WA, ID | Training Verification Worksheet – available through store supply #5048 | Associate File |
| | I-9 Immigration (Employment Eligibility Verification) | Proof that associate is eligible to work in US. Form must be filled out exactly as indicated in example. Original (white) copy should be placed in associate's personnel file. | White copy to Personnel File |
| | State Work Permit for Minors (if applicable) | Certificate may be required by state if new associate is under 18. If manager is not sure of state's minor work rules, refer to the handbook or call Human Resources. | Associate File |
| | Direct Deposit Authorization | Election to deposit paycheck in checking or savings accounts. A voided check must be attached to this form. This program is optional but highly recommended. | Payroll |
| | Stock Purchase Plan Enrollment Form | All part-time and full-time associates may choose to participate in this program by completing the form and sending it to Payroll. | Payroll |
| | Supplemental Pay (AM, MIT, Trainee only) | (For all states EXCEPT California) Associate must complete this form acknowledging that they are eligible for supplemental pay for any hours worked over 40. | Associate File |
| | Group Health Benefits | This is a reminder that if the associate does not receive a benefits packet within two weeks of their employment, they should contact Human Resources at 614-283-6623. | Associate Keeps |

*Place in Associate's File when Checklist is Completed and Signed*

ANF

Revised 1/05

PERSONNEL FILE

EXHIBIT
4
tabbies

**ORIENTATION CHECKLIST, Page 2**                                     **(continued)** –

## II. COMPANY POLICIES AND PROCEDURES TO COVER
### New associates must be given time necessary to read the Store Associate Handbook.

The items below must be explained to the new associate by a member of management. Associate must initial each item to indicate it was covered and all questions were answered. Use the Employee Handbook as a talking point for this section. Refer to the appropriate page number (indicated at the right) and go through the detailed information for each section.

### Employment and Benefits

Handbook Page Number

Customer Service – Review Service Standards and explain policies and procedures....................................16-17

Look Policy - Review Brand Rep position description and look guidelines.................................................24-25

Partners in Growth (pt only) – Explanation of flexible and fluctuating weekly scheduled hours for Brand Reps........13

Discrimination & Harassment Policy – Definition of policy including definition of sexual harassment and steps to report suspected violations.................................................................................................................................6-8

Respect Policy – Respecting others and their unique qualities...........................................................................8

Americans with Disabilities Act –Policy regarding equal treatment of disabled customers, applicants and employees............8-9

Non-Fraternization Policy (all members of store management) – Policy regarding relationships at work..................37

Violations of Company Policy – Grounds for termination.  See "Introduction" and "Conduct" sections ...............3, 23-24

Performance or "Quality" Reviews/Pay Increases –Brand Rep Quality Reviews will occur no less frequently than once per year. All managers are evaluated once a year in March.  Pay increases are determined by Quality Review rating......................................................11

Family Medical Leave Act – Policy regarding associate leaves due to a personal serious medical condition or to care for family members with a serious medical condition.  Associates expected to be off work for three or more days should discuss eligibility for coverage under FMLA with their manager and Human Resources.............................................................................................................15-16

SARP (401K Savings and Retirement Plan) – Associates are eligible to participate in SARP after 1 year of service, if they are 21 years old and have worked 1,000 hours or more.  Associates will be sent a packet of info to their home when they become eligible.....................................................................................................................33-35

Associate Discount Info – Abercrombie & Fitch and abercrombie store associates: 30% off original ticket price for all PT associates and 40% off the original ticket price for all FT associates.  All stores: "AAA" Abercrombie Associate with Attitude - Special discount given periodically for associates to receive designated items at special offerings....................................................................................................29-30

### Loss Prevention

Bag/Coat Checks - Associates must be accompanied by a manager and their bags and coats checked whenever they leave the store, including breaks....................................................................................................................19

What Is Shrinkage? Discuss store's current shrink - Review section of Store Associate Handbook.........................18

Store Loss Prevention Rules and Forewarned is Fairwarned –Point out Loss Prevention Posters and take time to explain each rule...............20

How to Spot and Stop a Shoplifter - Review sections of Store Associate Handbook...........................................20

Sensormatic Systems - Explain use and removal of sensors, how to approach customer if Sensormatic alarm sounds as they enter or leave store, and Ink tags. All merchandise in the store must be tagged with a sensor at all times...............................................................21

No Wearing Merchandise before Purchase – Associates must never wear merchandise for any reason prior to purchasing the item....................................................................................................................19

Loss Prevention Hotline - If you suspect any wrongdoing or policy violations, you must contact Loss Prevention at 800-666-4712 or immediately inform your manager.....................................................................................20

*Place in Associate's File when Checklist is Completed and Signed*                          ANF        Revised 1/05

**ORIENTATION CHECKLIST,  Page 3**                    *(continued)*

(Continued) The items below must be explained to the new associate by a member of management. Associate must initial each item to indicate it was covered and any questions were answered. Refer to Handbook for detailed information where a page number is indicated to the right.

### Attendance, Work Schedule and Pay

☒ Schedule – See "Absence" section.  Review how to request time off, posting of schedule, "call-ins", what to do when sick, must switch schedules with "like" person via manager (i.e., cashiers only switch with cashiers, men's department with men's department, etc.) and who to notify with schedule conflicts...................................................................................................................................14

☒ Attendance/Punctuality – Procedures for "calling off", importance of promptness (i.e., relieving associates for breaks, end of shifts, etc.) and consequences of excessive abuse..........................................................................................................14

☒ Record of Hours Worked – Signing in and out at register, when to notify manager for help and meal breaks................13

☒ Privacy of Confidential Information – Your paycheck is a confidential document....................................................13

☒ Pay period/Pay day – See "Your Paycheck" section.  Paid every 2 weeks.  Associate picks up and verifies paycheck at store.  Next paydate is _____.  All questions about checks must be forwarded to Store Manager.  Review first paycheck carefully to verify social security number, address, pay rate, number of hours worked, etc....................................................................................13

☒ Assistant Manager/MIT Pay (For all states EXCEPT California) – Assistant Managers receive a weekly base salary for all hours worked each week.  Hours over 40 per week are paid at the Supplemental Pay rate....................................................................39

### Locations to Note

☒ Mall Parking Area - Where associates are required to park.

☒ Mall Entrance/Store Entrance - Which entrance associates use, note if there are different entrances for different times of day or different days of the week.  Is there is a doorbell at the store entrance?

☒ Lockers/Coat Area - Show location, give combination

☒ Break Area/Restrooms/First Aid - Show location and explain importance of cleanliness.

☒ Bulletin Boards/Zone Coverage Board - Show location.

☒ Telephones/Emergency Numbers/Fire Extinguishers - Show location.

### Fit Session/"AAA" Purchase

☒ New associates should try on a variety of items (i.e., bottoms, shirts, sweaters, etc.) to compare size and fit.

---

**By signing below, you acknowledge:**
- The items listed in the Orientation Checklist above have been explained to you in detail,
- You have received and been given an opportunity to read a copy of the Store Associate Handbook,
- You agree to abide by the statements and policies in the Store Associate Handbook,
- You are responsible for reporting violations of these policies to a member of management or the Human Resources Department,
- You understand that Abercrombie & Fitch reserves the right to change its policies and benefits at any time without prior notice,
- You understand that employment with Abercrombie & Fitch is "at will" and that receipt of this handbook and signing this acknowledgement do not constitute a contract of employment.

| | | |
|---|---|---|
| Store Manager Signature | Date | Associate Signature | Date |
| Store Manager Name (Print) | Date | Associate Name (Print) | Date |

*Place in Associate's File when Checklist is Completed and Signed*                    ANF          Revised 1/05

## Abercrombie & Fitch
## ORIENTATION CHECKLIST
### Page 1

NAME David Ponales    STORE # 529    DATE 8-01-05

### ORIENTATION OVERVIEW

We have achieved tremendous success because we have uncompromised standards for clean, easy to shop merchandise presentation and for friendly helpful customer service. And because we hire exceptional people to help maintain these standards and represent our brand with pride – cool people like you.

This orientation will take place during your first shift. The purpose of this orientation is to:

- Complete your new hire paperwork
- Provide you with a brief overview of your job responsibilities
- Inform you of essential Company policies and procedures
- Establish important job performance expectations
- Familiarize you with how the store works
- Answer any questions that you have

### I. FORMS TO COMPLETE
(Manager: Place initials in the Sign-off column at left when the form has been completed)

| Sign-off | Paperwork | Description | Distribution |
|---|---|---|---|
| DP | Orientation Checklists – All Three Pages | As each form described on this page is completed, the manager should place his or her initials in the column to the left. This page, along with the other two Orientation Checklist pages, should be completed and signed per instructions. As associate and manager review the information on pages 2 and 3, the new associate must initial the box at the left of each discussion point listed. When all discussion points have been covered, the new associate and manager must sign where indicated. | Associate File |
| DP | Application Form | Associate must have a completed application form on file. An extra application form is enclosed in this new hire packet. | Associate File |
| DP | Associate's Personnel Action form (PAF) | Associate must complete all areas specified. Management completes remaining sections. Manager must key info into PAF immediately following orientation to generate new hire PAF so new associate can verify info and sign, (i.e., social security number, pay rate, etc.). Print 2 copies of PAF–1st for associate's file and 2nd copy for associate. (Associates are responsible for updating personal info, i.e., address, phone number, etc. All Home Office correspondence will be sent to current address on file with Payroll department, i.e., all tax info including W-2's, stock info, etc. Refer to associate's last paycheck to verify address at Home Office.) | Associate File |
| DP | W-4 | Complete for proper tax deductions: 0=more taxes deducted & possible refund; 1=less deducted during year & less refunded/possible payment required; exempt=no taxes deducted - must be full time student or making less than amount specified on W-4 at year end from all sources. Consult your accountant for complete tax filing instructions. | Payroll |
| DP | State/Local Tax | Complete required forms. Refer to the Required State Tax Forms list in this Forms Booklet. State and local tax forms should be ordered and kept in stock as a separate supply item by each store. | Payroll |
| DP | Minnesota Only | Minnesota: Child Support Obligation Form – available through store supply #1046 | Associate File |
| DP | CA, WA, ID | Training Verification Worksheet – available through store supply #5048 | Associate File |
| DP | I-9 Immigration (Employment Eligibility Verification) | Proof that associate is eligible to work in US. Form must be filled out *exactly* as indicated in example. Original (white) copy should be placed in associate's personnel file. | White copy to Personnel File |
| DP | State Work Permit for Minors (if applicable) | Certificate may be required by state if new associate is under 18. If manager is not sure of state's minor work rules, refer to the handbook or call Human Resources. | Associate File |
| DP | Direct Deposit Authorization | Election to deposit paycheck in checking or savings accounts. A voided check must be attached to this form. This program is optional but highly recommended. | Payroll |
| DP | Stock Purchase Plan Enrollment Form | All part-time and full-time associates may choose to participate in this program by completing the form and sending it to Payroll. | Payroll |
| DP | Supplemental Pay (AM, MIT, Trainee only) | *(For all states EXCEPT California)* Associate must complete this form acknowledging that they are eligible for supplemental pay for any hours worked over 40. | Associate File |
| DP | Group Health Benefits | This is a reminder that if the associate does not receive a benefits packet within two weeks of their employment, they should contact Human Resources at 614-283-6623. | Associate Keeps |

*Place in Associate's File when Checklist is Completed and Signed*    ANF    Revised 1/05

**EXHIBIT**

5

tabbies

**ORIENTATION CHECKLIST, Page 2**                                    (continued) --

## II. COMPANY POLICIES AND PROCEDURES TO COVER
### New associates must be given time necessary to read the Store Associate Handbook.

The items below must be explained to the new associate by a member of management. Associate must initial each item to indicate it was covered and all questions were answered. Use the Employee Handbook as a talking point for this section. Refer to the appropriate page number indicated at the right and go through the detailed information for each section.

### Employment and Benefits

                                                                        Handbook Page Number

☑ **Customer Service** – Review Service Standards and explain policies and procedures..............................16-17

☑ **Look Policy** - Review Brand Rep position description and look guidelines...........................................24-25

☑ **Partners in Growth** *(pt only)* – Explanation of flexible and fluctuating weekly scheduled hours for Brand Reps............13

☑ **Discrimination & Harassment Policy** – Definition of policy including definition of sexual harassment and steps to report suspected violations..........................................................................................................6-8

☑ **Respect Policy** – *Respecting others and their unique qualities*.....................................................8

☑ **Americans with Disabilities Act** –Policy regarding equal treatment of disabled customers, applicants and employees.............8-9

☑ **Non-Fraternization Policy** *(all members of store management)* – Policy regarding relationships at work....................37

☑ **Violations of Company Policy** – Grounds for termination. See "Introduction" and "Conduct" sections..............3, 23-24

☑ **Performance or "Quality" Reviews/Pay Increases** –Brand Rep Quality Reviews will occur no less frequently than once per year. All managers are evaluated once a year in March. Pay increases are determined by Quality Review rating.............................................11

☑ **Family Medical Leave Act** – Policy regarding associate leaves due to a personal serious medical condition or to care for family members with a serious medical condition. Associates expected to be off work for three or more days should discuss eligibility for coverage under FMLA with their manager and Human Resources........................................................................................15-16

☑ **SARP (401K Savings and Retirement Plan)** – Associates are eligible to participate in SARP after 1 year of service, if they are 21 years old and have worked 1,000 hours or more. Associates will be sent a packet of info to their home when they become eligible.................................................................................33-35

☑ **Associate Discount Info** – Abercrombie & Fitch and abercrombie store associates: 30% off original ticket price for all PT associates and 40% off the original ticket price for all FT associates. All stores: "AAA" Abercrombie Associate with Attitude - Special discount given periodically for associates to receive designated items at special offerings.......................................................................29-30

### Loss Prevention

☑ **Bag/Coat Checks** - Associates must be accompanied by a manager and their bags and coats checked whenever they leave the store, including breaks..........................................................................................19

☑ **What is Shrinkage?** Discuss store's current shrink - Review section of Store Associate Handbook......................18

☑ **Store Loss Prevention Rules and Forewarned is Fairwarned** –Point out Loss Prevention Posters and take time to explain each rule..........20

☑ **How to Spot and Stop a Shoplifter** - Review sections of Store Associate Handbook.............................20

☑ **Sensormatic Systems** - Explain use and removal of sensors, how to approach customer if Sensormatic alarm sounds as they enter or leave store, and ink tags. All merchandise in the store must be tagged with a sensor at all times..............................................21

☑ **No Wearing Merchandise before Purchase** – Associates must never wear merchandise for any reason prior to purchasing the item...........................................................................................19

☑ **Loss Prevention Hotline** - If you suspect any wrongdoing or policy violations, you must contact Loss Prevention at 800-666-4712 or immediately inform your manager.......................................................................20

*Place in Associate's File when Checklist is Completed and Signed*                    ANF    Revised 1/05

**ORIENTATION CHECKLIST, Page 3**                                    **(continued)**

(Continued) The items below must be explained to the new associate by a member of management. Associate must initial each item to indicate it was covered and any questions were answered. Refer to Handbook for detailed information where a page number is indicated to the right.

### Attendance, Work Schedule and Pay

☑ Schedule – See "Absence" section. Review how to request time off, posting of schedule, "call-ins", what to do when sick, must switch schedules with "like" person via manager (i.e., cashiers only switch with cashiers, men's department with men's department, etc.) and who to notify with schedule conflicts.................................................................................................14

☑ Attendance/Punctuality – Procedures for "calling off", importance of promptness (i.e., relieving associates for breaks, end of shifts, etc.) and consequences of excessive abuse.................................................................................14

☑ Record of Hours Worked – Signing in and out at register, when to notify manager for help and meal breaks...............13

☑ Privacy of Confidential Information – Your paycheck is a confidential document..........................................................13

☑ Pay period/Pay day – See "Your Paycheck" section. Paid every 2 weeks. Associate picks up and verifies paycheck at store. Next payday is _____. All questions about checks must be forwarded to Store Manager. Review first paycheck carefully to verify social security number, address, pay rate, number of hours worked, etc..........................................................13

☑ Assistant Manager/MIT Pay (For all states EXCEPT California) – Assistant Managers receive a weekly base salary for all hours worked each week. Hours over 40 per week are paid at the Supplemental Pay rate...............................................39

### Locations to Note

☑ Mall Parking Area – Where associates are required to park.

☑ Mall Entrance/Store Entrance – Which entrance associates use, note if there are different entrances for different times of day or different days of the week. Is there is a doorbell at the store entrance?

☑ Lockers/Coat Area – Show location, give combination

☑ Break Area/Restrooms/First Aid – Show location and explain importance of cleanliness.

☑ Bulletin Boards/Zone Coverage Board – Show location.

☑ Telephones/Emergency Numbers/Fire Extinguishers – Show location.

### Fit Session/"AAA" Purchase

☑ New associates should try on a variety of items (i.e., bottoms, shirts, sweaters, etc.) to compare size and fit.

By signing below, you acknowledge:
- The items listed in the Orientation Checklist above have been explained to you in detail.
- You have received and been given an opportunity to read a copy of the Store Associate Handbook.
- You agree to abide by the statements and policies in the Store Associate Handbook.
- You are responsible for reporting violations of these policies to a member of management or the Human Resources Department.
- You understand that Abercrombie & Fitch reserves the right to change its policies and benefits at any time without prior notice.
- You understand that employment with Abercrombie & Fitch is "at will" and that receipt of this handbook and signing this acknowledgement do not constitute a contract of employment.

| _(signature)_ | | _(signature)_ | 8-01-05 |
|---|---|---|---|
| **Store Manager Signature** | **Date** | **Associate Signature** | **Date** |
| MICHAEL OLIVERAS | | David Porales | 8-01-05 |
| **Store Manager Name (Print)** | **Date** | **Associate Name (Print)** | **Date** |

*Place in Associate's File when Checklist is Completed and Signed*                    ANF        Revised 1/05

**PERSONNEL FILE**    ✓

*For All States Except California and Alaska*

# Abercrombie & Fitch

## SUPPLEMENTAL PAY ACKNOWLEDGEMENT
### FOR LOSS PREVENTION FIELD SUPERVISORS AND AGENTS

Loss Prevention Field Supervisors and Agents receive a weekly base salary for all hours worked each week. This base salary will be paid for all hours worked in the week, regardless of the number of hours worked. For <u>administrative purposes only</u>, this base salary is computed and reflected on paychecks at an hourly rate. In addition to the base salary, Loss Prevention Field Supervisors and Agents are eligible for hourly *Supplemental Pay* as overtime payment for hours worked in excess of 40 each week. Hours worked includes actual hours worked, such as regular work time, meetings in or out of the store, inventory, management training and court appearances.

Since the field supervisor or agent's base salary already includes compensation for all hours worked, a supervisor or agent who works more than forty hours is entitled to an additional ½ time overtime supplement for all hours worked over 40 in the workweek. The examples below show how this is calculated:

<u>Example 1:</u>
Base Salary $480
Hours Worked 45

$480 divided by 40 = $12.00 regular hourly rate
$12.00 divided by 2 = $6.00 supplemental rate
$6.00 supplemental rate x 5 overtime hours worked = $30.00 supplemental pay
$480 base salary + $30.00 supplemental pay = $510 total pay

<u>Example 2:</u>
Base Salary $480
Hours Worked 50

$480 ÷ 40 = $12.00
$12.00 ÷ 2 = $6.00
$6.00 x 10 hours = $60.00 supplemental
$480 + $60.00 = $540 total pay

All benefit hours must be paid at straight time hours. Benefit hours, excluding sick pay, will not count as hours worked or accumulate towards the calculation of supplemental overtime pay. Additionally, hours worked on a holiday must be paid based at straight time hours (this is in addition to the 8 hours of holiday pay). Only hours worked and sick pay hours are to be accumulated towards the calculation of supplemental overtime pay. Benefit hours include emergency absence, vacation, holiday, personal day, and jury duty.

*I understand and acknowledge that as a Loss Prevention Field Supervisor or Agent, that I am paid a straight salary each week <u>regardless of how many hours I actually work.</u> I also understand and acknowledge that my base salary includes compensation for all hours worked, including those over 40. I understand and acknowledge that if I work more than 40 hours in a week, I will be paid an additional amount at ½ time for all hours over 40 to compensate me for all overtime owed.*

_____     _____     11/18/06
Associate Signature               Title                              Date

Revised 9/05

**EXHIBIT**

6

**For All States _Except_ California and Alaska**

# Abercrombie & Fitch

## SUPPLEMENTAL PAY ACKNOWLEDGEMENT
### FOR LOSS PREVENTION FIELD SUPERVISORS AND AGENTS

Loss Prevention Field Supervisors and Agents receive a weekly base salary for all hours worked each week. This base salary will be paid for all hours worked in the week, regardless of the number of hours worked. For _administrative purposes only_, this base salary is computed and reflected on paychecks at an hourly rate. In addition to the base salary, Loss Prevention Field Supervisors and Agents are eligible for hourly _Supplemental Pay_ as overtime payment for hours worked in excess of 40 each week. Hours worked includes actual hours worked, such as regular work time, meetings in or out of the store, inventory, management training and court appearances.

Since the field supervisor or agent's base salary already includes compensation for all hours worked, a supervisor or agent who works more than forty hours is entitled to an additional ½ time overtime supplement for all hours worked over 40 in the workweek. The examples below show how this is calculated:

Example 1:
Base Salary $480
Hours Worked 45

$480 divided by 40 = $12.00 regular hourly rate
$12.00 divided by 2 = $6.00 supplemental rate
$6.00 supplemental rate x 5 overtime hours worked = $30.00 supplemental pay
$480 base salary + $30.00 supplemental pay = $510 total pay

Example 2:
Base Salary $480
Hours Worked 50

$480 ÷ 40 = $12.00
$12.00 ÷ 2 = $6.00
$6.00 x 10 hours = $60.00 supplemental
$480 + $60.00 = $540 total pay

All benefit hours must be paid at straight time hours. Benefit hours, excluding sick pay, will not count as hours worked or accumulate towards the calculation of supplemental overtime pay. Additionally, hours worked on a holiday must be paid based at straight time hours (this is in addition to the 8 hours of holiday pay). Only hours worked and sick pay hours are to be accumulated towards the calculation of supplemental overtime pay. Benefit hours include emergency absence, vacation, holiday, personal day, and jury duty.

_I understand and acknowledge that as a Loss Prevention Field Supervisor or Agent, that I am paid a straight salary each week regardless of how many hours I actually work. I also understand and acknowledge that my base salary includes compensation for all hours worked, including those over 40. I understand and acknowledge that if I work more than 40 hours in a week, I will be paid an additional amount at ½ time for all hours over 40 to compensate me for all overtime owed._

_Dawud Riddelle_       Loss prevention agent    11/24/06
Associate Signature                Title                      Date

Revised 9/05

EXHIBIT

7

*For All States Except California and Alaska*

# Abercrombie & Fitch

## SUPPLEMENTAL PAY ACKNOWLEDGEMENT
### FOR LOSS PREVENTION FIELD SUPERVISORS AND AGENTS

Loss Prevention Field Supervisors and Agents receive a weekly base salary for all hours worked each week. This base salary will be paid for all hours worked in the week, regardless of the number of hours worked. For administrative purposes only, this base salary is computed and reflected on paychecks at an hourly rate. In addition to the base salary, Loss Prevention Field Supervisors and Agents are eligible for hourly *Supplemental Pay* as overtime payment for hours worked in excess of 40 each week. Hours worked includes actual hours worked, such as regular work time, meetings in or out of the store, inventory, management training and court appearances.

Since the field supervisor or agent's base salary already includes compensation for all hours worked, a supervisor or agent who works more than forty hours is entitled to an additional ½ time overtime supplement for all hours worked over 40 in the workweek. The examples below show how this is calculated:

**Example 1:**
Base Salary $480
Hours Worked 45

$480 divided by 40 = $12.00 regular hourly rate
$12.00 divided by 2 = $6.00 supplemental rate
$6.00 supplemental rate x 5 overtime hours worked = $30.00 supplemental pay
$480 base salary + $30.00 supplemental pay = $510 total pay

**Example 2:**
Base Salary $480
Hours Worked 50

$480 ÷ 40 = $12.00
$12.00 ÷ 2 = $6.00
$6.00 x 10 hours = $60.00 supplemental
$480 + $60.00 = $540 total pay

All benefit hours must be paid at straight time hours. Benefit hours, excluding sick pay, will not count as hours worked or accumulate towards the calculation of supplemental overtime pay. Additionally, hours worked on a holiday must be paid based at straight time hours (this is in addition to the 8 hours of holiday pay). Only hours worked and sick pay hours are to be accumulated towards the calculation of supplemental overtime pay. Benefit hours include emergency absence, vacation, holiday, personal day, and jury duty.

*I understand and acknowledge that as a Loss Prevention Field Supervisor or Agent, that I am paid a straight salary each week regardless of how many hours I actually work. I also understand and acknowledge that my base salary includes compensation for all hours worked, including those over 40. I understand and acknowledge that if I work more than 40 hours in a week, I will be paid an additional amount at ½ time for all hours over 40 to compensate me for all overtime owed.*

_____     _____     _____
Associate Signature                    Title              Date

Revised 9/05

EXHIBIT

8

*For All States Except California and Alaska*

# Abercrombie & Fitch

## SUPPLEMENTAL PAY ACKNOWLEDGEMENT
### FOR LOSS PREVENTION FIELD SUPERVISORS AND AGENTS

Loss Prevention Field Supervisors and Agents receive a weekly base salary for all hours worked each week. This base salary will be paid for all hours worked in the week, regardless of the number of hours worked.  For administrative purposes only, this base salary is computed and reflected on paychecks at an hourly rate.  In addition to the base salary, Loss Prevention Field Supervisors and Agents are eligible for hourly *Supplemental Pay* as overtime payment for hours worked in excess of 40 each week.  Hours worked includes actual hours worked, such as regular work time, meetings in or out of the store, inventory, management training and court appearances.

Since the field supervisor or agent's base salary already includes compensation for all hours worked, a supervisor or agent who works more than forty hours is entitled to an additional ½ time overtime supplement for all hours worked over 40 in the workweek.  The examples below show how this is calculated:

**Example 1:**
Base Salary $480
Hours Worked 45

$480 divided by 40 = $12.00 regular hourly rate
$12.00 divided by 2 = $6.00 supplemental rate
$6.00 supplemental rate x 5 overtime hours worked = $30.00 supplemental pay
$480 base salary + $30.00 supplemental pay = $510 total pay

**Example 2:**
Base Salary $480
Hours Worked 50

$480 ÷ 40 = $12.00
$12.00 ÷ 2 = $6.00
$6.00 x 10 hours = $60.00 supplemental
$480 + $60.00 = $540 total pay

All benefit hours must be paid at straight time hours.  Benefit hours, excluding sick pay, will not count as hours worked or accumulate towards the calculation of supplemental overtime pay.  Additionally, hours worked on a holiday must be paid based at straight time hours (this is in addition to the 8 hours of holiday pay).  Only hours worked and sick pay hours are to be accumulated towards the calculation of supplemental overtime pay.  Benefit hours include emergency absence, vacation, holiday, personal day, and jury duty.

*I understand and acknowledge that as a Loss Prevention Field Supervisor or Agent, that I am paid a straight salary each week regardless of how many hours I actually work. I also understand and acknowledge that my base salary includes compensation for all hours worked, including those over 40. I understand and acknowledge that if I work more than 40 hours in a week, I will be paid an additional amount at ½ time for all hours over 40 to compensate me for all overtime owed.*

_____     Loss Prevention Agent   11/24/06
Associate Signature                 Title                    Date

D Pomales

Revised 9/05

**EXHIBIT**

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

                    Plaintiffs,

          -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
          d/b/a Abercrombie & Fitch,
          Abercrombie, Hollister and Ruehl,

                    Defendants.
-------------------------------------------------------------------------

08 CV 01859 (PKC) (AJP)

**DECLARATION OF
MATTHEW YOUNT**

          I, Matthew Yount, being first duly cautioned and sworn, and being more than age

eighteen and competent to testify about the matters contained herein, hereby declare and state as

follows upon personal knowledge or information:

          1.     I am the Loss Prevention Manager for Abercrombie & Fitch Stores, Inc.'s Fifth

Avenue location in New York, New York.

          2.     In my position, I am responsible for the Loss Prevention Associates ("LPAs")

who work in the Fifth Avenue location. I have held this position since April 2008. Before that

time, I worked for Abercrombie in various positions in the stores. My last position was as a

District Manager.

1

3.      The LPAs at Fifth Avenue have as their primary responsibility the effective implementation of Abercrombie's loss prevention and shortage reduction programs. That responsibility requires them to work with store management to prevent losses to the store through external, internal and operational causes. To that end, the LPAs are to provide regular training to management and employees, conduct regular audits, and analyze audit results to address any loss prevention issues in the store. They also are required to constantly be on the lookout for any loss prevention problems in the store and, if they find any problems, to formulate a way to address them. In addition, the LPAs are responsible to address external theft cases (which includes observing a suspect, apprehension, interviews and prosecution), internal theft cases (which includes researching causes for internal theft and collecting evidence to support the case), and operational losses (which includes monitoring operational procedures to stop losses caused by employees failing to follow the proper operational procedures).

4.      Unlike in most other stores, we work in a team format in the Fifth Avenue store. There are about 12 LPAs currently assigned to work at the Fifth Avenue store. Typically, there are about three to five agents assigned to a shift, which means that the LPAs do not individually complete all loss prevention duties every day they work – the duties are completed by the "team." In the team format, store management does not rely on one single LPA for loss prevention direction and assistance, but instead refers any questions or requests for assistance to any LPA or to the Loss Prevention Manager or Loss Prevention Investigator stationed at the store. There is one exception to the team format and that is on the overnight shift. On that shift, we sometimes have one LPA assigned, and at other times two LPAs. When the overnight LPA is functioning at the level he/she is required to function, the overnight store managers depend more heavily on the overnight LPAs than the daytime managers depend on any individual

daytime LPA. The overnight LPA is important because he/she is responsible for all loss prevention duties for the entire store during the entire shift. The overnight LPA conducts all of the training on the overnight shift, provides all of the guidance to the managers, responds to all loss prevention problems, and himself is responsible to implement and enforce loss prevention initiatives on that shift.

5.    The LPAs are assigned each day to rotate through two-hour shifts in three different posts. The first LPA who arrives for the day schedules him or herself and the remaining LPAs on a "grid" of two-hour periods of time for each of the three posts in the store. One post is in the closed circuit television ("CCTV") room where the LPAs monitor live surveillance video from cameras strategically placed throughout the store to assist in our loss prevention efforts. If the LPA assigned to the CCTV room suspects any losses while watching the monitors, he/she will put into action whatever he/she believes necessary to address his/her suspicions. While working in the CCTV room, the LPAs are also responsible to sign out store keys and sensor guns, and to maintain the lost and found. The second post is "greeter." A "greeter," works at the front-door location of the Fifth Avenue Store. The LPA checks employees' personal items when they leave the store and, when the sensormatic system alarms, searches the Abercrombie shopping bags of customers exiting the store. At different times of the year when the store's customer traffic is especially high, some LPAs may also be stationed just outside the store to monitor and control the line of customers waiting to enter the store. The LPA "greeter" also attends to any other loss-prevention related issues that may arise at the front of the store. While working at the greeter post, I expect the LPAs to make active observations that will help us more effectively implement our loss prevention initiatives. For example, I expect them to alert their fellow LPAs working on the sales floor to the presence of suspicious

3

customers. The third post is not really a "post." It involves the LPAs walking through the four levels of shopping area in the store looking for signs of potential loss and failure by employees to follow operational procedures.

6.    When the LPAs are not assigned to the various posts, they are able to train the managers and employees, conduct audits, review store logs and paperwork for operational and internal problems, monitor door alarms that sound when employees and customers access inappropriate exits and closely monitor shipment when it is delivered to the store.

7.    The Fifth Avenue LPAs are not scripted in their duties and they do not have a company-provided schedule or list of goals to complete throughout the day. The LPAs also do not have a binder that directs their every move. There are documents that serve as guides for the LPAs for reference as needed, but no scripts.

8.    I expect the LPAs to exercise independent judgment and discretion throughout the day. I believe they will be most beneficial to the Company if they do that. They must take ownership of their job and partner with store management to prevent loss in the store, and they should do that without constant input from me. Unfortunately, there are LPAs currently at Fifth Avenue who do not take ownership of their job and who do not partner with management to ensure the effective implementation of loss prevention initiatives and programs in the store. Those LPAs tend to rely too heavily on my guidance and direction. For example, I currently attend all management meetings at Fifth Ave., although the meetings should be attended by the LPAs. I attend the meetings because the managers in the store do not fully trust the LPAs. The LPAs have not effectively participated in the management meetings and the managers would rather that I attend. Also, too often, LPAs approach me when they need to speak with store management as opposed to speaking with the managers themselves. I have only been in this

4

position a couple of months and I am working to get the LPAs to work more independently, to work closer with store management, and to perform at the level the Company expects.

9.    I voluntarily gave this statement to Stacia Jones, attorney for Abercrombie & Fitch.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Matthew Yount**

8/11/08
**Date**

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And                                                                                08 CV 01859 (PKC) (AJP)

KENNETH FINGERMAN,                                                    **DECLARATION OF MICHAEL BARRETT**

                              Plaintiffs,

        -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
                    d/b/a Abercrombie & Fitch,
                    Abercrombie, Hollister and Ruehl,

                              Defendants.
-------------------------------------------------------------------X

        I, Michael Barrett, being first duly cautioned and sworn, and being more that age

eighteen and competent to testify about the matters contained herein, hereby declare and state as

follows upon personal knowledge or information:

        1.   I am currently employed by Abercrombie & Fitch as a Loss Prevention Agent

("LPA") in Abercrombie's South Street Seaport location in New York, New York.  I have been

employed in this position since February 10, 2008 according to company records.  Prior to

working at the South Street Seaport store, I was employed by Abercrombie at its Fifth Avenue

store in New York, New York.  I worked in that store from October 7, 2007 until I transferred

over to the South Street Seaport store in February, 2008.

1



2.   As an LPA at Fifth Avenue, I was part of a loss prevention team that had the ultimate responsibility for all loss prevention efforts and initiatives in the store. There were approximately seven to eight LPAs working at the Fifth Avenue store at that time. We collectively directed store management and employees in loss prevention efforts. We partnered with store management to respond to loss prevention issues and to help the store perform at its lowest shrink potential.

3.   Conversely, at the South Street Seaport store, I am one of only two LPAs assigned to work at that store. The other LPA and I only work together three days a week and, when we do, we work different shifts such that we only work in the store at the same time for a few hours a day at most. We are each independently responsible for performing the various loss prevention duties associated with that store, although we do communicate with each other on our various loss prevention efforts.

4.   My primary responsibilities at the South Street Seaport store include implementing loss prevention and shortage reduction programs, regularly training all store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

a.   I effectively work with store management to implement a loss prevention and shortage reduction program in each of my stores. While the larger goal of reducing shrink and following certain loss prevention rules to prevent shrink is the same for all stores, the shortage reduction programs for stores differs based upon the particular characteristics of each store. For example, those stores that have high shrink are placed on more aggressive shortage reduction programs that other, low shrink stores are not required to follow. Nonetheless, all programs must be



tailored to meet the specific problems in each individual store. I must decide, in partnership with store management, the most effective way to implement the programs so that I can optimize the opportunity for success in the store. When I identify specific problems in the store that must be address, I provide direction to store management to assist them in our overall efforts to reduce loss.

b. I conduct regular training sessions for associates and managers. Once a week, I conduct orientation for all new hires on how to detect, avoid, prevent and report any loss or potential loss. Orientation usually consists of a review of the company's basic loss prevention video and then I meet with the new associates to discuss the general topics addressed in the video and then also address various other specific topics with them. I determine what topics to address with them based upon my own experience and observations. I also decide how to deliver this orientation in a creative way based upon my own style. For example, rather than just talk at the associates regarding loss prevention issues and techniques, I like to make the session more interactive by presenting various situations to them and asking them how they would handle that particular situation. I also discuss with them particular situations I have experienced and how I've dealt with those situations so as to educate them on techniques to detect and prevent theft. I also conduct regular continuing training, or workshops, with managers and associates on the current loss prevention issues I detect in the store and strategies for preventing theft. I train management and associates how to approach customers suspected of theft in a way that will allow us to prevent theft while maintaining good customer relations. In addition, I attend weekly management meetings. At

3



these meetings, I field questions from management and I also notify them of current trends of theft and problems in the store that I have observed and discuss with them strategies for addressing those problems. None of the training sessions I conduct involve me reading from a script, and they vary widely depending on the particular loss issues existing at the store at any given time.

c.  There are two types of theft, external and internal.

    i.  External theft is theft by an individual who does not work for Abercrombie, usually a customer. When my observations at the store lead me to suspect external theft, I am responsible to take action to prevent the theft and apprehend the suspect when theft occurs, and I take the necessary action to address the suspect. When I apprehend a suspect I complete the necessary paperwork and contact the police. I do not have to report to anyone or get permission when taking these actions. I work alone with the police and prosecutors and will attend court if it is required. I complete all paperwork on my external cases and have to do so in a manner that will be most helpful in a later criminal or civil proceeding.

    ii.  Similar to external cases, if I suspect that there is internal theft, I decide what action to take to verify my suspicions. I do this by, for example, reviewing cash register transactions and associate purchase logs. I gather evidence and build a case to a certain point to assure that my suspicions are solidified and then I submit that evidence to my loss prevention manager who then conducts an interview of the internal suspect. I

4



complete paperwork for my internal cases and, again, must do so in a way that it will be most helpful in a court proceeding.

d.  In an effort to prevent loss, I conduct regular audits of my stores to ensure compliance with loss prevention initiatives. This is done by walking through the stores and responding to a loss prevention audit questionnaire. After conducting the audit, I review the results with management and identify with management what things must be improved. I then follow-up with management in our training sessions, workshops, meetings and during the normal course of the week to make sure that the issues identified in the audit are addressed.

e.  In addition to conducting the audits, I am always making observations in my store to determine whether there are any issues that need to be addressed. Once I identify any issues, I decide how to address the issues, whether through more training or meetings, or through a planned course of action.

5.  As an LPA, I have ultimate responsibility for all loss prevention efforts and initiatives in my store and me and my fellow LPA at the store are the main point of contact in that regard. I direct store management and employees in loss prevention efforts and hold them accountable for reaching the company's loss prevention goals. I also partner with store management to respond to loss prevention issues and to help the store perform at its lowest shrink potential. I regularly field loss prevention questions from the management in my store.

6.  It is essential to my success as an LPA, and to the success of the stores to which I am assigned, that I exercise independent judgment and discretion in performing my duties every day. I am constantly reviewing and analyzing the current loss prevention problems in each of my



5

store, determining what specific issues are hindering my store from meeting all loss prevention

goals, and determining the best way to help my store improve.

      7.    Earlier, I stated that I previously worked at the Fifth Avenue store. The Fifth Avenue

store is a completely separate monster from the South Street Seaport store due to the volume of

customers, the volume of business, the number and types of associates and managers hired at the

store and, therefore, the number and type of loss prevention issues that exist at that store. While

many of my loss prevention duties at the South Street Seaport store are similar to those I had at

the Fifth Avenue store I do not carry out my duties at the South Street Seaport in exactly the

same manner. First, at the Fifth Avenue store I was expected to work in different areas of the

store performing specific activities at specific times and I rotated through those areas and duties

with the various other LPAs working at the store. At the South Street Seaport store, I decide

when and how to perform my various loss prevention duties at the store each day based upon

what aspects of the store's loss prevention I determine I need to focus on at any given time.

Also, my duties at the South Street Seaport store do not require me to watch a live television

monitor to observe activity in the store in an effort to prevent theft. I was expected to do so at

the Fifth Avenue store at specified times each day. At the South Street Seaport store, I typically

only watch video from store monitors after the fact when I am investigating suspicions of

internal or external theft. Overall, I feel that I have more ownership of my loss prevention duties

at the South Street Seaport store than I did when I worked at Fifth Avenue because I am one of

only two LPAs assigned to that store and have more freedom in determining how and when to

perform each of my loss prevention duties. The store management and associates at the South

Street Seaport store rely on me to a much greater degree than they did at the Fifth Avenue store,

but only because the loss prevention team at Fifth Avenue was so much larger than the two of us

6

at South Street Seaport. That being said, I am a highly motivated individual and take pride in excelling at my job. As a result, even when I was at the Fifth Avenue store, I made efforts to be more involved in directing and implementing loss prevention initiatives at the store beyond the basic duties expected of me each day. For example, I often sought out additional involvement in associate and management orientation and other training. My managers at the Fifth Avenue store recognized my leadership potential early on and after only two or more weeks on the job, they involved me in management meetings where I was able to communicate with store management on loss prevention programs, issues and strategies to prevent theft. Conversely, I observed that most of my fellow LPAs at the Fifth Avenue store did not take initiative to engage in these efforts. It appeared to me that they preferred to perform the minimal duties required of them and nothing more. I believe my leadership ability and potential was a large part of the reason why I was asked so early in my employment at the company to transfer to the South Street Seaport store and implement and direct the loss prevention initiatives there.

8.    I record the hours I work by logging them on a timesheet. I also call my manager and report my hours to him each day. I record every hour that I work. I have not been instructed by management to alter my work time or to work off the clock. In fact, my manager has specifically instructed me that I am not permitted to work off the clock. I have been paid for every hour that I have worked for the company. I have never witnessed a manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

9.    I do not work significant, if any, overtime hours. I do not believe the LPA job requires much, if any, overtime. On the rare occasions that I can recall having worked overtime, I have recorded all such hours worked on a timesheet and have been paid accordingly.

10. My manager at the Fifth Avenue store was Damon Byron. My manager at the South Street Seaport store has been Robert Ruiz.

11. I voluntarily spoke with Corey Donovan, counsel for my employer Abercrombie & Fitch ("Abercrombie"), with respect to the issues set forth in this Declaration. Ms. Donovan informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. Ms. Donovan informed me that no retaliation would be permitted if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Donovan told me that she does not represent me individually. I understand that she represents the Company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_____
Michael Barrett

7/20/08
_____
Date

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And                                                                    08 CV 01859 (PKC) (AJP)

KENNETH FINGERMAN,                                                     **DECLARATION OF JOSEPH
                                                                       GANDOLFO**

                    Plaintiffs,

        -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
                d/b/a Abercrombie & Fitch,
                Abercrombie, Hollister and Ruehl,

                    Defendants.
-----------------------------------------------------------------------X

        I, Joseph Gandolfo, being first duly cautioned and sworn, and being more that age

eighteen and competent to testify about the matters contained herein, hereby declare and state as

follows upon personal knowledge or information:

        1.  I am currently employed by Abercrombie & Fitch as a Loss Prevention Agent

("LPA").

        2.  I have responsibility for three stores.  Two of my stores, Hollister and Abercrombie &

Fitch, are in the Monmouth Mall in Eaton Town, New Jersey and the other store, Hollister, is in

the Ocean County Mall in Ocean County, New Jersey.  I also have some responsibility for the

abercrombie store in the Monmouth Mall, but that responsibility is minimal since that store does

not have significant issues with theft.  I am the only LPA who works in my stores.

1

J6

3.  As an LPA, I have responsibility for all loss prevention efforts and initiatives in my three stores and, for those stores, I am the main point of contact in that regard.  I direct store management and employees in loss prevention efforts.  I partner with store management to respond to loss prevention issues and to help the store perform at its lowest shrink potential.  I regularly field loss prevention questions from the management in my stores.

4.  My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training all store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

   a.  I effectively implement a loss prevention and shortage reduction program in each of my stores.  Each of the stores that I work in have different loss prevention issues every week and I must decide the most effective way to implement loss prevention efforts in those stores so that I can optimize the opportunity for success in preventing theft in each store.  I do this by researching and analyzing inventory reports and other store documents, by observing conduct of associates and customers on the sales floor, and also by familiarizing myself with the current trends in organized retail crime in order to identify the main causes of loss in each particular store.  Once I identify the specific problems, I then decide how to implement the loss prevention initiatives in the particular store and how to allocate my loss prevention resources to end the loss.

   b.  I conduct regular training sessions for employees and managers.  Most weeks, I conduct orientation for all new hires on how to recognize, avoid, prevent and report any loss or potential loss.  Orientation usually consists of associates watching a loss prevention video and then I spend 30 to 40 minutes with them

discussing all aspects of loss prevention in the store, including the current trends in theft and strategies and techniques to detect and prevent that theft. I do not have a set list of topics that I have been instructed by the company to cover with the associates during orientation. Rather, I have created my own list of topics I developed through my own experience and observations as an LPA. I also conduct daily training, or workshops, with managers and associates on the current loss prevention issues that I detect in their particular store, as well as strategies for addressing those issues and preventing theft. In these workshops, I also train management and associates how to approach customers suspected of theft in a way that will allow us to prevent theft while maintaining good customer relations. In addition, I make presentations at management meetings. While I am required by the company to address a weekly loss prevention topic in these management meetings, I also cover various other loss prevention topics that I have determined, based upon my own observations and independent judgment, are worth discussing. For example, I will address recent trends in organized retail crime that may exist or current problems that I have observed within my stores that make them more susceptible to theft. I also ask each of my individual store managers to identify loss prevention issues they are having and then I provide them with feedback on how I think they should address those issues.

c.  There are two types of theft, external and internal.

  i.  External theft is theft by an individual who does not work for Abercrombie, usually a customer. When my observations lead me to suspect external theft, I am solely responsible to take action to prevent the

3

theft and apprehend the suspect when theft occurs, and I take whatever action I believe is proper to address the suspect within general company guidelines. When I apprehend a suspect I complete the necessary paperwork and contact the police. I do not have to report to anyone or get permission when taking these actions. I work alone with the police and prosecutors and will attend court if it is required. I complete all paperwork on my external cases and have to do so in a manner that will be most helpful in a later criminal or civil proceeding.

ii. Similar to external cases, if I suspect that there is internal theft, I pursue my suspicions. I do this by, for example, reviewing cash register transactions and associate purchase logs or reviewing videotapes of the specific time period and associate at issue to see if I can confirm the theft. After I gather all evidence I believe solidifies my suspicions, I submit that evidence to my District Loss Prevention Manager. My District Loss Prevention Manager then conducts an interview of the internal suspect to confirm the results of my investigation. When I attend these interviews, my manager will ask me after the interview for my input on the suspect and theft at issue.

d. In an effort to prevent loss, I conduct regular audits to ensure compliance with loss prevention policies and procedures. This is done by walking through the store and responding to a loss prevention audit questionnaire. After conducting the audit, I provide the results to management and identify what things must be improved.

4

e.  In addition to conducting the audits, I am always making observations in my stores to determine whether there are any issues that need to be addressed. I then adapt my daily and weekly loss prevention efforts to meet the needs of each particular store that I oversee. For example, if I determine that there is an increased problem with external theft at one of my stores, I may adapt my work schedule to spend more time at that store and then focus my time at the store on detecting and preventing the external theft observed at that store. I may forego other loss prevention duties that I might have otherwise performed that day in order to address the external theft at issue and put in place steps to prevent that theft. I make these decisions regarding where and how to direct my loss prevention efforts each week on my own.

f.  My duties do not regularly require me to sit and watch a television monitor to observe activity in the store in an effort to prevent theft. Rather, I only watch video from the store cameras as part of my investigation of suspicions of internal or external theft. When I do that, I will go back to video that has been recorded in the past and watch it for the particular time and associate or customer at issue in an attempt to confirm my suspicions of theft or to identify the particular associate or customer at issue.

5.  It is essential to my success as an LPA, and to the success of the stores to which I am assigned, that I exercise independent judgment and discretion in the handling of my loss prevention duties every day. I am constantly reviewing and analyzing the current loss prevention problems in each of my individual stores, determining what specific issues are hindering the prevention of theft, and determining the best way to help the stores improve.

5

J6

6.  Earlier, I stated that I am responsible for three separate stores.  Those stores are very different.  I do not carry out my duties in any of my three stores in exactly the same manner. Rather, I determine how to carry out my duties with respect to each store based upon the particular loss prevention issues each of those stores face each week.

7.  I record the hours I work by logging them on a timesheet.  I have not been instructed by management to alter my work time or to work off the clock.  I have never witnessed a manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

8.  My manager has been Carlos Ortiz until recently when he was promoted.

9.  I do not work significant, if any, overtime hours.  I do not believe the LPA job requires much, if any, overtime.

10. I voluntarily spoke with Corey Donovan, counsel for my employer Abercrombie & Fitch ("Abercrombie"), with respect to the issues set forth in this Declaration.  Ms. Donovan informed me that I was not required to speak with her and that I could have ended our conversation at any time.  I understand that this Declaration was obtained for purposes of Abercrombie's defense of <u>Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents.  The statements made in this Declaration are truthful and voluntary.  I am aware that I might be entitled to opt into the Litigation if the court allows it and that I could be entitled to monetary relief if I opt in and the plaintiffs are successful.  Also, Ms. Donovan informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her.  She told me if I experienced any retaliation, I could contact Human Resources immediately.  Also, I know that I will receive no special treatment for providing my statement.

6

Ms. Donovan told me that she does not represent me individually.  I understand that she represents the Company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_____
Joseph Gandolfo

_____7/19/08_____
Date

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

              Plaintiffs,

   -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
        d/b/a Abercrombie & Fitch,
        Abercrombie, Hollister and Ruehl,

           Defendants.
------------------------------------------------------------------------X

08 CV 01859 (PKC) (AJP)

**DECLARATION OF
JULIETTE HACKETT**

     I, Juliette Hackett, being first duly cautioned and sworn, and being more than age

eighteen and competent to testify about the matters contained herein, hereby declare and state as

follows upon personal knowledge or information:

     1.  I am currently employed by Gilly Hicks as a Loss Prevention Agent ("LPA") in the

Smith Haven Mall in Lake Grove, New York (the "Store"). I was hired on or around May 25,

2008, and have worked in Abercrombie & Fitch's South Street Seaport store and various

Hollister stores located in New Jersey.

     2.  Prior to working for Gilly Hicks, I was a surveillance investigator for about 10 years,

working for law firms, school districts and insurance companies. I conducted covert operations,



1

accident reconstruction, and was involved in trial preparation and the collection of witness statements. I was the Senior Vice President of the investigation company for which I worked.

3. As an LPA, I have ultimate responsibility to make sure that the Store meets all loss prevention expectations and initiatives, and to protect Store employees and assets. I instruct Store management and employees on company and store-specific loss prevention efforts and I hold them all accountable for reaching loss prevention goals. I am the main point of contact for all loss prevention initiatives and programs in the Store, and I regularly field loss prevention questions from the management in the Store. I partner with Store management to respond to loss prevention issues and strive for the Store to operate at its lowest shrink potential.

4. I have an individual relationship with all managers in the Store. They approach me with many questions every day, seeking my advice on a wide range of issues. For example, I recently had a manager call me and say that the normal Brinks person who picks up the cash deposits did not come to the Store -- there was a different person and the person did not seem to know what he was doing. The manger wanted to know what to do. I made some phone calls to figure out what was going on and then got back to the manager. I also receive calls about operational errors, cash register problems and other loss prevention issues, and about employee-related problems.

5. As an LPA, I must exercise independent judgment and discretion everyday. I could not succeed if I had to read a script, consult a binder, or otherwise follow a set formula that purported to direct my every move. I have to constantly analyze different situations, stay on my toes and use the years of investigation experience that I have to implement the loss prevention initiatives of the company and to execute my job so that the Store succeeds. I am solely

2



responsible to determine what specific issues hinder the Store from meeting all loss prevention goals, and to determine the best way to help the Store improve.

6. My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training all Store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal, external and operational loss.

a. I am the only agent assigned to the Store and I have no other stores that I am currently responsible for. When I started in the Store, it was on the Target Store Program ("TSP") -- only stores that have high shrink are placed on TSP. It is not good to be on TSP and I wanted to take action to get off TSP. It appeared to me that a large reason the Store was on TSP was loss caused by customers. To help get off TSP, I did several things, including conducting more audits that were focused on where it appeared the loss was most occurring. And I gave more training to employees and managers on how to approach suspicious customers in a legally responsible manner. The Store is now off the TSP.

b. There is also the Shortage Reduction Program ("SRP"). SRP is targeted towards managers to help them address loss issues in the Store. I oversee SRP in my Store and make sure that the managers are taking ownership of what they must do to help address the loss prevention problems in the Store. The managers consult me regarding the SRP and what they must do to succeed in the SRP. I receive reports bi-weekly regarding the Store's performance on the SRP. When I receive that report, I study it, and then discuss it with management. I direct management in a conversation about how the Store progressed or not over the past week and what

3



the Store must do to progress in the coming week. Also, there are problems that I
observe in the Store that are not on the report that I receive. Those issues I
similarly review with management.

c. The Store is fairly new and as a result I conduct a lot of training. I give individual
training to all managers, group training to employees, and, when situations arise,
individual training to employees. The training I provide is continual and takes
place in different formats, depending on the audience and topic. Weekly, I
conduct orientation for all new hires on how to respond to emergencies and how
to avoid, prevent and report any loss or potential loss. Also, I conduct regular
training of managers on the current loss prevention program and on loss
prevention issues I detect in the Store. I also train management how to approach
customers suspected of theft in a way that is legal and in compliance with
company policy. In addition, I make presentations at management meetings and
conduct workshops with store employees.

　　i. Some of the training that I conduct is required of me by the company and
there are specific topics pointed out by the company that I could cover
during the training. However, what the company gives me to discuss
during the training sessions is general. I am expected to and do discuss a
wide range of topics outside of what is asked of me by the company and I
tailor the company's general topics to my Store so that the training is
relevant and helpful. Honestly, after reviewing the training topics
suggested by the company one time, I do not consult them anymore. I
know what training the Store needs from working in it everyday and I

4



train on what is needed. None of the training sessions I conduct involve me reading from a script or acting as a puppet, and the training sessions vary widely depending on the Store. In addition, I must decide how to deliver the training (e.g. role playing or presentation format) and I must decide the most creative manner in which to deliver the training. For example, I saw that some of the employees in the Store were not following the fitting room policies. So, I got the employees together and reviewed the fitting room policies with them. I did so by role playing and also talking with them to make sure they understood not only how to appropriately work the fitting rooms, but also why the fitting room policies had to be followed.

ii. Recently, the Store was boosted. That means that professionals came into the store and stole a significant amount of merchandise—42 units with $1,109.00 ~ ~

~~$1,100~~ to be exact. I take all loss in the Store very personally and this was a serious concern for me. I collected evidence that was left in the Store by one of the suspects and worked with my management team to start collecting statements. Also, I partnered with the loss prevention agent from Banana Republic. That agent had information on the suspects. I alerted the authorities, worked with the police and detectives to collect evidence, and have continued to work them towards locating the suspects. Once the suspects are caught, I will work with the police and prosecutors to prosecute the case. When we were collecting the evidence, we had to have a Gilly Hicks manager go to the local precinct and be fingerprinted.



5

We had to separate her fingerprints from those of the suspect. She was very nervous and asked that I accompany her to precinct. I did accompany her and walked her through the process. After the boosting incident, I reviewed the surveillance tape and met with the management team. We reviewed the tape frame by frame to pick apart and analyze everything the suspects did from the time they entered the store until they left. For example, the suspects had concealed under their clothes a bag in which to place the merchandise and when they left the store, one stayed behind for a few minutes to determine whether anyone suspected them. We talked about what the Store could have done to prevent what occurred.

d.  I work hard to address and prevent "external loss." "External loss" is theft by an individual who does not work for Gilly Hicks, usually a customer. When I suspect external theft in my Store, I am responsible to decide what action is necessary to verify my suspicions and take that action, gather evidence in support of my suspicions, and take whatever action I believe is proper to address the suspect, if at all. If I apprehend an external suspect, then I am responsible to interview the suspect and take action to recover loss and make sure the case is prosecutable. I do not have to report to anyone or get permission when taking these actions. I work alone with the police and prosecutors and will attend court if any of my cases are prosecuted. I also complete all paperwork on external cases and have to do so in a manner that will be most helpful in a later court proceeding.

6

e.  Similar to external cases, if I suspect that there is internal theft, I decide,
sometimes in partnership with management, whether to pursue my suspicions.  If
I so decide, I am responsible to determine what action to take to verify my
suspicions and then take that action.  I do this by, for example, reviewing cash
register transactions and associate purchase logs.  After I gather all evidence I
believe solidifies my suspicions, I submit that evidence to a loss prevention
investigator who then conducts an interview of the internal suspect.  I complete
paperwork for my internal cases and, again, must do so in a way that it will be
most helpful in a court proceeding.

i.  Recently, there was a box of shipment missing, about 20 pairs of
underwear.  I interviewed managers to try to figure out if they had any
information that could help me determine what occurred.  I spoke with
Regional Loss Prevention Manager Robert Ruiz about placing additional
cameras in the Store.  I have since gone through the Store to determine
where we could strategically place additional cameras to stop internal loss.
There are cameras currently in the Store, but they are not placed in every
location.  I have experience from my prior employment on the placement
of cameras and I am using that expertise now to address this internal loss
problem.

f.  In an effort to prevent loss, I conduct regular audits of my Store to ensure
compliance with loss prevention initiatives.  This is done by walking through the
stores and responding to a loss prevention audit questionnaire.  After conducting
the audit, I review the results with management and identify with management

7

what things must be improved. I then follow-up with management in our training sessions and meetings and during the normal course of the week to make sure that the issues identified in the audit are addressed. I hold the management team accountable for addressing these issues. In addition to conducting the audits, I am always making observations in my Store to determine whether there are any issues that need to be addressed. Once I identify any problems, I decide how to address the problems, whether through more training or meetings, or through a planned course of action.

    i.  As an example, another LPA for the company told me that there was a problem with employees from another Abercrombie affiliated store coming into a Gilly Hicks store and stealing merchandise. The problem was that the fitting room attendants were not following the fitting room policies when the customer was an employee of an Abercrombie affiliated store. After learning about this, I met with my management team to tell them about the potential problem. To make sure that the problem did not occur in my Store, I started a new program, and did so without asking permission. Now, in my Store, when employees of my Store or from any other Abercrombie affiliated store come into my Store, they must alert a manager or me before trying on clothes. The manager or myself will then let the employee into the fitting room and complete the fitting room procedures for the employee.

g.  I work with management on employee issues related to loss prevention. For example, yesterday, a customer touched an employee in an improper manner.



8

The employee was upset that the customer touched her. The employee spoke with a manager who asked me to address the situation. I spoke with the employee and determined that the customer probably worked in the mall. I did some digging and located the customer. I then worked with mall security and the police to approach the customer. I acted as the liaison between the police, mall security, and the employee and her mother. I had to oversee the entire process, issue a criminal trespass warning against the customer, prohibiting him from entering any Gilly Hicks or other Abercrombie affiliated stores in any mall in any state. I also started the process of pressing charges against the customer. I did not need permission from store management or loss prevention management to take these actions.

7.   I have worked in some Hollister and Abercrombie stores. Sometimes, LPAs are asked to go to an Abercrombie affiliated sore that does not have an assigned LPA to perform a "blitz." A "blitz" occurs when there are significant losses in a particular store. LPAs are brought into conduct research and evaluate the store so that we can determine the cause of the loss. While we make our observations, we advise management on what they can do differently. We also look for external loss and take action to end it. After the blitz, we report to Mr. Ruiz what we observed and what we recommend.

8.   From talking with the LPAs assigned to Abercrombie and Hollister stores, and from training with them and conducting the blitzes, I know that we have similar duties, although how we execute those duties is very different and depends on the particular loss prevention problems plaguing our different stores.



9

9.  I partner with management to decide what discipline action to take against employees with loss prevention.  I also provide management with the evidence and advice necessary to make discipline decisions.  For example, in the incident described above about boosting, I noted from a surveillance tape that one of our employees was in a room adjacent to the room from where we were boosted.  That employee was talking to other employees and distracting them.  Had she not been talking and been more attentive to her job, we might not have had the loss.  I spoke with management about the employee and we talked about the fact that the employee is a constant distraction to other employees in the store.  The next time I saw her, I showed her the video, gave her a workshop about boosting and told her what she did wrong.  I told management that we had to monitor the employee closely.  I did not want the employee to work in the areas of the Store where we were most prone to loss because she was not attentive.  I did not want her at the fitting rooms because I was not convinced she would follow the policies, and I did not want her in the back of the Store because she had to be watched closely.  I told management that if the employee violated any more loss prevention policies she would have to be disciplined. Management listened to me and they are acting accordingly.

10. I work in an independent manner and the work I perform is office or non-manual work.

11. My work day is not scripted.  I am free to execute my duties in a manner that most benefits my store.  I use my training, skills and experience to spot problems and theft, and to decide how to address those issues.

12. I record the hours I work by logging them on a timesheet.  I have not been instructed by management to alter my work time or to work off the clock.  I have never witnessed a

10

manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

13. I do not work significant, if any, overtime hours. I do not believe the LPA job requires much overtime. When I do work overtime, I record all such hours worked on a timesheet and have been paid accordingly. No manager has ever told me not to record any hours I worked over 40.

14. I voluntarily spoke with Stacia Jones, counsel for my employer, with respect to the issues set forth in this Declaration. Ms. Jones informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of <u>Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. Ms. Jones informed that I would not be retaliated against for any of my statements. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statements in this Declaration. Ms. Jones told me that she does not represent me individually. She only represents the company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_____
**Juliette Hackett**

_____
**Date** 7/20/08

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And                                                                08 CV 01859 (PKC) (AJP)

KENNETH FINGERMAN,                                                  **DECLARATION OF SHAJI
                                                                   MATHEW**

                    Plaintiffs,

        -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
              d/b/a Abercrombie & Fitch,
              Abercrombie, Hollister and Ruehl,

                    Defendants.
------------------------------------------------------------------------X

        I, Shaji Mathew, being first duly cautioned and sworn, and being more than age eighteen

and competent to testify about the matters contained herein, hereby declare and state as follows

upon personal knowledge or information:

        1.  I am currently employed by Abercrombie & Fitch as a Loss Prevent Agent ("LPA").

I was hired by the company in March 2008. I have ultimate responsibility for all loss prevention

efforts and initiatives for six (6) stores located at the Westchester and Palisades Malls in New

York.  At the Westchester Mall, I oversee loss prevention at the Abercrombie & Fitch,

abercrombie and Hollister stores.  These same three stores are also located at the Palisades Mall.

        2.  I direct store management and associates in loss prevention efforts and hold them

accountable for reaching the company's loss prevention goals.  I also partner with store

1

SM

management to respond to loss prevention issues and to help the store perform at its lowest shrink potential. I regularly field loss prevention questions from the management in my stores. I keep them informed about recent trends so far as theft is concerned and educate them about issues that I have observed and actions that I have taken in other stores to further the company's loss prevention efforts. I regularly develop game plans for the stores that I oversee and challenge them to engage in activities that I believe will reduce the store's shrink.

3. It is essential to my success as an LPA, and to the success of the stores to which I am assigned, that I exercise independent judgment and discretion everyday. I am not a security guard and I do not follow a set formula that directs me in my every move. To the contrary, I review and analyze the current loss prevention problems in each of my individual stores, determining what specific issues are hindering the stores from meeting all loss prevention goals, and determining the best way to help the stores improve. For example, I regularly audit my stores' cash register logs and, if there is a shortage or overage in excess of $10.00, I will dig deeper by reviewing camera footage and analyzing and tracking register usage.

4. My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training all store associates and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

a. I effectively implement a loss prevention and shortage reduction program in each of my stores. While the larger goal of reducing shrink and following certain loss prevention rules to prevent shrink is the same for all stores, the shortage reduction programs that I implement are different from store to store. For example, those stores that have high shrink are placed on aggressive shortage reduction programs that other, low shrink stores are not required to follow. Nonetheless, all programs

2

SM

must be tailored to meet the specific problems in each individual store. Each of the stores that I work in is sufficiently different such that I must decide the most effective way to implement the programs so that I can optimize the opportunity for success in the store. I do this by researching and analyzing inventory reports and other store documents and information to identify the main causes of loss in each particular store. For example, if I find that a store is regularly missing large quantities of merchandise, then I may focus more on the stock room. Once I identify the specific problems, I then decide how to implement the loss prevention programs and initiatives in the particular store and how to allocate my loss prevention resources to end the loss.

b. I conduct regular training sessions for associates and managers. I conduct orientation every Sunday for all new hires on how to respond to emergencies and how to avoid, prevent and report any loss or potential loss. I begin the orientation by showing a video and then I quiz the associates and go over, in great detail, the broader loss prevention issues that were addressed in the video with a fine tooth comb. It is critical that I communicate to the associates, in great detail, what they should be looking for, in terms of identifying and preventing theft, before they begin their employment with the company. I also conduct regular training of managers on current loss prevention programs and on loss prevention issues I detect in their particular store. For example, I train management how to approach customers suspected of theft in a way that is legal and in compliance with company policy. While some of the training that I conduct is required of me by the company, I also discuss a wide-range of topics outside of what is asked of me

3

SM

by the company and I tailor the company's general topics to each of my stores so
that the training is relevant and helpful. During the weekly management meetings
that I attend, I speak with the managers about issues that I have personally
observed during the previous week and I use that meeting to communicate my
expectations to the management in terms of loss prevention efforts. For example,
I may communicate to management the need to concentrate on floor sweeping
(searching the floor for sensors and other evidence of loss) to reduce the store's
shrink.

c. There are two types of theft, external and internal.

    i. External theft is theft by an individual who does not work for
Abercrombie, usually a customer. When I suspect external theft in any of
my stores, I am responsible to decide what action is necessary to verify my
suspicions and take that action, gather evidence in support of my
suspicions, and take whatever action I believe is proper to address the
suspect, if at all. I interview external suspects and, to the extent I find that
a suspect caused a loss, take action to recover loss and make sure the case
is prosecutable. I do not have to report to anyone or get permission when
taking these actions. I then work also with the police and prosecutors to
pursue the case. I also complete all paperwork on external cases and have
to do so in a manner that will be most helpful in a later criminal or civil
proceeding.

    ii. Similar to external cases, if I suspect that there is internal theft, I decide,
sometimes in partnership with management, whether to pursue my

SM

suspicions.   If I so decide, I am responsible to determine what action to
take to verify my suspicions and then take that action.  I may review
video, reports, monitor the floor more closely, etc. depending on what I
think will be most effective.  After I gather all evidence I believe solidifies
my suspicions, I submit that evidence to my District Loss Prevention
Manager who then conducts an interview of the internal suspect.  I
complete paperwork for my internal cases and, again, must do so in a way
that it will be most helpful in a court proceeding.

d.  To identify loss, I review cash register transactions, associate purchase logs and
other documents to determine whether there are losses attributable to paperwork
error or other causes.  Based on what I find, I will either further investigate and/or
formulate a plan to address the losses.  I then partner with management to role out
the plan I devised and continue to work with management through the successful
completion of my plan.

e.  In an effort to prevent loss, I conduct regular audits of my stores to ensure
compliance with loss prevention initiatives.  I then follow-up with management in
our training sessions, workshops, meetings and during the normal course of the
week to make sure that the issues identified in the audit are addressed.  I hold the
management team accountable for addressing these issues.

f.  In addition to conducting the audits, I am always making observations in my
stores to determine whether there are any issues that need to be addressed.  Once I
identify any issues, I decide how to address the issues, whether through more
training or meetings, or through a planned course of action.

SM

5.  I do not execute discipline against associates.  However, I partner with management when disciplinary issues arise and I provide management with the evidence and advice necessary to make discipline decisions.  For example, as mentioned above, I regularly conduct associate clothing audits.  If I see an associate wearing a new item of the company's clothing, I may decide to perform an audit to confirm that the clothing has been purchased by that associate.  Or, if an associate is acting in a way that I deem to be suspicious, I may review that associates' purchase log to determine whether he or she purchased an item and I may decide to track that associate's purchases over a period of time.

6.  I am the only LPA who works in my stores.  I work in an independent manner.  Right now, the issue of organized retail crime ("ORC") is an epidemic in my area.  ORC involves groups of individuals who move from store to store stealing large amounts of merchandise.  The stores that I oversee are part of the company's Target Store Program, meaning that they have experienced a great deal of merchandise loss.  In order to confirm that the problem is ORC, I must first confirm that the problem is not related to internal theft.  Then, I must educate store managers and associates about ORC and the signs to look for and the steps to take to protect the company's merchandise.  I recently attended a very comprehensive all-day meeting on the topic of ORC.  Detectives from the New York Police Department were among the presenters.  Because the clientele at Westchester Mall is very different from the clientele at Palisades Mall, I then needed to educate the staff differently at my stores to effectively implement a loss prevention strategy in their particular stores.  I focus the majority of my attention on the Abercrombie & Fitch and Hollister stores at the Palisades and Westchester malls based on the level of shrink they are experiencing.

SM

7.  I use my training, skills and experience to spot problems and theft, and to decide how to address those issues.  I constantly educate managers and associates as to what signs they should look for to prevent internal and external theft.  And, I need to educate them how to make an appropriate recovery statement, how to create a presence on the sales floor and what to look for in terms of suspicious and potentially criminal behavior.

8.  I also oversee safety issues in all of my stores.  For example, I bring to the managers' attention any safety issues that I identify in the stores and recommend specific actions that need to be taken to address those issues.

9.  I complete monthly accomplishment reports and submit them to Rob Ruiz.  In these reports, I identify, for example, the number of apprehensions, orientations, training sessions, workshops, I have accomplished for that time period.  I typically complete these reports in an office inside one of our three (3) stores at the Westchester mall.

10. I don't have an office in any of my stores inside the Palisades mall and I don't have any monitors to review.  All of my stores inside the Westchester Mall, however, have monitors.  Therefore, my loss prevention efforts must vary between the stores at those two (2) malls.

11. The LPAs in our region participate in weekly conference calls.  If I am scheduled to be off the day and/or time of a meeting, I am not required to attend and I can get a recap of the meeting from another LPA.

12. I record the hours I work by logging them on a timesheet.  I accurately record every hour that I work.  I have not been instructed by management to work off the clock.  I have never witnessed a manager instruct any LPA to alter her work time or to work off the clock, nor has any LPA ever told me that a manager instructed her to do so.  I do not work more than forty (40) hours per week.

7

SM

13. My direct supervisor is Okitto Bailey, but I also report to Rob Ruiz.

14. I voluntarily spoke with Audrey Adams, counsel for my employer Abercrombie, with respect to the issues set forth in this Declaration. Ms. Adams informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of <u>Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. Ms. Adams informed that I would not be retaliated against for making my statements. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statements in this Declaration. Ms. Adams told me that she does not represent me individually. She only represents the company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_Shaji Mathew_    7-20-08

Shaji Mathew

8

SM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------

SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

              Plaintiffs,

    -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
           d/b/a Abercrombie & Fitch,
           Abercrombie, Hollister and Ruehl,

           Defendants.
------------------------------------------------------------------------

08 CV 01859 (PKC) (AJP)

**DECLARATION OF FELIX
RAMIREZ**

I, **Felix Ramirez**, being first duly cautioned and sworn, and being more than age eighteen

and competent to testify about the matters contained herein, hereby declare and state as follows

upon personal knowledge or information:

    1.  I am currently employed by Abercrombie & Fitch as a Loss Prevention Agent

("LPA") in Abercrombie's Fifth Avenue location in New York, New York ("Fifth Avenue").

    2.  I was first employed by Abercrombie as a Loss Prevention Supervisor at South Street

Seaport ("SSS") in New York, New York.  I was hired in February 2005.  My title was later

changed to Loss Prevention Agent ("LPA").  I was transferred to Fifth Avenue in ~~November~~ Spring F.R.

2006.

    3.  There are stark differences between working at SSS and working at Fifth Avenue.

1

FR

4.  At SSS, I was one of three LPAs.  We typically worked different shifts so that there was one LPA per shift.   When I worked at SSS, my primary focus was to effectively implement the company's loss prevention initiatives and shrinkage reduction program, and in doing so I constantly exercised independent judgment and discretion.  It was essential to my success as an LPA, and to the success of SSS, that I exercised independent judgment and discretion everyday. I was not working as security guard and I did not follow a set formula that directed me in my every move.  To the contrary, I was constantly analyzing the current loss prevention problems in SSS, determining what specific issues were hindering the store from meeting all loss prevention goals, and determining the best way to help the store improve. I did this in several ways.

   a.  First, I focused heavily on training.  I trained both managers and employees, and I did so with respect to all loss prevention initiatives, which included how to open and close the store, operate the cash register, address customers suspected of theft, monitor store employees to prevent theft, and take other necessary steps throughout the work day to prevent loss.   The training took place during weekly New Hire Orientation, management meetings and on a daily basis through the constant conversations I had with management.  Also, I had regular touch base meetings with employees on loss prevention issues.  The training I gave was not scripted.  There were general topics that the company wanted me to review, but I was expected and did tailor the training to the specific store and the problems I observed it to be having at the time.

   b.  Second, I worked as a partner with the in-store management team at SSS, and they relied on me heavily to address all loss prevention problems in the store.  The management team listened to me, addressed the problems I directed them to

2

*FIL*

address, and continuously asked for my advice on loss prevention problems and issues in the store.

c.  I helped management to address associates who I observed violate loss prevention policies.  For example, if I observed that an associate working in the fitting rooms was not operating those rooms pursuant to loss prevention policy, I would alert management to the problem then direct management to replace the associate at the fitting room.  Also, I gave management information necessary to discipline associates on loss prevention related problems and I partnered with them to decide what discipline to take.

d.  Third, I regularly conducted audits throughout the store.  The audits were designed to assist me in detecting loss prevention problems, including internal, external and operational loss.  After I conducted the audits, I met with management to review the audits and advised them on what specific things they needed to do to address the problem.  Also, while conducting the audits, I picked up on problems not necessarily covered in the audits, and I reviewed those problems with management.  In addition to meeting with management, I decided if additional training was necessary and I attended weekly management meetings to review any problems I found.  I then followed up with the management team and held them accountable for addressing the problems I found.  I did not need oversight nor approval for training and follow up with management.

e.  I was always focused on detecting external and internal loss and taking the appropriate action to address that loss.  To identify loss, I reviewed cash register transactions, associate purchase logs and other documents to determine whether

3

*FIL*

there were losses attributable to paperwork error or other causes, internal, external

or operational. Based on what I found, I would further investigate or formulate a

plan to address the problem. I then partnered with store management to roll out

the plan I devised and continued to work with management through the successful

completion of my plan.

f.   If I detected an external loss – loss caused by individuals who are not employees

of the company – I took actions to verify what I detected, approach the

individual(s) I believed was causing the loss, apprehend him/her, interview

him/her, involve the authorities, if appropriate, and take every action to assemble

a prosecutable case. I had no oversight in my execution of these external cases. I

used my own independent judgment and discretion in how to approach these

situations and how to address them.

g.   Internal loss is loss caused by an employee of the Company. If I detected that an

Abercrombie employee was causing a loss to the company, I researched journals,

logs and other paperwork to build my case. I decided what was necessary to build

the case and built it. I had no oversight when deciding whether to build a case

and while building it. If, after building a case, I thought there might be an internal

loss problem, I gave the case to my supervisor, Mike Oliveras. Mr. Oliveras

interviewed the individuals suspected of internal loss. There were times,

however, that after researching a potential problem, I did not believe an interview

was necessary, but rather that training and other types of communication were

necessary. For example, once, while reviewing the cash register transaction logs

at SSS, I noticed that a manager completed a return transaction after the store

4

closed. Comparing the cash register identification code in the log and, given that the transaction occurred after the store closed, I determined that the manager made a refund to himself, which is in violation of loss prevention policy. The manager could have run a refund transaction to get money for himself out of the cash register, but without returning any merchandise. After making this observation, I reviewed additional logs for the particular manager's cash register identification code to determine whether he completed any similar transactions at any other time. I found no other suspicions transaction. I decided that the manager was likely not causing an internal loss. I spoke with the manager about what he did and also spoke with the entire management team to re-train them on cash register transactions.

h.  The company gave us guidance on how to implement the loss prevention initiatives, but I had to tailor what the company gave me to meet the specific problems that I observed in SSS. I made decisions relating to how I should implement loss prevention programs by researching and analyzing inventory reports and other store documents and information. Based on my observations and research, I decided where to focus my attention in the store, what types of potential loss to address more aggressively, and how to perform my job on any particular day to best address the current loss prevention problems in the store.

5.  At SSS, there were some additional duties that I was responsible for, but those duties were not my primary duties or my primary focus. For example, I monitored shipment when it came in and I also went through the store trash to make sure that there was no merchandise hidden in the trash.

6. At Fifth Avenue, my duties are different.

    a. First, Fifth Avenue is much larger than SSS and has a much larger loss prevention team working in the store. I find that my days at Fifth Avenue are more structured than they were at SSS. I am assigned for different periods of time during every shift to work at posts. Currently, there are three posts. One post is greeting. Before recently, I was assigned as a greeter at the front door. That meant that I checked employees' personal items when they left the store, checked customer bags if the sensor alarm alerted upon their exit from the store, and attended to any other loss prevention problems by the front door. Another post is in the CCTV room where I watch monitors for cameras placed throughout the store. The third post is walking the sales floors to look for any potential loss to the company.

    b. We did not have posts at SSS and did not watch cameras or greet. My entire day at SSS was determined by what I thought the problems were and how I thought they needed to be addressed.

    c. I do conduct training at Fifth Avenue, but I do not get as involved as I did at SSS. However, I do have liberty to add information to training and to elaborate on the topics I am to discuss in training.

    d. I do not participate in management meetings at Fifth Avenue, but I do partner with management. I give management information that they can use to discipline or take other action against associates for loss prevention problems.

    e. I do review transaction logs and other documents the same as I did at SSS to detect signs of internal or external loss. I am responsible for external cases,

without oversight from management, and I am responsible to build internal cases, also without oversight. I do use independent judgment and discretion at Fifth Avenue – I have to if I am going to successfully implement our loss prevention initiatives and partner with management to reduce shrink. I would just say that it is not to the same degree as at SSS.

7. I have worked in loss prevention since about 1992. Prior to working for Abercrombie, I worked at Banana Republic and Bloomingdales. My experience at those stores was different from my experiences at SSS. At Banana Republic and Bloomingdales my work day was more structured and I did not have the opportunity to use the independent judgment and discretion that I exercised everyday at SSS. I did not partner with management at Banana Republic and Bloomingdales, and I did not have the freedom to alter training topic and formats in the same manner as at SSS.

8. I record the hours I work by punching in and out at a computer terminal. I accurately record every hour that I work. I have not been instructed by management to alter my work time or to work off the clock. I have never witnessed a manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

9. I have been paid for all time worked since being employed at Abercrombie.

10. During my time at Abercrombie, I have never been instructed to make daily reports. I do not make reports or complete other paperwork during times that I am off work.

11. I do not work significant, if any, overtime hours. I do not believe the LPA job requires much, if any, overtime. I do not spend overtime hours on regional loss prevention phone calls or drafting email communications to my manager. On those occasions that I can recall

having worked overtime, I have recorded all such hours worked on a timesheet and have been paid accordingly.

12. I voluntarily spoke with Stacia Jones, counsel for my employer Abercrombie, with respect to the issues set forth in this Declaration. Ms. Jones informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of <u>Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation if the Court allows it and that I could be entitled to monetary relief if I opt in and the plaintiffs are successful. Also, Ms. Jones informed that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statements in this Declaration. Ms. Jones told me that she does not represent me individually. She only represents the company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.


_____
**Felix Ramirez**

_____7/19/08_____
**Date**

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And                                                                    08 CV 01859 (PKC) (AJP)

KENNETH FINGERMAN,                                      **DECLARATION OF JAMIE
                                                                       VAN DUSEN**

                          Plaintiffs,

          -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
              d/b/a Abercrombie & Fitch,
              Abercrombie, Hollister and Ruehl,

                          Defendants.
-------------------------------------------------------------------X

     I, Jamie Van Dusen, being first duly cautioned and sworn, and being more than age

eighteen and competent to testify about the matters contained herein, hereby declare and state as

follows upon personal knowledge or information:

     1.  I am employed by Abercrombie & Fitch as a Loss Prevention Agent ("LPA"). As an

LPA, I am responsible for all loss prevention efforts and initiatives in four stores at the Garden

State Mall. Those stores include Abercrombie & Fitch, abercrombie, Hollister and Ruhl. I direct

store management and employees in loss prevention efforts and hold them accountable for

reaching the Company's loss prevention goals. I also partner with store management to respond

to loss prevention issues and to help the store perform at its lowest shrink potential. I regularly

field loss prevention questions from the management in my stores.

1

JV

2.  I constantly review and analyze the current loss prevention problems in each of my individual stores, determining what specific issues are hindering the stores from meeting all loss prevention goals, and determining the best way to help the stores improve.

3.  My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training all store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

    a.  I effectively implement a loss prevention and shortage reduction program in each of my stores.  While the larger goal of reducing shrink and following certain loss prevention rules to prevent shrink is the same for all stores, the shortage reduction programs must often be tailored to the specific needs of the individual stores.  For example, stores that have high shrink are placed on aggressive shortage reduction programs that other, low shrink stores are not required to follow.  Nonetheless, all programs must be tailored to meet the specific problems in each individual store.  Each of the stores that I work in is sufficiently different that I must decide the most effective way to implement the programs so that I can optimize the opportunity for success in the store. Once I identify the specific problems, I then decide how to implement the loss prevention programs and initiatives in the particular store and how to allocate my loss prevention resources to end the loss.

    b.  I conduct regular training sessions for employees and managers.  For example, I conduct regular training of managers on the current loss prevention program and on loss prevention issues I detect in their particular store.  I also train management how to approach customers suspected of theft in a way that is legal and in compliance with company policy.  In addition, I make weekly presentations at

management meetings. Some of the training that I conduct is required of me by the company and there are specific topics that I must cover during the training. But, I also address topics that are store-specific and I make recommendations based on successes that I have experienced at other stores and opportunities that I see to further loss prevention efforts.

c. There are two types of theft, external and internal.

   i. External theft is theft by an individual who does not work for Abercrombie, usually a customer. If I observe external theft in one of my stores, I will approach the suspect and apprehend him/her once I have confirmed that an illegal act has taken place. I do not have to report to anyone or get permission to take such action; however, I will ask a manager to be present when I interview the suspect simply as a witness. I work alone with the police and prosecutors and attend court. I also complete all paperwork on external cases and have to do so in a manner that will be most helpful in a later criminal or civil proceeding.

   ii. Similar to external cases, if I suspect that there is internal theft, I will conduct an investigation, monitoring the situation to confirm my suspicions. For example, I review cash register transactions and associate purchase logs. If I gather evidence that solidifies my suspicions, I submit that evidence to my Loss Prevention Manager who then conducts an interview of the internal suspect. I complete paperwork for my internal cases and, again, must do so in a way that it will be most helpful in a court proceeding.

d.   To identify loss, I review cash register transactions, associate purchase logs and other documents to determine whether there are losses attributable to paperwork error or other causes. Based on what I find, I will either further investigate and/or formulate a plan to address the losses. I then partner with management to roll out the plan I devised and continue to work with management through the successful completion of my plan.

e.   In an effort to prevent loss, I conduct regular audits of my stores to ensure compliance with loss prevention initiatives. I then follow-up with management in our training sessions, workshops, meetings and during the normal course of the week to make sure that the issues identified are addressed.

f.   In addition to conducting the audits, I am always making observations in my stores to determine whether there are any issues that need to be addressed. Once I identify any issues, I decide how to address the issues, whether through more training or meetings, or through a planned course of action.

g.   I am also responsible for identifying and monitoring cash register shortages. Because one isolated incident doesn't provide me with a clear view of what is going on, I may decide to review video transactions to determine whether there is a larger loss prevention issue. I may also decide to track the store, through reports and/or personal observations, to identify a pattern and possible employee theft.

h.   I also conduct monthly safety audits to make sure that the computers are operational and all Company and legally-required safety procedures are being

4

JV

followed. If I identify a concern or violation, I will recommend specific remedial steps to the Store Manager.

i.   I monitor store inventory and I am ultimately responsible for lost merchandise or "shrink." I have decided to focus my attention, at this time, on the Hollister store because it has a high shrink number. In order to reduce that number, I train associates in loss prevention techniques so that they are able to identify the root causes of the loss such as employee or customer theft and overall dishonesty issues. Loss prevention issues like this are broken down individually by store.

4.   I do not execute discipline against employees. But, if I observe an associate who is not performing his/her job I will recommend to the Store Manager that the associate be re-assigned to a different position. The managers typically follow my recommendations in order to further the Company's loss prevention efforts. And, I provide management with the evidence and advice necessary to make discipline decisions.

5.   I am the only LPA assigned to the Company's stores at the Garden State Mall. I work independently to advance the Company's loss prevention efforts at those stores.

6.   Earlier, I stated that I am responsible for four separate stores. Each store's loss prevention issues are different and unique based on the number of employees that work in the store, the volume of business the store conducts, the area in which the store is located, the dedication of the store management team, and the types of employees hired. I do not carry out my duties in any of the four stores in exactly the same manner. For example, my loss prevention tactics at the Hollister store are more aggressive than my tactics at the other stores at the Garden State Mall and will remain that way until I am able to decrease that Store's shrink number.

5

JV

7.  I use my training, skills and experience to spot problems and theft, and to decide how to address those issues.

8.  I have not been instructed by management to alter my work time or to work off the clock.  I have never witnessed a manager instruct any LPA to alter her work time or to work off the clock.  Nor has any LPA ever told me that a manager instructed her to do so.

9.  I do not work overtime hours.  Although Rob Ruiz schedules a regional loss prevention call for every Tuesday, I am not required to participate in the call if I am off work that day.  Instead, I will just ask another LPA for his/her notes from the call.

10.  Every month, I send my monthly accomplishments to Rob Ruiz.  For example, I advise him of my training accomplishments, a list of recovered merchandise, and other loss prevention efforts that I have accomplished.  If I do not complete this report at work, I finish it at home.  When that happens, I simply report to Rob the amount of time spent completing the report and he adds the time to pay for the week.  I have never had a problem getting paid for the time I submitted.  These reports don't take me longer than a half hour to complete.

11.  From what I have heard from LPA's at the Fifth Avenue store, my job is very different from their jobs.  I think there is a big difference being assigned to a mall versus a stand-alone store.  I don't have the luxury of a camera room.  I think I have the same title but a very different role.

12.  Although I am assigned to the Garden State Mall, Rob Ruiz has asked me, on different occasions, to report to a different mall because of loss prevention issues that need to be addressed at a particular store.  Often times, if there is a theft problem I will analyze the store to identify the problem and put in place a plan to decrease our losses.  In the event that I am asked to report to a different store, I am paid for my travel as well as all hours worked.

JV

13. I voluntarily spoke with Audrey Adams, counsel for my employer Abercrombie, with respect to the issues set forth in this Declaration. Ms. Adams informed me that I was not required to speak with her and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of <u>Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation if the Court allows it and that I could be entitled to monetary relief if I opt in and the plaintiffs are successful. Also, Ms. Adams informed that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statements in this Declaration. Ms. Adams told me that she does not represent me individually. She only represents the company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_____  7-19-08
Jamie Van Dusen

7

JV

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------
SHONECA DAVIS,
DAWUD EUDELLE,
JACLYN PAGNOTTA, and
DAVID POMALES

Individually and on behalf of all others similarly situated,
And

KENNETH FINGERMAN,

          Plaintiffs,

    -against-

ABERCROMBIE & FITCH CO.
ABERCROMBIE & FITCH STORES, INC.
ABERCROMBIE & FITCH TRADING CO.
        d/b/a Abercrombie & Fitch,
        Abercrombie, Hollister and Ruehl,

          Defendants.
-------------------------------------------------------------------------

08 CV 01859 (PKC) (AJP)

**DECLARATION OF ANDRE
WALKER**

    I, Andre Walker, being first duly cautioned and sworn, and being more than age eighteen

and competent to testify about the matters contained herein, hereby declare and state as follows

upon personal knowledge or information:

    1.   I am currently employed by Abercrombie & Fitch as a Loss Prevention Agent

("LPA") in Abercrombie's Fifth Avenue location in New York, New York ("Fifth Avenue"). I

have been employed in this position since August 19, 2007 according to company records.

    2.   As an LPA at Fifth Avenue, I am part of a loss prevention team that has the ultimate

responsibility for all loss prevention efforts and initiatives in the store. We direct store

management and employees in loss prevention efforts. We partner with store management to

respond to loss prevention issues and to help the store perform at its lowest shrink potential.

1



3.  My primary responsibilities include implementing loss prevention and shortage reduction programs, regularly training store employees and managers on loss prevention efforts and programs, and preventing, detecting and ending internal and external loss.

    a.  I conduct regular training sessions for employees and managers.  I conduct orientation for new hires on how to respond to emergencies, what techniques to use to prevent theft (e.g. recovery statements to use), how to avoid, prevent and report any loss or potential loss, and other general company policies such as the company's sexual harassment policy.  Several times a month I conduct workshops with store managers and associates on loss prevention issues I detect in Fifth Avenue and ways to prevent or reduce loss in the future.  I also train store management and associates how to approach customers suspected of theft in a way that will allow us to prevent theft while maintaining good customer relations.

    b.  There are two types of theft, external and internal.

        i.  External theft is theft by an individual who does not work for Abercrombie, usually a customer.  When my observations lead me to suspect external theft, I am solely responsible to take action to prevent the theft and apprehend the suspect when theft occurs, and I take whatever action I believe is proper to address the suspect.  When I apprehend a suspect I complete the necessary paperwork and contact the police.  I do not have to report to anyone or get permission when taking these actions. I work alone with the police and prosecutors and attend court if it is required.  I complete all paperwork on my external cases and have to do so



2

in a manner that will be most helpful in a later criminal or civil proceeding.

ii. Similar to external cases, if I suspect that there is internal theft, I pursue my suspicions. I do this by, for example, reviewing cash register transactions and associate purchase logs and through my own observations of associates. After I gather all evidence I believe solidifies my suspicions, I submit that evidence to my Loss Prevention Manager. My Loss Prevention Manager then conducts an interview of the internal suspect to confirm the results of my investigation.

c. In an effort to prevent loss, I conduct regular audits to ensure compliance with loss prevention initiatives and safety policies and procedures. This is done by walking through the store and responding to a loss prevention audit questionnaire. After conducting the audit, I review the results with management and identify with management what things must be improved.

d. In addition to conducting the audits, I am always making observations in my stores to determine whether there are any issues that need to be addressed. For example, I recently noticed that cashiers were switching registers without logging out. This causes a problem with respect to loss prevention because it prevents the accurate tracking of purchases. I approached a cash manager to report this concern, identified the employees I had observed engaging in this conduct and recommended that the manager issue discipline to the employees for their inappropriate conduct. The cash manager agreed with and implemented my recommendation.

3

e.  On most shifts that I work I am assigned to detect loss by watching monitors for 55 cameras located throughout Fifth Avenue. But, I do not simply sit and watch the monitors. Instead, I use my skills and training to detect potential loss, then manipulate the cameras so that I can hone in on the potential loss, and decide whether further action should be taken. If so, I then communicate with my fellow LPAs on the sales floor and we decide what action should be taken and put that action into place.

f.  Also, I am sometimes assigned to work in the loss prevention office where I am responsible to sign out store keys and sensor guns, and monitor the lost and found and door alarms.

g.  Throughout my different shifts, I may be assigned to complete my duties at a particular post in the store. If I am assigned to monitor the front doors, then I am also responsible to check customers and employees' personal items and/or purchases when they leave the store to make sure there is no theft. When I am not assigned to a particular post, however, I walk through Fifth Avenue looking for loss prevention problems, assessing those problems, and taking the appropriate action.

4.  I understand from talking to one of my fellow LPAs who worked with me at Fifth Avenue and now works in the South Street Seaport store that the Fifth Avenue Store is a different beast. Among other things, the South Street Seaport does not use televisions to monitor employees and customers for theft in the same manner as Fifth Avenue. He also indicated that Fifth ~~Street~~ Ave has more blind spots and less lighting and, therefore, more opportunities for theft.



4

Based upon this conversation, I believe that his job duties as an LPA at the South Street Seaport store differ from mine.

5.   I partner with management on deciding what discipline action to take against employees with loss prevention issues and I provide management with the evidence and advice necessary to make discipline decisions.

6.   I use my training, skills and experience to spot problems and theft, and to decide how to address those issues. If I did not, I would not be successful at my job. As a naturally competitive person, I am motivated to perform my job duties in ways that differ from and exceed the efforts of my fellow LPAs. I take pride in exercising my independent judgment in finding new ways to advance the store's loss prevention efforts and apprehend those who steal from the company.

7.   I record the hours I work by punching in and out at a computer terminal. I accurately record every hour that I work. I have not been instructed by management to alter my work time or to work off the clock. I have never witnessed a manager instruct any LPA to alter his/her work time or to work off the clock, nor has any LPA ever told me that a manager instructed him/her to do so.

8.   I do not work significant, if any, overtime hours. I do not spend overtime hours on regional loss prevention phone calls or drafting email communications to my manager. On the rare occasions that I can recall having worked overtime, I have recorded all such hours worked on the time clock and have been paid accordingly.

9.   I voluntarily spoke with Corey Donovan and Audrey Adams, counsel for my employer Abercrombie & Fitch ("Abercrombie"), with respect to the issues set forth in this Declaration. Ms. Donovan and Ms. Adams informed me that I was not required to speak with

5

them and that I could have ended our conversation at any time. I understand that this Declaration was obtained for purposes of Abercrombie's defense of Shoneca Davis, et al. v. Abercrombie & Fitch Co., et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Abercrombie Loss Prevention Agents. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation if the court allows it and that I could be entitled to monetary relief if I opt in and the plaintiffs are successful. Also, Mses. Adams and Donovan informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with them. They told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Mses. Adams and Donovan told me that they do not represent me individually. I understand that they represent the Company.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_____
Andre Walker

_____
Date

6

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2006 WL 278154 (S.D.N.Y.)
**2006 WL 278154 (S.D.N.Y.)**

▷

Morales v. Plantworks, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
José MORALES, Efren Morales, and Felix
Pacheco, and on behalf of themselves and all others
similarly situated, Plaintiffs,
v.
PLANTWORKS, INC., Neil Mendeloff, and Verna
Mendeloff, Defendants.
No. 05 Civ. 2349(DC).

Feb. 2, 2006.

Michael Faillace & Associates, P.C., By: Michael
Faillace, New York, New York, for Plaintiffs.
Goldberg and Weinberger LLP, By: Stuart Wein-
berger, New York, New York, for Defendants.

### MEMORANDUM DECISION

CHIN, J.
*1 Plaintiffs José Morales, Efren Morales, and Fe-
lix Pacheco were employed as landscapers by de-
fendant Plantworks, Inc. which is owned and oper-
ated by defendants Neil Mendeloff and Verna
Mendeloff. Plaintiffs bring this action pursuant to
the Fair Labor Standards Act (the "FLSA"), the
New York Labor Law, and the "spread of hours"
wage order of the New York Commission of Labor.
Plaintiffs contend that defendants maintained a
policy and practice of requiring plaintiffs to work
more than forty hours per week without paying
them minimum wage and overtime compensation in
violation of state and federal labor laws. Plaintiffs
also seek to recover damages against defendants for
discrimination and retaliation under Section 1981
of the Civil Rights Act of 1866, 42 U.S.C. § 1981,
the New York State Executive Law § 290*et seq.,*
the FLSA, 29 U.S.C. § 201*et seq.,* and New York
Labor Law § 215.

Plaintiffs move for an order (1) permitting plaintiffs
to proceed as a collective action with respect to
their FLSA claims; (2) compelling defendants to
furnish the names and last known addresses of all
employees of Plantworks since September 2002; (3)
authorizing plaintiffs to send a notice and "opt-in"
form to all prospective members of the collective
action; and (4) compelling Plantworks to post the
Court-approved "opt-in" notice in conspicuous loc-
ations in its offices. The motion is denied in part
and granted in part, as set forth below.

### DISCUSSION

The FLSA permits employees to maintain an action
"for and in behalf of ... themselves and other em-
ployees similarly situated."29 U.S.C. § 216(b). The
named plaintiffs must be "similarly situated" to the
proposed members of the class, and proposed class
members must "opt in" and consent in writing to
being a party to the action. *Id.*

In collective actions, courts in this circuit fre-
quently follow a two-stage certification process.
*Masson v. Ecolab, Inc.,* No. 04 Cv. 4488(MBM),
2005 WL 2000133, at *13 (S.D.N.Y. Aug. 17,
2005); *Gjurovich v. Emmanuel's Marketplace, Inc.,*
282 F.Supp.2d 91, 96 (S.D.N.Y.2003); *Rodolico v.
Unisys Corp.,* 199 F.R.D. 468, 480 (E.D.N.Y.2001)
(class certification in ADEA case); *see also* Charles
Alan Wright, Arthur R. Miller, and Mary Kay
Kane, 7B *Federal Practice and Procedure: Civil
3d* § 1807, at 487-53 (2005) (discussing two stages
of certification process) ("Wright, Miller & Kane").
At the first stage, the court examines the pleadings
and affidavits to determine whether the named
plaintiffs and putative class members are similarly
situated. *Masson,* 2005 WL 2000133, at *13. If the
court finds that they are, it conditionally certifies
the class and permits notice to be sent to putative
class members.*Id.;* Wright, Miller, & Kane, 7B
*Federal Practice and Procedure* § 1807, at 492-93.
At the second stage, the employer can move to de-
certify the class if discovery reveals that the

**EXHIBIT**

D

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 278154 (S.D.N.Y.)
**2006 WL 278154 (S.D.N.Y.)**

claimants are not similarly situated. *Masson,* 2005 WL 2000133, at *14.

*2 In collective actions, district courts have "broad discretion to grant certification, to allow discovery, and to regulate notice."Wright, Miller, & Kane, 7B *Federal Practice and Procedure* § 1807, at 486. *SeeHoffman v. Sbarro, Inc.,* 982 F.Supp. 249, 261 (S.D.N.Y.1997) ("It is well settled that district courts have the discretionary power to authorize the sending of ['opt-in'] notice[s] to potential class members."). Thus, at this early stage in the litigation, the threshold question for the Court is whether circumstances exist to warrant the exercise of this discretion or, in other words, whether plaintiffs have demonstrated that the potential class members are "similarly situated" to them. *Id.*

The FLSA does not define "similarly situated" nor does it set out standards for determining whether the requirement has been met. *Seeid.* In this Circuit, "courts have held that plaintiffs can meet this burden by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Hoffman,* 982 F.Supp. at 261 (citing cases).*SeealsoJackson v. New York Tel. Co.,* 163 F.R.D. 429, 431 (S.D.N.Y.1995) ("[P]laintiffs need merely provide 'some factual basis from which the court can determine if similarly situated potential plaintiffs exist." ') (quoting *Schwed v. General Electric Co.,* 159 F.R.D. 373, 376 (N.D.N.Y.1995)). The leniency of this requirement is consistent with the broad remedial purpose of the FLSA. *SeeHoffman,* 982 F.Supp. at 262 (citing cases discussing broad remedial purpose of FLSA).

In this case, plaintiffs have not met their burden. In support of their motion, plaintiffs submitted an affidavit of their attorney, to which were attached the following exhibits: (1) plaintiffs' First Amended Complaint; (2) a proposed "opt in" form; (3) a copy of the settlement form and general release issued to plaintiff Pacheco by defendants; (4) copies of four payroll check stubs for plaintiff José Morales; (5) copies of two payroll stubs for plaintiff Efren Mor-

ales; and (6) copies of two payroll stubs for plaintiff Felix Pacheco. (Faillace Aff. Ex. A-F). The payroll stubs support plaintiffs' claim that they were paid the regular rate for overtime. (Faillace Aff. Ex. D-F). The affidavit and exhibits, however, contain no reference to any Plantworks employee other than plaintiffs, and they make no allegations of a common policy or plan to deny plaintiffs overtime. The only additional support for plaintiffs' claim that they are similarly situated to other Plantworks' employees comes from their conclusory allegation in the amended complaint that "[t]here are over 20 current and former employees that are similarly situated to Plaintiffs and have been denied minimum wage and overtime compensation while working for Defendants. Plaintiffs are representative of these other workers and are acting on behalf of their interests as well as their own interests in bringing this action."(Am.Compl.¶ 33).

*3 Though the first stage of class certification only requires a "modest factual showing," it must be sufficient to demonstrate that plaintiffs and potential class members were victims of a common scheme or plan that violated the law. *SeeHoffman,* 982 F.Supp. at 261;*Levinson v. Primedia Inc.,* 02 Cv. 2222(CBM), 2003 WL 22533428 (S.D.N.Y. Nov. 6, 2003) (finding that plaintiff failed to meet "modest burden"). In making this showing, "[c]onclusory allegations are not enough."Wright, Miller, & Kane, 7B *Federal Practice and Procedure* § 1807, at 490-91. Here, plaintiffs have offered only a conclusory allegation in their complaint; they have offered nothing of evidentiary value. Because plaintiffs have failed to meet this minimal requirement, their motion for class certification is denied. In light of the remedial purpose of the FLSA and the Court's broad discretionary power, plaintiffs' motion for the names and addresses of Plantworks employees is granted, but only to the extent that defendants must produce the names and last known addresses of all individuals employed by Plantworks since 2002 in non-management positions with whom they have not entered settlement agreements. *SeeHoffmann-La Roche Inc. v. Sper-*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                           Page 3
Not Reported in F.Supp.2d, 2006 WL 278154 (S.D.N.Y.)
**2006 WL 278154 (S.D.N.Y.)**

*ling,* 493 U.S. 165, 168-70 (1989) (upholding district judge's order that employer produce names and addresses of discharged employees); Wright, Miller, & Kane, 7B *Federal Practice and Procedure* § 1807, at 495-96 ("If conditional certification is denied, the court may allow discovery to provide plaintiffs a second opportunity to obtain sufficient evidence of a collective to warrant conditional certification and the notice to opt in.")

### CONCLUSION

Based on the record before the Court, plaintiffs' motion for certification and for authorization to send a notice and 'opt-in" form is denied. Plaintiffs may renew the motion should discovery reveal additional facts to support the application. Plaintiffs' motion for the names and addresses is granted to the limited extent set forth above.

SO ORDERED.

S.D.N.Y.,2006.
Morales v. Plantworks, Inc.
Not Reported in F.Supp.2d, 2006 WL 278154 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DONALD J. BUNYAN,                      )
PHILLIP C. CENATIEMPO,                 )
DAVID M. FOULKES,                      )
RONALD LAURVICK, and                   )
JEAN L. HUNT, as personal representative )
of the estate of Michael E. Lewis,     )
                                       )
                   Plaintiffs,         )
                                       )
          vs.                          )      Case No. 07-CV-0089-MJR
                                       )
SPECTRUM BRANDS, INC., and             )
UNITED INDUSTRIES CORP.,               )
                                       )
                   Defendants.         )

### MEMORANDUM and ORDER

**REAGAN, District Judge:**

Plaintiffs filed this putative collective action on February 2, 2007 (Doc. 2) and amended their complaint on August 14, 2007 (Doc. 43). Plaintiffs allege that Defendants unlawfully refused to pay full overtime wages in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201. Defendants argue that the Plaintiffs fall within an exemption to the FLSA's overtime pay requirements. On April 13, 2007, Magistrate Judge Philip M. Frazier held a scheduling and discovery conference (Doc. 20). At that time, the Court entered an order limiting discovery to the collective action certification issue. This matter is now before the Court on Plaintiffs' motion for conditional certification of the proposed collective action (Doc. 79).

### A. Introduction and Background

Plaintiffs were originally employed by United Industries Corp., which was acquired by Spectrum Brands, Inc. in 2005. Defendants' work involves the packaging of various chemicals,

-1-



including insecticides and herbicides. Plaintiffs were employed as production supervisors within Defendants' St. Louis County, Missouri facilities. Work at these facilities is conducted in three 8-hour shifts—7 a.m. to 3 p.m.; 3 p.m. to 11 p.m.; and 11 p.m. to 7 a.m.—though Plaintiffs did not necessarily work on the same shift or production line.

Plaintiffs allege that they spent 50% or more of their time maintaining and servicing production line machinery. However, they also claim that they spent a large portion of their time (40%) working alongside the operators on the production line, where they placed chemicals into containers. The remainder of their job consisted of doing administrative work (10%).

Plaintiff Bunyan claims that he was originally compensated at an hourly rate and was given time-and-a-half for overtime work. At some point, however, Defendants instituted a Compensation Incentive Plan, which provided that compensation would be paid as a predetermined specific amount per pay period (i.e., salary). It is this plan that Plaintiffs say violated their rights under the FLSA.

Under the new plan, Plaintiffs' work responsibilities did not change. It appears that the salary under the plan was based on an 8-hour shift, though Plaintiffs did not receive overtime pay unless they worked more than 10 hours. According to Plaintiffs, this resulted in a pay decrease because they were always required to report 30 minutes prior to an 8-hour shift and remain on duty for at least 30 minutes after the shift ended. Essentially, Plaintiffs argue that Defendants consistently paid them for 8-hours of work, even though they worked 9-hour shifts or longer. Irrespective of the fact that their work weeks always lasted at least 45 hours, they allege that Defendants' compensation plan failed to compensate them for overtime.

Moreover, Plaintiffs allege that even when Defendants did pay them for overtime,

the plan only permitted compensation for additional time worked at the end of the shift, such that they never received credit for the 30 minutes prior to its start. Plaintiffs also claim that when overtime pay was awarded, it was improperly calculated because it did not account for retroactive raises or shift premiums.

Plaintiffs challenge this system as a violation of the FLSA, 29 U.S.C. § 207. They seek to proceed in a collective action under § 216 and request compensatory damages for all unpaid overtime, liquidated damages under the FLSA, and injunctive relief.

Plaintiffs now move this Court to conditionally certify a collective action in this case and require Defendants to send notice to all members of the putative class. Defendants argue that Plaintiffs cannot show that the proposed class members are similarly situated. On July 18, 2008, the Court held a hearing and heard argument on the underlying motion.

Having thoroughly reviewed the parties' arguments, the Court hereby **DENIES** Plaintiffs' motion for conditional certification as a collective action (Doc. 79).

## B. Analysis

Plaintiffs seek conditional collective action certification under **29 U.S.C. § 216(b)**, which provides:

> An action to recover the liability [under the FLSA] may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Thus, whether a collective action should be certified depends on whether the employees in the proposed class are "similarly situated."

As the FLSA itself makes a collective action available to claimants, the standards and procedures provided by FEDERAL RULE OF CIVIL PROCEDURE 23, which governs class actions, are inapplicable here. For instance, putative class members in a Rule 23 proceeding remain class members until they "opt out." Under the FLSA, however, putative class members must "opt in" if they wish to participate in the action.

It is within the sound discretion of the district court as to whether or not to certify a collective action under § 216(b). *See Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001).

1. Establishing the Proper Legal Standard

The level of scrutiny the Court uses to assess the certification issue varies depending on the stage of the litigation. While the Seventh Circuit has not provided a particular standard for determining when certification should be granted, the Southern District of Illinois follows the majority of district courts and typically applies an *ad-hoc* two-step process. *Perry v. National City Mortg., Inc.*, Case No. 05-CV-0891, 2007 WL 1810472 (S.D. Ill. June 21, 2007). In either step, the plaintiff bears the burden of showing that the employees are similarly situated. *Bouaphakeo v. Tyson Foods, Inc.*, Case No. 07-CV-4009, 2008 WL 2645759, *12 (N.D. Iowa July 3, 2008) (slip opinion).

The first step typically occurs where the parties have engaged only in minimal discovery. At this stage, the Court conducts a more lenient analysis of whether potential class members are "similarly situated," though mere allegations are insufficient, and "some evidence to support the allegations is required." *Bouaphakeo*, 2008 WL 2645759, at *12. If plaintiffs satisfy this hurdle, the class is conditionally certified, and potential class members are given notice and an

opportunity to opt in. Certification is "conditional" in the sense that it is not final and may be reassessed once more discovery has been conducted.

The second step occurs after substantial discovery is complete, at which time the party opposing collective action typically moves to decertify the class. *See Perry*, 2007 WL 1810472; *Flores*, 289 F.Supp.2d 1042, 1045 (N.D. Ill. 2003); *Rollison v. CC Servs., Inc.*, Case No. 05-CV-4193, 2006 WL 15696824; *see also Smith v. T-Mobile USA, Inc.*, Case No. 05-CV-5274, 2007 WL 2385131 (C.D. Cal. Aug. 15, 2007). At this stage, the Court makes a stringent, factual determination as to whether the members of the class are similarly situated. *Perry*, 2007 WL 1810472.

Importantly, Plaintiffs are not required to prove the merits of their claim at either stage of the certification process—that is, they need not show an actual violation of the FLSA. *Bouaphakeo*, 2008 WL 2645759, at *13. The Court's concern throughout the two-step process is whether certification will aid the litigation in light of § 216(b)'s fundamental purposes: "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves 'common issues of law and fact that arose from the same alleged activity.'" *Id.* (citing *Kautsch v. Premier Communications*, Case No. 06-CV-04035, 2008 WL 294271, at *2 (W.D.Mo. Jan. 31, 2008) (quoting *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D.Pa.2000))).

Here, the parties are unable to agree which stage the Court's inquiry should begin. Plaintiffs request that the Court conditionally certify the class proceeding under the first prong. Defendants argue that over fifteen months worth of discovery has been conducted, which eliminates the need for conditional certification. As such, Defendants argue that the Court should move

-5-

directly to the second step and the more stringent analysis.

There is support for Defendants' position. It is clear that courts permit a more lenient showing in the first stage because the parties have usually had very little time for discovery and minimal evidence is available at the time. Courts also recognize that once substantial discovery has been conducted, plaintiffs face a higher burden in proving that they and potential class members are similarly situated.

Thus, where plaintiffs request certification for the first time after significant discovery has occurred, some courts collapse the two-step inquiry into one and consider only the second inquiry. In *Harris v. Fee Transp. Servs., Inc.*, the Northern District of Texas explained:

> At the initial stage, a court ordinarily possesses "minimal evidence" and is thus instructed to apply a lenient standard in determining whether to conditionally certify. . . . But where the parties have had the opportunity to conduct discovery on the issue of certification, the similarly situated inquiry is more stringent. *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004). Courts generally consider the evidence submitted and the two-step inquiry collapses into one. *Id.* ("[I]n light of the substantial discovery that has occurred in this matter, the Court will consider the criteria for both the first and second steps in deciding whether it should certify."); *see also Pfohl v. Farmers Ins. Group*, No. CV-03-3080, 2004 WL 554834, at *3 (C.D. Cal. Mar. 1, 2004) (finding that where discovery relating to the issues of certification had been undertaken, the court could proceed to the second stage of the analysis and weigh the relevant factors to determine whether plaintiffs were similarly situated); *White v. Osmose, Inc.*, 204 F.Supp.2d 1309, 1313 n.2 (M.D.Ala.2002) (finding it appropriate to consider the evidence submitted by the parties when discovery had been conducted); *Ray v. Motel 6 Operating Ltd.*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. 1996) (applying a more stringent standard at the initial stage because "the facts before the Court are extensive [and] there is no need for discovery in order to reach a determination"). In the present case, the Court's Scheduling Order gave the parties over seven months to conduct discovery related to the certification issue; the Court finds this sufficient to engage the second step of the analysis. *See Brooks v. Bellsouth*

>Telecomm., Inc., 164 F.R.D. 561, 568–69 (N.D Ala.1995) (finding
>that a three month period for discovery was extensive enough to
>prompt the second stage of the analysis).

**Case No. 05–CV-0077, 2006 WL 1994586, \*3 (N.D. Tex. May 15, 2006).** Therefore, a court

following this approach moves directly to the second prong.

On the other hand, where substantial, but not all discovery occurred prior to the

plaintiffs' motion for certification, the Northern District of Iowa recently applied an intermediate

approach.   In ***Bouaphakeo***, the district court incorporated the procedural aspect of conditional

certification with the substantive analysis appropriate under each prong:

>The court will determine whether conditional certification of a
>collective action is appropriate by evaluating all the facts that have
>thus far been placed before it. Thus, procedurally, the court is not
>making any final decisions, and [defendant] will have an opportunity
>to later decertify the class if the court approves conditional
>certification and authorizes notice. Furthermore, substantively, the
>court will ultimately use the more onerous second stage analysis to
>account for all the important facts learned through discovery that
>inform what putative plaintiffs, if any, are similarly situated to
>existing plaintiffs.

**2008 WL 2645759, at \*15.** In other words, where plaintiffs successfully make a more stringent

showing based on the available evidence, the class may be conditionally certified, thereby giving

defendants an opportunity to move for decertification upon the completion of discovery.

In cases such as this one, where substantial but not all discovery has taken place, the

intermediate two-step approach seems particularly appropriate. Here, the Magistrate Judge held a

scheduling and discovery conference on April 13, 2007 (Doc. 20). At that time, the Court limited

discovery "to the collective action certification issue. In the event that the collective action is

certified, plaintiffs' counsel shall request that another scheduling conference be set to discuss a

further truncated discovery schedule which will allow the parties to participate in a meaningful

settlement conference."[1] The Court also provided that any motion to certify the collective action

was to be filed no later than February 1, 2008.

As a result, the Court provided nearly ten months for discovery on the issue of

whether the plaintiffs are similarly situated. Ultimately, Plaintiffs failed to meet the prescribed filing

deadline and were given and extension through March 17, 2008 to file a motion for certification

(Doc. 63).[2] By that time, over eleven months of discovery had been conducted. To date, over fifteen

months have passed since the initial discovery conference. Within that period it is clear that at some

point, Plaintiffs acquired a list of other production supervisors in the St. Louis County facilities as

potential members of the proposed class (See Doc. 69-2, Exh. 4).

It is clear that the parties have conducted a substantial amount of discovery in this

case. They have exchanged interrogatories, conducted depositions, and exchanged a large number

of documents. The Court cannot close its eyes to the amount of discovery already performed in this

action. At the same time, the Court is cognizant that Plaintiffs only seek conditional certification

at this point and that discovery is not complete. Taking the intermediate two-step approach permits

the Court to determine whether a sound basis exists for proceeding conditionally as a collective

action while also considering all evidence available at this time. Additionally, because discovery

---

[1] Plaintiffs argue that the schedule provided by the Court provided for initial discovery
on the issue of whether a conditional collective action could be certified. However, a common
sense reading of the Order suggests otherwise. The Court intended there be a round of discovery
on the collective action issue and did not mention an initial conditional certification phase. The
second round of discovery was clearly to be aimed at the merits of the plaintiffs' claims, as the
Court specifically states that discovery in that phase would "allow the parties to participate in a
meaningful settlement conference." Plaintiffs fail to explain how additional discovery on the
certification issue would facilitate such a conference.

[2] The Court later granted yet another extension of time to April 14, 2008, after Plaintiffs
realized they had failed to attach a memorandum of law supporting the initial filing (Doc. 77).

is not yet complete, conditional certification, if granted, permits Defendants to make a fully informed challenge to certification once discovery concludes. As such, the Court's analysis proceeds under the intermediate approach.

2. Analysis Under the Intermediate Approach to Conditional Certification

Plaintiffs seek conditional certification for "all employees of Spectrum Brands Inc., formerly known as Rayovac Corporation or United Industries Corporation a/k/a Spectrum Brands, who were, at any time during the last three years, paid according to the 2000 Production/Receiving/Rework Supervisor Computation Incentive Plan."

As a preliminary note, Plaintiffs appear to seek a collective action with a class of plaintiffs throughout the United States. Defendants argue that this is improper because Plaintiffs' complaint confines the class to employees in Spectrum's St. Louis County, Missouri facilities. In response, Plaintiffs argue that Count II of their complaint expands the class to include potential plaintiffs employed by Spectrum throughout the United States.

Further inspection suggests that if Plaintiffs intended to allege a nationwide class in Count II, they failed to do so. Count II realleges the claims in Count I and states that the compensation plan also "applied to production/receiving/rework supervisors who might not have done exactly the same mechanic/supervisor work as these four Plaintiffs at the same exact locations" (Doc. 43, ¶ 46). Plaintiffs then state that they "seek to prosecute their FLSA claims as a collective action on behalf of all present and past employees of Defendant Spectrum Brands similarly situated, in addition to those who did supervisor/mechanic work at the locations where Plaintiffs were employed in connection with the manufacture and packaging of insecticides, herbicides and other products" (Doc. 43, ¶ 7). Plaintiffs argue that Paragraph 47's "all present and past employees" and

-9-

"in addition to" language indicates a nationwide class action; in other words, the action is pursued on behalf of every similarly situated employee of Spectrum Brands.

Plaintiffs' complaint is not a model of clarity, and the Court finds Plaintiffs' position untenable. The Court notes that Plaintiffs never specifically allege, either directly or through incorporation of Count I, that Spectrum applied an unlawful policy to a nationwide class of employees. Additionally, taking Paragraphs 46 and 47 together, it appears to the Court that Plaintiffs draw a distinction between those doing "mechanic/supervisor work" in its St. Louis facilities, such as the named Plaintiffs, and "production/receiving/rework supervisors" at those same locations (Doc. 43, ¶ 46). Thus, the Court construes Paragraph 47 not to open the potential class to a nationwide group of employees, but rather as an attempt to include a group of employees who are subject to the compensation plan, yet perform a broader set of work duties than the named Plaintiffs. At any rate, Count II does not clearly indicate a nationwide class.

Accordingly, the Court finds that any request for conditional class certification must conform to the class indicated in the complaint. As such, the Court construes the instant motion to include only those similarly situated individuals who are subject to the compensation plan and employed in St. Louis County, Missouri.

### a. Analysis Under Step One

The Court now turns to the issue of whether the allegations and factual record to date support conditional class certification. The Court must first determine whether Plaintiffs have met their burden of showing, under the more lenient analysis, that they and potential claimants are similarly situated.

As previously explained, at this stage the Court conducts a more lenient analysis in

determining whether Plaintiffs and the potential class members are "similarly situated" victims of an unlawful policy or plan. *Bouaphakeo*, 2008 WL 2645759, at *12; *see Perry*, 2007 WL 1810472, at *2; *Rollison*, 2006 WL 15696824. However, mere allegations are insufficient, and "some evidence to support the allegations is required." *Bouaphakeo*, 2008 WL 2645759, at *12. Additionally, some Courts have required plaintiffs to present evidence that "other similarly situated individuals desire to opt in to the litigation." *Bouaphakeo*, 2008 WL 2645759, at *12 (quoting *Parker v. Rowland Express, Inc.*, 492 F.Supp.2d 1159, 1164-65 (D. Minn. 2007)).

The parties disagree, however, as to how minimal this showing can be. Pointing to language in *Perry*, Plaintiffs argue that they need only "demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." **2007 WL 1810472, at *2 (quoting *Flores*, 289 F.Supp.2d at 1045).** In other words, Plaintiffs believe the Court need only consider evidence supporting the allegations (1) that an unlawful compensation plan existed and (2) that Plaintiffs and potential claimants were all subject to that plan. Defendants, on the other hand, argue that the Court should require some basic showing that the Plaintiffs and potential claimants are similarly situated in their job duties as well.

The Court agrees that the "modest factual" showing does require at least some minimal support for Plaintiffs' allegation that they, along with potential plaintiffs, are similarly situated in their job duties and their compensation plan. Even in *Perry*, the Court clearly considered evidence that the day-to-day activities of defendants' employees differed depending on their experience and number of clients. **2007 WL 1810472, at *3.** There, Plaintiffs were able to convince the district court that the differences in their activities was overcome by the similarities in their general job requirements and duties. *Id.*

Other cases also support Defendants' position. For instance, in *Forney v. TTX Co.*, the plaintiff sought conditional certification in an attempt to recover overtime wages under the FLSA. **Case No. 05-CV-6257, 2006 WL 1030194 (N.D. Ill. April 17, 2006).** While conducting its inquiry in the first stage of the two-tiered process, the district court noted that the success of plaintiff's claims depended on whether employees were exempt under federal regulations. *Id.* at *2. The district court explained that in order to obtain conditional certification, plaintiffs "must come forward with evidence indicating her salary and duties were similar to those of other [employees]." *Id.* Ultimately, the court denied conditional certification, explaining that

> Most importantly, [plaintiff] fails to identify a single . . . employee who performed duties similar to hers. As a result, she cannot satisfy the evidentiary burden at step one of the *ad hoc* inquiry. . . . [Plaintiff's] reliance on job descriptions is unpersuasive. Whether similarly situated employees exist depends on the employees' actual qualifications and day-to-day duties, rather than their job descriptions.

*Id.* **at *2-3.** *See also Holt v. Rite Aid Corp.*, **333 F.Supp.2d 1265, 1274-75 (M.D. Ala. 2004) (denying conditional certification in the first stage, after considering evidence that there were substantial differences between individual employees' daily tasks and responsibilities, because plaintiffs had not met their burden of showing that employees were similarly situated);** *Mike v. Safeco Ins. Co. of America*, **274 F.Supp.2d 216, 220-21 (D. Conn. 2003) (holding that plaintiff failed to make an adequate showing that "questions common to a potential group of plaintiffs would predominate a determination of the merits in this case," because the merits of plaintiffs' claim would require a factual analysis of their individual day-to-day work functions).**

With these standards in mind, the Court finds that Plaintiffs fail to make the minimal showing required under the first step. Plaintiffs offer evidence that the employees in question are

all (1) production supervisors and (2) have been paid according to the terms of the compensation incentive plan. Plaintiffs also provide evidence that under the compensation plan, employees routinely worked more than 40-hour weeks, but were not always paid for overtime under the plan. To support their claim, Plaintiffs present pay stubs indicating that Bunyan was not always paid overtime (Doc. 79-3, Exh. 3), even though he routinely worked at least 45 hours per week. Emails sent to the production supervisors concerning the expectation that they arrive 30 minutes before their shift and stay 30 minutes afterwards also support the allegation that Plaintiffs worked more than 40 hours each week but were not paid for the additional time (Doc. 79-3, Exh. 2).

While this evidence provides factual support for the assertion that the employees were paid under the same compensation plan, Plaintiffs provide nothing to indicate that they are similarly situated with respect to their employment duties and circumstances. Even though each of the Plaintiffs and potential claimants were employed as "production supervisors," job descriptions alone are insufficient to clear even the low evidentiary hurdle at this stage. Moreover, Defendants offer evidence that there are significant differences in the nature of work each individual employee performed, as they worked at different locations, on different shifts, and on different production lines.

Given that Plaintiffs provide no evidence to the contrary, the Court finds that Plaintiffs have failed to provide sufficient evidence that they and the potential class members are similarly situated with respect to their work responsibilities and functions. As such, even under the lenient standard of step one, conditional collective action certification is not warranted.

b. Analysis Under Step Two

Even assuming that Plaintiffs could sustain their burden under the first step of the

-13-

inquiry, they certainly cannot sustain the more rigorous showing required in step two of the intermediate approach. Plaintiffs would have to show that, in light of all the evidence currently available, they and potential claimants appear to be "similarly situated" with respect to their job requirements and payment. *Bouaphakeo*, 2008 WL 2645759, at *13. In assessing the evidence, courts generally consider three factors: "(1) the employment and factual settings of plaintiffs; (2) the various defenses available to defendants; and (3) considerations of fairness, procedure, and manageability." *Id.* (citing *Kautsch*, 2008 WL 294271, at *2).

With respect to the first factor, Plaintiffs and potential claimants were all employed by Defendants in its St. Louis County facilities as production supervisors. As such, each was paid according to the terms of the compensation incentive plan (See Doc. 79-3, Exh. 4; Doc. 79-4, Exh. 5, pp. 19–20, 23).

Even though each of the Plaintiffs and potential claimants were employed as "production supervisors," many of them worked at different locations, on different shifts, and on different production lines. As such, it appears from the Defendants' evidence that there are significant differences in the nature of work each individual performed.

Plaintiffs' complaint generally alleges that the production supervisors spent 50% or more of their time maintaining and servicing production line machinery, spent 40% of their time working alongside workers on the production line, and spent 10% or less of their time conducting administrative work and filling out forms. But Defendants submit a variety of affidavits and deposition excerpts which indicate that the time each production supervisor allocates to these tasks varies depending on the person, shift, and location of the work (Cenatiempo Dep., Doc. 85-3, pp. 65, 67-68, 236; Schuchart Aff., Doc. 85-16, ¶ 4).

For instance, Mike Schuchart[3] stated in an affidavit that when working on certain production lines, he primarily ordered replacement parts and maintained records, while conducting no maintenance on machines (Doc. 85-16, ¶ 4). Other employees, however, reported doing no part-ordering on their lines at all (Hassell Aff., Doc. 85-12, ¶ 9). Schuchart also stated that he was often responsible for administrative tasks, such as reviewing payroll records, approving vacation time, and hiring employees (Doc. 85-16, ¶ 11, 15, 16). Plaintiffs, however, claim they spent very little time doing administrative activities. Additionally, Schuchart stated that he only infrequently operated machines (Doc. 85-16, ¶ 17), while the named Plaintiffs estimate that they spent 40% of their average workday doing so.

Affidavits from the production supervisors also indicated that only one supervisor was primarily responsible on each line for preventative maintenance (Bean Aff., Doc. 85-7, ¶ 28; Butler Aff., Doc. 85-8, ¶ 21). The amount of time spent on these activities also varied from 6-7 hours a week on some lines (Butler Aff., Doc. 85-8, ¶ 21) to approximately 2-3 hours on other lines (Black Aff., Doc. 85-9, ¶ 6; Hassell Aff., Doc. 85-12, ¶ 8).

Defendants delineate a number of other areas where production supervisors' duties and work varies from person to person and line to line. From the evidence before the Court, it also appears that the amount of time that different production supervisors dedicated to various tasks and responsibilities varied substantially. Given that Plaintiffs provide a dearth of evidence to the

---

[3] At the hearing, Plaintiff noted that Schuchart's name does not appear on the list of St. Louis County production supervisors originally provided by Defendants during discovery. However, the Court finds Schuchart's affidavit persuasive, as he states that he worked as a production supervisor from April 2001 through December 2006, which is within the relevant time period (Doc. 85-16; ¶ 3).

contrary, the Court need not reiterate the full spectrum of these differences.[4] More importantly, Plaintiffs offer no evidence that the similarities outweigh the differences between the employees.

Likewise, the second factor cuts decidedly against conditional certification. As noted above, Plaintiffs allege that they have been deprived of overtime pay in violation of the FLSA, 29 U.S.C. § 207. However, for certain executive employees, the FLSA includes a variety of exemptions with respect to § 207. *See* **29 U.S.C. § 213; 29 C.F.R. § 541.100.** Defendants argue that Plaintiffs and the potential claimants are exempt employees under these provisions. Therefore, Plaintiffs' claims, and those of the potential claimants, will ultimately turn on whether Plaintiffs can provide evidence that the work and duties they carried out are similar to those of the other production supervisors they wish to join in the collective action.

As already explained above, there are significant differences between the production supervisors at Defendants' facilities with respect to the types of work they perform and the amount of time allocated to their various tasks. The disparities between the employees' job responsibilities and duties indicate that the Court will have to consider the individual circumstances of each Plaintiff in order to resolve the issue of whether Plaintiffs are exempt employees.[5]

A number of district courts have recognized that where a fact-specific analysis of each individual plaintiff's employment responsibilities would be required to determine their status,

---

[4] It would not surprise the Court if even greater differences were uncovered if the proposed class was expanded to include production supervisors throughout the United States, as Plaintiffs apparently seek.

[5] While the Court considers the defenses available to the Defendants, this analysis does not consider whether the defense itself is meritorious. The Court states no opinion as to whether Plaintiffs are actually exempt employees under the FLSA. Rather, the analysis here simply indicates that conditional certification would be inefficient because the Court will have to undertake an analysis of each employee's work responsibilities in order to decide the issue.

class certification is not appropriate. *See Reich v. Homier Distributing Co.*, 362 F.Supp.2d 1009, 1013-14 (N.D. Ind. 2005) (collecting cases and denying certification because "potential class members [are not] similarly situated where liability depend[s] on an individual determination of each employee's duties."); *Clausman v. Nortel Networks, Inc.*, Case No. 02-CV-0400, 2003 WL 21314065 (S.D. Ind. 2003) (withdrawing certification because "members of [defendant's] sales staff performed their duties in a variety of ways, making individual inquiry necessary to determine whether each was properly classified" and "the factual inquiry necessary to make that determination weighs heavily against conditionally certifying a plaintiff class."); *see also Harris*, 2006 WL 1994586, at *5 (collecting cases; noting that "multiple courts in this circuit and elsewhere have refused to conditionally certify a class at the first stage of the analysis when the determination of whether certain employees were improperly classified as exempt would require a highly individualized inquiry."); *Holt*, 333 F.Supp.2d at 1274-75 (denying certification and finding that plaintiffs were not similarly situated because "the court would have to inquire . . . as to the daily tasks of each putative collective action member to determine whether they are similarly situated to the persons identified by the Plaintiffs, and then, on the merits, whether they had suffered an FLSA violation because they were not eligible for overtime compensation. Only once those determinations had been made could any collective proof as to the number of overtime hours be relevant."); *Pfohl v. Farmers Ins. Group*, 2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004) ("the exempt or non-exempt status of hundreds of independent contractor adjusters would need to be determined on an employee-by-employee basis. This would be inefficient and impractical, thereby defeating the purpose of a collective action.").

-17-

Because of the dissimilarities between Plaintiffs' individual employment duties and responsibilities, the Court finds that an individualized analysis will be required in order to resolve Plaintiffs' claims. In light of the need for individualized inquiries, it should be no surprise that certification of a collective action in this particular case would make the litigation unmanageable and inefficient. As such, conditional certification is not appropriate here.

Plaintiffs have not carried their burden of showing that the similarities between the production managers outweigh their differences, and as a result, the Court must deny Plaintiffs' request for conditional certification.

### C. Conclusion

In conclusion, based on the evidence currently before the Court, Plaintiffs fail to sustain their burden of proving, at either stage of the two-step inquiry, that they and the potential plaintiffs are similarly situated. Accordingly, the Court **DENIES** Plaintiffs' motion for conditional collective action certification (Doc. 79).

**IT IS SO ORDERED.**

**DATED this 31st day of July 2008.**

s/ Michael J. Reagan
MICHAEL J. REAGAN
United States District Judge

-18-

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1986 WL 11458 (S.D.N.Y.), 42 Fair Empl.Prac.Cas. (BNA) 212, 41 Empl. Prac. Dec. P
36,599
**1986 WL 11458 (S.D.N.Y.)**

H
Palmer v. Reader's Digest Ass'n, Inc.
S.D.N.Y., 1986.

United States District Court, S.D. New York.
Robert P. PALMER, on behalf of himself and other
employees similarly situated, Plaintiffs,
v.
The READER'S DIGEST ASSOCIATION, INC., et
al., Defendants.
**No. 84Civ.8397-CSH.**

Oct. 3, 1986.

Warshaw, Burstein, Cohen, Schlesinger & Kuh,
New York, New York, Martin R. Lee, Barbara L.
Levine, of counsel, for plaintiffs.
Proskauer, Rose, Goetz & Mendelsohn, New York,
New York, Howard L. Ganz, Bernard M. Plum,
Paul Salvatore, of counsel, for defendants.

MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:
*1 This Court's Memorandum Opinion and Order of
February 7, 1986 certified to the United States
Court of Appeals for the Second Circuit for inter-
locutory appeal, pursuant to 28 U.S.C. § 1292(b),
the question whether plaintiffs were entitled to dis-
covery of RDA's former employees, in preparation
for the sending of notices concerning this action.
*Cf. Braunstein v. Eastern Photographic Laborator-
ies,* 600 F.2d 335 (2d Cir.1978) (per curiam), *cert.
denied,* 441 U.S. 944 (1979). The Court of Appeals
declined to accept the interlocutory appeal. There-
fore, under the ruling in *Braunstein,* notices will be
sent. Counsel were asked in an exchange of corres-
pondence to advise the Court of any disputes that
might arise with respect to the form of the notice.

A number of disputes have arisen. One of them is a
dispute of substance, rather than form. It relates to
the boundaries of that class of RDA employees who
should be regarded as "similarly situated" to
plaintiff Robert P. Palmer. It was Palmer who filed

the complaint with the EEOC which forms the jur-
isdictional predicate for this action.

Only RDA employees "similarly situated" to Mr.
Palmer should receive notices. That phrase derives
from 29 U.S.C. § 216(b) (federal minimum wage
law), as made applicable to age discrimination
cases such s this one by 29 U.S.C. § 626(b).

Generally speaking, to approve an ADEA class
"plaintiffs need only show that their positions are
similar; they need not be identically situated to po-
tential class members." *Behr v. Drake Hotel,* 586
F.Supp. 427, 431 (N.D.Ill.1984), citing *Riojas v.
Seal Produce, Inc.,* 82 F.R.D. 613, 616
(S.D.Tex.1979). Nevertheless, there must be a
demonstrated similarity among the individual
"situations," which I take to mean some identifiable
factual nexus which binds the named plaintiffs and
the potential class members together as victims of a
particular alleged discrimination. *Cf. Riojas, supra,*
82 F.R.D. at 616 ("... the members of the class are
all field hand harvest workers who have been al-
legedly denied their minimum wages"); *Sussman v.
Vorando, Inc.,* 90 F.R.D. 680 (D.N.J.1981) (class
consisted of employees who had been terminated in
the wake of a strike).

In determining which employees are "similarly
situated" to the employee filing the EEOC com-
plaint, we may usefully start by understanding his
particular "situation." It is that situation which lies
at the center of the action; degrees of similarity
must be measured in relation to it.

The complaint at bar displays as an exhibit Mr.
Palmer's complaint to the EEOC, and of necessity
incorporates that complaint by reference. The
EEOC complaint alleges that Palmer, then 56 years
old and a veteran of 23 years' service for RDA, was
advised on June 26, 1984 by his supervisor that the
superior was "reorganizing" the department in
which Palmer worked, and had decided to
"terminate" Palmer. Palmer's complaint then under-

EXHIBIT

F

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1986 WL 11458 (S.D.N.Y.), 42 Fair Empl.Prac.Cas. (BNA) 212, 41 Empl. Prac. Dec. P 36,599
**1986 WL 11458 (S.D.N.Y.)**

takes to describe his "situation" and those employees who were similarly situated:

*2 "Complaint is but one of some 200-300 employees, 75% of whom are over 40 years of age, who have recently been terminated (i.e. within the last six months) by The Reader's Digest Association, Inc.

"On information and belief, the employees in the protected class appear universally to have been terminated in a very peremptory fashion under the guise of 'restructuring' the business, and, on information and belief, the job responsibilities performed by those employees have been assumed by younger people. Annexed hereto is a copy of a letter protesting the termination of complainant's employment which was sent to Mr. Bohane on July 23, 1984, together with his indifferent response of August 17, 1984."

This language is clear and unambiguous. It was Mr. Palmer's theory, embraced by the eleven other individual plaintiffs, that RDA, during the six-month period of time preceding June 1984, announced a "restructuring" of its business which constituted a sham and pretext for terminating employees because of their age. The situations of the twelve individual plaintiffs are all consistent with that theory. One of them was terminated in January 1984; one in May; five in June; three in July; and two in August. They filed their complaint in this Court, on their behalf of "other employees similarly situated," on November 21, 1984.

In the record developed thus far in the litigation, RDA does not deny that a corporate "restructuring" occurred in 1984. On the contrary: in any affidavit dated May 6, 1985, William J. Cross, the president and chief operating officer of the company, describes the manner in which that restructuring came about. Mr. Cross states that in April and early May 1984, the last of RDA's original owners died; two of the three members of its executive committee resigned; and a new management team determined that "it would be necessary to restructure and reor-

ganize RDA's operations, and, as an essential part of such reorganization, to eliminate unnecessary positions and thereby reduce its work force." Cross affidavit at ¶ 5. The Cross affidavit further recites that the restructuring "began in May 1984 and was largely finished by September of that year, although isolated staff reductions related to the restructuring occurred before May and after September."    ¶ 9. RDA's in-house newsletter, "Pegasus," printed in its September 1984 issue a statement from George Grune, RDA's Chairman, which stated in part:

"I want you to know this reorganization is essentially over and any future changes in personnel will reflect normal employee changes that happen in every well-managed business."

This statement to the RDA employees antedated the filing of the EEOC complaint and the complaint in this case (although Palmer has previously written to his supervisor at RDA complaining of his termination and reserving any "underlying claims which I have." Letter of July 23, 1984, attached to EEOC complaint.)O.

It is of course RDA's basis litigation position that the terminations of employment generated by the "restructuring" had nothing to do, in any individual case, with that individual's age.

*3 I now come to the central dispute between the parties. Plaintiffs wish to send a notice to RDA employees who were forced into premature retirement or terminated after November 26, 1983, and through and including the date of the notice. RDA wishes to confine the notice to the period January 1, 1984 through December 31, 1984. (The parties are agreed that in either event, the notices should be sent only to regular, salaried employees, excluding temporary or seasonal employees.)

RDA's rationale is that the calendar year 1984 furnishes the maximum boundaries of that "restructuring" process which lay at the heart of Palmer's EEOC complaint, and lies at the heart of this litigation.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                     Page 3
Not Reported in F.Supp., 1986 WL 11458 (S.D.N.Y.), 42 Fair Empl.Prac.Cas.(BNA) 212, 41 Empl. Prac. Dec. P
36,599
**1986 WL 11458 (S.D.N.Y.)**

Plaintiffs seeks to commence the notice period with the date of November 26, 1983, that being 300 days prior to the filing of the Palmer EEOC complaint, a date with statute of limitations implications. *Cf. Frank v. Capital Cities Communications, Inc.,* 509 F.Supp. 1352 (S.D.N.Y.1981). Plaintiffs' proposed notice is open-ended because plaintiffs' claim that "what defendants call 'restructuring' continues to date." Letter of plaintiffs' counsel of May 12, 1986 at 4.

On the present record, RDA's position with respect to the pertinent time frame is clearly correct. Plaintiff Palmer's EEOC complaint zeroed in upon a particular implementation of age discrimination, occurring at a particular time. The challenged implementation is the allegedly pretextual corporate "restructuring"; the year is 1984. These are the particular circumstances in which Palmer charged he was "situated." RDA employees "similarly situated" must fit within that same factual nexus, which was of plaintiffs' choosing and design, not that of defendants.

Furthermore, there is nothing in the present record to support plaintiffs' conclusory suggestions of a continuing policy of age discrimination forming part and parcel of the events of 1984. No discovery has been had to test the assertions of the Cross affidavit, which go to the heart of the matter. I do not say that in criticism; I only observe that there is no present basis upon which plaintiffs' expanded employee class can be justified.

Surely no justification appears in the most recent letters of counsel. Indeed, one assertion of plaintiffs' counsel is not only irrelevant, it is troublesome.

In plaintiffs' counsel's letter of May 12, 1986, and in support of the assertion that RDA employees continued to suffer from restructuring-oriented discrimination, counsel wrote this:

Additionally, as indicated by the document annexed hereto as Exhibit A, on June 20, 1985, the Chairman of the Board of Reader's Digest, in a letter to employees announcing a "Special Retirement Opportunity" spoke of continuing "restructuring."

I read counsel's letter before reading the document referred to, Exhibit A. I assumed from the quotation marks counsel used, as any reasonable reader would, that the Chairman of the Board actually used the word "restructuring" in his letter of June 20, 1985 to the RDA employees. I then read the document. It is in fact dated June 20, 1985. The letter is addressed to RDA employees and signed by Grune as Chairman of the Board and chief executive officer. After preliminary remarks about RDA's long-term goals and certain implementing steps, Grune announces "an enriched retirement opportunity," available only for a limited period of time, and voluntary in nature. The last paragraph of the June 20, 1985 letter sums up the purposes of the operational changes and retirement opportunity described therein:

*4 "In all these changes we have two principal objectives. The first is to streamline our operations to meet ever-changing conditions and challenges. The second is to recognize those employees who have given years of good service to the company and to reward them appropriately."

The word "restructuring" nowhere appears in the letter of June 20, 1985.

In an exercise of charity, I will ascribe counsel's restructuring of the June 20, 1985 letter to carelessness, rather than a deliberate effort to mislead the Court. In any event, the Chairman's letter of June 20, 1985, when given an accurate reading, has nothing to do with the issues arising out of this action.

Secondly, plaintiffs' counsel say in the letter under discussion that "[w]e have been contacted by employees claiming age discrimination based on firings occurring as late as December 31, 1985." Letter of May 12, 1986 at 2. The "employees" claiming age discrimination on firings as late as December 31, 1985 are not identified in counsel's letter.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1986 WL 11458 (S.D.N.Y.), 42 Fair Empl.Prac.Cas.(BNA) 212, 41 Empl. Prac. Dec. P
36,599
**1986 WL 11458 (S.D.N.Y.)**

However, defendants' counsel, in a letter dated May 19, 1986, calls the Court's attention to a consent to join the action filed by one Eugene Doherty, who claims to have been terminated by the Digest on December 31, 1985. Defendants' counsel state, without subsequent contradiction, that Doherty was employed for many years as the private chauffeur of Mr. and Mrs. Wallace, the Digest's original owners, now deceased; and, more recently, as a manager or supervisor of the estate on which the Wallaces lived. According to defendants' counsel, Doherty's employment was terminated "only after the estate was leased and ultimately sold to an unrelated third party." Letter of May 19, 1986 at 5. If these facts are true, the Doherty situation has nothing to do with the case at bar. No further pertinent particulars have been furnished by the plaintiffs.

On the present record, the notice to be mailed to potential opt-in class members will take the form suggested by defendants. I resolve the other disputed issues in defendants' favor, except that the deadline for filing shall be sixty (60) days from the date of the notice, as proposed by plaintiffs, rather than thirty (30) as proposed by defendants.

Defendants are directed to furnish plaintiffs' counsel with the names and last known addresses of potential plaintiffs within fourteen (14) days of the date of this Order.

The resolution of this motion is without prejudice to plaintiffs' right to renew an application to enlarge the class, in respect of periods of time or corporate affiliation, if subsequent discovery demonstrates a justification for doing so. *Cf. Frank v. Capital Cities Communications, Inc.,* 88 I.F.R.D. 674, 679 (S.D.N.Y.1981).

The parties are directed to complete discovery on these aspects of the case not later than February 2, 1987. Any application for enlargement of that time must be made by affidavits served and filed not later than seven (7) days preceding the deadline.

The parties are directed to settle an order on five

(5) days' notice, attaching a form of notice to potential opt-in plaintiffs consistent with this Opinion.

***5** All the foregoing is SO ORDERED.

S.D.N.Y., 1986.
Palmer v. Reader's Digest Ass'n., Inc.
Not Reported in F.Supp., 1986 WL 11458 (S.D.N.Y.), 42 Fair Empl.Prac.Cas. (BNA) 212, 41 Empl. Prac. Dec. P 36,599

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2008 WL 938584 (S.D.N.Y.)
**2008 WL 938584 (S.D.N.Y.)**

c
Mendoza v. Casa de Cambio Delgado, Inc.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
    United States District Court,S.D. New York.
    Gisele MENDOZA, Mary Gamboa, Zulay Scama-
ronez, Lorena Almeida, Nancy Mora, Greis Vidal,
    Lourdes Caisaguano, Sandra Gonzalez, Jeanneth
Garcia, Natalia Barona, and Martha Forero on be-
half of themselves and all others similarly situated,
                            Plaintiffs,
                                v.
    CASA DE CAMBIO DELGADO, INC., Delgado
    Travel Agency, Inc., Delgado & Delgado Travel
Corp., Denise Delgado, Hector Delgado, Jeanette
Delgado-Savino, and Linda Delgado, Defendants.
                    No. 07CV2579(HB).

                        April 7, 2008.

                    **OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge.
*1 Plaintiffs have sued their former employers Del-
gado Travel Agency, Delgado Travel Corp., and
Casa de Cambio Delgado, Inc. ("Defendants"), a
collection of travel agency and money wire busi-
nesses, for failure to pay overtime and spread of
hours wages in violation of the Fair Labor Stand-
ards Act, 29 U.S.C. § 201 et seq. ("FLSA") and the
New York Labor Law § 650 et seq. ("NYLL").
Plaintiffs move to certify a collective action under §
216 of the FLSA and a class action under
Fed.R.Civ.P. 23(a) and (b)(3) for the NYLL claims.
Defendants oppose the motion on the grounds that
Plaintiffs have failed to show 1) that the named
Plaintiffs are similarly situated with the putative
class members; and 2) that the Plaintiffs fail to
meet any of the class action requirements of FRCP
23. For the reasons outlined below, the Plaintiffs'
motion is denied but may be renewed. Fully briefed
motions are due within 60 days of the date hereof.

## I. FACTS

Plaintiffs allege that the Defendant corporations
maintain travel agencies and currency exchange
businesses in New York and other states. (First Am.
Compl. ¶¶ 29-31 ("Compl.").) Most of the named
Plaintiffs worked from Monday through Friday
from 9:00 am to 8:30 pm; 9:00 am through 6:00 pm
on Saturdays; and to 12:00 midnight during peak
travel periods, approximately 20 days per year.
(Compl.¶¶ 33-36.) Plaintiffs also allege that De-
fendants caused Plaintiffs to be paid a weekly
salary, rather than an hourly wage and based their
raises, if any, on these weekly salaries. (Compl.¶
43.) Finally, Defendants allegedly deducted approx-
imately $100 per day if any Plaintiff missed work
for illness, emergency or personal reasons.
(Compl.¶ 44.)

## II. LEGAL STANDARDS

### A. Collective Action Certification-FLSA § 216(b)

The FLSA permits employees to maintain an action
"for and in behalf of ... themselves and other em-
ployees similarly situated."29 U.S.C. § 216(b). Put
another way, the named Plaintiffs must be similarly
situated to the proposed members of the class, and
proposed class members must "opt in" and consent
in writing to being a party to the action. *Id.* Courts
have wide discretion here to grant certification, al-
low discovery and regulate notice. *Morales v.
Plantworks,* Inc., 05cv2349, 2006 WL 278154, at
*2 (S.D.N.Y. Feb. 2, 2006).

Though the FLSA does not define the standard for
"similarly situated," courts in this Circuit require
the Plaintiff to make only a "modest factual show-
ing" that the plaintiff(s) and potential collective ac-
tion members were victims of a common policy or
plan that violated the law. *Lynch v. United States
Auto Ass'n,* 491 F.Supp.2d 357 (S.D.N.Y.2007);
*Lee v. ABC Carpet & Home,* 236 F.R.D. 193, 196



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2008 WL 938584 (S.D.N.Y.)
**2008 WL 938584 (S.D.N.Y.)**

(S.D.N.Y.2006). While this is a very liberal standard, conclusory allegations or lack of a nexus with the putative class will prevent the case from moving forward as a collective action. *Morales,* 2006 WL 278154, at *3.

## B. Class Certification-FRCP §§ 23(a) and (b)(3)

*2 Plaintiffs bear the burden of proving that the putative class has satisfied all four prerequisites of Rule 23(a) and at least one of the requirements of Rule 23(b).*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997). The Second Circuit recently rejected the liberal burden, i.e. "some showing," and now the district court must determine and resolve factual disputes relevant to each Rule 23 requirement. *In re Initial Public Offering Sec. Litig.,* 471 F.3d 24, 40-43 (2d Cir.2006).

The party seeking class certification under Rule 23(b)(3) must show that common questions of law or fact predominate and that a class action is a means superior to other methods to adjudicate the claims. Fed.R.Civ.P. 23(b)(3). Plaintiffs must also prove that an identifiable class exists from the outset of litigation, and that the representative plaintiffs be members of that class.*Petrolito v. Arrow Financial Srvs., LLC,* 221 F.R.D. 303, 307 (D.Conn.2004) (citing *Norman v. Conn. State Bd. of Parole,* 458 F.2d 497 (2d Cir.1972)).

Like the collective action, class certification decisions by their nature are conditional, and a court has the power to alter or modify the class description if subsequent events suggest that it is appropriate to do so. *Catanzano by Catanzano v. Dowling,* 847 F.Supp. 1070, 1078 (W.D.N.Y.1994). District courts also have ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial. *In re IPO Sec.Litig .,* 483 F.3d 70, 73 (2d Cir.2007).

## III. DISCUSSION

## A. Collective Action FLSA § 216(b)

Here, the Plaintiffs have failed to provide allegations of the factual nexus between the named Plaintiffs and other putative class members. The affidavits by the former employees appear to be boilerplate and virtually identical. (*See generally* Faillace Aff, Exs. B-U.) Each affidavit by a former employee states that the employee either worked as a Travel Agent for Delgado Travel Agency or Cashier for Casa de Cambio Delgado; the Plaintiffs worked on average 66 or 68 hours per week, but were paid only between 52-63.5 hours per week; were never allowed breaks besides an unpaid lunch break of either 30 or 45 minutes; had $100 deducted from paychecks for sick days; and no vacation was permitted. (*See* Faillace Aff, Exs. B-K.) Plaintiffs' Counsel submitted one affidavit of a non-named Plaintiff.

The principal defect in these affidavits for collective certification is that not one Plaintiff affidavit purports a factual nexus with other putative employees of the Delgado network. *Id.* While there is a low bar for allegations required for collective action certification, the lack of factual allegations in the affidavits or complaint to show that the Plaintiffs are similarly situated with the other employees fail to meet that bar.

The First Amended Complaint which alleges the facts underlying the FLSA and NYLL claims is the only submission among the pleadings and affidavits which alleges that the named Plaintiffs are similarly situated with putative class members. Plaintiff does so in a single umbrella-like affidavit from Mr. Faillace, it reads in pertinent part:

*3 Plaintiffs allege on behalf of themselves and other similarly situated current, former, and future individuals employed by Defendants and who choose to opt-in to this action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), that they are entitled to (i) unpaid wages from Defendants for overtime work for which they did not receive any overtime

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2008 WL 938584 (S.D.N.Y.)
**2008 WL 938584 (S.D.N.Y.)**

premium pay; and (ii) liquidated damages pursuant to the FLSA, 29 U.S.C. §§ 201, et seq.

(Faillace Aff, Ex. A, First Am. Compl. ¶ 1.) The only other indication that employees may be similarly situated is based on the depositions of the Delgado family and payroll managers taken in May and June of 2006 in connection with an action in this Court against the same Defendants by other employees. (Faillace Aff, Exs. V-AA, Deps. in *Nancy Patricia Espinosa and Monica Montero*, 05cv6917 (SAS)(FM).)<sup>FN1</sup>

FN1. This 2005 case settled.

While the deposition of Mr. Delgado shows that there may have been a policy common to the organizations to pay employees a "weekly" salary, (Faillace Aff, Ex. X.), the depositions of Isabel Castro and Isabel Chaparro, payroll managers, show that actual hours worked were used to calculate payroll, (Faillace Aff, Exs. V 72-76; W 93-96). Even the individual earnings reports submitted to show "weekly" payments reflect variations in overtime hours. In many cases, weekly hours include a repeated 20 or 19.25 hours in overtime; however, other reports reflect variations in overtime for the same employee. The variations in some cases range from 3-24 hours with individual employees. (Faillace Aff, Ex. Q; T; U.)

There are even contradictions between the affidavits and the allegations in the Amended Complaint. For example, each of the affidavits asserts that the individual employee would work until 9:00 p.m. during the 20-day peak travel period. (Faillace Aff., Exs. B-L, ¶ 5.) However, in the Complaint, Plaintiffs, whether travel agents or cashiers, allege that each named Plaintiff worked until 12:00 midnight during that period. (Faillace Aff, Ex. A.; Compl. ¶¶ 33-42.) In short, the pleadings and affidavits of the Plaintiffs fail even to make the modest factual showing that they are similarly situated to other employees past and present, thus the collective action certification is denied without prejudice. *Morales*, 2006 WL 278154.

**B. Federal Rule of Civil Procedure 23 Class Action**

As noted above, the standard for evaluating Rule 23 class action certifications is not only stricter than collective action, it is stricter than the earlier treatment by courts in this Circuit. *In re IPO Sec. Litig.*, 471 F.3d at 40. The Plaintiffs assert approximately 100 employees are in the class; they do this by reliance on the 2006 depositions of the payroll managers that show approximate 210 total employees. (*E.g.*, Faillace Aff, Dep. Isabel Chaparro, Ex. W 70; Dep. Karina Leticia Vacacela Romero, Ex. AA 15.) At oral argument, Plaintiff's counsel noted possibly 300-400 affected employees without explaining how he derived that number. (Hrg. Tr. 18.) But no affidavit or other evidence by the employees provides any connection to other employees nor are there any estimates based on their own experience as to what the total numbers are.

*4 There is no articulation of what number of employees out of the total noted in 2006 would have been affected by such a policy nor is there any way to know how the Plaintiffs come to that number. The lack of evidence identifying the number in the *class* is linked with the identification of the class itself.*Petrolito*, 221 F.R .D. at 307. Here, there is no definition of the class. Thus, the Court need not reach the question of whether certification is appropriate. The additional requirements suffer from the same deficiencies in evidence. Plaintiffs if they can, must incorporate material gleaned from discovery and provide adequate details for the two certifications, or there will be no certification. Having read all the papers, one cannot help but ask "where's the beef."

**C. Court-Supervised Notice to Claimants**

I agree with Defendants that the notice should be jointly prepared and that preparation should begin promptly. (Faillace Aff., Ex. BB.; Def. Mem. 23-24.) At present, the proposed notice discusses both options regarding the opt-in and opt-out

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 4
Slip Copy, 2008 WL 938584 (S.D.N.Y.)
**2008 WL 938584 (S.D.N.Y.)**

without distinguishing the two. Claimants are likely to be confused about their obligations and rights. The parties should prepare the notice jointly, and, failing agreement, each side should submit a proposed notice to the Court for its decision.

### III. CONCLUSION

Both conditional certifications, i.e. that for the collective action and for the Rule 23 class action are denied without prejudice. Plaintiffs may refile their motion after some discovery, which should be and I presume is ongoing and said motion must be fully briefed within 60 days from the date hereof. Discovery will end 90 days from the date hereof to maintain the sanctity of the trailing trial calendar.

**SO ORDERED**

S.D.N.Y.,2008.
Mendoza v. Casa de Cambio Delgado, Inc.
Slip Copy, 2008 WL 938584 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Not Reported in F.Supp.2d                                                                           Page 1
Not Reported in F.Supp.2d, 2006 WL 1662614 (E.D.N.Y.)
**2006 WL 1662614 (E.D.N.Y.)**

▷
Prizmic v. Armour, Inc.
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Elijo PRIZMIC, on behalf of himself and all others
similarly situated, Plaintiffs,
v.
ARMOUR, INC., et al., Defendants.
No. 05-CV-2503 (DLI)(MDG).

June 12, 2006.

Karl J. Stoecker, Law Offices of Karl J. Stoecker,
New York, NY, for Plaintiff.
Howard S. Krebs, Howard S. Krebs, P.C., Great
Neck, NY, for Defendants.

*ORDER*

GO, United States Magistrate Judge.
**\*1** Plaintiff Elijo Prizmic ("plaintiff") brings this
action against defendants Armour, Inc., Ramiz
Mrkulic, and Al Parviz ("defendants") pursuant to
section 216(b) of the Fair Labor Standards Act
("FLSA"), 29 U.S.C. § 201 *et seq.,* as a putative col-
lective action by employees of defendants alleging
that he and others similarly situated have been
denied overtime compensation, as required by the
FLSA. Plaintiff moves to compel defendants to
provide the names and addresses of their current
and former employees who were not paid overtime
and for permission to notify them of the pendency
of this action.[FN1]

> FN1. I note that the instant motion is with-
> in my pre-trial authority to decide under 28
> U.S.C. § 636(b)(1)(A). See *Patton v.
> Thomson Corp.,* 364 F.Supp.2d 263,
> 265-66 (E.D.N.Y.2005) (magistrate judge
> had authority to compel production of in-
> formation about putative class members
> and to permit notice of collective action);
> *Mazur v. Olek Lejbzon & Co.,* No. 05 Civ.

2194, 2005 WL 3240472, at \*2 n. 1
(S.D.N.Y. Nov. 30, 2005).

For the reasons set forth below, plaintiff's motion to
compel and for permission to send notice to poten-
tial class members is denied without prejudice.

BACKGROUND

In his unverified complaint, plaintiff alleges that he
was employed as an asbestos installer by defend-
ants, from October 2004 through March 2005.
Complaint ("Comp.") at ¶ 4. Plaintiff further al-
leges that during his employment, plaintiff and his
fellow insulation installers routinely worked more
than forty hours per week but were not paid time
and a half of their regular rate of pay for any hours
worked in excess of forty hours per week.*Id.* at ¶ 8.
Plaintiff has not submitted any affidavit or docu-
mentation in support of the instant motion.

At an initial conference held on July 28, 2005, the
Court ordered that automatic disclosures be served
by September 8, 2005 and that the parties inform-
ally exchange information before the next confer-
ence. *See* minute entry dated July 28, 2005. At a
discovery conference held on October 19, 2005, the
Court ordered that fact discovery be completed by
April 12, 2006. *See* minute entry dated October 19,
2005. By letter dated December 23, 2005, plaintiff's
counsel informed the Court that defendants had not
responded to plaintiff's discovery requests. Ct. doc.
7. On January 4, 2006, the Court ordered defend-
ants to provide the outstanding discovery responses
by January 31, 2006. *See* minute entry dated Janu-
ary 4, 2006. At a conference held on June 8, 2006,
the parties confirmed that defendant had provided
the information sought. On February 24, 2006,
plaintiff filed the instant motion. *See* ct. doc. 8.

DISCUSSION

Plaintiff moves to compel disclosure of the names

EXHIBIT
H

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2006 WL 1662614 (E.D.N.Y.)
**2006 WL 1662614 (E.D.N.Y.)**

and addresses of "[a]ll current and former employees of Armour, Inc., who were employed by the Company at any time during the past three years and were not paid overtime for each hour worked in excess of forty hours per week" and for court authorized notice informing those potential plaintiffs of the opportunity to "opt-in" to the present lawsuit. *See* ct. doc. 8-2 at 1, 6.

Section 216(b) of the FLSA provides:

An action to recover ... liability ... may be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

**\*2** 29 U.S.C. § 216(b). It is well settled that district courts have the discretion whether to authorize the sending of notice to potential class members and direct an employer defendant to disclose the names and addresses of similarly situated potential plaintiffs in a collective action brought pursuant to section 216(b) of the FLSA. *Morales v. Plantworks, Inc.,* No. 05 Civ. 2349, 2006 WL 278154, at \*2 (S.D.N.Y. Feb. 2, 2006); *Patton,* 364 F.Supp.2d at 266;*Hoffmann v. Sbarro,* 982 F.Supp. 249, 262-63 (S.D.N.Y.1997); see *also Hoffmann-La Roche v. Sperling,* 493 U.S. 165, 169 (1989).

The threshold issue in deciding whether to authorize class notice in an FLSA action is whether plaintiffs have demonstrated that potential class members are "similarly situated." *Morales,* 2006 WL 278154, at \*1;*Levinson v. Primedia, Inc.,* No. 02 Civ. 2222, 2003 WL 22533428, at \*1 (S.D.N.Y. Nov. 6, 2003); 29 U.S.C. § 216(b). Although neither the FLSA nor its implementing regulations define the term "similarly situated," in this Circuit, "courts have held that plaintiffs can meet this burden by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan

that violated the law."*Morales,* 2006 WL 278154, at \*2 (quoting *Hoffmann,* 982 F.Supp. at 261);*see Barfield v. New York City Health and Hospitals Corp.,* No. 05 Civ. 6319, 2005 WL 3098730, at \*1 (S.D.N.Y. Nov. 18, 2005); *Levinson,* 2003 WL 22533428, at \*1. At the initial stage, "the court examines the pleadings and affidavits to determine whether the named plaintiffs and putative class members are similarly situated."*Morales,* 2006 WL 278154, at \*1;*Flores v. Osaka Health Spa, Inc.,* No. 05 Civ. 962, 2006 WL 695675, at \*2 (S.D.N.Y. March 16, 2006); *see Masson v.. Ecolab,* Inc., No. 04 CV 4488, 2005 WL 2000133, at \*13 (S.D.N.Y. Aug. 17, 2005); *Lee v. ABC Carpet & Home,* No. 00 CIV. 984, 2006 WL 1408837, at \*2 (S.D.N.Y. May 22, 2006) (court's initial determination based on "pleadings and affidavits"). If the court finds that they are similarly situated, it may conditionally certify the class and authorize notice to be sent to putative class members. *See Morales,* 2006 WL 278154, at \*1;*Lee,* 2006 WL 1408837, at \*2. Only after discovery has been completed should the Court engage in a second more heightened stage of scrutiny to determine whether the class should be decertified or the case should proceed to trial as a collective action. *See Lee,* 2006 WL 1408837, at \*2;*Masson,* 2005 WL 2000123, at \*14.

Although the plaintiff's burden at this initial stage is not onerous, "[m]ere allegations in the complaint are not sufficient; some factual showing by affidavit or otherwise must be made."*Camper v. Home Quality Mgmt. Inc.,* 200 F.R.D. 516, 519 (D.Md.2000); *see Lee,* 2006 WL 1408837, at \*2 (court's determination "based on pleadings and affidavits"); *Masson,* 2005 WL 2000133, at \*13 (same); *7B* Charles Alan Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 1807 (3d ed. 2005) ("Conclusory allegations are not sufficient .... courts requir[e] that there be some factual support and affidavits showing that the class members are 'similarly situated' "). A plaintiff must provide actual evidence of a factual nexus between his situation and those that he claims are similarly situated rather than mere conclusory al-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1662614 (E.D.N.Y.)
**2006 WL 1662614 (E.D.N.Y.)**

legations. See Flores, 2006 WL 695675, at *3;Morales, 2006 WL 278154, at *3. Absent such a showing, an employer may be "unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense."D'Anna v. M/A-Com, Inc., 903 F.Supp. 889, 893-94 (D.Md.1995); see Smith v. Sovereign Bancorp, Inc., No. civ. A. 03-2420, 2003 WL 22701017, at *2 (E.D.Pa. Nov. 13, 2003) (conditional certification based solely on allegations in complaint is "an inefficient and overbroad application of the opt-in system, and at worst it places a substantial and expensive burden on a defendant to provide names and addresses of thousands of employees who would clearly be established as outside the class if the plaintiff were to conduct even minimal class-related discovery").

*3 Here, plaintiff has not submitted any evidence by affidavit or otherwise to demonstrate that he and other potential plaintiffs were victims of a common policy or plan that violated the law. On the contrary, plaintiff makes only general allegations in his complaint that he and other installation installers were denied overtime compensation. Denying in their answer that plaintiff was an employee of defendants within the meaning of the FLSA, defendants allege that plaintiff never performed insulation installation services for defendants and that plaintiff and other insulation installers never worked overtime without the proper compensation. Answer at ¶¶ 4, 6, 8, 9, 38. Defendants further allege that plaintiff was an independent contractor whose duties were limited to cleaning up debris and making deliveries. Id. at ¶¶ 4, 19, 38.Despite defendants' denials, plaintiff has not submitted any specific facts concerning his employment nor connecting his situation to others that he claims are similarly situated. For example, plaintiff fails to describe or submit any documentation showing how he or anyone else employed by defendants were paid, what their job duties were or the hours they worked. Nor has plaintiff identified a single potential plaintiff even though defendant apparently has provided the names of current and former employees. Not only has plaintiff failed to provide the minimal requisite factual showing that he was in an employee-employer relationship with defendants and was denied overtime pay, he has not substantiated his allegation that the same was true of other potential plaintiffs. Other than the allegation that plaintiff is an asbestos installer, there is no information that could distinguish this purported employment relationship from that of any other employer.

Moreover, plaintiff does not consistently define the universe of similarly situated individuals. In his complaint, plaintiff alleges that only his fellow installation installers were denied overtime compensation. Yet, in the instant motion, plaintiff seeks to notify "all current and former employees of Armour, Inc." over the past three years who were not paid overtime. Ct. doc. 8-2 at 1. "Where the named plaintiff is unable to state clearly and specifically to whom it is that she contends she is similarly situated, it is not possible for the Court to conclude that a collective action certification is warranted."Flores, 2006 WL 695675, at *3.

Where "conditional certification is denied, the court may allow discovery to provide plaintiffs a second opportunity to obtain sufficient evidence of a collective to warrant conditional certification and the notice to opt in."Federal Practice & Procedure, § 1807. However, plaintiff has not provided any facts for his claim that a class of similarly situated plaintiffs exist to warrant disclosure of the names and addresses of potential plaintiffs. See Diaz v. Elec. Boutique of America, No. 04-CV-0840E, 2005 WL 2654270, at *3-*5 (W.D.N.Y. Oct. 17, 2005) (denying conditional certification, notice to and discovery about potential class members where plaintiff did not make requisite factual showing); Barfield, 2005 WL 3098730, at *1 (denying conditional certification, discovery of names and addresses of potential opt-in plaintiffs and mailing of notice because plaintiff provided no evidence of policy to deprive nurses of overtime compensation); Hall, 2002 WL 413901, at *3 (denying conditional certification, notice to potential plaintiffs and limited discovery of identifying information of sim-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                          Page 4
Not Reported in F.Supp.2d, 2006 WL 1662614 (E.D.N.Y.)
**2006 WL 1662614 (E.D.N.Y.)**

ilarly situated employees where plaintiff did not submit affidavits or even names of potential plaintiffs); *see also Levinson,* 2003 WL 22533428, at *2 (denying motion to circulate notice to potential plaintiffs where plaintiff failed to make factual showing that others were similarly situated). Unlike two cases from the Southern District of New York where conditional certification was denied but the court nonetheless ordered defendants to produce identifying information of potential plaintiffs, here, plaintiff submitted no evidence whatsoever to substantiate his claims that a collective action is appropriate. *Cf. Flores,* 2006 WL 695675, at *3 (plaintiff submitted affidavit in support of unopposed motion for discovery and approval of notice to putative plaintiffs); *Morales,* 2006 WL 278154, at *2 (plaintiffs submitted copies of payroll stubs supporting their claim that they were paid the regular rate for overtime). While plaintiff may be correct that he was not given addresses of employees, he has made no effort to utilize the payroll information received to assist in determining whether conditional certification is appropriate. As this Court warned in an endorsed order filed on January 4, 2006, the parties "must proceed diligently." Although plaintiff apparently has not, plaintiff's application is nonetheless denied without prejudice to a future "modest factual showing" that plaintiff and those similarly situated were victims of a common policy or plan that violated the FLSA.

## CONCLUSION

*4 For the foregoing reasons, plaintiff's motion is denied without prejudice.

SO ORDERED.

E.D.N.Y.,2006.
Prizmic v. Armour, Inc.
Not Reported in F.Supp.2d, 2006 WL 1662614 (E.D.N.Y.)

END OF DOCUMENT



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
BETH AMENDOLA, on behalf of herself and  :
others similarly situated,               :
                           Plaintiff,    :     07 Civ. 6088 (DLC)
                                         :
                                         :
          -v-                            :     OPINION & ORDER
                                         :
BRISTOL-MYERS SQUIBB COMPANY, and Does   :
1 through 20, inclusive,                 :
                           Defendants.   :
                                         :
-----------------------------------------X

Appearances:

For Plaintiff:

Ilann M. Maazel
Elizabeth S. Saylor
Jonathan S. Abady
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019

James A. Jones
Gillespie, Rozen, Watsky & Jones, P.C.
3402 Oak Grove Ave., Suite 200
Dallas, Texas 75204

David Sanford
Stefanie Roemer
Sanford, Wittels & Heisler, LLP
1666 Connecticut Avenue, North West
Suite 310
Washington, District of Columbia 20009

Eric B. Kingsley
Kingsley & Kingsley
City National Bank Building, 7th Floor
16133 Ventura Boulevard
Encino, California 91436

EXHIBIT

I

For Defendant Bristol-Myers Squibb Company:

Bettina B. Plevan
Joshua F. Alloy
Proskauer Rose LLP
1585 Broadway
New York, New York 10036


DENISE COTE, District Judge:

This litigation raises the question of whether pharmaceutical representatives ("PRs") employed by a major pharmaceutical company are properly classified as exempt from the overtime compensation rules prescribed by the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"). Plaintiff Beth Amendola ("Amendola") has moved for discovery of the names and addresses of the defendant's PRs, authorization for notice of this collective action to be sent to those potential plaintiffs, and equitable tolling of any claims they may file. Finding among other things that the defendant's PRs are not exempt from the FLSA's overtime compensation provisions under the exemption which applies to outside salespersons, but that they are likely subject to the exemption for administrative employees, the plaintiff is not authorized to send notice to the defendant's PRs. The request for equitable tolling is denied.

PROCEDURAL HISTORY

Amendola was employed by defendant Bristol-Myers Squibb Company ("BMS") as a PR from February 1998 through March 2006. She filed this action, individually and on behalf of other similarly situated BMS employees, on June 28, 2007, alleging that BMS often required her to work more than forty hours per week but never paid her overtime wages. She quickly demanded that BMS provide her with the names and contact information of all PRs, or, in the alternative, that BMS consent to the equitable tolling of any FLSA claims. BMS refused, and Amendola requested discovery tailored to and in anticipation of her motion for authorization of notice of this collective action to all PRs employed by BMS.

At a conference held to address the parties' disputes over the scope of discovery, BMS explained that its PRs include four levels of seniority and are employed by five distinct business units, each of which is subdivided across several geographic regions. BMS asserted that it would challenge Amendola's contention that all of its PRs are "similarly situated" for purposes of the FLSA collective action without regard to their seniority, business unit, or geographic location. The Court rejected Amendola's assertion that she immediately needed the names of all PRs -- roughly 4,500 in total -- employed by BMS during a three-year period. Instead, the Court instructed BMS

3

to provide Amendola with the names of two or three PRs randomly selected from each business unit, geographic region, and job level. By October 19, BMS had provided Amendola with the names and addresses of 350 employees, as well as more than 6,000 documents. In response to Amendola's Rule 30(b)(6) notice, BMS produced five witnesses for depositions -- one vice president or manager overseeing each of BMS's five business divisions. Amendola deposed solely these five witnesses, and BMS deposed Amendola.

Following this preliminary discovery, Amendola moved for authorization to send notice of this collective action to all of BMS's PRs.[1] BMS has opposed the motion, arguing principally that its PRs are exempted from the FLSA overtime compensation rules by one or more of four statutory and regulatory exemptions. Following a description of the evidentiary record presented by

---

[1] Amendola has also moved for "conditional certification" of this case as a collective action. In contrast to the procedural requirements set forth in Rule 23 of the Federal Rules of Civil Procedure for class actions, however, neither the FLSA nor the Federal Rules of Civil Procedure provide for the certification of an FLSA collective action. Actions brought under the FLSA often also allege related state labor law claims for which class action certification may be sought. It is perhaps for this reason that district courts have imported the term "certification" to describe the authorization of notice of the collective action to potential plaintiffs. This Opinion will treat Amendola's motion as a request for authorization of notice and will not further refer to the motion as one for certification.

4

the parties on this motion, the Opinion will address each of
these four exemptions.


BACKGROUND

I. Structure of BMS's Operations

     BMS is a global pharmaceutical company with headquarters in
New York.  It employs about 2,400 PRs to promote BMS products to
physicians, hospitals, clinics, and medical institutions across
the United States.[2]  BMS, like other pharmaceutical companies,
classifies these employees -- who work from their own homes --
as exempt from the FLSA.  PRs receive a salary plus incentive
compensation.  They do not record the hours they work, nor do
they receive payments for overtime work.

     BMS's PRs are all employed within its U.S. Pharmaceutical
Group.  The U.S. Pharmaceutical Group consists of five separate
business units: (i) Cardiovascular/Metabolics ("CV/Met"); (ii)
Virology; (iii) Oncology; (iv) Immunoscience; and (v)
Neuroscience.  Within CV/Met, PRs are assigned to either
"Primary Care" or "Specialty Sales."  Those assigned to
Specialty Sales "call on different customers, they have deeper
product and disease state knowledge, they have deeper market and
industry knowledge, [and] they are usually more experienced"

---

[2] While BMS currently employs about 2,400 PRs, the total number
of PRs that were employed by BMS over the time period relevant
to this motion is estimated at 4,500.

than Primary Care PRs.  Primary Care PRs typically receive lower base salaries than PRs assigned to Specialty Sales and BMS's four other business units.  The five business units have separate management, training resources, customers, and incentive compensation structures.

The five business units are each divided geographically into "Regions," and then further divided into "Districts," which are in turn subdivided into "Territories."  At least one PR is assigned to each Territory.

Finally, PRs are appointed to one of at least three levels of seniority: Territory Business Manager ("TBM"), Senior TBM, and Executive TBM.  The Primary Care sector of CV/Met also has a trainee or Associate TBM ("ATBM") position.  All PRs, at whatever level of seniority, are supervised by District Business Managers.

II. Duties of PRs[3]

PRs are required to be in the field visiting medical providers from 8 a.m. to 5 p.m., and spend time in the evenings preparing for these visits. The goal of the visits is to influence the prescription practices of the providers. PRs record notes about their "calls" -- as these visits are known in the pharmaceutical industry -- in a "Call Max" system. They are required to attend online and in-person training, which includes instruction on the BMS "ENGAGE" method -- a tool to teach PRs how to prepare for, conduct, and record calls to medical providers. BMS has developed a "core message" about each drug and trains PRs to relay that message on every visit. District Business Managers supervise PRs principally by joining them on their calls about once every month.

---

[3] When analyzed with care, the parties' factual submissions are largely consistent in their description of PR duties at BMS. While the plaintiff's declarations submitted by Amendola and four former PRs, each of whom worked as a Primary Care TBM, do not contain the detail added by the defendant's witness declarations, they do not disagree in any material way with the defendant's evidence. BMS has submitted affidavits from a Senior TBM in the Specialty Sales sector of CV/Met, a Senior TBM in Immunoscience, an Executive TBM in Neuroscience, and a Senior TBM in Virology, as well as the transcript of Amendola's deposition. In her deposition, Amendola essentially confirmed the accuracy of the job description provided by the defendant's declarants. In addition, one of Amendola's four declarants had worked for a period as a TBM in the Neuroscience unit and asserted that her job duties were essentially identical to those of a Primary Care TBM.

BMS provides a list of medical providers upon whom PRs are expected to call, and sets guidelines as to how many calls they should average per day. BMS assigns one to three drugs to each PR, and often specifies the order in which the drugs should be promoted during a call. A PR's adherence to these guidelines affects the employee's bonus.

PRs have flexibility in determining which provider to call upon on any given day and how often to do so, setting their own daily and weekly schedules. Subject to the approval of their supervisors, they can also add to and subtract from their lists of assigned providers. Amendola often did so, explaining that "[a]s long as you fulfilled your requirement, then you could add to your call list." She noted that in one instance an antibiotic she was assigned to promote had an indication appropriate for urologists and she decided to "pick ten urologists and start calling on them." This strategy resulted in the antibiotic becoming "a number one product" for her.

Physicians do not generally purchase drugs.[4] Instead, they write prescriptions, which their patients present to pharmacies, or they order that drugs be administered within a hospital

---

[4] A Senior TBM working in Immunoscience reports that the drug he represents, Orencia, is an intravenous product and is, therefore, usually purchased by the physicians themselves from pharmacies or wholesalers for infusion into their patients. Thus, unlike other PRs who seek to influence physicians to write more prescriptions for a drug, his goal is to convince medical providers to purchase the drug from pharmacies or wholesalers.

setting.  Similarly, PRs do not sell drugs to providers or take orders for drugs from the providers on whom they call.  PRs will ask the providers they visit, however, for a non-binding "commitment" to prescribe a BMS drug when it is appropriate for their patients.[5]  Amendola testified at her deposition that she would ask doctors for non-binding commitments to prescribe BMS drugs as "one other way to possibly move the business." Amendola taught these "closing skills" to other PRs.

BMS provides PRs with data about the prescribing practices of each medical provider on their lists.  PRs tailor their presentations to each medical provider based, for instance, on the provider's past prescribing habits, patient population, and individual personality.  They also use the data to structure their call schedules.  As Amendola described, "you never picked a doctor to call on who wouldn't see you.  You would sit down and analyze the data that you had and see the doctor's history with either your product or the competition and you decide, well, this is a good target."

Guidelines set by BMS and the U.S. Food and Drug Administration ("FDA") restrict the materials and information that PRs can present during their calls and that they can use to

---

[5] The parties do not explain what a "commitment" by a provider to prescribe a drug actually entails since it is undisputed that a provider remains entirely free to prescribe any drug she believes will benefit an individual patient.

9

answer providers' questions.[6]  For example, PRs cannot highlight any information on the written materials that BMS provides for distribution to physicians, and PRs can only offer pre-approved information to the medical providers.  Yet, PRs determine which visual aids to use in each presentation to a provider, as well as how many samples and promotional materials, if any, to distribute.  Amendola explained that she "had a slew of promotional materials" and so "would pick the one that was appropriate for the doctor and use that."  "To drive the business," Amendola testified that it was important to "allocate the right amount of samples to the right people."  In deciding how to allocate the samples she was allotted, Amendola would determine "if an office was busy or not," "note the patient population," "go into the sample closet to see if there were any samples," and "look to see if there were a lot of the competitor's samples there and would it be worthwhile to buck the competition by putting the samples."  She sought to avoid allocating samples to medical providers who would not distribute samples or would just give them to family members.

PRs are also allotted promotional budgets, which they spend on breakfasts, lunches, or dinners for the medical providers on

---

[6] While the parties agree on this point, neither has provided citations to the pertinent FDA regulations.

their lists.[7]  Although these meals may include lecture programs,
the speakers must be chosen from a list approved by BMS.  PRs
decide which of the medical providers on their lists to invite
to these programs, as well as how many such programs to
organize.  Amendola explained that she spent her budget "where
[she] thought that [she] would get a return on [her]
investment."  For example, if a drug was given preferred status
by a particular insurance plan but "we found out that the doctor
wasn't taking patients who were covered by that insurance
anymore, then we certainly weren't going to do a lunch there or
take the doctor out to dinner because he could love the product,
but he was not going to prescribe it."

    Although all of BMS's PRs share these same basic job duties
and restrictions, compensation levels vary across business units
and seniority levels.  In recent years, each of BMS's affiants
has earned over $100,000 in annual base salary plus incentive
compensation as either a Senior or Executive TBM.  In contrast,
Amendola was earning an annual base salary of $62,000 as a TBM
when she left BMS; her incentive compensation varied by year,
but in 2004 it totaled about $22,000.

---

[7] Each PR in CV/Met, for example, receives an average budget of
$15,000 per year.

DISCUSSION

Amendola asserts that all of the defendant's PRs are "similarly situated" to her in that they perform essentially similar work and are also entitled under the FLSA to overtime compensation. In addition, Amendola asserts that BMS has acted improperly, such that the statute of limitations should be equitably tolled for all potential plaintiffs. BMS classifies all of its PRs as exempt from the FLSA's overtime compensation requirements. It relies on four FLSA exemptions to the overtime compensation law to justify its classification of PRs as "exempt" employees. It also argues that differences in the job responsibilities among classes of PRs may affect the application of these exemptions and that, therefore, this action is not well-suited to collective adjudication.

Although BMS initially resisted Amendola's claims in this lawsuit with arguments that there were at least three material distinctions among PRs based on their business unit, assigned geographic territory, and seniority level, it has presented no evidence in opposition to this motion to warrant a finding that geographic territory affects a PR's duties in any material way. BMS has offered some evidence that the PRs promoting pharmaceuticals to specialized medical providers have more responsibility and discretion than PRs promoting BMS drugs to primary care providers, and that PRs holding positions of

12

greater seniority also have more discretion in the performance of their jobs.[8]  Most of the evidence that has been presented, however, describes responsibilities and areas of discretion that are common to all of BMS's PRs, irrespective of their business unit or seniority level.  Thus, the thrust of BMS's argument is that all of its PRs are properly classified as exempt employees and that Amendola's "mere allegations" to the contrary are insufficient to justify court-authorized notice to thousands of PRs.

While each of the four exemptions on which BMS relies to defend its classification of PRs as exempt from FLSA overtime compensation law will be discussed in turn, it is the second of these exemptions that dictates the outcome of this motion.  For the reasons explained below, it appears at this stage of the litigation that BMS's PRs fall under the exemption for administrative employees, and, therefore, it is not appropriate to authorize notice of this collective action to other PRs.

Before turning to the standard for authorizing notice of a collective action and a discussion of the four exemptions upon which BMS relies, it is appropriate to address an additional argument that the defendant makes in opposition to this motion.

---

[8] For example, PRs in the specialty divisions discuss products in greater detail because they are frequently able to refer to more clinical studies than Primary Care PRs during their calls on specialists.  Even so, they are restricted to using pre-approved materials.

13

BMS argues that Amendola is not entitled to authorized notice of this collective action because she has not demonstrated a sufficient interest in her lawsuit by other PRs.  BMS points out that while Amendola has been given the names of 350 PRs and has widely publicized this action in news articles and online, not one other PR has joined this action.

FLSA plaintiffs are not required to show that putative members of the collective action are interested in the lawsuit in order to obtain authorization for notice of the collective action to be sent to potential plaintiffs.  See Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 622-23 & n.7 (D. Conn. 2007).  There are many reasons why current employees of BMS might hesitate to join a lawsuit against their employer. The cases on which BMS relies in support of its argument are neither controlling nor persuasive, particularly in light of the "broad remedial purpose of the [FLSA], which should be given a liberal construction."  Braunstein v. E. Photographic Labs., Inc., 600 F.2d 335, 336 (2d Cir. 1978) (per curiam).

I. Authorization of Notice

Congress enacted the FLSA in 1938 "to protect all covered workers from substandard wages and oppressive working hours, labor conditions that are detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers."  Barrentine v. Arkansas-Best

14

Freight Sys., Inc., 450 U.S. 728, 739 (1981) (citation omitted).
Among other protections from workplace abuse, the FLSA mandates
increased wages for overtime work.  Section 207(a)(1) provides
that "no employer shall employ any of his employees . . . for a
workweek longer than forty hours unless such employee receives
compensation for his employment in excess of the hours above
specified at a rate not less than one and one-half times the
regular rate at which he is employed."  29 U.S.C. § 207(a)(1);
Grochowski v. Phoenix Constr., 318 F.3d 80, 87 (2d Cir. 2003).

    The FLSA permits one or more employees alleging violations
of the FLSA to pursue an action in a representative capacity for
"other employees similarly situated."  29 U.S.C. § 216(b).
Section 216(b) states, in relevant part, that an action to
recover damages under the FLSA:

> may be maintained against any employer . . . by any
> one or more employees for and on behalf of himself or
> themselves and other employees similarly situated.  No
> employee shall be a party plaintiff to any such action
> unless he gives his consent in writing to become such
> a party and such consent is filed in the court in
> which such action is brought.

Id.  Thus, to join an FLSA action an employee must file written
consent with the court, that is, "opt in."

    District courts may set the conditions under which a
plaintiff gives notice to fellow employees of the existence of a
collective action and the steps they must take if they wish to
join the action.  Hoffman-La Roche Inc. v. Sperling, 493 U.S.

165, 169 (1989) (construing 29 U.S.C. § 216(b) in the context of an ADEA lawsuit).  This authority derives from courts' inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  Id. at 173 (citation omitted).  "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative."  Id. at 172.  Thus, "[a]lthough one might read the [FLSA], by deliberate omission, as not providing for notice, . . . it makes more sense, in light of the 'opt-in' provision of § 16(b) of the Act, 29 U.S.C. § 216(b), to read the statute as permitting, rather than prohibiting, notice in an appropriate case."  Braunstein, 600 F.2d at 336.

Ordinarily, a federal court authorizes notice of the litigation to employees after making a preliminary determination that the employees who will be receiving the notice are similarly situated to the plaintiff.  See, e.g., Lynch v. United Servs. Auto Ass'n, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007).  To obtain such authorization, a plaintiff must make only a "modest factual showing" that she and the other putative collective action members "were victims of a common policy or plan that violated the law."  Realite v. Ark Restaurants Corp., 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998) (collecting cases).  Where a plaintiff fails to carry this burden or where a defendant employer shows either that the potential recipients of the

notice are not similarly situated to the plaintiff or that it will likely succeed at trial in proving that the employees are not entitled under the FLSA to overtime compensation, a court may refuse to authorize notice or postpone deciding the issue pending further discovery and motion practice.[9]

In this case, Amendola alleges that BMS misclassified all PRs as exempt employees under the FLSA and wrongfully failed to pay them overtime. Congress has expressly exempted certain categories of employees from the FLSA's overtime requirements. See 29 U.S.C. § 213. In light of the Act's remedial purpose, though, "exemptions to the FLSA are narrowly construed against the employers seeking to assert them," and "[t]he burden of invoking these exemptions rests upon the employer." Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217, 222 (2d Cir. 2002) (citation omitted). BMS asserts that four exemptions

---

[9] Although district courts have held that the merits of a plaintiff's FLSA claim should not be evaluated in determining whether to authorize notice, see, e.g., Lynch, 491 F. Supp. 2d at 368, these holdings may have derived from jurisprudence discouraging engagement with the merits that was developed in the context of Rule 23 class action certification. Fed. R. Civ. P. 23. But, the Second Circuit in In re Initial Pub. Offering Sec. Litig. ("In re IPO"), 471 F.3d 24 (2d Cir. 2006), recently clarified that courts deciding whether to certify a class action must determine that each Rule 23 requirement has been met, and that "the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue." Id. at 41. This Court will, therefore, scrutinize the merits based on the record developed to date by the parties and to the extent necessary to address this motion for authorization of notice.

apply to all or at least some of its PRs.  These are the

"outside sales exemption," the "administrative exemption," the

exemption for "highly compensated employees," and the "motor

carrier exemption."  BMS argues that consideration of these

exemptions "inevitably requires an individualized fact-based

analysis that is inappropriate for collective adjudication."

    A. Outside sales exemption

    BMS argues that all PRs are exempt from the requirement that

overtime compensation be paid because they are outside

salespersons.  The FLSA exempts "any employee employed . . . in

the capacity of outside salesman." 29 U.S.C. § 213(a)(1).

Under the authority granted to it by the statute, see id., the

Department of Labor ("DOL") has defined the outside sales

exemption as follows:

> (a) The term "employee employed in the capacity of
> outside salesman" in section 13(a)(1) of the Act shall
> mean <u>any employee</u>:
>
> (1) <u>Whose primary duty is</u>:
>
> (i) <u>making sales</u> within the meaning of section 3(k) of
> the Act, <u>or</u>
>
> (ii) <u>obtaining orders</u> or contracts for services or for
> the use of facilities for which a consideration will
> be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from
> the employer's place or places of business in
> performing such primary duty.
>
> (b) The term "primary duty" is defined at § 541.700.
> In determining the primary duty of an outside sales
> employee, work performed incidental to and in
> conjunction with the employee's own outside sales or
> solicitations, including incidental deliveries and

> collections, shall be regarded as exempt outside sales
> work.  Other work that furthers the employee's sales
> efforts also shall be regarded as exempt work
> including, for example, writing sales reports,
> updating or revising the employee's sales or display
> catalogue, planning itineraries and attending sales
> conferences.

29 C.F.R. § 541.500 (emphasis added).[10]  Section 3(k) of the FLSA

specifies that the terms "sale" or "sell" include "any sale,

exchange, contract to sell, consignment for sale, shipment for

sale, or other disposition."  29 U.S.C. § 203(k).  The

regulations further explain that "[s]ales within the meaning of

section 3(k) of the Act include the transfer of title to tangible

property, and in certain cases, of tangible and valuable

_____

[10] In 2004, the DOL issued revisions to the regulations defining
this and other FLSA exemptions.  These revisions represented a
major overhaul to regulations that had remained unchanged for
decades; the minimum salary level and the job duty requirements
had last been updated in 1975 and 1949, respectively.  Defining
and Delimiting the Exemptions for Executive, Administrative,
Professional, Outside Sales and Computer Employees ("Defining
and Delimiting the Exemptions"), 69 Fed. Reg. 22122, 22122 (Apr.
23, 2004).  Apart from increasing the minimum salary level,
however, the revisions generally were not meant to introduce
substantive changes but to streamline the job duty requirements
and "provide needed simplification and more clarity to a complex
regulation."  Id. at 22126-27.  For example, whereas the current
definition of "outside salesman" requires that the "primary
duty" of the employee involve "making sales" or "obtaining
orders," the prior version of the regulation used a cumbersome,
percentage-based definition, which provided that any hours spent
on work other than "making sales" or "obtaining orders" could
"not exceed 20 percent of the hours worked in the workweek by
nonexempt employees of the employer."  See 29 C.F.R. § 541.500
(2004).  Except where noted below, the 2004 regulations did not
materially alter the legal standards that are of relevance to
this Opinion; accordingly, case law interpreting the prior
regulations continues to have relevance.

evidences of intangible property." 29 C.F.R. § 541.501(b). DOL regulations "have the force of law and are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute." Freeman v. Nat'l Broad. Co., Inc., 80 F.3d 78, 82 (2d Cir. 1996) (citation omitted). The DOL's interpretations of its own regulations, moreover, are given deference unless they are plainly erroneous or inconsistent with the statute or regulations. See Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C., 522 F.3d 242, 247-48 (2d Cir. 2008).

For the purpose of this exemption, the regulations distinguish sales work from promotional work. "Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work." 29 C.F.R. § 541.503(a).

This distinction between promotional and sales work was also drawn in a 1999 DOL Opinion Letter.[11] The DOL expressed its view that college recruitment counselors were not exempt outside

---

[11] Under the more limited deference described in Skidmore v. Swift & Co., 323 U.S. 134 (1944), agency interpretations contained in opinion letters are "entitled to respect . . . to the extent that those interpretations have the power to persuade." Christensen v. Harris County, 529 U.S. 576, 587 (2000); see Boykin v. KeyCorp, 521 U.S. 202, 208 (2d Cir. 2008).

salespersons because they were "not engaged in making sales of
the college's services, or obtaining contracts for its services."
Opinion Letter No. 2138, [1999-02 Wages-Hours] Lab. L. Rep. (CCH)
¶ 33,030 (Apr. 20, 1999).  Rather, their work was akin to "sales
promotion work" because they were "engaged in identifying
qualified customers, i.e., students, and inducing their
application to the college, which in turn decides whether to make
a contractual offer of its educational services to the
applicant."  Id.

    The purpose of the outside sales exemption has been
explained by the Tenth Circuit:

>     Such salesmen, to a great extent, work[]
> individually.  There are no restrictions respecting the
> time he shall work and he can earn as much or as
> little, within the range of his ability, as his
> ambition dictates.  In lieu of overtime, he ordinarily
> receives commissions as extra compensation.  He works
> away from his employer's place of business, is not
> subject to the personal supervision of his employer,
> and his employer has no way of knowing the number of
> hours he works per day.

Jewel Tea Co. v. Williams, 118 F.2d 202, 207-08 (10th Cir. 1941).

    The DOL explained the reasoning behind this and other so-
called "white collar" FLSA exemptions from the overtime
compensation rules in 2004.

>     The legislative history indicates that the section
> 13(a)(1) exemptions were premised on the belief that
> the workers exempted typically earned salaries well
> above the minimum wage, and they were presumed to enjoy
> other compensatory privileges such as above average
> fringe benefits and better opportunities for

> advancement, setting them apart from the nonexempt
> workers entitled to overtime pay. Further, the type of
> work they performed was difficult to standardize to any
> time frame and could not be easily spread to other
> workers after 40 hours in a week, making compliance
> with the overtime provisions difficult and generally
> precluding the potential job expansion intended by the
> FLSA's time-and-a-half overtime premium.

Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22123-24.

The cases that have upheld the outside sales exemption have

typically involved employees whose primary duties include clearly

exempt sales work, such as either obtaining orders for goods or

services or actually selling goods. Compare Ackerman v. Coca-

Cola Enters., Inc., 179 F.3d 1260, 1266-68 (10th Cir. 1999)

(sales representatives who obtained orders and engaged in

merchandising activities for soft drink company were exempt), and

Jewel Tea, 118 F.2d at 207-08 (route salesmen who sold and

delivered products to customers in their homes were exempt), with

Hodgson v. Klages Coal & Ice Co., 435 F.2d 377, 382-84 (6th Cir.

1970) (routemen for drink bottler, whose work consisted

principally of restocking store shelves and who occasionally

solicited additional shelf space or new customers, were not

exempt). Thus, in almost every case where the exemption has been

upheld, the employee either sold goods or services or took

purchase orders. But see Nielsen v. Devry, Inc., 302 F. Supp. 2d

747, 760 (W.D. Mich. 2003) (college's field representatives

exempt as outside salespersons where college used only objective

admissions criteria and representatives "performed the essential role in getting students to sign the enrollment agreement").

The parties in this case agree that all PRs regularly work out of their homes. They disagree as to whether they are engaged in sales. BMS, which bears the burden of establishing the exemption, has failed to show that it is likely to prevail at trial on its contention that the "outside sales" exemption applies to PRs.

As a starting point, the interpretation of the exemption rests on the plain meaning of the statutory and regulatory texts that define it. "To interpret the terms of a statute, we look first to the statutory language itself." Puello v. Bureau of Citizenship and Immigration Servs., 511 F.3d 324, 327 (2d Cir. 2007) (citation omitted). Likewise, "[i]n interpreting an administrative regulation, . . . we must begin by examining the language of the provision at issue." Am. Fed'n of State, County & Mun. Employees v. Am. Int'l Group, Inc., 462 F.3d 121, 125 (2d Cir. 2006) (citation omitted). Thus, the "analysis necessarily begins with the 'plain meaning' of a law's text and, absent ambiguity, will generally end there." Puello, 511 F.3d at 327 (citation omitted). "In ascertaining the plain meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." Id. (citation omitted).

23

Influencing physicians to prescribe BMS drugs to patients or even obtaining non-binding "commitments" from the physicians to do so does not constitute a "sale, exchange, contract to sell, consignment for sale, [or] shipment for sale" as these terms from 29 U.S.C. § 203(k) are customarily understood.  The Oxford English Dictionary (2d ed. 1989) defines a sale as "[t]he action or an act of selling or making over to another for a price," or "the exchange of a commodity for money or other valuable consideration." 14 id. at 388.  It defines an exchange as "[t]he action, or an act, of reciprocal giving and receiving . . . of things in general" or "of goods." 5 id. at 501.

The catch-all phrase "or other disposition," which completes the statutory definition of the terms "sale" and "sell," see 29 U.S.C. § 203(k), does not expand the definition to encompass promotional work by PRs.  "[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114-115 (2001) (citation omitted).

The conclusion that the promotional work by PRs does not constitute a sale is unsurprising since the parties agree that medical providers do not purchase BMS products from PRs and that

federal law prohibits PRs from selling pharmaceutical products.[12]
BMS has nonetheless relied on this exemption as the principal
reason why notice of a collective action should not be
authorized.  It makes essentially two arguments.

First, BMS relies on a multi-factor test that courts have
used to determine whether employees are exempt salespersons.[13]
The factors in this test include "whether the employee: must
solicit new business; receives specialized sales training; was
hired and denominated as a salesperson; and whether the position
was advertised as a sales position." Nielsen, 302 F. Supp. 2d at
756.  Additional factors that support application of the outside
sales exemption are receipt of commission compensation and the
"lack of direct or constant supervision." Id.  While BMS may be
correct in its contention that most of these factors apply to its
PRs, it has failed to show that this test has any applicability
here.

The multi-factored test originated from the former 29 C.F.R.
§ 541.505(e) (2004), in a section titled "Driver salesmen." See

_____

[12] The Prescription Drug Manufacturing Act, for example, imposes
criminal penalties for "knowingly selling, purchasing, or
trading a drug or drug sample."  21 U.S.C. § 333(b)(1)(B).

[13] BMS's argument concerning the outside sales exemption is not
based on an analysis of whether all PRs are "similarly
situated."  BMS does note, however, that in the case of Orencia
and other infusible drugs, physicians purchase the products
themselves, albeit from pharmacies or wholesalers and not from
PRs.

Hodgson, 435 F.2d at 382-83.  Section 541.505 was withdrawn in
2004, but the language of this subsection is preserved in the
current 29 C.F.R. § 541.504, titled "Drivers who sell," which
provides:

> Several factors should be considered in determining if a
> driver has a primary duty of making sales, including,
> but not limited to: a comparison of the drivers duties
> with those of other employees engaged as truck drivers
> and as salespersons; possession of a selling or
> solicitor's license when such license is required by law
> or ordinances; presence or absence of customary or
> contractual arrangements concerning amounts of products
> to be delivered; description of the employee's
> occupation in collective bargaining agreements; the
> employer's specifications as to qualifications for
> hiring; sales training; attendance at sales conferences;
> method of payment; and proportion of earnings directly
> attributable to sales.

29 C.F.R. § 541.504(b).  Thus, this test was developed to assist
in the adjudication of "mixed duties" cases, where the employees
engage in sales and also perform a significant amount of non-
sales work, and specifically in the adjudication of overtime
claims brought by drivers who perform mixed duties.  See, e.g.,
Hodgson, 435 F.2d at 382-83; Jewel Tea, 118 F.2d at 208.  In such
cases, the question is not -- as it is here -- whether the
employees make sales at all, but whether their work primarily
consists of making those sales.

Second, BMS relies on a series of recent cases in which
California federal courts have found PRs to be exempt from
California's overtime laws as outside salespersons.  See Menes v.

Roche Labs. Inc., No. 07 Civ. 1444, 2008 U.S. Dist. LEXIS 4230,
at *7 (C.D. Cal. Jan. 7, 2008); Barnick v. Wyeth, 522 F. Supp. 2d
1257, 1264 (C.D. Cal. 2007); D'Este v. Bayer Corp., No. 07 Civ.
3206, 2007 U.S. Dist. LEXIS 87229, at *13-14 (C.D. Cal. Oct. 9,
2007).  These cases analyze the exemption's application to PRs
using the multi-factor test developed in the FLSA context that is
now contained in 29 C.F.R. § 541.504.  While acknowledging that
PRs do not sell products to providers "in the classic sense,"
Menes, 2008 U.S. Dist. LEXIS 4230, at *4, the California federal
courts nonetheless utilize the multi-factor test to conclude that
the exclusion of PRs from the outside sales exemption would
constitute "an illogical elevation of form over substance."
Barnick, 522 F. Supp. 2d at 1264; see Menes, 2008 U.S. Dist.
LEXIS 4230, at *7; D'Este, 2007 U.S. Dist. LEXIS 87229, at *12.
These California decisions will not be followed here.  Of course,
these cases apply California's labor laws, and not the FLSA.
More significantly, however, they do not acknowledge that the
FLSA's exemptions must be narrowly construed against employers,
or address the governing principles of statutory construction in
grappling with the plain meaning of the regulatory term
"sales."[14]

---

[14] Barnick is further distinguishable because the plaintiff there
occasionally took orders from physicians for certain vaccines
that he represented.  See Barnick, 522 F. Supp. 2d at 1258.

27

BMS has not demonstrated at this stage that it is likely that the outside sales exemption will apply to PRs. Consideration of this exemption does not, therefore, weigh against issuing notice of this action to other PRs.

B. Administrative exemption

BMS next contends that all PRs are exempted from overtime compensation because they are administrative employees. The FLSA exempts from its overtime compensation provisions "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); Freeman, 80 F.3d at 82. The regulations promulgated by the DOL in 2004 define an "employee employed in a bona fide administrative capacity" as someone whose (1) "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and whose (2) "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."[15]  29 C.F.R. § 541.200(a).

---

[15] Before they were amended in 2004, the regulations provided a "long test" and a "short test" for determining whether an employee worked in an administrative capacity.  The "long test" required an employee to earn a minimum weekly salary of $155, but it could be substituted by the "short test" if the employee earned at least $250 per week.  See 29 C.F.R. § 541.2 (2004). When the DOL revised the regulations in 2004, it replaced these two tests with the current universal definition.  This revised rule is substantially equivalent to the "short test," except that it requires that the employee receive a salary "not less

To satisfy the first requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Id. § 541.201(a). The types of work that satisfy this first requirement include "advertising," "marketing," and "public relations" work. Id. § 541.201(b).

An interpretive regulation enacted in 2004 and addressed to the financial services industry provides further guidance about the distinction between marketing and sales.[16] Subsection 541.203(b) provides:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the

---

than $455 per week." Id. § 541.200(a)(1); see Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22142-43. Amendola does not contend that the salaries of BMS's PRs fall below this minimum.

[16] Regulations withdrawn in 2004 had also explained that employees engaged in production or in sales in a retail or service establishment were non-exempt employees. The regulations stated that "[t]he phrase 'directly related to management policies or general business operations . . .' describes those types of activities relating to the administrative operations of a business as distinguished from 'production,' or in a retail or service establishment, 'sales' work." 29 C.F.R. § 541.205(a) (2004). "Administrative operations" were meant to "include the work performed by so-called white collar employees engaged in 'servicing' a business," such as "representing the company" and "promoting sales." Id. § 541.205(b) (2004) (emphasis added).

> customer's needs and financial circumstances; advising
> the customer regarding the advantages and
> disadvantages of different financial products; and
> <u>marketing, servicing or promoting the employer's
> financial products</u>.  However, an employee whose
> primary duty is <u>selling financial products does not
> qualify</u> for the administrative exemption.

<u>Id.</u> § 541.203(b) (emphasis added).  Subsection 203(b) gives

detailed guidance "in the financial services industry because of

growing litigation in this area," but it is intended to be

consistent with the more general principles found in case law

which distinguish between exempt and non-exempt employees "based

on the duties they perform, not the identity of the customers

they serve."  Defining and Delimiting the Exemptions, 69 Fed.

Reg. at 22145-46.

As to the second requirement for the administrative

exemption, "the exercise of discretion and independent judgment

involves the comparison and the evaluation of possible courses of

conduct, and acting or making a decision after the various

possibilities have been considered;" "[t]he term 'matters of

significance' refers to the level of importance or consequence of

the work performed." 29 C.F.R. § 541.202(a).  This second

requirement "must be applied in the light of all the facts

involved in the particular employment situation." <u>Id.</u> §

541.202(b).

A non-exclusive list of factors that may be relevant to the determination of whether a job entails sufficient discretion and independent judgment includes:

> whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; . . . whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; . . . and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id. The regulations further explain that "[t]he exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision." Id. § 541.202(c). Employees' work performance may satisfy this requirement "even if their decisions or recommendations are reviewed at a higher level."

Id. Thus,

> the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.

Id.  In addition, the regulations explain that "[a]n employer's volume of business may make it necessary to employ a number of employees to perform the same or similar work;" therefore, "[t]he fact that many employees perform identical work or work of the same relative importance does not mean that the work of each such employee does not involve the exercise of discretion and independent judgment with respect to matters of significance." Id. § 541.202(d).  But, to qualify for this exemption "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."  Id. § 541.202(e).

The administrative exemption has been applied in a variety of contexts.  Of particular relevance to this case, a 1945 Opinion Letter from the DOL applying this exemption found that a pharmaceutical company's "medical detailists" were exempt from overtime compensation.  See Applicability of Exemption for Administrative Employees to Medical Detailists, [1943-48 Wages-Hours] Lab. L. Rep. (CCH) ¶ 33,093 (May 19, 1945).  These employees were "engaged principally in work apparently aimed at increasing the use of subject's product in hospitals and through physicians' recommendations" -- work which required "a high degree of technical knowledge."  Id.  The Opinion Letter summarized the job duties of these "detailists" as follows:

> They train personnel, make special surveys and reports,
> and in general maintain this company's relations with
> the medical and associated professions.  They are
> consulted with respect to individual nutritional
> problems encountered by hospitals and physicians, such
> as determining whether the use of subject's product in
> a hospital was related to the occurrence of an
> epidemic.  When necessary, they arrange for added
> deliveries of subject's product to take care of
> emergencies.  They instruct the firm's salesmen in such
> technical matters as disease prevention, the chemical
> components of their product and nutritional research.
> They work virtually without supervision and are paid
> salaries in excess of $200 per month.

Id.  On the basis of these facts, the DOL determined that the

"medical detailists" were "engaged in a form of promotional or

missionary work having for its object not the making of specific

transactions but concerning itself with matters directly related

to general business operations." Id.  In doing so, the

detailists carried out "special assignments requiring the use of

their discretion and independent judgment and, furthermore,

frequently calling for the employment by them of skills or

knowledge acquired through special training or experience." Id.

See also Cote v. Burroughs Wellcome Co., 558 F. Supp. 883, 887

(E.D. Pa. 1982) ("detail person" for pharmaceutical company

exempt from FLSA as administrative employee).[17]

---

[17] Amendola argues that the scope of discretion granted to
today's PRs may differ significantly from that given to the
medical detailists whose work was reviewed in the Cote decision
as well as the 1945 Opinion Letter.  The pharmaceutical industry
is now more tightly regulated.  For example, in finding that the
plaintiff exercised significant discretion, the Cote court
explained that "[c]learly, on entering the physicians office

There are also several opinions that, in construing the administrative exemption, have elaborated on issues of relevance here. For instance, a First Circuit decision has shed light on the distinction in the FLSA administrative exemption regulation between non-exempt "production" employees and exempt administrative employees.[18]  In Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997),[19] the First Circuit affirmed the district court's determination that the "marketing representatives" of an insurance company were exempt administrative employees. Id. at 14. The representatives were the company's primary contacts with the licensed independent insurance agents who sold insurance products to consumers. Id. at 3. Drawing a distinction between administrative and production workers, the First Circuit explained that the

---

(even if plaintiff had very little choice in deciding which physician to visit or which product to detail) the detail person was expected to use a wide degree of discretion in deciding how to encourage the use of the product." Cote, 558 F. Supp. at 887.

[18] As described above, § 541.201(a) distinguishes between "work directly related to assisting with the running or servicing of the business" and "working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a)

[19] John Alden relied in part on the "promoting sales" language from 29 C.F.R. § 541.205(b) (2004), a regulation that has since been withdrawn. John Alden, 126 F.3d at 10. Nonetheless, the DOL referred to John Alden with approval when it issued the revised regulations in 2004. See Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22145-46. Thus, the First Circuit's analysis remains relevant.

marketing representatives were not "production" employees because
John Alden's "products" were its insurance policies, and "the
marketing representatives are in no way involved in the design or
generation of insurance policies." Id. at 9.  Thus, "the
activities of the marketing representatives are clearly ancillary
to John Alden's principal production activity -- the creation of
insurance policies." Id. at 10.  Moreover, the nature and impact
of the representatives' work indicated that it was "directly
related to the management policies or general business
operations" of their company; by "disseminating information to
the marketplace, understanding customers and competitors, and
gathering available information," the representatives were
"directly related to operations, and at the heart of John Alden's
business success." Id. at 11-12 & n.8 (citation omitted).

      In determining whether employees exercise discretion and
independent judgment sufficient to satisfy the second requirement
for the administrative exemption, courts have pointed to factors
beyond those enumerated in the regulations.  One additional
factor is an employee's discretion to set her schedule and to
tailor communications to a client's individual needs.  For
instance, the John Alden court found it significant that the
marketing representatives had "discretion in choosing which agent
to contact on any given day, and concerning which products to
discuss with each agent," and that they relied "on their own

35

knowledge of an agent's business to help tailor proposals for the agent's end-customers." Id. at 13. But, in doing so the representatives did "not use prepared scripts or read from a required verbatim statement, nor [did] they operate within the contours of a prescribed technique or 'sales pitch.'" Id. at 14. See also Savage v. UNITE HERE, No. 05 Civ. 10812 (LTS), 2008 WL 1790402, at *9-10 (S.D.N.Y. Apr. 17, 2008) (organizer for international labor union qualified for administrative exemption because she "made her own decisions about whom to approach and tailored her approach to each individual worker," and "also exercised discretion in identifying and developing potential leaders from amongst the workers at the plants").

Finally, courts have frequently concluded that the administrative exemption applies even in those situations in which the employee's discretion in the performance of her duties is circumscribed by an employer's detailed instructions or industry regulations. As recently explained by the Seventh Circuit, "independent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines." Roe-Midgett v. CC Servs., Inc., 512 F.3d 865, 875 (7th Cir. 2008) (claims adjusters exercised independent judgment even though they used manuals and estimating software to guide their work). See also Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 374 (7th Cir. 2005) (employees of nuclear power plant

qualified for administrative exemption although their discretion was channeled by regulation); Donovan v. Burger King Corp., 675 F.2d 516, 521-22 (2d Cir. 1982) (assistant managers in fast food restaurants exercised discretion sufficient for managerial exemption even though this performance was "circumscribed by prior instruction" and "detailed guidelines"). But see Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 404 (6th Cir. 2004) ("The fact that the industry is heavily regulated may indeed mean that a [nuclear] facility . . . may employ fewer individuals who actually exercise discretion.").

BMS has shown that its PRs perform non-manual work directly related to the general business operations of the company. Each PR represents BMS in meetings with medical providers and promotes BMS drugs.[20] The success of BMS's business depends in part on the success of its PRs in educating physicians about BMS

---

[20] Amendola argues that PRs do not "promote" sales in the manner intended by the regulations because PRs promote only individual sales, not the company's sales generally. But, Amendola's argument and her reliance on cases such as Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 903-05 (3d Cir. 1991) (inside salespersons are "production" workers and not administrative employees), and Casas v. Conseco Fin. Corp., No. Civ. 00-1512, 2002 WL 507059, at *9 (D. Minn. Mar. 31, 2002) (loan originators are "production" workers and not administrative employees), are unavailing because PRs have no contact with individual purchasers. In Martin and Casas, the employees sold the company's products to customers. Amendola's work more closely resembles the work performed by the marketing representatives in John Alden, 126 F.3d at 3. Just as the insurance agents in John Alden did not purchase policies from the plaintiff representatives, physicians do not purchase BMS drugs from PRs.

drugs. Thus, the nature of the work performed by PRs is directly related to BMS's management or business operations.

Relying on the distinction in 29 C.F.R. § 541.201(a) between employees who assist in servicing or running the business and those who work "on a manufacturing production line," Amendola argues that PRs are production workers. BMS's products, however, are the drugs it designs, patents, and manufactures. PRs do not produce those products. See John Alden, 126 F.3d at 9-10 (marketing representatives do not produce the company's insurance policies). Therefore, PRs are not properly classified as "production" employees.

The record assembled to date indicates that BMS is also likely to be able to prove at trial that the second prong of the administrative exemption is satisfied. Its PRs tailor the content of their presentations to each medical provider based on the provider's patient population, prescription practices, and other factors, and independently decide what promotional message will be most effective. For each medical provider, PRs individually determine whether to request a "commitment" and, if so, the extent of that "commitment." They strategically manage their call lists, exercising their own judgment in deciding how often to visit a doctor and whether to add new providers to their lists. PRs, moreover, allocate their allotted samples in accordance with their own assessment of how effectively each

provider will utilize those samples.  They also determine how to spend their sizeable promotional budgets, deciding for example whether to organize group lecture programs or to order meals for individual providers.  Each of these daily acts reflects "the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," and each of these decisions is made "free from immediate direction or supervision."  29 C.F.R. § 541.202(a),(c).  Further, these areas of discretion and independent judgment involve "matters of significance" because, in making each of these decisions, PRs seek to influence prescription writing practices -- a matter of great consequence to BMS's business.  Indeed, Amendola described these exercises of judgment as ways to "drive the business" or "move market share," and she worked to develop relationships with medical providers "[b]ecause it was important for the company, because if the doctor didn't like me, then the doctor was not going to prescribe the drug."

In sum, BMS has shown that all of its PRs qualify for the administrative exemption under the first prong of the pertinent regulation, and that it will likely succeed in proving that they operate with the discretion required by the second prong of the exemption.  In light of this likelihood, notice of this lawsuit to BMS's thousands of PRs is not authorized.  Such notice would

39

not promote the fair and expeditious resolution of the claims
raised in this action.

    C. Exemption for highly compensated employees

    BMS also argues that the exemption for highly compensated
employees will apply to many PRs.  Effective August 2004, a
regulation titled "Highly compensated employees" provides that
"[a]n employee with total annual compensation of at least
$100,000 is deemed exempt under section 13(a)(1) of the Act if
the employee customarily and regularly performs any one or more
of the exempt duties or responsibilities of an executive,
administrative or professional employee."[21]  29 C.F.R. §
541.601(a).  Total compensation may "include commissions,
nondiscretionary bonuses and other nondiscretionary
compensation."  Id.  The regulation explains that "[a] high
level of compensation is a strong indicator of an employee's
exempt status, thus eliminating the need for a detailed analysis
of the employee's job duties."  Id. § 541.601(c).  Among other
things, this exemption removes any requirement that an employer
prove that an administrative employee exercised discretion in
the performance of her duties.

---

[21] The regulation specifies that this exemption "applies only to
employees whose primary duty includes performing office or non-
manual work."  29 C.F.R. § 541.601(d).  Thus, "employees who
perform work involving repetitive operations with their hands,
physical skill and energy are not exempt under this section no
matter how highly paid they might be."  Id.

This exemption applies to many but not all of BMS's PRs. While it is undisputed that Amendola never earned $100,000 in annual compensation at BMS, BMS has shown that Senior and Executive TBMs in four specialty business units -- namely, Virology, Oncology, Immunoscience, and Neuroscience -- commonly earn more than $100,000 in base salary plus incentive compensation, and thus since August 2004 have been exempted as highly compensated employees from the FLSA's overtime requirements.  In light of the conclusion already reached, however, that notice of this collective action will not be authorized, the exemption for highly compensated employees has no impact on the scope of notice in this action.[22]

D. Motor carrier exemption

The fourth and final exemption upon which BMS relies in opposing Amendola's motion for collective action notice is the motor carrier exemption.  The FLSA exempts from its overtime requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service."  29 U.S.C. § 213(b)(1).  This exemption is limited to employees who (1) "[a]re employed by carriers whose transportation of passengers or property by motor vehicle is

---

[22] Given this result, it is unnecessary to address Amendola's argument that the "highly compensated employees" exemption exceeds the scope of the DOL's regulatory authority and is therefore ultra vires.

41

subject to . . . the Motor Carrier Act," and who (2) "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a). Effective August 2005, Congress amended the Motor Carrier Act to limit its coverage to persons transporting property by commercial motor vehicles, which are defined as weighing at least 10,001 pounds. 49 U.S.C. § 13102(15); 49 U.S.C. § 31132(1).

The statute of limitations for violation of the FLSA is ordinarily two years, but for willful violations it is extended to three years. 29 U.S.C. § 255(a); Brock v. Superior Care, Ind., 840 F.2d 1054, 1061 (2d Cir. 1988). A willful violation exists when an employer knew or recklessly disregarded the fact that its conduct violated the FLSA. McLoughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); Brock, 840 F.2d at 1062. Thus, absent equitable tolling, the motor carrier exemption will not apply to any PR who joins this lawsuit unless the PR joins before August 2008 and is able to show that BMS willfully violated the FLSA. And even then, it will apply for at most three months. Given the minimal time period during which the motor carrier exemption could apply to potential plaintiffs, further consideration of this exemption on this motion would be

unwarranted even if the administrative exemption did not control the outcome of the motion.

II. Equitable Tolling

Amendola requests that the claims of any PRs who opt in to this litigation be deemed filed as of June 23, 2007, the date she filed her complaint. Notwithstanding the conclusion that court-authorized notice of this action to other PRs is inappropriate, Amendola's request merits consideration because PRs who are aware of this litigation by other means may still join this litigation.

"Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances." Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996). It is, however, "a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." Wallace v. Kato, 127 S. Ct. 1091, 1100 (2007); see Zerilli-Edelglass v. New York City Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003) ("[E]quitable tolling is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights." (citation omitted)).

Equitable tolling is generally considered appropriate in situations where the complainant has "actively pursued his judicial remedies by filing a defective pleading during the

43

statutory period, or where the complainant has been induced or
tricked by his adversary's misconduct into allowing the filing
deadline to pass." Irwin v. Dep't of Veterans Affairs, 498 U.S.
89, 96 (1990). See also Dodds v. Cigna Sec., Inc., 12 F.3d 346,
350 (2d Cir. 1993). Although this remedy is regularly granted
where defendants have engaged in fraudulent concealment, "the
application of the doctrine of equitable tolling is not limited
to such cases," and "it does not assume a wrongful -- or any --
effort by the defendant to prevent the plaintiff from suing."
Valdez ex rel. Donely v. United States, 518 F.3d 173, 182-83 (2d
Cir. 2008) (citation omitted). Rather,

> [w]hen determining whether equitable tolling is
> applicable, a court must consider whether the person
> seeking application of the equitable tolling doctrine
> (1) has acted with reasonable diligence during the time
> period she seeks to have tolled, and (2) has proved
> that the circumstances are so extraordinary that the
> doctrine should apply.

Zerilli-Edelglass, 333 F.3d at 80-81 (citation omitted).

Amendola has not shown that the claims of any PRs who join
this lawsuit should be equitably tolled. She has not shown the
existence of extraordinary circumstances to justify this remedy.
She does not contend that other PRs have acted with reasonable
diligence during the intervening months since she filed suit.[23]

---

[23] As noted above, through initial discovery Amendola was given
the names and contact information of 350 BMS PRs and has widely
publicized this litigation. As of today, no PRs have joined
Amendola to prosecute this litigation.

She also has not shown that BMS caused any delay in connection
with either discovery or this motion practice or that it has
interfered with its employees' assertion of their FLSA rights.

Despite Amendola's assertions to the contrary, FLSA
defendants are not obligated from the inception of a litigation
either to provide contact information of putative collective
action members or to toll potential claims voluntarily.  To
grant the exceptional remedy of equitable tolling any time an
FLSA defendant declines to provide contact information or to
toll claims would, in effect, require that the statute of
limitations for FLSA claims be tolled as a matter of course for
all potential plaintiffs whenever the first plaintiff files her
complaint -- a result plainly contrary to the procedural rules
that govern FLSA collective actions.  See also Boykin, 521 F.3d
at 211 n.10 ("[T]o permit equitable tolling for [an] entire
class of individuals would threaten to extend the doctrine
beyond its limitation to 'rare and exceptional
circumstances.'").  As this very case illustrates, such a rule
would also be unwise.  The analysis of who is a similarly
situated employee may be a complicated issue and a plaintiff's
request for notice may be overbroad.  Requiring the scope of
notice to be dictated by the formulation in a complaint may lead
to excessive litigation costs that grossly outweigh the benefits
that can be justly achieved through the litigation.  To the

45

extent that other courts have concluded differently, see, e.g., Adams v. Inter-Con Sec. Sys., Inc., 242 F.R.D. 530, 542-43 (N.D. Cal. 2007); Baldozier v. Am. Family Mut. Ins. Co., 375 F. Supp. 2d 1089, 1092-93 (D. Colo. 2005), their decisions will not be followed here.

Further, the fact that BMS classified PRs as "exempt" from the FLSA's overtime pay requirements does not warrant equitable tolling.  To hold that "a failure to disclose that an employee is entitled to overtime pay is sufficient to work an equitable toll would be tantamount to holding that the statute is tolled in all or substantially all cases seeking unpaid overtime." Patraker v. Council on the Env't of New York City, No. 02 Civ. 7283(LAK), 2003 WL 22703522, at *2 (S.D.N.Y. Nov. 17, 2003).


CONCLUSION

Plaintiff's January 22, 2008 motion for discovery of names, authorization of notice, and equitable tolling is denied.


SO ORDERED:

Dated:    New York, New York
          June 4, 2008

_____
DENISE COTE
United States District Judge



**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division
Washington, D.C. 20210

**FLSA2006-30**

September 8, 2006

Dear **Name\***:

This is in response to your request for an opinion concerning whether Loss Prevention Managers (LPMs) employed by your client, a large retail business operating over 200 department stores, qualify for the administrative exemption under Fair Labor Standards Act (FLSA) section 13(a)(1) (copy enclosed). Based on a review of the information provided, it is our opinion that LPMs qualify for the administrative exemption.

You state that the primary function of an LPM is the effective implementation of a loss prevention and shortage control program for the store where the LPM is employed. The effective implementation of a loss prevention and shortage control program is an essential ingredient for the profitability of your client's retail stores. This is a significant matter that frequently determines the success or failure of a store. In this capacity, the LPM is the primary communicator between the store and the Regional Loss Prevention Manager on specific issues and concerns, and serves as the co-chair of the store's Loss Prevention and Safety Committee. As co-chair of this committee, the LPM ensures training standards for associates regarding emergency procedures, robbery, fire, etc. The LPM reports directly to the Store Manager and the Regional Loss Prevention Manager, and provides both with current reports and information.

The LPM utilizes company programs and also develops complementary store-specific programs to meet or exceed the store's shortage goals. In developing the Store Shortage Reduction Action Plan, the LPM analyzes inventory shortage results, allocates store Loss Prevention resources to successfully reduce inventory shortage, focuses prevention activities on high shortage departments, identifies paperwork control weaknesses and implements procedures to correct them, conducts audits for compliance and ensures store follow up on price accuracy initiatives, and sells/partners with store management to implement the plan. The LPM investigates the causes of inventory shortage (*e.g.*, complex "paperwork" problem or theft) and then selects appropriate steps to solve the problem. Once the appropriate course of action is selected, the LPM pursues that course of action to a successful completion. In developing cash shortage controls and programs to manage and reduce loss, the LPM develops an appropriate training and awareness program to reduce error, reviews cash discrepancies to keep store within allowable guidelines, and identifies cash registers with unacceptable shortages. Also, the LPM regularly reviews loss prevention exception reports for signs of dishonesty.

Depending on the size of the store, its history, and other factors, an LPM may supervise one or more Loss Prevention Associates (LPAs).[1] The LPM guides the store management and LPAs in conducting investigations, training, and addressing shortage related issues. In providing direction for LPAs, the LPM interviews all LPA candidates and conducts and supervises

---

[1] Notwithstanding the LPM's supervisory authority, you asked, for purposes of this opinion request, that we address only the applicability of the administrative exemption.

**EXHIBIT**

J

training for LPAs on a continual basis. In developing store associate awareness and support programs, the LPM promotes customer approach programs and ensures that all associates receive loss prevention awareness training, including the distribution of associate awareness material. One aspect of these programs deals with how to approach customers in a way that is legal and appropriate. In ensuring that programs to prevent and detect internal theft are followed, the LPM, in consultation with management, determines what internal investigations to pursue and when to conduct interviews, and ascertains prosecutable cases. Also, the LPM must be proficient in covert camera installation and the operation of photographic and video equipment. The LPM is responsible for taking appropriate legal steps with respect to shoplifters, including apprehensions of suspects and the filing of police reports, but this duty arises on average once or twice per week. In this regard, LPMs are directed to focus their efforts on deterrence, training, and associate awareness. The LPM also has responsibilities, in conjunction with the human resources department, for the prompt and thorough investigation of harassment allegations. With respect to all of the above job functions, the LPM consults with and provides expert advice to store management. The LPM works in an independent manner and his or her typical work day consists of performing office or non-manual work. The LPM is paid in excess of $455 per week on a salary basis.

FLSA section 13(a)(1) provides a complete minimum wage and overtime pay exemption for "any employee employed in a bona fide executive, administrative, or professional capacity," as those terms are defined in 29 C.F.R. Part 541. An employee may qualify for exemption if all of the pertinent tests relating to duties and salary are met. Please note that revisions to 29 C.F.R. Part 541 were published as a final rule in the Federal Register on April 23, 2004 (69 Fed. Reg. 22,122) and became effective on August 23, 2004 (copy enclosed).

As stated in 29 C.F.R. § 541.200(a), the term "employee employed in a bona fide administrative capacity" means "any employee":

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ;
(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

In the context of the administrative exemption,

[t]he phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a).

Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b).

To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

29 C.F.R. § 541.202(a).

The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). Section 541.202(c) further notes that "[t]he exercise of discretion and independent judgment implies that the employee has the authority to make an independent choice, free from immediate direction or supervision." As the preamble to the final rule explained, 69 Fed. Reg. 22,143 (Apr. 23, 2004) (copy enclosed), federal courts generally find that employees who meet at least two or three of the indicators mentioned in 29 C.F.R. § 541.202(b) are exercising discretion and independent judgment, although a case-by-case analysis is required.

The administrative exemption thus has requirements pertaining both to the "type of work performed" and to "the level of importance or consequence of the work performed." 69 Fed. Reg. 22,139 (copy enclosed). With regard to the type of work performed, the preamble explains that "the administrative exemption covers only employees performing a particular type of work—work related to assisting with the running or servicing of the business." *See* 69 Fed. Reg. 22,141. Furthermore:

> [T]his exemption is intended to be limited to those employees whose duties relate "to the administrative as distinguished from the 'production' operations of a business." Thus, it relates to employees whose work involves servicing the business itself—employees who "can be described as staff rather than line employees, or as functional rather than departmental heads."

*Id.* Although the production versus staff dichotomy is illustrative, rather than dispositive, "it is still a relevant and useful tool in appropriate cases to identify employees who should be excluded from the exemption." *Id.*

Based on a review of the information provided, we believe that the LPM's primary duty of effectively implementing a loss prevention and shortage control program by, among other duties, analyzing inventory results, allocating store Loss Prevention resources to successfully reduce inventory shortage, focusing prevention activities on high shortage departments, identifying paperwork control weaknesses and implementing procedures to correct them, conducting audits for compliance and ensuring store follow-up on price accuracy initiatives, reviewing cash discrepancies to keep the store within allowable guidelines, identifying cash registers with unacceptable shortages, and regularly reviewing loss prevention exception reports for signs of dishonesty directly relates to the functional areas of accounting, auditing, and quality control discussed in 29 C.F.R. § 541.201(b). *See* 69 Fed. Reg. 22,140-22,142. The duties performed by the LPM such as interviewing all loss prevention candidates, conducting and supervising training for LPAs on a continual basis, and providing direction for LPAs also directly relate to the functional areas of personnel management and human resources. By ensuring training standards for associates regarding emergency procedures, robbery, fire, etc., as co-chair of the store's Loss Prevention and Safety Committee, the LPM performs work that is directly related to the functional area of safety and health. Furthermore, as described above, the LPM's typical work day consists of performing office or non-manual work. Therefore, the LPM's primary duty involves the "performance of office or non-manual work directly related to the management or general business operations of the employer." 29 C.F.R. § 541.200(a)(2). *See* Wage and Hour Opinion Letter September 20, 1982 (copy enclosed).

Moreover, we believe that the LPM's primary duty "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Working independently shows that the LPM has certain decision-making authority that is "free from immediate direction or supervision." 29 C.F.R. § 541.202(c). In selecting appropriate steps to address the problem of inventory shortage and pursuing the selected course of action, the LPM compares and evaluates possible courses of conduct, and acts or makes a decision after the various possibilities have been considered as discussed in 29 C.F.R. § 541.202(a). The

LPM's primary duty of implementing the loss prevention and shortage control program for the store and, in certain situations, the LPM's supervisory responsibilities over one or more LPAs demonstrate that the employee "implement[s] management policies or operating practices." 29 C.F.R. § 541.202(b); *see also* 69 Fed. Reg. 22,142-22,144 (copies enclosed). In implementing the loss prevention and shortage control program for the store, the LPM "performs work that affects business operations to a substantial degree" because the effective performance of such duty is essential for the profitability of the store and, in fact, frequently determines the store's success or failure. 29 C.F.R. § 541.202(b). In developing complementary store-specific programs to meet or exceed the store's shortage goals, the LPM "carries out major assignments in conducting the operations of the business." *Id.* In determining what internal investigations to pursue and when to conduct interviews, in ascertaining prosecutable cases, and in investigating harassment allegations, the LPM "investigates and resolves matters of significance on behalf of management." *Id.* In addition, in consulting with and providing expert advice to store management with respect to the loss prevention and shortage control program, the LPM "provides consultation or expert advice to management." *Id.* Therefore, the LPM's duties meet several of the factors in 29 C.F.R. § 541.202(b) indicating the sufficient "exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Based on this review, it is our opinion that LPMs qualify for the administrative exemption under FLSA section 13(a)(1).

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issues addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust that this letter is responsive to your inquiry.

Sincerely,


Paul DeCamp
Administrator


**\* Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. § 552(b)(7).**

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2000 WL 198888 (N.D.Ill.), 8 Wage & Hour Cas.2d (BNA) 977
**2000 WL 198888 (N.D.Ill.)**

▷

Pfaahler v. Consultants for Architects, Inc.
N.D.Ill.,2000.

United States District Court, N.D. Illinois, Eastern
Division.
Evan PFAAHLER, on behalf of himself and all oth-
er similarly situated, Plaintiffs,
v.
CONSULTANTS FOR ARCHITECTS, INC., De-
fendants.
**No. 99 C 6700.**

Feb. 8, 2000.

MEMORANDUM OPINION AND ORDER

CONLON, District J.
*1 Evan Pfahler ("Pfahler") sues Consulting for Ar-
chitects, Inc. ("CFA") under the Fair Labor Stand-
ards Act, 29 U.S.C. § 201 *et seq* ("FLSA"). Pfahler
claims CFA failed to pay him $191.28 in overtime
wages. Pfahler moves for conditional certification
of a collective action pursuant to § 216(b) of the
FLSA.

BACKGROUND

CFA is a referral company that places architects
and design professionals with corporate clients on a
contractual, job-to-job basis. According to Pfahler,
designers seeking work register with CFA, and
CFA then finds them jobs in Chicago-area busi-
nesses. Pfahler is a designer who sought placement
through CFA. In January 1999, CFA found a job
for Pfahler at Ricondo & Associates ("Ricondo").

Pfahler contends that even though he was working
at Ricondo, he was an "employee" of CFA within
the meaning of the FLSA. Pfahler claims he was
paid on an hourly basis by CFA and was entitled to
overtime pay for working in excess of 40 hours per
week, but that he did not receive overtime pay from

CFA. According to Pfahler, CFA improperly classi-
fies its registrants as "independent contractors" in
order to avoid paying overtime wages. Pfahler con-
tends that while working at Ricondo, he was re-
quired to work a regular shift at Ricondo and could
not seek work elsewhere. Moreover, he asserts his
agreement with CFA prevented him from employ-
ment by Ricondo during the term of his placement
there.

Pfahler seeks certification of a collective action un-
der the FLSA so that he may represent other work-
ers he believes were improperly denied overtime
wages by CFA. According to Pfahler, CFA has
failed to pay overtime wages to at least 140 workers
since October 1996. CFA responds that the workers
are independent contractors who decide when,
where, and for whom they wish to work. CFA con-
tends it provides its referral services to people with
various levels of experience and skill, and that it
places these people in various positions. Some of
these positions (such as project managers) require
independent thought, while others do not require
much skill or experience. CFA compensates work-
ers by billing the client with whom the worker is
placed for the worker's services, deducting a com-
mission for placement, and issuing a check to the
worker.

DISCUSSION

Section 216(b) of the FLSA permits a plaintiff to
bring a collective action on behalf of other potential
claimants. A collective action under § 216(b) dif-
fers from a class action under Fed.R.Civ.P. 23. *See
Woods v. New York Life Ins. Co.,* 686 F.2d 578 (7th
Cir.1982). A collective action can be brought under
§ 216(b) as long as the plaintiff is "similarly situ-
ated" with those potential claimants he wishes to
represent. 29 U.S.C. § 216(b). In a collective ac-
tion, no claimant shall be a member of or bound by
the action unless he or she "opts in" to the action.
*Id.* For this reason, notice is sent to potential

EXHIBIT

K

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                 Page 2
Not Reported in F.Supp.2d, 2000 WL 198888 (N.D.Ill.), 8 Wage & Hour Cas.2d (BNA) 977
**2000 WL 198888 (N.D.Ill.)**

claimants once a collective action is authorized. *Woods,* 686 F.2d at 580 (7th Cir.1982).

**\*2** Pfahler contends he is similarly situated with other potential class members because he was improperly classified as an independent contractor and denied overtime wages. However, Pfahler has failed to demonstrate any basis for a finding that he is similarly situated with other potential claimants. Liability in Pfahler's case will turn on whether Pfahler is an "independent contractor" or an "employee" within the meaning of the FLSA. The same is true for every potential claimant included in the collective action. Those who are "independent contractors" would not be similarly situated with Pfahler, who claims he is an "employee."

In order to determine who is an independent contractor and who is an employee, the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's employment relationship with CFA; this inquiry could also entail examining each claimant's relationship with the various corporate clients with whom they were placed by CFA.[FN1] Where this is the case, certification of a collective action under the FLSA is inappropriate. *Donihoo v. Dallas Airmotive, Inc.,* 1998 WL 91256, at \*1 (N.D.Tex. Feb. 23, 1998) ("an inquiry into the employee's specific job duties ... is not appropriate in a class lawsuit under Section 216(b)").*Tumminello v. United States,* 14 Cl.Ct. 693, 697 (1988). A collective action under the FLSA is only appropriate where those in the pool of potential claimants perform the same duties as the plaintiff. *See Donihoo,* 1998 WL 91256, at \*2.

> FN1. In making this determination, the court must evaluate the employment status of each claimant in light of the following factors:
>
> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> 4) whether the service rendered requires a special skill;
>
> 5) the degree of permanency and duration of the working relationship;
>
> 6) the extent to which the service rendered is an integral part of the alleged employer's business.
>
> *Secretary of Labor v. Lauritzen,* 835 F.2d 1529, 1535 (7th Cir.1987).

Pfahler makes no showing that other potential claimants performed the same type of duties as himself, or that they could be classified as "independent contractors." Pfahler provides no grounds indicating his knowledge of the work other workers performed, the circumstances under which work was performed, or the circumstances of potential claimants affecting their desire to work as independent contractors or employees. Moreover, Pfahler testified that aside from Ricondo, "I don't know anything about [CFA's] relationships with any other companies."Pfahler Dep. p. 108. Pfahler attests that most, if not all, of those others with whom he worked while at CFA held ministerial, non-supervisory positions, with little or no exercise of discretion or judgment. Pfahler Decl. ¶ 20. However, Pfahler's belief as to the nature of the employment relationship between other workers and CFA is insufficient to meet the similarly situated requirement. Pfahler must point to something concrete aside from his belief.

Moreover, Pfahler is able to identify only three other people placed by CFA that he purportedly met while working at Ricondo. As to the rest of the potential claimants, Pfahler merely attaches a list of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3
Not Reported in F.Supp.2d, 2000 WL 198888 (N.D.Ill.), 8 Wage & Hour Cas.2d (BNA) 977
**2000 WL 198888 (N.D.Ill.)**

all persons referred by CFA who worked over 40 hours per week. He provides no basis for concluding these workers were "employees" and not "independent contractors." Simply identifying a group who worked overtime does nothing to establish a situation similar to Pfahler's. Rather, he must make some showing that the nature of the employment relationship between these workers and CFA renders them "employees" under the FLSA. *See Klegerman v.. F.G. Apparel, Inc.,* 1986 WL 2531, at *6 (N.D.Ill. Feb. 11, 1986) (Nordberg, J.) (denying collective action where plaintiff failed to identify any other individuals alleged to be similarly situated and merely alleged defendant discriminated against other employees); *D'Anna v. M/ A-Com, Inc.,* 903 F.Supp. 889, 893-94 (D.Md.1995) (requiring plaintiff to make a modest preliminary showing that a similarly situated group of potential claimants exists and concluding that broad allegations of class-wide discrimination along with a mere list of names, without more, is insufficient to show plaintiff is similarly situated).

*3 Pfahler argues he is similarly situated because he and other potential claimants were all subjected to the same CFA interviewing, testing, screening, and placement procedures, and that they all submitted CFA time sheets, were paid by computer generated checks, and were all placed in jobs in the Chicago area. But the similarity of the procedures through which workers registered and were paid is not probative of the nature of their employment status with each of the various corporate clients with whom they were placed. Pfahler devotes significant time to discussing the background and facts he believes establish his status as an employee and his entitlement to overtime pay. However, the facts that may establish Pfahler's status as an employee have no bearing on whether other potential claimants experienced similar relationships with CFA.

Finally, Pfahler relies on *Behr v. Drake Hotel,* 586 F.Supp. 427 (N.D.Ill.1984) and *Allen v. Marshall Field & Co.,* 93 F.R.D. 438 (N.D.Ill.1982) in sup-

port of his argument that he makes the minimal showing necessary to establish he is similarly situated with other potential claimants. Those cases involved claims of discrimination under the Age Discrimination in Employment Act, which incorporates the collective action provision of the FLSA. In a discrimination case, it is relatively easy to satisfy the similarly situated standard. As noted in *Allen* and *Behr,* a discrimination case focuses on whether the defendant had a policy of discriminating against its employees. The primary showing of discrimination is common to all potential claimants. However, the focus of a collective action in this case would be the distinction between an employee and an independent contractor. The focus would not be CFA's actions, but rather the nature of the claimants' employment relationship with CFA. A collective action in this situation is only appropriate where the plaintiff makes some showing that the nature of the work performed by other claimants is at least similar to his own. *See Donihoo,* 1998 WL 91256, at *2. Pfahler fails to do so.

CONCLUSION

Pfahler's motion for conditional certification of collective action and to send notice of collective action is denied.

N.D.Ill.,2000.
Pfaahler v. Consultants for Architects, Inc.
Not Reported in F.Supp.2d, 2000 WL 198888 (N.D.Ill.), 8 Wage & Hour Cas.2d (BNA) 977

END OF DOCUMENT



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 21314065 (S.D.Ind.)
**2003 WL 21314065 (S.D.Ind.)**

**H**

Clausman v. Nortel Networks, Inc.
S.D.Ind.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. Indi-
ana,Indianapolis Division.
Mark A. CLAUSMAN, and other similarly-situated
individuals, Plaintiff,
v.
NORTEL NETWORKS, INC., Defendant.
**IP 02-0400-C-M/S.**

May 1, 2003.

James D. Masur II, Locke Reynolds LLP, Indiana-
polis, IN, for Plaintiff.
Michael A. Moffatt, Ogletree, Deakins, Nash,
Smoak & Stewar, Indianapolis, IN, for Defendant.

*ORDER ON DEFENDANT'S MOTION TO
WITHDRAW ORDER*

LARRY J. McKINNEY, Chief Judge.

*1 This matter is before the Court on defendant's,
Nortel Networks, Inc. ("Nortel"), motion to with-
draw the Court's Order of November 20, 2002,
which approved notification of this lawsuit to po-
tential class members, and directed Nortel to pro-
duce names and address of potential class members.
For the reasons set forth herein, Nortel's motion to
withdraw is **GRANTED** and plaintiff's, Mark A.
Clausman ("Clausman"), motions for approval of
class notification and for an order for Nortel to pro-
duce are **DENIED**.

**I. FACTUAL AND PROCEDURAL BACK-
GROUND**

Clausman brought his complaint against Nortel pur-
suant to 29 U.S.C. § 216(b), on behalf of himself
and all other similarly-situated sales personnel at
Nortel. Complaint ¶ 7. Clausman alleges that he
and others were salespersons for Nortel, and that
Nortel did not pay the plaintiffs overtime that was

due them under the Fair Labor Standards Act
("FLSA").*Id.* ¶ 9. Clausman alleges that Nortel im-
properly classified him and others as "outside sales-
men," who are exempt from the overtime protec-
tions of the FLSA. *See id.* ¶ 10.Clausman defines
the other potential plaintiffs as those having worked
for Nortel as "sales/account/territory executives/
managers/account representatives."*Id.* ¶ 20.

In support of his motion for approval of class noti-
fication, Clausman submitted his affidavit, as well
as those of two other former Nortel salespersons,
tending to show that they were not "outside sales-
men" exempt from receiving overtime pay, and
thus, tending to show that Clausman was similarly-
situated to other individuals for purposes of the rep-
resentative lawsuit. Clausman testified that while
employed for Nortel, he spent approximately 65
percent of his time at his home office or at Nortel's
office. Affidavit of Mark A. Clausman ¶ 3. Claus-
man testified that he spent approximately 35 per-
cent of his time meeting face-to-face with Nortel
customers, and that at least 50 percent of those
meetings included an "Outside Vendor." *Id.* ¶¶ 5, 8.
Clausman testified that he never sold, delivered or
transferred title to a Nortel product, to any custom-
er in a face-to-face meeting, nor did he enter into a
contract for the sale of a Nortel product during a
face-to-face meeting with a customer. *Id.* ¶ 12.

Likewise, Lonnie Powell testified that he spent "the
great majority" of his time at his home office or at
Nortel's office. Affidavit of Lonnie Powell ¶ 3.
Powell said that a "considerably smaller part" of his
work time involved face-to-face meetings with cus-
tomers. *Id.* ¶ 5. Like Clausman, Powell testified that
he did not deliver equipment or order forms to cus-
tomers or take purchase orders from customers
while at the customers' places of business. *Id.* at 6.
Also like Clausman, Powell said that about 50 per-
cent of his face-to-face meetings with customers in-
cluded an outside vendor. *Id.* ¶ 7.

Christopher Calvert similarly claimed that he spent

**EXHIBIT**

L

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2003 WL 21314065 (S.D.Ind.)
**2003 WL 21314065 (S.D.Ind.)**

approximately 50 percent of his work time at his home office or at Nortel's office, and the other 50 percent attending face-to-face meetings with customers. September 24, 2002, Affidavit of Christopher Calvert ¶ 3, 5. Calvert also did not deliver equipment to customers or enter into sales contracts with customers during face-to-face meetings. *Id.* ¶ 7. About 50 percent of Calvert's face-to-face meetings with customers included an outside vendor. *Id.* ¶ 9.

*2 Based on these affidavits, the Court issued an order on November 20, 2002, granting Clausman's motions to approve notification to potential class members and for an order directing Nortel to provide names and addresses of potential class members. The order noted that the three affidavits Clausman submitted made the modest showing required to support Clausman's allegation that similarly-situated individuals exist.

On November 27, 2002, Nortel moved the Court to withdraw its November 20, 2002, order and to grant Nortel additional time to file a surreply in opposition to Clausman's request for approval of notification. On February 18, 2003, Nortel submitted a surreply to Clausman's motions, for the primary purpose of refuting Clausman's showing that others are similarly-situated.

Nortel has submitted an affidavit by Clausman's former supervisor, Mike Hinger, explaining that Nortel employs different categories of sales persons, whose sales duties and responsibilities vary. Affidavit of Mike Hinger ("Hinger Aff.") ¶¶ 9-11. Those sales persons work within different Nortel business lines, including the Carrier Group and the Enterprise Group. *Id.* ¶ 4. Powell testified at his deposition that sales within the Carrier Group are made "in an entirely different way" than sales made within the Enterprise Group. Deposition of Lonnie Powell at 11-12. As a sales executive in the Carrier Group, Powell worked directly with the customers and executed contracts with the customers. *Id.* at 11. However, in the Enterprise Group, Powell worked more closely with a distributor and did not

execute contracts with end users. *Id.* Powell estimates that he spent about 99 percent of his time in the Enterprise Group with customers, and only about 20 percent of his time with customers in the Carrier Group. *Id.* at 33. When visiting customers in the Enterprise Group, Powell always had his distributor with him. *Id.* at 38.

Clausman, Powell, Calvert, Hinger, and Martin Richey all agree that Nortel sales employees each determine how much time to spend in or out of the office, and that each sales person performed his or her job differently. Calvert now says that he spent at least 80 percent of his time preparing for and meeting with customers. October 14, 2002, Affidavit of Christopher Calvert ¶ 6. Calvert adds that face-to-face meetings were an integral part of his sales process. *Id.* ¶ 7. Calvert only used phone calls to exchange information or to arrange personal meetings. *Id.*

Lonny Hatland, a current Nortel Territory Account Manager, spends at least 60 percent of his time in customer meetings. Affidavit of Lonny J. Hatland ("Hatland Aff.") ¶ 3. Sometimes he has a distributor with him at these meetings. *Id.* ¶ 4. When he was a Channel Partner Manager, Hatland spent very little of his time meeting with customers, but worked with the distributors directly. *Id.* ¶ 9. Each Territory Sales Representative could decide for himself what method to use to obtain sales. Deposition of Mark A. Clausman at 27-28. Hinger has testified that Territory Sales Representatives, like Clausman, make sales as "a direct result of the personal relationship and face to face meetings with customers." Hinger Aff. ¶ 14.

## II. DISCUSSION

*3 Section 16(b) of the FLSA ("Section 16(b)") provides that an action against an employer for an FLSA violation may be brought by "any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The Court has a duty

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2003 WL 21314065 (S.D.Ind.)
**2003 WL 21314065 (S.D.Ind.)**

to manage the process of notifying potential plaintiffs in a representative suit under the FLSA. *Woods v. New York Life Ins. Co.,* 686 F.2d 578, 580 (7th Cir.1982). Section 16(b), unlike Rule 20 of the Federal Rules of Civil Procedure,

authorizes a representative action; and this authorization surely must carry with it a right in the representative plaintiff to notify the people he would like to represent that he has brought a suit, and a power in the district court to place appropriate conditions on the exercise of that right.... It also follows that counsel for the representative plaintiff could seek from the district court an order approving the notice, to protect himself from being accused of stirring up litigation in violation of state law, as well as an order directing the defendant, in an appropriate case, to furnish the plaintiff with the names and addresses of potential class members.

*Id.* One such appropriate condition this Court must make on Clausman's right to notify potential plaintiffs is that he first must make a threshold showing that he is similarly-situated to those whom he proposes to represent. *See Bontempto v. Metro Networks Communications Ltd. Partnership,* No. 01 C 8969, 2002 WL 1925911, *1 (N.D.Ill. May 3, 2002); *Severtson v. Phillips Beverage Co.,* 137 F.R.D. 264, 267 (D.Minn.1991).

The Seventh Circuit has not specifically addressed a standard for determining whether potential plaintiffs are similarly-situated. However, "courts generally do not require prospective class members to be identical."*Moss v. Crawford & Co.,* 201 F.R.D. 398, 409 (W.D.Pa.2000). Although a plaintiff need not meet the Rule 23 standards for class certification, or be identically situated to potential class members, there should be "a demonstrated similarity among the individuals."*Heagney v. European Am. Bk.,* 122 F.R.D. 125, 127 (E.D.N.Y.1988); *see also Garza v. Chicago Transit Auth.,* No. 00 C 0438, 2001 WL 503036, *2 (N.D.Ill. May 8, 2001) (holding that a plaintiff need not meet the Rule 23 requirements of numerosity, commonality and adequacy of representation). At

this early stage of the case, the Court should examine the record and affidavits to determine whether notice should be given to potential plaintiffs. *See Moss,* 201 F.R.D. at 398. The standard at this time is "fairly lenient" and often results in the "conditional certification" of the class. *Id.* Later in a case, when more factual information is available, a defendant may choose to petition to decertify the class, at which time courts apply a higher standard to determine whether plaintiffs are "similarly-situated." *See id.*The difference in factual and employment settings of the individual plaintiffs can be examined at that time. *See id.* at 409-410;*Champneys v. Ferguson Enter., Inc.,* No. IP 02-535-C H/K, 2003 WL 1562219, *4 (S.D.Ind. March 11, 2003) ("Before notice is authorized, the court is not required to come to a 'final determination' that the similarly-situated requirement has been met.").

*4 On the other hand, where liability to each plaintiff will depend on whether that plaintiff was correctly classified as an "outside salesman," the Court will be required to make a fact-intensive inquiry into each potential plaintiff's employment situation. *See Pfaahler v. Consultants for Architects, Inc.,* No. 99 C 6700, 2000 WL 198888, *2 (N.D.Ill. Feb. 8, 2000); *Tumminello v. United States,* 14 Cl.Ct. 693, 697 (1988) ("The determination of whether an exemption applies to a given individual, however, is a very fact-specific exercise."). In that case, certification of a collective action is inappropriate. *See id.;Donihoo v. Dallas Airmotive, Inc.,* No. 3:97-CV-0109-P, 1998 WL 91256, *1 (N.D.Tex. Feb. 23, 1998) ("an inquiry into the employee's specific job duties ... is not appropriate in a class lawsuit under Section 216(b)"). Outside salesmen are excluded from the minimum wage and overtime protections of the FLSA, and thus any individual properly classified as an "outside salesman" has no FLSA claim. *See*29 U.S.C. § 213(a)(1).

The FLSA does not define "outside salesmen" but the Department of Labor has provided some guid-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2003 WL 21314065 (S.D.Ind.)
**2003 WL 21314065 (S.D.Ind.)**

ance in the regulations implementing the FLSA. An "outside salesman" is any employee:

(a) Who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in: (1) making sales within the meaning of section 3(k) of the act; or (2) Obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (b) Whose hours of work of a nature other than that described in paragraph (a)(1) or (2) of this section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer: *Provided,* That work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

29 C.F.R. § 541.500.

Central to Clausman's case is whether he was classified correctly as an outside salesman. The same would be true for every other potential plaintiff. Even those individuals with the same job title as Clausman may or may not be exempt employees. *See Tumminello,* 14 Cl.Ct. at 697. Accordingly, many more questions must be asked of each affiant or deponent to determine whether he was an "outside salesman." For example, the Court must determine precisely what each individual did while at his home office or Nortel's office. Was that work "incidental to" the work of outside sales? *See Ackerman v. Coca-Cola Enter., Inc.,* 179 F.3d 1260, 1264-66 (10th Cir.1999) (using the federal regulations as a guide to determine whether work performed by the plaintiffs/employees was "incidental to and in conjunction with" their sales). From some testimony, it appear that it was; as to others it is unclear. A related question is whether each potential plaintiff "consummated" their sales at the customer locations they visited. *See id.* at 1266-67.It appears from the affidavits submitted to the Court that sometimes salespersons consummated sales in conjunction with outside vendors, and sometimes

without. Further, the Court must determine whether each individual spent greater than 20 percent of his workweek doing nonexempt work. While arguably the affiants have testified as to the percentage breakdown of their workweek, it is clear that each salesperson at Nortel operates differently. It is precisely because these questions must be answered that the Court cannot approve notification of potential class members. The Court cannot make these inquires of each of the unknown number of potential plaintiffs.

**\*5** The November 20, 2002, order granting Clausman's request was based on a finding that his affidavit, along with those of Powell and Calvert, made the modest showing required that other individuals are similarly-situated to Clausman. The new information before the Court makes clear that (1) members of Nortel's sales staff performed their duties in a variety of ways, making individual inquiry necessary to determine whether each was properly classified as an "outside salesperson," and thus, (2) Powell's and Calvert's testimony in their original affidavits that they spent only 50 percent of their workweek in face-to-face meetings with customers does not necessarily make them similarly-situated to Clausman. It may be that Nortel improperly classified Clausman and the other affiants as outside salesmen. But the factual inquiry necessary to make that determination weighs heavily against conditionally certifying a plaintiff class. Exercising its discretion in whether to approve notification of this lawsuit to potential plaintiffs, the Court **WITHDRAWS** its November 20, 2002, order and **DENIES** Clausman's motions for approval of notification and for an order directing Nortel to produce names and addresses.

### III. *CONCLUSION*

For the reasons discussed herein, Nortel's motion to withdraw the November 20, 2002, order is **GRANTED.**Clausman's motion for approval of notification is **DENIED** and Clausman' motion for an order directing Nortel to produce names and addresses of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2003 WL 21314065 (S.D.Ind.)
**2003 WL 21314065 (S.D.Ind.)**

potential plaintiffs is **DENIED.**

S.D.Ind.,2003.
Clausman v. Nortel Networks, Inc.
Not Reported in F.Supp.2d, 2003 WL 21314065
(S.D.Ind.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 945139 (E.D.Pa.)
**2004 WL 945139 (E.D.Pa.)**

▷

Lawrence v. City of Philadelphia, Pennsylvania
E.D.Pa.,2004.
Only the Westlaw citation is currently available.
    United States District Court,E.D. Pennsylvania.
        Richard LAWRENCE, et al., Plaintiff,
                         v.
        THE CITY OF PHILADELPHIA,
        PENNSYLVANIA, Defendant
                 **No. 03-CV-4009.**

                  April 29, 2004.

Robert A. Jones, Chamberlain Kaufman and Jones,
Albany, NY, Solomon Z. Krevsky, Solomon Z.
Krevsky, LLC, Harrisburg, PA, for Plaintiffs.
George A. Voegele, Jr., Mark J. Foley, Victoria L.
Zellers, Klett Rooney Lieber & Schorling, Phil-
adelphia, PA, for Defendant.

                    *MEMORANDUM*

GREEN, J.
**\*1** Presently before the Court is Defendant's Motion
for Misjoinder of Claims and Plaintiffs' Opposition
thereto. For the reasons set forth below, Defend-
ant's motion will be granted.


Background

Plaintiffs filed a Complaint against Defendant City
of Philadelphia ("City"), alleging that Defendant
violated the Fair Labor Standards Act, 29 U.S.C. §
201 *etseq.*. ("FLSA"), based on an alleged failure to
pay Plaintiffs overtime wages for scheduled hours
worked in excess of forty (40) in a single work-
week. Plaintiffs also claim that Defendant's failure
to pay Plaintiffs for unscheduled "off-the-clock"
time, spent replenishing supplies before or after
compensated hours, violates the overtime wage re-
quirement under the FLSA. Plaintiffs seek to main-
tain both claims in a collective action against De-
fendant for FLSA overtime wage violations, as au-
thorized by FLSA § 216(b). Plaintiffs are all cur-

rent or former employees of Defendant who worked
as Fire Service Paramedics. Subsequent to the filing
of the Complaint, Plaintiffs filed numerous opt-in
consent forms for Fire Service Paramedics to be-
come plaintiffs in this action.

Defendant's Motion for Misjoinder of Claims

Defendant presently moves for misjoinder of
Plaintiff's off-the-clock claims pursuant to Federal
Rule of Civil Procedure 21, and in the alternative
for dismissal of the collective action pursuant to 29
U.S.C. § 216(b). Defendant argues that, unlike the
claim based on overtime compensation for regularly
scheduled hours, the "off-the-clock" claim is based
on allegations of hours worked beyond a regular
schedule, requiring an individual case-by-case ana-
lysis for each Plaintiff. In order to meet the FLSA §
216(b) collective action requirement for plaintiffs
to be similarly situated to each other, Defendant ar-
gues that this Court should look at variations in em-
ployment activities, oversight and instruction,
whether plaintiffs worked in different geographic
locations, and discretionary powers given to
plaintiffs.

On the other hand, Plaintiffs contend that the
"similarly situated" requirement under FLSA §
216(b) is unrelated to the requirements for class ac-
tion plaintiffs pursuant to Fed.R.Civ.P. 23, and is
less strict than the requirements for joinder under
Fed.R .Civ.P. 20(a). Urging this Court to adopt a le-
nient standard for the "similarly situated" require-
ment, Plaintiffs rely upon *Lockhart v. Westinghouse
Credit Corp.,* 879 F.2d 43, 51 (3rd Cir.1989), and
argue that they are similarly situated for FLSA §
216(b) purposes because although they work in dif-
ferent locations: (1) all members of the collective
action work(ed) in the Fire Department's Emer-
gency Medical Services Unit; (2) their claims all
arise from the same pattern, plan or practice of De-
fendant; and, (3) they all seek the same form of re-
lief-unpaid overtime compensation, liquidated dam-

EXHIBIT

M

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                         Page 2
Not Reported in F.Supp.2d, 2004 WL 945139 (E.D.Pa.)
**2004 WL 945139 (E.D.Pa.)**

ages, costs and attorneys' fees.

Discussion

Section 216(b) of the FLSA reads, in pertinent part, "[a]n action to recover ... may be maintained against any employer (including a public agency) ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Under Fed.R.Civ.P. 21, however, "[a]ny claim against a party may be severed and proceeded with separately." Fed.R.Civ.P. 21. In *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43 (3rd Cir.1989), *overruled on other grounds,* the Third Circuit applied a three-prong test for determining whether plaintiffs are similarly situated under FLSA § 216(b): (1) whether they all worked in the same corporate department, division and location; (2) whether they all advanced similar claims; and (3) whether they sought substantially the same form of relief. *See,Lockhart,* 879 F.2d at 51 (citing *Plummer v. General Electric Co.,* 93 F.R.D. 311, 312 (E.D.Pa.1981)). As a result, Plaintiffs pursuing a collective action under FLSA § 216(b) only need to show that their positions are "similar, not identical" to each other. *Sperling v. Hoffman-LaRoche,* 118 F.R.D. 392, 407 (D.N.J.1988), *aff'd in part and appeal dismissed in part,* 862 F.2d 439 (3rd Cir.1988), *aff'd,Hoffman-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).

*2 In the instant matter, all current and prospective plaintiffs are or were employed as Fire Service Paramedics within the City Fire Department's Emergency Medical Services Unit. According to Defendant's Personnel Department, each of the current Plaintiffs, and potential opt-in plaintiffs, is classified as a "Fire Service Paramedic" and has the same general job description. However, Plaintiffs work in different unit types, different platoons, different locations, and have different supervisors. Unlike the Plaintiffs' first claim, alleging failure to pay overtime wages for scheduled hours worked in excess of 40 in a single workweek, the "off-the-clock"

claim does not involve regularly scheduled time that is worked by all members of the class. Rather, each of the Plaintiffs may potentially claim that on any given day he or she arrived early or departed outside of their regularly scheduled hours and were not compensated for such. The circumstances of those individual claims potentially vary too widely to conclude that in regard to their "off-the-clock" claim, the Plaintiffs are similarly situated. The questions of fact will likely differ for each Plaintiff and will be unduly burdensome to both Defendant and to the Court in managing as a collective claim. Consequently, Plaintiffs' "off-the-clock" claim for unpaid work performed outside of their regularly scheduled hours will be severed from the collective claim for unpaid overtime for regularly scheduled hours. Plaintiffs' claims for "off-the-clock" unpaid work, will be dismissed without prejudice to each plaintiff filing said claim individually. The lead Plaintiff in this matter, Richard Lawrence, will be able to proceed in this civil action with his individual "off-the-clock" claim.

With regard to Plaintiffs' claims for unpaid overtime for regularly scheduled hours in excess of forty in a single work week, the court finds that the Plaintiffs are similarly situated for purposes of maintaining a collective action pursuant to FLSA § 216(b). Plaintiffs allege that they should be paid overtime for all weeks in which their regularly scheduled working hours exceed forty per week. This claim is the same for each Plaintiff. In its motion for misjoinder, Defendant does not assert that the Plaintiffs are not similarly situated for purposes of this claim. The Court, therefore, will permit Plaintiffs to maintain a collective active regarding their regularly scheduled hours claim. Defendant's alternative motion for dismissal of the entire action under FLSA § 216(b) will be denied.

Finally, in *Hoffman-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989), the Supreme Court clearly stated that collective actions maintained under FLSA § 216(b) authorize a district court to issue court-approved notice to addi-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 945139 (E.D.Pa.)
**2004 WL 945139 (E.D.Pa.)**

tional potential plaintiffs at its discretion. This Court concludes that court-supervised notice is appropriate in the interest of promoting judicial economy and an efficient resolution to the collective action claim in this case.

*3 An appropriate order follows.

### ORDER

AND NOW, this day of April, 2004, IT IS HEREBY ORDERED that, Defendant City of Philadelphia's Motion for Misjoinder of Claims is GRANTED, and Defendant City of Philadelphia's alternative Motion to Dismiss the entire collective action is DENIED. With the exception of the lead Plaintiff in this action, Richard Lawrence, all other Plaintiffs' claims for wages for hours for which Plaintiffs were allegedly not paid for either reporting early or departing after their regularly scheduled hours are severed from this action and dismissed without prejudice to each Plaintiff filing a separate action for said claim. If any said action is filed, it is to be randomly assigned.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Approval of Notice to Prospective Additional Plaintiffs and for Discovery is GRANTED to the extent that it applies only to the collective action claim permitted as a result of this Order. The form of Notice as set forth in Exhibit No. 6 to the Declaration of Robert A. Jones shall be revised to remove all references to the claims dismissed as a result of this order. Defendant shall provide to Plaintiffs' counsel, within fifteen (45) days of this Order, the last known names and addresses of all such similarly situated current and former employees who have worked as Fire Service Paramedics at any time from July 7, 2000 to the present date.

E.D.Pa.,2004.
Lawrence v. City of Philadelphia, Pennsylvania
Not Reported in F.Supp.2d, 2004 WL 945139 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Not Reported in F.Supp.2d                                                                                Page 1
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
**2005 WL 2654270 (W.D.N.Y.)**

▷

Diaz v. Electronics Boutique of America, Inc.
W.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
Milton DIAZ, Tim Ostrander, Anthony Capizzi,
Andrew Secor and Jeffrey Hochmuth, Individually
and on Behalf of All Others Similarly Situated,
Plaintiffs,
v.
ELECTRONICS BOUTIQUE OF AMERICA, INC.
and Electronic Boutique Holding Corp., Defend-
ants.
No. 04-CV-0840E(SR).

Oct. 17, 2005.

Judith Ann Biltekoff, Sullivan, Oliverio & Gioia,
Buffalo, NY, Brett Cebulash, Esq., Garwin, Ger-
stein & Fisher, LLP, New York, NY, for Plaintiff.
Christina L. Feege, Littler Mendelson, P.C., New
York, NY, John G. Horn, Robert C. Weissflach,
Harter, Secrest and Emery LLP, Buffalo, NY,
Samuel S. Shaulson, Morgan, Lewis & Bockius
LLP, New York, NY, for Defendant.

MEMORANDUM and ORDER [FN1]

FN1. This decision may be cited in whole
or in any part.ELFVIN, J.

*1 Plaintiff Milton Diaz commenced this action on
October 13, 2004 against his former employer, de-
fendants Electronics Boutique of America, Inc. and
Electronics Boutique Holding Corp. (collectively
"EB"). On November 24, 2004 plaintiff Tim Os-
trander filed a consent to become a party plaintiff
and proposed to be a named representative for a
subclass of EB Store Managers ("SMs") and Diaz
filed a consent to become a party plaintiff and pro-
posed to be a named representative for a subclass of
EB Assistant Store Managers ("AMSs"). [FN2]
Plaintiffs allege that EB routinely and intentionally
failed to pay its store employees minimum wages

and overtime pay in violation of (1) the Fair Labor
Standards Act ("FLSA"), 29 U.S.C. § 201*et seq.,*
("Federal Claims") and (2) Article 19 of New York
Labor Law ("NYLL") and its implementing regula-
tion, Section 142-2.2 of the New York Compilation
of Codes, Rules and Regulations ("NYCCRR"),
Title 12 ("State Claims"). On December 22, 2004
plaintiffs moved for conditional certification and
facilitation of notice of their Federal Claims "on be-
half of all current and former [EB] employees who
did not receive overtime pay at the rate of time and
one half for any hours worked in excess of 40 per
week and/or who were otherwise not compensated
for work performed."(Pls.' Mem. Supp. Mot. Con-
ditional Certification at 1-2 .) On March 17, 2005
plaintiffs, pursuant to Rule 23(a) and (b)(3) of the
Federal Rules of Civil Procedure ("FRCvP"),
moved for class certification of their State Claims
on behalf of "all current and former [EB][SMs] and
[ASMs] who worked in any of [EB's] New York
State stores from October 13, 1998 to the
present."(Pls.' Mem. Supp. Mot. Class Certification
at 1.) On March 11, 2005 EB moved to dismiss
plaintiffs' State Claims. All three motions are
pending before the Court and, for the reasons set
forth below, all three motions will be denied.[FN3]

FN2. On April 18, 2005 Anthony Capizzi
filed a consent to become a party plaintiff
and proposed to represent others similarly
situated and Jeffrey Hochmuth and An-
drew Secor did so September 30, 2005.
This Order does not address these parties
because they were not included in
plaintiffs' papers and, even if they were in-
cluded, such would not alter the reasoning
or the holding.

FN3. Plaintiffs in their motions also re-
quest an order from the Court (1) authoriz-
ing notification to all potential class mem-
bers, (2) directing EB to provide plaintiffs
with the names and residences of all poten-
tial class members, (3) requiring EB to

EXHIBIT

N

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
**2005 WL 2654270 (W.D.N.Y.)**

publicize the action and (4) prohibiting EB from threatening, harassing or retaliating against those seeking to join the action. Because the Court will deny certification of plaintiffs' Federal and State Claims, notice to and information about potential class members will not be necessary. The Court, furthermore, need not prohibit EB from threatening, harassing or retaliating because the law already prohibits such conduct.

The facts, for the purpose of the pending motions, are found as follows and are undisputed except where otherwise noted. EB is a retail chain that specializes in the sale of video game hardware and software and personal computer entertainment software and accessories. EB has more than 1,460 stores nationwide, 98 of which are located in New York State. EB stores are located in rural, urban and suburban areas, range from 422 to 5,000 square feet and earn between $514,999 and $3.5 million in annual sales. EB stores are divided into 112 districts, each consisting of 15 to 18 stores and each with a District Manager who supervises the SMs in the district. Each EB store has an SM-like Ostrander-who receives a flat annual salary, is exempt from overtime pay, is responsible for the daily operations of the store and ensures that each employee reviews his or her timesheet and is paid for all hours worked. Each SM supervises anywhere from three to twelve employees and may manage his or her own store while also supervising SMs in other stores. EB also employs over 1,375 ASMs-like Diaz-and nearly 4,700 Sales Associates ("SAs")-90 percent of whom work part-time. ASMs and SAs are paid at an hourly rate and thus are nonexempt from receiving overtime pay.

**\*2** Both plaintiffs are former employees of the Blasdell, N.Y. EB store where Ostrander was Diaz's manager. Plaintiffs first claim that Ostrander and other SMs were misclassified as exempt and thus wrongly denied overtime compensation because (1) they have "little, if any, significant discretion" in operating the store, (2) their "primary function" is not managing the store and (3) they spend nearly 80 percent of their time selling merchandise. (Pls.' Mem. Supp. Mot. Class Certification at 9.) Plaintiffs contend that, although Ostrander was paid a salary based on working 40 hours per week, he typically worked between 60 and 70 hours per week without receiving additional compensation. Plaintiffs further allege that SMs share similar experiences due to the significant control EB exercises over all aspects of the operations of stores.

Additionally, plaintiffs contend that Diaz, although classified as a nonexempt ASM, was not compensated for the overtime hours he had worked, which averaged ten to twelve per week. Plaintiffs allege that it was EB's practice to understaff the Blasdell store by allocating insufficient payroll hours, which required Ostrander and Diaz to work uncovered shifts and resulted in their working more than 40 hours a week without receiving adequate overtime compensation. Ostrander allegedly attempted to compensate Diaz by allowing him to take time off in exchange for overtime hours worked, but such was often impossible due to understaffing of the store. Moreover, plaintiffs claim that Diaz's hours were manually adjusted to comply with EB's policy restricting overtime pay. According to plaintiffs, EB was aware of these allegedly illegal wage practices due to its advanced information technology system with centralized control and monitoring of payroll and hours worked. Thus, plaintiffs claim that EB's refusal to pay overtime for hours worked in excess of 40 hours per workweek was willful and EB persuaded its employees-allegedly through intimidation and empty promises of advancement-to work without adequate compensation, all in violation of federal and state wage laws.

Plaintiffs first move for class certification of their Federal Claims under FLSA § 216(b), alleging that they were deprived of minimum wages and overtime pay in violation of the FLSA. In particular, plaintiffs claim that EB engaged in a common scheme violating the FLSA by (1) misclassifying

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                           Page 3
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
**2005 WL 2654270 (W.D.N.Y.)**

SMs as exempt from federally mandated wage laws, (2) requiring its employees to work hours in excess of 40 per workweek without compensation, (3) insisting that all employees clock-out prior to cleaning and closing the store-which often take over an hour to complete-, (4) requiring its employees to enter payroll early on Saturdays to ensure that employees are paid only the pre-determined number of scheduled work hours and (5) forcing SMs to "volunteer" their time to conduct inventories at other EB stores.

The FLSA requires covered employers to, *inter alia,* pay their employees at least the governing minimum wage, 29 U.S.C. § 206, and overtime wages, at the rate of time and one-half, for hours in excess of 40 hours worked in a single week. 29 U.S.C. § 207.[FN4] Exempt, however, from the FLSA's overtime requirements are employees who are "employed in a bona fide executive, administrative, or professional capacity".29 U.S.C. § 213(a)(1). An "employee employed in a bona fide executive capacity" is one, *inter alia,* "[w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof" and "[w]ho customarily and regularly directs the work of two or more other employees".29 C.F.R. § 541.100. "Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption".29 C.F.R. § 541.106.[FN5]"Determining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing administrative duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities." ' *Mike v. Safeco Ins. Co. of Am.,* 274 F.Supp.2d 216, 220 (D.Conn.2003) (citation omitted).

FN4. The FLSA states, in pertinent part:

"[N]o employer shall employ any of [its] employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed ."29 U.S.C. § 207(a)(1).

FN5.29 C.F.R. § 541.106 states, in pertinent part:

"(a) Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700. Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.

(b) For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. An assist-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
2005 WL 2654270 (W.D.N.Y.)

ant manager can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves."

*3 The FLSA provides a mechanism whereby plaintiffs can bring a collective action on behalf of themselves and other employees who are similarly situated. 29 U.S.C. § 216(b).[FN6] Plaintiffs have the burden of demonstrating that they are "similarly situated" to members of their proposed collective action. *Hoffmann v. Sbarro, Inc.,* 982 F.Supp. 249, 261 (S.D.N.Y.1997). To meet this burden, plaintiffs must "mak[e] a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law."*Ibid.* A similar situation exists if there is a factual nexus between Diaz and Ostrander's situations and the situations of other current and former employees whom plaintiffs seek to join as putative members of the collective action. *Id.* at 261-262.

FN6. The FLSA states, in pertinent part:

"An action to recover * * * liability * * * may be maintained against any employer * * * in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."29 U.S.C. § 216(b).

Plaintiffs have filed consents to become parties plaintiff.

Plaintiffs, therefore, must demonstrate that Ostrander and Diaz are similarly situated to a putative class consisting of nonexempt SAs and ASMs as well as exempt SMs. Plaintiffs assert similar situation based on the allegation that all putative class members were victims of EB's "company-wide plan of not paying their employees overtime or other wages for work performed."(Pls.' Mem. Supp. Mot. Conditional Certification at 10.) EB, in opposing certification of plaintiffs' Federal Claims, argues that (1) Ostrander and Diaz are not similarly situated to one another because Ostrander is exempt and Diaz is nonexempt and (2) plaintiffs are not similarly situated to other EB employees-SMs, ASMs or SAs-throughout the country because of the differences among the many stores. In response, plaintiffs claim that Ostrander and Diaz are similarly situated to each other and to proposed class members because (1) they are all victims of EB's common practice of failing to pay overtime and other wages and (2) SMs and ASMs had virtually identical job descriptions until EB's recent alterations.

The gravamen of Ostrander's claim, as distinct from that of Diaz's, is that EB avoided paying him overtime wages by willfully misclassifying him as exempt although his duties consisted primarily of nonexempt tasks. Ostrander's claim and the claims of other SMs thus will involve an analysis of daily duties and responsibilities and the amount of time spent on each, whereas Diaz's claim and the claims of ASMs and SAs will involve an examination of hours worked, payroll records and EB's knowledge and/or permission of the alleged overtime hours worked. As such, Ostrander and Diaz are not similarly situated to one another for no factual nexus exists between their situations. *See, e.g., Davis v. Lenox Hill Hosp.,* 2004 WL 1926086, at *7 (S.D.N.Y.2004) (holding that the plaintiff, a nurse in an exempt program claiming denial of overtime wages, was not similarly situated to nonexempt nurses); *Mike,* at 220-221 (denying class certification where the plaintiff claimed that he was misclassified as exempt "because the proof in th[e] case [was] specific to the individual [and] * * * any other plaintiff would also have to present specific evidence of his or her daily tasks, and the court

Westlaw.

Not Reported in F.Supp.2d                                           Page 5
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
2005 WL 2654270 (W.D.N.Y.)

would have to apply the regulations on an individu-al basis * * * [and] engage in an ad hoc inquiry for each proposed plaintiff to determine whether his or her job responsibilities were similar to [plaintiff's]"); *Morisky v. Pub. Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493, 498-499 (D.N.J.2000) (finding that the plaintiffs' claim that the defend-ant's "common scheme" was denying them over-time and thus making the exempt and nonexempt plaintiffs similarly situated was, in fact, "really challenging * * * defendant's determination that they are exempt under the FLSA", which would result in certification of "a class based upon [plaintiffs'] own belief as to which employees do not satisfy any of the exemption criteria-the very is-sue to be litigated in th[e] action [and one that if] litigat[ed] * * * as a collective action would be any-thing but efficient").

*4 Moreover, just as a determination of Ostrander's exempt or nonexempt status requires a detailed fac-tual analysis of his daily activities and responsibilit-ies, so does a determination of every individual SM's exempt or nonexempt status. *Morisky,* at 499 ("The exempt or non-exempt status of potentially hundreds of employees would need to be determ-ined on a job-by-job, or more likely, an employee-by-employee basis."). The responsibilities of SMs vary in number and types of employees supervised and in types of stores managed-in terms of physical space, sales volume and geographic location. Al-though SMs share the same job description, their responsibilities, in fact, may differ and thus a highly fact-specific and detailed analysis of each SM's duties is required, making class treatment in-appropriate. *See* 29 C.F.R. § 541.2 ("A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."); *Cooke v. Gen. Dynamics Corp., Elec. Boat Div.,* 993 F.Supp. 56, 61 (D.Conn.1997) ("Whether an employee is exempt is determined by the em-ployee's actual work activities, not by the employ-er's characterization of those activities through a job title or job description."). Plaintiffs, therefore, cannot make the necessary modest showing that Ostrander is similarly situated to other SMs.

Diaz's claim, likewise, is particular to his experi-ences at the Blasdell store. Plaintiffs assert that Diaz's timesheets were altered so that EB would not be required to provide overtime pay. First, plaintiffs do not contend that such was at the direction of EB management or in conjunction with a clear EB policy. Rather, plaintiffs simply allege that ASMs' overtime work must be approved and, thus, EB had a policy of not paying for overtime work. This is insufficient to suggest that all ASMs and SAs were subject to a policy of requiring but not compensat-ing employees for overtime work. *Compare Hoff-mann,* at 261-262 (finding that the plaintiffs had made "a modest factual showing sufficient to demonstrate that they and potential plaintiffs to-gether were victims of a common policy or plan that violated the law" where the defendant had ad-mitted that it had a policy of requiring managers to reduce their compensation and managers were re-quired to sign a form agreement explicitly authoriz-ing wage deductions), *with Holt v. Rite Aid Corp.,* 333 F.Supp.2d 1265, 1274-1275 (M.D.Ala.2004) (finding that, where the defendant's allegedly inac-curate exempt classification of store managers and assistant store managers was the formal policy al-legedly in violation of the FLSA, certification of the collective action would require an inquiry "as to the daily tasks of each putative collective action member to determine whether they are similarly situated to the persons identified by the Plaintiffs, and then, on the merits, whether they had suffered an FLSA violation because they were not eligible for overtime compensation"; hence, "the Plaintiffs employed as Store Mangers or Assistant Managers, * * * even within the region * * *, are not similarly situated").

*5 Second, Diaz's allegations-*viz.,* that he worked "off-the-clock" without compensation and that his timesheets were altered to delete overtime hours

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
**2005 WL 2654270 (W.D.N.Y.)**

worked-are too individualized to warrant collective action treatment. *Lawrence v. City of Philadelphia, P.A.,* 2004 WL 945139, at *2 (E.D.Pa.2004) ("[T]he 'off-the-clock' claim does not involve regularly scheduled time that is worked by all members of the class. Rather, each of the Plaintiffs may potentially claim that on any given day he or she arrived early or departed outside of their regularly scheduled hours and were not compensated for such. The circumstances of those individual claims potentially vary too widely to conclude that in regard to their 'off-the-clock' claim, the Plaintiffs are similarly situated."). The court in *Lawrence* held that the questions of fact would most likely differ for each plaintiff, as each worked in different locations with different supervisors, and thus would be unduly burdensome to manage as a collective claim. *Ibid.* Similarly here, Diaz's off-the-clock claims require an examination by the Court of when he was scheduled to work, when he actually worked, whether he was paid for such and whether Ostrander altered his timesheets and, then, the Court would to have conduct the same inquiry as to each other class member. Taking plaintiffs' allegations as true, altering Diaz's timesheets may have been the Blasdell store's method of dealing with overtime issues, but such may not have been the case at other stores. All ASMs, therefore, have not been shown to be similarly situated and plaintiffs' speculative allegations do not rescue their claims from being "insufficiently specific beyond their own [respective] circumstances." *See Levinson v. Primedia Inc.,* 2003 WL 22533428, at *1-*2 (S.D.N.Y.2003) (holding that employees who claimed that they were misclassified as independent contractors had failed to demonstrate that putative plaintiffs at other sites were "similarly situated" because "they failed to support [their] legal conclusion with a factual showing that extends beyond their own circumstances"-in particular, "[w]hile plaintiffs ha[d] provided factual assertions in support of the claim that *they* were in an employee-employer relationship with defendants, and that *they* were deprived of a minimum wage and overtime rates, they ha[d] failed to make a sufficient showing

that the same was true for other potential plaintiffs"); *Stubbs v. McDonald's Corp.,* 227 F.R.D. 661, 666 (D.Kan.2004) ("While * * * plaintiff [need not] come forward with evidence of actual proof of a decision, policy or plan, the initial *ad hoc* FLSA class certification standard does require plaintiff to provide more than his own speculative allegations, standing alone."); *Holt,* at 1272 ("[P]laintiffs are not similarly situated if the action relates to circumstances personal to the plaintiff rather than a generally applicable policy.").

As for claiming similar situation to SAs, for the reasons mentioned *supra*[FN7] and because 90 percent of SAs worked part-time and thus overtime laws do not apply to them, Diaz and Ostrander are not similarly situated to SAs. Plaintiffs, therefore, fail to show that Ostrander and Diaz are similarly situated to one another, that Ostrander is similarly situated to the proposed class of ASMs, that Diaz is similarly situated to the proposed class of SMs and that either is similarly situated to SAs and their motion for conditional certification of their Federal Claims will be denied .[FN8]

> FN7. Plaintiffs are not similarly situated to each other, to SMs or to ASMs; thus, logically, they are not similarly situated to SAs.

> FN8. Plaintiffs mention that, if the Court finds "significant differences" between SMs and ASMs, it can divide the class into subclasses. (Pls.' Mem. Further Supp. Mot. Conditional Certification at 19.) Plaintiffs, however, cannot show sufficient similarity to certify a class of SMs and ASMs, nor can they show sufficient similarity to certify a class of just SMs or just ASMs. Plaintiffs urge that, at this preliminary stage, the Court should certify the class for notice and discovery purposes and leave further determinations to a later date. *See, e.g., Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1218-1219 (11th Cir.2001). Courts that have certified classes at the ini-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
**2005 WL 2654270 (W.D.N.Y.)**

tial stage with the possibility of decertification or subclassification have done so when discovery may have revealed latent differences in the putative class. *See, e.g., Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F.Supp.2d 101, 105 (S.D.N.Y.2003). In the instant case, however, significant differences are apparent at the outset and discovery cannot resolve the defects in plaintiffs' claims.

**\*6** Turning to plaintiffs' motion for class certification of their State Claims, plaintiffs assert violations of NYLL §§ 160 *et seq.,* 190 *et seq.* and 650 *et seq.* and seek class certification of their State Claims pursuant to FRCvP 23. NYLL § 652 delineates a minimum wage schedule and NYLL § 655 provides for overtime rates and requirements, which, pursuant to the implementing regulation, apply the FLSA standards in determining exemptions from New York State overtime laws. 12NYCCRR § 142-2.2.[FN9] Thus, plaintiffs have the same obstacle with respect to Ostrander's claim-*viz.,* that a determination of nonexempt status requires an inquiry into the specifics of Ostrander's job and a similarly individualized inquiry into the specifics of each SM whom plaintiffs are seeking to join.

> FN9. 12 NYCCRR § 142-2.2 states, in pertinent part:
>
> "An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of \* \* \* the [FLSA] \* \* \*. In addition, an employer shall pay employees subject to the exemptions of section 13 of the [FLSA] \* \* \* overtime at a wage rate of one and one-half times the basic minimum hourly rate."
>
> 12 NYCCRR § 142-2.4 provides that an employee shall receive one hour's pay at the basic minimum hourly wage rate for

any day in which the spread of hours exceeds ten hours or there is a split shift or both situations occur.

FRCvP 23 sets forth the requirements for bringing and maintaining a class action in federal court and plaintiffs bear the burden of proof on a motion for class certification under FRCvP 23. *Monaco v. Stone,* 187 F.R.D. 50, 59 (E.D.N.Y.1999)."In determining the propriety of a class action, the question is not whether \* \* \* plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of [FRCvP] 23 are met."*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Although the Court will accept all of plaintiffs' allegations as true and avoid conducting an inquiry into the merits, "the decision whether to certify a class may involve considerations related to the factual and legal issues that comprise [plaintiffs'] cause of action [and] the presence of an affirmative defense should be considered in determining whether class certification is appropriate." *Noble v. 93 Univ. Place Corp.,* 224 F.R.D. 330, 337 (S.D.N.Y.2004) (quotations and citation omitted).

Plaintiffs must demonstrate that under FRCvP 23(a) the putative class has (1) sufficient numerosity to make individual joinder impracticable, (2) commonality of questions of law or fact, (3) typicality of claims and (4) representatives who fairly and adequately protect the interests of the class. Second, because plaintiffs move for class certification under FRCvP 23(b)(3), they must show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class is superior to other available methods for fair and efficient adjudication of the controversy."FRCvP 23.[FN10]The numerosity element "requires a finding that the numerosity makes joinder of all class members 'impracticable.' ' *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993). A class comprised of more than forty members generally satisfies numerosity.*Consol. Rail Corp., v. Town of Hyde*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                          Page 8
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
**2005 WL 2654270 (W.D.N.Y.)**

*Park,* 47 F.3d 473, 483 (2d Cir.1995). The Court will assume *arguendo* that plaintiffs have met the numerosity requirement of FRCvP 23(a)(1).

FN10. FRCvP 23(a) and (b) states, in pertinent part:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

Next, plaintiffs must demonstrate commonality-*viz.,* that there are "questions of law or fact common to the class."FRCvP 23(a)(2). Plaintiffs' claims and the class claims must be "so interrelated that the interests of the class members will be fairly and adequately protected in their absence."*Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). For the same reasons that plaintiffs cannot meet the similarly situated requirement of class certification under the FLSA-to wit, plaintiffs' factual allegations are specific to only Ostrander and Diaz and an individual factual determination is necessary to distinguish between exempt and nonexempt employees, to determine if an SM should be exempt or nonexempt and to determine if an ASM worked off-the-clock-, plaintiffs fail to meet the commonality requirement of FRCvP 23(a).*See Davis,* at *5 (finding that "categories of employees whose jobs were governed by different pay and benefits policies"-to wit, those who are allegedly incorrectly classified as exempt and those who are classified as nonexempt-do not share common issues of law or fact and thus cannot meet the commonality requirement of FRCvP 23(a)); *Morisky,* at 500 (holding that "the question of whether defendant improperly classified employees as exempt is unique to each employee and his or her particular job responsibilities" and claims so "individual in nature" do not meet the commonality requirement of FRCvP 23(a)). As stated *supra,* both Ostrander's and Diaz's claims are individual in nature, present factual questions specific to each and separate from the other's and from those of proposed class members. Plaintiffs admit that the commonality inquiry is one that asks "whether the common questions are at the 'core' of the cause of action alleged" and that such is the case when the "legal or factual questions linking class members are substantially related to the resolution of the litigation."(Pls.' Mem. Supp. Mot. Class Certification at 15 (citations omitted) .) Plaintiffs claim that the factual and legal issue is whether EB properly compensated its employees. This is clearly, as found *supra,* an oversimplification and misstatement of the issues. The factual is-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
**2005 WL 2654270 (W.D.N.Y.)**

sues with respect to Ostrander and SMs are based on their daily activities and responsibilities and with respect to Diaz and ASMs arise from their hours scheduled to work and actually worked. The legal issues with respect to Ostrander and SMs are based on the FLSA's definition of exempt employees and with respect to Diaz and ASMs focus on timesheets and authority to work overtime. Therefore, the commonality requirement of FRCvP 23(a) is not met.

*7 FRCvP 23(a) also conditions class certification on plaintiffs establishing that the legal positions of the representative parties-Ostrander and Diaz-are "typical" of the absent class members. To be typical, "claims of the class representatives [must] be typical of those of the class, and [occurs] when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."*Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir.2001) (quotations and citation omitted); *see also Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir.1992) (finding that the typicality requirement is met if the plaintiffs' claims "arise[ ] from the same event of practice or course of conduct that gives rise to the claims of the class members, and * * * [are] based on the same legal theory"). Class certification may not be granted "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation ."*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir.2000) (citation omitted). Again, plaintiffs' claims are not typical of each other or of those of the proposed class. As the courts in *Davis* and *Morisky* held, the individualized nature of claims alleging incorrect exemption status preclude meeting the typicality requirement. *See Davis*, at *6;*Morisky*, at 500.Ostrander's misclassification claim is factually and legally different from Diaz's off-the-clock claim and warrant different defenses from EB. *Noble*, at 343 ("[W]here [unique] defenses * * * threaten [ ] to become the focus of the litigation, the plaintiff cannot be considered

'typical' of the class.") (citation and quotations omitted). Furthermore, as explained *supra*, Ostrander's alleged reasons for claiming to be misclassified arises from a different course of events-*viz.*, those particular to the Blasdell EB store-than those that may cause another SM to be misclassified. The same holds true for Diaz's claim as applied to other ASMs-*viz.*, the reasons why he was allegedly not compensated for off-the-clock overtime work is likely different from why another ASM performed and was not compensated for off-the-clock work. FRCvP 23(a)'s typicality requirement, therefore, has not been met.

The final FRCvP 23(a) requirement-adequacy-tends to merge with the commonality and typicality requirements. *Amchem Prod. Inc. v. Windsor*, 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)."[C]lass representative[s] must * * * 'possess the same interest and suffer the same injury' as the class members."*Id.* at 625-626 (citation omitted). Again, Ostrander and Diaz did not suffer the same injury inasmuch as Ostrander was allegedly misclassified and Diaz was allegedly required to work off-the-clock. *See Davis*, at *6 (finding that the plaintiff "does not possess the same interests and has not suffered the same injuries as other members of the purported class" because of the difference in their exemption status). As the claims of each individual SM and ASM also vary, Ostrander and Diaz are not adequate representatives of a class, or classes, with such highly individualized claims. *See Mike v. Safeco Ins. Co. of Am.*, 223 F.R.D. 50, 53 (D.Conn.2004) ("The same reasons that preclude [plaintiff] from proceeding as a collective action under the FLSA preclude him from defining a tenable class under [FRCvP] 23. * * * [N]o benefit is derived from proceeding as a class action because class membership is not founded upon any Safeco policy or other generalized proof, but rather on the fact-specific determination of each individual plaintiff's day-to-day tasks."). Plaintiffs, therefore, have failed to meet the requirements of FRCvP 23(a) and their motion for certification of their State Claims will be denied.[FN11]

Westlaw.

Not Reported in F.Supp.2d                                                                Page 10
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)
**2005 WL 2654270 (W.D.N.Y.)**

FN11. As plaintiffs' have failed to meet the requirements of FRCvP 23(a), there is no need to continue the analysis as to FRCvP 23(b)(3).

**\*8** Turning to EB's motion to dismiss plaintiffs' State Claims, EB claims that (1) a class action under NYLL would violate the Rules Enabling Act ("REA") on a variety of grounds and (2) there is no New York State overtime statute and the corresponding regulation, 12 NYCCRR § 142-2.2, is thus illegitimate. This Order will deny certification of plaintiffs' State Claims and thus EB's REA claim will be moot. As to EB's claim that there are no overtime laws in New York State, EB cites three cases-*Hornstein v. Negev Airbase Constructors,* 110 A.D.2d 884, 488 N.Y.S.2d 435 (2d Dep't 1985), *Gallegos v. Brandeis Sch.,* 189 F.R.D. 256 (E.D.N.Y.1999) and *Ballard v. Cmty. Home Care Referral Serv., Inc.,* 264 A.D.2d 747, 695 N.Y.S.2d 130 (2d Dep't 1999)-in support of its claim. The court in *Hornstein* stated that "New York does not have a mandatory overtime law" without citing to a prior decision. 488 N.Y.S.2d at 437.*Gallegos* states the same and cites *Hornstein* for the proposition. 189 F.R.D. at 259. Neither the *Hornstein* nor the *Gallegos* decision explains or justifies the proposition. In *Ballard,* on the other hand, explained that, although "[t]here are no provisions governing overtime compensation in the New York State Labor Law[,] * * * the Commissioner of Labor has the power to * * * appoint a wage board * * * [who] may recommend such regulations as it deems appropriate with respect to, *inter alia,* overtime rates * * *."695 N.Y.S.2d at 131. The court continued to explain that, "[i]n accordance with these empowering statutes, the Commissioner of Labor determined that some form of overtime compensation was appropriate and issued the Miscellaneous Wage Order found at [NYCCRR] 142-2.2."*Ibid.* Thus, the case that EB claims supports its position, in fact, directly conflicts with it. Furthermore, subsequent to *Hornstein* and *Gallegos,* the Second Circuit Court of Appeals and other New York District Courts have verified that over-

time claims may be brought pursuant to NYLL § 650 *et seq.* and that implementing regulation 12 NYCCRR 142-2.2 carries the force of the law. *See, e.g., Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61, 78 (2d Cir.2003) (upholding district court's analysis of the plaintiffs' state overtime claims under 12 NYCCRR 142-2.2 based on the "same analysis" as applied under the FLSA); *Mascol v. E & L Transp., Inc.,* 2004 WL 1541045 (E.D.N.Y.2005) (granting the plaintiffs' motion for class certification of a class of drivers allegedly not paid overtime wages in violation of NYLL and its implementing regulations, 12 NYCCRR § 142-2.2).

Accordingly, it is hereby ORDERED that plaintiffs' motion for conditional certification of their Federal Claims is denied, that plaintiffs' motion for class certification of their State Claims is denied and that EB's motion to dismiss is denied.

W.D.N.Y.,2005.
Diaz v. Electronics Boutique of America, Inc.
Not Reported in F.Supp.2d, 2005 WL 2654270 (W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Westlaw.

Slip Copy                                                                Page 1
Slip Copy, 2006 WL 3393706 (M.D.Fla.)
**2006 WL 3393706 (M.D.Fla.)**

c
Robbins-Pagel v. Puckett
M.D.Fla.,2006.
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.
Carolyne ROBBINS-PAGEL, Larry Pagel and Diane Bozutto, Plaintiffs,
v.
WM. F. PUCKETT, Inc., Defendant.
**No. 6:05-cv-1582-Orl-31DAB.**

Nov. 22, 2006.

Richard Bernard Celler, Morgan & Morgan, Ft. Lauderdale, FL, for Plaintiffs.
Kelly V. Parsons, Thomas J. Leek, Cobb & Cole, PA, Daytona Beach, FL, for Defendant.

**ORDER**

GREGORY A. PRESNELL, District Judge.
*1 This action concerns an alleged violation of the Fair Labor Standards Act ("FLSA") for the failure of Defendant WM. F. Puckett, Inc., ("WMF") to pay its employees over-time pay. Plaintiff Carolyne Robbins-Pagel ("Robbins-Pagel") filed a Motion (Doc. 31) requesting that the Court conditionally certify a collective action and grant permission to send court supervised notice to similarly situated employees of their opt-in rights pursuant to 29 U.S.C. § 216(b).[FN1] On September 1, 2006, Magistrate Judge Baker issued a Report that recommended denying Plaintiff's motion. (Doc. 44). Judge Baker held that Plaintiff had failed to submit sufficient evidence that the members of the putative class were similarly situated or that others desired to join the suit.. Plaintiff then submitted a timely objection to that Report and Recommendation (Doc. 45), to which Defendant failed to respond. For the reasons stated below, this Court sustains Plaintiff's objection and declines to adopt the Report and Recommendation.

FN1. Defendant's Response to this motion is filed at Doc. 43.

**I. Background**

Robbins-Pagel sued under the Fair Labor Standards Act (FLSA) for unpaid overtime compensation she allegedly earned while employed as an hourly paid employee for Defendant, a grower, shipper and distributor of quality floral greens. Plaintiff asserts that her work included "process[ing] incoming orders and creat[ing] promotional material for Defendant's upcoming shows."(Doc. No. 31-2). Plaintiff's suit is brought individually and on behalf of others similarly situated who are and were employed by Defendant during the three years preceding the suit. Plaintiff seeks conditional certification of a collective action and an order permitting notice to all hourly paid employees employed by Defendant over the last three years who were "subjected to Defendant's corporate practice and policy of misclassifying hourly paid employees as "agriculturally exempt" under the FLSA, and not paying full and proper overtime compensation for all overtime hours worked."(Doc. No. 31 at 2). Defendant opposes the collective action and notice to other employees because it asserts that the class is defined too broadly and the hourly employees do not have sufficient commonality as to their job descriptions sufficient to justify a collective approach. Defendant asserts that as, a grower, it employs field hands and packers, as well as drivers and salespeople, and an individual analysis as to each job description and applicable exemptions is necessary. (Doc. No. 43).

**II. Legal Analysis**

Title 29 U.S.C. 216(b) provides a right of action to recover unpaid minimum wages, unpaid overtime compensation, and for other relief if retaliation is at issue. The Act provides:

An action to recover the liability [for unpaid overtime] may be maintained against any employer

EXHIBIT

O

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                                      Page 2
Slip Copy, 2006 WL 3393706 (M.D.Fla.)
**2006 WL 3393706 (M.D.Fla.)**

(including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*2 29 U.S.C. § 216(b).

In *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir.2001), the Eleventh Circuit recommended that district courts utilize a two-stage process to certify a collective action under FLSA. The first step is the "notice stage," in which the district court makes a determination as to whether notice of the action should be given to potential collective class members. *Id.* at 1218.The standard applied in this first stage is a lenient one which "typically results in conditional certification" of the collective action.*Rodgers v. CVS Pharmacy, Inc.*, 2006 WL 752831, *2 (M.D.Fla. March 23, 2006). If the district court conditionally certifies the collective class, putative members are given notice and a chance to opt in. *Hipp* at 1218.The action proceeds as a representative action through discovery. A second determination is usually made after a motion for decertification is made by the Defendant. At the second stage, the district court must determine if the plaintiffs are "similarly situated." *Id.* at 1217.If so, the action proceeds to trial as a representative action. If not, the district court "decertifies" the collective class, and the opt-in plaintiffs are dismissed, without prejudice. The case proceeds on the individual claims of the original plaintiffs. *Id.* at 1218.

At the notice stage, "[p]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members."*Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir.1996) (internal quotations and citations omitted)."[P]laintiffs bear the burden of demonstrating a 'reasonable basis' for their claim of class-wide discrimination."*Id.* at 1097."The

plaintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary."*Id.* at 1097.Even a single affidavit or consent to join submitted by another individual stating that they are similarly situated and wish to join the suit is enough to bring the Plaintiff's contentions above pure speculation. *Guerra v. Big Johnson Concrete Pumping, Inc.*, 2006 U.S. Dist. LEXIS 58484, *10 (S.D.Fla. May 17, 2006).[FN2] This Court finds that Judge Baker's Report analyzed Plaintiff's motion under the more stringent second stage of the *Hipp* test.

> FN2.*See also Tyler v. Payless Shoe Source, Inc.*, 2005 WL 3133763, *3 (M.D.Ala. Nov. 23, 2005) (three to five consents to join were sufficient to establish that others desired to opt in).

In this case, Plaintiff has submitted her own affidavit and the affidavits of two additional former employees of the Defendant. (See Doc. 31) All three affidavits allege that the employees were not paid over-time pay as required by the FLSA because they were incorrectly labeled as exempt agricultural employees and that Defendant has followed this same practice with regard to all hourly paid employees. Defendant's argument that each Plaintiff's case may present individual questions regarding the definition of their job or the hours worked is not relevant here. At this stage, the Court must rely only on the pleadings and affidavits and should not make any factual determinations or take into account any alleged defenses. *Pendlebury v. Starbucks Coffee Co.*, 2005 WL 84500, *3 (S.D.Fla. Jan. 3, 2005). Furthermore, the inquiry under *Hipp* is much less stringent than the inquiry under Rule 23, which requires that common questions of law or fact dominate. Defendant's objections to certification are more appropriate at the second stage, after discovery has been completed. Therefore, Plaintiff has submitted sufficient evidence to establish a reasonable basis to believe that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



there are similarly situated individuals who may be interested in joining the action, if given notice.

**\*3** The question remains, how to define the group of individuals to be given notice. All three affidavits are submitted by former hourly-paid employees, who worked in Volusia County, Florida for over 40 hours/workweek, and who were mischaracterized as agriculturally exempt and therefore denied the over-time pay to which they claim entitlement. Plaintiff has presented no indication that employees outside of Volusia County are similarly situated or would desire to join the suit, and therefore the notice must be geographically limited. Therefore, the Court will authorize notice to current and former employees of WMF, working in Volusia County, whose duties were not primarily agricultural and who worked more than 40 hours/workweek within the last three years but were not paid overtime pay as required by FLSA.[FN3]

> FN3. The three-year limitation is required by the applicable statute of limitations.

Plaintiff has submitted a proposed notification and opt-in form that tracks the form approved of in the case of *Bell v. Mynt Entertainment Co.,* 223 F.R.D. 680 (S.D.Fla.2004). However, this Court finds that form inadequate because it fails to inform potential plaintiffs that, if they do opt-in and are unsuccessful on the merits of their claim, they may be responsible for the defendant's costs in this matter. Any notice, to be approved by this Court, must include a full disclosure of the individuals' rights *and* responsibilities should they decide to opt-in to the suit. Therefore, Plaintiff must amend the notice form to include such information.

**IV. Conclusion**

Accordingly, it is

**ORDERED** that Plaintiff's objection to the Report and Recommendation (Doc. 45) is **SUSTAINED** and Plaintiff's Motion for an Order Permitting Court Supervised Notice to Employees of Their Opt

In Rights (Doc. 31) is **GRANTED.** Plaintiff shall submit a proposed notification form, in compliance with this Order, within ten (10) days. Defendant may file any objections to that form within ten (10) days of it being filed with the court.

**DONE and ORDERED.**

M.D.Fla.,2006.
Robbins-Pagel v. Puckett
Slip Copy, 2006 WL 3393706 (M.D.Fla.)

END OF DOCUMENT

Westlaw.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                        Page 1
Not Reported in F.Supp.2d, 2004 WL 1718420 (N.D.Ill.)
**2004 WL 1718420 (N.D.Ill.)**

▷

Heitmann v. City of Chicago
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Hans G. HEITMANN Plaintiff,
v.
CITY OF CHICAGO Defendant.
**No. 04 C 3304.**

July 30, 2004.

Julie Sparling Desierto, Witwer, Poltrock &
Giampietro, Paul D. Geiger, Law Offices of Paul D.
Geiger, Chicago, IL, for Plaintiff.
Mara Stacy Georges, Tracey Renee Ladner, Gia L.
Morris, City of Chicago, Law Department, Corpor-
ation Counsel, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

COAR, J.

*1 Plaintiff Hans Heitmann has filed this action
against the City of Chicago on behalf of himself
and other similarly situated plaintiffs who are or
were employees of the Chicago Police Department
between May 10, 2001 and May 10, 2004. The
Complaint alleges that during this three year period,
the Chicago Police Department violated the Fair
Labor Standards Act (FLSA) in its administration
of accumulated compensatory time. The case comes
before the Court at this early stage on the Defend-
ant's Motion to Strike and Bar Plaintiff's Notice and
Consent Forms.

I. BACKGROUND

Plaintiff contends that the Chicago Police Depart-
ment has been illegally denying officers' requests
for accumulated compensatory time. Plaintiff as-
serts that the Fair Labor Standards Act requires re-
quests for accumulated compensatory time off to be
granted unless the granting of those requests would

"unduly disrupt" the department. Pursuant to feder-
al regulations, "any employee of a public agency
who has accrued compensatory time and requested
use of this compensatory time, shall be permitted to
use such time off within a 'reasonable period' after
making the request, if such use does not 'unduly
disrupt' the operations of the agency."29 C.F.R. §
553.25(a). The regulations further define what con-
stitutes an undue disruption of the operations of the
agency: "Mere inconvenience to the employer is an
insufficient basis for denial of a request for com-
pensatory time off. For an agency to turn down a
request from an employee for compensatory time
off requires that it should reasonably and in good
faith anticipate that it would impose an unreason-
able burden on the agency's ability to provide ser-
vices of acceptable quality and quantity for the pub-
lic during the time requested without the use of the
employee's services."29 C.F.R. § 553.25(d).
Plaintiff's Complaint alleges that the Chicago Po-
lice Department does not comply with these re-
quirements in its administration of requests for
compensatory time off.

The case arises under Section 16(b) of the FLSA,
29 U.S.C. § 216(b). The statute provides that a civil
action may be maintained "by any one or more em-
ployees similarly situated." 29 U.S.C. § 216(b). The
statute further provides that "[n]o employee shall
be a party plaintiff to any such action unless he
gives his consent in writing to become such a party
and such consent is filed in the court in which such
action is brought."*Id.* The pending motion chal-
lenges the adequacy of the notice that Plaintiff
provided to other similarly situated individuals and
the consent form that Plaintiff provided to those
employees.

II. DISCUSSION

Defendant has several objections to the Plaintiff's
notice and consent forms that were provided to po-
tential plaintiffs. First, it asserts that Plaintiff erred

**EXHIBIT**

P

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1718420 (N.D.Ill.)
**2004 WL 1718420 (N.D.Ill.)**

Page 2

in failing to seek leave of court to issue notice and consent forms to the potential plaintiffs. Second, it asserts general and specific objections to the form of the notice already provided. Third, it asserts general and specific objections to the form of the consent forms already provided. The Court will address each objection in turn.

### A. Plaintiff's Failure to Provide Notice Prior to Distribution

**\*2** The Defendant contends that Plaintiff's distribution of notice and consent forms was improper because Plaintiff did not provide notice to the Defendant nor did he seek leave of the court. Plaintiff, in its response to the motion, asserts that it was not aware of any requirement to provide notice to defense counsel or the Court prior to distributing notice and consent forms. It is settled law in this Circuit that Plaintiff must provide notice to the Defendant prior to distributing notice and consent forms in FLSA actions under 29 U.S.C. § 216(b). See *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 580 (7th Cir.1982) (holding it is improper for the plaintiff to issue notice and consent forms "without first communicating to the defendant's counsel his intention to do so, so that the defendant's counsel would have an opportunity to verify the accuracy of the notice and, if he wished, to move for an order amending the notice or limiting its distribution in an appropriate manner."). Plaintiff's ignorance of this requirement is somewhat understandable as the Seventh Circuit, in *Woods,* could not "find any express basis in rule or statute" for the requirement of providing notice; instead, the requirement is "inferred" from the statute and Rule 83 of the Federal Rules of Civil Procedure, which permits courts to regulate their own practice consistent with the other federal rules. *Id.* Nevertheless, the rule is more than twenty years old now, and Plaintiff should have followed it.

Plaintiff was not required, however, to seek leave of the court prior to distributing the notice and consent forms. Although many courts have implemented this practice, it is not required in FLSA cases. Indeed, the ideal scenario from the Court's perspective would have the parties agreeing on the form and content of these notice and consent forms. For failing to notify the Defendant prior to distribution, however, Plaintiff will be required to amend the notice and consent form to bring them both into compliance with the requirements of this opinion.

### B. Defendant's Objections to the Content of the Notice

Defendant contends that the notice of the lawsuit that Plaintiffs provided to the potential plaintiff class was false and misleading. Defendant specifically complains that the notice "does not accurately advise potential plaintiffs of the issues in the complaint; their rights with respect to joining the lawsuit; the impact of joinder on their potential claims; and their right to choose [separate] counsel."(Def. Mot. at 1-2.)

Plaintiff provided notice to other potential plaintiffs in the June 2004 newsletter of the Fraternal Order of Police, the FOP News. The Court has reviewed the notice in its entirety.[FN1] Defendant's general objection to the notice, that it is "false and misleading," is not well-founded. The notice may not include some information that the Defendant believes is important, but it is neither false nor misleading. The Court also rejects Defendant's contention that the notice as provided does not accurately advise potential plaintiffs of the issues in the lawsuit. The Complaint alleges that the City has been illegally denying police officers' requests for compensatory time. The notice explains the Plaintiff's view of that practice in plain and simple terms. Nothing further is required.

> FN1. The FOP News included a longer narrative description of the lawsuit as well as a shorter description of the lawsuit above the consent form. The shorter description reads as follows:

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1718420 (N.D.Ill.)
**2004 WL 1718420 (N.D.Ill.)**

On May 10, 2004, a lawsuit was filed by our Lodge attorneys alleging that the City of Chicago has violated the Fair Labor Standards Act by refusing to grant compensatory time. Any officer that has requested to use compensatory time within the last three years and has been denied may join the lawsuit as a plaintiff. Federal law does not allow this lawsuit to proceed as a class action. All officers that wish to join in the action must fill out the consent form that appears below and return it to the Lodge.

A similar lawsuit brought by Milwaukee police officers named better than 1,800 officers as plaintiffs. The Fair Labor Standards Act requires that when a timely request to use compensatory time is made, the Police Department can only deny the request if it can demonstrate that granting the request would cause an "undue disruption" in service. It is our contention that the Department has been denying the compensatory time requests illegally.

This consent form will only appear in this issue and next month's issue of the newsletter. The Lodge urges all officers that have been denied the use of comp time to join in the action by filling out the form and sending it to us. The use of comp time is a pervasive problem throughout the Department. If we are going to be successful in making real changes, we need your help.

**\*3** Defendant also contends that the notice fails to notify the potential plaintiffs of the impact of joinder on their claims. In traditional class actions, such a notice is necessary because failure to join the suit can preclude a potential plaintiff from ever bringing a claim. Representative actions under Section 216(b) of the FLSA, however, are not traditional class actions. Failure to join a representative action

under Section 216(b) does not affect a plaintiff's right to bring an action in the future. In these cases, it is not required to inform the class of potential plaintiffs of the impact of joinder on their claims in the notice of a lawsuit.

Defendant's remaining two objections to the content of the notice are that it does not inform the potential plaintiffs of their rights with respect to joining the lawsuit nor of their ability to choose separate counsel. These objections are well grounded. Both of these pieces of information should be included in the notice to provide potential plaintiffs with an understanding of their full panoply of rights, including their right to select separate counsel, their right to bring a separate action, and their right not to sue.

C. Defendant's Objections to the Consent Form

Defendant contends that the consent form Plaintiff provided to potential plaintiffs is inaccurate and misleading because it does not state the issues presented by the lawsuit. Defendant also complains that the consent form does not allow potential plaintiffs to elect separate counsel.

As to the latter objection, the consent form should allow potential plaintiffs to elect separate counsel. It imposes a *de minimus* burden on Plaintiff to allow potential plaintiffs to elect their representative on the consent form. This provides appropriate respect to the potential plaintiffs right to elect counsel of their own choosing in this case. With respect to the former objection, the consent form is not required to state all the issues presented by the lawsuit. All the consent form is required to do is clearly express the individual's consent to be a plaintiff in the lawsuit.

Although the Defendant does not mention it specifically, the consent forms Plaintiff has distributed are additionally insufficient because they do not mention this lawsuit by name or by number. The consent of potential plaintiffs to join this lawsuit must be specific to the lawsuit currently pending

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2004 WL 1718420 (N.D.Ill.)
**2004 WL 1718420 (N.D.Ill.)**

before this Court. The final consent forms must in-
clude the case number and the case name.

D. Defendant's Proposed Notice and Consent Forms

Defendant has provided the Court with an altern-
ative notice form that it would like the Plaintiff to use
when notifying other potential plaintiffs. Although
Defendant's proposed notice and consent forms
would be adequate, the Court will not order the
Plaintiff to use the Defendants' proposed forms.
"The Court has both the power and the duty to en-
sure that the notice is fair and accurate, [but] that
power should not be used to alter plaintiffs' pro-
posed notice unless such alteration is
necessary." *King v. ITT Continental Baking Co.,* No.
84 C 3410, 1986 WL 2628, at *3 (N.D.Ill. Feb.18,
1986) (Rovner, J.). There are myriad minor vari-
ations in the presentation of information that might
make a difference to the parties in the case. As one
example, the Plaintiff may want to generate the no-
tice on the stationery of its law firm rather than a
page headed with a formal case caption. The only
thing that matters to the Court is that the notice of
lawsuit and consent form convey accurately and
fairly all the necessary information at this stage.

*4 Plaintiff also makes the bizarre contention that
the Defendant's forms refer to a retaliation claim
"that does not appear in the pleadings."(Pl. Resp.
Def. Mot. Strike at 4.) Plaintiff's Complaint alleges
that defendant "retaliat[ed] against some who asser-
ted rights under the FLSA and thereby intimidat[ed]
others from asserting similar rights."(Comp.¶ 3.)
Defendant seeks to "accept Plaintiff's response as a
motion to withdraw his claim of retaliation."(Def.
Reply Mot. Strike at 4.) Defendant's suggestion is
not the way this Court prefers to do business. Any
party seeking to change the content of its pleadings
must do so clearly and in writing.

III. CIVILITY

At this stage, this case is still in its infancy. The
distribution of notice and consent forms in FLSA
cases is a relatively straightforward matter. Never-
theless, the submissions of both sides demonstrate
that somehow they have each managed to whip
themselves into a froth over it. Plaintiff accuses the
Defendant of filing a frivolous or immaterial mo-
tion as a delay tactic. (Pl. Resp. Def. Mot. Strike at
1, 3.) Defendant accuses the Plaintiff of disingenu-
ousness. (Def. Rep. Mot. Strike at 4, 7.) This level
of rancor is entirely unnecessary and can only delay
the disposition of this case. In future submissions to
this Court, the parties would be well-advised to fo-
cus more of their attention on the factual and legal
issues presented and less of their attention on pla-
cing barbs under the skin of their opponent: such
barbs can find their way under the skin of the
Court.

CONCLUSION

For the reasons set forth above, Defendant's Motion
to Strike Plaintiff's Notice and Consent Forms is
granted.

N.D.Ill.,2004.
Heitmann v. City of Chicago
Not Reported in F.Supp.2d, 2004 WL 1718420
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2007 WL 2873929 (S.D.N.Y.)
**2007 WL 2873929 (S.D.N.Y.)**

**H**

Chowdhury v. Duane Reade, Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Enamul CHOWDHURY, Individually and on Behalf of All Others Similarly Situated, Plaintiff,
v.
DUANE READE, INC., et al., Defendants.
No. 06 Civ. 2295(GEL).

Oct. 2, 2007.

Seth R. Lesser, Fran L. Rudich, Locks Law Firm PLLC, New York, N.Y. (Adam T. Klein, Justin M. Swartz, Linda A. Neilan, ReNika C. Moore, Outten & Golden, LLP, New York, NY, on the brief), for plaintiff.
Craig R. Benson, Gerald T. Hathaway, Stephen A. Fuchs, Littler Mendelson, New York, NY, for defendants.

### OPINION AND ORDER

GERARD E. LYNCH, District Judge.
*1 In this action brought under the Fair Labor Standards Act ("FLSA"), plaintiff moves for court-authorized notice to potential opt-in plaintiffs pursuant to 29 U.S.C. § 216(b). The motion will be granted.

### BACKGROUND

On March 24, 2006, plaintiff Enamul Chowdhury brought suit on behalf of himself and others similarly situated against his former employer, Duane Reade ("defendants" or "Duane Reade"), alleging principally that Duane Reade had failed to pay overtime wages to daytime and evening assistant store managers in accordance with the FLSA and New York State law. *See*29 U.S.C. § 207; N.Y. Lab. Law § 650 *et seq.*[FN1] Plaintiff worked for approximately twenty months as an assistant daytime and evening store manager at one of Duane Reade's

retail drugstores in the New York City metropolitan area. (Compl.¶ 25.) Despite being designated an assistant "manager," plaintiff claims "[h]is duties did not include managerial responsibilities or the exercise of independent judgment" at the store (*id.* ¶ 27), and that Duane Reade employed the term "assistant manager" in an effort to evade overtime requirements under FLSA's "bona fide executive" exemption for salaried managerial employees. (Pl.Mem.1.) *See*29 U.S.C. § 213(a).

> FN1. For the sake of simplicity and consistency, the Court will refer to plaintiff's FLSA and New York State claims as the "collective claims."

According to plaintiff, shortly after filing his complaint, he learned of another case pending before this Court alleging virtually identical claims against defendants. *See Damassia v. Duane Reade, Inc.,* 04 Civ. 8819(GEL). Like Chowdury, the *Damassia* plaintiffs allege that Duane Reade has failed to pay overtime wages to assistant store managers in accordance with FLSA and New York State law. Also like Chowdury, the *Damassia* plaintiffs allege that Duane Reade has relied on the "bona fide executive" exemption to justify that failure. The sole difference between the *Damassia* plaintiffs' claims and Chowdury's claims is that Chowdury alleges the denial of overtime pay to *daytime and evening* assistant store managers, while the *Damassia* plaintiffs allege the denial of overtime pay to *overnight* assistant store managers. In every other respect, the collective claims in the two cases are identical. (*Compare* Compl. ¶¶ 27-28, *with Damassia v. Duane Reade, Inc.,* No. 04 Civ. 8819, 2006 WL 2853971, at *1 (S.D.N.Y. Oct. 5, 2006).)

Considering the virtually identical nature of the collective claims, plaintiff moved to have his case transferred to this Court and consolidated with *Damassia.* The case was transferred to this Court, but finding consolidation to be premature, the Court denied plaintiff's motion to consolidate without pre-

**EXHIBIT**

Q

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

judice to renewal in the future. (Order of the Court, Nov. 20, 2006, at 1.) However, considering the virtually identical nature of the collective claims in the two cases, the Court ordered that discovery and other pre-trial matters in the cases be conducted jointly. (*Id.* at 2.)

At approximately the same time plaintiff filed his complaint initiating this action, the *Damassia* plaintiffs moved for court-authorized notice to potential opt-in plaintiffs pursuant to § 216(b). On October 5, 2006, the Court granted the *Damassia* plaintiffs' motion. *Damassia,* 2006 WL 2853971, at *8. The Court found that "[p]laintiffs' affidavits and allegations, taken together with defendant's admissions, more than suffice[d]" to establish that the *Damassia* plaintiffs were similarly situated to each other for purposes of satisfying the "minimal" showing required by § 216(b).*Id.* at *4. In so finding, the Court rejected defendant's attempts to distinguish among the potential plaintiffs by drawing irrelevant distinctions between them with respect to their "abilities and competence." *Id.* at *6. The Court posited that "[o]n defendant's logic, no group of opt-in plaintiffs would ever be 'similarly situated' unless they were clones of one another working in completely identical stores, in identical neighborhoods, with identical clientele."*Id.*

*2 Although they allege virtually identical collective claims, because *Damassia* and *Chowdury* remain technically separate cases, the opt-in notice approved by the Court in *Damassia* did not also result in the approval of opt-in notice to potential plaintiffs in this case. Thus, on April 16, 2007, plaintiff filed the instant motion seeking court-authorized notice to potential opt-in plaintiffs who qualify as daytime and evening assistant store managers, the same notice granted by the Court in *Damassia* with respect to overnight assistant store managers. Between April 11 and June 21, 2007, approximately thirteen individuals who had worked as assistant daytime and evening store managers filed forms with the Court consenting to be party plaintiffs pursuant to FLSA's opt-in

Defendants responded to the motion on June 15, 2007; the motion was fully briefed as of July 6, 2007.

> FN2. Some of the opt-in plaintiffs and potential opt-in plaintiffs may still work at Duane Reade. (*See, e.g.,* Boswell Decl. Ex. 7 ¶ 1.) For the sake of simplicity and consistency, the Court will generally refer to plaintiffs' and opt-in plaintiffs' employment activities in the past tense.

### DISCUSSION

I. *Collective Actions and Court-Authorized Notice*

While an understanding of the "bona fide executive" exemption may be "helpful in analyzing plaintiff['s] motion for court-authorized notice," it is well-established that "the merits of plaintiff['s] claims need not be resolved at this stage." *Damassia,* 2006 WL 2853971, at *2. *See Scholtisek v. Eldre Corp.,* 229 F.R.D. 381, 387 (W.D.N.Y.2005); *Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F.Supp.2d 101, 103-04 (S.D.N.Y.2003); *Hoffman v. Sbarro, Inc.,* 982 F.Supp. 249, 260-61 (S.D.N .Y.1997). Moreover, the elements of the exemption were carefully laid out in *Damassia,* and do not require repetition here. *See Damassia,* 2006 WL 2853971, at *2. The only relevant inquiry here is whether plaintiff is similarly situated to the potential opt-in plaintiffs.

The FLSA allows employees to sue on behalf of themselves and other employees who are "similarly situated." 29 U.S.C. § 216(b). The similarly-situated employees may "opt in" to the lawsuit and become party plaintiffs by filing a written consent with the court. *See Masson v. Ecolab, Inc.,* No. 04 Civ. 4488, 2005 WL 2000133, at *13 (S.D.N.Y. Aug. 17, 2005). In a collective action under FLSA-unlike in a class action under Federal Rule of Civil Procedure 23-only plaintiffs who affirmatively opt in can benefit from the judgment or be bound by it. *Gjurovich,* 282 F.Supp.2d at 103-04;*see Hoffman-*

Slip Copy                                                                    Page 3
Slip Copy, 2007 WL 2873929 (S.D.N.Y.)
**2007 WL 2873929 (S.D.N.Y.)**

*La Roche Inc. v. Sperling,* 493 U.S. 165 (1989); *Braunstein v. E. Photographic Labs., Inc.,* 600 F.2d 335 (2d Cir.1979). When a court certifies a collective action, it may require an employer to disclose the names and addresses of potential plaintiffs. *See Patton v. Thomson Corp.,* 364 F.Supp.2d 263, 266 (E.D.N.Y.2005).

"Courts in this circuit and elsewhere have held that a court may authorize notice-and certify a collective action-if the court makes a 'preliminary determination' that potential opt-in plaintiffs are 'similarly situated' to the named plaintiffs." *Damassia,* 2006 WL 2853971, at *3, citing *Patton,* 364 F.Supp.2d at 267;*see Trezvant v. Fidelity Employer Servs. Corp.,* 434 F.Supp.2d 40, 43 (D.Mass.2006); *Sbarro,* 982 F.Supp. at 261;*cf. Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1217 (11th Cir.2001) ("[P]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members.") (alteration in original) (citation and internal quotation marks omitted).*See, e.g., Gjur- ovich,* 282 F.Supp.2d at 104 ("[I]t is 'well settled' that district courts have the power to authorize an FLSA plaintiff to send such notice."), quoting *Sbarro,* 982 F.Supp. at 260 (additional citations and internal quotation marks omitted). While this normally requires a "modest factual showing" that the plaintiff and the potential plaintiffs were victims of a common policy or plan violating FLSA, *Gjur- ovich,* 282 F.Supp.2d at 104 (citation and internal quotation marks omitted), "it may be appropriate in some cases to find plaintiffs and potential plaintiffs similarly situated based simply on plaintiffs' 'substantial allegations' that they and potential plaintiffs were common victims of a FLSA violation, particularly where defendants have admitted that the actions challenged by plaintiffs reflect a company-wide policy."*Damassia,* 2006 WL 2853971, at *3, quoting *Ayers v. SGS Control Servs., Inc.,* No. 03 Civ. 9078, 2004 WL 2978296, at *5 (S.D.N.Y. Dec. 21, 2004); *see Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 480 (E.D.N.Y.2001). In either case, a plaintiff's burden at this preliminary stage is "minimal." *Damassia,*

2006 WL 2853971, at *3;*see id.*(listing cases).

*3 Defendants argue that, "[w]hen there has been substantial discovery prior to" the filing of a § 216(b) motion, a higher level of scrutiny should apply to the § 216(b) determination. (Defs. Mem. 5; *see id.* at 6, citing *Torres v. Gristede's Operating Corp.,* No. 04 Civ. 3316, 2006 WL 2819730, at *6 (S.D.N.Y. Sept. 29, 2006).) Specifically, defendants argue that, because they have already deposed several of the opt-in plaintiffs, the Court should "conduct a *detailed* factual analysis of the individual duties and responsibilities of the Plaintiff and the potential opt-in plaintiffs to determine whether the action may proceed as a collective action."(*Id.* at 5 (emphasis added).) Defendants made a similar argument in *Damassia,* in which they argued that "the [C]ourt should skip the initial [§ 216(b) ] inquiry, reasoning that discovery has already provided sufficient evidence to justify a final determination that plaintiffs are not similarly situated."2006 WL 2853971, at *4. However, defendants disavow the notion that their argument in this case is identical to the one they made in *Damassia,* contending that, while in *Damassia* they argued that the Court should "skip" the § 216(b) inquiry altogether and proceed directly to a determination on the merits, here defendants argue that while a "final" analysis should not yet be conducted, the Court should nevertheless conduct a "detailed" factual analysis based on a handful of depositions submitted by defendants. (Defs. Mem. 5 n. 5.)

Defendants are prudent to disavow the seeming similarity between this argument and the one in *Damassia,* as that argument was specifically rejected by the Court in that case. *See*2006 WL 2853971, at *4. However, even assuming that the arguments are conceptually distinct, defendants' argument still fails. Defendants provide no authority for their contention that there should *ever* be a "detailed" factual analysis in a pre-discovery § 216(b) determination; indeed, the authority cited by defendants stands for the contrary proposition that "the Court applies heightened scrutiny" only to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 4
Slip Copy, 2007 WL 2873929 (S.D.N.Y.)
**2007 WL 2873929 (S.D.N.Y.)**

*"post-discovery"* determinations, "usually precipit-ated by a defendant's motion for decertification of the class," and not by a § 216(b) motion. *Torres,* 2006 WL 2819730, at *7. *See Damassia,* 2006 WL 2853971, at *3 (only "[a]fter discovery" do courts "engage in a 'second tier' of analysis to determine on a full record-and under a more stringent stand-ard-whether the additional plaintiffs are in fact sim-ilarly situated").

Moreover, as in *Damassia,* fact discovery in this case remains in its early phases. Although at the time the instant motion was fully briefed, defend-ants had deposed some of the opt-in plaintiffs who submitted declarations in support of court-au-thorized notice (Defs. Mem. 3; *see* Fuchs Decl. Exs. A-L), according to plaintiff, defendants have not yet responded to plaintiff's document requests or interrogatories, and plaintiff has not taken any depositions. (Pl. Reply 6.) Furthermore, the dead-line for fact discovery does not fall until three months after the Court's Rule 23 class certification decision, and in any event no earlier than Novem-ber 30, 2008. (Rudich Decl. Ex. A.) Thus, as in *Damassia,* it would be inappropriate to make more than a "preliminary determination" at this time, or to require plaintiff to meet a more stringent stand-ard than that typically applied at the early stages of litigation. *See Prizmic v. Armour, Inc.,* No. 05 Civ. 2503, 2006 WL 1662614, at *2 (E.D.N.Y. June 2, 2006) ("Only *after discovery has been completed* should the Court engage in a second more heightened stage of scrutiny to determine whether the class should be decertified or the case should proceed to trial as a collective action.") (emphasis added); *Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 482 (E.D.Cal.2006) (noting that *"[w]here discovery is complete,* courts sometimes bypass" the preliminary determination and apply the more stringent analysis for a final determina-tion) (emphasis added).

## II. *Plaintiff's Motion for Court-Authorized Notice*

*4 As in *Damassia,* plaintiff's affidavits and allega-tions, taken together with defendants' admissions, "more than suffice" to entitle plaintiff to court-authorized notice in this case. 2006 WL 2853971, at *3. Plaintiff's complaint alleges, for example, that plaintiff is similarly situated to potential opt-in plaintiffs, because (1) none of them, despite the title of their position, performed primarily mana-gerial duties at Duane Reade stores (*see, e.g.,* Com-pl. ¶ 27), and (2) defendants, relying without basis on FLSA's "bona fide executive" exemption, *see* 29 U.S.C. § 213(a), subjected them and other assistant daytime and evening managers to a company-wide policy depriving them of overtime compensation in violation of 29 U.S.C. § 207 (*see, e.g.,* Compl. ¶ 9). The affidavits of plaintiff and opt-in plaintiffs sup-port these allegations, as does their deposition testi-mony. (*See* Boswell Decl. Exs. 1-11; Pl. Reply 4-6.)

Furthermore, as discussed in *Damassia,* defendants have conceded that the business practices at issue in this case are uniform among its stores. 2006 WL 2853971, at *4. (*See* DeFazio Dep. 30 ("[E]ach store has the same exact policy as every other store.").) Although *Damassia* involves overnight assistant managers and not daytime and evening as-sistant managers, defendants also concede that they apply the "bona fide executive" exemption to *all* assistant managers, whether they work during the daytime, evening, or overnight. (Rizzo Dep. 147-55; DeFazio Dep. 53-54.) Moreover, Duane Reade's own job description for all assistant man-agers reveals that their duties and responsibilities are "centrally derived, regardless of the shift they work."(Pl. Mem. 5, citing Rudich Decl. Ex. D (Assistant Manager Job Description); *see* Rizzo Dep. 78 (noting that, in 1998, all assistant store managers were collectively bargained out of the union at the same time).) Thus, just as court-authorized notice was appropriate in *Damassia,* court-authorized notice is also appropriate here, as there is no relevant distinction between the job re-sponsibilities of any assistant store managers, whether they work during the daytime, evening, or overnight.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                                                     Page 5
Slip Copy, 2007 WL 2873929 (S.D.N.Y.)
**2007 WL 2873929 (S.D.N.Y.)**

In opposing court-authorized notice, defendants argue, as they did in *Damassia,* that plaintiff and potential opt-in plaintiffs are not similarly situated for purposes of § 216(b). Although an identical argument, based on similar evidence, was specifically rejected in *Damassia,* defendants nevertheless devote almost half of their brief to describing certain dissimilarities between plaintiff's and opt-in plaintiff's job responsibilities, and arguing that those dissimilarities render plaintiff not similarly situated to the opt-in plaintiffs. (*See* Defs. Mem. 10-17.)

Once again, defendants' argument fails. As in *Damassia,* "[a]t most, defendant[s'] attacks on plaintiff['s] affidavits and other evidence raise questions as to whether plaintiff[ ] could prevail under a more stringent standard and whether the opt-in plaintiffs will survive a decertification motion at the close of discovery." 2006 WL 2853971, at *5. It is unnecessary here to undertake a point-by-point refutation of defendants' attack on the record. It is sufficient simply to note that the same concerns which motivated the Court to reject this argument in *Damassia* apply here. For example, defendants' position that plaintiff and opt-in plaintiffs are not similarly situated "is fatally undermined ... by earlier concessions" to the contrary that all assistant store managers have the same duties and responsibilities as a matter of official company policy. *Id.* Those concessions are "difficult, if not impossible, to reconcile with defendant[s'] claim that there are significant variations in the work performed by [assistant store managers] at different stores which preclude a finding that plaintiff[ ] and potential opt-in plaintiffs are similarly situated." *Id.*

*5 Furthermore, defendants' attack on plaintiff's factual showing focuses mostly on irrelevant differences between plaintiff and opt-in plaintiffs. The proper inquiry in a § 216(b) determination is whether plaintiffs are similarly situated *"with respect to their allegations that the law has been violated,"* *Young,* 229 F.R .D. at 54 (emphasis added), and not whether plaintiffs' job responsibilities are

identical in every possible respect. Defendants claim, for example, that the deposition testimony proves wide variance in plaintiff's and opt-in plaintiffs' abilities and competence, the length of time they worked at Duane Reade stores, and their specific tasks at each store. "But such facts, even if true, do not undermine [the] claim that they are similarly situated with respect to their allegation that defendant[s'] company-wide compensation policies violate FLSA's overtime requirements." *Damassia,* 2006 WL 2853971, at *6. Defendants cannot defeat a § 216(b) motion simply by pointing out all the ways in which plaintiff's exact day-to-day tasks differ from those of the opt-in plaintiffs; instead, defendants must show that plaintiffs are not similarly situated *in ways relevant* to their entitlement to overtime compensation under FLSA, which defendants have not done.

Only one of defendants' arguments warrants additional discussion. Defendants argue that Chowdury's individual claims in this action "are unique to his personal circumstances, and are not based on a general claim for overtime pay."(Defs.Mem.7.) Specifically, defendants argue that Chowdury testified during his deposition that his claims are not for unpaid overtime, but for other alleged unlawful conduct by defendants, such as "forc[ing][him] to work off of the Company's payroll system" for a period of time, resulting in his being compensated at a significantly lower salary. (*Id.,* citing Chowdury Dep. 60:25-63:19, 122:24-124:5, 175:8-18, 295:1-296:13.) Thus, defendants argue that Chowdury's suit is "completely unique" to himself, and therefore that he is not similarly situated to the opt-in plaintiffs. (*Id.* at 8.)

Defendants' argument lacks merit. First, defendants have mischaracterized plaintiff's testimony. Although defendants claim that plaintiff made no mention of unpaid overtime during his deposition, the deposition testimony on which defendants rely does not support that assertion. (*See* Chowdury Dep. 296-97 ("I learned I was to get overtime pay. There's pay difference when you're working



Slip Copy                                                                    Page 6
Slip Copy, 2007 WL 2873929 (S.D.N.Y.)
**2007 WL 2873929 (S.D.N.Y.)**

overnight.").) Moreover, even if plaintiff's individual claims include grievances unrelated to overtime compensation, the inclusion of individual claims in a collective action does not render plaintiff not similarly situated to the opt-in plaintiffs. Instead, plaintiff may maintain his individual claims in the collective action, so long as he pursues the collective claims as well. *See, e.g., Iglesias-Mendoza v. La Belle Farm, Inc.,* 239 F.R.D. 363, 372 (S.D.N.Y.2007) (in class action context, class representatives must have only "adequate personal knowledge of the essential facts of the case"). As is readily apparent from his complaint, declaration, and deposition testimony, plaintiff has demonstrated knowledge of, and adequately pursued, those claims to render him similarly situated to the potential opt-in plaintiffs. (*See* Chowdury Decl. ¶ 4 ("I was regularly required to work approximately 70-80 hours per week without being paid an overtime premium for all of the hours that I worked 40 hours per week.").)

*6 In sum, because plaintiff's allegations, affidavits, and additional evidence, considered in light of defendants' concessions regarding their business practices, more than suffice to support a preliminary determination that plaintiff and potential opt-in plaintiffs are similarly situated, plaintiff's motion for court-authorized notice is granted.[FN3]

> FN3. Defendants also argue that plaintiff's § 216(b) motion is premature and improper. Specifically, defendants allege that, during a prior proceeding, the parties agreed that this action is limited to claims by assistant store managers, and does not encompass claims by other nonexempt Duane Reade employees. According to defendants, the Court ordered plaintiff to amend his complaint to reflect this limitation, and plaintiff has failed to do so. Defendants claim that plaintiff's failure to so amend his complaint "renders his motion ... inappropriate, or at least premature."(Defs.Mem.6.) Plaintiff claims that

the Court never ordered him to amend his complaint, but instead that he agreed to do so "in due course, if needed." (Pl. Mem. 7 n. 10 (internal quotation marks omitted).)

> Defendants are incorrect that plaintiff's failure to amend his complaint renders his motion "inappropriate, or ... premature." (Defs.Mem.6.) As plaintiff notes, defendants have deposed several of the current opt-in plaintiffs, "without any issues regarding the scope of this action."(Pl. Mem. 7 n. 10.) Moreover, defendants have not indicated that they have suffered any prejudice resulting from plaintiff's delay in amending his complaint. Instead, it is clear, both from the parties' conduct during discovery and from the papers submitted in connection with this motion, that both parties understand the proper scope of this case. Furthermore, there has been no attempt by plaintiff to unduly extend the scope of the action to include claims by nonexempt Duane Reade employees who are not also assistant store managers. Thus, plaintiff's § 216(b) motion is neither premature nor inappropriate.

> However, contrary to plaintiff's belief, amendment of his complaint should have occurred as a matter of course, not as a matter of discretion. On November 20, 2006, the Court issued an order stating, "[a]s the parties agreed at today's conference, the *Chowdhury* action is limited to claims made by assistant managers. The *Chowdhury* complaint *shall be amended* in due course to reflect this agreement."(Order of the Court, Nov. 20, 2006, at 2 (emphasis added).) The phrase "in due course" did not provide the plaintiff with discretion to determine whether to amend his complaint, but merely provided plaintiff a certain

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                    Page 7
Slip Copy, 2007 WL 2873929 (S.D.N.Y.)
**2007 WL 2873929 (S.D.N.Y.)**

amount of leeway with respect to the exact timing of that amendment. Almost a year has passed since plaintiff was ordered to amend his complaint, and he has failed to do so. Accordingly, plaintiff is directed to comply with the Court's prior order forthwith and promptly amend his complaint to limit the collective claims to encompass only those claims made by assistant store managers, as previously agreed by the parties.

III. *Identification of, and Communication with, Potential Opt-In Plaintiffs*

Plaintiff requests that the Court order defendants to provide "[a] list, in electronic format, of all persons employed by Defendants as daytime and evening assistant managers, three years from the date of the order to the present including: name, address, telephone number, social security number, dates of employment, location of employment, [and] employment number, if any."(Pl.Mem.15.) The *Damassia* plaintiffs made an identical request for Social Security numbers, which was denied by the Court in that action. 2006 WL 2853971, at *8. Once again, the Court agrees with defendants that it is unnecessary and inappropriate to require defendants to provide Social Security numbers at this time. Although plaintiff claims that failure to provide Social Security numbers in *Damassia* has resulted in some of the notices being returned as undeliverable (Pl. Mem. 2 n. 1), plaintiff has not shown a need to disclose such confidential information, as he has not demonstrated that such information will aid in further reducing the already low number of notices that were returned undeliverable in *Damassia.* (*See* Defs. Mem. 20 (stating that 38 out of approximately 257 notices were returned as undeliverable).) In all other respects, plaintiff's request is granted.FN4

> FN4. As in *Damassia,* the "past three years" shall be interpreted to mean the three years prior to the filing of this Opin-

ion and Order.

With respect to the specific contents of the notice, the Court will not address the minor issues raised by defendants. (*See* Defs. Mem. 19.) Instead, the Court expects the parties to work out those issues on their own, and provide the Court with the stipulated notice by October 16, 2007. The notice should track as close as possible to that already approved in *Damassia* to ensure consistency between the actions. In the event of a dispute, the parties shall jointly submit a single letter to the Court setting forth their respective positions.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for court-authorized notice is granted. Details regarding the content and communication of the notice shall be negotiated in accordance with Part III of this Opinion and Order.

SO ORDERED.

S.D.N.Y.,2007.
Chowdhury v. Duane Reade, Inc.
Slip Copy, 2007 WL 2873929 (S.D.N.Y.)

END OF DOCUMENT



Westlaw.

Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2003 WL 23142183 (S.D.Ind.)
**2003 WL 23142183 (S.D.Ind.)**

C
Carter v. Indianapolis Power and Light Co.
S.D.Ind.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. Indiana, Indiana-
polis Division.
George M. CARTER, Bobby M. Majors, and
Steven M. Glasgo, individually and on behalf of
others similarly situated, Plaintiffs,
v.
INDIANAPOLIS POWER AND LIGHT COM-
PANY, Defendant.
**No. IP102CV01812SEBVSS.**

Dec. 23, 2003.

John R. Price, John R. Price & Associates, Indiana-
polis, IN, for Plaintiffs.
Michael A. Moffatt, Jan J. Kinzie, Ogletree,
Deakins, Nash, Smoak & Stewart, Indianapolis, IN,
for Defendant.

*ENTRY ON PLAINTIFFS' MOTION TO JOIN AD-
DITIONAL PARTIES*

BARKER, J.

*Introduction*

*1 This matter comes before the Court on Plaintiffs'
Motions to Join Additional Parties, to Order De-
fendant to Produce List of Potential Plaintiffs and
To Approve Form of Class Notice. Plaintiffs
George M. Carter ("Carter"), Bobby M. Majors
("Majors") and Steven M. Glasgo ("Glasgo") are
former employees of the Indianapolis Power and
Light Company ("IPL") who filed this suit on be-
half of themselves and other similarly situated indi-
viduals alleging that IPL failed to compensate them
for overtime hours worked as required by the Fair
Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et
seq. The plaintiffs seek a conditional certification
of a plaintiff collective action under § 216(b) and
the necessary discovery to allow for written notific-
ation of the potential class. The defendant is op-

posed on two grounds: 1) the plaintiffs fail to show
they are similarly situated to the employees in the
proposed class and; 2) they fail to show that any
similarly situated putative class member desires to
opt-in to their lawsuit. For the reasons explained
below, the plaintiffs' motions are *GRANTED.*

*Factual and Procedural Background*

Carter, Major and Glasgo were employed by IPL as
"supervisors." Pls.' Complaint ¶¶ 7-9; Def.'s An-
swer ¶¶ 7-9. Carter and Glasgo were first level su-
pervisors in the Harding Street Power Plant and
Major was a first level supervisor in the Petersburg
Power Plant. Def.'s Opp'n Br. at 7; Kunz Aff., ¶¶
4-6. In the IPL "exempt position description" docu-
ments offered by Defendant, Carter is described as
a Coal & Ash Foreman who reported to the Opera-
tions Supervisor and Majors and Glasgo were
Mechanical Maintenance Foremen reporting to the
Maintenance Supervisor. Id.; Exhibits A-C.

The plaintiffs allege that despite their title of super-
visor, they were essentially non-exempt, hourly em-
ployees with no management responsibilities. For
instance, they were classified as "non-exempt su-
pervisors" on internal payroll records, performed
duties more similar to their union brethren in the
company than to other salaried management per-
sonnel, and were never invited to attend manage-
ment meetings. Pls.' Complaint ¶¶ 28-34. As such,
plaintiffs argue that under the wage and hour provi-
sions of the FLSA, they were entitled to be paid for
overtime work at one and one-half times their
hourly rate rather than on a straight time basis in
contravention of the FLSA.[FN1] In their Complaint,
the plaintiffs described the potential class of simil-
arly situated employees as hourly, non-managerial
"supervisors" who were paid for overtime work on
a straight time basis. Id. ¶ 1-4.More recently,
however, the plaintiffs have sought to expand the
class to all patently non-managerial employees who
were paid on a straight time basis for overtime

EXHIBIT
R

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2003 WL 23142183 (S.D.Ind.)
**2003 WL 23142183 (S.D.Ind.)**

hours worked. Pls.' Response Br. at 4.

> FN1.29 U.S.C. § 207(a)(1): Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

In support of their motion for joinder of additional parties (also referred to as a motion for approval of class notification), the plaintiffs submit three affidavits and a consent form from a former employee who wishes to opt-in to the litigation. Two former employees attest to the nature of their job responsibilities and overtime compensation while IPL supervisors. Pls.' Response Br. at 2; Aff. of Majors; Pls.' Submission of Add'tl Support; Aff. of Pierson. Former IPL employee, Jim Collins, asserts that the company assigned a special payroll designation (wage hour designation code 6) to those employees who were to receive straight-time compensation for overtime hours. Pls.' Response Br. at 2; Ex. B. Finally, to support the expansion of the proposed plaintiff class to include other employees who were similarly underpaid for overtime hours, but who, unlike the plaintiffs were not "supervisors," the plaintiffs submit a consent form signed by "management trainer" Debbie J. Johnson-Miller who wishes to join the litigation. Id. at 4; Ex. C.

*2 Plaintiffs request that the defendant produce a list of names and addresses of former and current IPL employees, namely those patently non-managerial employees classified as supervisors, foremen, management trainers, etc., who were paid straight-time rather than time-and-a-half for overtime work. They wish the court to approve the form of the proposed notice, which states, in part:

Please be advised that on November 21, 2002 George M. Carter, Bobby M. Majors and Steven M. Glasgo brought a law suit in the United States District Court for the Southern District of Indiana, Indianapolis Division (Cause No. 1:02-CV-1812-SEB-VSS). The suit seeks recovery on behalf of the Plaintiffs from Indianapolis Power & Light Company for unpaid overtime pay for certain employees and former employees of IPALCO. Those employees are persons who are designated in the Complaint as "supervisors" and who were paid straight time for their overtime hours, as opposed to time and a half. The supervisors are persons who are not members of the Union IBEW. The Plaintiffs have represented in their suit that the primary duties of the supervisors did not consist of management of IPALCO; that they did not have authority to hire or fire other employees, or to bind the company as to their suggestions and recommendations concerning the hiring and firing of other employees; they did not customarily and regularly exercise discretion and independent judgment consistent with administrative positions; and they could, occasionally, if needed, perform manual work related to their employment.

Pls.' Motion to Join Additional Parties.

### Discussion

#### I. Motion to Join Additional Parties

#### A. Class Certification Under the FLSA

The express terms of the statute provide that an action for unpaid overtime compensation may be brought "by any one or more employees for and in behalf of himself or themselves and other employees *similarly situated.*" 29 U.S.C. § 216(b) (emphasis supplied). Such a collective action differs markedly from a Rule 23 class action, however, because of a crucial provision in § 216(b)



Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2003 WL 23142183 (S.D.Ind.)
**2003 WL 23142183 (S.D.Ind.)**

which renders the two types of collective actions fundamentally incompatible: class members must *opt in* to be bound while in a Rule 23 action they must *opt out* not to be bound.[FN2] *Woods v.. New York Life Ins. Co.,* 686 F.2d 578, 579 (7th Cir.1982); 29 U.S.C. § 216(b); Fed.Rules Civ.Proc. Rule 23. So while the plaintiffs' joinder request in the case before us is analogous to a class certification request in a civil class action under Rule 23, the Rule and its standard do not govern a FLSA case.

> FN2.Title 23 of the United States Code, Section 216(b): No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

As a threshold matter, it is well-settled that a District Court has the discretion to authorize notice to similarly situated employees so that they may opt-in to a class. See *Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 169, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Yet the method by which the Court determines whether a FLSA class should be certified (and notice given to the prospective class) is a matter which divides courts along two lines. See*generallyMooney v. Aramco Services Co.,* 54 F.3d 1207, 1212-16 (5th Cir.1995); *Burns v. Village of Wauconda,* 1999 WL 529574, *1 (N.D.Ill.1999)

*3 The first method tracks the elements of Rule 23 class certification and examines "numerosity," "commonality," "typicality" and "adequacy of representation" to determine whether a class should be certified. *Shushan v. University of Colorado,* 132 F.R.D. 263 (D.Colo.1990); *Mooney,* 54 F.3d at 1214. The second and more lenient method takes a two-step approach to class certification. See*Lusardi v. Xerox Corp.,* 118 F.R.D. 351 (D.N.J.1987). The first step, or the "notice stage," involves an analysis of the pleadings and any affidavits which have been submitted to determine whether notice should be given to potential class members. The second step, which usually occurs

after discovery has largely been completed, allows a court the opportunity to determine whether the class should be decertified or restricted because various putative class members are not in fact similarly situated as required by the statute. *Mooney,* 54 F.3d at 1213-14;*Burns,* 1999 WL 529574 at *2.

*B. Similarly Situated*

Courts in our district and throughout the Seventh Circuit have tended to adopt the second approach FN3 and so shall we. To prevail on their motion, the plaintiffs are expected to make a threshold showing that they are similarly situated to the employees on whose behalf they are seeking to pursue this claim. See *Severtson v. Phillips Beverage Co.,* 137 F.R.D. 264, 267 (D.Minn.1991) ("To obtain court authorization to send the proposed notice, plaintiffs must submit evidence establishing at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exist."); *Krieg v. Pell's, Inc.,* 2001 WL 548394, *1 (S.D.Ind.2001) (modest showing that "at least some employee-managers exist who are similarly situated to" plaintiff was sufficient to allow notice). Before notice is authorized, the court is not required to come to a "final determination" that the similarly-situated requirement has been met. *Champneys v. Ferguson Enterprises, Inc.* 2003 WL 1562219, *4 (S.D.Ind.2003); *Severtson,* 137 F.R.D. at 267;*Bontempo v. Metro Networks Communications Ltd. Partnership,* 2002 WL 1925911, *1 (N.D.Ill.2002).

> FN3.*Champneys v. Ferguson Enterprises, Inc.,* 2003 WL 1562219 (S.D.Ind.2003) (granting conditional class certification); *Krieg v. Pell's, Inc.,* 2001 WL 548394 (S.D.Ind.2001) (granting conditional class certification); *Pfaahler v. Consultants for Architects, Inc.* 2000 WL 198888 (N.D.Ill.2000) (denying conditional class certification); *Bontempo v. Metro Networks Communications Ltd. Partnership,* 2002 WL 1925911, *1 (N.D.Ill.2002) (granting approval of opt-in notice to po-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 23142183 (S.D.Ind.)
**2003 WL 23142183 (S.D.Ind.)**

tential class members).

Carter, Majors and Glasgo contend they are similarly situated to other potential class members because they perform the duties of "non-exempt" employees despite their job titles (supervisor, management trainer) and should therefore be paid for overtime hours in compliance with the FLSA § 207.

The plaintiffs offer the affidavit of representative plaintiff Majors to describe the class of employees called supervisors but lacking in supervisory duties. Majors alleges that since 1987, he and other "non-managerial" employees, i.e., employees with no ability to hire or fire or make management decisions for the company, routinely received straight-time pay for overtime work contrary to law. Pls.' Response Brief, Ex. B. The affidavit of Robert Pierson, also employed as a supervisor, alleges that he and four (4) other supervisors known to him had no managerial duties despite their titles and as hourly employees were paid straight time rather than one and half times their wage for overtime hours worked. Pls.' Submission of Additional Support, Aff. of Robert Pierson. In addition, former IPL employee Jim Collins attests to personal knowledge of several hundred IPL employees who were not "bona fide" management personnel (supervisors, foremen, management trainers) but were given a wage designation code of 6 in payroll records which resulted in their exemption from the overtime protections in the FLSA. Pls.' Response Brief at 2; Ex. A. One such former employee, Debbie Johnson-Miller, has already granted her consent to be added as a plaintiff in this cause. Id., Ex. C. Ms. Johnson-Miller was employed as a "management trainer" and was paid only straight time rather than time and half for overtime hours. Id. at 4.

*4 The plaintiffs have offered more than the required "modest showing" and seek the defendant's assistance in identifying those employees who were: a) clearly not in management positions and; b) paid straight time for overtime hours. We recognize that when a court feels compelled to conduct a fact-specific inquiry into the job duties of each opt-in class member, then certification is not appropriate. *Tumminello v. United States,* 14 Cl.Ct. 693, 697 (1998); *Pfaahler v. Consultants for Architects, Inc,* 2000 U.S. Dist. Lexis 17722, *8 (E.D.Ill.2000). However, after the requested discovery has been completed, those persons not in *bona fide* management positions within IPL but employed in various positions such as supervisor, foreman, management trainer who were paid for overtime at a straight time rate should form themselves into a recognizable class of employees similarly situated to the named representatives.

*C. Motion to Strike the Affidavits*

Defendant has moved to strike Plaintiffs' affidavits for being vague, conclusory and without foundation as to personal knowledge. Def.'s Surreply at 3. We *DENY* the motion because we find the assertions in the Majors and Pierson affidavits to be sufficiently based on personal knowledge of their own employment experience. For example, it is reasonable for them to reliably attest to the nature of their job responsibilities as supervisors, to their never having fired or hired personnel while employed as supervisors, and to the terms of their overtime compensation over the years spent at IPL.

For the reasons stated above, we *GRANT* the conditional certification of the class.

**II. *Motions to Order Defendant to Produce List of Potential Plaintiffs***

Upon the conditional certification of collective action under the FLSA, it follows that the representative plaintiffs could seek from the District Court an order approving the proposed form of notice as well as an order directing the defendant, in an appropriate case, to furnish the plaintiff with the names and addresses of potential class members. In *Hoffmann-LaRoche, Inc.,* the Supreme Court found the District Court appropriately permitted discovery of the names and addresses of discharged employees after



Not Reported in F.Supp.2d                                                      Page 5
Not Reported in F.Supp.2d, 2003 WL 23142183 (S.D.Ind.)
**2003 WL 23142183 (S.D.Ind.)**

the Court found that the discovery was relevant to the subject matter of the action and that there were no grounds to limit the discovery under the facts and circumstances of [the] case. 493 U.S. at 170 (1989); *see also, Woods,* 686 F.2d at 580.

Upon our conditional certification of a proposed class, we find it appropriate to *GRANT* Plaintiffs' motion for disclosure of names and addresses of potential plaintiffs. *See Champney's,* 2003 WL 1562219 at *7 (S.D.Ind.2003); *Severtson,* 137 F.R.D. at 267 (D.Minn.19) (remanding for reconsideration under different standard magistrate's approval of notification; noting that if notice is warranted, discovery of names and addresses of potential plaintiffs should be allowed).

### III. *Notice to Potential Plaintiffs*

**\*5** We cannot, however, approve the plaintiffs' proposed form of notice because it is tailored only to those IPL employees designated as "supervisors" who were paid straight time for their overtime hours rather than time and a half. The plaintiffs have successfully argued that the potential class encompasses all those persons who were not in bona fide management positions within IPL but had various positions such as supervisor, foreman, management trainer and were paid for overtime at a straight time rate; accordingly, the notice should reflect this designation. As a result, Plaintiffs have leave to resubmit their proposed notice.

### Conclusion

For the reasons given above, we *GRANT* Plaintiffs' Motion to Join Additional Parties and to Order Defendant to Produce a List of Potential Plaintiffs. We give the plaintiffs' leave to resubmit the letter directed to the putative class members.

S.D.Ind.,2003.
Carter v. Indianapolis Power and Light Co.
Not Reported in F.Supp.2d, 2003 WL 23142183 (S.D.Ind.)

END OF DOCUMENT



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

Page 1

**C**
Laroque v. Domino's Pizza, LLC
E.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Wessley LAROQUE; Jean Claude Saint-Eloi; Jean
Lisvonce; and Brant Bissainthe; on behalf of them-
selves and other employees similarly situated,
Plaintiffs,
v.
DOMINO'S PIZZA, LLC, Defendant.
No. 06-CV-6387 (DLI)(VVP).

May 30, 2008.

**Background:** Employees brought Fair Labor
Standards Act (FLSA) action against employer al-
leging that employer failed to fully compensate
them for the hours they worked, and failed to pay
overtime wages for the hours they worked in excess
of forty per week. Employees moved for prelimin-
ary collective action certification.

**Holding:** The District Court, Dora L. Irizarry, J.,
held that employees were entitled to preliminary
conditional certification of class.

Motion granted in part and denied in part.

**[1] Time 378 ⮞ 3**

378 Time
    378k3 k. Computation in General; Tolling. Most
Cited Cases
Rule providing discretion for extensions of time
periods under rules of federal civil procedure ap-
plies to any temporal requirement found in the fed-
eral rules, unless expressly excepted. Fed.Rules
Civ.Proc.Rule 6(b)(1, 2), 28 U.S.C.A.

**[2] Labor and Employment 231H ⮞ 2374**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime

Pay
        231HXIII(B)6 Actions
            231Hk2373 Actions on Behalf of Oth-
ers in General
                231Hk2374 k. In General. Most
Cited Cases
Employees' delay in filing motion for an extension
of time period in which they could file affidavits in
support of their original motion for collective ac-
tion certification in Fair Labor Standards Act
(FLSA) action against employer was not a result of
bad faith, nor would employer be prejudiced by the
court's consideration of the additional affidavits, so
as to entitle employees to such an extension, where
employees had delayed filing additional affidavits
because they were unaware that affiants had also
worked for employer. Fed.Rules Civ.Proc.Rule
6(b), 28 U.S.C.A.

**[3] Labor and Employment 231H ⮞ 2377.5**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime
Pay
        231HXIII(B)6 Actions
            231Hk2373 Actions on Behalf of Oth-
ers in General
                231Hk2377.5 k. Notice and Opting-
In. Most Cited Cases
District courts have discretion under Fair Labor
Standards Act (FLSA) to direct a defendant em-
ployer to disclose the names and addresses of simil-
arly situated potential plaintiffs and to authorize the
sending of notice to these individuals, so that they
may opt in to the collective action. Fair Labor
Standards Act of 1938, § 16(b), 29 U.S.C.A. §
216(b).

**[4] Limitation of Actions 241 ⮞ 126.5**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Re-

EXHIBIT

S
_____



--- F.Supp.2d ----                                                                                      Page 2
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

lation Back
    241k126.5 k. Class Actions, Matters Peculiar To. Most Cited Cases
Once a plaintiff opts in to a collective action by filing notice with the court, the statute of limitations on their Fair Labor Standards Act (FLSA) claim is tolled. Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A. § 216(b).

**[5] Labor and Employment 231H  2375**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)6 Actions
                231Hk2373 Actions on Behalf of Others in General
                    231Hk2375 k. Employees Similarly Situated. Most Cited Cases
In determining whether a matter should proceed as a collective action under Fair Labor Standards Act (FLSA), courts follow a two-step process, looking first to the pleadings and affidavits to determine whether the putative class members are similarly situated. Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A. § 216(b).

**[6] Labor and Employment 231H  2377.5**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)6 Actions
                231Hk2373 Actions on Behalf of Others in General
                    231Hk2377.5 k. Notice and Opting-In. Most Cited Cases
If Fair Labor Standards Act (FLSA) plaintiffs can satisfy a minimal burden of showing that they are similarly situated to the potential class members, the court certifies the class and provides for notice to be sent to the potential class members who are then given the chance to opt in to the action. Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A.

§ 216(b).

**[7] Labor and Employment 231H  2375**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)6 Actions
                231Hk2373 Actions on Behalf of Others in General
                    231Hk2375 k. Employees Similarly Situated. Most Cited Cases
After discovery in a Fair Labor Standards Act (FLSA), a second inquiry begins, generally precipitated by a defendant employer's motion for decertification of class, in which the court examines with a greater degree of scrutiny whether the members of the plaintiff class, including those who have opted in, are similarly situated. Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A. § 216(b).

**[8] Labor and Employment 231H  2375**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)6 Actions
                231Hk2373 Actions on Behalf of Others in General
                    231Hk2375 k. Employees Similarly Situated. Most Cited Cases

**Labor and Employment 231H  2377**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)6 Actions
                231Hk2373 Actions on Behalf of Others in General
                    231Hk2377 k. Class Actions. Most Cited Cases
If the court is satisfied at post-discovery stage that

--- F.Supp.2d ----                                                    Page 3
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

Fair Labor Standards Act (FLSA) class members are similarly situated, the collective action proceeds to trial; otherwise, the court decertifies the class, and the class members must pursue their claims individually. Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A. § 216(b).

**[9] Labor and Employment 231H ☞ 2375**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)6 Actions
            231Hk2373 Actions on Behalf of Others in General
               231Hk2375 k. Employees Similarly Situated. Most Cited Cases
At preliminary stage of Fair Labor Standards Act (FLSA) action, plaintiffs can satisfy burden for certification of collective action by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law. Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A. § 216(b).

**[10] Labor and Employment 231H ☞ 2375**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)6 Actions
            231Hk2373 Actions on Behalf of Others in General
               231Hk2375 k. Employees Similarly Situated. Most Cited Cases
Employee delivery drivers and customer service representative stationed at employer's subject store were similarly situated with delivery drivers and customer service representatives who worked at same store, so as to entitle employees to preliminary conditional certification of class for collective action under Fair Labor Standards Act (FLSA), although some of the alleged facts were unique to individual employees, where putative plaintiff employees, who were allegedly denied proper compensation from employer, identified numerous other delivery drivers and customer service representatives who they believed were also denied proper compensation, there was a common accusation that management of subject store prevented the store's delivery and customer service employees from being fully compensation for regular and overtime hours that they worked, and class certification would not prejudice employer in its defense of the collective action. Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A. § 216(b).

**[11] Labor and Employment 231H ☞ 2377.5**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)6 Actions
            231Hk2373 Actions on Behalf of Others in General
               231Hk2377.5 k. Notice and Opting-In. Most Cited Cases
Determining what constitutes sufficient notice to putative plaintiffs in Fair Labor Standards Act (FLSA) collective action is a matter left to the discretion of the district courts. Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A. § 216(b).

Anthony Carabba, Jr., Jeffrey I. Schulman, Carabba Locke LLP, New York, NY, for Plaintiffs.
Dana J. Scher, Kevin G. Lauri, Peter C. Moskowitz, Jackson Lewis, LLP, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*

DORA L. IRIZARRY, District Judge:
**\*1** Plaintiffs Wessley Laroque, Jean Claude Saint-Eloi, Jean Lisvonce, and Brant Bissainthe were all employed, for varying amounts of time between 2001 and 2006, by defendant Domino's Pizza, LLC ("Domino's") as delivery drivers at the Domino's store located at 900 Coney Island Avenue, Brook-



--- F.Supp.2d ----                                                    Page 4
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

lyn, NY, 11218 (the "Coney Island Store"). Plaintiffs bring this lawsuit on behalf of themselves and a putative class of similarly situated individuals, alleging that Domino's violated the Fair Labor Standards Act ("FLSA") and New York State Labor Law by failing to fully compensate them for the hours they worked, and by failing to pay overtime wages for the hours they worked in excess of forty per week. On September 25, 2007, plaintiffs moved the court, pursuant to Section 216(b) of the FLSA, for preliminary collective action certification, approval of a "Notice of Lawsuit" to be sent to all potential plaintiffs, and an order directing Domino's to produce the names and last known address of each potential plaintiff. Thereafter, on March 25, 2008, plaintiffs moved the court for an extension of time, pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, to file two additional affidavits in support of the pending motion. For the reasons set forth below, plaintiff's motion for an extension of time is granted and the additional affidavits have been considered. Furthermore, collective action certification is preliminarily approved insofar as the plaintiff class shall consist of all delivery drivers and customer service representatives who worked at the Coney Island Store within the past three years, i.e., between May 30, 2005 and May 30, 3008, but is denied as to the employees of the other stores owned and operated by Domino's that plaintiffs identify in their complaint. Within ten business days from the date of this order, i.e., by June 13, 2008, plaintiffs are directed to amend the "Notice of Lawsuit" and submit the amended version for the court's approval, and Domino's is directed to produce the name and last known address of each potential plaintiff.

## I. Background

Plaintiffs propose a putative class consisting of all delivery drivers and customer service representatives who worked at the Coney Island Store within the past three years, as well as all delivery drivers and customer service representatives who worked at the following Domino's locations during the same

time period: (1) 1555 Nostrand Avenue, Brooklyn, New York, 112266; (2) 1772 Ralph Avenue, Brooklyn, New York 11236; (3) 1972 Flatbush Avenue, Brooklyn, New York 11234; (4) 3901 4th Avenue, Brooklyn, New York 11232; and (5) 1479 Fulton Street, Brooklyn, New York 11216 (collectively, the "Brooklyn Area Stores").

Each of the named plaintiffs submitted an affidavit alleging he was not fully compensated for the hours he worked while employed as a delivery driver at the Coney Island Store. Wessley Laroque, employed by Domino's from approximately the spring of 2005 until June 2006, claims that Domino's management regularly required him to continue working after he clocked out for the day, and edited his computerized time records, and thus he was paid for significantly fewer hours than he actually worked. (Laroque Aff. ¶¶ 3-7.) Laroque further alleges that these policies also prevented him from receiving proper overtime compensation, as the hours he worked in excess of forty per week were not reflected in his paychecks. (*Id.* at ¶ 5.)

**\*2** Brant Bissainthe worked at the Coney Island Store from approximately the fall of 2005 until May 2006, and also accuses Domino's management of reducing his hours and requiring him to work off-the-clock. (Bissainthe Aff. ¶¶ 2-11.) Bissainthe further alleges that he was forced to reimburse Domino's after someone stole between $80 and $90 of delivery money from his locker at the Coney Island Store, and that Domino's forced him to cover the loss and failed to conduct an investigation into the incident. (*Id.* at ¶ 12.)Jean Lisvonce worked at Domino's from approximately November 2001 until June 2006, and alleges that he was required to work off-the-clock. (Lisvonce Aff. ¶¶ 2-5.) Likewise, Jean Claude Saint-Eloi, a Domino's employee from approximately the fall of 2004 until August 2006, alleges that he too was required to continue working after he clocked out. (Saint-Eloi Aff. ¶¶ 2-4.)

Martine DeLesca, although not a plaintiff, submitted an affidavit stating that she worked as a customer service representative at the Coney Island Store

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

from approximately the fall of 2004 until April 2005, and that, during that time, she was required to work off-the-clock. (DeLesca Aff. ¶¶ 2-5.) DeLesca also states that there often were discrepancies between the hours she worked and the hours for which she was paid. (*Id.* at ¶ 6.) The plaintiffs and DeLesca further allege that numerous other employees at the Coney Island Store are forced to work off-the-clock and had their hours reduced by Domino's management. Laroque asserts that two assistant managers, Ahmad Azfar Sharza and a man identified only as "Joseph," both of whom had worked at several Brooklyn Area Stores in addition to the Coney Island Store, informed him that Domino's intentionally underpaid its hourly employees at all of the stores where they had worked. (Laroque Aff. ¶¶ 10-11.) Laroque also claims that an individual named Margareth St. Cyr ("St. Cyr"), who worked as a delivery driver at the Brooklyn Area Store located at 1772 Ralph Avenue, informed him that her hours were reduced by Domino's management. (*Id.* at ¶ 12.) According to Laroque, St. Cyr stated to him on one occasion that, "when you work overtime[, Domino's] pays you for less than 40 hours." (*Id.*)

Subsequent to filing their motion for collective certification, plaintiffs filed a motion under Rule 6(b) asking the court to consider the affidavits of Emile Zama ("Zama") and Monel Marseille ("Marseille") in further support of the certification motion. Domino's employed Zama as both a delivery driver and an assistant manager from 1995 to 2003 at five different locations in Brooklyn, including the Brooklyn Area Store located at 1479 Fulton Street. (Zama Aff. ¶ 1.) Zama alleges that he was forced to work off-the-clock at every Domino's location where he was employed. (*Id.* at ¶¶ 4-5.) Zama further states that he knows his time records were altered by Domino's management at three locations where he worked, not including the Fulton Street location, and that he suspects that his time records were altered at the other locations as well. (*Id.* at ¶¶ 6-7.) Finally, Zama alleges that he was not allowed to take meal breaks, and that, as an assistant man-

ager, he was directed to keep the cost of labor to a minimum. (*Id.* at ¶¶ 2-9.) Monel Marseille worked as a delivery driver and a customer service representative for Domino's at its store located at 1763 Union Street in Brooklyn from 2001 until July 2003, and alleges that, during his employment, his hours were reduced by Domino's management and he was required to work off-the-clock. (Marseille Aff. ¶¶ 1, 3-5.)

**\*3** In opposing plaintiffs' certification motion, Domino's submitted a variety of documents, including affidavits from management and corporate personnel, detailing Domino's method of computing employee time and their policy of paying their hourly employees for the full amount of hours that they worked. One such affidavit was from Sharza, who refuted Laroque's allegation that he told Laroque of a widespread policy of undercompensating hourly employees at the Brooklyn Area Stores. (Sharza Aff. ¶ 12.) Another affidavit submitted by Karl De Nazareth, a Domino's employee responsible for providing human resources support to the Brooklyn Area Stores, noted that Domino's had no record of anyone named Margareth St. Cyr ever working at the 1772 Ralph Avenue Store. (De Nazareth Aff. ¶ 24.)

Domino's also submitted two "Payroll Changes Reports" detailing the changes made to the time records of employees at the Coney Island Store in 2006. The first report lists the changes made to the time records of the four plaintiffs, and the second report lists the changes made to the time records of the other delivery drivers and customer service representatives identified by plaintiffs in their motion papers. (Mayer Aff., Ex. A, B.) These records indicate that, in 2006, no changes were made to the time records of Lisvonce and Saint-Eloi, Bissainthe's records were edited once, and Laroque's records were edited ten times over a four-month period. (*Id.* at Ex. A.) Of the eleven other Coney Island Store employees mentioned in plaintiff's filings, only six had their time records edited in 2006. (*Id.* at Ex B.) Domino's contends that all of these

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                   Page 6
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

edits were made to correct the employees' "clock in" and "clock out" times in order to more accurately reflect the hours that the employees actually worked. Domino's did not submit any records for any of the other years that plaintiffs worked at the Coney Island Store.

## II. Plaintiffs' Motion under Rule 6(b)

[1] Subsequent to filing their certification motion, plaintiffs filed a motion asking the court to enlarge the time in which they could file affidavits in support of the original motion, so that the court could consider the affidavits of Zama and Marseille. Generally, affidavits must be served contemporaneously with the motion that they support. Fed.R.Civ.P. 6(c)(2).Rule 6(b), however, provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time ... on motion made after the time has expired if the party failed to act because of excusable neglect."Fed.R.Civ.P. 6(b)(1). This grant of discretion applies to any temporal requirement found in the Federal Rules, unless expressly excepted, which the requirement regarding service of affidavits is not. *See Raymond v. Int'l Business Machines Corp.,* 148 F.3d 63, 66 (2d Cir.1998) (quoting *Pioneer Investment Servs. Co. v. Brunswick Assocs.,* 507 U.S. 380, 389 n. 4, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)); Fed.R.Civ.P. 6(b)(2). Therefore, the court may consider the Zama and Marseille affidavits if plaintiffs can establish "excusable neglect" for failing to file the affidavits with the original motion. In determining what constitutes excusable neglect for the purposes of granting an extension, district courts should conduct an equitable inquiry, "taking account of all relevant circumstances surrounding the party's omission, including prejudice to the other party, the reason for the delay, its duration, and whether the movant acted in good faith."*Raymond,* 148 F.3d at 66 (quoting *Pioneer,* 507 U.S. at 395, 113 S.Ct. 1489) (internal quotation marks omitted).

*\*4 [2] Plaintiffs' initial certification motion was

filed on September 25, 2007, and their motion for an extension of time was served on Domino's on March 3, 2008. Plaintiffs contend that they delayed filing the additional affidavits because Laroque, despite having known Zama for some time, was unaware until recently that Zama had also worked for Domino's. After learning of this litigation, Zama then put plaintiffs in contact with Marseille. Domino's offers no reason to doubt this explanation, but instead argues that the affidavits are irrelevant because neither Zama nor Marseille worked at the Coney Island Store or the other Brooklyn Area Stores within the past three years, and thus, neither can bring a timely FLSA claim against Domino's arising from their employment at any of the stores identified in plaintiffs' complaint. Regardless of the merits of this argument, it does not demonstrate that plaintiffs' delay was a result of bad faith, or that Domino's will be prejudiced by the court's consideration of the additional affidavits. Accordingly, plaintiffs' Rule 6(b) motion is granted, and the court will consider the affidavits of Zama and Marseille as well as Domino's arguments as to why those affidavits fail to support certification-in connection with the underlying motion.

## III. Plaintiffs' Motion under Section 216(b) of the FLSA

[3][4] Plaintiffs move to preliminarily certify this case as a collective action, define the group of potential plaintiffs, compel Domino's to produce the names and last known addresses of the potential plaintiffs, and allow notice to be sent to the potential plaintiffs. Pursuing FLSA claims collectively is contemplated by Section 216(b) of the FLSA, which provides that an action under the FLSA to recover unpaid wages:

> [M]ay be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

such consent is filed in the court in which such action is brought.

29 U.S.C.A. § 216(b). District courts have discretion under this section to direct a defendant employer to disclose the names and addresses of similarly situated potential plaintiffs and to authorize the sending of notice to these individuals, so that they may "opt in" to the collective action. *See Hoffmann v. Sbarro, Inc.,* 982 F.Supp. 249, 261 (S.D.N.Y.1997) (citing *Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989)). Once a plaintiff opts in to a collective action by filing notice with the court, the statute of limitations on their FLSA claim is tolled. *Levy v. Verizon Information Servs., Inc.,* No. 06-CV-1583, 2007 WL 1747104 at *3 (E.D.N.Y. June 11, 2007) (citing *Sbarro,* 982 F.Supp. at 260).

[5][6][7][8] In determining whether a matter should proceed as a collective action, courts follow a two-step process, looking first to the pleadings and affidavits to determine whether the putative class members are "similarly situated." *Jacobs v. New York Foundling Hospital,* 483 F.Supp.2d 251, 265 (E.D.N.Y.2007) (citing *Lee v. ABC Carpet & Home,* 236 F.R.D. 193, 197 (S.D.N.Y.2006)). If the plaintiffs can satisfy a minimal burden of showing that they are similarly situated to the potential class members, the court certifies the class and provides for notice to be sent to the potential class members who are then given the chance to opt in to the action. *Id.* After discovery, a second inquiry begins, generally precipitated by a defendant's motion for decertification, in which the court examines with a greater degree of scrutiny whether the members of the plaintiff class-including those who have opted in-are similarly situated. *Id.; see also Torres v. Gristede's Operating Corp.,* No. 04-Civ-3316, 2006 WL 2819730 at *9 (S.D.N.Y. Sept. 29, 2006) (noting that "[p]ost-discovery ... the Court applies heightened scrutiny to [the similarly situated] inquiry as compared to pre-discovery") (citation omitted). If the court is satisfied at this stage that the class members are similarly situated, the col-

lective action proceeds to trial; otherwise, the court decertifies the class, and the class members must pursue their claims individually. *Jacobs,* 483 F.Supp.2d at 265 (citing *Lee,* 236 F.R.D. at 197).

*5 [9] Although the Second Circuit has yet to prescribe a particular method for determining whether members of a putative class are similarly situated, district courts in this circuit look to the "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against notification to the class." *Guzman v. VLM, Inc.,* No. 07-CV-1126, 2007 WL 2994278 at *3 (E.D.N.Y. Oct. 11, 2007) (collecting authority) (internal quotation marks omitted). At this preliminary stage, plaintiffs can satisfy their burden "by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Sbarro,* 982 F.Supp. at 261 (collecting authority).*See also Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F.Supp.2d 101, 104 (S.D.N.Y.2003) ("A plaintiff's burden is minimal, especially since the determination that potential plaintiffs are similarly situated is merely a preliminary one.") (citations and quotation marks omitted); *Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 480 (E.D.N.Y.2001) ("Generally, at the notice stage, courts require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan.") (citations and quotation marks omitted). Keeping in mind the preliminary posture of this litigation, as well as the FLSA's remedial purpose, the court considers whether plaintiffs have sufficiently demonstrated that they are similarly situated to the other hourly employees at the Coney Island Store, and the hourly employees at the five other Brooklyn Area Stores.

*A. The Coney Island Store*

Each of the four named plaintiffs has submitted an

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



--- F.Supp.2d ----                                                                Page 8
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

affidavit alleging that he was denied proper compensation, in violation of the FLSA, while employed as a delivery driver at the Coney Island Store. DeLesca, a putative class member, alleges that while employed as a customer service representative at the Coney Island Store she too was denied proper compensation. Additionally, the plaintiffs and DeLesca identified numerous other delivery drivers and customer service representatives at the Coney Island Store they believe also were denied proper compensation. Although some of the alleged facts are unique to individual plaintiffs, such as Bissainthe's allegation regarding the delivery money stolen from his locker, there remains a common accusation that the management of the Coney Island Store prevented the store's delivery drivers and customer service representatives from being fully compensated for the regular and overtime hours that they worked either by forcing them to work off-the-clock or by modifying their computerized payroll records.

[10] For the purposes of conditional certification, the court finds that plaintiffs have met their burden of demonstrating they are similarly situated to a putative class of delivery drivers and customer service representatives who worked at the Coney Island Store within the past three years. A class, so constituted, would involve individuals with similar responsibilities, who worked in the same location, during the same general period, under essentially the same management, and pursuant to the same general policies regarding the hours they worked and how those hours were recorded and compensated. Domino's defense to these claims-as demonstrated by the pleadings, affidavits, and exhibits already submitted-focuses on the payroll policies of Domino's in general, and the actions of the Coney Island Store managers in particular. Moreover, certifying a class of delivery drivers and customer service representatives who worked at the Coney Island Store will not unduly prejudice Domino's in their defense of this action, as Domino's has already identified the managers working at the Coney Island Store during the relevant time period,

and it has produced documentation regarding the official corporate payroll policies of Domino's, as well as the 2006 Payroll Changes Report for the Coney Island Store.

*6 The cases cited by Domino's in opposing the certification motion reinforce the court's conclusion that plaintiffs have met their burden. In *Prizmic v. Armour, Inc.,* United States Magistrate Judge Marlyn D. Go declined to certify a class based on an unsupported allegation in the plaintiff's complaint that he and his co-workers were denied overtime compensation by their employer. No. 05-CV-2503, 2006 WL 1662614 (E.D.N.Y. June 12, 2006). In denying the certification motion, the court noted that "[a]lthough the plaintiff's burden at this initial stage is not onerous, '[m]ere allegations in the complaint are not sufficient; some factual showing by affidavit or otherwise must be made.'" *Prizmic,* 2006 WL 1662614 at *2 (quoting *Camper v. Home Quality Mgmt., Inc.,* 200 F.R.D. 516, 519 (D.Md.2000)). The court found that the plaintiff had failed to satisfy that burden because he had "made only general allegations in his complaint," and had "not submitted *any* evidence by affidavit or otherwise to demonstrate that he and other potential plaintiffs were victims of a common policy or plan that violated the law."*Id.* at *3."Nor ha[d] plaintiff identified a single potential plaintiff," or even provided "the minimal requisite factual showing that he [or the other putative class members were] in an employee-employer relationship with defendants."*Id.Prizmic* is easily distinguishable from the situation at hand, in which numerous affidavits have been submitted, a specific pattern of FLSA violations has been alleged, and a number of other potential class members have been identified by name.

*Morales v. Plantworks*, upon which Domino's also relies, likewise lends little support to its position. *See*No. 05-Civ-2349, 2006 WL 278154 (S.D.N.Y. Feb. 2, 2006). In *Morales,* the plaintiffs' motion for certification was denied because the affidavits and exhibits plaintiffs submitted made "no reference to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                          Page 9
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

any ... employee other than plaintiffs, and they ma[d]e no allegations of a common policy or plan to deny plaintiffs overtime."*Id.* at *2. The court found that the plaintiffs had "offered only a conclusory allegation in their complaint" that they were similarly situated to putative class members, and thus had failed to meet their minimal burden.*Id.* at *3. As noted above, the plaintiffs in this case have made a significantly greater evidentiary showing.

Domino's also argues that claims of "off-the-clock" work and altered time sheets inherently are too individualized to be pursued collectively. The court disagrees. District courts in this circuit regularly grant certification under similar circumstances. *See Bowens v. Atlantic Maintenance Corp.,* 2008 WL 1827439 at *24 (E.D.N.Y. Apr. 23, 2008) (approving a class of plaintiffs alleging "off-the-clock" claims) (citing *Young v. Cooper Cameron Corp.,* 229 F.R.D. 50, 55 (S.D.N.Y.2005); *Patton v. Thomson Corp.,* 364 F.Supp.2d 263, 267 (E.D.N.Y.2005); *Roebuck v. Hudson Valley Farms, Inc.,* 239 F.Supp.2d 234, 238-39 (N.D.N.Y.2002)).*Cf. Diaz v. Electronics Boutique of America, Inc.,* No. 04-CV-840E, 2005 WL 2654270 at *5 (W.D.N.Y. Oct. 17, 2005) (denying certification because "questions of fact would most likely differ for each plaintiff, as each worked in different locations with different supervisors.") (citing *Lawrence v. City of Philadelphia,* No. 03-CV-4009, 2004 WL 945139 at *2 (E.D.Pa. Apr. 29, 2004)).

*7 Domino's additionally argues that plaintiffs' allegation regarding improperly edited time records lacks evidentiary support. In support of this claim, Domino's cites a decision from the Southern District of Ohio, in which the district court declined to certify a class of McDonald's employees who alleged that their time-keeping records had been improperly altered. *See Harrison v. McDonald's Corp.,* 411 F.Supp.2d 862 (S.D.Ohio 2005). The *Harrison* court observed that "there is nothing inherently improper or unlawful about editing [ ]

time-keeping records," and concluded that certification was unwarranted because the plaintiff had failed to produce specific admissible evidence indicating that McDonald's had acted in violation of the FLSA, as opposed to for some innocuous reason, when it modified her time records. *Id.* at 870. *Harrison* fails to persuade the court that a similar result is warranted in the present case. First, multiple plaintiffs in this case have specifically alleged, in sworn affidavits, that their time records were altered in order to prevent them from being paid for more than forty hours per week. Second, the *Harrison* court appears to have applied a more stringent standard than is applicable here. The standard in this circuit is clear; the merits of plaintiffs' claim are not at issue in a motion for conditional certification. "Once the [p]laintiff makes a colorable claim for relief, the only inquiry necessary is whether the potential plaintiffs to be notified are similarly situated to the named plaintiff."*Gjurovich,* 282 F.Supp.2d at 105 (citing *Sbarro,* 982 F.Supp. at 262). The court is satisfied that plaintiffs have made the requisite showing.

Domino's next directs the court's attention to a decision of a district court in the Central District of California, *Smith v. T-Mobile USA, Inc.,* a case in which former employees of T-Mobile sought to certify a class consisting of "approximately 15,000 similarly-situated plaintiffs nationwide," alleging they had been forced to work off-the-clock and had been denied proper overtime compensation. No. CV-05-5274, 2007 WL 2385131 at *1 (C.D.Cal. Aug. 15, 2007). After reviewing the declarations of thirty-three "potential plaintiffs in 17 different states, who worked at 38 different store locations, under at least 41 different managers," the *T-Mobile* court concluded that "while plaintiffs' claim that they are illegally denied overtime pay is ostensibly a common legal nexus giving rise to a common injury, that commonality is illusory because the underlying allegations are disparate."*Id.* at *5. What Domino's fails to mention in citing *T-Mobile,* however, is that the court in that case actually had granted conditional certification to the class under

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



--- F.Supp.2d ----                                                                                    Page 10
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

the lenient "first-tier" analysis, and only denied certification after concluding, upon a motion for reconsideration, that discovery as to class issues had been completed, and that accordingly, the more stringent "second-tier" analysis should be applied. *See id.* at *4. Because the present case is still in its preliminary stages, the more lenient standard applies. *T-Mobile* thus lends no support Domino's position.

**\*8** Based on the foregoing, the court grants plaintiffs' motion for preliminary collective action certification as to those delivery drivers and customer service representatives who worked at the Coney Island Store within the past three years, i.e., between May 30, 2005 and May 30, 2008.[FN1]

B. *The Brooklyn Area Stores*

In addition to the employees of the Coney Island Store, plaintiffs also contend they are similarly situated to the hourly employees who worked at the five other Brooklyn Area Stores. Although plaintiffs, all of whom were employed at the Coney Island Store, have alleged enough facts to allow the court to certify a class of individuals who worked at the same location during the same period, those facts fail to demonstrate that plaintiffs are similarly situated to individuals who worked at a number of different locations, and under a number of different managers. The sum of plaintiffs' allegations regarding the other five Brooklyn Area Stores consist of (1) Laroque's claim that two managers of the Coney Island Store, Sharza and "Joseph," admitted to Laroque that they knew Domino's modified its employees' time records and forced its employees to work off-the-clock at the Brooklyn Area Stores; (2) Laroque's claim that St. Cyr, a delivery driver who worked at the 1772 Ralph Avenue location, told him that Domino's reduced her hours; and (3) Zama's generalized allegations of wrongdoing at every Domino's location he worked, including the Brooklyn Area Store located at 1479 Fulton Street.

Domino's responds to these allegations by denying any improper actions, submitting Sharza's affidavit, in which he denies ever telling Laroque of a policy or plan of forcing off-the-clock work or improperly editing time records at the Brooklyn Area Stores, and submitting De Nazareth's affidavit, which notes that Domino's has no record of an employee named Margareth St. Cyr ever working at 1772 Ralph Avenue. Thus, plaintiffs' factual support regarding the situation of the employees of the Brooklyn Area Stores is reduced to a hearsay statement that has been rebutted by the declarant (Sharza), a hearsay statement by an individual whose identity remains unknown ("Joseph"), a hearsay statement, the reliability of which has been seriously drawn into question (St. Cyr), and a an individual's statement that at sometime between 1995 and 2003, he worked at one of the Brooklyn Area Stores, was required to work off-the-clock at that location, and suspects that his time records were reduced while he worked there (Zama). Although plaintiffs' burden at this stage of the proceedings is modest, the court cannot justify certifying a class of plaintiffs, likely numbering in the hundreds, on the basis of such thin factual support. Accordingly, plaintiffs' motion for certification is denied with respect to the employees of the Brooklyn Area Stores.

C. *Form of the "Notice of Lawsuit"*

[11] Determining what constitutes sufficient notice to putative plaintiffs in a Section 216(b) collective action is a matter left to the discretion of the district courts. *Gjurovich,* 282 F.Supp.2d at 105-06 (citing *Hoffmann,* 493 U.S. at 170, 110 S.Ct. 482). The court approves the format of plaintiffs' proposed notice, noting that it mirrors closely the reasonable format set out by a district court in the Southern District of New York in *Gjurovich v. Emmanuel's Marketplace, Inc. See id.* at 106-09. Domino's objects to the content of the proposed notice, however, claiming that it is overbroad, in that it purports to define the class:

**\*9** All current and former employees of [Domino's] who were or are employed within



--- F.Supp.2d ----                                                      Page 11
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

three (3) years preceding [the date of the Court's order approving this notice], in non-exempt positions (non-managerial employees) who worked at one (or more) of the following locations: [the Coney Island Store and the Brooklyn Area Stores], and whose hours worked were reduced by Domino's management, or who were required to perform unpaid "off-the-clock" work, or who were required to reimburse [Domino's] when the money they collected from customers was lost or stolen or who did not receive overtime compensation at the rate of one and one-half times the regular rate at which they were employed for the hours they worked in excess of 40 in one week.

(Carabba Aff., Ex. G at 1-2.) As the class has now been certified, the court agrees with Domino's that this definition is overbroad. The court directs plaintiff to use the following class definition:

All current and former employees of Domino's Pizza, LLC ("Domino's") who were or are employed within the past three (3) years, i.e., between May 30, 2005 and May 30, 2008, as delivery drivers or customer service representatives at the Domino's store located at 900 Coney Island Avenue, Brooklyn, New York 11218, and whose hours worked were reduced by Domino's management, or who were required to perform unpaid "off-the-clock" work, such that they were not paid for all of the hours that they worked and/or did not receive overtime compensation at the rate of one and one-half times the regular rate at which they were paid for hours they worked in excess of forty (40) in one week.

The court further directs plaintiffs to use the above definition consistently throughout the notice form, such that the exact same language is used in the "TO:" section, the "DESCRIPTION OF THE LAWSUIT" section, at least insofar that the description of plaintiffs' claims in that section should mirror the description of the claims of the potential plaintiffs in the other sections, and the "COMPOSITION OF THE CLASS" section.

Additionally, plaintiffs must omit any reference in the Notice of Lawsuit to claims stemming from allegations that plaintiffs or potential plaintiffs were required to reimburse Domino's when the money they collected from customers was lost or stolen, as that claim is unique to Bissainthe, and cannot be pursued collectively. Further, under the section titled "YOUR RIGHT TO PARTICIPATE IN THIS LAWSUIT," the date that potential plaintiffs must send their consent forms to plaintiffs' counsel must be more definite, as it is unclear how long plaintiffs' counsel will need to file the form with the court. This section should advise the potential plaintiffs to send their "opt-in" consent forms "to plaintiffs' counsel so that they are received by plaintiffs' counsel on or before [50 days from the date of the notice mailing]." Likewise, the section titled "EFFECT OF JOINING THIS CASE" should advise potential plaintiffs choosing to be represented by separate counsel that their attorneys must send their "opt-in" consent forms "to plaintiffs' counsel so that they are received by plaintiffs' counsel on or before [50 days from the date of the notice mailing]." Plaintiffs' counsel then will have ten days to file with the court the consent forms of all the plaintiffs that have opted in to the lawsuit. Finally, the section titled the "EFFECT OF JOINING THIS CASE" must also advise the potential plaintiffs of their right to separate counsel with greater clarity. Instead of the present language, "Furthermore, you can join this lawsuit by counsel of your own choosing," the following language should be used, "Furthermore, you can join this lawsuit and be represented by counsel of your own choosing, payment of whose fees is your sole responsibility." Plaintiffs are directed to submit for the court's approval an amended form of notice incorporating the court's recommendations within ten business days of the date of this order, i.e., by June 13, 2008.

D. *Identities of Potential Plaintiffs*

**\*10** Domino's is directed to produce, within ten business days from the date of this order, i.e., by June 13, 2008, the names and last known addresses

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



--- F.Supp.2d ----                                                    Page 12
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)
**2008 WL 2303493 (E.D.N.Y.)**

of all individuals who worked as either a delivery driver or a customer service representative at the Coney Island Store within three years from the date of this order.

**IV. Conclusion**

For the foregoing reasons, plaintiffs' motion for an extension of time under Rule 6(b) to file affidavits is granted, and plaintiffs' motion for preliminary collective action certification under Section 216(b) of the FLSA is granted as to those delivery drivers and customer service representatives who worked at the Coney Island Store within the past three years, i.e., between May 30, 2005 and May 30, 2008. Within ten business days from the date of this order, i.e., by June 13, 2008, plaintiffs are directed to amend the "Notice of Lawsuit" and submit the amended version for the court's approval, and Domino's is directed to produce the name and last known address of each potential plaintiff.

SO ORDERED.

> FN1. FLSA claims must be commenced within two years after a cause of action accrues, or within three years after a cause of action accrues, if the violation is willful. 29 U.S.C. § 255. Plaintiffs allege willful violations, thus, three years is the appropriate limitations period.

E.D.N.Y.,2008.
Laroque v. Domino's Pizza, LLC
--- F.Supp.2d ----, 2008 WL 2303493 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Slip Copy
Slip Copy, 2006 WL 2853971 (S.D.N.Y.)
**2006 WL 2853971 (S.D.N.Y.)**

H

Damassia v. Duane Reade, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Kelvin DAMASSIA, Arnold Caballero, Dayanand
Baldeo, Marlon Fegus, Mohammed Hoque,
Muhammed Khawaja, Ifeanyi Malu, Mourad
Mansy, Maxwell Okeke, and Delfin Ruiz, on behalf
of themselves and all others similarly situated,
Plaintiffs,
v.
DUANE READE, INC., Defendant.
No. 04 Civ. 8819(GEL).

Oct. 5, 2006.

Tarik F. Ajami, Outten & Golden LLP, New York,
N.Y. (Adam T. Klein, Justin M. Swartz, ReNika C.
Moore, on the brief), for plaintiffs.
Dan Woods, White & Case LLP, New York, N.Y.
(Daniel P. Goldberg and Timothy M. Rusche, on
the brief), for defendant.

OPINION AND ORDER

LYNCH, J.
*1 In this action brought under the Federal Labor
Standards Act ("FLSA"), plaintiffs move for court-
authorized notice to potential opt-in plaintiffs pur-
suant to 29 U.S.C. § 216(b).[FN1] The motion will
be granted.

> FN1. After receiving notice that the parties
> were entering mediation, this Court issued
> an Order on June 5, 2006, deeming the in-
> stant motion withdrawn, without prejudice
> to its resubmission in the event that medi-
> ation proved unsuccessful; the Order fur-
> ther indicated that, should mediation fail,
> plaintiffs could reinstate the motion by
> sending a letter directly to chambers. After
> mediation failed in July 2006, plaintiffs
> submitted a letter to chambers requesting

that the Court reinstate the motion.

BACKGROUND

On November 5, 2004, plaintiff Kelvin Damassia
brought suit on behalf of himself and others simi-
arly situated against his former employer, Duane
Reade, Inc. ("defendant" or "Duane Reade"), al-
leging principally that Duane Reade had failed to
pay overtime wages in accordance with FLSA and
New York state law. See29 U.S .C. § 207; N.Y.
Lab. Law § 650 et seq. According to the complaint,
plaintiff worked for approximately seventh months
as an assistant night manager at one of Duane
Reade's 252 retail drugstores in the New York City
metropolitan area. Despite being designated an as-
sistant "manager," plaintiff claims that he per-
formed "few or no" managerial duties at the store
(Complaint ¶¶ 2-3; seealso Second Amended Com-
plaint ("SAC") ¶¶ 2-3), and that Duane Reade em-
ployed the term "assistant manager" in an effort to
evade overtime requirements under FLSA's "bona
fide executive" exemption for salaried managerial
employees. See29 U.S.C. § 213(a). An amendment
to the complaint named Arnold Caballero as an ad-
ditional plaintiff; Caballero's allegations are sub-
stantially similar to Damassia's. (See,e.g., First
Amended Complaint ¶¶ 44-52.)

Defendant moved to dismiss the amended com-
plaint in part, and for partial summary judgment,
arguing that plaintiff Damassia's claims were time
barred. Defendant also argued that a 2003 Depart-
ment of Labor ("DOL") audit had determined that
defendant acted properly in classifying assistant
night managers as "bona fide executives" exempt
from overtime requirements. According to defend-
ant, the DOL's finding created a statutory affirmat-
ive defense of good faith under 29 U.S.C. § 259,
warranting judgment as a matter of law. Rejecting
these arguments, the Court denied defendant's mo-
tion on May 22, 2005. SeeDamassia v. Duane
Reade, Inc., 04 Civ. 8819(GEL), 2005 WL
1214337, at *1 (S.D.N.Y. May 20, 2005).

**EXHIBIT**
T

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2853971 (S.D.N.Y.)
**2006 WL 2853971 (S.D.N.Y.)**

II. *Collective Actions and Court-Authorized Notice*

FLSA allows employees to sue on behalf of themselves as well as employees who are "similarly situated." 29 U.S.C. § 216(b). The similarly situated employees may "opt in" to the lawsuit and become party plaintiffs by filing a written consent with the court. See *Masson v. Ecolab, Inc.,* 04 Civ. 4488(MBM), 2005 WL 2000133, at *13 (S.D.N.Y. Aug. 17, 2005). In a collective action under FLSA-unlike in a class action under Federal Rule of Civil Procedure 23-only plaintiffs who affirmatively opt in can benefit from the judgment or be bound by it. *Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F.Supp.2d 101, 103-04 (S.D.N.Y.2003).

Though § 216(b) does not expressly provide for court-authorized notice to potential opt-in plaintiffs in a collective action, "it is 'well settled' that district courts have the power to authorize an FLSA plaintiff to send such notice." *Id.,* quoting *Hoffman v. Sbarro, Inc.,* 982 F.Supp. 249, 260 (S.D.N.Y.1997) (additional citations and internal quotation marks omitted); see *Hoffman-La Roche Inc. v. Sperling,* 493 U.S. 165 (1989); *Braunstein v. E. Photographic Labs., Inc.,* 600 F.2d 335 (2d Cir.1979). Orders authorizing notice are often referred to as orders "certifying" a collective action, even though FLSA does not contain a certification requirement. See *Lee v. ABC Carpet & Home,* 236 F.R.D. 193, 197 (S.D.N.Y.2006); *Scholtisek v. Eldre Corp.,* 229 F.R.D. 381, 387 (W.D.N.Y.2005). When a court certifies a collective action, it may require an employer to disclose the names and addresses of potential plaintiffs. See *Patton v. Thomson Corp.,* 364 F.Supp.2d 263, 266 (E.D.N.Y.2005).

*3 Courts in this circuit and elsewhere have held that a court may authorize notice-and certify a collective action-if the court makes a "preliminary determination" that potential opt-in plaintiffs are "similarly situated" to the named plaintiffs.[FN4] *Patton,* 364 F.Supp.2d at 267 (citations and internal quotation marks omitted); see *Trezvant v. Fidelity Employer Servs. Corp.,* 434 F.Supp.2d 40, 43

(D.Mass.2006); *Lee,* 236 F.Supp.2d at 197; *Sbarro,* 982 F.Supp. at 261; *cf.Hipp v. Liberty Nat, Life Ins. Co.,* 252 F.3d 1208, 1217 (11th Cir.2001) ("[P]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members."(alteration in original) (citation and internal quotation marks omitted)). While this normally requires a "modest factual showing" that the plaintiff and the potential plaintiffs were victims of a common policy or plan violating FLSA, *Gjurovich,* 282 F.Supp.2d at 104 (citation and internal quotation marks omitted), it may be appropriate in some cases to find plaintiffs and potential plaintiffs similarly situated based simply on plaintiffs' "substantial allegations" that they and potential plaintiffs were common victims of a FLSA violation, particularly where defendants have admitted that the actions challenged by plaintiffs reflect a company-wide policy. *Ayers v. SGS Control Servs., Inc.,* 03 Civ. 9078(RMB)(RLE), 2004 WL 2978296, at *5 (S.D.N.Y. Dec. 21, 2004); *Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 480 (E.D.N.Y.2001). In either case, a plaintiff's burden at this preliminary stage is "minimal." *Wraga v. Marble Lite, Inc.,* 05 Civ. 5038(JG) (RER), 2006 WL 2443554, at *1-*2 (E.D.N.Y. Aug. 22, 2006); see *Kreher v. City of Atlanta,* 04 Civ. 2651(WSD), 2006 WL 739572, at *3 (N.D.Ga. Mar. 20, 2006); *Lee,* 236 F.R.D. at 197; *Scholtisek,* 229 F.R.D. at 387; *Dietrich v. Liberty Square, L.L .C.,* 230 F.R.D. 574, 578-79 (N.D.Iowa 2005); *Gjurovich,* 282 F.Supp.2d at 104; see also *Young v. Cooper Cameron Corp.,* 229 F.R.D. 50, 55 (S.D.N.Y.2005) (describing plaintiffs' burden as "very limited"); *cf.Cameron-Grant v. Maxim Healthcare Servs ., Inc.,* 347 F.3d 1240, 1243 n. 2 (11th Cir.2003) (noting that courts "us[e] a fairly lenient standard" in deciding whether notice is proper). A court need not evaluate the underlying merits of a plaintiff's claims to determine whether the plaintiff has made the minimal showing necessary for court-authorized notice. *Scholtisek,* 229 F.R.D. at 391; *Gjurovich,* 282 F.Supp.2d at 105; *Sbarro,* 982 F.Supp. at 262.

Slip Copy                                                                Page 2
Slip Copy, 2006 WL 2853971 (S.D.N.Y.)
**2006 WL 2853971 (S.D.N.Y.)**

Between September 1 and November 15, 2005, about twenty individuals who had worked as assistant night managers filed forms with the Court consenting to be party plaintiffs pursuant to FLSA's opt-in provision, 29 U.S.C. § 216(b).[FN2] On November 4, 2005, plaintiffs filed the instant motion seeking court-authorized notice to potential opt-in plaintiffs. After the motion was fully briefed, plaintiffs filed a second amended complaint naming eight new plaintiffs in addition to Damassia and Caballero. The new plaintiffs-Dayanand Baldeo, Marlon Fergus, Mohammed Hoque, Muhammed Khawaja, Ifeanyi Malu, Mourad Mansy, Maxwell Okeke, and Delfin Ruiz-were among those who had already submitted consent forms under § 216(b). All of the plaintiffs worked as assistant night managers and allege violations of state and federal overtime requirements.

> FN2. Some of the opt-in plaintiffs and potential opt-in plaintiffs may still work at Duane Reade. (See,e.g., Ajami Dec. Ex. T ¶ 1.) For the sake of simplicity and consistency, the Court will generally refer to plaintiffs' and opt-in plaintiffs' employment activities in the past tense.

## DISCUSSION

### I. *FLSA Overtime Requirements and the "Bona Fide Executive" Exemption*

*2 Though the merits of plaintiffs' claims need not be resolved at this stage, an understanding of those claims will be helpful in analyzing plaintiffs' motion for court-authorized notice. The main provision under which plaintiffs sue is 29 U.S.C. § 207, which requires employers to pay their employees at a rate of "one and one-half times the regular rate at which [the employee] is employed" for each hour worked in excess of forty hours in a single week. 29 U.S.C. § 207(a)(1). The requirement does not apply, however, with respect to certain categories of employees, including those that are "employed in a bona fide executive ... capacity."29 U.S.C. §

213(a)(1). The "bona fide executive" exemption is an affirmative defense on which the defendant bears the burden of proof, *seeCorning Glass Works v. Brennan,* 417 U.S. 188, 196-97 (1974), and is narrowly construed against the employer, *seeBilyou v. Dutchess Beer Distribs., Inc.,* 300 F.3d 217, 222 (2d Cir.2002).

Pursuant to federal regulations, an employer may only apply the "bona fide executive" exemption to employees:

(1) [Who are c]ompensated on a salary basis at a rate of not less than $455 per week ...;

(2) Whose primary duty is management of the enterprise in which the employee [s][are] employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly direct[ ] the work of two or more other employees; and

(4) Who ha[ve] the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. The regulations provide guidance to courts applying this provision by defining several of its key terms in detail. *See,e.g.,id.* § 541.102 (defining "management"); *id.* at § 541.103 (defining "department or subdivision"); *id.* at § 541.105 (defining "particular weight"); *id.* § 541.700 (defining "primary duty").[FN3]

> FN3. The regulations were amended in mid-2004. *Compare*29 C.F.R. § 541.1 (2004), *with*29 C.F.R. § 541.100 (2006). While the differences between the current regulations and those previously in effect will be relevant to the merits of plaintiffs' claims, the differences are sufficiently minor as to be irrelevant for purposes of analyzing the motion for court-authorized notice.

Westlaw.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 4
Slip Copy, 2006 WL 2853971 (S.D.N.Y.)
**2006 WL 2853971 (S.D.N.Y.)**

FN4. The Second Circuit has yet to provide standards to apply in determining whether court-authorized notice is appropriate.

Plaintiffs who opt in to a collective action after a court authorizes notice do not necessarily remain parties to the action through trial. After discovery, courts typically engage in a "second tier" of analysis to determine on a full record-and under a more stringent standard-whether the additional plaintiffs are in fact similarly situated. *Morden v. T-Mobile USA, Inc.,* 05 Civ. 2112(RSM), 2006 WL 2620320, at *4 (W.D.Wash. Sept. 12, 2006); *Gjurovich,* 282 F.Supp.2d at 105. If the factual record reveals that the additional plaintiffs are not similarly situated to the original plaintiffs, the collective action is "decertified," and the claims of the opt-in plaintiffs are dismissed without prejudice. *Lee,* 236 F.R.D. at 197; *Scholtisek,* 229 F.R.D. at 387.FN5

FN5. Some courts, rather than employing the two-tiered analysis described here, have simply relied on Federal Rule of Civil Procedure 23's requirements for class certification to determine whether court-authorized notice is warranted under 29 U.S.C. § 216(b). *See Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1102-03 (10th Cir.2001) (describing varying approaches to motions for court-authorized notice under § 216(b)). Other courts have relied on the requirements of the pre-1966 version of Federal Rule 23. *See Thiessen,* 267 F.3d at 1102-03. As the *Thiessen* court explained, however, "Congress clearly chose not to have the Rule 23 standards apply to [§ 216(b) ], and instead adopted the 'similarly situated' standard. To now interpret this 'similarly situated' standard by simply incorporating the requirements of Rule 23 (either the current version or the pre 1966 version) would effectively ignore Congress' directive." 267 F.3d at 1105; *see also Vogel v. Am. Kiosk Mgmt.,*

371 F.Supp.2d 122, 127 (D.Conn.2005) ("[T]he prevailing view in the Second Circuit, and other Circuits, is that actions ... pursuant to section 216(b) of the FLSA are not subject to Rule 23 requirements and principles.").

*4 Defendant suggests that the court should skip the initial inquiry, reasoning that discovery has already provided "sufficient evidence" to justify a "final" determination that plaintiffs are not similarly situated. (D. Mem. in Opposition to P. Mot. for Court-Authorized Notice ("D.Mem.") at 2, 20-22.) Fact discovery is in its early phases, however. At the time the instant motion was fully briefed, defendant had deposed only about half of the twelve opt-in plaintiffs who submitted declarations in support of court-authorized notice (*see id.* at 5 n. 3; D. Supplemental Mem. in Opposition to P. Mot. for Court-Authorized Notice ("D.Supp.Mem.") at 1), and plaintiffs had not yet had an opportunity to depose *any* of the 56 individuals who submitted affidavits in support of defendant's opposition (P. Reply at 7 n. 4). The deadline for fact discovery, moreover, does not fall until three months after the Court's Rule 23 class certification decision (8/5/05 Case Management Plan at 3), and the motion for class certification is not even due until December 2006. (8/28/06 Endorsed Letter at 2.) It would therefore be inappropriate to make more than a "preliminary determination" at this time, or to require plaintiffs to meet a more stringent standard than typically applied at the early stages of litigation. *See Prizmic v. Armour, Inc.,* 05 Civ. 2503(DLI)(MDG), 2006 WL 1662614, at *2 (E.D.N.Y. June 2, 2006) ("Only *after discovery has been completed* should the Court engage in a second more heightened stage of scrutiny to determine whether the class should be decertified or the case should proceed to trial as a collective action."(emphasis added)); *Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 482 (E.D.Cal.2006) (noting that *"[w]here discovery is complete,* courts sometimes bypass" the preliminary determination and apply the more stringent analysis

Slip Copy                                                                                                          Page 5
Slip Copy, 2006 WL 2853971 (S.D.N.Y.)
**2006 WL 2853971 (S.D.N.Y.)**

for a final determination (emphasis added)).

### III. *Plaintiffs' Motion for Court-Authorized Notice*

Plaintiffs' affidavits and allegations, taken together with defendant's admissions, more than suffice to entitle plaintiffs to court-authorized notice in this case. Plaintiffs' complaint alleges, for example, that plaintiffs are similarly situated to each other and to potential opt-in plaintiffs, because (1) none of them, despite the title of their position, performed primarily managerial duties at Duane Reade stores (*see, e.g.,* SAC ¶¶ 59-155), and (2) defendant, rely-ing without basis on FLSA's "bona fide executive" exemption, *see* 29 U.S.C. § 213(a), subjected them and other assistant night managers to a company-wide policy depriving them of overtime compensa-tion in violation of 29 U.S.C. § 207 (*see, e.g.,* SAC ¶ 56). The affidavits of plaintiffs and opt-in plaintiffs support these allegations (*see* Ajami Dec. Exs. K-V), as do the official job descriptions pro-duced by Duane Reade regarding assistant man-agers (*id.* Exs. F, G; *see also id.* Ex. W). Significantly, defendant has twice conceded to the Court that the business practices at issue in this case are uniform among its stores. (*See* 2/7/05 Rizzo Dec. at ¶ 2; 12/22/04 Rizzo Dec. at ¶ 2.) Defendant also con-cedes that it applies the "bona fide executive" ex-emption to all assistant night managers. (*See, e.g.,* D. Mem. at 1, 2-3, 6.)[FN6]

> FN6. Defendant claims that its classifica-tion of assistant night managers as exempt dates back to a ruling by an arbitrator in 1998, who allegedly found that assistant night managers "should be salaried, ex-empt employees." (D. Mem. at 1.) The ar-bitrator found no such thing, but rather concluded only that assistant managers hired after September 1, 1998, would not be members of a collective bargaining unit. (*See* Request for Judicial Notice in Support of D. Opp. to P. Mot., Ex. A at 13.)

*5 In opposing court-authorized notice, defendant

dedicates a substantial portion of its briefs to the misplaced argument that plaintiffs' claims fail on the merits. (D. Mem. at 1, 3-11; D. Supp. Mem. at 1-3.) As noted above, courts need not resolve the merits in order to find plaintiffs and potential opt-in plaintiffs similarly situated for purposes of author-izing notice.[FN7] *See Scholtisek,* 229 F.R.D. at 391; *Gjurovich,* 282 F.Supp.2d at 105; *Sbarro,* 982 F.Supp. at 262; *see also Young,* 229 F.R.D. at 54 ("The focus of this inquiry .. is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situ-ated' ... with respect to their allegations that the law has been violated."). Defendant baldly asserts that this view of the law is "incorrect," but it does not cite a single authority to support its position. (D. Mem. at 8.)[FN8]

> FN7. Though the Court need not analyze defendant's arguments on the merits at this stage, it is worth bringing one substantial flaw in those arguments to the parties' at-tention, particularly in view of the fact that defendant's misconceptions have infected its briefing on the instant motion. Defend-ant appears to believe that evidence demonstrating a difference between the re-sponsibilities of assistant night managers and the responsibilities of stock clerks nec-essarily supports a finding that assistant night managers are properly subject to the bona fide executive exemption. (*See, e.g.,* D. Mem. at 10.) The question on the mer-its, however, will be whether, in view of the functions they perform as assistant night managers, plaintiffs satisfy the re-quirements of the bona fide executive ex-emption, as specified in federal statutes, regulations and case law. The mere fact that plaintiffs' job responsibilities differ from, and are more important than, the re-sponsibilities of stock clerks does not nec-essarily mean that the requirements of 29 C.F.R. § 541.100 and related provisions are satisfied. *See also* 29 C.F.R. § 541.1



Slip Copy                                                                                    Page 6
Slip Copy, 2006 WL 2853971 (S.D.N.Y.)
**2006 WL 2853971 (S.D.N.Y.)**

(2004). In other words, employees do not become bona fide executives under FLSA simply because there are employees lower than them in the company's hierarchy. It is possible that *both* stock clerks *and* assistant night managers are entitled to overtime compensation, even if assistant night managers have more authority and more responsibility than the clerks.

FN8. Defendant argues that the merits are at issue "because a requirement for granting this motion [for court-authorized notice] is that plaintiffs and potential collective action members were victims of a common policy or plan in violation of the law."(D. Mem. at 8.) This misstates the law. As explained *supra*, plaintiffs need not definitively *prove* that they were victims of a common illegal policy. At most, they need only make a modest factual showing in support of their allegation that they were victims of such a policy. The Court, moreover, only needs to make a *preliminary* determination at this stage.

In some portions of its briefs, defendant comes closer to focusing on the proper question, arguing that plaintiffs and potential opt-in plaintiffs are not similarly situated for purposes of § 216(b). However, defendant's position is fatally undermined-at least for purposes of the instant motion-by earlier concessions to the Court. In two sworn declarations submitted in support of Duane Reade's unsuccessful motion to dismiss in part or for partial summary judgment, Duane Reade's Vice President of Human Resources, James Rizzo, acknowledged that Duane Reade's "relevant business practices" with respect to assistant night managers were uniform among its stores. (*See* 2/7/05 Rizzo Dec. at ¶ 2; 12/22/04 Rizzo Dec. at ¶ 2.) The concessions were reinforced by Mr. Rizzo's testimony at an October 20, 2005, deposition, during which he agreed with the questioning attorney that "one can draw accurate conclusions about assistant managers com-

pany wide by looking at assistant managers in ... Westchester," New York. (10/20/05 Rizzo Dep. at 68-69.) [FN9] Mr. Rizzo explained that Duane Reade relied on the Department of Labor's 2003 audit of labor practices at the Westchester stores to conclude that the general characterization of assistant night managers as exempt executives throughout Duane Reade stores was legal. (*Id.* at 68-69, 75-76.)To the Court's surprise, defendant argues again in its brief opposing court-authorized notice that the DOL's 2003 audit of a few Westchester stores allows one to draw company-wide conclusions about the employment activities of assistant night managers. (*See* D. Mem. at 1, 3.) These arguments and concessions are difficult, if not impossible, to reconcile with defendant's claim that there are significant variations in the work performed by assistant night managers at different stores which preclude a finding that plaintiffs and potential opt-in plaintiffs are similarly situated.

> FN9. Defendant's concessions of uniform business practices with respect to assistant night managers distinguish this case from cases cited by defendant, in which courts found that an inquiry into whether potential plaintiffs were exempt under 29 U.S.C. § 213(a)(1) would require an individualized analysis for each employee. *See,e.g.,Diaz v. Elecs. Boutique of Am., Inc.,* 04 Civ. 840, 2005 WL 2654270, at *2 (W.D.N.Y. Oct. 17, 2005); *Mike v. Safeco Ins. Co. of Am.,* 274 F.Supp.2d 216, 220 (D.Conn.2003).

Even if one looks past defendant's concessions with respect to its uniform business practices, its challenges to plaintiffs' factual showing are both inadequate and premature. As emphasized above, the question at this early stage is only whether, applying a "lenient" standard, the court is satisfied that plaintiffs, through their allegations, affidavits and other evidence, have met their "minimal" burden of demonstrating entitlement to a "preliminary" determination that they are similarly, even if not

Slip Copy                                                                                                                 Page 7
Slip Copy, 2006 WL 2853971 (S.D.N.Y.)
**2006 WL 2853971 (S.D.N.Y.)**

identically, situated with respect to their FLSA claims. At most, defendant's attacks on plaintiffs' affidavits and other evidence raise questions as to whether plaintiffs could prevail under a more stringent standard and whether the opt-in plaintiffs will survive a decertification motion at the close of discovery; defendant's arguments and evidence do not, however, undermine plaintiffs' "modest factual showing" to such an extent that a preliminary determination in favor of plaintiffs is unwarranted at this stage.

**\*6** Much of the problem with defendant's attack on plaintiffs' factual showing is that defendant focuses on alleged differences among plaintiffs and among Duane Reade stores that have little if anything to do with whether plaintiffs are similarly situated *"with respect to their allegations that the law has been violated ." Young,* 229 F.R.D. at 54 (emphasis added). Defendant claims, for example, that plaintiffs' deposition testimony proves wide variance in plaintiffs' abilities and competence, and in the length of time they worked at Duane Reade stores. (D. Mem. at 16.) But such facts, even if true, do not undermine plaintiffs' claim that they are similarly situated with respect to their allegation that defendant's company-wide compensation policies violate FLSA's overtime requirements. Plaintiffs and opt-in plaintiffs may be similarly entitled to overtime compensation regardless of whether some of them performed their jobs less competently or worked at Duane Reade for a shorter amount of time.

Defendant also points to evidence in plaintiffs' deposition testimony that trucks made deliveries during some of plaintiffs' shifts but not during other plaintiffs' shifts; that some plaintiffs took breaks more often than others; that some plaintiffs had the authority to arrange store displays, while others did not; and that there was variation among the stores at which plaintiffs worked with respect to the stores' location, their layout, their hours of operation, the amount of customer traffic, the amount of office space, the number of "RF guns" used for inventory, the amount of money in the safe, the loca-

tion of cigarette cartons, and the frequency with which outside cleaning crews visited the store. (D. Mem. at 15-18; D. Supp. Mem. at 4.) Such differences are hardly relevant to whether plaintiffs and potential opt-in plaintiffs were common victims of an illegal application of the "bona fide executive" exemption to overtime compensation requirements. On defendant's logic, no group of opt-in plaintiffs would ever be "similarly situated" unless they were clones of one another working in completely identical stores, in identical neighborhoods, with identical clientele.

That is not to say that all of defendant's arguments are misplaced or irrelevant. Defendant contends, for example, that according to plaintiffs' own testimony, assistant store managers had varying amounts of authority with respect to "writing-up" employees, approving employee discounts, training other employees, and determining which supplies to purchase. (D. Mem. at 17.) Whether such differences existed is plainly relevant to whether plaintiffs and potential plaintiffs are similarly situated with respect to the bona fide executive exemption. *See*29 C.F.R. § 541.102 (defining "management" activities for purposes of § 541.100 to include training and disciplining employees, and determining the types of supplies to be purchased, stocked, and sold); *seealso*29 C.F.R. § 541.102 (2004).

**\*7** To a large extent, however, defendant has mischaracterized plaintiffs' testimony. For instance, though defendant cites plaintiffs' testimony for the proposition that the authority of assistant store managers to train employees varied among stores, the deposition testimony on which defendant relies does not support that assertion. (*See* D. Mem. at 17.) Two of the cited witnesses testified that they trained employees to a limited extent (Baldeo Dep. at 252; Caballero Dep. at 204-06); another witness testified that there were no new employees to train during his short time at Duane Reade (Damassia Dep. at 130); and a fourth witness testified that he could not recall whether he trained any employees

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                          Page 8
Slip Copy, 2006 WL 2853971 (S.D.N.Y.)
**2006 WL 2853971 (S.D.N.Y.)**

(Malu Dep. at 269).[FN10] In support of the alleged variance in assistant managers' authority to purchase supplies for the store, defendant cites the testimony of two witnesses, but neither of them claim that ordering store supplies formed part of their responsibilities. (Caballero Dep. at 186; Malu Dep. at 255.)[FN11]

> FN10. Defendant's supplemental brief provides information on the training responsibilities of additional employees, but fails to demonstrate any significant variance in those responsibilities. The brief explains that one of the additional employees trained employees, while the other had no need or opportunity to do so. (D. Supp. Mem. at 6.)

> FN11. Caballero testified that he would make a list of items when the store ran out of them, and pass the list along to his superior. If, during the night, the store ran out of bags, he would call another store to request more. (Caballero Dep. at 186.)

In addition to attacking the testimony of plaintiffs' witnesses, defendant has submitted 56 affidavits from assistant managers who purportedly "performed their jobs very differently than those who presented declarations to the Court" on behalf of plaintiffs. (D. Mem. at 18.) According to defendant, the affidavits demonstrate that these 56 assistant managers exercised primarily managerial responsibilities. It is unclear, however, what defendant intends to accomplish with this argument. On the one hand, by emphasizing that the affiants have "very different[ ]" job responsibilities than the named plaintiffs and are thus not "similarly situated" to the plaintiffs, defendant appears to be conceding, albeit indirectly, that the named plaintiffs did *not* perform primarily managerial responsibilities. Such an argument, of course, is incompatible with defendant's insistence that the named plaintiffs performed primarily managerial functions and that they therefore satisfied the requirements of the bona fide executive exemption. On the other hand,

to the extent defendant presents the 56 affidavits as evidence that all assistant managers, including plaintiffs, exercise substantial management responsibilities, defendant is not only making a premature argument on the merits, but appears to be conceding that plaintiffs and other assistant night managers are similarly situated.

In any event, even assuming that defendant could construct an internally consistent argument against court-authorized notice based on the 56 affidavits, the evidentiary value of the affidavits is sharply limited by the fact that plaintiff had not yet had an opportunity, at the time the instant motion was fully submitted, to depose any of the affiants. (*See* P. Reply Mem. at 7 n. 4.) Given that the Court must be "lenient" in deciding whether plaintiff has met its "minimal" burden at this stage, untested evidence such as the affidavits submitted by defendant cannot, under the circumstances present here, defeat plaintiffs' entitlement to a preliminary determination that they are similarly situated to other assistant night managers. At the close of discovery, defendant will have ample opportunity to explain why the affidavits, taken with other evidence, demonstrate that plaintiffs' case should not proceed as a collective action.

*8 In sum, because plaintiffs' allegations, affidavits and additional evidence, considered in light of defendant's concessions regarding its business practices, more than suffice to support a preliminary determination that plaintiffs and potential opt-in plaintiffs are similarly situated, plaintiffs' motion for court-authorized notice is granted.

IV. *Identification of, and Communication with, Potential Opt-In Plaintiffs*

Plaintiffs request that the Court order defendant to provide "an updated computer-readable data file containing the names, last known mailing addresses, telephone numbers, and Social Security numbers of all current and former employees of defendant who have worked as assistant managers on

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



the night shift for the past three years."(P. Mem. at 2 n. 1.) The Court agrees with defendant that it is unnecessary and inappropriate to provide Social Security numbers at this time. In all other respects, the plaintiffs' request is granted. The "past three years" shall be interpreted to mean the three years prior to the filing of this Opinion and Order.

The parties are willing to negotiate the content of the proposed notice. Such negotiations shall take place by November 15, 2006. In the event of a dispute, the parties shall jointly submit a single letter to the Court setting forth their respective positions. Defendant shall be permitted to review the "Consent Form" postcard to which the plaintiffs' proposed notice refers.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for court-authorized notice is granted. Details regarding the content and communication of the notice shall be negotiated in accordance with Part IV of this Opinion and Order.

SO ORDERED.

S.D.N.Y.,2006.
Damassia v. Duane Reade, Inc.
Slip Copy, 2006 WL 2853971 (S.D.N.Y.)

END OF DOCUMENT



© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.